IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| EDITH CHOMA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-486-JJF |
| | ) | |
| BLUE CROSS BLUE SHIELD | ) | JURY TRIAL DEMANDED |
| OF DELAWARE, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S OPENING BRIEF IN SUPPORT OF ITS
## MOTION FOR SUMMARY JUDGMENT

Scott A. Holt, Esquire (No. 3399)
Adria B. Martinelli, Esquire (No. 4056)
YOUNG CONAWAY STARGATT & TAYLOR, LLP The
Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware  19899-0391
Telephone: (302) 571-6623; 571-6613
Facsimile: (302) 576-3299; 576-3314
Email:  sholt@ycst.com; amartinelli@ycst.com
Attorneys for Defendant

DATED:   October  12, 2007

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

NATURE AND STAGE OF PROCEEDINGS ....................................................... 1

SUMMARY OF ARGUMENT ................................................................................ 1

STATEMENT OF UNDISPUTED FACTS ............................................................ 3

ARGUMENT ........................................................................................................ 20

I.     STANDARD OF REVIEW ......................................................................... 20

II.    PLAINTIFF'S AGE DISCRIMINATION CLAIM SHOULD BE DISMISSED. .. 21

   A.  Plaintiff's Claim That Her 1999 Performance Review Was Motivated By
      Age Discrimination Is Time-Barred. ........................................................ 21

   B.  Plaintiff Cannot Establish That BCBSD's Legitimate, Nondiscriminatory
      Reasons For Its Adverse Job Actions Were A Pretext For Age
      Discrimination. ......................................................................................... 23

     1.  Plaintiff Cannot Prove A Prima Facie Case Of Age Discrimination. ................. 24

     2.  Plaintiff Has Adduced No Evidence That BCBSD's Legitimate
        Nondiscriminatory Reasons For Her Reassignment Were Pretextual. .............. 25

III.   THE COURT SHOULD DISMISS PLAINTIFF'S DISABILITY CLAIM
      BECAUSE SHE CANNOT MEET HER PRIMA FACIE CASE AND HAS
      FAILED TO REBUT BCBSD'S LEGITIMATE REASONS. ............................... 28

   A.  Plaintiff Cannot Prove A Prima Facie Case of Disability Discrimination. .............. 28

   B.  Plaintiff Cannot Establish That BCBSD's Legitimate, Nondiscriminatory
      Reasons For Her Reassignment was a Pretext. ....................................... 31

   C.  Plaintiff Failed To Point To Any Reasonable Accommodation that
      Would Allow Her to Do Her Job. ............................................................. 31

IV.    PLAINTIFF HAS NOT MET HER BURDEN TO PROVE THE PRIMA
      FACIE ELEMENTS OF RETALIATION, NOR CAN SHE REBUT
      DEFENDANT'S LEGITIMATE, BUSINESS REASONS FOR ITS
      DECISIONS. ............................................................................................. 32

A.  Plaintiff Has Not Proved A Causal Connection To Her Charge Filed Twenty Months Earlier Or That The Decision-Maker Was Aware She Had Filed It. ...................................................................................33

B.  Plaintiff Failed To Offer Sufficient Evidence For A Reasonable Fact Finder To Conclude That BCBSD's Reasons Were Pretextual. ..............................34

V.  PLAINTIFF'S DECISION TO RETIRE WITH FULL BENEFITS IN 2005 DID NOT AMOUNT TO CONSTRUCTIVE DISCHARGE. ...............................35

VI.  PLAINTIFF'S IMPLIED COVENANT CLAIM MUST BE DISMISSED BECAUSE IT IS BARRED BY THE EXCLUSIVITY PROVISION OF DELAWARE'S DISCRIMINATION IN EMPLOYMENT ACT. ........................38

CONCLUSION ..............................................................................................................40

## TABLE OF AUTHORITIES

Page

**Cases**

AMTRAK v. Morgan,
   536 U.S. 101 (2002).............................................................................................................. 22

Anderson v. Liberty Lobby, Inc.,
   477 U.S. 242 (1986)...................................................................................................... 21, 23

Billet v. CIGNA Corp.,
   940 F.2d 812 (3d Cir. 1991) ........................................................................................ 26, 27

Burlington Northern & Santa Fe Rwy. Co. v. White,
   126 S. Ct. 2405 (2006)......................................................................................................... 25

Cardenas v. Massey,
   269 F.3d 251 (3d Cir. 2001) ............................................................................................... 24

Celotex Corp. v. Catrett,
   477 U.S. 317 (1986)...................................................................................................... 20, 21

Clark County School District v. Breeden,
   532 U.S. 268 (2001)............................................................................................................. 33

Clowes v. Allegheny Valley Hosp.,
   991 F.2d 1159 (3d Cir. 1993) ............................................................................................ 36

Cole v. Del. Technical & Cmty. Coll.,
   459 F. Supp. 2d 296 (D. Del. 2006).............................................................................. 36, 37

E.I. Dupont de Nemours and Co. v. Pressman,
   679 A.2d 436 (Del. 1996) ............................................................................................. 38, 39

Fischer v. Andersen Corp.,
   2006 U.S. Dist. LEXIS 17086,
   (D. Minn. April 6, 2006)...................................................................................................... 38

Forsyth v. City of Dallas,
   91 F.3d 769 (5th Cir. 1996) ............................................................................................... 25

Fuentes v. Perskie,
   32 F.3d 759 (3d Cir. 1994) ................................................................................................ 26

Givens v. Cingular Wireless,
   396 F.3d 998 (8th Cir. 2005) ............................................................................................. 38

Gray v. York Newspapers, Inc.,
   957 F.2d 1070 (3d Cir. 1992) ........................................................................ 36

Hughes v. Derwinski,
   967 F.2d 1168 (7th Cir. 1992) ...................................................................... 34

James v. Booz-Allen & Hamilton, Inc.,
   368 F.3d 371 (4th Cir. 2004) ........................................................................ 36

Krouse v. American Sterilizer Co.,
   126 F.3d 494 (3d Cir. 1997) .......................................................................... 33

Langley v. Merck & Co.,
   2006 U.S. App. LEXIS 14958 (3d Cir. 2006) ............................................ 24

Lewis v. Norfolk S. Corp.,
   271 F. Supp. 2d 807 (E.D. Va. 2003) .......................................................... 22

Lord v. Souder,
   748 A.2d 393 (Del. 2000) ............................................................................. 38

McDonnell Douglas Corp. v. Green,
   411 U.S. 792 (1973)....................................................................................... 23

McGorrian v. E.M.S.A.,
   2003 U.S. App. LEXIS 25631,
   (3d Cir. Dec. 18, 2003) ................................................................................. 34

Merrill v. Crothall-American, Inc.,
   606 A.2d 96 (Del. 1992) ............................................................................... 38

Milton v. Scrivner, Inc.,
   53 F.3d 1118 (10th Cir. 1995) ...................................................................... 31

Moon v. Del. Riv. & Bay Auth.,
   2006 U.S. Dist. LEXIS 7101,
   (D. Del.  Feb. 24, 2006) ................................................................................ 40

Naghiu v. Inter-Continental Hotels Group, Inc.,
   165 F.R.D. 413 (D.Del. 1996) ...................................................................... 20

Olson v. Gen. Elec. Astrospace,
   101 F.3d 947 (3d Cir. 1996) .......................................................................... 29

Pennsylvania State Police v. Suders,
   542 U.S. 129 (2004)....................................................................................... 36

Rhett v. Carnegie Ctr. Assocs.,
    129 F.3d 290 (3d Cir. 1997) ............................................................ 32

Richards v. City of Wilmington,
    2004 U.S. Dist. LEXIS 4987,
    (D. Del. Mar. 24, 2004) .................................................................. 33

Richmond v. Oneok, Inc.,
    120 F.3d 205 (10th Cir. 1997) ....................................................... 34

Robinson v. City of Pittsburgh,
    120 F.3d 1286 (3d Cir. 1997) ......................................................... 33

Rush v. Scott Specialty Glasses, Inc.,
    113 F.3d 476 (3d Cir. 1997) ........................................................... 22

Schoch v. First Fid. Bancorporation,
    912 F.2d 654  (3d Cir. 1990) .......................................................... 21

Schuster v. Derocili,
    775 A.2d 1029 (2001) ..................................................................... 39

Sempier v. Johnson & Higgins,
    45 F.3d 724 (3d Cir. 1995) ............................................................. 24

Shaner v. Synthes (USA),
    204 F.3d 494 (3d Cir. 2000) ........................................................... 33

Sheridan v. E.I. Dupont de Nemours,
    100 F.3d 1061 (3d Cir. 1996) ......................................................... 35

Spence v. Md. Casualty Co.,
    995 F.2d 1147 (2d Cir. 1993) ......................................................... 36

St. Mary's Honor Ctr. v. Hicks,
    509 U.S. 502 (1993)......................................................................... 23

Stewart v. Happy Herman's Cheshire Bridge, Inc.,
    117 F.3d 1278 (11th Cir. 1997) ................................................. 31, 32

Stiner v. Univ. of Del.,
    243 F. Supp. 2d 106 (3d Cir. 2003) ............................................... 36

Texas Dep't of Cmty. Affairs v. Burdine,
    450 U.S. 248 (1981).................................................................. 23, 25

Tojzan v. New York Presbyterian Hosp.,
  2003 WL 1738993
  (S.D. N.Y Mar. 31, 2003) .................................................................................... 30

Toyota Motor Mfg. v. Williams,
  534 U.S. 184 (2002) ........................................................................................... 30

Visser v. Packer Eng'g Assoc., Inc.,
  924 F.2d 655 (7th Cir. 1991) ............................................................................. 28

Williams v. Rohm & Haas Co.,
  90 Fed. Appx. 627 (3d Cir. 2004) ..................................................................... 22

Zechman v. Christiana Care Health Systems,
  2007 U.S. Dist. LEXIS 47349
  (D. Del. June 26, 2007) ...................................................................................... 23

## Other Authorities

19 Del. C. § 711 (2006) ............................................................................................. 1

19 Del. C. §§ 723, 724, and 726 (2006) ................................................................... 1

29 C.F.R. § 1630.2(j) ............................................................................................... 29

29 U.S.C. §  621 ........................................................................................................ 1

29 U.S.C. § 626(d)(2) .............................................................................................. 21

42 U.S.C. § 12102(2)(A) ......................................................................................... 29

## NATURE AND STAGE OF PROCEEDINGS

On August 7, 2006, Plaintiff Edith Choma ("Plaintiff" or "Choma") filed the instant complaint against Defendant Blue Cross Blue Shield of Delaware ("BCBSD") asserting claims of age discrimination under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, et seq. ("ADEA") and 19 Del. C. § 711 (2006), disability discrimination under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, et seq. ("ADA") and 19 Del. C. §§ 723, 724, and 726 (2006), retaliation, and breach of the covenant of good faith and fair dealing. Discovery is now closed and BCBSD herein moves for summary judgment because there are no genuine issues of material fact and BCBSD is entitled to judgment as a matter of law.

## SUMMARY OF ARGUMENT

1.      Plaintiff is a former administrative assistant in BCBSD's Medical Management Division.  As administrative assistant, she performed general secretarial duties for the Medical Director and other employees in the division.

2.      In 1999, she was assigned to support the new Medical Director, Dr. Paul Kaplan, who was given instructions by the board of directors to obtain accreditation for BCBSD with a national organization focusing on quality assurance.  The accreditation process was lengthy and involved an extensive survey of the insurer's practices and procedures.  Part of Choma's duties included assisting him with administrative work necessary for the accreditation, including transcribing dictation and committee minutes.

3.      Kaplan was dissatisfied with Choma's overall performance, particularly with the speed and accuracy of her work.  She also made mistakes transcribing Kaplan's dictation.  She attributed these mistakes to a hearing impairment, but admitted there was no accommodation that could be made to assist her with this function.  Kaplan's first evaluation of her performance in

1999 pointed out these deficiencies, but later he revised it after Choma complained that he did

not understand all of the work she did for other employees in the division.  Even after she was

given credit for these additional responsibilities, however, Kaplan remained dissatisfied with

Choma's overall organization and efficiency.

4.      In July 2002, Kaplan transferred the responsibility for the quality assurance

accreditation to the new Director of Quality Improvement, Debbie Sweeney.  He assigned

Choma to support Sweeney since Choma had experience with the accreditation process.  Kaplan

assigned another administrative assistant, Pat Carpenter, who had a reputation for efficiency and

organization, to provide support for him.  In November 2002 Choma filed a charge of

discrimination based on her age and disability (hearing).

5.      In July 2004, Sweeney assigned Choma to help Carpenter with the completion of

insurance claim denial and appeal letters which had steadily grown because of BCBSD's

increasing membership.  The rate at which Choma completed the letters was significantly less

than what Carpenter completed.  In October 2004, after monitoring Choma's lack of progress,

Sweeney began drafting a performance improvement plan to set objectives for Choma to

accomplish.  Before the PIP was completed, however, Choma discovered the draft on Sweeney's

computer, and subsequently announced her intention to retire  because she felt she was being

harassed.  She retired on February 1, 2005 at age 65.

6.      Plaintiff's lawsuit, in which she asserts a hodge podge of federal and state law

claims alleging discrimination based on age, disability and retaliation, reflects Plaintiff's

inability to acknowledge the fact she was not meeting the expectations of her supervisors, who

had recurring concerns about the efficiency and accuracy of her work.  Instead of accepting

accountability and focusing on improving her performance, Plaintiff spent a five year span

blaming others for trivial workplace matters and speculating about their possible motives. As set forth below, Plaintiff's claims are without merit and built on conjecture and surmise. BCBSD is entitled to summary judgment.

## STATEMENT OF UNDISPUTED FACTS

Blue Cross and the Medical Management Division.

Blue Cross Blue Shield of Delaware (BCBSD) is a nonprofit health care insurer serving the Delaware community. It is comprised of several units, including the Medical Management Division which is primarily responsible for responding to inquiries about insurance claims and coverage issues. (Choma 43; A154). The Medical Management Division, in turn, includes the Quality Improvement, Utilization and Case Management, Outpatient Referral, and Behavioral Health departments. (Sweeney 61; A332).

Edith Choma began working at BCBSD in 1989 as a secretary. Choma 23. She provided secretarial support for a number of employees, and eventually came to support Carol Doohan, the Director of the Cost Containment Department which later became the Quality Improvement Department. (Choma 27-28; A151-52). The head of the Medical Management Division was the Medical Director, Dr. Powell, although Doohan handled most of the day to day operations. (Kaplan 67-69; A380-82).

In 1999, BCBSD offered an early retirement program, and a number of employees from the Medical Management Division elected to retire, including Doohan and Powell. (Choma 27; A150); (Kaplan 68-69; A381-82). Dr. Paul Kaplan ("Kaplan"), who had previously been Associate Medical Director, assumed the role of Acting Medical Director for the Medical Management Division. (Kaplan 67-70; A380-83).

The NCQA Accreditation.

One of the first tasks assigned to Kaplan was to obtain National Committee for Quality Assurance (NCQA) accreditation for BCBSD. The Board of Directors had issued Kaplan a mandate to secure accreditation and to obtain NCQA's highest rating level. (Kaplan 145; A394).

NCQA accreditation is extremely valuable to a health care insurer. It is the equivalent of obtaining the Good Housekeeping seal of approval. (Kaplan 168-70; A406-08). Accreditation demonstrates that the insurer has good practices and is fair to its members and health care providers. (Kaplan 170; A408).

The accreditation process is fairly lengthy and involves a complete review of the insurer's practices. Representatives from the NCQA conduct an extensive survey of the insurer's policies, procedures, minutes of meetings, and correspondence between the insurer and members and health care providers, in order to assess the quality of the insurer's practices. (Kaplan 170; A408). The first accreditation survey for BCBSD was scheduled for 2000, and in order to maintain accreditation, BCBSD was required to be resurveyed every three years. (Kaplan 170; A408).

Choma was assigned to support Kaplan when he assumed responsibility for the Medical Management Division. (Kaplan 68-69; A381-82). Her principle functions included scheduling meetings and teleconferences, preparing files and reports, processing time sheets, and transcribing Kaplan's dictation. (Choma 28-29; 145; 153; A51-52; 181; 188). She also provided administrative support for Kaplan related to the NCQA accreditation process. (Choma 51-52; A157-58). (Kaplan 64; A377). According to Choma, Kaplan was usually very busy and recorded large volumes of dictation. (Choma 61-62; A162-63). In addition to her responsibilities to Kaplan, Choma also provided administrative support for others in the Medical Management Division. (Choma 30; A153).

Choma was one of two administrative assistants who worked in the Medical Management Division. The other administrative assistant, Christine Zakutney ("Zakutney"), also provided some support for the division, but most of her work was confined to supporting the Director of the Outpatient Referral Department. (Choma 30; A153); ( Zakutney 8; A316).

<u>Kaplan's Dissatisfaction With Choma's Performance and her Problems With Transcription.</u>

Kaplan was unhappy with Choma's initial performance. He felt Choma took an inordinate amount of time to accomplish her tasks and that she lacked organization. (Kaplan 152-154; A398-400). Kaplan gave Choma her first performance evaluation in July 1999. (D83-89; A9-15). In the evaluation, Kaplan noted a numbers of areas where Choma was not meeting his expectations, particularly with the speed and accuracy of her work:

> Edith provides secretarial support to the Medical Directors and the Director of the QI Program. While she is able to prioritize her work, there are instances when getting denial letters typed has not been given as timely a focus as I would like.
>
> …
>
> Most voice dictated transcription does contain errors. Edith seems to take a long time on each word processing assignment.
>
> …
>
> I would like to see her complete these tasks more rapidly. She seems to spend a lot more time on some of these tasks than necessary.
>
> …
>
> Because Edith appears to work slowly at the tasks she is given I am unable to utilize her time and skills for all of the projects I envisioned for this department. (D85-87; A11-13).

Choma received an overall evaluation score of 2.69 (1 being the lowest – 5 being the highest) which resulted in a 3.01% increase in salary. (D82; A16).

Choma admitted that Kaplan was not happy with her performance, but took exception with his assessment of her work. (Choma 70-73; A164-67).  She believed that Kaplan did not understand all of the work she did for other members of the group.[1] (Choma 80-82; A168-70).

Choma testified that when she met with Kaplan to discuss the performance review, he was demeaning and started getting into, as she put it, "all this little crap." (Choma 99; A174). She claimed Kaplan made statements about her attitude, efficiency, and intelligence.[2]

After the performance evaluation meeting, Choma contacted the human resources director for BCBSD, Vicki Sessoms ("Sessoms"), to complain about her evaluation. (Choma 105-06; A175-76); (Kaplan 100; A385).  Sessoms subsequently met with Kaplan and informed him he should revise the performance evaluation in order to appease Choma. (Kaplan 86; A384). On August 20, 1999 Kaplan revised the Choma's performance evaluation and gave her a score of 3.48 which resulted in a 3.9% increase in pay. (D586; A17).  Choma was satisfied with these revisions. (Choma 120; A177).  She also received an increase in grade from 7 to 8, which resulted in an additional 1% increase in salary, which was designed to compensate for her claim that she did work for multiple directors. (Choma 136; A180); (D587; A18).

Despite the revised evaluation and increase in grade, Kaplan remained generally dissatisfied with the level of Choma's performance.  For example, in a memo dated March 3, 2000, Kaplan informed Choma:

---

[1] Kaplan also discussed Choma's performance with Jane Israel, the Director of Quality Improvement, and she expressed some of the same concerns.  (Kaplan 153-155; A399-401).
[2] Choma claims that Kaplan said "I don't like the way you lift up your glasses to look at the screen," "it annoys me when you go to the copy machine it should take you one second to copy a page," "I don't think blood is getting to your brain, maybe it's your thyroid," and "you know the saying kick the dog, that's why I treat you the way I do." (Choma 95-96; A172-73). Kaplan denied making these statements. (Kaplan 106-08; A386-88).

> You were given a change in grade because of the fact that you have to do
> additional work for multiple Directors.  This change has certain
> responsibilities and expectations associated with it.  We are now getting
> busier due to the fact that the NCQA survey will be taking place within 3
> months.  Also, the volume of work being handled by the managed care
> department has increased.
>
> My expectation is that you have to be able to keep up with this increased
> work load.  Your inability to keep up with the volume of work, and the
> concern amongst some of the Directors you work with that you will not
> complete your assignments on time, makes it very difficult to plan
> efficiently.
> . . .
> As our workload continues to increase, it is imperative that you
> keep up with the increased volume as well.  Failure to do so could
> jeopardize our meeting NCQA timelines. (D560; A19).

Kaplan did note that Choma was trying harder at her job, and acknowledged the

increased effort in her 2000 and 2001 performance evaluations.[3] (Kaplan 138; 148-49; A393;

136-97).  However, he was still not satisfied with Choma's performance in several key areas,

including the speed in which she completed assignments and her ability to keep his files

organized. (Kaplan 132-33; 147-48; A391-92; 395-96).

Choma also continued to have problems accurately transcribing Kaplan's dictation and

committee minutes. (Kaplan 147-48; A395-96).  According to Choma, she had a hearing

impairment in her left ear that made it difficult for her to understand his dictation.[4] (Choma 151;

A186); (Kaplan 149; A397).  Choma stated that sometimes she could compensate for this by

turning up the volume on the headphones. (Choma 147-48; A183-84).  In other instances, Choma

would just leave blanks on the document for words she could not understand. (Choma 149;

A185).

---

[3] Choma testified that she was satisfied with her evaluations and that she and Kaplan were
working more efficiently together. (Choma 124-125; A178-79).
[4] Choma claims she was diagnosed with Meniere's Disease which she states affected her ability
to hear in her left ear. (Choma 146; A182).

Choma also claimed her hearing impairment interfered with her ability to perform her minute-taking duties at meetings. At one meeting, she informed Kaplan that she could not understand what the people at the meeting were saying because everyone was talking at once. (Choma 240-41; A213-214).

Choma informed Kaplan that her hearing problem made it difficult to perform her duties. Kaplan asked Choma if there was any accomodation BCBSD could make to help her perform her job. (Kaplan 65-66; A378-79). Choma stated there was nothing that could be done to help her. (Choma 152-54; A187-89).

Choma testified she was aware that Kaplan was not satisfied with the way she performed her transcription and minute taking responsibilities. (Choma 157; A190). One of Choma's co-workers, Tim Toole ("Toole"), informed her that he had overheard Kaplan state that he wanted to get rid of her because she was making mistakes as a result of her hearing difficulties. (Choma 242; A215). Despite Choma's deficiencies performing transcription, it remained an integral part of her job, and Kaplan testified it was more efficient for her to do it rather than himself. (Kaplan 149; A397).

Choma continued to report directly to Kaplan until July 2002. During this period Choma identified several incidents where she believed she was not treated fairly. The first involved an instance where she claims she was not allowed to attend a financial planning seminar.

BCBSD holds various financial planning and retirement seminars for employees. (Choma 172; A193). The seminars are typically held during working hours and open to all available employees. Employees who wish to attend must coordinate with their supervisor. (D357; A20). On one particular occasion, a series of financial planning seminars were scheduled to be held in late May and early June 2002. About four days before the seminar, Choma emailed Kaplan and

asked if she could attend. (D357; A20).  Kaplan informed Choma that he needed to see how backed up the department was with letters before he could give his approval. (D357; A20); (Choma 176-77; A194-95); (Kaplan 166-67; A404-05).  Choma never checked back with Dr. Kaplan, however, to see if she could attend. (Choma 183; A196); (Kaplan 167; A405).

On another occasion, Choma claimed that Kaplan became upset with her because he was asked to sign some benefit paperwork. (Choma 281; A233).  Kaplan had already completed one set of forms, only to be informed that they had been rejected because the wrong form had been prepared.  (Kaplan 162-63; A402-03).  Kaplan asked Choma to see if someone else could complete the forms, referring to it as "stupid work." (Choma 281-82; A233-34); (Kaplan 163; A403). Choma testified that a co-worker, Theresa Smith, overheard Kaplan's comment and supposedly told Choma that he would not treat her that way if she was younger. (Choma 280-283; A232-35).[5]

Choma Is Reassigned to Quality Improvement and Files a Charge of Discrimination.

By 2002, the amount of work in the Medical Management Division was steadily increasing. Choma 208.  To make room for growth in the division, the members of the Quality Improvement Department were slated to be moved to a refurbished area on the other side of the building. (Sweeney 61; A332).

In addition, the NCQA reaccreditation process was scheduled to occur in 2003.  Kaplan, who had been heavily involved in the NCQA survey process in 2000, reassigned the primary

---

[5] Choma later admitted that this statement by Smith was the only evidence she had that her age played any role in BCBSD's decisions. (Choma 279-280; A231-32).

responsibility for obtaining reaccreditation to the new Director of Quality Improvement, Debbie Sweeney ("Sweeney"). (Kaplan 191-92; A412-13).[6]

As part of the reorganization, Kaplan reassigned Choma, who had actively been involved in the NCQA process with him, to provide direct support for Sweeney. (Choma 246; A216); (Kaplan 176-77; A409-10).  Kaplan believed Choma's familiarity with NCQA would benefit Sweeney whose responsibility it was now to ensure accreditation. (Kaplan 177; A410); (Sweeney 68; A333).  He also believed that Choma's institutional knowledge of the division and its various records and committees would be helpful to Sweeney since she was new to the organization. (Choma 252-53; A217-18); (Kaplan 177; A410).

With Choma assigned to Sweeney, Kaplan reassigned another administrative assistant, Patricia Carpenter ("Carpenter"), to report directly to him. (Kaplan 176-77; A409-10).  Carpenter had been employed with BCBSD since 1977, and was previously the executive secretary to Jerry Icenogle ("Icenogle"), a top executive at BCBSD. (Choma 209; A207).  After Icenogle retired, Carpenter transferred to Medical Management in 2001 and was initially assigned to support Jane Israel ("Israel"), the Director of Quality Improvement. (Choma 246; A216). Ms. Israel had recently resigned to take a position at another company. (Kaplan 125-26; A389-90).

Kaplan was familiar with Carpenter's work as executive secretary for Icenogle.  He knew that she had the reputation for being organized and efficient, qualities that he believed Choma was lacking. (Kaplan 177-78; A410-11).  Kaplan also had first hand knowledge of Carpenter's work in the Medical Management Division. (Kaplan 178; A411).

Kaplan met with Choma in July 2002 to inform her of his decision, and that she would be moving with the Quality Improvement department. (Choma 252; A217).  Although Choma

---

[6] Debbie Sweeney was hired by BCBSD on July 1, 2002. (Sweeney 32; 35; A331; A34).

understood that she had no choice in the decision, she informed him she needed to "think about it."[7]

Choma eventually contacted human resources to discuss whether the reassignment would affect her raises. (Choma 270-71; A227-28). Human resources informed Choma that the reassignment would have no effect whatsoever on her status or compensation, and that the only change would be reporting structure and workplace location within the building. (P1792; A21). Choma thereafter agreed to move to her new cubicle next to Sweeney's office on August 12, 2002. (Choma 256; A221).

Choma was the last to move to the new location. (Choma 261; A224). She stated that her new worksite looked as if it had been thrown together compared to the others, and that the cubicle walls had tears in the fabric and there were "dust mites" present in the area. (Choma 257-58; A222-23). She also stated that her new location lacked a fax machine or a color printer. (Choma 257; A222). Her cubicle was later refurbished and she received new furniture. (Choma 257; A222).

Choma viewed her move to the QI Department as a demotion, even though her compensation, benefits, and job grade did not change. (Choma 269-70; A226-27). On November 22, 2002, Choma filed a charge of discrimination against BCBSD alleging that she had been discriminated against because of her age and disability (hearing). (D60; A25).[8]

Choma's Work in Quality Improvement.

---

[7] Choma stated that she went home and discussed the reassignment with her husband who advised her "just don't move, just go to your desk and just do your work," and so she delayed moving to her new location. (Choma 255; A220).

[8] Choma also made an internal complaint to human resources, but an investigation revealed there was no evidence that Kaplan had discriminated against Choma because of her age or disability. (D149-151; A22-24).

Choma reported directly to Sweeney beginning in the fall of 2002.  Sweeney, who had just been hired, did not assign Edith Choma much work initially.  Sweeney maintained her own calendar, did her own scheduling, and did most of her own typing—functions that Choma previously performed for Kaplan.(Sweeney 68; A33).  Choma continued to perform tasks associated with the NCQA process, including transcribing some dictation of meeting minutes from Dr. Kaplan that were necessary for the 2003 NCQA reaccreditation process. (Choma 263; A225); (Sweeney 74-75; A334-35); (Kaplan 64; 198; A377; A414).

Choma received her first annual performance appraisal from Sweeney in January  2003.  P620-29.  Sweeney obtained input from Kaplan because he was still providing Choma with some work related to the NCQA process. (Sweeney 111-12; A336-37).  Overall, Choma was given a score of 3 or "meets expectations," for her performance evaluation. (P629; A47). (Sweeney 111; A336). Choma was satisfied with her rating. (Choma 322; A240).

While Sweeney initially had no problems with Choma's work quality, she did observe a recurring issue with Choma being away from her desk for prolonged periods of time and not putting in a full day's work. (Sweeney 184; A354).  On one occasion, Choma had returned late from lunch with several coworkers.  Although all of the employees worked in the Quality Improvement, Choma was the only nonexempt hourly employee in the department.  Choma had been informed by Sweeney in the past that lunchtime was limited to one hour.  When she returned late Sweeney verbally admonished Choma in front of the others. (Sweeney 182; A353).  Sweeney did not admonish the others because they were exempt salaried employees. (Sweeney 182; A353).

Choma's non-exempt status also meant that she was the only employee in Quality Improvement who was required to keep track of her hours. (Choma 56; 59; A159; A160).

Tracking of hours is necessary in order to determine whether the nonexempt employee is entitled to overtime. Choma typically worked a 7.75 hour workday beginning at 8:00 a.m. until 4:30 p.m. and took a one hour lunch. (Choma 335; A246). Any hours worked over 7.75 in a day were considered overtime. (Choma 60; A161). Under BCBSD's policy, all overtime had to be approved in advance by the employee's supervisor or manager. (Choma 336; A247). An employee who worked unauthorized overtime was subject to disciplinary action.

Although Choma was occasionally allowed to work overtime, in many cases Sweeney would deny her request for budgetary reasons. (Sweeney 168-69; A349-50). Choma believed that Zakutney, who worked in a different department and for a different manager, was allowed to work more overtime hours than her, but admitted that she had no proof. (Choma 394-95; 461-62; A249-50; 269-70).[9]

Choma also claimed Sweeney did not allow to her use scheduled paid time off ("PTO") for a medical appointment. Under BCBSD's PTO policy, employees were required to get pre-approval by 4:30 p.m. on the prior day in order to qualify for scheduled paid time off. If there is no pre-approval before this time, the PTO is considered unscheduled. (Choma 326-27; A242-43). The policy provided that any approval for PTO was within the discretion of the employee's supervisor. (Choma 329-330; A244-45).

On one occasion in July 2003 Choma did not find out she needed to see a physician for a test until the evening before the appointment. (Choma 598; A297). Choma left a message with Sweeney the morning of the appointment and so Sweeney treated the missed time as

---

[9] Zakutney testified that she like Choma had been denied overtime by her supervisor for budgetary reasons. (Zakutney 88-89; A324-25). Zakutney also confirmed that all employees needed authorization to work overtime from their manager, and that she had been reprimanded the one time she worked it without obtaining express authorization. (Zakutney 89; A325).

unscheduled PTO. (Sweeney 132; A339). After Choma explained the circumstances, however, Sweeney agreed to change the occurrence to scheduled PTO. (Sweeney 136; P1347; A340; A51).

Choma also believed that Sweeney restricted her ability to make up time for scheduled out of office appointments and instead required her to use PTO time. (Choma 325-26; A241-42). BCBSD's policy provides that make up time is within the discretion of the employee's supervisor. (D173; A48); (Choma 329-330; A244-45). Sweeney noted that initially, Choma's outside appointments during the work day had not been a problem, but that in 2004 they increased in number and became excessive. (Sweeney 130; A338). Zakutney testified that she also was required to use her PTO time instead of make up time because of too many outside appointments. (Zakutney 91-92; A326-27).

Choma's 2003 Performance Review and Goals for 2004.

Choma received her 2003 performance evaluation on or around January 27, 2004. (D397-406; A56-65). She received a overall score of 3 out of 5 for a "meets expectations." (D406; A65). In the evaluation, Sweeney noted that Choma, although requiring some assistance with problem-solving, had shown greater initiative in 2003. Sweeney also noted that Choma had done a better job of adhering to BCBSD standards regarding lunch times. (D405; A64).

Sweeney pointed out several areas of improvement that she wanted Choma to focus on in 2004:

> In 2004 I would like to see Edith take over additional administrative functions being performed by the clinical QI resources (follow-up to ensure receipt of medical records requested for quality review, after hours accessibility calls as a few examples). Edith also needs to become proficient in terms of sending denial/approval letters for the UM and CM staff and receiving these communications via e-mail. She will need to cover for Pat Carpenter when Pat is on vacation and staff cannot be asked to change the process for submitting letters when Edith is covering. Assuming these

14

additional responsibilities will mean Edith will need to focus on time management and organization in order to complete tasks in a timely and accurate manner. (D405; A64).

<u>The Denial/Approval Letters and Plaintiff's Ensuing Problems With Completing Them</u>.

Under the NCQA accreditation guidelines, BCBSD had a certain time frame in which to respond to claims for benefits and appeals of claim determinations. BCBSD was subject to various financial penalties and fines for failing to timely respond to the claims and appeals. (Choma 47-48; A155).

BCBSD's responses were in the form of approval, denial or appeal letters. Denial letters involved initial determinations where it is determined that the claim must be denied in whole or in part. (Sweeney 156; A343). If the provider or member appealed the initial determination, the appeal letter is the response to their request for reconsideration. (Sweeney 156-57; A343-44).

In 2002, the response letters were automated at BCBSD. (Sweeney 157; A344). However, in January 2003, a new Department of Labor (DOL) regulation went into effect that required the letters to be manually generated. (Sweeney 157; A344).

The process for typing the letters was fairly straightforward. The typist would use a template form letter, insert the relevant information supplied by nurses or claims agents, and produce a letter. The letters would be reviewed by Sweeney prior to mailing. (Choma 203-04; A203-04). The typist was generally responsible for making sure punctation was accurate and font sizes were uniform in the text of the letter. (Choma 538; A278). Choma testified that she found typing the letters to be monotonous, but agreed that it was very important that the letters were done accurately and on a timely basis. (Choma 205; 534; A205; A277).

Initially, the volume of response letters generated was not all that great and could be performed by one person. (Sweeney 157-58; A344-45). By 2004, however, BCBSD membership increased significantly and this resulted in an increase in the number of response

15

letters required to be processed. (Kaplan 221; A415);  (Sweeney 158-59; A345-46).  In early

2004, most of the letters were still being processed by Pat Carpenter, although Sweeney had

informed Choma in her last evaluation that she would be expected to assume some of this

responsibility. (D405; A64).

 In July 2004, Pat Carpenter took her planned two week vacation. (Sweeney 154; A341).

Choma was assigned to complete the letters during Carpenter's absence. (Sweeney 154; A341).

Choma asked Sweeney if she could work overtime to do the letters, but Sweeney informed her

that it was not in the budget. (Choma 359; 583; A248; A292); (Sweeney 168; A349).  Sweeney

testified that she periodically checked with Choma during Carpenter's absence and that she

indicated there were no problems completing the letters. (Sweeney 154; A341).  When Carpenter

returned from vacation, however, many of the letters assigned to Choma had not been typed and

there were numerous errors in those that were completed. (Sweeney 154-55; A341-42).

 Sweeney determined that Carpenter could no longer perform the letter function by

herself.  The volume of letters being generated was steadily increasing, and a new system

BCBSD had developed for automatically generating the letters had been put on hold for the

foreseeable future due to a recent change in NCQA standards. (Sweeney 155; A342).  As a

result, Sweeney divided the responsibility for completing the letters between Carpenter and

Choma. (Sweeney 155; A342).

 Several weeks later, on Friday, August 20, 2004, Choma slipped on the cement steps

outside her home and injured her right wrist. (Choma 400; A251).  She was treated by an

emergency room physician and returned to work on Monday, August 23, 2004.  Choma wore a

soft cast on her right wrist and provided a medical note from the treating physician which did not

contain any description of work restrictions. (Choma 430-31; A260-61); (P138; A66).  Sweeney

suggested that Choma consider applying for short term disability because of her wrist, but Choma stated that she preferred to work. (Sweeney 163; A348); (Choma 435-36; A263-64). Sweeney asked Choma if she could distribute mail, make photocopies, and perform other duties that required only one hand, but Choma preferred to remain seated so she could keep her right arm elevated. (Sweeney 162; A347); (D777; A67).

Choma was assigned a batch of response letters to type, but by the end of the day she had completed very few letters. (Sweeney 173; A352); (Choma 434; A262). Choma also informed Sweeney that she had worked through lunch. (D777; A67). Sweeney reminded Choma that she was required under BCBSD's policy to take a lunch. (D1008-D1010; A73-75). Choma also disclosed to Sweeney at this time that she worked overtime in July 2004 during Carpenter's absence, despite Sweeney's instructions to the contrary. (D1009; A74); (Choma 359; A248); (Sweeney 234-35; A365-66).[10]

The next day, on August 24, 2004, Sweeney revised Choma's duties to limit her to copying, sorting and distributing mail. (Choma 442; 492; A265; A273); (D778; A68). On August 25, 2004, Choma's primary care physician, Dr. Hilton, issued her a note indicating that she could not perform any work duties that involved her right arm. (P108; A76); (Choma 444-45; A266-67). Dr. Hilton stated that if such restrictions were not feasible that Choma should remain out of work. (P108; A76). Choma was subsequently placed on short-term disability leave. (Choma 498; A274); (P1692-94; A80-82). A worker from a temporary agency completed

---

[10] Choma was reprimanded for working overtime without authorization. (D532; A77).

Choma's duties during her leave. Sweeney 169-70. Choma returned to work on September 20, 2004 and no longer had any restrictions on using her right hand.[11] (Choma 403; A254).

Despite having no restrictions on her ability to type, Choma was still falling behind in the completion of response letters. (D1014; A78). On September 30, 2004, Sweeney began formally tracking Choma's progress with the completion of letters. To gauge how many letters should be completed, Sweeney requested Carpenter and Choma to monitor how long it took them to complete letters and recorded their error rates. (Sweeney 194-97; A356-359). This was accomplished by having them write down the time of the day they started typing the letters and when they finished. (Choma 526; A276).

Plaintiff Retires When She Learns She is To Be Given Performance Improvement Goals.

By early October 2004, Choma had been assigned the letter responsibilities for a number of weeks, yet her production of letters and accuracy rate were far below that of Carpenter's. (Sweeney 195-97; A198-99); (P70; A101). Sweeney contacted human resources and asked for assistance in developing a performance improvement plan (PIP) for Choma that would outline BCBSD's expectations in a number of areas, including completion of the letters. (Sweeney 207; A363).

Sweeney had never drafted a PIP before and worked with Donna May of human resources over several weeks to develop an improvement plan that would be fair and set reasonable goals. (Sweeney 240; A367). Unbeknownst to Sweeney or May, however, Choma discovered the draft PIP on Sweeney's computer and began reviewing it as early as October 11, 2004. (Choma 557-61; A279-83); (Sweeney 241-42; A368-69). Choma accessed the draft, which

---

[11] Her orthopaedic specialist released her to return to work and the only restrictions were that she could perform "no heavy lifting - 10lbs." (P115; A83). Edith Choma continued therapy for her wrist for a couple months, beginning in September 2004. (Choma 404; A255).

was marked confidential, on at least five occasions during the month of October. (Choma 557-560; A279-82); (P608; A99).

Aware that Sweeney was in the process of administering a PIP, Choma filed a charge of discrimination with the Delaware Department of Labor alleging retaliation on October 22, 2007. (P499; A84). Choma claimed Sweeney was coming to her desk "every five minutes" and asking how many letters she had completed, and pointing her finger in her face explaining the she needed to follow directions. (Choma 610-612; A298-300). (Sweeney 198-200; A360-62); (D759; A92).

The following week, on October 27, 2004, Choma emailed Susan Slaysman ("Slaysman"), the human resources manager, and stated that she wished to retire on January 3, 2005, and wanted to confirm that by working until end of the year she would receive her 2004 incentive compensation bonus. (D753; A95); (Choma 616; A301).  She also stated that she felt she had no option but to retire because she was being harassed. (D753; A95). Slaysman immediately contacted May in human resources to investigate Choma's harassment allegation.

May met with Choma to discuss her complaint, and then spoke with Sweeney about the allegations of harassment. (Choma 616-618; A301-03).  It was during this meeting that Sweeney learned that Choma had filed a charge of discrimination previously in November 2002. (Sweeney 185; A355). After investigating Choma's complaint, May concluded that there was no basis for her allegation of harassment, and that Sweeney was just trying to get Choma to meet performance expectations. (D767; A96).

On Friday, October 29, 2004, Sweeney and May met with Choma to administer the PIP. The plan included performance objectives for processing letters, obtaining approval for overtime, adhering to lunch breaks, and confirming hours worked. (P68-69; A99-100). To confirm hours

worked, Sweeney asked Choma to send an email to her at the beginning and end of the day and when she went for lunch.[12] (P69; A100).  Choma admitted that every goal in her PIP was reasonable and was readily achievable. (Choma 566-73; 594-97; A284-291; A293-96).

On Monday, November 1, 2004, Choma reported to work and sent an email to Sweeney at 7:56 a.m. informing her that she was "checking in at 7:50 a.m." (P42; A104).  Sweeney asked if she had performed any work prior to arriving. (P42; A104).  Choma worked one more day at BCBSD, then took a medical leave of absence at the advice of her therapist. (Choma 623; A307). She never returned to work at BCBSD, and officially retired on February 1, 2005 at the age of 65, receiving her full pension and retiree health benefits from BCBSD. (Choma 472-73; 624; A271-72; A308).

**ARGUMENT**

**I.    STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56 requires the entry of judgment against a non-moving party who fails to offer admissible evidence sufficient to establish the existence of every element to her case on which she bears the burden of proof. See Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). Rule 56 is designed "secure the just, speedy and inexpensive determination of every action," and "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." Id. at 327.

The moving party's burden is well settled.  The defendant must only point out that there is an absence of evidence to support plaintiff's case or, in the alternative, offer evidence which demonstrates that the plaintiff cannot prove her case. Naghiu v. Inter-Continental Hotels Group, Inc., 165 F.R.D. 413, 418 (D.Del. 1996).  After the moving party demonstrates a lack of

---

[12] BCBSD had no time-clock so associates were responsible for tracking their own hours. (Choma 319-20; A238-39).

20

evidence, the plaintiff must point to competent evidence designating "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324.

While the court must view all evidence in a light favorable to the non-moving party, the mere existence of some alleged factual disputes between the parties will not defeat an otherwise properly supported motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The key issue is whether there exists a dispute over a material fact. In this regard, plaintiff cannot rely on speculation or conclusory allegations. To survive summary judgment, she must come forward with specific, admissible and credible evidence supporting each element essential to her case. Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990).

## II. PLAINTIFF'S AGE DISCRIMINATION CLAIM SHOULD BE DISMISSED.

Plaintiff alleges that Kaplan gave her a negative performance review in July 1999 and reassigned her to Debbie Sweeney in July 2002 because of her age. As set forth below, her claim that the performance review was discriminatory is barred by the statute of limitations. There is also no evidence her reassignment constituted an adverse employment action, or that Kaplan's stated reasons for his decision were pretextual.

### A. Plaintiff's Claim That Her 1999 Performance Review Was Motivated By Age Discrimination Is Time-Barred.

Choma filed her first Charge of Discrimination on November 25, 2002. (A25). Among other alleged facts, she mentioned her "discriminatory performance review" in July 1999, more than two years before she filed her charge. A plaintiff seeking to recover under the ADEA must file a discrimination charge with a state agency within 300 days of the occurrence of the alleged unlawful employment practice. See 29 U.S.C. § 626(d)(2). Discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. See,

e.g., Rush v. Scott Specialty Glasses, Inc., 113 F.3d 476, 484 (3d Cir. 1997); Williams v. Rohm

& Haas Co., 90 Fed. Appx. 627, 628 (3d Cir. 2004) (citing AMTRAK v. Morgan, 536 U.S. 101,

114 (2002)).

Acts which occur at a discrete point in time and are easily identified when they occur,

such as a performance review, are considered "discrete" acts under the Morgan analysis, and

must be acted on immediately within the statutory timeframe.  See Rush, 113 F.3d at 484

(holding that the defendant's failure to consider the plaintiff for promotion, was an "independent

act" that should have prompted the plaintiff to file a charge of discrimination).  The Supreme

Court in Morgan gave some examples of discrete discriminatory acts: termination, failure to

promote, denial of transfer, or refusal to hire.  Morgan, 536 U.S. at 122-23.  The Court's opinion

suggests that "discrete discriminatory acts" is a very broad category.  A poor performance review

clearly falls within this category.  See Lewis v. Norfolk S. Corp., 271 F. Supp. 2d 807 (E.D. Va.

2003) (dismissing plaintiff's allegations regarding a negative performance review as untimely

based on the Morgan analysis).

Thus, under well settled law Choma had to file a charge of discrimination based on this

act within 300 days from July 1999—or no later than May 2000.  There is ample testimony by

Choma that she believed her evaluation was discriminatory at the time she received it, yet she

consciously chose not to file a charge. (A229-30).  As a result, her November 2002 charge was

not timely as to this act, and therefore allegations with respect to the 1999 evaluation are time

barred.[13]

---

[13] Any claim under the ADA based on the 1999 evaluation would similarly be time barred.

**B.      Plaintiff Cannot Establish That BCBSD's Legitimate,
Nondiscriminatory Reasons For Its Adverse Job Actions Were
A Pretext For Age Discrimination.**

Choma's claim that her reassignment was based on unlawful age discrimination also fails

as a matter of law.  Kaplan reassigned Choma because he believed her knowledge of NCQA

could be better utilized to support Sweeney, and that Carpenter's superior organization and time

management skills were better suited to his needs.  Choma's reassignment did not affect her job

status, pay, benefits, grade level, or opportunities for promotion, and her administrative duties

remained essentially the same.

Plaintiff's age discrimination claim is governed by familiar burden-shifting framework

set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and

clarified in St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993).  See Zechman v. Christiana

Care Health Systems, 2007 U.S. Dist. LEXIS 47349 at *10 (D. Del. June 26, 2007).  Under that

framework, the plaintiff has the initial burden of establishing a prima facie case of discrimination

by a preponderance of the evidence.  See Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248,

252-53 (1981).  If the plaintiff succeeds in establishing a prima facie case, the burden then shifts

to the employer, who must merely articulate (as opposed to prove) a legitimate, non-

discriminatory reason for the employee's discharge. Burdine, 450 U.S. at 254; Anderson v.

McIntosh Inn, 295 F. Supp. 2d 412, 418 (D. Del. 2003).  Once the defendant meets this minimal

burden of production, the burden shifts back to plaintiff to prove by a "preponderance of

evidence" that BCBSD's stated reasons "were not true, but were a pretext for discrimination."

Id.

23

### 1.     Plaintiff Cannot Prove A Prima Facie Case Of Age Discrimination.

In order to establish a prima facie case of age discrimination under the ADEA, the Plaintiff must show that: (1) he or she is at least 40 years of age; (2) he or she is qualified for the position in question; (3) he or she has suffered an adverse employment action, and (4) he or she has been replaced by a sufficiently younger employee to permit a reasonable inference of age discrimination.[14] <u>Sempier v. Johnson & Higgins</u>, 45 F.3d 724, 728 (3d Cir. 1995).  An "adverse employment action"  is defined as "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment."  <u>Cardenas v. Massey</u>, 269 F.3d 251, 262 (3d Cir. 2001).

Plaintiff's reassignment did not constitute an adverse employment action.[15]  When Choma was reassigned to support Sweeney, her job status, pay, benefits, grade, and duties remained essentially unchanged.  The only change was that, instead of reporting directly to Kaplan, she now reported to Sweeney.  Choma continued to be an administrative assistant for BCBSD and there is nothing to suggest the reassignment affected her opportunities for advancement.  <u>See</u>, <u>e.g.</u>, <u>Langley v. Merck & Co.</u>, 2006 U.S. App. LEXIS 14958 (3d Cir. 2006) (holding no adverse employment action where plaintiff was reassigned but her pay and grade level remained the same).  The Court in <u>Langley</u> noted that an employee's change in title, office, responsibilities or reporting relationship were minor actions "generally insufficient to constitute adverse employment actions."  <u>Id.</u>

---

[14] At the time of the reassignment, Choma was 62 and Carpenter was 49.

[15] Although barred by the statute of limitations, Plaintiff's 1999 performance evaluation also did not constitute an adverse employment action.  This is because Plaintiff was reevaluated and testified that she was happy with her revised evaluation. (A178-79).

"Choma's only gripe appears to be that the reassignment might be perceived as a "demotion."  However, "a plaintiff's subjective perception that a demotion has occurred is not enough." See Forsyth v. City of Dallas, 91 F.3d 769, 774 (5th Cir. 1996).

The fact that Choma's workspace was dusty and had tears in the cubicle walls when she first moved is also not sufficient to constitute an adverse employment action.  As the lowest level employee in the department, she cannot rightfully claim she was entitled to the best workspace, and the record shows that these minor issues were rectified in a few months. (A222).  Such petty and temporary annoyances do not affect the terms and conditions of her employment. See Burlington Northern & Santa Fe Rwy. Co. v. White, 126 S. Ct. 2405, 2415 (2006)(discrimination laws not intended to redress "petty slights or minor annoyances…all employees experience").  Accordingly, Plaintiff has failed to establish the prima facie elements for a claim of age discrimination.

> **2.    Plaintiff Has Adduced No Evidence That BCBSD's Legitimate Nondiscriminatory Reasons For Her Reassignment Were Pretextual.**

Kaplan reassigned Plaintiff to provide administrative support for Sweeney because he believed Plaintiff's experience in the NCQA would be helpful to Sweeney who had just started and had assumed responsibility for that project.  In addition, he reassigned Carpenter to report to him because she was more efficient and had better organizational skills which was more beneficial to his needs.  Thus, BCBSD has met its burden to articulate a legitimate, non-discriminatory reason for Plaintiff's reassignment. See Texas Dept. of Cmty. Affairs v. Burdine, 450 248, 254 (1981).

The burden now shifts to Choma to point to evidence that would allow a fact finder to reasonably infer that BCBSD's  reasons for her reassignment were either a post-hoc fabrication

or otherwise did not actually motivate the employment action. See Fuentes v. Perskie, 32 F.3d

759, 764 (3d Cir. 1994).  As the Fuentes further explained:

> [T]he nonmoving plaintiff must demonstrate such weaknesses,
> implausibilities, inconsistencies, incoherencies, or contradictions in the
> employer's proffered legitimate reasons for its action that a reasonable fact
> finder could rationally find them 'unworthy of credence,' and hence infer
> 'that the employer did not act for [the asserted] nondiscriminatory reasons.'

Id. (internal citations omitted).

Choma vainly attempts to rebut BCBSD's legitimate business reasons by maintaining

that she was more qualified than Carpenter, despite the fact that Carpenter had worked 12 more

years at BCBSD than her and had been the executive secretary of a senior executive.

Nevertheless, whether Choma is in fact more competent, however, is not the relevant issue.  The

relevant inquiry is whether the decisionmaker, in this case Kaplan, honestly believed that

Carpenter was a better candidate to provide support for him.  See Billet v. CIGNA Corp., 940

F.2d 812, 825 (3d Cir. 1991) ("what matters is the perception of the decision maker," not the

comments or perceptions of the plaintiff or other employees).  Nor is whether the employer's

decision a wise one relevant to the analysis.  See, e.g., Fuentes, 32 F.3d at 765 (holding that the

issue is not  "whether the employer is wise, shrewd, prudent, or competent," but whether

discriminatory animus motivated the employer).

In this case, the record is clear that Kaplan honestly believed that Carpenter was better

qualified to support him.  He was aware of Carpenter's reputation for speed, efficiency, and

organization as executive secretary for one of BCBSD's executive officers.  He had the

opportunity to observe her work first-hand in the Medical Management Division.  The record is

also clear that, despite Choma's efforts at improvement, she was still not meeting his

expectations.

Choma claims that David Martin ("Martin") and Tim Toole ("Toole"), two of her coworkers at the time and whom remain her friends, thought her work quality was excellent. However, Toole's testimony on this point was lukewarm at best, stating that both Carpenter and Choma did a "good" job. (A312; 313-14). Martin testified that he believed Choma's work was superior to Carpenter's.(A371). However, neither employee supervised or was responsible for evaluating the performance of Carpenter or Choma. Both testified that they were one of many to whom Choma and Carpenter provided occasional secretarial support. (A310-11); (A372-73). Indeed, Martin acknowledged that Kaplan would be in a "much better position" to evaluate Carpenter's performance than he. (A374-75).

It is thus questionable whether Toole or Martin could provide any meaningful insight into Choma's job performance. Nevertheless, their testimony on this point is irrelevant since they had no involvement in the decision to reassign Choma, and it is therefore not their opinion that matters. Billet, 940 F.2d at 825.

In short, Kaplan made the decision to reassign Choma because he felt that Carpenter was better suited to the position. Choma was obviously displeased with his decision, but there is no competent evidence that the Kaplan's reasons were a pretext for age discrimination.

Choma also may claim that the alleged statement of a co-worker, Theresa Smith, that Kaplan would not treat her that way if she were younger, somehow constitutes evidence that Kaplan had age-related animus. (A381-82). But Smith's double hearsay statement amounts to pure speculation as to Dr. Kaplan's motivation at best. Choma offers nothing to link this supposed remark to Kaplan's motive. Mere speculation as to intent, without more, cannot defeat summary judgment. See, e.g., Visser v. Packer Eng'g Assoc., Inc., 924 F.2d 655, 659 (7th Cir.

1991) (granting summary judgment for defendant and rejecting as evidence of discrimination

speculation by other employees as to the employer's discriminatory motive).

**III.    THE COURT SHOULD DISMISS PLAINTIFF'S DISABILITY CLAIM
         BECAUSE SHE CANNOT MEET HER PRIMA FACIE CASE AND HAS FAILED
         TO REBUT BCBSD'S LEGITIMATE REASONS.**

Plaintiff contends that BCBSD discriminated against her based on her alleged

disabilities–hearing impairment and fractured wrist–by: (1) reassigning her to support a different

manager; and (2) failing to provide her with reasonable accommodations.  A review of the

record, however, reveals that her disability claims fail as a matter of law for a multitude of

reasons.[16]

First, Plaintiff's fractured wrist and hearing impairment do not constitute protected

disabilities under the ADA, because they did not substantially limit a major life activity.

Plaintiff's wrist injury was of a short, temporary duration.  Choma admitted her hearing

difficulties were intermittent and not severe.  In addition, even if Plaintiff had a disability, there

is no evidence that BCBSD failed to engage in the interactive process.  Finally, Plaintiff's claim

that she was transferred to another position because of her alleged disability fails because there is

no evidence that BCBSD's stated reasons for reassigning her were a pretext for disability

discrimination.

**A.    Plaintiff Cannot Prove A Prima Facie Case of Disability
        Discrimination.**

To present a prima facie case of discrimination under the ADA, Plaintiff must

demonstrate that: (1) she has a "disability" within the meaning of the ADA; (2) she is otherwise

---

[16] Plaintiff also brings a claim under Delaware's Handicapped Persons Employment Protections
Act, 19 Del. C. § 720 et seq.  However, both the state and federal claims are governed by the
same legal standards. Testerman v. Chrysler Corp., 1997 WL 820934 at *11 (D.Del. Dec. 30,
1997).

qualified for her position, meaning that she can perform the essential functions of her job with or without reasonable accommodations; and (3) she has suffered an adverse employment decision as a result of discrimination based on her disability.  Olson v. Gen. Elec. Astrospace, 101 F.3d 947, 951 (3d Cir. 1996).  Choma cannot establish that she is an individual with a disability, qualified for the job, or that she was subject to an adverse employment decision based on a disability.

A "disability" under the ADA is defined as a physical or mental impairment that substantially limits one or more of the major life activities of such an individual. 42 U.S.C. § 12102(2)(A).  The term "substantially limits" is defined in 29 C.F.R. § 1630.2(j).  Section 1630.2(j)(2) lists three factors to consider in determining whether an individual is substantially limited in a major life activity: "(i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment."

In the instant case, Plaintiff cannot establish that her injured wrist substantially limited her in a major life activity.  Choma's wrist had essentially healed in about one month and she testified that she suffers no long standing effects from the injury. (A251-53).  It is well settled that "temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities. Such impairments may include, but are not limited to, *broken limbs*, *sprained joints*, concussions, appendicitis, and influenza." 29 C.F.R. Part 1630 App., § 1630.2(j) (emphasis added).  As a result, Plaintiff's ADA claims related to her wrist injury fail as a matter of law.

There also is insufficient evidence that the alleged hearing difficulty was substantially limiting.  Choma testified that she had difficulty hearing out of her left ear, but that the severity

varied and fluctuated depending upon things such as the weather. (A182). She testified that sometimes she would not have a problem hearing Kaplan's dictation, and at other times she might have to turn up the volume. (A183-84). Choma stated that her hearing was usually worse when she had a vertigo attack,[17] and described it "like having someone put their finger in their ear and when the attack was over, they take their finger out." (A259). There is no substantive evidence that her hearing difficulties "prevent[ed] or severely restrict[ed] [her] from doing activities that are of central importance to most people's daily lives." Toyota Motor Mfg. v. Williams, 534 U.S. 184, 198 (2002); see also, Tojzan v. New York Presbyterian Hosp., 2003 WL 1738993 at *7-8 (S.D. N.Y Mar. 31, 2003) ("Since [plaintiff's] physical impairments are episodic and are not consistently severe, they do not substantially limit a major life activity.")

Even if Plaintiff's hearing impairment constituted a disability, she still cannot meet her burden to show that she was "qualified" to perform the essential functions of her job with or without reasonable accommodations. The transcription duties were part of Choma's job and an important component of the NCQA certification process. (A377; 397). Plaintiff was unable to perform these functions in a satisfactory manner. (A378). Although Plaintiff contends that the reason was because of her hearing difficulties, her own testimony establishes that there was no accommodation BCBSD could have made that would have allowed her to satisfactorily perform these functions. Indeed, when Plaintiff was asked if there was anything that could have been done to help her hear the dictation better she testified that there was "[nothing] that I was aware of." (A187). Under the ADA, a plaintiff has the burden to prove that she requested an accommodation and that it was both reasonable and necessary for the performance of the essential functions of the position. Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d

---

[17] Choma testified that she did not get vertigo attacks very often. (A256-58).

1278, 1286 (11th Cir. 1997). "An employer is not required by the ADA to reallocate job duties in order to change the essential function of a job." Milton v. Scrivner, Inc., 53 F.3d 1118, 1124 (10th Cir. 1995). Thus, Plaintiff's own testimony establishes that she is not protected under the ADA.

**B.    Plaintiff Cannot Establish That BCBSD's Legitimate, Nondiscriminatory Reasons For Her Reassignment was a Pretext.**

As stated supra in Section II. B. of this brief, BCBSD has met its burden to articulate a legitimate, non-discriminatory reason for Plaintiff's reassignment, and there is no evidence that Kaplan was motivated by disability discrimination, or that BCBSD's stated reasons for its decision were pretextual. Nor is Kaplan's alleged statement that he wanted to get rid of Plaintiff because she made mistakes evidence of disability discrimination. The record is clear that Plaintiff had difficulties with taking minutes and transcription, and that there was nothing that BCBSD could have done to help her perform her job better. Kaplan's alleged statement is merely a confirmation that she was not meeting his expectations. Plaintiff cannot seek protection under the ADA when the evidence is undisputed that she was not qualified to do her job.

**C.    Plaintiff Failed To Point To Any Reasonable Accommodation that Would Allow Her to Do Her Job.**

Plaintiff also claims that BCBSD failed to provide her reasonable accommodations by allowing her light duty while her wrist healed and by not modifying her job to eliminate "activities that cause dizziness." Pl's Resp. to Def's Interrogs. These claims fail as a matter of law, because Plaintiff was not protected under the ADA and never met her burden to articulate a reasonable accommodation.

As previously explained, Plaintiff fractured wrist was of a short, temporary nature, and thus did not constitute a disability under the ADA. See Rhett v. Carnegie Ctr. Assocs., 129 F.3d

290, 303 (3d Cir. 1997) ("temporary disabilities are excluded from the ADA.")  Accordingly,

BCBSD did not have an obligation to provide her with reasonable accommodations regarding

her wrist injury.  Nevertheless, the record reflects that BCBSD encouraged her to apply for

intermittent FMLA so she could stretch her hands, but Plaintiff refused because she did not want

to use her PTO time. (A275).

Plaintiff's claim that BCBSD should have allowed her to avoid duties that caused

dizziness is also without merit.  Indeed, when Plaintiff informed Sweeney that her doctor told her

to avoid any activities that cause dizziness, Sweeney asked her to provide a list of activities that

would cause it. (A93).  Plaintiff responded that she did not know what activities would result in

dizziness. (A93). This is does not satisfy Plaintiff's burden to articulate a reasonable form of

accommodation.  An employer is not required to guess or surmise what might allow an employee

to perform her job – it is up to the employee to articulate what accommodation is needed and

establish that it is both reasonable and necessary.  See Stewart, 117 F.3d at 1286.  In short,

Plaintiff has failed to meet her burden and thus her claim that she was denied reasonable

accommodations fails as a matter of law.

## IV.    PLAINTIFF HAS NOT MET HER BURDEN TO PROVE THE PRIMA FACIE ELEMENTS OF RETALIATION, NOR CAN SHE REBUT DEFENDANT'S LEGITIMATE, BUSINESS REASONS FOR ITS DECISIONS.

Plaintiff alleges that BCBSD retaliated against her for filing her charge of discrimination

in November 2002. (A305-06).  The standard for proving retaliation is well settled. Plaintiff

bears the burden of demonstrating a prima facie case of retaliation by proving that: (1) she

engaged in a protected activity; (2) her employer took adverse action against her either after, or

contemporaneously with, her protected activity; and (3) there is a causal connection between the

protected activity and the employer's adverse action.  Richards v. City of Wilmington, 2004 U.S.

Dist. LEXIS 4987, at *15 (D. Del. Mar. 24, 2004) (citing Woodson v. Scott Paper, 109 F.3d 913,

920 (3d Cir. 1997)).  Once the plaintiff has established a prima facie case, the defendant can

offer a legitimate, nondiscriminatory explanation for its actions.  The plaintiff then must offer

evidence showing that the defendant's rationale is merely a pretext for discriminatory motives.

Id.  However, "the plaintiff's 'ultimate burden in a retaliation case is to convince the fact finder

that retaliatory intent had a 'determinative effect' on the employer's decision."  Id. (quoting

Shaner v. Synthes (USA), 204 F.3d 494, 501 (3d Cir. 2000)).

> **A.     Plaintiff Has Not Proved A Causal Connection To Her Charge
> Filed Twenty Months Earlier Or That The Decision-Maker
> Was Aware She Had Filed It.**

Plaintiff contends that beginning in August 2004 Sweeney engaged in unlawful

retaliation by unfairly scrutinizing the speed at which she completed letters and eventually

placed her on a PIP.  To sustain her prima facie claim of retaliation, Plaintiff must be able to

produce evidence of a causal connection between these acts and the charge of discrimination she

filed approximately 20 months earlier.  Proof of causation may be shown by evidence of

temporal proximity and the employer's knowledge of that activity. See Robinson v. City of

Pittsburgh, 120 F.3d 1286, 1302 (3d Cir. 1997); Krouse v. American Sterilizer Co., 126 F.3d

494, 503 (3d Cir. 1997).

Here, Plaintiff cannot establish temporal proximity between Plaintiff's protected activity

and BCBSD's acts.  Twenty months passed and there is no evidence linking the two events.

Clark County School District v. Breeden, 532 U.S. 268, 273-74 (2001) (holding that action taken

20 months later, by itself, suggests no causality). The Third Circuit in Krouse found that a gap of

nineteen months between the protected activity and the employer's acts was conclusive that no

causal connection existed.  Krouse, 126 F.3d at 504.  Cases with significantly smaller gaps have

been held insufficient to establish causation.  See Richmond v. Oneok, Inc., 120 F.3d 205, 209

(10th Cir. 1997) (holding three month period insufficient to establish causation); <u>Hughes v. Derwinski</u>, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (holding four month period insufficient to establish causation).

There is also no evidence that Sweeney was even aware of Plaintiff's charge of discrimination until after she had prepared the PIP.  Causation requires evidence that the employer knew of the protected activity and acted with retaliatory motive.  Absent evidence that the decision-maker had knowledge of the protected activity, "a substantial gap [exists] in any causal chain suggested [even] by temporal proximity." <u>McGorrian v. E.M.S.A.</u>, 2003 U.S. App. LEXIS 25631 *8 (3d Cir. Dec. 18, 2003) (not precedential).  <u>See</u> <u>also</u> <u>Breedon</u>, 532 U.S. at 273 (finding no causation where there was no evidence the decisionmaker even knew of protected activity).

Nor is there no evidence of any pattern of intervening antagonism that would suggest retaliatory motive.  While Sweeney did reprimand Plaintiff once for returning late for lunch in 2003, the record reflects that Plaintiff was treated the same as other administrative assistants, including Zakutney, with respect to compliance with policies and procedures.  Accordingly, without evidence to show that Plaintiff's charge of discrimination was a factor in BCBSD's decisions, there is no triable issue of fact as to the element of causation.

B.      **Plaintiff Failed To Offer Sufficient Evidence For A Reasonable Fact Finder To Conclude That BCBSD's Reasons Were Pretextual.**

Even if the Court were to conclude that Plaintiff's evidence was sufficient to establish a <u>prima</u> <u>facie</u> case of retaliation, Plaintiff has not offered sufficient evidence for a reasonable fact finder to conclude that BCBSD's reason for administering the PIP was so unworthy of credence as to constitute a pretext.  Sweeney tracked Plaintiff's progress of completing response letters and found she was far below what others were completing on an average basis.  In addition,

Choma had recently violated several BCBSD policies regarding overtime, hours worked and lunch breaks. The PIP was administered to establish performance objectives for Plaintiff in these areas. Accordingly, BCBSD has articulated a legitimate non-discriminatory reasons for its decision in response to Plaintiff's claim of retaliation.

The burden thus shifts to Plaintiff to cast sufficient doubt on these reasons in order to establish that they are a pretext for retaliation. Sheridan v. E.I. Dupont de Nemours, 100 F.3d 1061, 1072 (3d Cir. 1996). Plaintiff contends that only she was timed on her completion of the letters, but the undisputed record reflects that Carpenter was also timed. (A1-3). Zakutney was also placed on a PIP for her performance issues and given goals similar to those given to Choma. (A53-55); (A317-21). Nor can Plaintiff argue that the performance objectives were unreasonable or arbitrary. She admitted that the goals set by Sweeney were readily achievable. (A284-91; A293-96). Accordingly, Choma has failed to cast sufficient doubt on BCBSD's reasons to establish a pretext.

## V.    PLAINTIFF'S DECISION TO RETIRE WITH FULL BENEFITS IN 2005 DID NOT AMOUNT TO CONSTRUCTIVE DISCHARGE.

Choma claims that she was "constructively discharged in or around February 1, 2005 in that she was forced to retire as a result of the hostile work environment." (A107). On her notice form dated October 27, 2004, she stated that she was forced to retire because of the "constant harassment." (A95). The conditions she alleges fall far short of those required to constitute a constructive discharge. Moreover, the timing and sequence of events surrounding her retirement suggest it was related entirely to her ability to draw full benefits from her retirement, and nothing to do with any actions of BCBSD.

To prove constructive discharge, a plaintiff must show that "the abusive working environment became so intolerable that [the plaintiff's] resignation qualified as a fitting

response." Pennsylvania State Police v. Suders, 542 U.S. 129, 133 (2004).  The Third Circuit

has similarly held that the test for constructive discharge is "whether the conduct complained of

would have the foreseeable result that working conditions would be so unpleasant or difficult

that a reasonable person in the employee's shoes would resign." Gray v. York Newspapers, Inc.,

957 F.2d 1070, 1079 (3d Cir. 1992).  The test is an objective one; the subjective perceptions of

the plaintiff are not determinative.  Stiner v. Univ. of Del., 243 F. Supp. 2d 106, 113 (3d Cir.

2003);  Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1162 (3d Cir. 1993).  A reasonable

person would not resign due to "[m]ere dissatisfaction with work assignments, a feeling of being

unfairly criticized, or difficult or unpleasant working conditions."  Cole v. Del. Technical &

Cmty. Coll., 459 F. Supp. 2d 296, 309 (D. Del. 2006) (quoting James v. Booz-Allen & Hamilton,

Inc., 368 F.3d 371, 374 (4th Cir. 2004)).

    Here, the alleged "harassment" essentially consisted of Sweeney badgering her for not

completing response letters in a timely fashion, and pointing her finger in Choma's face.  Other

employees, however, were also monitored on their completion of their work, and the record

shows that those who did not meet their supervisor's expectations were placed on a PIP. (A317-

21); (A357-59).

    Sweeney was simply insisting on a reasonable and attainable standard of work

performance, which she was perfectly justified in doing.  "An employer is entitled to insist on as

high a standard of work performance as it deems appropriate, and the fact that an employee

develops stress-related ill health from the demands of his voluntarily undertaken position or from

criticisms of his performance . . . does not normally amount to a constructive discharge."  Spence

v. Md. Casualty Co., 995 F.2d 1147, 1156 (2d Cir. 1993).

Even if Choma were unfairly singled out in this fashion, this would not rise to the level such that a reasonable person would feel compelled to resign. Instead, the alleged events reflect at the worst a "feeling of being unfairly criticized, or difficult or unpleasant working conditions"—exactly the sort rejected by the Court in Cole as amounting to a constructive discharge. See Cole, 459 F. Supp. 2d at 309.

The timing of Choma's decision to resign also suggests her working environment was not the reason. Choma sent a letter on October 27, 2004 saying she wanted to retire effective January 3, 2005, further stating that she "had no option because she was being harassed." (A95); (A301). Notably, she also inquired about whether she would receive her bonus for that year if she retired on that date. Id. If the working conditions were so terrible that she was forced to resign, then why was she prepared to endure them for more than two more months before actually leaving the workplace. The fact she did not leave the workplace immediately, but rather was willing to work into the next calendar year (after confirming she would receive her annual incentive bonus if she retired on that date), makes clear that Choma's decision to retire was based primarily, if not entirely, on her own calendar and pecuniary interest in obtaining a year-end bonus.

Choma's PIP also would not compel a reasonable person to resign. Two days after Choma's announcement of her retirement, Sweeney and May met with Choma to administer the PIP. Choma testified that each and every one of the PIP's goals were reasonable and readily achievable. (A284-91; A293-96). In fact, she asserted that she could handily exceed some of the goals: where the PIP initially required her to complete letters in eight minutes, she admitted she could easily complete them in four. (A284-85). She worked two days under the PIP, and took a medical leave of absence on Wednesday, November 3, 2004. She did not return the office, and

officially retired on February 1, 2005, at the age of 65. (A308).  A reasonable person would not feel compelled to resign based on a PIP whose goals were completely reasonable.  Imposing such a plan, particularly when there is no dispute as to its reasonableness, does not constitute constructive discharge.  See, e.g., Givens v. Cingular Wireless, 396 F.3d 998 (8th Cir. 2005) (holding that a PIP alone does not constitute constructive discharge); Fischer v. Andersen Corp., 2006 U.S. Dist. LEXIS 17086 at *6, 12-13 (D. Minn. April 6, 2006) (holding that the imposition of a PIP did not constitute constructive discharge where it was undisputed that the objectives were reasonable).

In sum, BCBSD's actions preceding Choma's retirement were insufficient to constitute a constructive discharge.  The evidence reflects that her decision to resign, and timing thereof, was based on her desire to retire at age 65 and collect a modest incentive bonus, rather than her alleged mistreatment at the workplace.

## VI.    PLAINTIFF'S IMPLIED COVENANT CLAIM MUST BE DISMISSED BECAUSE IT IS BARRED BY THE EXCLUSIVITY PROVISION OF DELAWARE'S DISCRIMINATION IN EMPLOYMENT ACT.

Delaware courts have carved out an exception to the general presumption that a contract for employment, unless otherwise expressly stated, is at-will in nature, with duration indefinite.  Merrill v. Crothall-American, Inc., 606 A.2d 96, 102 (Del. 1992).  While at-will employment remains a heavy presumption, the Delaware Supreme Court has recognized the limited application of the implied covenant of good faith and fair dealing (the "Covenant") to an at-will employment contract.  Id.

The Delaware Supreme Court, however, has strictly limited the application of the Covenant in the employment context, holding that a plaintiff must establish that he or she falls into one of four specific categories.  E.I. Dupont de Nemours and Co. v. Pressman, 679 A.2d 436, 442 (Del. 1996); Lord v. Souder, 748 A.2d 393, 401 (Del. 2000) (holding that the four

categories are exclusive).  The four categories are: (1) where the discharge violates public policy; (2) where the employer misrepresented an important fact, and the employee relied thereon to either accept a new position or remain in a present one; (3) where the employer used its superior bargaining power to deprive an employee of clearly identifiable compensation earned through the employee's past service; and (4) where the employer falsified or manipulated employment records to create fictitious grounds for discharge.  See Pressman, 679 A.2d at 441-44.

Choma failed to allege which of the four prongs she is alleging under the Covenant.  She states only that "Defendant breached the Covenant of Good Faith and Fair Dealing to Plaintiff by terminating her based upon an actual and/or perceived disability and /or based on her limitations due to her disability and/or based upon retaliatory motives, and by discriminating against her based upon her age." (A107).  Based on this statement, as well as the detailed allegations in the remaining Complaint, the only conceivable category that could be implicated is the public policy prong.

In 2004, the Delaware General Assembly acted to clarify the reach of Covenant claims where they implicate rights already protected by state statutes.   The Assembly amended the code related to Discrimination in Employment, adding that "this subchapter shall afford the sole remedy for claims alleging a violation of this chapter to the exclusion of all other remedies." 19 Del. C. § 712(b).  Moreover, the General Assembly's synopsis of the amendments to the Act states that:

> This bill confirms that Chapter 7 is the exclusive and sole remedy for employment discrimination claims, requiring initial processing of all such claims with the Department of Labor for review and action. This bill effectively re-establishes the exclusive remedy put in question by the decision in Schuster v. Derocili, 775 A.2d 1029 (2001).

S.B. 154, 142d Gen. Ass. (Del. 2004).

39

Accordingly, the Court must dismiss Choma's Covenant claim. Choma's claims are based solely on age and disability discrimination and retaliation, causes of action which are addressed in the Delaware Discrimination in Employment Act. Therefore, this statute provide the exclusive remedy and Choma's Covenant claim should be dismissed. See Moon v. Del. Riv. & Bay Auth., 2006 U.S. Dist. LEXIS 7101 at * 12-13 (D. Del. Feb. 24, 2006) (dismissing Plaintiff's implied covenant claim based on exclusivity provision).

## CONCLUSION

For the reasons set forth in the brief above, there are no genuine disputes of material fact and the Court should grant BCBSD's motion for summary judgment as to all of Plaintiff's claims.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Scott A. Holt*

Scott A. Holt, Esquire (No. 3399)
Adria B. Martinelli, Esquire (No. 4056)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6623; 571-6613
Facsimile: (302) 576-3299; 576-3314
Email: sholt@ycst.com; amartinelli@ycst.com
Attorneys for Defendant

DATED:        October 12, 2007