IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

EDITH CHOMA,                           )
                                       )
                    Plaintiff,         )
                                       )
          v.                           )     C.A. No. 06-486-JJF
                                       )
BLUE CROSS BLUE SHIELD                 )
OF DELAWARE,                           )
                                       )
                    Defendant.         )


**DEFENDANT'S ANSWERING BRIEF IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**


Scott A. Holt, Esquire (No. 3399)
Adria B. Martinelli, Esquire (No. 4056)
YOUNG CONAWAY STARGATT & TAYLOR, LLP The
Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware  19899-0391
Telephone: (302) 571-6623; 571-6613
Facsimile: (302) 576-3299; 576-3314
Email:  sholt@ycst.com; amartinelli@ycst.com
Attorneys for Defendant


DATED:   October  30, 2007

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 2

ARGUMENT ...................................................................................................................... 3

    I.      PLAINTIFF HAS NOT ESTABLISHED THAT SHE IS PROTECTED UNDER THE ADA. ........................................................................................... 3

    II.     CHOMA PROVIDES NO EVIDENCE OR ANALYSIS TO SUPPORT HER DISABILITY AND RETALIATION CLAIMS ...................................................... 6

CONCLUSION .................................................................................................................. 13

# TABLE OF AUTHORITIES

**Page**

## Cases

Burlington Northern & Santa Fe Rwy. Co. v. White,
  126 S. Ct. 2405 (2006) ................................................................................................. 8

Cardenas v. Massey,
  269 F.3d 251 (3d Cir. 2001) ....................................................................................... 10

Hammel v. Eau Galle Cheese Factory,
  407 F.3d 852 (7th Cir. 2005) ....................................................................................... 5

Hummel v. County of Saginaw,
  40 Fed. Appx. 965 (6th Cir. 2002) ............................................................................... 5

Jenkins v. Northwood Rehab. & Extended Care Facility,
  2003 U.S. Dist. LEXIS 8505 (D.N.Y. 2003) ............................................................... 5

Langley v. Merck & Co.,
  2006 U.S. App. LEXIS 14958 (3d Cir. 2006) ............................................................. 8

Stewart v. Happy Herman's Cheshire Bridge, Inc.,
  117 F.3d 1278 (11th Cir. 1997) ................................................................................... 4

## Other Authorities

29 C.F.R. § 1630.2(m) ..................................................................................... 3, 4, 6

DB01:2472038.1                                    052305.1028

## INTRODUCTION

Defendant Blue Cross Blue Shield of Delaware (BCBSD) hereby submits this Answering Brief in response to Plaintiff's motion for partial summary judgment.

The fact that Plaintiff has moved for summary judgment on her disability and retaliation claims is virtually unprecedented.  It defies logic Plaintiff would even consider filing such a motion in view of her burden of proof for each element of her discrimination claims.

Even more dumbfounding is that Plaintiff seeks summary judgment on the flimsiest of records.  Indeed, her statement of "undisputed facts" is brimming with speculative assertions, vague commentaries, and outright mischaracterizations of the record.

The argument section of Plaintiff's brief is even more confounding.[1]  The four (4) pages she devotes to her argument is virtually devoid of any substantive analysis of the applicable law or the burdens she must satisfy.  Indeed, fundamental elements of her discrimination claims are completely missing as if they did not even exist.

On the other hand, Defendant showed in its Opening Brief in support of its Motion for Summary Judgment that there is insufficient evidence in the record to support each element of Plaintiff's claims.  In other words, the record demonstrates that there are no genuine issues for a trial in this case.

So why then has Plaintiff moved for summary judgment?  The inescapable conclusion is that Plaintiff seeks to conceal the underlying weaknesses in her case by distracting the Court with a summary judgment motion of her own.  The Court should not be duped by such a ploy.

---

[1] Plaintiff's opening brief contained no table of contents or table of citations as required by Local Rule 7.1.3(c).

Plaintiff has no basis for partial summary judgment and her motion should be denied as meritless.

## STATEMENT OF FACTS

Plaintiff's statement of "undisputed facts" is anything but that.  It consists mainly of a series of disjointed statements much of which lack any relevance to the issues at hand.  Plaintiff wastes considerable effort making unsupported assertions that have no relevance to the pending motion.[2]  In some instances, her factual assertions are so far removed from what the actual underlying testimony provides that any reliance upon them would be foolhardy.

Rather than recite the entire record, Defendant incorporates by reference the statement of undisputed facts provided in its Opening Brief in Support of its Motion for Summary Judgment. In addition, for purposes of brevity, Defendant addresses each of Plaintiff's factual assertions as they may (or may not) relate to her claim for summary judgment.

---

[2] For instance, Plaintiff asserts that Dr. Paul Kaplan suffered impaired memory and a "personality change" when he slipped and hit his head eleven (11) years ago. Pl.'s Op. Br. at 2. Why this would be relevant to Plaintiff's claim is anyone's guess, especially since it occurred three (3) years before Kaplan even worked with Plaintiff.  Moreover, Plaintiff's characterization of Kaplan's injuries and alleged "personality change" are a gross exaggeration of his deposition testimony and just one of many efforts by Plaintiff to embellish the facts.

**ARGUMENT**

I.     **PLAINTIFF HAS NOT ESTABLISHED THAT SHE IS PROTECTED UNDER THE ADA.**

Plaintiff contends Defendant violated her rights under the Americans with Disabilities Act (ADA).  She claims she meets her prima facie burden by asserting there "can be no question that [her] hearing impairment qualifies as a disability," and that she was a "qualified individual" because she was able to perform the essential functions of her position as administrative assistant to Kaplan. Pl.'s Op. Br. at 9-10.  Plaintiff's contention should be rejected both as a matter of law and fact.

To make out a prima facie case of disability discrimination under the ADA, Plaintiff must establish that she (1) has a "disability," (2) is a "qualified individual," and (3) has suffered an adverse employment action because of that disability. <u>Buskirk v. Apollo Metals</u>, 307 F.3d 160, 166-69 (3d Cir. 2002) (citation omitted).  Plaintiff has not established any of these elements. First, she makes a conclusory statement she has a "disability" because she is hearing impaired, but provides no evidence to support her claim.

She next asserts she was "qualified" for the position under the ADA.  The EEOC regulations divide the inquiry of qualified into two parts: (1) whether the individual has the requisite skill, experience, education and other job-related requirements of the position sought, and (2) whether the individual, with or without reasonable accommodation, can perform the essential functions of that position. 29 C.F.R. § 1630.2(m).  Here, both Plaintiff and Kaplan testified that transcribing dictation was part of the function of her position and an important

3

component of the NCQA certification process. (A187-88; A377; A397).[3] There is no dispute that Plaintiff was unable to perform this function in a satisfactory manner. (A378). The ADA does not protect an employee unable to perform the essential functions of the employment position that such individual holds, even if the reason is because of a physical impairment. See 29 C.F.R. pt. 1630, app. § 1630.2(m). Thus, Plaintiff's conclusory statement that she was qualified fails as a matter of law.

Plaintiff also contends that Defendant violated the ADA by failing to transfer her transcription duties to someone else. This argument fails for two reasons. First, the record is clear that Plaintiff never requested such an accommodation. Indeed, Kaplan testified that he asked Choma if there was anything BCBSD could do regarding her dictation duties and she said there was nothing. (A378-79). Plaintiff testified the same, stating there was "[nothing] that [she] was aware of" that could be done to accommodate her. (A187).[4] The burden of satisfying that she requested a reasonable accommodation under the ADA rests with the Plaintiff. Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1286 (11th Cir. 1997). There is not a scintilla of evidence in the record indicating Plaintiff made such a request.

The second reason Plaintiff's reasonable accommodation argument fails is Defendant had no obligation to reassign her transcription duties to others. EEOC regulations and case law make clear that the ADA does not require the reallocation of essential functions to other employees. 29 C.F.R. pt. 1630, App. § 1630(o) ("An employer or other covered entity is not required to reallocate essential functions."); Hummel v. County of Saginaw, 40 Fed. Appx. 965, 970 (6th

---

[3] "A___" refers to citations in the Sealed Appendix filed in support of Defendant's Opening Brief.
[4] Kaplan allowed Plaintiff to perform her transcription duties as best she could, but her performance in this and other areas was never satisfactory to him. (A378-79).

Cir. 2002) (the ADA does not require employers to accommodate individuals by shifting an

essential job function onto others"); Jenkins v. Northwood Rehab. & Extended Care Facility,

2003 U.S. Dist. LEXIS 8505 *16 (D.N.Y. 2003) ("[T]he ADA does not require an employer to

eliminate or relocate essential functions of a position in order to provide accommodation."). The

transcription duties were a vital part of the NCQA certification process and a major component

of Plaintiff's responsibilities. (A377) (A157-58). Plaintiff does not contest this fact. Indeed,

when asked if the transcription duties were her responsibility, she admitted "what can I tell you,"

"it's part of my job." (A187-88).

Despite well settled authority that Defendant had no obligation to reassign her duties,

Plaintiff contends that Defendant could have should have given her transcription duties to "other

secretaries." Pl.'s Op. Br. at 3. However, there is no evidence that "other secretaries" were

available to perform Plaintiff's transcription duties. Indeed, Kaplan said no such thing. When

asked why he did not reassign Plaintiff's duties to Chris Zakutney, an administrative assistant for

another director in the Division, Kaplan explained that Zakutney had other responsibilities and

worked in a different department. (A379). In any event, Defendant had no duty to require

another employee to do Plaintiff's job. Hammel v. Eau Galle Cheese Factory, 407 F.3d 852, 867

(7th Cir. 2005) ("[T]he courts have been reticent, as they should be, to require employers to

provide accommodations that necessitate the enlistment of another employee to assist an ADA

claimant in performing the essential functions of the job.").

Plaintiff also contends that Defendant violated the ADA when Kaplan allegedly stated to

one of her co-workers that he wanted to get rid of Plaintiff because she could not hear. This

argument fails both as a matter of fact and law. First, the assertion is a distortion of the record

since it omits a crucial undisputed fact. Kaplan testified that he was not happy with Plaintiff's

performance in certain areas, including errors she made while transcribing dictation. (A395-96).
Plaintiff testified that Timothy Toole told her he overheard Kaplan remark that she *made
mistakes* because she could not hear. (Exhibit 1, Choma 242-43). Toole's testimony confirmed
that Kaplan's remark was that Plaintiff *made mistakes* on her dictation for what she blamed was
a result of her hearing difficulties. (Exhibit 2, Toole 34; 48). Thus, even viewing the record in a
light most favorable to Plaintiff (as opposed to Defendant), the record shows that it was
Plaintiff's mistakes that prompted Kaplan to state his dissatisfaction with her performance.

The more fundamental problem with Plaintiff's argument, however, is that Kaplan's
dissatisfaction with Plaintiff's ability to do her job is not evidence of discrimination, even if her
performance problem was due in part to her hearing. Indeed, Plaintiff's inability to perform her
transcription duties in a satisfactory manner demonstrates that Defendant had a legitimate
performance concern which would justify appropriate disciplinary action, assuming such action
even occurred.[5] The fact that Kaplan allegedly expressed his dissatisfaction with Plaintiff's level
of performance merely reinforces this point. Needless to say, Plaintiff's alleged hearing
impairment does not excuse her from being able to perform the functions of her position. See 29
C.F.R. pt. 1630, App. § 1630.2(m).

## II.    CHOMA PROVIDES NO EVIDENCE OR ANALYSIS TO SUPPORT HER DISABILITY AND RETALIATION CLAIMS.

Plaintiff's argument that she is entitled to summary judgment on her retaliation and
disability claims is essentially this:  "BCBSD inflicted multiple adverse employment actions
upon [her] due to her disability and in retaliation for her complaints about the disability
discrimination imposed upon her." Pl.'s Op. Br. at 10. Conspicuously absent from her argument,

---

[5] Plaintiff claims that Kaplan stated he wanted to "get rid of her" in 2000-2001, but the record shows that she worked until 2005 and then retired at age 65.

6

however, is any recitation of evidence that age or disability motivated these alleged actions, or even a proffer that Defendant's legitimate non-discriminatory reasons were a pretext to mask unlawful discrimination.  Thus, Plaintiff would have the Court find that she is entitled to judgment as a matter of law on the sole basis that Defendant allegedly took adverse action against her, without any proof that Defendant engaged in unlawful discrimination.   There is no need to dwell on the ludicrousness of Plaintiff's proposition, other than it appears to be a strategy motivated for the sole purpose of concealing the inherent deficiencies in her case.  This strategy fails.

Defendant demonstrated in its Opening Brief in support of its Motion for Summary Judgment why Plaintiff cannot prevail on her claims.  Many of the alleged discriminatory events are barred by the statute of limitations.  All of her claims lack evidence to establish key elements of her prima facie case of age or disability discrimination.  Moreover, Plaintiff cannot point to any admissible evidence that Defendant's rationale for its decisions were a pretext for discrimination.  Plaintiff also fails to link any evidence that Defendant retaliated against her for a charge of discrimination filed almost two years earlier.[6]

Even when one reviews the partial evidence provided by Plaintiff of the so-called adverse actions, it is readily apparent she cannot even prevail on this element of her prima facie case.  In her brief, Plaintiff references several incidents that she alleges occurred during a six year period prior to her retirement in 2005.  Yet a close examination of these incidents reveals they are based on conjecture and distortions of the record.

---

[6] Plaintiff testified that she was retaliated against for filing a discrimination charge in November 2002. (Exhibit 1, Choma 621-22).  Plaintiff filed a second charge alleging retaliation on October 22, 2004. (A84).  However, there is no evidence that Defendant received the second charge until after Plaintiff had announced her intention to retire and left work permanently on disability leave. (A95; A271-72).

7

For instance, Plaintiff claims Defendant only gave her a one percent raise in 1999 because she could not take dictation. Pl.'s Op. Br. at 10.  This blanket statement is a flat out mischaracterization of the record.  Indeed, after Plaintiff complained about her 1999 performance evaluation, Kaplan revised it and she received a 3.9% increase in salary. (A17).  In addition, because Plaintiff claimed she did more work than Kaplan was aware of, she received an increase in grade and an additional 1% increase in salary. (A18; A180).  This amounted to a 4.9% total increase in her salary for 1999, and Plaintiff even admitted that she was happy with her revised evaluation. (A177).  This event, even if it was not barred by the statute of limitations, did not constitute a adverse employment action.  Also, where is the evidence that this alleged event was motivated by discriminatory animus?  Plaintiff provides no clue.

Plaintiff also contends her reassignment from Kaplan to Sweeney constituted an adverse employment action.  As explained in Defendant's Opening Brief, when Plaintiff was reassigned to support Sweeney, her job status, pay, benefits, and grade remained the same.  Plaintiff even testified that her duties remained essentially unchanged. (A226-27).  There is no evidence the reassignment affected her opportunities for advancement. See, e.g., Langley v. Merck & Co., 2006 U.S. App. LEXIS 14958 (3d Cir. 2006) (holding no adverse employment action where plaintiff was reassigned but her pay and grade level remained the same).  Thus, Plaintiff's claim that the reassignment rose to the level of an adverse employment action is without support.

Plaintiff also takes issue with the condition of her workspace after the reassignment. Although her workspace was remodeled in several months, she claims that when she first moved in her cubicle walls were "mismatched" and it was "dirty."  This temporary inconvenience is insufficient as a matter of law to constitute an adverse employment action.  See Burlington Northern & Santa Fe Rwy. Co. v. White, 126 S. Ct. 2405, 2415 (2006) (discrimination laws not

intended to redress "petty slights or minor annoyances").  Moreover, Plaintiff leaves us guessing what evidence there is to link this perceived slight to Defendant's supposed discriminatory animus.

Plaintiff also claims that she was demoted because she was required to report to another administrative assistant, Pat Carpenter. Pl.'s Op. Br. at 11.  As with the majority of Plaintiff's allegations, this claim is shear speculation as confirmed by her own testimony:

Q.    Ms. Choma, was Ms. Carpenter ever your supervisor?

A.    Yes.

Q.    When was she your supervisor?

A.    I don't know because I was never told.

Q.    Were you ever given any kind of discipline by Ms. Carpenter?

A.    No.

Q.    Was she responsible for your raises?

A.    I do not know what role she played because I found out she was my supervisor.

Q.    Did she ever review your performance?

A.    I don't know.

Q.    Did you have performance reviews at Blue Cross?

A.    Yes.

Q.    Did she participate in those reviews?

A.    She could have.  I don't know.

(Exhibit 1, Choma 286-287).

Plaintiff's testimony demonstrates her entire allegation is shear fantasy conceived out of conjecture rather than admissible fact.  There is no evidence that Carpenter supervised Plaintiff's

work, evaluated her performance, or performed anything that would be considered indicia of a supervisor.  Indeed, the only tangible evidence Plaintiff could identify was several extraneous documents which listed Carpenter as the head of the division's administrative assistants. (Exhibit 1, Choma 290-92).  But even this flimsy evidence was explained away by Sweeney, who testified that Carpenter was listed as the head of the administrative assistants for recordkeeping purposes only so the division could budget for the administrative employees. (Exhibit 3, Sweeney 149-51).  In short, there is absolutely no evidence that Carpenter ever supervised Plaintiff.

Plaintiff also claims that Defendant subjected her "outrageous mistreatment."  She first claims that Sweeney "publicly berated" her when she returned late from lunch. Pl.'s Op. Br. at 6, 11.  This "public berating," as it turns out, was one instance where Plaintiff was verbally admonished by Sweeney for returning late from lunch. (A353).  Plaintiff admits that she was in fact late, and her only gripe is that others who were with her were not admonished.  Of course, Plaintiff conveniently ignores the fact that she was the only employee in the group who was nonexempt, and thus accountable for her hours, and the only one who reported directly to Sweeney. (A353).  In any event, an admonishment for coming back late from lunch does not under any stretch of the imagination alter the terms or conditions of Plaintiff's employment. See Cardenas v. Massey, 269 F.3d 251, 262 (3d Cir. 2001) (An "adverse employment action" is defined as "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.")

Plaintiff also claims that she was forced to type with a broken arm and timed on her production of letters. Pl.'s Op. Br. at 11.  This is yet another instance where Plaintiff distorts the record to inflate her claim.  First, the record shows that *all* of the production rates for

administrative assistants were monitored by Defendant, including Carpenter and Zakutney. (A356-359; A317-21). In fact, Zakutney also was placed on a Performance Improvement Plan (PIP) for failing to meet production rates. (A53-55). Thus, the fact that Plaintiff's production rate was monitored just like all of the other administrative assistants is not evidence of discrimination.

Plaintiff's contention that she was forced to type with one hand is also an exaggeration of the record. Sweeney testified that the day Plaintiff returned to work with a soft cast on her wrist, she asked Plaintiff if she could distribute mail, make photocopies, and perform other duties that required only one hand, but that Plaintiff insisted she could type and wanted to remain seated. (A347) (A67). The next day, after it became readily apparent that Plaintiff could not effectively type with the soft cast on her wrist, Sweeney revised her duties to limit her to copying, sorting and distributing mail. (A265; A273) (A68). Three days later, Plaintiff went out on short term disability, and when she returned to work several weeks later with no restrictions, she was expected to meet Defendant's standards for producing claim and appeal letters. (A274; A80-82). Plaintiff cannot hide from her responsibility to perform the functions of her position with hyped up allegations and mischaracterizations of the record.

Finally, Plaintiff contends the PIP issued by Sweeney "set unreasonable goals for typing Denial and Appeal Letters." Pl.'s Op. Br. at 11. This assertion directly contradicts her sworn testimony. Indeed, the PIP set an initial goal of eight minutes per letter, and for Plaintiff to eventually be able to type the letters on average in five minutes. (A99-100). In her deposition, Plaintiff testified as follows:

Q.    In that same row, what is expected, Ms. Sweeney is informing you that she wants all new letters to be typed within an average of eight minutes. Do you see that?

A.    Yes.

Q.     Could that be done, could letters be typed in an average of eight minutes?

A.     They could be done sooner than that.

Q.     Could you do the letters consistently typed with an average of eight minutes?

A.     Yes, I could do it in four minutes.

Q.     So, that goal would be a reasonable goal for her to set for you, is that correct?

A.     Yes, it would be.

(A284-285).

A review of Plaintiff's deposition transcript reveals that she admitted that *each and every goal* in her PIP was reasonable and readily attainable. (A284-296).  She is not permitted to contradict her sworn testimony with self-serving unsupported allegations.  As a result, Plaintiff's allegation that she was given unreasonable goals in her PIP fails as a matter of law.

12

**CONCLUSION**

Plaintiff has not demonstrated that she is entitled to partial summary judgment on any of her claims. For this reason, Plaintiff's motion should be denied.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Scott A. Holt*
_____
Scott A. Holt, Esquire (No. 3399)
Adria B. Martinelli, Esquire (No. 4056)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware  19899-0391
Telephone: (302) 571-6623; 571-6613
Facsimile: (302) 576-3299; 576-3314
Email:  sholt@ycst.com; amartinelli@ycst.com
Attorneys for Defendant

DATED:    October 30, 2007

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

EDITH CHOMA,                        )
                                    )
            Plaintiff,              )
                                    )   Civil Action
v.                                  )   No. 06-486-JJF
                                    )
BLUE CROSS BLUE SHIELD OF           )   - VOLUME II -
DELAWARE,                           )
                                    )
            Defendant.              )

            Deposition of EDITH A. CHOMA taken
pursuant to notice at the law offices of Young,
Conaway, Stargatt & Taylor, LLP, The Brandywine
Building, 1000 West Street, 17th Floor, Wilmington,
Delaware, beginning at 9:12 a.m. on Wednesday, April
25, 2007, before Christina M. Vitale, Certified
Shorthand Reporter and Notary Public.

APPEARANCES:

        LORI ANN BREWINGTON, ESQUIRE
        MARGOLIS EDELSTEIN
          750 South Madison Street
          Wilmington, Delaware  19801
          For the Plaintiff

        SCOTT A. HOLT, ESQUIRE
        YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
          The Brandywine Building
          1000 West Street, 17th Floor
          Wilmington, Delaware  19899
          For the Defendant


ALSO PRESENT:  Donna E. May, Blue Cross Blue Shield


                WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                 (302) 655-0477
                 www.wilfet.com



**WILCOX & FETZER LTD.**
Registered Professional Reporters

ORIGINAL

Edith A. Choma

242

1    A.    Yes.

2    Q.    The next sentence starting with, "CMO has made

3    remarks," do you see that?

4    A.    Yes.

5    Q.    Could you read that for me.

6    A.    "CMO has made remarks at meeting such as she

7    makes mistakes because she is deaf," and I have the

8    witnesses written there that were at this meeting and

9    told me this.

10   Q.    There was a meeting where Dr. Kaplan referenced

11   that you make mistakes at the meeting because you are

12   deaf?

13   A.    Yes.

14   Q.    Who told you that he made this comment?

15   A.    Tim Toole.

16   Q.    Anyone else?

17   A.    I went to Judy Charles in provider relations

18   because she was at this meeting and her statement to

19   me was that, yes, he did say that and would you

20   believe it and he is a doctor too?

21   Q.    Did she say anything else to you about this

22   meeting or what he said?

23   A.    No.  She just repeated that he did make a

24   statement referring that I make mistakes because I'm

Edith A. Choma

243

1    deaf.

2    Q.    Did Mr. Toole make the same statement to you?

3    A.    Yes.

4    Q.    Do you know who else attended this meeting

5    where Mr. Kaplan made these statements?

6    A.    There is quite a few people that attended that.

7    I believe that was a CQIC meeting and I have the date,

8    but I can't recall it.

9    Q.    Do you know the names of anyone else who

10    attended that meeting?

11    A.    Let's see.  It depends on who was in.  I

12    believe Dr. Castiglioni was in on that.  I would have

13    to go look at my notes and see who was there and the

14    date.  I can get you that.

15    Q.    But Dr. Castiglioni might have been there?

16    A.    He could have been because it's medical

17    directors and people that have things to do with the

18    CQIC committee.

19    Q.    Did you ever speak to Dr. Castiglioni about

20    this statement that Dr. Kaplan made?

21    A.    No.

22    Q.    Dr. Kaplan knew that you had a hearing problem,

23    is that correct?

24    A.    He yelled at me enough.  He should have.

Edith A. Choma

286

1   Blue Cross?

2    A.    No.

3    Q.    No?

4    A.    No.

5    Q.    Dr. Kaplan's superior was Tim Constantine, is

6   that correct?

7    A.    Yes.

8    Q.    Did you report it to him?

9    A.    No.

10   Q.    Ms. Choma, was Ms. Carpenter ever your

11  supervisor?

12   A.    Yes.

13   Q.    When was she your supervisor?

14   A.    I don't know because I was never told.

15   Q.    So, you were never informed that Ms. Carpenter

16  was your supervisor?

17   A.    No.

18   Q.    Were you ever given any kind of discipline by

19  Ms. Carpenter?

20   A.    No.

21   Q.    Was she responsible for giving you your raises?

22   A.    I do not know what role she played because I

23  found out she was my supervisor.

24   Q.    Did she ever review your performance?

Edith A. Choma

287

1  A.    I don't know.

2  Q.    Did you have performance reviews at Blue Cross?

3  A.    Yes.

4  Q.    Did she ever participate in those reviews?

5  A.    She could have.  I don't know.

6  Q.    When you had your performance review, did you

7  sit down normally with your direct supervisor?

8  A.    My direct supervisor who was Debbie Sweeney she

9  -- the employees were told to do your own performance

10  review, put down what you think about this, this, what

11  you do and all that.  I wasn't allowed to do that.

12  She would not permit me to do that.  She typed my

13  performance review for me.

14  Q.    Well, back to my question.  Isn't it true that

15  you would meet with your direct supervisor when you

16  had your performance evaluation?

17  A.    I don't know because there was so much going on

18  and so much as far as Carpenter when I didn't know who

19  was doing what or who was -- all I know is I was still

20  doing his work and Debbie Sweeney told me that she was

21  going to type up my performance review and if I felt

22  there was anything that needed to be added to let her

23  know.

24  Q.    It's true that Dr. Kaplan when he did your

1  Slaysman's voicemail and never got a response.  I

2  should have E-mailed her so I would have that

3  document, but I did not.

4        Towards the end of the day Sweeney came out

5  and said, "Call Susan Slaysman and tell her I want her

6  to get back to me."  It was towards the end of the

7  day.  So, I E-mailed Susan and I think I have an

8  E-mail about that.

9    Q.  Going back to Ms. Carpenter, Ms. Choma, what

10  evidence do you have that she was your supervisor?

11    A.  Well, at one point in time she changed --

12        MS. BREWINGTON:  Did you say Ms. Choma was

13  her supervisor?

14        MR. HOLT:  What evidence does Ms. Choma

15  have that Ms. Carpenter was her supervisor.

16        MS. BREWINGTON:  Thank you.

17  BY MR. HOLT:

18    A.  She sent me an E-mail and told me to change my

19  cost center and I E-mailed her back and said -- and I

20  have an E-mail regarding this -- "Why aren't I under

21  Debbie Sweeney's cost center?  That's who I report

22  to."  She said, "Dr. Kaplan did some reorganization

23  and just put that down on your time sheet."

24    Q.  What is a call center?



Edith A. Choma

291

1    A.    A cost center is a cost center for payroll,

2    like who you work under.  Like you always have a cost

3    center, right?

4    Q.    Is that call center or cost center?

5    A.    Cost.

6    Q.    I'm sorry, I misunderstood you.

7            MS. BREWINGTON:  Me too.

8    BY MR. HOLT:

9    Q.    So, this is essentially what Blue Cross uses to

10   designate for payroll purposes, is that correct?

11   A.    Yes.

12   Q.    Go ahead.

13   A.    And I have the E-mail where I E-mailed Pat

14   Carpenter and I said, "Does this change who I report

15   to?"  First I E-mailed and asked her why because

16   Debbie Sweeney I work for her.  She said, "He did some

17   reorganization and that's why you have to use this

18   cost center."  Then, I set another E-mail and said,

19   "Does this change who I report to?"  I never got an

20   answer back.

21   Q.    Either way?

22   A.    No, never, never got an answer.

23   Q.    Anything else?

24   A.    No, that's what happened.

Edith A. Choma

292

```
 1              MS. BREWINGTON:  When you say "anything
 2    else," do you mean anything else in that conversation?
 3              MR. HOLT:  I'll clarify.
 4    BY MR. HOLT:
 5    Q.   Anything else that you believe constitutes
 6    evidence that Ms. Carpenter was your direct supervisor
 7    at some point?
 8    A.   Oh, yes, I have evidence.  I got a 15-year old
 9    gift for my 15 years being there from Care First and
10    they sent me a letter to pick out what I wanted and
11    they had immediate supervisor on this piece of paper,
12    Pat Carpenter.  When I was out on disability I got an
13    E-mail from Met Life asking Pat Carpenter, since she
14    was my supervisor, if I returned back to work yet
15    because apparently she never told them I was back at
16    work.  You don't get paid unless that's reported.
17    That's how I knew.
18    Q.   Any other evidence?
19    A.   Well, I was never told, I was never told that
20    she was my supervisor.  It was just done behind my
21    back.
22    Q.   Based on this evidence you concluded that Ms.
23    Carpenter was your supervisor?
24    A.   Well, the fact that she wouldn't answer my
```

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

EDITH CHOMA,                          )
                                      )
            Plaintiff,                )
                                      )    Civil Action
v.                                    )    No. 06-486-JJF
                                      )
BLUE CROSS BLUE SHIELD OF             )    - VOLUME III -
DELAWARE,                             )
                                      )
            Defendant.                )

            Deposition of EDITH A. CHOMA taken
pursuant to notice at the law offices of Young,
Conaway, Stargatt & Taylor, LLP, The Brandywine
Building, 1000 West Street, 17th Floor, Wilmington,
Delaware, beginning at 10:12 a.m. on Thursday, June
14, 2007, before Christina M. Vitale, Certified
Shorthand Reporter and Notary Public.

APPEARANCES:

        LORI ANN BREWINGTON, ESQUIRE
        MARGOLIS EDELSTEIN
            750 South Madison Street
            Wilmington, Delaware  19801
            For the Plaintiff

        SCOTT A. HOLT, ESQUIRE
        YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
            The Brandywine Building
            1000 West Street, 17th Floor
            Wilmington, Delaware  19899
            For the Defendant

                    WILCOX & FETZER
        1330 King Street -  Wilmington, Delaware 19801
                    (302) 655-0477

                www.wilfet.com



**WILCOX & FETZER LTD.**
Registered Professional Reporters

ORIGINAL

Edith A. Choma

621

1    Q.    What do you mean you know you went there?

2    A.    I know I put charges in, but I just --

3    Q.    You don't know what date that earliest incident

4    of discrimination was that is referenced there?

5    A.    6/15/04?  I don't know.  I really don't know.

6    Q.    And then there is a latest date on there that

7    states October 20, 2004.  Do you see that?

8    A.    Yes.

9    Q.    Was that the date that perhaps Ms. Sweeney was

10   pointing her finger in your face and yelling at you?

11   A.    She did that on I forget what day I told you

12   you if I even told you a day.  It was right around

13   there.  That's why I went up there.  They also have an

14   X there with continuing action.  So, they go back so

15   many months I believe and just put that in there like

16   that.  I think that's how they work it, I'm not sure.

17   I think you have so many days or --

18   Q.    Looking at the text of this charge again there

19   is in the middle of the document a statement there

20   about charging parties protected class.  Do you see

21   that?

22   A.    Yes.

23   Q.    And it says, "Charging party," that's you,

24   "previously filed a charge of discrimination against

Edith A. Choma

622

1    respondent," that's Blue Cross.  Do you see that?

2    A.    Yes.

3    Q.    So, you believe that Ms. Sweeney was

4    retaliating against you for you filing this charge of

5    discrimination?

6    A.    No doubt about it.

7    Q.    And that's the charge that you filed in 2002,

8    correct, based on disability and age?

9    A.    Yes, I guess it was.  There are so many charges

10   I don't know which one is which.

11   Q.    You filed a total of two charges of

12   discrimination if I'm correct?

13   A.    Now, this is with the DDOL.  There were charges

14   filed to the EEOC as well.

15   Q.    When you filed your first page, you filed it

16   with both the DDOL and EEOC, correct?

17   A.    When I first went to the DDOL I was only

18   dealing with that and they told me they were going to

19   refer my case to the EEOC.  Then, I talked to someone

20   up in the EEOC and he told me he was going to

21   investigate.

22   Q.    And that was the same case, the same charge?

23   A.    Yes, all the same charges, yes.

24   Q.    And this is the second charge you filed with

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


EDITH CHOMA,                          )
                                      )
              Plaintiff,              )
                                      )   Civil Action
v.                                    )   No. 06-486-JJF
                                      )
BLUE CROSS BLUE SHIELD OF             )
DELAWARE,                             )
                                      )
              Defendant.              )

          Deposition of TIMOTHY J. TOOLE taken
pursuant to notice at the law offices of Margolis
Edelstein, 750 South Madison Street, Wilmington,
Delaware, beginning at 10:37 a.m. on Wednesday,
June 6, 2007, before Christina M. Vitale, Certified
Shorthand Reporter and Notary Public.

APPEARANCES:

     LORI ANN BREWINGTON, ESQUIRE
     MARGOLIS EDELSTEIN
        750 South Madison Street
        Wilmington, Delaware   19801
        For the Plaintiff

     SCOTT A. HOLT, ESQUIRE
     YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
        The Brandywine Building
        1000 West Street, 17th Floor
        Wilmington, Delaware   19899
        For the Defendant


          WILCOX & FETZER
1330 King Street -  Wilmington, Delaware 19801
          (302) 655-0477
          www.wilfet.com



**WILCOX & FETZER LTD.**
Registered Professional Reporters



Timothy J. Toole

34

1    that Edith makes mistakes because she is deaf?

2    A.    The incident I heard was the only time I heard

3    about that.

4    Q.    Do you know whether Kaplan ever said anything

5    to you or anyone else that Edith never did anything?

6    A.    He never said that to me.

7    Q.    Did Kaplan ever tell you that he wanted to fire

8    everyone and pick who he wanted?

9    A.    Yes.

10    Q.    When did he say that?

11    A.    You know, it has been many years.  It was

12    probably in a leadership meeting and I'm putting

13    probably because when did this start all over again.

14    Q.    What was the context of that conversation?

15    A.    We were going through a lot of changes, there

16    was a lot of reorganization in the department,

17    changing of roles and activities and goals took place

18    in that context.

19    Q.    Was anybody's name mentioned in the context of

20    those conversations?

21    A.    It was more of a general, I wish I could get

22    rid of everybody and start all over again.

23    Q.    When you heard him say that, did you tell

24    anyone that you heard him say that?

Timothy J. Toole

48

1    Q.    Do you know if Ms. Choma did dictation for Dr.

2  Kaplan?

3    A.    I don't know for sure, no.

4    Q.    Did you ever see Ms. Choma doing dictation?

5    A.    I'm trying to think.  No, I can't recollect her

6  specifically doing dictation.

7    Q.    Do you know if Ms. Choma ever took meetings or

8  minutes at meetings for Dr. Kaplan or anyone else?

9    A.    I would say my understanding was that she had

10 that responsibility.

11   Q.    Now, going back to your testimony on the

12 statement by Dr. Kaplan at the CQIC meeting, you

13 referenced Dr. Kaplan said Ms. Choma made mistakes, is

14 that correct?

15   A.    Yes.

16   Q.    Do you know what he was referring to, what kind

17 of mistakes?

18   A.    No.  At that time it was just his frustration

19 over something, I don't know what the something was.

20   Q.    Again, that was she was making mistakes because

21 she couldn't hear?

22   A.    Yes.

23   Q.    But you don't know what mistakes he was

24 referring to?



# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

EDITH CHOMA,                          )
                                      )
            Plaintiff,                )   C.A. No. 06-486
                                      )
v.                                    )
                                      )
BLUE CROSS BLUE SHIELD OF             )
DELAWARE,                             )
                                      )
            Defendant.                )

            Deposition of DEBORAH M. SWEENEY
taken pursuant to notice at the law offices of
Margolis Edelstein, 750 South Madison Street,
Suite 102, Wilmington, Delaware, beginning at
10:05 a.m., on Friday, September 7, 2007, before
Patricia L. Shelton, Registered Professional Reporter
and Notary Public.


APPEARANCES:

        HERBERT W. MONDROS, ESQ.
        MARGOLIS EDELSTEIN
           750 South Madison Street - Suite 102
           Wilmington, Delaware  19801
           For the Plaintiff

        SCOTT A. HOLT, ESQ.
        YOUNG CONWAY STARGATT & TAYLOR LLP
           1000 West Street - 17th Floor
           Wilmington, Delaware  19801
           For the Defendant

ALSO PRESENT:   EDITH CHOMA
                MATTHEW HELM


            WILCOX & FETZER
  1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477
                www.wilfet.com



WILCOX & FETZER LTD.
Registered Professional Reporters



Deborah M. Sweeney

149

1  A.   To my knowledge, there is not a job title.

2  Q.   Tell me again what Patricia Carpenter's title

3  is now.

4  A.   I honestly don't know what her title is right

5  now.  She doesn't report directly to me, so I don't do

6  her performance appraisal.  I don't see her associate

7  profiles.

8  Q.   And Dr. Kaplan does that?

9  A.   That is correct.

10  Q.   So he should know?

11  A.   Yes.

12  Q.   How long has Patricia Carpenter worked at

13  Blue Cross Blue Shield?

14  A.   I don't know.

15  Q.   At some point in time, did Patricia Carpenter

16  become Edith Choma's direct supervisor?

17  A.   At a point in time, Dr. Kaplan and I had a

18  conversation regarding the fact that we had three

19  administrative assistants, and that we needed to get a

20  sense of what each one of those administrative

21  assistants was doing.

22       And I did make the suggestion that perhaps

23  we would want work funneled through one person who

24  would be able to identify which of the three

Deborah M. Sweeney

150

1    individuals had the capacity to work on special

2    projects, special mailings that might need to be done.

3            For example, if we were doing a letter to

4    women who appeared to be noncompliant with getting a

5    mammogram, who would be the best person to do that?

6    Who would have the capacity?

7            So there was a conversation between

8    Dr. Kaplan and I regarding that.  And we did collect

9    information from all of the administrative assistants

10   in terms of the responsibilities that they had.

11           To my knowledge, there was never anyone

12   formally placed in the supervisor role, although that

13   was something that was discussed.

14           We also did create a separate cost center

15   for administrative services so that we could record

16   things such as pens and paper and office supplies that

17   were being used by the entire medical management

18   department, instead of having whomever was ordering

19   the supplies say, okay, which department am I going to

20   charge this to.  Am I going to charge it to the

21   outpatient referral unit, to behavioral health, to

22   utilization management, to quality improvement, to

23   quality -- well, to any of the various departments.

24   All office supplies could then be allocated to a

Deborah M. Sweeney

151

```
1   single cost center.
2              I do not know whether the associate --
3   whether associates were assigned to that cost center.
4              MR. MONDROS:  I'm sorry.  Can you tell me
5   what my question was?
6              (The reporter read back as instructed.)
7   BY MR. MONDROS:
8     Q.    Is there a yes or no answer to that question?
9     A.    To my knowledge, no.
10    Q.    You said during your testimony that you and
11  Dr. Kaplan had a meeting and you discussed whether it
12  made sense to put one of the administrative assistants
13  in charge.  Is that an accurate characterization of
14  your testimony?
15    A.    Yes.
16    Q.    When was that meeting?
17    A.    Some time in, to the best of my recollection,
18  2003.
19    Q.    Late 2003?  Early 2003?
20    A.    Mid 2003.
21    Q.    And who was the person you chose to be the
22  administrative assistant in charge?
23    A.    There was, to my knowledge, no decision made
24  that there would be.  It was a suggestion.
```

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters