IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| EDITH CHOMA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-486-JJF |
| | ) | |
| BLUE CROSS BLUE SHIELD | ) | JURY TRIAL DEMANDED |
| OF DELAWARE, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

MARGOLIS EDELSTEIN
Herbert W. Mondros, Esq. (Del No. 3308)
750 South Madison Street, Suite 102
Wilmington, DE 19801
302.888.1112
Attorneys for Plaintiff

Dated: October 30, 2007

## TABLE OF CONTENTS

Table of Contents................................................................................................i

Table of Authorities...........................................................................................iii

Preliminary Statement..................................................................................... 1

Statement Of Facts........................................................................................... 3

     A.       The Undisputed Material Facts ...................................................3

     B.       The Material Facts In Dispute....................................................9

Argument........................................................................................................10

I.    The Standard For Summary Judgment Is Well Established............................10

II.   Summary Judgment On Edith's Age Discrimination Claim Is Precluded
     By Both The Undisputed Facts And The Material Facts In Dispute...............10

     A. Edith's Age Discrimination Claim Is Not Time-Barred............................12

     B. A Jury Would Reasonably Conclude That Edith Was
       Discriminated Against As A Result Of Her Age.....................................14

            i.   Edith Has Proven Her Prima Facie Case Of Age Discrimination,
               And Has Demonstrated That BCBSD's NCQA Story Is But A
               Pretext For Kaplan's Having Gotten Rid Of Edith In
               Favor Of The Younger Carpenter.........................................14

III.    The *Direct Evidence* That BCBSD Discriminated Against Edith
     As A Result Of Her Disabilities Precludes Entry Summary of
     Judgment On Her Disability Claim Or Warrants Judgment In Her Favor.........17

    a.   Edith Has Proven A Prima Facie Case Of Disability Discrimination...............17

    b.   Because Edith Has Offered Direct Evidence Of  Disability Discrimination
       By BCBSD, Edith Need Only Show That The Unlawful Motive Was A
       'Substantial Motivating Factor' In The Adverse Employment Action..............20

    c.   BCBSD Failed to Accommodate Edith.................................................22

IV.    The Direct Evidence That BCBSD Retaliated Against Edith
     As A Result Of Her Hearing Disability Precludes Summary
     Judgment On Her Retaliation Claims.................................................23

V.    A Jury Would Reasonably Find That BCBSD
      Constructively Discharged Edith........................................................26

    VI.    Count IX: Breach Of The Implied Covenant
           Of Good Faith And Fair Dealing ................................................27

Conclusion...........................................................................................28

# TABLE OF AUTHORITIES

CASE LAW

### U.S. Supreme Court

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)…………………………………..21

### U.S. Courts of  Appeal

*Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074 (3d Cir. 1996)……………………..27

*Bray v. Marriott Hotels*, 110 F.3d 986 (3d Cir. 1997)……………………………………....16

*Connors v. Chrysler Fin. Corp.*, 160 F.3d 971 (3d Cir. 1998) ………………………… .20

*Deane v. Pocono Medical Center*, 142 F.3d 138 (3d Cir. 1998)…………………………17

*Fakete v. Aetna, Inc.*, 308 F.3d 335 (3d Cir. 2002)…………………………………....11, 20, 21

*Farrell v. Planters Lifesavers Co.*, 206 F.3d 271 (3d Cir. 2000)………………………..25

*Goss v. Exxon Office Sys. Co.*, 747 F.2d 885 (3d Cir. 1984)…………………………..26, 27

*Gray v. York Newspapers, Inc.*, 957 F.2d 1070 (3d Cir. 1992)…………………..……..27

*Hook v. Ernst & Young*, 28 F.3d 366 (3d Cir. 1994)…………………………………..……..21

*Jovanovic v. in- Sink-Erator*, 201 F.3d 894 (7th Cir. 2000)…………………………..…..22

*Krouse v. American Sterilizer Co.*, 126 F.3d 494 (3d Cir. 1997)…………………..23, 25

*Robinson v. Southeastern Pa. Transp. Auth.*, 982 F.2d 892 (3d Cir. 1993))…………. 25

*Rush v. Scott Specialty Gases*, 113 F.3d 476, (3d Cir. 1997)…………………………..…12

*Shellenberger v. Summit Bancorp*, 318 F.3d 183 (3d Cir. 2003) …………………..20, 25

*Sheridan v. E. I. DuPont de Nemours and Co.*, 100 F.3d 1061 (3d Cir. 1996)……..17, 27

*Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089 (3d Cir. 1995)……………..……20

*Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296 (3d Cir. 1999)……………………….17, 22

U.S. District Courts

*Blozis v. Mellon Trust of Del. Nat'l Ass'n*, 494 F. Supp. 2d 258 (D. Del. 2007)………16

*Breitigan v. New Castle County*, 350 F. Supp. 2d 571 (D. Del. 2004) ……………11, 16

*Brodsky v. Hercules, Inc.*, 966 F. Supp. 1337 (D. Del. 1997)………………………..16

*Clancy v. Preston Trucking Co.*, 967 F. Supp. 806 (D. Del. 1997)……………….11, 17

*Claycomb v. Playtex Prods.*, 2007 U.S. Dist. LEXIS 44769 (D. Del. 2007)………..…20

*Conneen v. MBNA Am. Bank, N.A.*, 182 F. Supp. 2d 370 (D. Del. 2002)……………22

*Davis v. Gen'l Accident Ins. Co.*, 200 U.S. Dist. Lexis 17356 (E.D.Pa.)……………..13

*Dowd v. SEPTA*, 2006 U.S. Dist. LEXIS 30619 (D. Pa. 2006)………………………13

*Fini v. Remington Arms Co.*, 1998 U.S. Dist. LEXIS 8261 (D. Del. 1998)…………..16

*Houlihan v. Sussex Tech. Sch. Dist.*, 461 F. Supp. 2d 252 (D. Del. 2006)………..23, 24

*Monk v. Williams*, 2007 U.S. Dist. LEXIS 72226, 5-7 (D. Del. 2007)………..………10

*Priller v. Town of Smyrna,* 430 F.Supp 2d 371, 381 (D. Del. 2006) …………………14

*Samuels v. Albert Einstein Med. Ctr.*, 1998 U.S. Dist. LEXIS 17320 (D. Pa. 1998).…13

*Sempier v. Johnson & Higgins*, 45 F.3d 724 (3d Cir. 1995)…………………………...11

*Underwood v. Sears, Roebuck & Co.*, 343 F. Supp. 2d 259 (D. Del. 2004)……….10, 16

*Zechman v. Christiana Care Health Sys.*, 2007 U.S. Dist. LEXIS 47349 (D. Del.).… 17

STATUTES

29 U.S.C. § 623(a)(1)…………………………………………………………………..11

42 U.S.C. § 12203(a)………………………………………………………………...…23

OTHER

http://www.mayoclinic.com/health/menieres-disease/DS00535……………………………3

Plaintiff, Edith Choma ("Edith"), through her undersigned counsel, respectfully requests that the Defendant's Motion for Summary Judgment be denied because (1) the undisputed facts demonstrate that Defendant, Blue Cross Blue Shield of Delaware ("BCBSD"), is not entitled to judgment as a matter of law; and (2) disputed material facts preclude a grant of summary judgment in this case. These reasons are amplified below.

## PRELIMINARY STATEMENT

In this case, Plaintiff, Edith Choma, has adduced *direct evidence* of discrimination in the form of a confession by BCBSD's Chief Medical Officer, Paul Kaplan.

Kaplan told other BCBSD managers that he wished he could "get rid of Edith because she couldn't hear." [B0147-B0148]. As BCBSD's Chief Medical Officer, Kaplan, (a licensed medical doctor, who himself has a brain disability that prevents him from practicing medicine [B0125]), granted his own wish: When Debbie Sweeney, a new Quality Improvement Director joined BCBSD, Kaplan demoted Edith to work for Sweeney and replaced Edith with a secretary who was 14 years younger than Edith. Kaplan claimed to have "no idea" that Carpenter was younger than Edith. [B0158].

BCBSD relocated Edith to a cubicle that was in "deplorable" condition. [B0078-B0080; B0268-B0271]. Sweeney routinely castigated Edith in front of her coworkers. [B0109-B0110; B0282-B0283; B0077]. Although BCBSD knew Edith's hearing was impaired, and that this impairment inhibited Edith's ability to do transcription, Kaplan continually gave Edith transcription assignments, and continually complained that she was deficient at transcription. [B0130-B0131]. Notably, however, *transcription was never part of Edith's job description.*

1

[B0001-B0006, Summary of Position Medical Administrative Assistant, Pay Grade 7 and Pay Grade 8].

BCBSD timed Edith on the rate at which she typed Denial and Appeal Letters, and disciplined her when she failed to type them fast enough ... even though Edith had a broken wrist at the time and was forced by BCBSD to type with one hand. [B0048-B0051; B0102-B0106].

Ultimately, BSCBSD constructively terminated Edith by engaging in continual antagonistic conduct designed to induce Edith to terminate her employment, including subjecting Edith to public beratings, imposing an unreasonable Performance Improvement Plan ("PIP") on Edith, and enforcing that PIP in a wholly unreasonable manner.    For example, (i) the PIP unreasonably required Edith to improve her rate of typing Denial Letters by forty percent in six weeks; and (ii) Sweeney interrogated Edith about what work she had done during a six minute period before her official work day had started, on November 1, 2004, the day after the PIP was implemented (the "Six Minute Incident"). [B0111-B0113; B0061].

The undisputed facts in this case would lead a reasonable trier of fact to find that Blue Cross Blue Shield of Delaware intentionally discriminated against Edith Choma on the basis of her age and/or her disability, retaliated against her when she complained about the discrimination and constructively terminated her.  Defendant's Motion for Summary Judgment must be denied. Edith's Motion for Partial Summary Judgment should be granted, and the remaining claims should be tried before a jury.

2

## STATEMENT OF FACTS

### A.    THE UNDISPUTED MATERIAL FACTS[1]

The following material facts are not in dispute:

1.        Plaintiff Edith Choma ("Edith") began her employment with Defendant, Blue Cross Blue Shield of Delaware ("BCBSD") in 1989. [B0187].

2.        In 1995 Edith was diagnosed with Meniere's Disease, an inner ear disease that causes, among other things, hearing loss and vertigo. [B0010-B0012; http://www.mayoclinic.com/health/menieres-disease/DS00535].

3.        In early 2000, Dr. Paul Kaplan became the new Chief Medical Officer at Blue Cross Blue Shield. [B0126].  Kaplan, a South Africa-born and educated doctor, had been a practicing physician until 1996, when he suffered a serious head injury.  The injury left him with impaired memory that forced him to retire as a practicing physician, and for which he continues to receive disability payments [B0122-B0125, B0132-B0133].  The injury also resulted in changes in Dr. Kaplan's personality.[2] [B0141; B0075-B0076].

4.        In 1999 Edith became the administrative assistant to Dr. Kaplan. [B0188-B0190, B0199-B0200].

5.        Dr. Kaplan and Edith worked in the Medical Management Division at BCBSD, which, among other things, advised BCBSD's health insurance subscribers that BCBSD was denying coverage on health insurance claims made by subscribers. Such denials were made in what BCBSD called "Denial Letters." [B0162; B0193-B0195, B0248-B0251; B0098-B0099].  Dr. Kaplan was (and is) the official at BCBSD who makes the ultimate

---

[1] This Statement of Undisputed Facts was taken from the Brief in Support of Plaintiff's Motion for Partial Summary Judgment.

[2] Dr. Kaplan's impaired memory was evident at his deposition where he testified that he could "not remember" on at least 39 occasions.

decision as to whether a particular claim is denied. [B0181-B0182]. Edith was the BCBSD employee who was responsible for typing the Denial Letters. [B0143; B0202-B0203, B0279-B0281; B0097-B0099].

6.      In addition to having Edith draft Denial Letters, Dr. Kaplan required Edith to take dictation. [B0130-B0131, B0134, B0143, B0152; B0189, B0196-B0197, B0229]. Dr. Kaplan would dictate onto microcassettes, and Edith would transcribe from the microcassettes. [B0130; B0229-B0230]. As a result of her impaired hearing, Edith struggled with the dictation. Edith advised Dr. Kaplan, who was well-aware of Edith's hearing disability, that her hearing impairment impeded her ability to take dictation. [B0130-B0131, B0159; B0230-B0237]. Dr. Kaplan was extremely dissatisfied with the dictation work Edith did for him. [B0130-B0131, B0134 , B0153-B0154; B0230-B0237]. There were other secretaries to whom Dr. Kaplan could have assigned the dictation duties, but Dr. Kaplan continued to assign dictation to Edith. [B0131].

7.      In or around July 1999, Dr. Kaplan evaluated Edith's employment performance for the first time. [B0014-B0020]. Kaplan gave Edith a very poor review. Among other things, Edith received a poor review for her performance of her dictation duties. [B0138].

8.      Edith was unhappy with Kaplan's review of her performance. [B0199]. She confronted Kaplan about her review. [B0139-B0140; B0198-B0201]. During their meeting, Kaplan made several discriminatory and inappropriate statements to Edith. He told her: (1) "I can't stand the way you lift up your glasses to see the screen!"; (2) "Maybe it's your Thyroid"; (3) "Maybe the blood isn't getting to your brain!"; and (4) "You know the saying "Kick the Dog", that's why I treat you the way I do!" [Complaint at ¶13; B0204-

4

B0226]. Although Kaplan denies making these statements [B0141], after their meeting, Edith reported Kaplan to the BCBSD Human Resources Department. [B0208-B0226; B0135-B0136]

9.      The Human Resources Department at BCBSD directed Dr. Kaplan to revise Edith's 1999 Performance Evaluation. [B0136]. Kaplan was unhappy that Human Resources had interceded, and he was unhappy that he was directed to change Edith's Performance Evaluation. [B0136-B0137]. Nevertheless, he made the changes, improving Edith's Performance Evaluation. [B0136-B0140].

10.     In or around September 2, 1999, BCBSD's Human Resources Department contacted Edith to schedule a meeting to discuss the content of her job. Upon completion of that meeting, Edith's position was reevaluated and Edith was promoted from a grade 7 to a grade 8. Edith was only given a 1% increase for her change in grade. When Edith protested this meager increase, Kaplan stated to Edith that if it was up to him, she would not have received anything. [B0142-B0143].

11.     Dr. Kaplan admitted he was unhappy that Edith reported him to Human Resources and that Human Resources had ordered him to make changes to Edith's Performance Evaluation. Nevertheless, Kaplan testified that he had no grudge against Edith. [B0147].

12.     Kaplan, however, admitted to being extremely frustrated with Edith. [B0147-B0148, B0151, B0159].

13.     In a leadership meeting after the confrontation over the 1999 performance evaluation, Kaplan told BCBSD managers that he wanted to get rid of Edith because she couldn't hear. [B0147-B0148, B00151; B0255-B0258; B0070-B0072].

14.    Tim Toole, then and still Director of Behavioral Health at BCBSD testified: "My recollection is [Dr. Paul Kaplan] said he wished he could get rid of Edith because he said she couldn't hear." [B0070-B0072]. Kaplan admitted that he said that he wanted to get rid of Edith because she couldn't hear, and admitted that he said that because he was frustrated with Edith. [B0147-B0148, B0151, B00159].

15.    After the 1999 Performance Evaluation, and indeed, until Edith was forced to retire from BCBSD, [B0063-B0066], Kaplan continued to make Edith do dictation, despite knowing that Edith's disability impeded her ability to do dictation and despite Kaplan's remaining dissatisfied with Edith's dictation work. In Kaplan's 2000 Performance Evaluation of Edith, he complained that Edith's hearing difficulties sometimes creates [sic] a problem for her to hear words while transcribing dictation. [B0023-B0030].

16.    Ultimately, Kaplan made good on his wish to get rid of Edith because of her hearing. On or around August 12, 2002, Edith was *"demoted"* (Plaintiff's word) or *"transferred"* (Defendant's word), from Administrative Assistant to Medical Director Paul Kaplan to Administrative Assistant to the new Quality Improvement ("QI") Director, Debbie Sweeney. [B0157-B0158; B0087-B0090; B0192, B0252, B0259-B0260]. In connection with that move, Patricia Carpenter, a younger, and non-hearing impaired secretary in the Medical Management Department at BCBSD became Kaplan's secretary. [B0158-B0159; B0091-B0093; B0252, B0259-B0266]. After the change, instead of reporting directly to BCBSD's Chief Medical Officer, Kaplan, Edith reported to Sweeney, who reported to Kaplan. [B0158, B0162; B0085-B0086; B0190-B0191, B0192, B0252, B0259]. Later, in 2003 or 2004, BCBSD changed Edith's direct report to Patricia Carpenter. [B0260-B0261, B0272-B0278, B0007-B0009, B0042-B0044, B0062].

6

17.     When Edith was transferred to the QI Department, to work for Sweeney, the condition of her cubicle was deplorable. The walls were mismatched, it was much smaller than her previous cubicle and the cubicles of Carpenter and Zakutny, and it was covered in dirt and dust mites. It took about 2 months for BCBSD to replace her cubicle. [B0078-B0080; B0268-B0271].

18.     After demoting Edith, Kaplan and BCBSD continued to discriminate her and to retaliate against her for complaining to Human Resources and later to the EEOC and Delaware Department of Labor. [B0036-B0039].

19.     Sweeney publicly berated Edith when she returned a half hour late from lunch. Although four other BCBSD employees were also late, Sweeney singled Edith out for a very public tongue-lashing. [B0109-B0110; B0282-B0283; B0077].

20.     Beginning in 2004, BCBSD experienced a sharp increase in the number of health insurance claims it was denying, and hence a sharp increase in the number of Denial Letters that needed to be typed. [B0100]. As a result of the increase in denials and Denial Letters, there was also an increase in the number of BCBSD subscribers who appealed BCBSD's denial of benefits. [B0101]. This caused a sharp increase in the number of "Appeal Letters" BCBSD sent, and Edith was responsible for typing those Appeal Letters, as well as the Denial Letters. [B0096]. On August 19, 2004, Edith suffered a broken wrist, and went to work with a cast on her right (primary) wrist. Notwithstanding Edith's broken wrist, Sweeney required Edith to type the Denial and Appeal Letters, and timed Edith to assess the rate at which Edith was typing the Denial and Appeal Letters. [B0102]. Edith typed the Denial and Appeal Letters with one hand. Sweeney then complained because Edith was not typing the Denial and Appeal Letters quickly enough. [B0102; B0048-B-0050]. When

7

Edith attempted to work through lunch to type the letters informing the BCBSD subscribers their claims were being denied, Sweeney reprimanded her for working through lunch. [B0048-B0051; B0103-B0106]. When Edith stayed late to get the work done, Sweeney refused to authorize overtime. [B0051].

      21.        On October 22, 2004, Edith filed a complaint with the Delaware Department of Labor and the EEOC complaining of BCBSD's discriminatory treatment. [B0067]. On October 29, 2004, BCBSD placed Edith on a Performance Improvement Plan ("PIP"). [B0056-B0060]. Among other things, the PIP (1) set unreasonable expectations for the rate at which Edith would type Denial and Appeal Letters[3]; (2) established Edith's official hours as starting between 8:00 and 8:30 AM; and (3) required Edith to notify Sweeney when she arrived in the morning, when she left for and returned from lunch and when she departed work in the evening.

      22.        On November 1, 2004, the very first day after BCBSD implemented Edith's PIP, Edith arrived in the morning and emailed Sweeney that she had arrived at 7:50 AM. Sweeney responded by email that while Edith had claimed to have arrives at 7:50 AM, Sweeney did not receive the email until 7:56 AM. Sweeney demanded to know what Edith had been doing for the previous six minutes. [B0111-B0113; B0061].

      23.        On February 1, 2005, Edith retired from BCBSD, in her exit interview, Edith wrote "Had to retire because of retaliation and constant harassment." [B0063-B0066; B0294].

---

[3] For example, as of the date of the PIP, Edith's Denial Letter rate, as timed by Sweeney was greater than 8 minutes. The PIP required Edith to improve her rate of typing Denial Letters to an average of 5 minutes, a 40% improvement within 6 weeks.

## B.    THE MATERIAL FACTS IN DISPUTE

1. When Edith confronted Kaplan about her 1999 performance evaluation, Kaplan made several discriminatory and inappropriate statements to Edith. He told her: (1) "I can't stand the way you lift up your glasses to see the screen!"; (2) "Maybe it's your Thyroid"; (3) "Maybe the blood isn't getting to your brain!"; and (4) "You know the saying "Kick the Dog", that's why I treat you the way I do!" [Complaint at ¶13; B0204-B0226]. Kaplan denies making these statements [B0141].

2. Transcription was *never* a part of Edith's job description. Compare Edith's Job Description as provided by BCBSD, [B0001-B0006 (no mention of transcription or any duty analogous to transcription)], with Kaplan's testimony  and the Defendant's Opening Brief which claimed that transcription was an essential part of Edith's job. [Def. App. 397 (B0151); Defendant's Opening Brief ("DOB") at 31 ("transcription duties were part of Choma's job"; transcription was an "important component"; one of the "essential functions of the position")].

3. Edith was demoted in the summer of 2002 from administrative assistant to Chief Medical Officer Kaplan to administrative assistant to Assistant Medical Director Deborah Sweeney. Edith was again demoted in or around December 1, 2003 when she was directed to report directly to Kaplan's administrative assistant, Patricia Carpenter. [B0009, B0042-B0044, B0062].

4. BSBSD claims that Edith never requested an accommodation for her hearing impairment. [DOB 30]. The record, however, reflect that Edith and BCBSD did agree on an accommodation: Edith would do the transcription "in the best form she could and [Kaplan] would then have to fill in the blanks. [B0130-B0131; B0033-B0035].    Despite this

"accommodation," BCBSD continued to complain about Edith's transcription and discriminate against Edith.

## ARGUMENT

### I.    THE STANDARD FOR SUMMARY JUDGMENT IS WELL ESTABLISHED

> A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. . . . "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." ...If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law.

*Monk v. Williams*, 2007 U.S. Dist. LEXIS 72226, 5-7 (D. Del. 2007).

Applying these standards, is clear that BCBSD is not entitled to summary judgment.

### II.    SUMMARY JUDGMENT ON EDITH'S AGE DISCRIMINATION CLAIM IS PRECLUDED BY BOTH THE UNDISPUTED FACTS AND THE MATERIAL FACTS IN DISPUTE

"The Age Discrimination Act ("ADEA") prohibits an employer from 'discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.'" *Underwood v. Sears, Roebuck & Co.*, 343 F.

Supp. 2d 259, 266 (D. Del. 2004)(quoting 29 U.S.C. § 623(a)(1)). Where a plaintiff does not provide direct evidence of age discrimination, this court analyzes her claim under the familiar burden shifting approach. *Id.* (citing *Fakete v. Aetna, Inc.*, 308 F.3d 335 (3d Cir. 2002)).

Count 1 of the Complaint alleges that BCBSD violated the ADEA by discriminating against Edith by (i) giving her a poor performance evaluation in 1999; (ii) by limiting her bonus to one percent when others similarly situated received three percent (though if it were up to Kaplan, Edith would have gotten no bonus); (iii) requiring Edith to do work that younger, similarly situated secretaries or administrative assistants were not required to do; (iv) demoting her from administrative assistant to the medical director to administrative assistant to the Director of Quality Improvement; (v) harassing her, by, among other things, publicly castigating her, and making unreasonable demands upon her; and (vi) forcing her to resign or retire through a combination of all of its actions.

A prima facie case of age discrimination under the ADEA generally requires the plaintiff to allege the following four elements: (1) she is at least 40 years of age; (2) she is qualified for the position; (3) she suffered an adverse employment decision; and (4) non-members of the protected class were treated more favorably than she was, in other words, the circumstances give rise to an inference of discrimination. *Breitigan v. New Castle County*, 350 F. Supp. 2d 571, 575 (D. Del. 2004)(citation omitted).

Edith's prima facie case of age discrimination is: (1) she was over 40; (2) she was qualified for the position in question; (3) she was demoted, harassed and constructively terminated; and (4) she was replaced by a sufficiently younger person. *See Clancy v. Preston Trucking Co.*, 967 F. Supp. 806, 812 (D. Del. 1997)(citing *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995)).

Edith has adduced evidence sufficient to support each of these four elements. In response, BCBSD raises a hodge-podge of defenses, including (i) Edith's claim is time-barred; (ii) Edith has failed to allege a prima facie case of age discrimination; and (iii) Edith has not established that the reasons for BCBSD's discrimination were pretextual. [DOB at 21-28]. These arguments are addressed below.

a.    EDITH'S AGE DISCRIMINATION CLAIM IS NOT TIME-BARRED

According to Blue Cross Blue Shield of Delaware, one of its discriminatory acts toward Edith – Paul Kaplan's 1999 negative evaluation of Edith's work performance – may not be the subject of an ADEA claim because it is time-barred. Thus, BCBSD claims that the charges that Edith filed with the Equal Opportunity Employment Commission and the Delaware Department of Labor were not timely and that Count I, to the extent it alleges age discrimination as a result of the 1999 employment evaluation is time-barred. [DOB at 21-22].

This claim should be rejected. First, although Edith does allege that Kaplan's negative 1999 employment evaluation of her was motivated in part[4] by her age, Edith's November 25, 2002 discrimination complaints to the DDOL and EEOC cited discrimination beyond the 1999 employment evaluation,[5] and her age discrimination claim asserted in Count I also encompasses BCBSD's conduct in demoting Edith, harassing Edith, and forcing Edith to retire. Hence, there is no basis for dismissal of Count I, which alleges violation of the ADEA. *See contra, Rush v. Scott Specialty Gases, 113 F.3d 476, 483 (3d Cir. 1997)*(ADEA claim dismissed where plaintiff

---

[4] It is, of course, possible for a jury to conclude that negative evaluation was the result of Kaplan's discriminating against Edith on the basis of her hearing disability, or simply the result of Kaplan's memory and/or personality issues. It will be for a jury to sort out BCBSD's motivation for its actionable conduct against Edith.

[5] That complaint also alleged hostile comments made by Kaplan, retaliation based on age and disability, Kaplan did not want a secretary in my condition, and - trying to fire her (Jane Israel asked for her retirement date), the demotion in January 2, 2002, and statements made at meeting that she made mistakes because she was deaf. [B0036-B0039].

did not allege any instances of discriminatory failure to promote and train after the 300 day statutory deadline).

Second, Kaplan's negative performance evaluation of Edith marked only the beginning of Kaplan's and BCBSD's persecution of Edith on age and disability grounds. Kaplan admitted that he did not consult with Edith's former supervisor prior to evaluating Edith's performance in 1999, and did not know that Edith had always had favorable reviews prior to 1999. [B0135]. Further, Kaplan admitted that though he changed Edith's 1999 evaluation at the behest of management, he was unhappy that Edith complained to Human Resources and that Human Resources requested that he change the evaluation. The unhappiness over this event as well as Edith's 2002 discrimination claim influenced Kaplan's and BCBSD's subsequent conduct toward Edith, and is thus inextricably intertwined with the actionable conduct of BCBSD which violated the ADEA. The 1999 employment evaluation will thus clearly be admissible at trial. *See Samuels v. Albert Einstein Med. Ctr.*, 1998 U.S. Dist. LEXIS 17320, 10-11 (D. Pa. 1998)(evidence of discriminatory conduct which is time barred may be relevant in certain circumstances).

Finally, the claim is not time-barred, but rather, as described above, is part of a continuing violation. Contrary to BCBSD's statement, discriminatory acts – even discrete ones – may be deemed part of a continuing violation. BCBSD's precise argument was rejected in *Dowd v. SEPTA*, 2006 U.S. Dist. LEXIS 30619 (D. Pa. 2006), where the court found that the alleged act claimed to be time-barred was not disparate from the non-time-barred claims, and applied the continuing violation doctrine to permit the claim. *Id.* at ** 12-13 (we cannot say that, as matter of law, the written reprimand cannot be part of a continuing violation)(citing *Davis v. Gen'l*

13

*Accident Ins. Co. of Am.*, Civ. A. No. 98-4736, 2000 U.S. Dist. LEXIS 17356, *6-8 (E.D. Pa. Dec. 1, 2000)).

Edith's ADEA claim, asserted in Count I of her Complaint is not time-barred, and BCBSD's Motion for Summary Judgment on that claim must be denied.

b.    A JURY WOULD REASONABLY CONCLUDE THAT EDITH WAS DISCRIMINATED AGAINST AS A RESULT OF HER AGE.

BCBSD next contends that Edith's ADEA claim fails as a matter of law because "Kaplan reassigned Choma because he believed her knowledge of NCQA could be better utilized to support Sweeney and that Carpenter's superior organization and time management skills were better suited to his needs..." [DOB at 23].

In addition to testifying to his pretext, (the NCQA affair), Kaplan told other BCBSD managers that he wanted to get rid of Edith because she could not hear, and then proceeded to "get rid" of Edith by replacing her with a younger secretary. Kaplan asseverated that he did not know that Carpenter was younger than Edith, but Carpenter is, in fact, Edith's junior by 14 years.

Accordingly, by simply offering the direct evidence of discrimination provided by Kaplan himself, Edith has demonstrated that BCBSD's reasons for demoting her, harassing her and constructively terminating her were "but a pretext for discrimination." *See Priller v. Town of Smyrna,* 430 F.Supp 2d 371, 381 (D. Del. 2006). The undisputed facts thus require that summary judgment be denied and that this case be submitted to a jury.

i. **Edith Has Proven Her Prima Facie Case Of Age Discrimination, and Has Demonstrated that BCBSD's NCQA Story Is But A Pretext for Kaplan's Having Gotten Rid of Edith in Favor of the Younger Carpenter.**

Kaplan, who suffers from memory loss and personality changes to the extent that he cannot practice medicine, and years after his brain injury still collects disability, did indeed

14

testify at his deposition that he sent Edith to work for Debbie Sweeney because of her NCQA experience. Kaplan told other BCBSD managers that he wanted to get rid of Edith because she could not hear. Kaplan told Edith that Patricia Carpenter had the NCQA expertise. [B0266-B0267].

Subsequent to making those statements, Kaplan "got rid" of Edith by demoting her to work for Sweeney. Kaplan replaced Edith with Patricia Carpenter, who, to Kaplan's apparent surprise, turned out to be Edith's junior by a mere 14 years. Kaplan nevertheless continued to demand that Edith work for him on non-NCQA functions, including transcription, even though transcription was not a part of Edith's job description, even though Edith struggled with transcription because of her hearing impairment and even though the younger Carpenter could have done the transcription.

Tellingly, neither Kaplan, nor anyone else at BCBSD attempted to justify Edith's demotion on NCQA grounds at the time of the demotion, further evidence that NCQA was a pretext, manufactured by BCBSD to defend the instant litigation. Indeed, Kaplan explained to Edith that he was "transferring" her to work for Sweeney because Edith "was good at schmoozing." [B0266, B0269-B0271; B0007-B0009]. Further proof that NCQA is a pretext comes from an August 7, 2002 electronic mail message from BCBSD's Human Resource Department's Donna May stating, "Dr. Kaplan informed me that with this change of management he intends to make no changes to your salary or 'status' as an Administrative Assistant. The only two changes that are taking place are your reporting structure of which will now be to Debbie Sweeney, Director of QA and your location to the QA department." [B0032]. This message nowhere explains that Edith is moving because she was experienced in the NCQA program. "An inference of pretext may arise if the plaintiff can raise suspicions with respect to

15

the defendant's credibility or the employer's treatment of the employee." *Fini v. Remington Arms Co.*, 1998 U.S. Dist. LEXIS 8261 (D. Del. 1998)(citing *Bray v. Marriott Hotels*, 110 F.3d 986, 990 (3d Cir. 1997)). Here, this inference, along with the other components of Edith's prima facie case would compel a jury to conclude that BCBSD was actually motivated by illegal bias. *See, id.*

The record also demonstrates that Patricia Carpenter, Edith's younger replacement as administrative assistant to Chief Medical Officer Kaplan, was knowledgeable about NCQA and could have handled those functions for Sweeney. [B0266-B0267].

In sum, there is ample evidence from which a jury would reasonably conclude that BCBSD's NCQA justification for demoting, harassing, and constructively terminating Edith Choma, (b. March 20, 1939), is but a pretext, and that BCBSD discriminated against Edith on the basis of her age. See *Blozis v. Mellon Trust of Del. Nat'l Ass'n*, 494 F. Supp. 2d 258, 269-270 (D. Del. 2007)(defendants' motion for summary judgment on plaintiff's age discrimination claim denied record demonstrated that management of plaintiff was not a model of clarity (i.e. here, dictation was not even in Edith's job description)); *Underwood v. Sears, Roebuck & Co.*, 343 F. Supp. 2d 259, 268 (D. Del. 2004)(summary judgment denied on ADEA claim where fact finder could reasonably determine that defendant's promotion determination was based subjectively on age rather than non-discriminatory reasons); *Brodsky v. Hercules, Inc.*, 966 F. Supp. 1337 (D. Del. 1997)(Summary judgment on ADEA claim denied where, although employer established legitimate reason for termination, employee provided sufficient evidence that he was qualified to work on other projects).

Because Edith has "produced sufficient evidence to raise a genuine issue of fact as to whether the employer's proffered reasons were not its true reasons for the challenged

16

employment action," summary judgment must be denied. *See Clancy v. Preston Trucking Co.*, 967 F. Supp. 806, 812 (D. Del. 1997)(quoting *Sheridan v. E. I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1071 (3d Cir. 1996), *cert. denied*, 117 S. Ct. 2532 (1997)).

III. **THE *DIRECT EVIDENCE* THAT BCBSD DISCRIMINATED AGAINST EDITH AS A RESULT OF HER DISABILITIES PRECLUDES ENTRY SUMMARY JUDGMENT OF HER DISABILITY CLAIM OR WARRANTS JUDGMENT IN HER FAVOR**

BCBSD next claims that this Court should grant summary judgment on Edith's disability claim because (i) Edith has failed to prove a prima facie case of disability discrimination; (ii) Edith cannot establish that BCBSD's purported reasons for its adverse employment actions were pretextual; and (iii) Edith failed to point to any reasonable accommodation. [DOB 28-31].

Edith's disability claim is the subject of Plaintiff's Motion for Partial Summary Judgment. The facts cited, and arguments made therein are incorporated herein by reference.

"To prove a prima facie case of discrimination under the ADA, the employee must demonstrate that he or she 1) has a disability, 2) is a qualified individual; and 3) has suffered an adverse employment action." *Zechman v. Christiana Care Health Sys.*, 2007 U.S. Dist. LEXIS 47349 (D. Del. 2007)(citing *Deane v. Pocono Medical Center*, 142 F.3d 138, 142 (3d Cir. 1998); *see also Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999)).

a. EDITH HAS PROVEN A PRIMA FACIE CASE OF DISABILITY DISCRIMINATION

For present purposes, Edith has proven a prima facie case of disability discrimination. BCBSD attempts to argue that Edith was not disabled by virtue of her hearing impairment or her wrist injury.[6] [DOB 29-30]. This argument must be rejected. First, with respect to her hearing impairment, Edith was diagnosed with Meniere's Disease. BCBSD and Kaplan knew of this diagnosis and of the debilitating symptoms, including permanent hearing loss and vertigo that

---

[6] The irony of BCBSD, no less the disabled Dr. Kaplan, asserting this defense will not be lost on the jury.

accompanied Meniere's Disease. [B0010-B0012; B0201-B0202, B0236-B0237]. Kaplan knew that Edith's hearing loss impeded her ability to take dictation. [B0033-B0035; B0130-B0131, B0159]. Indeed, Edith's decision to seek treatment for her hearing loss at Johns Hopkins. [B0010-B0013; B0236-B0237, B0238-B0240].

Notably, BCBSD argues that transcription was an "essential" duty of Edith's job and that "the transcription duties were part of Choma's job and an important part of the NCQA certification process." Kaplan even testified under oath that transcription "was part of Edith's job description." [Def. App. 397 (B0151)]. If this were true, one would expect "transcription" to be listed prominently in the written Job Description BCBS provided to Edith. [B0001-B0006]. The written Job Description makes no reference to "Transcription" or anything closely analogous to transcription. In light of this fact, BCBSD may not legitimately argue that it was "not required to change the *essential function*" of Edith's job. [DOB 31 (emphasis added)]. This evidence will permit the jury to draw the inference that not only was Edith disabled, but that Kaplan, in demanding that Edith do transcription, was deliberately discriminating against Edith for her disability.

With respect to the broken right wrist Edith suffered on Thursday, August 19, 2004, the evidence shows that Edith fell at her home on that date, was treated for a fractured wrist, was out of work on Friday, August 20, 2004, and returned to work at BCBSD with a cast on her wrist on Monday August 23, 2004. [B0045-B0046; B0284-B0287]. Between August 23 and August 25, 2004, Edith tried to type the Denial and Appeal Letters, and in fact did type them. She was, however, required to keep her right (and dominant) arm above her head, and could not type the letters fast enough to satisfy her then-boss Debbie Sweeney. [B0048-B0051; B0284-B0287; B0107-B0108]. Edith attempted to compensate by working through her lunch hour, but was

disciplined by Sweeney for working through lunch. Edith attempted to compensate by working overtime, but Sweeney denied Edith overtime compensation.[7]   Subsequently, on August 25, 2004, Edith's physician restricted Edith from doing tasks that involved using her right hand. [B0047].   Between August 28, and September 19, 2004, Edith was placed on Short Term Disability ("STD") for her wrist injury by BCBSD.  [B0052-B0053].  On September 20, 2004, the day Edith returned to work from her STD absence, her supervisor welcomed her back with email messages describing the Denial and Appeal letters that Edith had failed to complete. [B0054-B0055].

No less cynical than BCBSD's claims that Edith was not really disabled, is its contention that Edith did not request any accommodation.  In light of the fact that BCBSD forced Edith to do transcription in spite of her hearing impairment even though transcription was not a part of Edith's job description, it will be clear to the trier of fact that BCBSD was purposefully discriminating against Edith, and will corroborate the evidence that Kaplan indeed wanted to get rid of Edith because she could not hear.

To the extent that BCBSD seeks summary judgment on Edith's disability claim because she was neither disabled nor qualified to perform the essential functions of her job, these arguments must be rejected.

---

[7] The younger, and non-disabled administrative assistant, Christine Zakutny was routinely paid for overtime. [See Plaintiff's Response to Interrogatory No. 6].

b. BECAUSE EDITH HAS OFFERED DIRECT EVIDENCE OF DISABILITY
DISCRIMINATION BY BCBSD, EDITH NEED ONLY SHOW THAT THE
UNLAWFUL MOTIVE WAS A 'SUBSTANTIAL MOTIVATING FACTOR' IN
THE ADVERSE EMPLOYMENT ACTION

Dr. Kaplan told other managers at BCBSD that he wanted to get rid of Edith because she could not hear.[8]  Subsequently, he transferred Edith to work for the new BCBSD employee, Debbie Sweeney. In addition, BCBSD harassed Edith with public castigation, and unreasonable work demands.

Where, as here, the plaintiff puts forth *direct evidence* of discrimination, this Court will apply the "mixed motive" analysis to the discrimination claim. This means that Edith "need only show that the unlawful motive was a 'substantial motivating factor' in the adverse employment action." *Claycomb v. Playtex Prods.*, 2007 U.S. Dist. LEXIS 44769 (D. Del. 2007)(citing *Shellenberger v. Summit Bancorp*, 318 F.3d 183, 187 (3d Cir. 2003)).

For purposes of this inquiry, "'direct evidence' means evidence sufficient to allow the jury to find that "the decision makers placed substantial negative reliance on [the plaintiff's disability] in reaching their decision"'…. *Fakete v. Aetna, Inc.*, 308 F.3d 335, 339 (3d Cir. 2002)(quoting *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 976 (3d Cir. 1998)).  "Such evidence 'leads not only to a ready logical inference of bias, but also to a rational presumption that the person expressing bias acted on it' when he made the challenged employment decision." *Id.* (quoting *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1097 (3d Cir. 1995)).

The Third Circuit has held that the burden may be shifted with evidence of statements by a person involved in the decisionmaking process that reflect a discriminatory or retaliatory

---

[8] According to BCBSD, this "alleged statement is merely a confirmation that [Edith] was not meeting [Kaplan's] expectations." [DOB 31]. First, Kaplan's statement is not an allegation, it is an undisputed fact that entitles Edith to summary judgment. Second, whether Kaplan's statement that he wanted to get rid of Edith because she could not hear meant that Kaplan wanted to get rid of Edith because she could not hear, or rather was a euphemism for "Edith is not meeting my expectations," is a matter properly left to the finder of fact, the jury.

animus of the type complained of in the suit." *Fakete* at 339 (citing Hook v. Ernst & Young, 28 F.3d 366, 374 (3d Cir. 1994)). This is true "even if the statements are not made at the same time as the adverse employment decision, and thus constitute only circumstantial evidence that an impermissible motive substantially motivated the decision." *Id.* (citation omitted).

In *Fakete*, the employer stated that he was "looking for younger single people" and that, as a consequence, Fakete "wouldn't be happy [at the employer] in the future." The trial court dismissed the statement as "a stray remark that did not directly reflect the decisionmaking process of any particular employment decision," and dismissed the age claim there on summary judgment. The Third Circuit, believing that "a reasonable jury might disagree," reversed. *Id.* at 339-40.

Kaplan's statement here is analogous to the employer's statement in *Fakete,* and provides direct evidence of bias. A reasonable jury could easily find that Kaplan wanted to get rid of Edith because she could not hear. Thus, the burden shifting analysis under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), is unnecessary.

To the extent that Edith would be required to show that BCBSD's supposed "legitimate non-discriminatory reasons" for demoting Edith from administrative assistant to Kaplan, the Chief Medical Officer to administrative assistant to Sweeney, the Director for Quality Improvement, and otherwise harassing and constructively terminating her, [DOB at 31], those pretexts are addressed *supra* at 17-19 (Other secretaries were as involved in the NCQA project as Edith was, transcription was *not* part of Edith's job description, BCBSD did not come up with its NCQA explanation contemporaneously, but rather much later in connection with its defense of this litigation, *etc.*).

c.    BCBSD FAILED TO ACCOMODATE EDITH

BCBSD's next claim is that it was not required to accommodate Edith because "she was not protected under the ADA." Edith, however, was protected by the ADA, *see* discussion *supra* at 17-20. BCBSD could easily have accommodated Edith's symptoms from her Meniere's Disease, for example by having Christine Zakutny or Patricia Carpenter do the transcription (since it was not a part of Edith's job description) and could have accommodated Edith's broken wrist by having an able-bodied secretary, (again, Zakutny or Carpenter), type the Denial and Appeal Letters.

Indeed, although BSBSD claims that Edith never requested an accommodation for her hearing impairment, [DOB 30], the record reflects that Edith and BCBSD did agree on an accommodation: According to Kaplan, he and Edith "agreed that she would do the transcription in the best form she could and [Kaplan] would then have to fill in the blanks." [B0130-B0131; B0033-B0035]. Despite this "accommodation," BCBSD continued to complain about Edith's transcription and discriminate against Edith for her struggles with transcription.

BCBSD's duty to provide a reasonable accomodation was triggered when Edith put BCBSD    on    notice    that    an    accommodation    was    necessary.    *See Conneen v. MBNA Am. Bank, N.A.*, 182 F. Supp. 2d 370, 378-379 (D. Del. 2002)(citing *Jovanovic v. in- Sink-Erator*, 201 F.3d 894, 899 (7th Cir. 2000)). Here, BCBSD clearly knew of both Edith's disability and her desire for accommodations for her disability, *see Taylor v. Phoenixville School District*, 184 F.3d 296, 313 (3d Cir. 1999). While BCBSD purported to accommodate Edith's disability, BCBSD failed to actually do so.

For all of these reasons, BCBSD's motion to dismiss Edith's disability claim must be denied.

## IV.    THE DIRECT EVIDENCE THAT BCBSD RETALIATED AGAINST EDITH AS A RESULT OF HER HEARING DISABILITY PRECLUDES SUMMARY JUDGMENT ON HER  RETALIATION CLAIMS

BCBSD next seeks dismissal of Edith's claim that BCBSD harassed and took other adverse employment actions against her in retaliation for her having asserted her rights under the ADA and the ADEA. Specifically, BCBSD propounds its familiar arguments that Edith has failed to allege a prima facie case of retaliation and has failed to demonstrate that its proffered reasons for its employment actions were pretextual.  [DOB 32-34].  These arguments must be rejected, and summary judgment on Edith's retaliation claim must be denied.

"The ADA retaliation provision, 42 U.S.C. § 12203(a), states that 'no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge . . . under [the ADA].'" *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997).

"[A] prima facie case of retaliation under the Rehabilitation Act requires the plaintiff to show (1) he or she was engaged in protected activity; (2) the alleged retaliator knew the plaintiff was involved in protected activity; (3) adverse action was taken by the employer either after or contemporaneous with the employee's protected activity; and (4) a causal connection exists between the protected activity and the adverse action." *Houlihan v. Sussex Tech. Sch. Dist.*, 461 F. Supp. 2d 252, 257 (D. Del. 2006)(describing elements of retaliation under Rehabilitation Act which are same as under ADA)(citing *Krouse*, 126 F.3d at 500).

In Count VII of her Complaint, Edith alleges that BCBSD retaliated against her for complaining to BCBSD Human Resources, the EEOC and the DDOL by (i) refusing to pay her appropriate bonuses; (ii) demoting her to work for Sweeney the Director of Quality Improvement, from Kaplan, the Medical Director; (iii) banishing her to a dilapidated cubicle in

deplorable condition; (iv) refusing to accommodate her hearing and other disabilities; (v) harassing her by yelling at her in public and by placing unreasonable work demands and performance improvement plans upon her; and (vi) ultimately forcing her into retirement.

BCBSD moves for summary judgment of this claim on the sole grounds that Edith has "not proved a causal connection to her charge filed twenty months earlier. . . "[9]  [DOB 33]. Evidently, BCBSD has framed Edith's retaliation claim as an allegation that BCBSD retaliated against Edith for her November 25, 2002 discrimination claim with the EEOC. This, however, is but a part of Edith's retaliation claim. Indeed, Edith engaged in protected activities when she complained to Human Resources about her 1999 employment evaluations, when Kaplan took her aside and told her (1) "I can't stand the way you lift up your glasses to see the screen!"; (2) "Maybe it's your Thyroid"; (3) "Maybe the blood isn't getting to your brain!"; and (4) "You know the saying 'Kick the Dog', that's why I treat you the way I do!"  [Complaint at ¶13; B0204-B0226].[10]

The fact that Edith reported Kaplan to HR (a protected activity), and the fact that HR required Kaplan to change his evaluation of Edith as a result of that report angered Kaplan, and from that point on, a jury might infer that the adverse employment actions to which Edith was subjected were retaliatory. Likewise, Edith engaged in protected activity when she filed her discrimination claims on November 25, 2002 and again on October 22, 2004.

BCBSD's contention that Edith has failed to prove a causal connection must be rejected. "The Third Circuit has recognized that 'temporal proximity between the protected activity and the [adverse employment action] is [itself] sufficient to establish a causal link'." *Houlihan v.*

---

[9] BCBSD thus concedes that Edith was engaged in protected activity, that BCBSD knew she was engaged in protected activity and that the acts alleged to have been retaliatory were, in fact adverse employment actions.

[10] These are disputed material facts. Although Kaplan denies making these statements [Kaplan 106-108], after their meeting, Edith reported Kaplan to the BCBSD the Human Resources Department. [Choma 101-119; Kaplan 84-89].

*Sussex Tech. Sch. Dist.*, 461 F. Supp. 2d 252, 259 (D. Del. 2006) (quoting *Shellenberger v.*

*Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003). Temporal proximity, however, is

"insufficient to establish the necessary causal connection, unless the temporal relationship is

'unusually suggestive.'" *Id.*  (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d

Cir. 2000)). For example, the fact that BCBSD placed Edith on her PIP, on October 29, 2004

exactly one week after October 22, 2004 when Edith had a "blow-up" with Sweeney and filed a

second discrimination and retaliation claim with the DDOL and EEOC.

In *Krouse*, the Third Circuit explained that temporal proximity is not the *sine qua non* of

a causal connection:

> The "mere passage of time is not legally conclusive proof against retaliation.". . .
> When temporal proximity between protected activity and allegedly retaliatory
> conduct is missing, courts may look to the intervening period for other evidence
> of retaliatory animus. For example, in SEPTA, we stated: "The temporal
> proximity noted in other cases is missing here and we might be hard pressed to
> uphold the trial judge's finding [of causal link] were it not for the intervening
> pattern of antagonism that SEPTA demonstrated."

*Krouse v. American Sterilizer Co.*, 126 F.3d 494, 504 (3d Cir. 1997)(quoting, *inter alia,*

*Robinson v. Southeastern Pa. Transp. Auth.*, 982 F.2d 892, 894-95 (3d Cir. 1993)). In *Krouse,*

the Court of Appeals upheld dismissal of the retaliation claim because the plaintiff failed to offer

any "evidence of intervening antagonism or retaliatory animus" between the time of the

protected activity and the retaliatory act.

Here, however, the record is full of evidence of antagonism and retaliatory animus from

the time of Kaplan's 1999 performance evaluation of Edith until BCBSD constructively

terminated Edith in February of 2005. For example, throughout her employment at BCBSD,

Kaplan continued to give Edith transcription and continued to complain about her transcription,

even though he knew that her hearing impairment impeded Edith from doing transcription. In

March 2000, Kaplan disciplined Edith for a confrontation with a temporary employee and noted areas in which Edith's performance needed improvement. [B0021]. In May 2001, Kaplan complained about Edith's sick time. [B0022]. In May 2002, Kaplan prohibited Edith from attending a financial planning seminar, purportedly on the ground that her work was not completed. [B0031;B0241-B0247]. In January 2003, Sweeney and Edith had a disagreement over Edith's performance evaluation. The Department of Labor's October 21, 2003 Notice of Reasonable Cause Finding also contributed to the antagonism and animus that pervaded Edith's employment at BCBSD between 1999 and 2005. [B0040-B0041]. Finally, the events of 2004, including the public "blow-up" between Edith and Sweeney, [B0080-B0082; B0290-B0293], the incident in which Sweeney singled Edith out for a public tongue-lashing when Edith and a group of co-workers returned from lunch a half hour late, the timing of Edith typing Denial and Appeal Letters while Edith had a broken wrist, the PIP and the enforcement of the PIP are further evidence of antagonism and animus.

A causal connection between Edith's protected activities and BCBSD's retaliatory actions has been proven. The motion for summary judgment on Edith's retaliation claim must be denied.

## V.    A JURY WOULD REASONABLY FIND THAT BCBSD CONSTRUCTIVELY DISCHARGED EDITH

In *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 888 (3d Cir. 1984), the Third Circuit held that no finding of a specific intent on the part of the employer to bring about a discharge is required for the application of the constructive discharge doctrine. The court need merely find that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign.

Thus, under the applicable law, Edith, even though she voluntarily resigned, may maintain a case of constructive discharge because BCBSD's discriminatory conduct created an atmosphere that was the constructive equivalent of a discharge. *See Sheridan v. E.I. Dupont de Nemours & Co.*, 100 F.3d 1061, 1075 (3d Cir. 1996)(citing *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1079 (3d Cir. 1992)). This Court applies "an objective test to determine whether 'the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign.'" *Id.* (quoting *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1084 (3d Cir. 1996)); Goss, 747 F.2d at 888.

Applying that standard to the evidence described above, beginning with Kaplan's performance evaluation of Edith in 1999, and the associated discriminatory rant; to his statements that he wanted to get rid of Edith because she could not hear, to the demotion to working first for Sweeney, and then for Kaplan's secretary, to the public castigations, to the timing of Edith's typing of denial and appeal letters, to the PIP to the Six Minute Incident of November 1, 2004, it is clear that a reasonable jury could and would find that BCBSD "knowingly permitted conditions of discrimination so intolerable that a reasonable person subject to them would resign." The motion for summary judgment should be denied so that this claim may be heard and decided by a jury.

## VI.    COUNT IX: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

In light of the strength of Edith's claims under the ADEA, the ADA, and for retaliation and constructive termination, as discussed *supra*, and in an effort to narrow the issues for trial, Edith does not oppose summary judgment as to Count IX.

## CONCLUSION

For all the foregoing reasons, Edith Choma respectfully requests that Defendant's Motion

for Summary Judgment be denied.

MARGOLIS EDELSTEIN

/s  **_Herbert W. Mondros_**
Herbert W. Mondros, Esq. (Del. No. 3308)
750 South Madison Street, Suite 102
Wilmington, DE 19801
302.888.1112
Attorneys for Plaintiff

Dated: October 30, 2007

# TAB 1

6 of 13 DOCUMENTS

**ERNEST O. FINI, JR., Plaintiff, v. REMINGTON ARMS COMPANY, INC., Defendant.**

**C.A. No. 97-12-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*1998 U.S. Dist. LEXIS 8261*

**May 27, 1998, Decided**

**NOTICE:**        [*1]    FOR ELECTRONIC PUBLICATION ONLY

**DISPOSITION:**    Defendant's motion for summary judgment and plaintiff's motion for partial summary judgment denied.

**COUNSEL:** Thomas S. Neuberger, Esquire, Wilmington, Delaware, for plaintiff.

William J. Rodgers, Esquire, and John P. Lohrer, Esquire, Of Counsel, Collier, Shannon, Rill & Scott, PLLC, Washington, D.C., for plaintiff.

Kathleen Furey McDonough, Esquire, and Jennifer Gimler Brady, Esquire, of Potter Anderson & Corroon, Wilmington, Delaware, for defendant.

Allan L. Shackelford, Esquire, and Alexander L. Maultsby, Esquire, Of Counsel, Smith, Helms, Mulliss & Moore, L.L.P., Greensboro, North Carolina, for defendant.

**JUDGES:** Sue L. Robinson, District Judge.

**OPINION BY:** Sue L. Robinson

**OPINION**

**MEMORANDUM OPINION**

Dated: May 27, 1998

Wilmington, Delaware

Sue L. Robinson

**District Judge**

**I. INTRODUCTION**

Plaintiff Ernest O. (Bud) Fini ("Fini"), a Pennsylvania resident, filed this action on January 8, 1997 against defendant Remington Arms Company, Inc. ("Remington"), a Delaware corporation, asserting a claim under the Age Discrimination in Employment Act ("ADEA"), *29 U.S.C. § 621 et seq.* (D.I. 1, 5) Plaintiff alleges generally that he was [*2] terminated from his job as Group Manager for Marketing and Communications because of his age, in violation of the ADEA. (D.I. 1, 5) Plaintiff also asserts state law claims under the doctrines of promissory and equitable estoppel as well as for wrongful discharge in violation of the implied covenant of good faith and fair dealing. Currently before the court is defendant's motion for summary judgment. (D.I. 46) Also before the court is plaintiff's motion for partial summary judgment on his claim for age discrimination. (D.I. 49) The court has jurisdiction pursuant to *28 U.S.C. § 1331* and *§ 1332.* The court has supplemental jurisdiction over the state law claims pursuant to *28 U.S.C. § 1367.*

For the reasons stated below, defendant's motion for summary judgment and plaintiff's cross motion for partial summary judgment shall be denied.

**II. BACKGROUND**

Prior to his termination, plaintiff had been employed by defendant Remington since 1976. At the time of the challenged employment action, plaintiff served as Group Manager, Marketing Communications ("MCD"), a position he had held since 1991. In this position, he was responsible for supervising the other members of MCD; planning [*3] and attending promotional and public relations events; working on the Remington catalog and a publication entitled "Remington County"; and working on "advertising for the various business units . . ., on promotional publications, on press relations, on consumer services and merchandising for preferred customers, and on conservation services." (D.I. 51 at 64A) In

1995, plaintiff's base salary was approximately $ 100,000 annually; that year he also received a bonus of $ 44,000. (D.I. 48 at A93, A97) Fini was 51 or 52 years of age at all times relevant to this action.

Prior to December 1, 1993, Remington was owned by E.I. DuPont de Nemours & Company. On December 1, 1993, RACI Acquisition Corp. ("CD&R"), which was owned by investors at Clayton Dubilier & Rice, purchased Remington as part of a leverage buyout. Following the buyout, a new senior management team, led by Thomas Millner as president, was installed at Remington. Other members of the team included Bob Euritt, Vice President, Human Resources, and Robert Haskin, Vice President and General Counsel. (D.I. 51 at 1A-5A)

Following the buyout, Fini initially reported directly to Millner from whom he generally received positive comments [*4] about his performance. According to Fini, in late March 1995 during the IWA trade show in Germany, he had what amounted to an informal "mini-review" with Millner. (D.I. 48 at A91-92) Although he did not remember Millner's exact words, he recalled being "very, very happy with [Millner's] response in terms of [his own] personal performance, as well as the group's." (D.I. 48 at A92) Subsequently, the plaintiff received a more formal review during which, according to Fini, Millner told him he was a "highly valued employee, did an exceptional job with his people, performed a valuable function for the company, was able to carry his own weight with the CD&R people and should look forward to a long future with the Remington Arms Company." (D.I. 48 at A77; D.I. 51 at 7A) According to Fini, when he asked Millner whether his was "carrying his own weight with the new company," Millner responded that Fini was a "valuable member of the team, doing outstanding work, outstanding relationship with his people, budgetarily responsible. Don't have to change

I told him I wouldn't accept the job. Nothing that he had done wrong or what they were offering but that I felt that CD&R, based on the bonus I had just received, based on their projections for the company, the way they were handling things at that point in time, I felt better served by continuing my 20 years' service, or 19 at that point in time, here and I appreciated his offer but [it] just wasn't the right time to make the change. I thought I would be long-term better off to remain with Remington. . . . I had had a mini review with [Millner] at the IWA show . . . and I used that as a basis for judgment.

(D.I. 48 at A91-92)

Following the IWA show, Fini talked with an [*6] Italian firearms company, Perazzi USA, regarding employment. (D.I. 48 at 93-95) A verbal offer of employment was made, but it was never followed up by a formal, written proposal. (D.I. 48 at A95) According to Fini, even if he had received a formal offer of employment, he would have turned it down "based on [Millner's] interview and the bonus." [2] (D.I. 48 at A96)

2    Fini indicated during his deposition that talks with Perazzi are still ongoing: "We're still talking to this day about my employment at Perazzi." (D.I. 48 at A96)

In the spring of 1995, Haskin, who had no formal marketing training, assumed responsibility for the entire marketing arm of Remington, including MCD. Effective April 6, 1995, Fini was to report to Haskin. (D.I. 48 at A221; D.I. 51 at 6A) By the fall of 1995, MCD was

MCD. (D.I. 48 at A225) Subsequently, Haskin elimi- nated these two functions from MCD as well as the man- ager positions associated with these groups, thereby re- sulting in the termination of Rosendahl and Heath. (D.I. 48 at A141; D.I. 51 at 99A) At the time of their termina- tions, Rosendahl and Heath were 50 and 59 years of age, respectively. (D.I. 51 at 8A, 79A) Following their termi- nations, Rosendahl obtained a position with Remington's computer group and Heath was made a consultant re- tained by Remington on a contract [*8] basis. (D.I. 51 at 99A-100A) Haskin also discharged Wreden in March 1996. (D.I. 51 at 101A) Wreden was 46 years of age at the time of his termination. (D.I. 51 at 8A, 79A)

Also in August 1995, Millner circulated a memoran- dum to Haskin, among others, indicating that Remington was experiencing an economic crisis, the result of a slowdown in the marketplace beginning in March 1995, that required "drastic action." (D.I. 48 at A186-87, A229- 30) The plan called for "reductions in travel, people, ex- penses, consultants, overtime, outside contractors, and new hires." (D.I. 48 at A229; A226-28)

Among the decisions made by the new management team was to move the company to North Carolina. This decision was formally announced to all Remington em- ployees on or about mid-September 1995.

During a business trip with Millner in September 1995, Fini asked for Millner's impression concerning the recommendations he had made regarding which of the MCD personnel should receive offers to go to North Carolina. (D.I. at A80) According to Fini, Millner indi- cated that, with the exception of one employee, the rec- ommendations he had made had been accepted: "You and all your people are getting letters and are [*9] being invited to North Carolina. There will be no reason not to do that. You're all doing a great job. We look forward to having you down there." (D.I. 48 at A80, A118; D.I. 51 at 9A) Millner testified that he did not recall having such a conversation with Fini. (D.I. 51 at 114A)

On October 3, 1995, Fini met with Haskin and re- ceived the notification letters regarding the move to North Carolina. (D.I. 48 at A119) No mention of Fini's status was made at the meeting. (D.I. 48 at A119) Three days later, on October 6, 1995, Fini asked Euritt whether Euritt knew if he (Fini) was to be invited to go to North Carolina. (D.I. 48 at A120) Euritt replied that Haskin had told him not to prepare such a letter for Fini. (D.I. 48 at A120) Later that same day, Fini questioned Haskin about the move. (D.I. 48 at A120) Haskin indicated that it was his expectation that Fini would not be needed in his cur- rent capacity any longer. [3] (D.I. 48 at A120, A234) Has- kin informed Fini that "the best case was that [Fini] could stay with the company until [it] moved in June, or in the worse case [he] could probably stay until the first

of the year." (D.I. 48 at A121, A234) Haskin also asked Fini to supply [*10] him a list of positions within Rem- ington for which Fini felt he was qualified, should the decision be made to continue Fini's employment. [4] (D.I. 48 at A120, A234) Haskin also requested that Fini advise him on how to restructure MCD. [5] (D.I. 48 at A120, A234)

> 3   According to Haskin, the decision to eliminate Fini's position was based on his belief that Fini
>
>> was [not] performing a neces- sary or valuable function for the organization. In my judgment, the group could be reorganized with- out [Fini's] supervisory position in place and would be more efficient and more economical as a result. . . . The supervisory tasks were largely eliminated. The need for the tasks in large part didn't exist, in my view. To the extent that on- going supervisory responsibility did exist, that responsibility would have fallen to me. Recognize you're talking about a function that is supervising a very small group. It was no longer a nineteen-man operation. It was--it was a handful of people for which we had three levels of management. In my view, that simply was not good business. It wasn't necessary. It wasn't productive. It wasn't effi- cient. It certainly wasn't cost- effective.
>
> (D.I. 48 at A159-60)

[*11]

> 4   In his response, Fini documented his 19-year employment history with Remington, listing some of his most significant accomplishments. (D.I. 48 at A231) He did not, however, speculate as to what positions he might be qualified osten- sibly because he was unsure of what jobs within Remington were to be retained. (D.I. 48 at A231)
>
> 5   Haskin contends that Fini did not respond to this request. Fini testified, however, that he ap- proached Haskin the Monday after the meeting and told Haskin that he saw no need to change MCD. (D.I. 48 at A47) According to Fini, Has- kin's response was: "You're right. One of the rea- sons I'm eliminating you is that your people are

1998 U.S. Dist. LEXIS 8261, *

so good, they don't need you anymore." (D.I. 48 at A47)

On October 19, Haskin met with Fini because he had heard that Fini was expressing his dissatisfaction with Remington both within and without the company, indicating that he would soon be leaving Remington's employ. (D.I. 48 at A234) Haskin reiterated that Fini would not be receiving an invitation at this time, but that a final decision had not yet been made regarding him. (D.I. 48 at [*12] A121, A234) Haskin also indicated that Fini should continue with his duties and that he would be discussing the reorganization of MCD, and Fini's possible role within it, at some point in the future. (D.I. 48 at A121; D.I. 55 at 52B)

Haskin and Euritt met with Fini again on October 25, 1995 to discuss an expense report of Fini's which did not conform with, and had been filed in violation of, company policy. (D.I. 48 at A235, A222) At the conclusion of the meeting, Haskin asked Fini to complete several projects he had been assigned previously. (D.I. 48 at A235) Haskin told Fini he would give further consideration to the expense account incident. (D.I. 48 at A235)

Within hours after this meeting, Haskin learned that Fini was telling people outside the corporation he would be fired within a few days. (D.I. 48 at A235) Haskin, Euritt, Fini and Fini's attorney (by phone) met to discuss Fini's conduct. (D.I. 48 at A235) Fini was instructed that his behavior was destructive to the company and that, with the exception of his wife and attorney, he wasn't to speak with anyone regarding his situation. (D.I. 48 at A235) He was informed that effective the following week Wreden, Fine, Wohl, and [*13] Miller would not be reporting to him, but instead would be reporting to either Haskin or another Remington employee, and that he was to prepare a list of his current projects as well as a time line for their completion. (D.I. 48 at A235) Fini complied with this latter request later that day. (D.I. 51 at A10A)

In January 1996, Fini attended the SHOT show, an industry-wide trade show. Prior to the beginning of the show, Haskin had informed Fini that Fini would not be attending the show; therefore, Fini attended not as a Remington representative but "in order to remain visible within the industry." (D.I. 55 at 68B) In order to attend the show, Fini needed an official SHOT show badge, which he obtained from George Beauregard of Beauregard Company. (D.I. 55 at 68B) According to Fini, once Remington's executive vice president and director of international sales knew he would be attending the show, he was asked to meet with Remington's international customers at Remington's international booth, which he willingly did. (D.I. 55 at 69B) Haskin considered Fini's "wearing the name badge of another organization and standing adjacent to and outside the Remington booth space throughout the course [*14] of the show" to be both inappropriate and unprofessional. (D.I. 48 at A170-72)

Following the SHOT show, Haskin concluded that he was unable to find an opening for Fini within Remington. (D.I. 48 at A170-72) According to Haskin, "as of that date [Fini] had burned sufficient bridges that there was no possibility that [he] was going to retain [Fini] within the organization." (D.I. 48 at A169) On January 31, 1996, Haskin informed Fini that he had decided to accelerate Fini's phase-out to two weeks from that date, February 15. (D.I. 51 at 15A)

Following Fini's termination, Wohl, Fine, and Wreden reported directly to Haskin. Kurek, Davis, and Haldas continued to report to Wreden. However, by June 1996, MCD had been completely restructured. Wreden was terminated in March 1996, and Haldas was moved to a unit outside MCD. (D.I. 48 at A195-96, A212) Miller's position was eliminated after she opted not to move to North Carolina. (D.I. 48 at A210-211, A236-38) Davis was not offered a position in North Carolina and her position was eliminated. (D.I. 48 at A199, A210-11) Finally, Kurek was replaced by Becky Lipovan. (D.I. 48 at A236-38)

Effective April 1, 1996, Mark Noyes, age 36, was hired [*15] as Manager, Marketing Services at a salary of $ 2916.67 semi-monthly. (D.I. 51 at 16A, 27A) Noyes reported directly to Haskin, and Mark Fisher, Marketing Assistant, and Amber Colley, a new-hire, reported to Noyes. (D.I. 48 at A196, A236-38) Colley also reported to Phil Murdock, who had been hired in 1995 at age 27 to supervise Remington's sponsorship of a NASCAR stock car racing team, a project Fini had developed and for which he had been responsible. (D.I. 51 at 96A-97A) Noyes' responsibilities included most of Fini's former budget duties as well as the majority of Fini's duties for advertising and promotions, including preparation of Remington's catalog (initially these latter duties had been assumed by Wreden). (D.I. 48 at A148-49, A193-94)

The remainder of Fini's former duties were either further delegated or eliminated. Fini's supervision of conservation services was ended when Heath was terminated. Jerry Guiliano assumed responsibility for planning and attending trade show events, and Wohl became Remington's representative at celebrity events. [6] (D.I. 48 at A149-50)

> 6  With respect to Fini's press relations function, an organizational chart prepared by Noyes approximately two weeks after he was hired based on his understanding of his job responsibilities indicated that he was responsible for supervising

1998 U.S. Dist. LEXIS 8261, *

Remington's press personnel, i.e., Fine and Wohl. (D.I. 51 at A28-29) However, Noyes testified that he never managed these individuals. (D.I. 51 at 148A)

At some point after he was hired, Noyes received a copy of the memorandum Fini had prepared detailing his job responsibilities. Noyes could not recall who gave him the memorandum although he assumed it was Haskin since the memorandum was initially to Haskin.

[*16] **III. STANDARD OF REVIEW**

Summary judgment should be granted only if the court concludes that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(c)*. The moving party bears the burden of proving that no genuine issue of material fact is in dispute. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)*. Once the moving party has carried its initial burden, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id. at 587* (quoting *Fed.R.Civ.P. 56(e)*). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995)* (citations omitted). If the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, the moving party is entitled [*17] to judgment as a matter of law. *See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. The mere existence of some evidence in support of the nonmoving party will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that factual issue. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. This court, however, must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995)* (citation omitted). With respect to summary judgment in discrimination cases, the court's role is "'to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff.'" *Revis v. Slocomb Industries, Inc., 814 F.*

*Supp. 1209, 1215 (D. Del. 1993)* (quoting *Hankins v. Temple* [*18] *Univ., 829 F.2d 437, 440 (3d Cir. 1987))*.

**IV. DISCUSSION**

Currently before the court are the parties' cross-motions for summary judgment. In its motion for summary judgment, defendant asserts that plaintiff has not offered sufficient evidence to suggest that its proffered legitimate, nondiscriminatory reason is a pretext for discrimination. Defendant also asserts that plaintiff lacks sufficient evidence to prove his promissory estoppel and equitable estoppel claims as well as his claim for breach of implied covenant of good faith and fair dealing. In his cross motion, plaintiff asserts that he has proffered direct evidence of age discrimination, which entitles him to the burden shifting framework of the mixed motive mode of analysis, and that defendant is unable to meet its burden. The court will address the issues *seriatim*.

**A. Age Discrimination** [7]

> 7    Regardless of whether there exists a genuine issue of material fact with respect to one of the two modes of analysis, plaintiff may present his case under both theories at trial. *See Armbruster v. Unisys Corp., 32 F.3d 768, 781-82 n.17 (3d Cir. 1994)*.

[*19] As applicable to the present case, the ADEA states that "it shall be unlawful for an employer . . . to discharge any individual . . . because of such individual's age. *29 U.S.C. § 623(a)(1)*. Claims brought under the ADEA are subject to the same burden-shifting framework as those brought pursuant to Title VII of the Civil Rights Act of 1964. *See Miller v. CIGNA Corp., 47 F.3d 586, 592 (3d Cir. 1995)* (en banc). Thus, the plaintiff may present either direct evidence of discriminatory intent under *Price Waterhouse v. Hopkins, 490 U.S. 228, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989)* ("mixed motives" cases) or indirect evidence of discrimination under the framework of *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)* and *Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)* ("pretext" cases). Under both analyses, the plaintiff must first state a *prima facie* case of discrimination. With respect to a suit under the ADEA, the plaintiff can do so by showing by a preponderance of the evidence that: (1) he is over 40; (2) he was qualified for the position in question; (3) he suffered an adverse [*20] employment decision; and (4) he was replaced by a sufficiently younger person to create an inference of age discrimination. *See Sempier v. Johnson & Higgins, 45 F.3d 724, 728 (3d Cir. 1995)*. The burden of proof, however, varies depending on whether the case is characterized as being a "pretext"

or mixed motives" case. *See Price Waterhouse, 490 U.S. at 246-48.*

### 1. Pretext

In pretext cases, once the plaintiff has established a *prima facie* case of employment discrimination, the burden of production shifts to the defendant who is then required to articulate a legitimate, nondiscriminatory reason for the challenged employment action. *See McDonnell Douglas, 411 U.S. at 802-03; Burdine, 450 U.S. at 252-55; Bray v. Marriott Hotels, 110 F.3d 986, 990 (3d Cir. 1997).* The defendant need only present enough evidence, which if taken as true, raises a genuine issue of fact "as to whether it discriminated against the plaintiff." *Burdine, 450 U.S. at 254-55.* If the defendant is successful in meeting its burden of production, the presumption of discrimination created by the *prima facie* showing drops from the case, and

> the plaintiff must produce evidence [*21] from which a reasonable factfinder could conclude either that the defendant's proffered justifications are not worthy of credence or that the true reason for the employer's act was discrimination. The plaintiff must:

>> demonstrate such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence" and hence infer "that the employer did not act for [the asserted] nondiscriminatory reasons."

Otherwise, the employer is entitled to judgment as a matter of law.

An inference of pretext may arise if the plaintiff can raise suspicions with respect to the defendant's credibility or the employer's treatment of the employee. The inference, along with the components of the plaintiff's prima facie case, allow a jury to conclude that the employer was actually motivated by illegal bias, but it does not compel that result. Moreover, the plaintiff cannot prevail under Title VII

merely by establishing that the employer made a decision that was wrong or mistaken.

*Bray, 110 F.3d at 990* (citations omitted). At all times, [*22] the ultimate burden of persuading the trier of fact of the defendant's discriminatory intentions remains with the plaintiff. *See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993).*

In the instant action, defendant does not dispute that plaintiff has proffered sufficient evidence to establish a *prima facie* case of age discrimination. [8] Defendant, however, has come forward with evidence which, if taken as true, demonstrates that there was a legitimate, nondiscriminatory reason for the decision to discharge plaintiff; that is, plaintiff's position was eliminated as part of the overall restructuring and downsizing of MCD in the face of economic hardship.

> 8   Specifically, defendant states that it "may not and does not base its motion on a failure by the plaintiff to produce evidence to support a prima facie case." (D.I. 47 at 25)

In reply, plaintiff contends that he has proffered evidence sufficient to create a genuine issue of material fact by demonstrating that [*23] defendant's putative justification is unworthy of credence and that age-related animus in fact motivated the decision to terminate him. Plaintiff first points to the lack of contemporaneous documentation, i.e., organizational charts, job discrimination documents, and business plans, identifying **specifically** when or how plaintiff's job was to be eliminated. He also identifies inconsistencies in the organizational charts proffered by defendant. Second, he identifies alleged inconsistencies in defendant's position regarding when and on what bases the decision was made to eliminate his job. Third, plaintiff contends that there are inconsistencies in defendant's contention that his position was in fact eliminated. Specifically, he identifies Noyes, a younger new-hire, as assuming the great majority of his job functions. Finally, plaintiff interprets statements made by Haskin during his deposition testimony as demonstrating that Haskin's dissatisfaction was not with plaintiff's position but with plaintiff himself. In addition, plaintiff contends that Haskin stated he would "fire all the old Remington people if he could." [9] (D.I. 51 at 137A) This evidence is sufficient to cast doubt [*24] on defendant's position that it fired plaintiff as part of a restructuring/downsizing. Given the dearth of objective, contemporaneous evidence, the court concludes that a factfinder reasonably could infer from the evidence that defendant's proffered nondiscriminatory reason "was either a post hoc fabrication or otherwise did not actually

motivate the employment action (that is, the proffered reason is pretext)." *Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994); see also Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1072* (3d Cir. 1996 (en banc). Accordingly, defendant's motion for summary judgment with respect to plaintiff's claim of age discrimination shall be denied.

> 9    The parties dispute the meaning of the phrase "old Remington people." Plaintiff contends that the phrase refers to Remington's older (with respect to age) employees, whereas defendant argues that it refers to those employees who worked for Remington prior to the leverage buyout.

## 2. Mixed Motives

In a mixed motives [*25] case under *Price Waterhouse*, once the plaintiff has produced direct evidence that an illegitimate criterion was a motivating factor in the employment decision, both the burden of production and the burden of persuasion shift to the defendant. *See id., 490 U.S. 228 at 277.* The defendant then must show by a preponderance of the evidence it would have made the same employment decision regardless of its discriminatory animus. *See id. at 244-46.* To come within the *Price Waterhouse* framework, the evidence presented by the plaintiff "must directly reflect a discriminatory . . . animus on the part of a person involved in the decision making process." *Armbruster v. Unisys Corp., 32 F.3d 768, 778 (3d Cir. 1994); see also, Ostrowski v. Atlantic Mutual Ins. Cos., 968 F.2d 171, 182 (2d Cir. 1992).* "'Direct evidence is evidence which, if believed, proves the fact without inference or presumption.'" *Nixon v. Runyon, 856 F. Supp. 977, 983 (E.D. Pa. 1994)* (quoting *Brown v. East Miss. Elec. Power Ass'n, 989 F.2d 858, 861 (5th Cir. 1993)); Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1223 (11th Cir. 1993)* ("Evidence [of discrimination] is direct when it is sufficient [*26] to prove discrimination without inference or presumption."). Thus, if a plaintiff's "'evidence is directly tied to the forbidden animus, for example[,] policy documents or statements of a person involved in the decisionmaking process that reflect a discriminatory or retaliatory animus of the type complained of in the suit, that plaintiff is entitled to a burden-shifting instruction.'" *Starceski v. Westinghouse Elec., Corp., 54 F.3d 1089, 1097 (3d Cir. 1995)* (quoting *Ostrowski, 968 F.2d at 182*).

In his motion for partial summary judgment, plaintiff contends that he has direct evidence of age-based discrimination. Plaintiff purports to find this evidence in the deposition testimony of Haskin:

Q: I think you also testified that you believe that -- Strike that.

Did you ever consider Bud Fini not sufficiently productive?

A. Yes. Sir.

Q. And what was the basis for that feeling?

A. In my opinion Bud Fini **retired years ago and never bothered to tell anybody.**

Q. What do you mean by "retired years ago"?

A. Bud Fini undoubtedly at some point in his career was a productive employee. During the time period that I was responsible for the supervision [*27] of Bud Fini, in my judgment, Bud Fini's primary focus was hobnobbing with the rich and famous and attending trapshoots. That was his primary goal in life. And that, in my opinion, is less than productive.

\* \* \*

Q. Mr. Haskin, you testified to your belief that Mr. Fini had retired years ago but not bothered to tell anybody. . . . What do you mean by that phrase?

A. Whatever zeal or ambition, dedication, driving force of any nature that was behind Bud Fini, in my opinion, had been sidestepped by him at some period of time prior to the spring of 1995 when I became responsible for him and his group. I believe that Bud Fini held a great deal of knowledge that was beneficial to the organization. I believe that Bud Fini had the potential to be a productive employee. I also came to believe that **Bud Fini had been in the position so long that he was no longer effective in that position** and that the only hope that we had to retain Bud Fini was to put him in a new position with new challenges that would motivate him to once again be a productive employee.

(D.I. 51 at 107A-08A) (emphasis added). According to plaintiff, these statements reflect the impermissible and stereotypical [*28] belief that his productivity and competence declined with age. *See Hazen Paper Co. v. Big-*

gins, *507 U.S. 604, 610, 123 L. Ed. 2d 338, 113 S. Ct. 1701 (1993)* ("It is the very essence of age discrimination for an older employee to be fired because the employer believes that productivity and competence decline with age.") Defendant contends that these statements do not reflect plaintiff's age but rather his tenure, a factor which is analytically distinct from age. *See id. at 611* (finding that "an employee's age is analytically distinct from his years of service"). In addition, defendant asserts the following deposition testimony creates a genuine issue of material fact regarding Haskin's motivation:

> Q. Did you take into account a person's years of service in deciding whether or not to terminate them from Remington?
>
> A. No. Years of service were not important to me. What was important was the necessity of the function and how critical that person was in continuing that function or performing that function. In other words, instead of looking at whether the individual in question has twenty years with Remington or six months, the question was how long would it take to [*29] get another person up to speed performing that function, assuming it was a necessary function. And if the answer was six months, then it didn't make any difference that the individual had twenty years with Remington. They were easily replaced. . . .
>
> * * *
>
> Q. And did you consider the age of the people you terminated when you terminated them?
>
> A. I did not take age into consideration for purposes of my decisions on whether or not to retain or terminate anyone.

(D.I. 53 at B6-B7)

Under the standard set forth above regarding direct evidence, the court concludes that Haskin's statements cannot be found sufficient, as a matter of law, to constitute direct evidence of age discrimination. A reasonable trier of fact could infer either that the statements, which were made by the sole decision maker, relate only to plaintiff's tenure in his position as defendant argues, or that they are indicative of age-animus, as plaintiff contends. On a motion for summary judgment, the court may not weigh competing inferences. *See Sheridan, 100 F.3d at 1071-72; Siegel v. Alpha Wire Corp., 894 F.2d 50, 55 (3d Cir. 1990); Finch v. Hercules, Inc., 865 F. Supp.* *1104, 1124 (D. Del.* [*30] *1994).* The court concludes, therefore, that there exists a genuine issue of material fact as to whether age-bias was a motivating factor in defendant's decision to terminate plaintiff. Accordingly, the court shall deny plaintiff's motion for partial summary judgment.

## B. Promissory and Equitable Estoppel

Plaintiff states claims for both promissory and equitable estoppel. With respect to his claim for promissory estoppel, plaintiff contends that he detrimentally relied on defendant's promises and representations that he would be retained as an employee by rejecting another offer of employment. (D.I. 5 at P 21) Regarding his claim for equitable estoppel, plaintiff alleges that defendant concealed material facts regarding his termination, expecting that doing so would influence him, which it did. (D.I. 5 at P 27) To show both equitable and promissory estoppel, plaintiff must prove, by clear and convincing evidence,

> "(1) that a promise was made, (2) that it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee, (3) that the promisee relied [10] on the promise and took action to his detriment, and (4) that such promise [*31] is binding because injustice can be avoided only by enforcement of the promise."

*Keating v. Board of Education of the Appoquinimink School District, 1993 Del. Ch. LEXIS 244,* at *10, Civ. A. No. 12589, 1993 WL 460527, at *4 (Del. Ch. Nov. 3, 1993) (quoting *Lawrence v. Board of Education, 1993 Del. Ch. LEXIS 30,* at *7, C.A. No. 12572, 1993 WL 40051, at *2 (Del. Ch. Feb. 8, 1993)); *accord Brandner v. Delaware State Housing Authority, 1993 Del. Ch. LEXIS 278,* No. C.A. 1132-K, 1993 WL 548831, at *3 (Del. Ch. Dec. 9, 1993). As to the promise requirement, "plaintiff must prove the existence of a real promise, . . . 'mere expressions of opinion, expectation or assumption are insufficient.'" *Konitzer v. Carpenter, 1993 Del. Super. LEXIS 458,* No. C.A. 92 C-07-067, 1993 WL 562194, at *7 (Del. Super. Ct. Dec. 29, 1993) (quoting *Reeder v. Sanford School, 397 A.2d 139, 141 (Del. Super. Ct. 1979)*) (citations omitted). In the absence of falsity or fraud, "there must be an actual promise or definite assurance, and promissory form." *Peterson v. Beebe Medical Center, Inc., 1992 Del. Super. LEXIS 454,* C.A.Mo.No. 91 C-07-147, 1992 WL 354087, at *4 (Del. Super. Ct. Nov. 13, 1992), *aff'd, 1993 Del. LEXIS 142, 1993 WL 102560 (Del. Mar. 24, 1993)* (unpublished opinion). To the extent equitable estoppel and promis-

sory estoppel [*32] are two distinct claims, equitable estoppel involves "misrepresentation before execution," whereas promissory estoppel involves a promise of future conduct. *Reeder, 397 A.2d at 141.*

> 10 Although not articulated in the standard, "implicit in this formulation is the requirement that the promisee's reliance be reasonable or justifiable." *Brandner v. Delaware State Housing Authority, 1993 Del. Ch. LEXIS 278*, No. C.A. 1132-K, 1993 WL 548831, at *3 (Del. Ch. Dec. 9, 1993).

In the instant action, plaintiff asserts that Millner's September 1995 promise to him provides the necessary basis for his claims of promissory and equitable estoppel. Plaintiff alleges that on September 25, 1995, he was told by Millner that he was to be invited to go to North Carolina. (D.I. 48 at A79-80) As proof of his allegation, plaintiff proffers a memo he authored dated September 25, 1995 that records the substance of the conversation. (D.I. 51 at 9A) The record indicates that Millner does not recall having such a conversation. (D.I. 51 at 114A) Thus, there [*33] is a genuine issue of material fact not only as to whether Millner made the alleged representation, but whether the representation rises to the level of a "real promise." The other criteria of an action for equitable and promissory estoppel not only assume the existence of a promise (a material fact in dispute), but also involve factual questions for a jury, e.g., intent to induce reliance, the reasonableness of reliance. Accordingly, the court concludes that summary judgment is inappropriate at this juncture.

## C. Covenant of Good Faith and Fair Dealing

Plaintiff also alleges that defendant violated "the covenant of good faith and fair dealing" included in every employment contract. In this regard, plaintiff puts forth two arguments. First, he contends that "defendant's agents intentionally, maliciously, and in bad faith misrepresented the defendant's intentions to terminate [him]." (*D.I. 5 P 23*) Second, he alleges that "defendant terminated [him] because of his age in violation of the public policy prohibiting adverse employment actions on the basis of age." (*D.I. 5 P 24*)

The Delaware Supreme Court has recognized a narrow exception to the employment at-will doctrine created [*34] by the implied covenant of good faith and fair dealing. *See E.I. DuPont de Nemours & Co. v. Pressman, 679 A.2d 436 (Del. 1996); Merrill v. Crothall-American, Inc., 606 A.2d 96 (Del. 1992).* Specifically, the Delaware Supreme Court has limited the covenant to the following categories, where:

(1) the termination violated public policy; (2) the employer misrepresented an important fact and the employee relied "thereon either to accept a new position or remain in a present one"; (3) the employer used its superior bargaining power to deprive an employee of clearly identifiable compensation related to the employee's past service; or (4) the employer falsified or manipulated a record to create fictitious grounds to terminate the employee.

*Layfield v. Beebe Medical Center, Inc., 1997 Del. Super. LEXIS 472*, No. Civ. A. 95 C-12-007, 1997 WL 716900, at *4 (Del Super. Ct. July 18, 1997) (quoting *Pressman, 679 A.2d at 442-44*). These limitations, however, are not "to be construed as limiting an employer's freedom to terminate an at-will employment contract for its own legitimate business, or even highly subjective, reasons." *Merrill, 606 A.2d at 103; accord Pressman, 679 A.2d at 441.* Thus, there [*35] in order

> "to constitute a breach of the implied covenant of good faith, the conduct of the employer must constitute 'an aspect of fraud, deceit or misrepresentation.' . . . The lodestar here is candor.

*Merrill, 606 A.2d at 101* (citations omitted).

In order to succeed on his claim for breach of covenant under the facts of this case, plaintiff must demonstrate either that defendant misrepresented an important fact and he relied thereon to remain in his present position or that he was terminated in violation of public policy. As noted above, plaintiff alleges that on September 25, 1995, two weeks prior to his termination, he was told by Millner that he was to receive a letter inviting him to go to North Carolina. (D.I. 48 at A79-80; D.I. 51 at 9A) According to the record, Millner does not recall having such a conversation or when he was informed plaintiff's position was to be eliminated. (D.I. 51 at 114A; D.I. 55 at 77B) Thus, there remains a genuine issue of material fact as to whether at the time of the alleged conversation, Millner was aware that plaintiff's job was to be eliminated. Accordingly, to the extent that plaintiff alleges he was induced to stay in his [*36] position based upon a misrepresentation, the court shall deny defendant's motion for summary judgment on this issue.

Plaintiff's second argument is coterminous with his ADEA claim. As such it does not fall within the public policy category of exceptions to the employment at-will doctrine created by the covenant. As this court noted in *Finch v. Hercules, 809 F. Supp. 309 (D. Del. 1992),*

1998 U.S. Dist. LEXIS 8261, *

given that only careful incursions have thus far been made upon the employment at-will doctrine, the Court is convinced the Delaware Supreme Court would not create a common-law public policy exception to the employment at-will doctrine where there is in place an elaborate statutory scheme addressing the same public policy concerns.

*Id. at 312* (granting a motion to dismiss plaintiff's complaint of age discrimination under state law for wrongful termination in violation of public policy since Delaware's statute prohibiting employment discrimination, *19 Del. C. §§ 710 et seq.*, provides a statutory remedy); *accord*

*Williams v. Caruso, 966 F. Supp. 287, 292 (D. Del. 1997)*; *Ayres v. Jacobs & Crumplar, P.A., 1996 Del. Super. LEXIS 565, 1996 WL 769331*, at *11 (Del. Super. Ct. Dec. 31, 1996). Thus, insofar [*37] as plaintiff's claim is based on the public policy exception to the employment at-will doctrine, it is blocked by the existence of elaborate federal and state statutory schemes related to age discrimination claims.

## V. CONCLUSION

For the reasons stated, defendant's motion for summary judgment and plaintiff's motion for partial summary judgment shall be denied.

An order shall issue.

# **TAB 2**

LEXSEE

**SLYVIA SAMUELS v. ALBERT EINSTEIN MEDICAL CENTER**

**CIVIL ACTION NO. 97-3448**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*1998 U.S. Dist. LEXIS 17320*

**November 4, 1998, Decided
November 5, 1998, Filed, Entered**

**DISPOSITION:** [*1] Defendant's Motion for Bifurcation of Trial DENIED. Defendant's Motion in Limine GRANTED IN PART AND DENIED IN PART.


**COUNSEL:** For SYLVIA SAMUELS, PLAINTIFF: WILLIAM B. HILDEBRAND, FELDMAN & HILDEBRAND, CHERRY HILL, NJ USA.

For ALBERT EINSTEIN MEDICAL CENTER, DEFENDANT: HOPE A. COMISKY, ANDERSON, KILL, OLICK & OSHINSKY, P.C., PHILA, PA USA.

**JUDGES:** HERBERT J. HUTTON, J.

**OPINION BY:** HERBERT J. HUTTON

**OPINION**

### MEMORANDUM AND ORDER

HUTTON, J.

November 4, 1998

Presently before the Court are Defendant's Motion for Bifurcation of Trial (Docket No. 11), Plaintiff's response (Docket No. 18), and Defendant's reply thereto (Docket No. 20). Also before the Court are Defendant's Motion in Limine (Docket No. 12), Plaintiff's response (Docket No. 19), and Defendant's reply thereto (Docket No. 21). For the reasons stated below, the Defendant's Motion for Bifurcation of Trial is **DENIED** and Defendant's Motion in Limine is **GRANTED IN PART AND DENIED IN PART**.

### I. BACKGROUND

Sylvia Samuels ("Plaintiff" or "Samuels") received her Bachelors of Science degree in nursing from Holy Family College. The Defendant, Albert Einstein Medical Center, hired Plaintiff as a medical-surgical [*2] nurse in 1986. When Samuels started her employment, the Defendant gave her a copy of its employee handbook. The handbook contained an equal employment opportunity policy, a progressive discipline policy, and a disclaimer stating that employees remained at-will.

In July 1994, Defendant first disciplined the Plaintiff. Nurses must complete competencies, which are tests that must be completed on a quarterly basis, to maintain their degree. Defendant gave Plaintiff a counseling document, the lowest level of discipline under Defendant's progressive discipline policy, for failing to complete competencies.

In December 1994, Defendant disciplined Plaintiff for the second time. The Hospital assigned Plaintiff to a patient for testing. During the testing, Dr. John H. Wertheimer ordered intravenous fluids for the patient to flush out the dye received during the testing. Plaintiff contends that she was assisting another patient, Debby Chaess, in critical condition at the time. Nevertheless, the Defendant gave her a warning, the second level in Defendant's progressive discipline policy.

In June 1995, Defendant disciplined Plaintiff for the third time. Plaintiff, along with six other nurses, [*3] failed to notice that a patient was given the wrong medicine. Defendant disciplined all six nurses, including the Plaintiff. Defendant gave Plaintiff a suspension, the third level in Defendant's progressive discipline policy.

In September of 1995, Defendant disciplined Plaintiff for the fourth and final time. Defendant alleges that Plaintiff sent a patient with a known heart condition for testing to a lab without a nurse or monitor. Defendant states that this action violated their written policy. As part of the fourth level of Defendant's progressive discipline policy, Defendant fired the Plaintiff.

1998 U.S. Dist. LEXIS 17320, *

Subsequently, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC). Plaintiff then brought suit claiming that the Defendant discharged her because of her religion in violation of Title VII of the Civil Rights Act (Count I) and breached an implied contract created by its handbook (Count II). Defendant contends that it discharged her for the aforementioned disciplinary reasons. On September 14, 1998, this Court granted summary judgment in Defendant's favor on Plaintiff's breach of implied contract claim (Count II).

On May 22, 1998, Defendant [*4] filed a Motion for Bifurcation of Trial and a Motion in Limine to preclude certain evidence of the Plaintiff. Plaintiff filed responses to both of these motions. Because both Motions are ripe for adjudication, this Court considers Defendant's Motion for Bifurcation of Trial and Defendant's Motion in Limine together.

## II. DISCUSSION

### A. Bifurcation of the Trial

*Federal Rule of Civil Procedure 42(b)* provides the district courts with authority to sever litigation and try it in separate stages. *See Fed. R. Civ. P. 42(b)*; *see also American Nat'l Red Cross v. Travelers Indemn. Co., 924 F. Supp. 304, 306 (D.D.C. 1996)*. This Rule states:

> The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues, always preserving inviolate the right of trial by jury as declared by the *Seventh Amendment to the Constitution* or as given by a statute of the United States.

*Fed. R. Civ. P. 42(b)*. [*5] The court is given broad discretion in exercising this power for the fairness and convenience of the parties. *See Lis v. Robert Packer Hosp., 579 F.2d 819, 824 (3d Cir. 1978)*; *Idzojtic v. Pennsylvania R.R. Co., 456 F.2d 1228, 1230 (3d Cir. 1972)*; *In re Unisys Sav. Plan Litig., 1997 U.S. Dist. LEXIS 7723*, No. CIV.A.91-3067, 1997 WL 299425, at *2 (E.D. Pa. May 29, 1997); *Thompson v. Glenmede Trust Co., 1996 U.S. Dist. LEXIS 13662*, No. CIV.A.92-5233, 1996 WL 529694, at *1 (E.D. Pa. Sept. 16, 1996).

"A [party] seeking bifurcation has the burden of presenting evidence that a separate trial is proper in light of the general principle that a single trial tends to lessen the

delay, expense, and inconvenience to the parties." *Mangabai v. Sears Roebuck & Co., 1992 U.S. Dist. LEXIS 13031*, No. CIV.A.92-1742, 1992 WL 211561, *1 (E.D. Pa. Aug. 26, 1992). Bifurcation is an "extraordinary remedy" that is not to be routinely ordered. *See Lis, 579 F.2d at 824*.

In the instant case, Defendant moves for a bifurcation of the upcoming trial. Defendant argues that the Court should first try the issue of whether Plaintiff timely asserted her administrative claims of discrimination and, thereby, properly exhausted her administrative remedies. Then, if Plaintiff's [*6] claim survives this initial stage, the Court should try her claim of discrimination on the merits. The Plaintiff disagrees and argues that bifurcation is not proper because Plaintiff timely filed her administrative claims. [1]

> 1 The parties also spill much of their ink over the merits of whether the Plaintiff timely filed her administrative claims. As this is an issue for trial, the Court does not address these arguments.

This Court finds that bifurcation is not appropriate in this case. In essence, Defendant's argument is premised upon the assumption that it will win the failure to timely assert the administrative claim issue. The Court cannot accept this premise, however, as that would require it to assume the very thing that Defendant must prove. Furthermore, to the extent that Defendant's argument has merit and may bar Plaintiff's discrimination claim on the merits, the length of the entire trial-- estimated by both parties to be approximately four to five days-- is not sufficiently large as to raise serious [*7] concerns of expense and warrant bifurcation. Accordingly, the Court denies Defendant's Motion to Bifurcate.

### B. *Motion in Limine*

#### 1. *Time Barred Evidence*

Defendant seeks to exclude all evidence of allegedly discriminatory conduct prior to July 20, 1995 because that date is 300 days prior to the date that Plaintiff filed her EEOC charge. If a plaintiff files a charge with a state or local agency, he or she has three hundred (300) days after the date of the alleged act of discrimination within which to file an administrative charge with the EEOC. *See 42 U.S.C. § 2000e-5(e)(1) (1994)*. Pursuant to this part of Title VII and *Federal Rules of Evidence 401, 402, and 403*, Defendant argues that any evidence of discriminatory conduct prior to this date is irrelevant and highly prejudicial because any such acts are no longer actionable.

Under *Federal Rule of Evidence 401*, "'relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the deter-

1998 U.S. Dist. LEXIS 17320, *

mination of the action more probable or less probable than it would be without the evidence." *Fed. R. Evid. 401.* "The standard of relevance established by [*Rule 401*] is not [*8] high." *Carter v. Hewitt, 617 F.2d 961, 966 (3d Cir. 1980).* Once the threshold of logical relevancy is satisfied, the matter is largely within the discretion of the trial court. *See United States v. Steele, 685 F.2d 793, 808 (3d Cir. 1982).* Federal Rule of Evidence 402 states: "All relevant evidence is admissible, expect as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible." *Fed. R. Evid. 402.*

Under *Federal Rule of Evidence 403*, relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Fed. R. Evid. 403.* "*Rule 403* does not act to exclude any evidence that may be prejudicial, but only evidence the prejudice from which substantively outweighs its probative value. Prejudice within the meaning of *Rule 403* involves identifying a special damage which the law finds impermissible." Charles E. Wagner, *Federal Rules of Evidence Case Law Commentary* 145 (1996-97) (footnotes omitted).

Defendant [*9] cites *Rush v. Scott Specialty Gases, Inc., 113 F.3d 476 (3d Cir. 1997),* for the proposition that "evidence of acts prior to the statutory time period is generally excludable under *Rules 401, 402,* and *403 of the Federal Rules of Evidence.*" *See* Def.'s Mem. in Support of Mot. in Limine at 7. The Court disagrees and finds that the *Rush* court held nothing of the sort.

In *Rush,* the jury found for the plaintiff under Title VII on two claims: a failure to promote claim and a sexual harassment claim. *See Rush, 113 F.3d at 480.* On appeal, the Third Circuit held that the district court erred in failing to recognize that plaintiff's failure to promote claim was time barred. *See id. at 483.* The court, however, reversed both verdicts concluding that it was prejudicial for the jury to hear evidence on the time barred claim. *See id. at 485* ("Our review of the record compels the conclusion that the presence of the failure to promote and train claim and the introduction of evidence related to and supporting that claim infected the jury's liability verdicts on the sexual harassment and constructive discharge claims as well as the verdict for the damages."). The court, unable [*10] to distinguish the evidence between the two claims, remanded the case to the district court for a new trial on the sexual harassment claim. *See id.*

While the Third Circuit discussed the impact of the evidence of the time barred claim on the jury's considera-

tion of the properly brought claim, by no means did the Court specifically hold that all time barred evidence is irrelevant and prejudicial as the Defendant characterizes. Rather, the Third Circuit discussed the evidence in terms of whether the court could permit the verdict on the properly brought claim to stand given the evidence the jury heard on the claim that was time barred.

While Rush is not directly on point, another Third Circuit case is on point. *See Stewart v. Rutgers State Univ., 120 F.3d 426, 433 (3d Cir. 1997).* In *Stewart,* an assistant professor sued his employer, a public university, alleging that the university denied tenure to him based on race discrimination. *See id. at 428.* The university denied him tenure in the 1992-93 school year and in the 1994-94 school year. *See id.* The district court granted summary judgment for the university. *See id. at 433.* In deciding the summary judgment [*11] motion, the district court declined to consider a grievance committee report in 1992-93, that found the denial of tenure was arbitrary, because any claim based on the 1992-93 tenure denial was time barred. *See id.* The Third Circuit reversed and held that: "While the district court was correct in finding that any discrimination claim based on [plaintiff]'s 1992-93 tenure denial is time-barred, we reject the notion that the events surrounding that denial are not relevant evidence which [plaintiff] could use at trial [to show the 1994-95 tenure denial was racially discriminatory]." Thus, the Third Circuit held that evidence of discriminatory conduct which is time barred may be relevant in certain circumstances. *See id.; see also United Air Lines v. Evans, 431 U.S. 553, 558, 52 L. Ed. 2d 571, 97 S. Ct. 1885 (1977)* ("A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed. It may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which [*12] has no present legal consequences.").

In the case at bar, the Defendant asks this Court to prevent Plaintiff from presenting any evidence of discriminatory conduct if it is time barred. The Court cannot impose such a blanket ruling. Because the Third Circuit in *Stewart* held that this type of evidence may be admitted in certain circumstances, the Court denies Defendant's request to exclude all Plaintiff's evidence that relates to allegedly discriminatory conduct prior to July 20, 1995. *See also Roebuck v. Drexel Univ., 852 F.2d 715, 733 (3d Cir. 1988)* (upholding admissibility of discriminatory comment by decision maker made five years before denial of tenure).

### 2. *After the Fact Evidence*

Case 1:06-cv-00486-JJF    Document 64-2    Filed 10/30/2007    Page 16 of 50

Page 4
1998 U.S. Dist. LEXIS 17320, *

In an almost identical manner, the Defendant asks this Court to exclude all evidence that occurred after Plaintiff's termination as irrelevant and highly prejudicial. Defendant asserts that the critical question in a religious discrimination case is what was the intent of the decision maker at the time of discrimination. Thus, Defendant argues that any evidence after such termination is irrelevant and/or highly prejudicial.

After the fact evidence is often irrelevant to a person's [*13] intent, knowledge, or state of mind at an earlier time. *See, e.g., Gulbranson v. Duluth, Misabe & Iron Range Railway Co., 921 F.2d 139, 142 (9th Cir. 1990)*; *Arnold v. Riddell, Inc., 882 F. Supp. 979, 993 (D. Kan. 1995)*; *Sealover v. Carey Canada, 793 F. Supp. 569, 579 (M.D. Pa. 1992)*. This case law, cited by the Defendant, clearly supports this proposition for personal injury actions. *See, e.g., Gulbranson, 921 F.2d at 142* (finding the fact that railroad was aware of problem in railroad in 1985 not probative of its knowledge of that problem in 1984); *Arnold, 882 F. Supp. at 993* (finding video made six years after injury is irrelevant to prove warnings available in product liability case); *Sealover v. Carey Canada, 793 F. Supp. at 579* (excluding evidence that manufacturer had knowledge of health risks posed by its product in 1961-62 where plaintiff had to prove manufacturer had knowledge prior to 1960). In the realm of discrimination, however, after the fact evidence possesses more relevance to a person's intent, knowledge, or state of mind. *See Abrams v. Lightolier, Inc., 50 F.3d 1204, 1214 (3d Cir. 1995)* ("Indeed, we have held that discriminatory [*14] comments by nondecisionmakers, or statement temporally remote from the decision at issue, may properly be used to build a circumstantial case of discrimination."); *Lockhart v. Westinghouse Credit Corp., 879 F.2d 43, 54 (3d Cir, 1989)* (finding age biased comment relevant even when made subsequent to plaintiff's termination).

In this case, Defendant asks this Court to exclude any evidence that Plaintiff offers if it occurred after the alleged racially discriminatory termination except as it relates to Plaintiff's grievance procedure. Again, the Court is unwilling to impose a blanket ruling without more specificity from the Defendant. The law in this circuit states that after the fact evidence may be admissible as circumstantial evidence to show discrimination. *See id.* (finding age biased comment relevant even when made subsequent to plaintiff's termination). Therefore, the Court denies Defendant's request to exclude all Plaintiff's evidence that relates to conduct after September 27, 1995.

As a side note, the Court notes that if it were to agree with Defendant's after the fact evidence argument and Defendant's time barred argument above, this Court would have excluded Plaintiff's [*15] evidence before July 20, 1995 and after September 27, 1995. Besides background evidence, Plaintiff would then be required to prove her case within a two month and one week period despite the fact that she was employed by Defendant for many years. Given the difficult nature of proving discrimination and the necessity of discrimination plaintiffs to rely on circumstantial evidence, the Court refuses to impose such a burden on this Plaintiff. *See Sheridan v. E.I. DuPont De Nemours & Co., 100 F.3d 1061, 1071 (3d Cir. 1996)* ("Cases charging discrimination are uniquely difficult to prove and often depend upon circumstantial evidence."), *cert. denied, 521 U.S. 1129, 138 L. Ed. 2d 1031, 117 S. Ct. 2532 (1997)*.

### 3. Testimony of Dr. Wertheimer, Debby Chaess, and Jeff Chaess

At trial, Plaintiff seeks to offer evidence that she was assisting a patient, Debby Chaess, in critical condition while she was supposed to be providing intravenous fluids to the other patient as ordered by Dr. Wertheimer. Plaintiff also wants to call Mrs. Chaess' husband to testify to this point. Finally, Plaintiff offers the testimony of Dr. Wertheimer who apparently believes that the delay in carrying out his order [*16] was excusable and finds that receipt of the disciplinary warning was not justified.

Defendant argues that this Court should exclude the testimony of these three proposed witnesses as irrelevant. Plaintiff states that her supervisor, Tom White, told her not to talk to Dr. Wertheimer concerning the disciplinary warning she received. Plaintiff argues that if she spoke to Dr. Wertheimer at that time, the warning may have been rescinded. Thus, Plaintiff counters that the testimony of Chaess and Wertheimer is relevant to show that this warning could have been avoided.

This Court finds that this evidence is not relevant. Relevant evidence is evidence that has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *Fed. R. Evid. 401*. Evidence showing that Plaintiff ignored a doctor's orders in order to aid someone in critical condition, while admirable, does not make it any more or less probable that the Defendant discriminated against the Plaintiff because of her religion. Along the same lines, the doctor's further reflection on those events and subsequent conclusion that [*17] he may have been too harsh on his nurse does not make it any more probable that a decision maker at the Hospital fired Plaintiff because of her religion.

Moreover, while neither party addresses whether this evidence is relevant to pretext, this Court finds that any such argument lacks merit. Under the shifting burdens used in discrimination cases, a plaintiff may be required to prove the employer's proffered reason for the

1998 U.S. Dist. LEXIS 17320, *

employment action was not the real reason, but rather, was pretextual. *See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 508, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993).* Nevertheless, the proposed testimony of Debby Chaess, Jeff Chaess, and Dr. Wertheimer would not show that Defendant's reason was not the real reason. Rather, by offering this evidence, Plaintiff is trying to show that the Hospital was too harsh on the Plaintiff. This is not pretext. Plaintiff argues that Defendant should not have disciplined her in that instance, not that Defendant's real reason was not the true reason.

Finally, this evidence may have been relevant to Plaintiff's breach of implied contract claim. Nevertheless, this Court granted summary judgment for the Defendant on this claim. [*18] *See Samuels v. Albert Einstein Med. Ctr., 1998 U.S. Dist. LEXIS 14486,* No. CIV.A.97-3448, 1998 WL 690107, at *8 (E.D. Pa. Sept. 16, 1998). Therefore, because the Court fails to see the relevance of this evidence to Plaintiff's discrimination claim, it will exclude the evidence.

### 4. *Testimony of Deborah Dallen*

Defendant next argues that the testimony of Deborah Dallen should be excluded because it has no relevance and is highly prejudicial. Dallen will testify that Anne Marie Mayer, Plaintiff's Nurse Manager in 1986, said that she would never hire another nurse who required Fridays off. Defendant argues that this evidence is not relevant because the statement relates to hiring and was allegedly made more than seven years prior to termination. Defendant also argues that allowing this testimony would be highly prejudicial because it would inflame the jury. Plaintiff responds that this statement is relevant as it indicates "corporate bias against Sabbath-observant individuals."

Many courts state that the probative value of discriminatory remarks is significantly diminished by the temporal distance between the statements and the employment decision in question. *See, e.g., Ezold v. Wolf, Block,* [*19] *Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1993)* (rejecting statements made five years prior to partnership decision and holding that "stray remarks by nondecision-makers or by decision-makers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision"); *Frieze v. Boatmen's Bank of Belton, 950 F.2d 538, 541-42 (8th Cir. 1991)* (determining that four year old remark made too long before employment decision to create inference of discrimination); *McCarthy v. Kemper Life Ins. Cos., 924 F.2d 683, 687 (7th Cir. 1991)* (disregarding discriminatory statements made two years prior to plaintiff's termination); *Haskell v. Kaman Corp., 743 F.2d 113, 120 (2d Cir. 1984)* (devaluing statements made three years or more before

plaintiff's termination). While courts have indicated that the temporal distance to the decision in question decreases the probative value of the statement, nevertheless, these courts often admit the statements into evidence. *See Roebuck, 852 F.2d at 733.* In *Roebuck,* the Third Circuit considered the probative value of evidence of a discriminatory statement made over five [*20] years before the alleged discriminatory decision. *See id.* The court held that, while the statement standing alone was insufficient to uphold a finding of discrimination because of its temporal distance from the decision in question, the statement was still probative evidence that would support a finding of discrimination in connection with other evidence. *See id.*

This Court finds the reasoning employed in Roebuck persuasive. The Court will allow Dallen to testify to the statement because it finds the statement may be relevant to support Plaintiff's other evidence of discrimination.

Finally, Defendant argues that the statement was made by a non-decision maker and is therefore irrelevant on that ground. The Third Circuit has held that "discriminatory comments by nondecisionmakers, or statement temporally remote from the decision at issue, may properly be used to build a circumstantial case of discrimination." *Abrams, 50 F.3d at 1214.* Therefore, the Court will allow the testimony to "build" a circumstantial case of discrimination.

### 5. *Testimony of James MacElwee*

Defendant makes numerous objections to the testimony of James MacElwee, a co-employee of the Plaintiff. [*21] Plaintiff offers MacElwee to testify that: (1) nurses were instructed not to communicate with Plaintiff following her discharge; (2) Plaintiff's name and phone number were blacked out of a phone book on the floor; (3) Plaintiff's demeanor changed following her discharge; (4) Plaintiff had an exemplary work ethic; and (5) Plaintiff complained about discrimination prior to her discharge. Defendant objects to the testimony above because it is irrelevant and hearsay. Although the Plaintiff does not address Defendant's hearsay argument, Plaintiff argues that MacElwee's testimony is relevant because he will testify that the Defendant treated Plaintiff's termination different than that of other employees.

The Court agrees with Defendant's argument that certain of MacElwee's testimony is irrelevant. Plaintiff offers MacElwee to testify, *inter alia,* that nurses were instructed not to communicate with Plaintiff after her termination and that Plaintiff's name and telephone number were blacked out of a phone book in the Hospital. This evidence has no relevance to the critical question of whether the Defendant fired the Plaintiff because of her religion. It is a common practice to delete the [*22] names and phone numbers of terminated employees from

the employment records. This would occur whether Plaintiff was terminated for her religion or not. Therefore, the Court will not permit Mr. MacElwee to testify concerning these matters.

Defendant next questions the relevancy of MacElwee's testimony concerning Plaintiff's demeanor following her discharge. While Plaintiff was no doubt quite upset that Defendant terminated her, the Court does not understand how that makes her more or less likely to have been subjected to religious discrimination. Therefore, Mr. MacElwee is precluded from testifying concerning this matter.

Defendant also challenges the admissibility of MacElwee's testimony concerning the Plaintiff's work ethic. Defendant argues that this testimony is not by a decision maker and, therefore, irrelevant. This Court disagrees. Plaintiff may be called upon to show that the Defendant's disciplinary justification for terminating the Plaintiff was pretextual. MacElwee's testimony, as a co-employee, that Plaintiff had a fine work ethic would tend to make it more likely that Defendant's justification that Plaintiff was disciplined for failing to maintain a certain quality of [*23] work was pretextual. Thus, the Court finds that this evidence is relevant and admissible.

Finally, Defendant contends that MacElwee's testimony that Plaintiff complained of discrimination to him prior to discharge is hearsay not within a recognized exception. Without more information provided by the parties, this Court cannot rule on this objection. Therefore, the Court will reserve ruling on this issue until trial.

### 6. Testimony of Tom White

Finally, Defendant asks this Court to preclude Plaintiff from calling Tom White, Plaintiff's Nurse Manager and a key member of the termination of Plaintiff, as a witness. Defendant argues that Plaintiff seeks to introduce evidence of Mr. White's resignation which occurred two years after Plaintiff's termination. Defendant argues that this evidence is (1) after the fact evidence; (2) irrelevant; and (3) improper character evidence under *Federal Rule of Evidence 404*. Plaintiff responds that White lied about the events surrounding his resignation and, as a key witness, his credibility is at issue.

The simple fact that the events surrounding Mr. White's resignation took place after Plaintiff's termination does not in it of itself mean [*24] that it is irrelevant evidence. Mr. White may have resigned because he disagreed with the Defendant's alleged continued and persistent practice of discrimination. This Court was not provided any information by either party as to why Mr. White resigned. Without more, the Court is simply unwilling to prevent the Plaintiff from calling a witness, let alone a witness who was an important member in deciding to terminate Plaintiff, because Defendant simply states that the events surrounding his termination are irrelevant.

Moreover, the Court is uncertain how White's testimony concerning his resignation is improper character testimony. Again, the parties provided no foundation indicating to this Court which part of White's proposed testimony constitutes improper character evidence. Therefore, the Court will deny Defendant's request at this time.

An appropriate Order follows.

### ORDER

AND NOW, this 4th day of November, 1998, upon consideration of Defendant's Motion for Bifurcation of Trial and Defendant's Motion in Limine, IT IS HEREBY ORDERED that Defendant's Motion for Bifurcation of Trial is DENIED and Defendant's Motion in Limine is **GRANTED IN PART AND DENIED IN PART**.

[*25] IT IS FURTHER ORDERED THAT:

(1) The Defendant's request to preclude any evidence to challenge the merits of any employment decision made prior to July 20, 1995 is **DENIED**;

(2) The Defendant's request to preclude any evidence of conduct occurring after Plaintiff's termination on September 27, 1995 is **DENIED**;

(3) The Defendant's request to preclude the testimony of Debby and Jeff Chaess is **GRANTED**;

(4) The Defendant's request to preclude the testimony of Dr. John Wertheimer concerning the Plaintiff's care of one of his patients in December of 1994 is **GRANTED**;

(5) The Defendant's request to preclude the testimony of Deborah Dallen is **DENIED**;

(6) The Defendant's request to preclude the testimony of James MacElwee is **GRANTED** to the extent that Plaintiff offers Mr. MacElwee to testify concerning the blacking out of Plaintiff's name, instruction by the Defendant not to talk to the Plaintiff, and Plaintiff's demeanor following termination, but is **DENIED** in all other respects; and

(7) The Defendant's request to preclude the testimony of Tom White concerning the reasons for his resignation from employment with the Defendant is **DENIED**.

[*26] BY THE COURT:

HERBERT J. HUTTON, J.

# **TAB 3**

2 of 4 DOCUMENTS

**WILLIAM F. DAVIS v. GENERAL ACCIDENT INSURANCE COMPANY OF AMERICA and WILLIAM JENKINS**

**CIVIL ACTION NO. 98-4736**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2000 U.S. Dist. LEXIS 17356*

**December 1, 2000, Decided**

**DISPOSITION:**    [*1]    Defendants' Motions GRANTED IN PART and DENIED IN PART.

**COUNSEL:** For WILLIAM F. DAVIS, PLAINTIFF: ANNA M. DURBIN, ANNA M. DURBIN, ESQUIRE, ARDMORE, PA USA. JOYCE COLLIER BRONG, JOYCE    COLLIER    BRONG,    ESQUIRE, PHILADELPHIA, PA USA.

For GENERAL ACCIDENT INSURANCE COMPANY OF AMERICA, DEFENDANT: CAROLYN P. SHORT, DON A. INNAMORATO, REED, SMITH, SHAW & MCCLAY, PHILADELPHIA, PA USA.

For WILLIAM JENKINS, DEFENDANT: CAROLYN P. SHORT, DON A. INNAMORATO, REED, SMITH, SHAW & MC CLAY, PHILADELPHIA PA USA. EDWARD    J.    DAVID,    MYLOTTE, DAVID & FITZPATRICK, PHILADELPHIA, PA USA.

**JUDGES:** HERBERT J. HUTTON, J.

**OPINION BY:** HERBERT J. HUTTON

**OPINION**

*MEMORANDUM AND ORDER*

HUTTON, J.

December 1, 2000

Presently before the Court are the Defendant's Motions in Limine (Docket No. 46), the Plaintiff's Memorandum of Law in Opposition to the Defendant's Motions (Docket No. 61), and the Defendant's Reply Memorandum of Law in Further Support of Their Motions (Docket No. 69).

**I. *BACKGROUND***

The Plaintiff, William Davis, initiated this action on September 3, 1998 against the Defendants, General Accident Insurance Company of America (GAI) and William Jenkins (Jenkins). On March 3, 1999, the Plaintiff [*2] filed a first amended complaint which requests relief from both Defendants for racially-motivated employment discrimination under *42 U.S.C. § 1981*, conspiracy to deprive the Plaintiff of his rights to make and enforce an employment contract under *42 U.S.C. § 1985(3)*, and neglect to prevent conspiracy under *42 U.S.C. § 1986*. In addition, the Plaintiff sought relief from a violation of Title VII of the Civil Rights Act of 1964 from the Defendant GAI only.

The substance of the allegations surround the Plaintiff's resignation from Defendant GAI in September of 1997. The Plaintiff began working for the Defendant GAI in December of 1983 as a team leader in the corporate project management department. After two years at GAI, the Plaintiff was promoted to a manager position which he held until January of 1993. In January of 1993, GAI took away the Plaintiff's management responsibilities and reduced his salary grade from a level 18 to a level 16 pursuant to a departmental reorganization.

The Plaintiff alleges that at the time of his "demotion" his manager put a memo in his personnel file recommending the Plaintiff be [*3] considered when a managerial position came up in the future. Since that time, the Plaintiff enumerates five positions, considered promotions, which he was not offered. In addition, Plaintiff claims to have been demoralized by certain conduct in the office. According to the Plaintiff, the Defendants refused to promote the Plaintiff despite efforts by his supervisors to get him promoted. In addition, he claims to have been subjected to humiliating working

conditions. The Plaintiff claims this is the result of the Defendants' racial animus.

These issues finally came to a head in September of 1997. Prior to that time, the Plaintiff's former supervisor, John H. Cousins, III (Cousins), filed a retaliation lawsuit against GAI claiming that he had been terminated as a result of his vocal opposition to what he believed was discrimination against the Plaintiff. In February of 1997, the Plaintiff was asked to discuss what he knew about the Cousins lawsuit with GAI management. Plaintiff alleges that in retaliation for his responses to this questioning, he was taken off of a high profile project which he had hoped would put him in line for a promotion. After these actions, the Plaintiff resigned [*4] from GAI in September of 1997.

On July 20, 2000, the Defendants filed these motions in limine seeking to preclude the introduction of certain pieces of evidence. The Plaintiff responded and the Defendants filed a reply brief in further support of their motions. The Court has considered these filings and now addresses the Defendants' requests.

## II. *DISCUSSION*

Under *Federal Rule of Evidence 401*, "'relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Fed. R. Evid. 401*. "The standard of relevance established by [*Rule 401*] is not high." *Carter v. Hewitt, 617 F.2d 961, 966 (3d Cir. 1980)*. Once the threshold of logical relevancy is satisfied, the matter is largely within the discretion of the trial court. *See United States v. Steele, 685 F.2d 793, 808 (3d Cir. 1982)*. *Federal Rule of Evidence 402* states: "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the [*5] Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible." *Fed. R. Evid. 402.*

Under *Federal Rule of Evidence 403*, relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Fed. R. Evid. 403*. "*Rule 403* does not act to exclude any evidence that may be prejudicial, but only evidence the prejudice from which substantively outweighs its probative value." Charles E. Wagner, *Federal Rules of Evidence Case Law Commentary* 212 (1999-2000). The Court addresses each of the Defendants' evidentiary claims using these standards.

*A. Evidence of Alleged Acts of Discrimination Occurring Before September 3, 1996 and Evidence Re-*

*lated to Defendant GAI's Investigation of John H. Cousins, III's Internal Complaint*

The Defendants request that the Court preclude the presentation of any evidence regarding discriminatory conduct which would be time-barred if brought as its own claim. They also assert that the Court should bar evidence of an internal complaint filed by the Plaintiff's former supervisor. The arguments put forth for the exclusion [*6] of both sets of evidence are substantially similar as to merit discussing them together.

The Defendants propose that the admission of time-barred claims may constitute reversible error. This proposition is gleaned from the Third Circuit's decision in *Rush v. Scott Speciality Gases Inc., 113 F.3d 476 (3d Cir. 1997)*. The Defendants' argument must fail for several reasons: (1) their analysis of which claims are time barred is inaccurate; (2) their reading of the *Rush* case is too broad; and (3) the analysis in *Stewart v. Rutgers, The State University, 120 F.3d 426 (3d Cir. 1997)*, is applicable to the instant case.

To determine which discriminatory acts are time-barred, the Defendants have used as their benchmark September 3, 1998, the date that the Plaintiff filed his complaint. The Defendants work their way backward using the relevant statute of limitations periods. This analysis ignores the impact of the continuing violation theory which allows the Plaintiff to recover for a pattern of discriminatory acts if the Plaintiff shows that one act of discrimination occurred within the filing period and "that the harassment is 'more than the occurrence [*7] of isolated or sporadic acts of intentional discrimination.'" *See West v. Philadelphia Elec. Co., 45 F.3d 744, 754-55 (3d Cir. 1995)*. The Plaintiff has alleged timely claims of, as the Defendants put it, "discriminatory reduction in responsibilities and constructive discharge." While the Defendants assert that these are entirely different from the Plaintiff's claims of "discriminatory demotion, failure to promote/reclassify and the purported 'racial' comments", the Court disagrees. As a result, the Plaintiff has adequately alleged discrimination within the statute of limitations period and a pattern of discriminatory behavior. Applying the continuing violations theory, the Plaintiff would be allowed to recover for acts that would otherwise be time-barred. *See Id. at 755.*

To exclude this evidence, the Defendants have relied too heavily on a broad reading of the Third Circuit's decision in *Rush v. Scott Speciality Gases, Inc. 113 F.3d 476*. In *Rush*, the Court reversed a verdict handed down on a sexual harassment and constructive discharge claim because the verdict had been "infected" by the presence of a time-barred claim for failure [*8] to promote and train. *Id. at 485*. The Defendants' themselves point out that the failure to promote and train claims in *Rush* were

both outside of the statute of limitations period. That is starkly different from the instant case where the Plaintiff has alleged discriminatory acts within the limitations period. In addition, *Rush* was a case where a time-barred discrimination claim was tried with separate and distinct discrimination claims. *Id. at 483.* That is very different from a case where all of the claims are tied to continuing violations.

Even if the continuing violations theory was not warranted, the discriminatory acts would still be admissible to support timely allegations of adverse employment actions. The Plaintiff has alleged adverse employment decisions into 1997, within the statute of limitations period. To recover on these claims, the Plaintiff will be required to show that the actions were motivated by discrimination. *See Stewart, 120 F.3d 426 at 432 at 432-33.* The prior acts of discrimination are relevant to this determination. *See Id. at 433.*

The case before the Court is much more similar to [*9] *Stewart v. Rutgers, The State University* than to the *Rush* case. *See Id. at 426.* In *Stewart*, the Third Circuit reversed the district court's grant of summary judgement claiming it was error for the district court to exclude the grievance committee's finding that a previous tenure denial of the Plaintiff was "arbitrary and capricious." *Id. at 433.* The Third Circuit stated that "while the district court was correct in finding that any discrimination claim based on [the Plaintiff's] 1992-93 tenure denial is time-barred, we reject the notion that the events surrounding that denial are not relevant evidence which [the Plaintiff] could use at trial." *Id.* In reaching this conclusion, the Court relied upon precedent from the United States Supreme Court which has found that discriminatory acts which are time barred may still "constitute relevant background evidence in a proceeding in which the status of a current practice is at issue," this is true even though "separately considered, it is merely an unfortunate event in history which has no present legal consequences." *Id.* (quoting *United Air Lines v. Evans, 431 U.S. 553, 558, 97 S. Ct. 1885, 1889, 52 L. Ed. 2d 571 (1977)).* [*10] *Stewart* is a case where the Plaintiff wanted to use past acts of discrimination, not to create a separate and distinct claim as in *Rush*, but to show that recent misconduct of a similar nature was motivated by discrimination. As stated previously, the instant case involves timely allegations of adverse employment actions motivated by discrimination and the Plaintiff is entitled to use past acts of discrimination to show that the explanation for the employment actions offered by the Defendants is pretextual.

For the foregoing reasons, the Defendants' motion to exclude all evidence of time-barred claims and evidence of an internal complaint filed by John H. Cousins, III is denied.

### B. Evidence Related to Plaintiff's Back Pay or Front Pay Losses

The purpose of a motion in limine is "to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." *Bradley v. Pittsburgh Bd. of Educ., 913 F.2d 1064, 1069 (3d Cir. 1990).* This stands in contrast to a motion for summary judgement which has as its purpose "to eliminate a trial in cases where there are no genuine issues of fact." *Id.* If a party's motion in limine seeks to [*11] preclude all evidence that would support the other party's claims, their motion in limine is essentially acting like a motion for summary judgement. *Id. at 1069-70.* That is precisely what the Defendants have attempted to do in the instant case.

By arguing that evidence of back and front pay should be excluded because the Plaintiff's have failed to make a claim for constructive discharge, the Defendants are asking the Court to weigh in on the merits of the Plaintiff's constructive discharge claim. This Court's scheduling orders have provided that "all dispositive motions [shall be] filed not later than two (2) weeks prior to the close of discovery." In this case, discovery was required to be completed by October 25, 1999. At this stage of the proceedings, it is untimely for a summary judgement motion and too early for a motion for judgement as a matter of law. *See Thompson v. Glenmede Trust Co., 1996 U.S. Dist. LEXIS 13674*, at *2, No. 92-5233 (E.D.Pa. Sept. 16, 1996).

Moving beyond the request for summary judgment on the Plaintiff's constructive discharge claim, the Defendant urges the Court to declare back and front pay inappropriate in this case. [*12] If a plaintiff is successful in a discrimination action against an employer, they may be entitled to an award of both front and back pay to make the victim whole and account for pre-judgment and post-judgment effects of discrimination. *See Loeffler v. Frank, 486 U.S. 549, 558, 108 S. Ct. 1965, 100 L. Ed. 2d 549 (1988); Sellers v. Delgado College, 902 F.2d 1189, 1196 (5th Cir. 1990).* Repeatedly, the Defendants rely on the fact that the Plaintiff's salary increased when he left the Defendants' employ to show that their could not possibly be any front or back pay damages. This assertion is rebutted by the Plaintiff's allegation that his salary would have been much higher, and the salary at his new job would not have been an increase, if the alleged discrimination had never occurred. It would be inappropriate to make a determination of the reasonableness of these claims and appropriateness of these remedies prior to the presentation of evidence.

For the foregoing reasons, the Defendants' motion to exclude evidence on back pay and front pay losses is denied.

## C. *Evidence of Plaintiff's Emotional Distress Damages*

The Defendants urge the [*13] Court to exclude all evidence related to the Plaintiff's damages in the form of emotional distress. The Defendants' argument is essentially that the Plaintiff has no evidence of such an injury. In *Blackshear v. City of Wilmington, 15 F. Supp. 2d 417 (D.Del. 1998)*, the court stated that "intangible injuries such as sleeplessness, headaches, and feelings of humiliation and embarrassment are sufficient to support an award for compensatory damages." *Id. at 430.* The court continued that while a discernable injury is necessary, "medical evidence and corroborating testimony is not always necessary to support an award of mental anguish damages." *Id.* The Third Circuit has held that expert testimony is not necessary to corroborate a claim for emotional distress in the civil rights context because of "the broad remunerative purpose of the civil rights laws." *Bolden v. SEPTA, 21 F.3d 29, 34 (3d Cir. 1994)*. While it is true that if the Plaintiff offers no evidence of actual injury a claim for emotional distress damages would be unwarranted, that is very different from a situation where the Plaintiff simply does not offer expert testimony. [*14] *See Gunby v. Pennsylvania Elec. Co., 840 F.2d 1108, 1121 (3d Cir. 1988)* (Plaintiff's claim for emotional damages rejected because he offered "no evidence" to support his claim). It is premature for the Court to conclude that the Plaintiff has no credible evidence to support his claim for emotional distress damages.

For the foregoing reasons, the Defendants' motion to exclude evidence of emotional damages is denied.

## D. *Evidence Relating to Alleged Discrimination Against Individuals Other Than the Plaintiff*

The Defendants claim that the presentation of any evidence relating to other employees' claims of discriminatory conduct by the Defendants would be unduly prejudicial and should be precluded by this Court. This arises specifically in the context of three potential witnesses: John H. Cousins, III (Cousins), Ralph Herbst, and Derrick Coker. The Plaintiff states that they do not intend to offer any evidence of discrimination against Ralph Herbst and Derrick Coker; therefore, the Defendants' motion regarding those two witnesses will be granted. The Court turns its attention to the evidence sought regarding Cousins.

The Defendants' argument for excluding [*15] the testimony of Cousins is essentially that because Cousins was discharged on July 31, 1996, he cannot provide any evidence that does not relate to time-barred claims. Because of the reasons set forth above in the Court's discussion of time-barred claims, the Defendants' argument must fail with respect to Cousins. As the Plaintiff's supervisor, Cousins had first-hand knowledge of the moti-

vations behind employment decisions involving the Plaintiff. That information is highly relevant to an essential element of the Plaintiff's case, whether the Defendants' employment decisions regarding the Plaintiff were motivated by discrimination. *See Stewart, 120 F.3d 426 at 432 at 432-33.*

For the foregoing reasons, the Defendants' motion regarding the exclusion of evidence related to Ralph Herbst and Derrick Coker is granted and the Defendants' motion regarding the exclusion of evidence related to John H. Cousins, III is denied.

## E. *Evidence Regarding the Racial Composition of the Defendants' Workforce*

The Defendants next contention is that the Court should preclude the admission of statistical evidence regarding the racial composition of the Defendants' workforce [*16] because that information is irrelevant, unduly prejudicial, and misleading to the jury. The main objection to the Plaintiff's proferred statistical evidence is that the numbers represent simply the percentage of minorities holding officer positions with the Defendant GAI and contain no analysis of those numbers such as the relevant qualifications of the candidates that had applied for those positions. Without an analysis of the applicant pool and qualifications for those positions, the Defendants contend, a statistical analysis of the racial composition of the management/officer level would not be probative of the motivations behind the employment decisions effecting the Plaintiff. The data that Plaintiff seeks to introduce in this case consists only of GAI's EEO-1 data, which shows great disparity between the number of Caucasians and African-Americans in the manager/officer ranks, and Defendant GAI's admission that one out of 70 officers in the company is "African American."

GAI's EEO-1's, which contain evidence of gross disparity at the officer/manager level positions, are highly probative and relevant to drawing an inference of racial discrimination, and whether GAI was aware of [*17] this disparity.

For the forgoing reasons, the Defendants' motion to exclude evidence relating to the racial composition of Defendant GAI's workforce is denied.

## F. *Evidence Relating to the Plaintiff's Unrelated Medical Conditions and Testimony Concerning Defendant Jenkins' Alleged Extramarital Affair*

The Defendants next seek to exclude the admission of evidence of the Plaintiff's back condition and heart arrhythmia claiming they are unrelated to the present claim. In addition, they seek the exclusion of evidence pertaining to Defendant Jenkins' alleged extramarital affair. The Plaintiff has stated that he does not intend to introduce any evidence on these matters at trial. There-

fore, the Defendants' motion to exclude evidence on the Plaintiff's back condition and heart arrhythmia, and evidence regarding Defendant Jenkins alleged extramarital affair is granted.

### G. Examination of Defendant Jenkins on His Alleged Use of Racial Epithets

Finally, the Defendants ask the Court to preclude questioning of the Defendant Jenkins on his alleged use of racial epithets because it will inflame the jury, is highly prejudicial, and is impermissible character evidence. [*18] In attempting to prove a discrimination case, circumstantial evidence is essential and discriminatory comments by an executive in the decision making process can provide strong circumstantial evidence. See *Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1083 (3d Cir. 1996)*; *Abrams v. Lightolier Inc., 50 F.3d 1204, 1215 (3d Cir. 1995)*. While the introduction of this evidence can be prejudicial, it can also prove highly probative. See *Abrams, 50 F.3d at 1215*. The key inquiry is whether the probative value of the evidence is substantially outweighed by its prejudicial effect. *Fed. R. Evid. 403*.

The defense contends that the Plaintiff will question the Defendant Jenkins on his alleged use of racial slurs thirty to forty years ago as a youth. The Court finds that this evidence has no probative value in answering the question at issue because the time frame is too remote and an answer would shed no light on the Defendant's current state of mind. As a result, the Plaintiff shall not question the Defendant Jenkins on his childhood use of racial epithets.

The analysis changes when focusing on the Defendant's alleged recent use of racial [*19] slurs. Discriminatory comments made in the workplace are relevant circumstantial evidence probative of a decision maker's motivations in making employment decisions. See *Abrams, 50 F.3d at 1215*. The Court find that the same is true for racial slurs made outside of the workplace. While the weight given to external comments will be less than that given to workplace comments, the language itself represents relevant circumstantial evidence of the decision maker's mindset. The Defendant claims that the jury will be prejudiced by the Defendant's admission that he has, at times, used a racial slur when becoming upset while driving. There is no reason to believe that the jury cannot appropriately separate an angry utterance in the heat of "road rage" from an indication of a state of mind which may have influenced the Defendant's conduct toward the Plaintiff.

However, any such inquiry into racial epithets must have a relevant time frame. As the first alleged discriminatory acts against the Plaintiff took place in 1993, the Plaintiff will only be allowed to question Defendant Jen-

kins on his use of racial epithets in the period of time after 1990. The probative value of any [*20] older claims is outweighed by the prejudicial effect it will have on the jury.

For the foregoing reasons, the Defendants' motion to prevent the questioning of Defendant Jenkins regarding his alleged use of racial epithets is granted as to any alleged older uses of racial epithets and denied as to his alleged more recent use.

An appropriate Order follows.

### ORDER

AND NOW, this 1st day of December, 2000, upon consideration of the Defendant's Motions in Limine (Docket No. 46), the Plaintiff's Memorandum of Law in Opposition to the Defendant's Motions (Docket No. 61), and the Defendant's Reply Memorandum of Law in Further Support of Their Motions (Docket No. 69), IT IS HEREBY ORDERED that the Defendants' Motions are **GRANTED IN PART and DENIED IN PART.**

IT IS HEREBY FURTHER ORDERED that the Defendants' Motion to:

> 1) exclude all evidence of time-barred claims is **DENIED**;

> 2) exclude evidence of an internal complaint filed by John H. Cousins, III is **DENIED**;

> 3) exclude evidence on back pay and front pay losses is **DENIED**;

> 4) exclude evidence of emotional damages is **DENIED**;

> 5) to exclude evidence related to Ralph Herbst and [*21] Derrick Coker is **GRANTED**;

> 6) to exclude evidence related to John H. Cousins, III is **DENIED**;

> 7) exclude evidence relating to the racial composition of Defendant GAI's workforce is **DENIED**;

> 8) exclude evidence on the Plaintiff's back condition and heart arrhythmia is **GRANTED**;

> 9) exclude evidence regarding Defendant Jenkins alleged extramarital affair is **GRANTED**; and

> 10) prevent the questioning of Defendant Jenkins regarding his alleged use

2000 U.S. Dist. LEXIS 17356, *

of racial epithets is **GRANTED IN PART and DENIED IN PART**, the Plaintiff will only be allowed to question Defendant Jenkins on his use of racial epithets in the period of time **AFTER 1990**.

BY THE COURT:

HERBERT J. HUTTON, J.

# **TAB 4**

LEXSEE

## SHAREEF DOWD v. SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY

### CIVIL ACTION 04-294

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*2006 U.S. Dist. LEXIS 30619*

### May 16, 2006, Decided

**SUBSEQUENT HISTORY:** Costs and fees proceeding at *Powell v. SEPTA, 2007 U.S. Dist. LEXIS 44758 (E.D. Pa., June 18, 2007)*

**PRIOR HISTORY:** *Dowd v. SEPTA, 2004 U.S. Dist. LEXIS 22425 (E.D. Pa., Nov. 2, 2004)*

**COUNSEL:** [*1] For SHAREEF DOWD, Plaintiff: OLUGBENGA O. ABIONA, PHILADELPHIA, PA.

For SEPTA, Defendant: MARIA L. LEWIS, MILLER ALFAND & RASPANTI, PHILADELPHIA, PA.

**JUDGES:** J. Curtis Joyner, J.

**OPINION BY:** J. Curtis Joyner

## OPINION

### *MEMORANDUM AND ORDER*

#### JOYNER, J.

Via the motions now pending before this Court, Defendant, Southeastern Pennsylvania Transportation Authority ("SEPTA" or "Defendant"), moves for judgment as a matter of law or, in the alternative, a new trial, and Plaintiff, Shareef Dowd ("Officer Dowd" or "Plaintiff") moves to recover attorney fees and costs and for injunctive relief. For the reasons set forth below, Defendant's motion shall be DENIED, and Plaintiff's motion shall be GRANTED in part and DENIED in part.

### I. Background

Plaintiff, a SEPTA police officer, brought this suit to recover for alleged racial discrimination in violation of *42 U.S.C. § 2000e* ("Title VII"), *42 U.S.C. § 1981* ("*Section 1981*"), and the Pennsylvania Human Relations Act ("PHRA"), *43 P.S. §§ 951, et seq.*. Plaintiff presented

claims based on both disparate treatment and hostile work environment theories.

Plaintiff, [*2] along with seven other SEPTA officers, filed a race discrimination complaint against SEPTA with the Pennsylvania Human Relations Commission ("PHRC") as Officers United for Justice ("OUJ"). This complaint was simultaneously filed with the Equal Employment Opportunity Commission ("EEOC"). On February 25, 2003, four SEPTA officers and OUJ filed a Complaint in this Court. *Gardner v. SEPTA*, Civ. A. No. 03-1031. An amended complaint was filed in that action on July 8, 2003, removing OUJ as a plaintiff and adding additional individual officers, including Officer Dowd. This Court ordered each of the officers that wished to move forward against SEPTA to file individual civil actions. The Order of January 15, 2004 requiring these separate suits noted that the complaint in each action would be dated back to February 25, 2003, the date of the filing of the original complaint. Plaintiff submitted his individual complaint on January 26, 2004, initiating the action now before us. Each of the plaintiffs in the resulting actions is represented by the same attorney, Olugbenga O. Abiona, Esquire. *See Gardner*; *Blakeney v. SEPTA*, Civ. A. No. 04-296; *Johnson v. SEPTA*, Civ. A. No. 04-297; [*3] *Ross v. SEPTA*, Civ. A. No. 04-293; *Rushing v. SEPTA, 2004 U.S. Dist. LEXIS 22426, Civ. A. No. 04-295*; *Walls v. SEPTA*, Civ. A. No. 04-291.

Beginning on September 12, 2005, this Court presided over a three and one-half day jury trial for Plaintiff's discrimination claims. The evidence presented and legal determinations made during that trial are presented as necessary in the discussion below. On September 15, 2005, the jury returned a verdict in favor of Plaintiff. The jury found that SEPTA had discriminated against Plaintiff on the basis of his race, and awarded Plaintiff $ 40,000.00 in monetary damages. Defendant now seeks

Case 1:06-cv-00486-JJF    Document 64-2    Filed 10/30/2007    Page 28 of 50

Page 2
2006 U.S. Dist. LEXIS 30619, *

judgment as a matter of law or, in the alternative, a new trial. Plaintiff seeks attorney's fees and costs, as well as injunctive relief.

## II. Motion for Judgment as a Matter of Law

### A. Legal Standard for Rule 50(b)

Defendant has moved for judgment as a matter of law pursuant to *Federal Rule of Civil Procedure 50(b)*. Judgment as a matter of law may be entered only when there is no legally sufficient basis for a reasonable jury to have found for the nonmoving party. *See Fed. R. Civ. P. 50(a)* [*4]  ; *see also Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 149-150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)*. In considering a motion under *Rule 50(b)*, a district court must view the record as a whole, drawing "all reasonable inferences in favor of the nonmoving party." *Reeves, 530 U.S. at 150*; *McDaniels v. Flick, 59 F.3d 446, 453 (3d Cir. 1995)*. The court may not weigh the parties' evidence or determine the credibility of the witnesses. *Reeves, 530 U.S. at 150*; *McDaniels, 59 F.3d at 453*. The court must also disregard all evidence favorable to the nonmoving party that the jury is not required to believe. *Reeves, 530 U.S. at 150*. If the record contains even the "minimum quantum of evidence upon which a jury may reasonably afford relief," the verdict must be sustained. *Parkway Garage, Inc. v. City of Philadelphia, 5 F.3d 685, 691 (3d Cir 1993)* (quoting *Keith v. Truck Stops Corp. Of America, 909 F.2d 743, 745 (3d Cir. 1990))*.

### B. Discussion of Rule 50(b) Motion

#### 1. Failure to Identify Right-to-Sue Letter

Defendant submits that Plaintiff's claims [*5] were procedurally defective and should never have been submitted to a jury because he did not identify a right-to-sue letter related to his claims. Defendant provides no legal authority, however, for the contention that discrimination claims must be dismissed where the plaintiff pleads, but does not affirmatively prove, receipt of a right-to-sue letter. The cases relied upon by Defendant are both nonbinding and distinguishable from the instant case. In each of the cited cases, the defendant sought dismissal based on the fact that the plaintiff actually did not receive, and therefore could not even plead receipt of, a right-to-sue letter.

In *Tori v. Shark Information Services, Civ. A. No. 1995 U.S. Dist. LEXIS 19018, *3-4 (E.D. Pa. Dec. 18, 1995)*, the plaintiff attempted to go forward with a Title VII claim before receiving a right-to-sue letter. The plaintiffs claimed that the EEOC should have, consistent with its own policies, issued such a letter before the suit was filed, but that some clerical error had occurred. *Tori, 1995 U.S. Dist. LEXIS 19018 at *2*. The plaintiffs assured the court that they would immediately request the issuance of a right-to-sue letter. [*6] *Id.* The court found that such anticipated receipt of a right-to-sue letter insufficient to support a claim. *Id.* In distinguishing the Third Circuit's holding that failure to plead the issuance of a right-to-sue letter was not fatal where a letter was actually issued, they noted that the plaintiffs before them not only failed to plead the existence of a right-to-sue letter, but also admitted that no such letter was issued or received. *Id.* (distinguishing *Gooding v. Warner-Lambert Co., 744 F.2d 354, 358 (3d Cir. 1984))*. Such is not the case here. Plaintiff plead the receipt of an individual right-to-sue letter, and has maintained throughout that it was actually received. Defendant does not claim that the letter was never issued or received, but instead asserts that Plaintiff had a burden to prove receipt of the letter.

Similarly, in *Styles v. Phila. Elec. Co., Civ. A. No. 93-4593, 1994 U.S. Dist. LEXIS 7486, *3-5 (E.D. Pa. June 6, 1994)*, the plaintiff acknowledged that she had never received a right-to-sue letter. Finding that plaintiff's counsel had made no effort to obtain a letter, the court refused to waive the prerequisite of issuance [*7] of a right-to-sue letter. *See also Arizmendi v. Lawson, 914 F. Supp. 1157, 1160 (E.D. Pa. 1996)* (recognizing receipt of right-to-sue letter even though letter was submitted by defendant, not plaintiff). This determination does not support Defendant's assertion that Plaintiff had the burden of proving actual receipt for the case to continue. Thus, to the extent that SEPTA asks the Court to rule that, as a matter of law, Plaintiff's case should not have proceeded to the jury because Plaintiff did not present a copy of or other proof of receipt of a right-to-sue letter, the law presented does not mandate judgment in Defendant's favor.

Furthermore, Defendant did not present evidence at trial suggesting that Plaintiff did not actually receive a right-to-sue letter. Nor did Defendant request that the factual issue of whether such a letter was received be placed before the jury. (*See* Def.'s Proposed Jury Interrogatories, Def.'s Pre-trial Memorandum, Def.'s Proposed Jury Instructions.) In the absence of both evidence presented on this issue and submission of this question to the jury, we cannot conclude that there was no legally sufficient evidence for the jury to have [*8] found for Plaintiff. *See Fed. R. Civ. P. 50(b)*.

#### 2. Timeliness of Title VII and PHRA Claims

Case 1:06-cv-00486-JJF    Document 64-2    Filed 10/30/2007    Page 29 of 50

Page 3
2006 U.S. Dist. LEXIS 30619, *

Defendant argues that judgment as a matter of law is appropriate because Plaintiff's claims under Title VII and the PHRA are time-barred because Plaintiff failed to file suit within ninety days of receipt of a right-to-sue letter. (Def.'s Br. at 9.) Upon receipt of a right-to-sue letter sent as a result of a Title VII complaint, a complainant has ninety days to file a law suit. *42 U.S.C. § 2000e-5(f)(1)*. This ninety day period acts as a statute of limitations, and generally will not be extended unless it is equitably tolled. *See, e.g., McCray v. Corry Manufacturing, Co., 61 F.3d 224, 229 (3d Cir. 1995)*.

Arguments that a claim is barred by a statute of limitations are treated as affirmative defenses. *See Ebbert v. DaimlerChrysler Corp., 319 F.3d 103, 108 (3d Cir. 2003)*. The burden of proving that a claim is time-barred, including presenting proof of the start date of the statute of limitations, thus rests with the defendant asserting such defense. *Id.*

As discussed [*9] above, Defendant presented no evidence at trial or in support of earlier motions either showing that Plaintiff did not receive a right-to-sue letter, or establishing when any such letter was received. Although Plaintiff presented no evidence regarding his receipt of a right-to-sue letter, it was Defendant's burden, not Plaintiff's, to present evidence in support of an affirmative defense that Plaintiff's complaints were filed outside of the relevant statute of limitations. In the absence of any evidence from Defendant or submission to the jury of the question of when and whether Plaintiff received an individual right-to-sue letter, we cannot conclude that there was no legally sufficient evidence for the jury to have found in Plaintiff's favor.

To the extent that Defendant asks this Court to determine that, as a matter of law, Plaintiff's case should not have been placed before a jury because Plaintiff did not timely file this suit, Defendant's argument must fail. Plaintiff asserted in his Complaint, and later in his deposition, that he received a right-to-sue letter based on his individual complaint on June 10, 2003. (*See* Compl. at P6; Pl.'s Mem. of Law in Opp. to Def.'s Mot. [*10] for Summary Judgment at 57.) Defendant's arguments focus on Plaintiff's failure to provide or prove the receipt of the right-to-sue letter. (*See, e.g.*, Def.'s Mot. for Summary Judgment at 10-13.)

These arguments could be interpreted in two ways. Either (1) Defendant sought to create a question of fact for jury by challenging the receipt or existence of the letter, or (2) Defendant did not dispute that such a letter had been received, but instead argued only that Plaintiff's claim failed as a matter of law because he did not present such letter in support of the pleadings. If Defendant intended the former, it has now waived the right to have that issue of fact submitted to a jury because Defendant

presented no evidence on this matter, did not include this question on its proposed special verdict slip, and made no objection to either the verdict slip or the instructions given to the jury by this Court. If Defendant intended the latter, the fact of receipt remains undisputed, and Plaintiff's claim is not time-barred because he filed his first complaint on July 8, 2003, well within the ninety day period. Thus, either way we interpret Defendant's arguments, judgment as a matter of [*11] law is not appropriate. [1]

> 1  As Defendant points out, Title VII and PHRA claims are treated consistently. Finding that Defendant's arguments of untimeliness under Title VII fail, we need not address the timeliness of the PHRA claims, particularly because PHRA right-to-sue letters allow an even longer time to file after receipt.

### 3. Timeliness of Administrative Complaints

Defendant argues that Plaintiff's claims, to the extent they seek redress for the written reprimand issued to Plaintiff in 1999, must be dismissed because no timely administrative complaint was filed based on that incident of alleged discrimination. Given that Plaintiff, during trial, decided not to pursue any claim based on the 1999 written reprimand as a separate incident of discrimination, this argument is moot in so far as it asks the Court to dismiss any separate claim based on that incident. (*See* Trial Tr. Day 3 at 32.)

Defendant further argues that the reprimand could not have been part of a continuing violation. [*12] Defendant asserts that the other, undated, incidents presented by Plaintiff were too disparate in nature to be considered part of a continuing violation. We find, however, that Plaintiff presented evidence "legally sufficient" for the jury to conclude that the written reprimand was part of a continuing violation of Plaintiff's rights. Defendant relies on *Rush v. Scott Specialty Gases, Inc., 113 F.3d 476 (3d Cir. 1997)* in concluding that the written reprimand cannot be part of a continuing violation. (Def.'s Br. at 12.) In *Rush*, the Third Circuit found that the plaintiff's claims that her employer failed to promote and train her because of her gender could not be part of a continuing violation by virtue of plaintiff's additional claim based on a hostile work environment. *Rush, 113 F.3d at 478*. Defendant's application of this holding, and the factors considered in reaching it, however, is far too broad. Unlike the plaintiff in *Rush*, Plaintiff does not bring claims

Case 1:06-cv-00486-JJF    Document 64-2    Filed 10/30/2007    Page 30 of 50

Page 4
2006 U.S. Dist. LEXIS 30619, *

based on two different theories of discrimination. Plaintiff's case, including the 1999 written reprimand, is based on various instances of allegedly disparate discipline and monitoring. [*13] The difference between a written reprimand and a verbal reprimand or excessive monitoring in the hopes of an opportunity for a reprimand is hardly equivalent to the difference between failure to promote because of gender and inappropriate sexual behavior in the workplace. *See, e.g., Davis v. Gen'l Accident Ins. Co. of Am., Civ. A. No. 98-4736, 2000 U.S. Dist. LEXIS 17356, *6-8 (E.D. Pa. Dec. 1, 2000)* (finding that the differences between various instances of failure to promote or actions intending to discourage the plaintiff from seeking or obtaining promotion were not comparable to the disparity between the two claims in *Rush*). Based on the testimony of various ongoing disparate monitoring techniques, we cannot say that, as matter of law, the written reprimand cannot be part of a continuing violation.

In addition to arguing that any claims based on the written reprimand should be dismissed, Defendant also argues that all evidence thereof should have been excluded. Defendant never actually moved to strike testimony as to the written reprimand, and did not object to this Court's instruction to the jury that prior instances of discrimination may be considered [*14] in determining whether Defendant should be liable for later incidents. (*See* Trial Tr. Day 3 at 34-36; Day 4 at 79.) Even if Defendant had properly objected, such objection would have been correctly overruled. A discriminatory act for which a claim is time-barred may, nonetheless, be relevant evidence to support timely-filed discrimination claims. *See Stewart v. Rutgers, The State Univ. of N.J., 120 F.3d 426, 432 (3d Cir. 1997)* (citing *United Air Lines v. Evans, 431 U.S. 553, 558, 97 S. Ct. 1885, 52 L. Ed. 2d 571 (1977)).* Not only does the above discussion belie Defendant's claim that the written reprimand is too remote in time and nature from the other alleged discriminatory acts, but this argument is even less convincing in light of the legal principals directing consideration of such acts.

### 4. Timeliness of § 1981 Claim

Defendant argues that Plaintiff failed to file his claim pursuant to *42 U.S.C. § 1981* within the two year statute of limitations. Defendant seeks dismissal of Plaintiff's § 1981 claim to the extent that it seeks recovery for the 1999 written reprimand. For the reasons outlined in the above discussion [*15] of Defendant's substantially similar arguments with regard to the timeliness of the administrative filings, we find judgment as a matter of law inappropriate. [2]

2   Like PHRA claims, § 1981 claims are treated consistently with Title VII claims. This consistent treatment includes the applicability of continuing violation theory, where appropriate. *See Verdin v. Weeks Marine Inc., 124 Fed. Appx. 92, 96 (3d Cir. 2005).*

### 5. Failure to Bring 1983 Claim with 1981 Claim

Defendant seeks judgment as a matter of law based on Plaintiff's failure to bring a claim pursuant to *42 U.S.C. § 1983* as the remedial vehicle for his § 1981 claim. Defendant admits that neither the Third Circuit nor the Supreme Court has ruled definitively on the issue of whether amendments to § 1981 effectively negated an earlier Supreme Court opinion that determined that § 1983 the "exclusive federal damages remedy" for violations of § 1981 by state actors. *See Jett v. Dallas Independent School District, 491 U.S. 701, 109 S. Ct. 2702, 105 L. Ed. 2d 598 (1989)*; [*16]  *42 U.S.C. § 1981(c)* (as amended 1991). The apparent, though not explicit, trend in the Third Circuit and its district courts is to continue to require § 1981 claims against state actors to be accompanied by claims pursuant to § 1983. We need not, however, attempt to resolve this unsettled question of law. Even were we to find that Plaintiff's § 1981 claim should not have proceeded, such a finding would not disturb the verdict. Plaintiff's Title VII and § 1981 claims were not presented separately. The jury was not provided with any instructions specific to § 1981. The damages awarded - $ 40,000.00 - are significantly below even the most restrictive statutory maximum applied to Title VII claims. [3] Absent the alleged procedural defects of Plaintiff's Title VII claims considered and rejected above, whether the § 1981 claim goes forward has no practical impact, yet requires us to venture into unsettled questions of law. Thus, judgment as a matter of law on the § 1981 claim is not appropriate.

3   *42 U.S.C. § 1981a* provides for caps on the total damages available for Title VII suits based on the number of people employed by a defendant. The lowest cap - $ 50,000.00 - is for those employing "more than 14 and fewer than 101 employees," while the highest - $ 300,000.00 - is for those who employ more than five hundred workers.

[*17] **III. Motion for a New Trial**

2006 U.S. Dist. LEXIS 30619, *

## A. Legal Standard for Rule 59

In contrast to judgment as a matter of law, ordering a new trial is squarely within the sound discretion of the district court. *Bonjorno v. Kaiser Aluminum & Chemical Corp., 752 F.2d 802, 812 (3d Cir. 1984)*, cert. denied, *477 U.S. 908, 106 S. Ct. 3284, 91 L. Ed. 2d 572 (1986)*. *Rule 59(a)* states, in pertinent part:

> (a) Grounds. A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States . . .

*Fed. R. Civ. P. 59(a)*. A court may grant a new trial if doing so is required to prevent injustice or to correct a verdict that was against the weight of the evidence. *Ballarini v. Clark Equipment Co., 841 F. Supp. 662, 664 (E.D. Pa. 1993)*, aff'd, *96 F.3d 1431 (3d Cir. 1996)*. A court may also grant a new trial based on a prejudicial error of law. *See M.B. v. Women's Christian Alliance, 2003 U.S. Dist. LEXIS 10105,* [*18] *(E.D. Pa. June 16, 2003)* (citing *Klein v. Hollings, 992 F.2d 1285, 1289-90 (3d Cir. 1993))*.

A new trial, however, cannot be granted merely because the court would have weighed the evidence differently or reached a different verdict. *Markovich v. Bell Helicopter Textron, Inc., 805 F. Supp. 1231, 1235 (E.D. Pa. 1992)*, aff'd, *977 F.2d 568 (3d Cir. 1992); See also Olefins Trading, Inc. v. Han Yang Chemical Corp., 9 F.3d 282, 290 (3d Cir. 1993)*. A court should grant a new trial "only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Williamson v. CONRAIL, 926 F.2d 1344, 1353 (3d Cir. 1991)* (citing *EEOC v. Del. Dep't Health, 865 F.2d 1408, 1413 (3d Cir. 1988))*. Thus, absent a showing of substantial injustice or prejudicial error, a new trial is not warranted and it is the court's duty to respect a plausible jury verdict. *Montgomery County v. Microvote Corp., 2001 U.S. Dist. LEXIS 8727, *26 (E.D. Pa. June 25, 2001)* (citing *Goodwin v. Seven-Up Bottling Co. of Philadelphia, Civ. A. No. 96-2301, 1998 U.S. Dist. LEXIS 11853* [*19] *(E.D. Pa. July 31, 1998))*.

## B. Discussion of Rule 59(e) Motion

### 1. Evidence of Time-Barred Claims

Defendant argues that a new trial is warranted because the jury was prejudiced by Plaintiff's presentation of evidence of discriminatory acts for which Plaintiff's claims were time-barred. We have already addressed and rejected this argument. *See supra*, II.B.3.

### 2. References to "Other Black Officers"

Defendant argues that Plaintiff's counsel repeatedly referenced discrimination claims brought by "other black officers." Defendant, in its Omnibus Motion in Limine, moved to preclude "testimony concerning complaints of discrimination/retaliation and discrimination/retaliation lawsuits filed against SEPTA by other SEPTA police officers." (Def.'s Mem. of Law in Supp. of its Omnibus Mot. in Limine at 5.) At the beginning of trial, this Court ruled that the testimony of other officers concerning Sergeant Reynolds' treatment of black officers under his supervision was admissible only to the extent that it related to Officer Dowd - an even broader prohibition than that requested in Defendant's motion in limine. (*See id.*, Trial Tr. Day 1 at 9.)

Defendant [*20] asserts that, despite this Court's ruling, Plaintiff continued to "elicit testimony and argue to the jury that Sergeant Reynolds discriminated against Plaintiff *and* other African American police officers." (Def.'s Br. at 23.) The jury was, according to Defendant, informed of the existence of "other cases out there" stemming from allegations of discrimination against SEPTA and Sergeant Reynolds. (*Id.*) Defendant claims that it was prejudiced by this evidence, which it argues was inadmissible as offered to show propensity, and by being forced to object to the extent that it appeared that Defendant was attempting to hide information from the jury.

Particularly in the civil context, courts presume that a jury can - and will - follow instructions. *Johnson v. Elk Lake Sch. Dist., 283 F.3d 138, 148 (3d Cir. 2001)* (quoting *Opper v. United States, 348 U.S. 84, 95, 75 S. Ct. 158, 99 L. Ed. 101 (1954))*. There are, however, "exceptional situations in which a new trial should be granted due to an attorney's inappropriate remarks even when the trial judge issues curative instructions." *Id.* This extraordinary remedy may be appropriate where it is "reasonably probable [*21] that the verdict was influenced by prejudicial statements." *Id. 283 F.3d at 148 n.5* (quoting *Greenleaf v. Garlock, Inc., 174 F.3d 352, 363-64 (3d Cir. 1999))*.

In support of its argument that this case is an exceptional situation warranting a new trial, Defendant relies on a group of civil cases in which a party was potentially

2006 U.S. Dist. LEXIS 30619, *

subject to criminal charges for the same actions, but was not prosecuted. *See Johnson, 283 F.3d at 147-48* (defense counsel in sexual harassment case mentioned in opening that defendant was not arrested for sexual assault); *see also Rabon v. Great Southwest Fire Ins. Co., 818 F.2d 306, 308-309 (4th Cir. 1987)* (plaintiff's counsel presented evidence/argument that client seeking fire insurance coverage was not prosecuted for arson); *Roberts v. State Farm Fire & Casualty Co., 809 F.2d 1247, 1248 (6th Cir. 1987)* (same). These cases are distinguishable from the instant case. Evidence or argument as to non-arrest, non-prosecution, or acquittal is generally inadmissible in a civil case based on the (potential) criminal charges because the significant disparity between civil and criminal burdens [*22] of proof make such information misleading. *Johnson, 283 F.3d at 147* (citing *Am. Home Assurance Co. v. Sunshine Supermarket, Inc., 753 F.2d 321, 325 (3d Cir. 1985)*). Thus, while the cited cases involved improper comments or testimony that threatened to undermine the important distinction between a civil and a criminal case, the comments here, at most, informed the jury that other officers complained of similar problems. The relatively modest verdict does little to suggest that the jury was influenced by reference to "other black officers," or that the verdict included compensation for injuries allegedly suffered by those other officers. Thus, we do not find that references to Sergeant Reynolds's allegedly discriminatory treatment of other black officers created such an "exceptional situation" that the jurors were not reasonably able to follow the curative instructions.

### 3. McKay Jones's Testimony

Defendant argues that this Court's decision not to strike the testimony of McKay Jones was reversible error because the testimony presented went beyond what was permitted under this Court's ruling limiting such evidence. Defendant objected to the admission [*23] of Mr. Jones' testimony on the basis that it was a "backdoor" way of presenting the complaints made by other officers. (Trial Tr. Day 1 at 6.) This Court prohibited Plaintiff from presenting the investigative report complied by Mr. Jones and its contents based on the determination that such testimony would constitute double hearsay that Plaintiff was unable to adequately cure. (*Id.*) At sidebar later in the trial, this Court ruled that Mr. Jones could testify for the limited purpose of rebutting testimony by Chief Evans that he had never been told that Sergeant Reynolds was using racial slurs. (Trial Tr. Day 3 at 19.)

Defendant argues that Mr. Jones's testimony did not satisfy Plaintiff's offer of proof because Mr. Jones testified that he met with Chief Evans in 2003 or 2004, while "Plaintiff filed suit in 2001." [4] Defendant incorrectly assumes that rebuttal of Chief Evans's claimed ignorance is relevant only to the extent that it might establish that the Chief knew of problems with Sergeant Reynolds before Plaintiff filed an administrative complaint. This is not the case, nor was Plaintiff's proffer so limited. (*See* Trial Tr. Day 3 at 5-6.) As this Court indicated when Defendant [*24] moved to strike Mr. Jones's testimony at trial, evidence rebutting Chief Evans's statements was for the jury to weigh. (*See id.* at 44-45.) Defendant presents no legal authority or logical reason that such evidence is not relevant and admissible as to Chief Evans's credibility. Thus, this Court properly denied Defendant's motion to strike on the basis that Plaintiff failed to address Chief Evans's testimony as per the offer of proof.

> 4 Defendant apparently refers not to the filing of the instant suit in 2003, but to the initial filing of an administrative complaint.

Defendant also complains that Mr. Jones presented previously precluded testimony regarding his investigation. Mr. Jones did describe that, at Chief Evans's request, he interviewed officers, summarized the results, and held a meeting with the Chief and others to discuss the results and address the issues they raised. (Trial Tr. Day 3 at 22.) Defendant did not object to this testimony when volunteered by Mr. Jones. (*See id.*) The extent to which [*25] Mr. Jones described any results was quite limited - he mentioned that the meeting discussed issues of discrimination, and that white officers had indicated there was a problem with Sergeant Reynolds. (*See id.* at 23.) The Court sustained Defendant's objection to further testimony on what officers told Mr. Jones and instructed Mr. Jones not to relate any further comments. (*Id.*) The Court then asked Mr. Jones from the bench whether, based on what he was told by the last out officers, he informed Chief Evans that Sergeant Reynolds was involved in racial discrimination, to which he answered in the affirmative. (*Id.*) There were no further objections, and no further testimony on direct examination about what the last out officers told Mr. Jones.

As above, Defendant's complaint here is that Plaintiff's counsel wrongfully "let the jury know that there were cases involving other African American police officers' claims of race discrimination against Sergeant Reynolds and SEPTA." (Def.'s Br. at 26.) Also as above, we find that the limited evidence of other complaints presented to the jury through Mr. Jones's testimony did not create prejudicial, reversible error warranting a new [*26] trial. The record, however, belies Defendant's claim that Mr. Jones was able to present the contents of his interviews and reports at length. Defendant also failed to contemporaneously object to what it now claims was a glaring error. The verdict does not indicate that any compensation was awarded for any claims of discrimination other than Plaintiff's own. Furthermore, the

Case 1:06-cv-00486-JJF    Document 64-2    Filed 10/30/2007    Page 33 of 50

Page 7
2006 U.S. Dist. LEXIS 30619, *

fact that other complaints were made was allowed to be presented to the jury in the form of evidence that OUJ existed and sued SEPTA for race discrimination. Defendant does not challenge that ruling, nor does Defendant persuade us that the limited testimony of Mr. Jones created some prejudice for which a new trial is warranted.

## IV. Motion for Attorney's Fees and Costs and Affirmative Action

### A. Attorney's Fees and Costs

#### 1. Legal Standard for Attorney's Fees and Costs

Reasonable attorney's fees may, at the discretion of the Court, be awarded to a party that successfully litigates claims pursuant to § 1981 or Title VII. *See 42 U.S.C. §§ 1988(b)* and *2000e-5(k)*. To determine the appropriate fee award for a prevailing party, the Court must determine [*27] the reasonable hourly rate for Plaintiff's counsel, as well as the number of hours reasonably expended in litigating the case. *See Interfaith Community Organization v. Heller-Jersey City, L.L.C., 426 F.3d 694, 703 n.5 (3d Cir. 2005)* (internal citations omitted). The product of these two figures is the "lodestar." *Id.*

The burden of showing the reasonableness of requested fees rests squarely on the party seeking the fee award. *Interfaith, 426 F.3d at 703 n.5* (citing *Rode v. Dellarciprete, 892 F.2d 1177, 1183 (3d Cir. 1990)*. The requesting party must establish the billing rate charged within the community by counsel of similar skill and experience for comparable work. *Evans v. Port Auth. of NY and NJ, 273 F.3d 346, 360-61 (3d Cir. 2001)* (internal citations omitted). The requestor must also submit evidence supporting the hours worked. *Interfaith, 426 F.3d at 703 n.5* (citing *Hensley v. Eckerhart, 461 U.S. 424, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983)*. Defendants may challenge the requested fees by objecting "with sufficient specificity" to the request. *Id.*

### B. Discussion of Reasonable Fees and [*28] Costs

Plaintiff seeks a fee award of $ 234,492.80. (Pl.'s Mot. for Attorney's Fees and Costs and Affirmative Action ("Pl.'s Fee Mot.") at P11.) This figure includes $ 216,492.50 in fees for the legal services of Mr. Abiona, $ 8,010.00 in fees for the paralegal services of Anna Maxwell, and $ 9,990.30 in litigation expenses. (*See* Pl.'s Fee Motion Ex. 1.)

#### 1. Reasonable Rates

Plaintiff asserts that Mr. Abiona's hourly rate of $ 350.00 per hour is reasonable within the community for an attorney of like experience performing comparable work. Plaintiff presents the certifications of George Styliades, Esquire, and Willan Joseph, Esquire in support of the reasonableness of the requested rate. (*See* Pl.'s Fee Mot. Exs. C and D.) Mr. Abiona further certifies that $ 350.00 has been his hourly rate since January 1, 2003, and that Judge Schiller approved an hourly rate of $ 250.00 for Mr. Abiona in 2001. (*See* Pl.'s Fee Mot. Ex. 1.)

Defendant argues that the requested rate is unreasonable in light of Mr. Abiona's performance at trial. [5] (Def.'s Opp. to Pl.'s Mot. for Attorney's Fees and Costs and for Affirmative Action ("Def.'s Opp.") at 8.) Much of Defendant's [*29] argument relies on a conclusion that, contrary to our decision above, Mr. Abiona's mistakes warrant judgment for Defendant or a new trial. (*See id.* at 8-9.) Defendant also asserts that reduction of the rate is appropriate in light of the quality of the pleadings submitted by Mr. Abiona, which were plagued by poor grammar and other apparently careless errors. (*See id.* at 9.) Defendant submits that an hourly rate of $ 150.00 would be appropriate. (*Id.*)

> 5  Defendant does not object to the $ 75.00 hourly rate requested for the time expended by paralegal Anna Maxwell. We find this rate to be reasonable within the community for paralegals assisting counsel in employment litigation. *See* CLS Fee Schedule, *infra.* (listing range of $ 70.00 to $ 90.00 per hour for paralegals in Philadelphia).

While we disagree that Plaintiff's counsel's performance warrants such a drastic decrease, we are not convinced that the requested rate is reasonable within the community. First, Mr. Abiona's certification that [*30] his hourly rate has been $ 350.00 since January 1, 2003 is of little probative value, particularly where Mr. Abiona apparently initially claimed a $ 500.00 hourly rate in the case before Judge Schiller on which he now relies. (*See* Pl.'s Fee Mot. Ex. A *James v. Norton, 176 F. Supp. 2d 385, 394 n.5 (E.D. Pa. 2001)* (Schiller, J.) (noting that Plaintiff initially requested $ 500.00 per hour for Mr. Abiona's work, but then reduced the request to $ 250.00)).

Second, we fail to see how, if Mr. Abiona now claims that $ 250.00 was an appropriate hourly rate of compensation for his employment litigation work in 2001, $ 350.00 is a reasonable rate five years later. This is a *forty percent* increase.

Last, the claimed rate does not comport with the Community Legal Services, Inc. Attorney's Fees

2006 U.S. Dist. LEXIS 30619, *

Charged to Opposing Parties Schedule of Hourly Rates ("CLS Fee Schedule"). *See* CLS Fee Schedule, Effective April 1, 2006, *available at* <http://www.clsphila.org/PDF%20folder/schedule_of_ho urly_rates_2006.pdf>. Courts in this district routinely turn to this schedule to determine the reasonableness of fees. *See, e.g., Maldonado v. Houstoun, 256 F.3d 181, 187 (3d Cir. 2001).* [*31] According to the CLS Fee Schedule, attorneys in the Philadelphia community with sixteen to twenty years of experience are compensated at hourly rates from $ 275.00 to $ 315.00. *See* CLS Fee Schedule, *supra.* Mr. Abiona's seventeen years of experience place him in the lower segment of this range.

Upon considering all relevant evidence, we find that the requested rate of $ 350.00 per hour is not reasonable. We therefore reduce the hourly rate to $ 285.00, and will apply this reasonable rate in our lodestar calculation.

### 2. Reasonable Time Expended

#### a. January 24, 2003 to July 6, 2003

Defendant objects to Plaintiff's claim for fees for time expended between January 24, 2003 through July 6, 2003. Defendant argues that time expended on Plaintiff's unsuccessful attempt to file suit as part of Officers United for Justice cannot be recovered. Defendant focuses on Plaintiff's failure to affirmatively show that he was merely substituting his name for that OUJ and that he could properly do so. The more important question here is whether time expended on the suit brought by OUJ can be considered time reasonably expended towards Plaintiff's eventual individual success.

[*32] Attorney's fees are only available on successful claims. The amended complaint filed on July 8, 2003 - the first to name Officer Dowd as an individual plaintiff - was submitted in lieu of a response to Defendant's motion to dismiss the original complaint for, among other things, OUJ's lack of standing to file suit on behalf of itself, its members, and other officers. The amended complaint removed OUJ as a plaintiff and added individual officers, including Officer Dowd. The initial complaint, therefore, can hardly be said to have asserted a successful claim such that recovery for time expended in preparing and filing it is recoverable by Officer Dowd. Thus, for the most part, only time expended subsequent to Officer Dowd's inclusion as an individually named plaintiff can be reasonably payable to him as a prevailing party under the statute. Those items, however, that were, as a practical matter, necessary to initiate any case on behalf of Plaintiff, and were not later repeated when Plaintiff was named as an individual, will not be excluded. The claimed time expended for the period start-

ing January 24, 2003 and ending July 6, 2003, will be reduced by the hours claimed for the drafting, [*33] typing and filing of the original complaint. This will subtract nine hours from Mr. Abiona's time, and six hours from Ms. Maxwell's time. In keeping with this determination, the $ 76.00 in costs expended on the original complaint shall be subtracted.

#### b. Overlap with other officers' cases

Defendant argues that Plaintiff cannot recover all the claimed fees for work performed and costs incurred prior to January 11, 2005 because such efforts were undertaken on behalf of all the plaintiffs named in the amended complaint. Defendant asserts that, as a result of this joint effort, Plaintiff is entitled to recover for only one-sixth of the work performed. Plaintiff responds that Mr. Abiona has "already adjusted the total amount of the time spent on matters that were jointly performed for any of the other Plaintiffs, and has billed Plaintiff in this case for his own portion of those services." (Pl.'s Reply Br. to Def.'s Opp. to Pl.'s Fee Motion ("Pl.'s Reply") at 2.)

Plaintiff denounces Defendant's argument as failing to point to specific instances in which costs should have been distributed among multiple clients. (*Id.*) It is Plaintiff, however, who ultimately bears the burden [*34] of showing that the time expended was reasonable. *Interfaith, 426 F.3d at 703 n.5* (citing *Rode v. Dellarciprete, 892 F.3d 1177, 1183 (3d Cir. 1990).* Plaintiff's reply offers no additional documentation to support his claim that the time entries have already been adjusted to distribute the cost among all of the officers who benefitted from the work performed. Mr. Abiona's certification does not claim that the hours expended or the hourly rate was split among all benefitted clients, that only one client was charged for each event, or that certain events have been omitted from his certified time entries. Nor do the entries submitted support that such adjustments have been made.

For example, while we agree with Plaintiff that fees for the depositions of the other officers may be properly sought to some extent, Plaintiff has not shown that the amount of time expended was reasonable. [6] Despite the admitted overlap between the cases with regards to the depositions of other officers also suing SEPTA, none of the evidence submitted shows that anything less than the full amount of time spent preparing for and attending the deposition is sought. In the absence [*35] of such evidence presented by Plaintiff, we cannot find that the entirety of the time sought is reasonably expended on behalf of *Plaintiff.* [7]

Case 1:06-cv-00486-JJF    Document 64-2    Filed 10/30/2007    Page 35 of 50

Page 9
2006 U.S. Dist. LEXIS 30619, *

6  Defendant objected to allowing Plaintiff to re-cover fees for the depositions of Jamison Ross, Luke Gardner, Kenneth Rushing, Marcus Blakeney, and Steven Johnson, who were co-plaintiffs in the amended complaint.

7  Likewise, time entries for review of docu-ments from this court that pertained to all of the officers appear to be attributed in full to this case. We fail to see how any adjustment was made to such entries as the review of this Court's order of January 15, 2004, requiring that each officer file an individual complaint when Mr. Abiona certi-fies that such review took him three-tenths of an hour, or twenty minutes. (*See* Pl.'s Fee Motion Ex. 1.) We cannot fathom that it actually took *longer* to review the brief order, and that the longer time was then apportioned among all of the officers.

Plaintiff complains that Defendant's suggestion of dividing [*36] the time sought among the clients sharing the benefit of the work is arbitrary and meritless. Plain-tiff's counsel is not, by virtue of seeking statutory fees, relieved of ethical obligations, including the obligation to charge a reasonable fee and to forthrightly communicate with his clients concerning the basis of that fee. This obligation has been interpreted to preclude attorneys from charging multiple clients for the same time or work. *See, e.g.,* ABA Comm. on Ethics and Professional Re-sponsibility, Formal Op. 93-379 (1993). Although there is not a clear violation of this obligation here, neither is there sufficient evidence presented by Plaintiff to support that the hours expended are reasonable in light of the significant overlap between Plaintiff's case and those of other SEPTA police officers represented by Mr. Abiona.

As a result, for the period before separate cases were filed by each officer, the hours expended on Plaintiff's behalf will be reduced to one seventh of what has been claimed. [8] This includes all entries from the service of the amended complaint on June 6, 2003 through the first work on the individual pleadings on January 12, 2004. [9] Thus, we will reduce [*37] Mr. Abiona's hours for this period from 55.25 to 7.89, and Ms. Maxwell's hours from 17.6 to 2.51. Similarly, the costs from this period will be reduced by six-sevenths, from $ 83.30 to $ 11.90.

8  The amended complaint listed seven plaintiffs. Defendants apparently treat Luke Gardner's case separately, and count only those plaintiffs that were added individually by the amended com-plaint. We see no reason for this distinction.

9  It appears from the time entries that work be-gan on the individual suits before the order of this

Court ordering the filing of new complaints was entered.

Determining the appropriate fees for the period fol-lowing the filing of Plaintiff's individual complaint is more complicated. As discussed above, the full amount of the fees associated with the depositions of Ross, Gardner, Rushing, Blakeney, and Johnson, appear to be sought in this case despite the fact that these individuals were also being deposed as plaintiffs in their own suits. In light of Plaintiff's failure to articulate [*38] any agreement or methodology by which the fees or the time claimed were "adjusted" to account for the overlap be-tween the cases being handled by Mr. Abiona, we will reduce the claimed hours expended for these by six-sevenths. This adjustment allows for recovery for a por-tion of the deposition, but also acknowledges that the same reasons that any portion of the deposition time is recoverable here would apply to each of the officers rep-resented by Mr. Abiona. Thus, the hours claimed by Mr. Abiona for these depositions and the preparation therefor will be reduced from 65.5 to 9.36. Likewise, the costs of these depositions will be proportionately reduced from $ 50.00 to $ 7.14.

It is less clear which of the other time expenditures benefitted other officers. Mr. Abiona claims already re-duced the time expended for review of documents that were applicable to multiple cases. Yet, the cost of copy-ing the documents produced by the PHRC has been claimed in full. Because these documents were from a complaint filed jointly by those officers that were plain-tiffs in the amended complaint, we will again allow only one seventh of this cost to be assessed in this case. We will, therefore, subtract [*39]  $ 1,472.15 from the claimed costs.

As for other depositions and discovery activity, nei-ther Plaintiff nor Defendant provides any specific infor-mation regarding which witnesses were also used in other cases, and whether the claims of other officers were actually covered in those depositions.

### c. Inaccurate entries

Defendant argues that Plaintiff's counsel's certifica-tion contains entries that overstate the time actually spent attending the noted events. Plaintiff responds that these entries include travel, preparation, and consultation time. Plaintiff also suggests that Defense counsel's recollection of Ms. Maxwell's early exit from trial is mistaken. Be-cause Defendant does not argue that consultation and preparation are not compensable, we will not reduce these entries.

2006 U.S. Dist. LEXIS 30619, *

3. Lodestar Calculation

Based on the adjustments made above, we will calculate the lodestar amount for the reasonably expended time at a reasonable rate, plus reasonable expenses.

| Claimed Hours | Reduced By | Total Hours | Rate | Sub-Total |
|---|---|---|---|---|
| 618.55 hrs. | - 112.50 hrs. | = 506.05 hrs. | $ 280.00 | $ 141,694.00 |
| 106.80 hrs. | - 21.09 hrs. | = 85.71 hrs. | $ 75.00 | $ 6,428.25 |
| $ 13,927.85 | - $ 1,662.41 | | | $ 12,265.44 |
| TOTAL | | | | [10] 160,387.69 |

[*40]  Given that Defendant's objections have already been accounted for above, we will not further adjust the fees and costs available to Plaintiff in this case.

> 10   This lodestar amount is $ 74,105.11 less than the requested $ 234,492.80 total.

**V. Conclusions**

For the reasons set forth in Parts II and III above, Defendant's motions for judgment as a matter of law or, in the alternative, for a new trial, are denied. For the reasons set forth in Part IV above, Plaintiff's motion for attorney's fees and costs and injunctive relief is granted in part and denied in part. An appropriate order follows.

***ORDER***

AND NOW, this 16th day of May, 2006, upon consideration of Defendant's Post-Trial Motion (Doc. No. 36), and all responses thereto (Doc. No. 37), and Plaintiff's Motion for Attorney's Fees and Costs and Affirmative Action (Doc. No. 31), and all responses thereto (Doc. Nos. 39, 40), it is hereby ORDERED that:

(1) Defendant's motion is DENIED;

(2) Plaintiff's motion is DENIED to [*41] the extent it seeks injunctive relief;

(3) Plaintiff's motion is GRANTED to the extent it seeks fees and costs; and

(4) Plaintiff's recovery of fees and costs from Defendant is limited to $ 160,387.69.

BY THE COURT:

s/

J. CURTIS JOYNER, J.

# TAB 5

3 of 3 DOCUMENTS

**ELLEN ZECHMAN, Plaintiff, v. CHRISTIANA CARE HEALTH SYSTEMS, Defendant.**

**C.A. No. 05-159-JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2007 U.S. Dist. LEXIS 47349*

**June 26, 2007, Decided**

**COUNSEL:** [*1] Herbert Weisasser Mondros, Esquire and Lori A. Brewington, Esquire of MARGOLIS EDELSTEIN, Wilmington, Delaware. Attorneys for Plaintiff.

Michael J. Ossip, Esquire and Thomas S. Bloom, Esquire of MORGAN, LEWIS & BOCKIUS LLP, Philadelphia, Pennsylvania. David H. Williams, Esquire of MORRIS, JAMES, HITCHENS & WILLIAMS LLP, Wilmington, Delaware. Attorneys for Defendant.

**JUDGES:** Joseph J. Farnan Jr., UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Joseph J. Farnan Jr.

**OPINION**

*MEMORANDUM OPINION*

> *June 26, 2007*
>
> *Wilmington, Delaware*

**Farnan, District Judge**

Pending before the Court is Defendant's Motion For Summary Judgement (D.I. 52). For the reasons discussed, the Court will grant the Motion.

**I. Background**

Plaintiff, Ellen Zechman, received her medical degree from East Carolina University ("ECU") in 1994. After graduation from medical school, Plaintiff began a four-year residency program in the Pathology Department at ECU. During her second year, Plaintiff left the residency program in order to devote more time to raising a family. In 2001, Plaintiff returned to her medical career full-time to pursue a specialty in Obstetrics and Gynecology ("OB/GYN").

In early 2002, at the age of 45, Plaintiff was selected to fill a vacant spot in the [*2] Department of Obstetrics and Gynecology at Christiana Care Health Systems ("Christiana Care") as a second-year resident starting on June 23, 2002. Plaintiff's one-year contract was effective from July 1, 2002, through June 30, 2003, and stated that renewal was contingent upon the recommendations of the Department Education Committee and Program Director, fulfillment of all licensure and regulatory requirements, and approval by the Graduate Medical Education Committee. (D.I. 55, A-14).

Shortly after starting her residency, Defendant alleges it became apparent that Plaintiff had some academic deficiencies including poor medical knowledge base, poor medical judgment, poor surgical skills, and poor prioritization skills. On October 28, 2002, the Resident Review Committee ("Committee"), held a meeting to evaluate the performance of all residents. The Committee's membership consisted of senior OB/GYN physicians employed by Defendant and outside attending physicians not employed by Defendant. According to Defendant, one of the Committee's functions is to evaluate the progress of residents and determine their status in the residency program. At the October 2002 meeting, because of the concerns [*3] about Plaintiff's skill level and performance in the program, the members of the Committee voted unanimously to appoint a faculty mentor, Dr. Patruno, to assist Plaintiff.

In December 2002, the then Residency Director, Dr. Anthony Sciscione, met with Plaintiff to review her progress in the residency program. Dr. Sciscione decided that it would be necessary to intensify Plaintiff's training in order to bring her to the same level of ability as other residents. A remediation program was designed for Plaintiff to include extra one-on-one instruction from all faculty. It was also recommended that Plaintiff attend extra rounds. Plaintiff voiced disapproval of the remedia-

Case 1:06-cv-00486-JJF    Document 64-2    Filed 10/30/2007    Page 39 of 50

Page 2
2007 U.S. Dist. LEXIS 47349, *

tion program via email conversations with Dr. Ekbladh, Chief of Defendant's OB/GYN Department.

Despite the remediation program, Defendant alleges that Plaintiff's evaluators continued to express concerns about her medical knowledge, medical judgment, progress, and resistance to the faculty's efforts to help her improve. At a meeting held on March 17, 2003, the Committee discussed Plaintiff's alleged inability to meet the skill level of other residents. The members of the Committee discussed various options for Plaintiff's [*4] participation in the program, including: a third year contract; a third year contract with ongoing remediation; a second year repeat contract with ongoing remediation; or no contract. During this meeting, members of the Committee voted to re-evaluate Plaintiff's contract at the next meeting in order to decide whether to renew Plaintiff's contract. From March 2003 to June 2003, Defendant alleges that Plaintiff's performance in the program did not improve. On June 16, 2003, the Committee considered terminating Plaintiff, but instead, decided to offer her the opportunity to repeat her second year of the residency program on a probationary status. Plaintiff agreed to this contract. However, according to Plaintiff, as a result of having to repeat her second year, she was even more isolated from her residency program colleagues.

On July 23, 2003, Plaintiff sent a letter to Dr. Ekbladh requesting accommodation for a medical condition diagnosed in 1997 as "a mixed connective tissue disorder." Plaintiff contends that the medical condition interfered with her work by causing her to suffer from occasional inability to concentrate, depression, fatigue, and joint pain, along with other more serious [*5] side effects. Plaintiff contends that her medical condition hindered her ability to function normally at her job because the high level of stress she experienced as a resident caused more "flare-ups" of her symptoms. Plaintiff requested an accommodation of two guaranteed three-day vacations per month.

In response to Plaintiff's request for accommodation, Dr. Ekbladh asked Plaintiff to provide supporting medical documentation for her condition. On August 11, 2003, Dr. Ekbladh spoke to Plaintiff's treating physician, Dr. Fraser, who told Dr. Ekbladh that time off would help Plaintiff manage her fatigue but gave no specific recommendation as to how to arrange the time off. Dr. Fraser faxed a written report regarding Plaintiff's condition and recommended that Plaintiff be allowed periods of rest during work and liberal use of vacation time to prevent flare-ups. As a result, Dr. Ekbladh decided to have Plaintiff apply for intermittent leave pursuant to the Family Medical Leave Act.

On July 30, 2003, Plaintiff signed a statement acknowledging that the members of the Committee would review her progress at their next meeting, to be held on August 18, 2003, and decide whether she should continue [*6] her status as a second year resident on probation, become a normal second year without probation, or be terminated from the program. At the August 18 meeting, the Committee invited three faculty members who had worked with Plaintiff to discuss Plaintiff's progress. According to the meeting minutes, Committee members voiced numerous concerns about Plaintiff's performance, as well as concerns about her mental health. (D.I. 55, A-65). The Committee ultimately decided to keep Plaintiff as a probationary second year resident on the condition that she seek psychological counseling. The Committee also decided to review Plaintiff's progress at their next meeting to be held in September 2003. (D.I. 55, A-64).

On September 29, 2003 the Committee met again to evaluate Plaintiff's performance. At the conclusion of the meeting, the Committee members voted to terminate Plaintiff's residency citing such factors as low evaluation scores, "not performing at appropriate level," failure to improve even with special help, "poor clinical judgment," and resistance to "educational interaction." (D.I. 55, A-80). By letter dated September 30, 2003, and marked as sent on October 2, 2003, Dr. Ekbladh informed [*7] Plaintiff that she was dismissed from the program for academic reasons. (D.I. 55, A-83).

On September 16, 2003, before Plaintiff's termination, Dr. Ekbladh informed Plaintiff that, in order to determine whether she was eligible for intermittent leave due to her medical condition under the Family and Medical Leave Act, she needed to submit, within fifteen days, a "Certificate of Healthcare Provider" completed by her medical provider. Plaintiff alleges that she faxed the "Certificate of Healthcare Provider" to Christiana Care on or about September 22, 2003. However, the fax was marked received on October 3, 2003. (D.I. 55, A-84). On October 6, 2003, Defendant approved Plaintiff's request for FMLA leave for intermittent time and reduced work schedule. (D.I. 55, A-90).

On June 14, 2004, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging that Defendant discriminated against her on the basis of age and disability and that Defendant retaliated against her. On March 15, 2005, Plaintiff filed the instant action alleging: 1) age discrimination under Title VII of the Civil Rights Act, *42 U.S.C. § 2000e et seq.*, the Age Discrimination [*8] in Employment Act of 1967 ("ADEA"), *29 U.S.C. § 621 et seq.*, and Delaware state law, *19 Del. C. § 711*; 2) disability discrimination under the Americans with Disabilities Act ("ADA"), *42 U.S.C. § 12101 et seq.*, and Delaware state law, *19 Del. C. § 723, 724, 726*; 3) retaliation; 4) detrimental reliance; and 5) breach of the covenant of good faith and fair dealing [1] arising out of the termination

2007 U.S. Dist. LEXIS 47349, *

of her employment. Defendant now moves for summary judgment.

> 1   In her Answer Brief to Defendant's Motion, Plaintiff voluntarily dismisses her claim of breach of good faith and fair dealing. (D.I. 57 at 1). Accordingly, the Court will not discuss that claim.

## II. LEGAL STANDARD

Pursuant to *Rule 56(c) of the Federal Rules of Civil Procedure*, a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. In determining whether there are triable issues of material fact, a court must review all of the evidence and construe [*9] all inferences in the light most favorable to the non-moving party. However, a court should not make credibility determinations or weigh the evidence.

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" However, the mere existence of some evidence in support of the nonmovant will not be sufficient to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the nonmovant on that issue. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*.

## III. DISCUSSION

### A. *Whether Defendant Is Entitled To Summary Judgment On Plaintiff's Age Discrimination Claim*

By her Complaint, Plaintiff alleges that Defendant deprived her of equal employment opportunity and otherwise affected her employment because of her age. Plaintiff contends that there was an "inherent age based bias" against her because she was the oldest resident in her program. By its Motion, Defendant contends that Plaintiff's age discrimination [*10] claims fail as a matter of law because there is no evidence that age was a motivating factor or pretext for her termination from the residency program.

When considering age discrimination claims under the ADEA, a court must use the burden-shifting analysis of *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*. *Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 330 (3d Cir. 1995)*. Under this analysis, a plaintiff must first establish a prima facie case of discrimination. *Green, 411 U.S. at 802*. A prima facie case of age discrimination under the ADEA requires the plaintiff to allege four elements: 1) he or she is at least 40 years of age, 2) he or she is qualified for the position in question, 3) he or she has suffered an adverse employment action, and 4) he or she has been replaced by a sufficiently younger employee to permit a reasonable inference of age discrimination. *Sempier v. Johnson & Higgins, 45 F.3d 724, 728 (3d Cir. 1995)*.

Once the plaintiff has established a prima facie case of discrimination, the burden shifts to the defendant. The defendant must "articulate some legitimate, nondiscriminatory reason" for its conduct. *Green, 411 U.S. at 802*. If the defendant produces [*11] a sufficient reason for its actions, the burden shifts back to the plaintiff to demonstrate that the reasons articulated by the defendant are merely a pretext for discrimination. *Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994)*. To defeat a motion for summary judgment, a plaintiff must point to some evidence from which the "factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* To accomplish this, a plaintiff can show a defendant's reasons are so weak, incoherent, implausible, or inconsistent such that they lack credibility. *Id. at 765*.

Reviewing the evidence presented by the parties in this case in the light most favorable to Plaintiff, the Court concludes that no factfinder could reasonably find for Plaintiff on her age discrimination claim. It is not disputed that Plaintiff was over 40 and suffered the adverse employment action of termination from the residency program. However, the Court concludes that Plaintiff has failed to establish sufficient evidence that she was qualified for continued [*12] employment in the residency program. Specifically, the Court concludes that Plaintiff has not presented evidence that she met the expected level of competency to be qualified for continued participation in the residency program. Members of the Resident Review Committee and other teaching physicians documented their concerns about Plaintiff's below-average skill level and lack of progress shortly after Plaintiff began her first year in the residency program in July 2002. As early as October 2002, Committee members initiated various remedial efforts intended to raise Plaintiff's performance level, including mentoring and one-on-one instruction. However, despite these efforts, the evidence shows that Plaintiff did not improve at a pace considered satisfactory by the teaching physicians. Although Plaintiff's contract was renewed once, effective until June 30, 2004, Plaintiff remained at the same sec-

2007 U.S. Dist. LEXIS 47349, *

ond-year status as the first contract. Eventually, members of the Committee voted to terminate Plaintiff's participation in the program after nearly two years of training, citing various academic and performance deficiencies. On this record, the Court concludes that Plaintiff has not provided [*13] evidence to establish that she was qualified for continuation in the residency program, and therefore, no factfinder could reasonably find that Plaintiff has established a prima facie case of age discrimination.

Furthermore, even if Plaintiff were able to establish a prima facie case, Plaintiff has not shown that Defendant's articulated reasons for its decision to terminate Plaintiff from the residency program were merely a pretext for discrimination. In its termination letter to Plaintiff, Defendant cited academic reasons as the cause for Plaintiff's termination from the program. As discussed above, members of the Committee and other attending physicians documented their concerns about Plaintiff's lack of ability and improvement throughout her time in the residency program. Thus, considering all the evidence presented, the Court concludes that Defendant has articulated legitimate, nondiscriminatory reasons for its decision to terminate Plaintiff from the residency program. Because of this conclusion, the burden shifts to Plaintiff to show that Defendant's articulated reasons for termination were a pretext for age discrimination.

Plaintiff contends that she experienced an "inherent age [*14] based bias" from faculty and colleagues in the residency program. Plaintiff was the oldest resident in the program and her age was known to the faculty and other residents. In support of her contentions, Plaintiff cites several incidences of alleged bias-revealing actions by Defendant. For example, Plaintiff contends that Sandy Kardos, Defendant's Residency Coordinator, stated, "[y]ou certainly don't look your age," when viewing her driver's license. Plaintiff contends that she was routinely questioned by other program participants why she wanted to be a resident at this stage in her life. Plaintiff further contends she was considered an "outsider" by her peers and that she felt animosity from other residents, including the Chief Resident, because she was "different". Additionally, Plaintiff contends that she was required to do more work and more rigorous work than the other residents, that she was reassigned from surgical training by the Chief Resident, and that she was denied learning opportunities.

In the Court's view, these examples, taken as true, fail to support a claim of pretext such that a factfinder might reasonably disbelieve Defendant's assertion that Plaintiff was terminated [*15] for reasons related to her lack of abilities and skills as a physician. Accordingly, the Court will grant Defendant's Motion with respect to Plaintiff's federal and state law age discrimination claims. [2]

2    Because the analysis for age discrimination claims under Title VII of the Civil Rights Act and state law, *19 Del. C. § 711*, is also based on the *McDonnell-Douglas* analysis, the Court will not address these claims separately and concludes that they fail for the same reasons that Plaintiff's age discrimination claim fails under the ADEA. *See Giles v. Family Court of Delaware, 411 A.2d 599, 601-02 (Del. 1980).*

B. *Whether Defendant Is Entitled To Summary Judgment On Plaintiff's Disability Discrimination Claim*

In her Complaint, Plaintiff alleges that Defendant violated her rights under the ADA by constructively discharging her as a result of a real or perceived disability and by denying her request for reasonable accommodation. Plaintiff also alleges she was denied equal employment opportunity because of an actual or perceived disability. By its Motion, Defendant contends that Plaintiff's disability discrimination claims are not sustainable as a matter of law because Plaintiff's medical condition [*16] does not constitute a disability under the ADA, Defendant offered Plaintiff accommodation, and Defendant's reasons for terminating Plaintiff are not a pretext for discrimination.

To prove a prima facie case of discrimination under the ADA, the employee must demonstrate that he or she 1) has a disability, 2) is a qualified individual; and 3) has suffered an adverse employment action. *Deane v. Pocono Medical Center, 142 F.3d 138, 142 (3d Cir. 1998)*. Reviewing the evidence here in the light most favorable to Plaintiff, the Court concludes that no jury could reasonably find for Plaintiff on her disability discrimination claim because the Court concludes that Plaintiff has failed to adduce evidence that she is a qualified individual. [3] Under the ADA, a "qualified individual" is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *42 U.S.C. § 12111(8)*. According to the EEOC regulations, a court must first determine whether the individual satisfies the requisite skill, experience, education and other job-related requirements of the position. *29 C.F.R. pt. 1630, app. § 1630.2(m)* If so, the [*17] court must next determine whether the individual can perform the essential functions of the job with or without accommodation. *Id.*

3    For purposes of the ADA, a disability is a physical or mental impairment that substantially limits a major life activity, taking into account any measures needed to correct for or mitigate the impairment. *Sutton v. United Airlines, Inc., 527 U.S. 471, 482, 119 S. Ct. 2139, 144 L. Ed. 2d*

2007 U.S. Dist. LEXIS 47349, *

*450 (1999).* If the plaintiff cannot demonstrate that his or her impairment meets the definition of a "disability" under the ADA, the plaintiff cannot establish a prima facie case of disability discrimination. *Kelly v. Drexel, 94 F.3d 102, 105, 109 (3d Cir. 1996).* In such circumstances, summary judgment is appropriate. *Id.* The Court is not persuaded that Plaintiff has adduced evidence sufficient to convince a jury to reasonably find that she is substantially limited by her intermittent and sporadic condition in a major life activity. However, because the Court concludes that Plaintiff cannot establish she is a qualified individual, the Court need not discuss this element of the prima facie case.

Considering all the evidence presented by the parties, the Court concludes that Plaintiff has not established that [*18] she was qualified for the residency program, regardless of accommodation for any disability. Evaluations of Plaintiff's performance in the residency program by attending physicians and members of the Committee clearly establish that, as early as October 2002, Plaintiff was performing below the level of her peers and was resistant to the efforts of the teaching physicians to assist her performance. Thus, reviewing all the evidence in the light most favorable to Plaintiff, the Court concludes that Plaintiff has not shown that she was able to perform the essential functions of her job prior to requesting the accommodation or even with the requested accommodation. Thus, the Court concludes that no factfinder could reasonably conclude that Plaintiff is a qualified individual for the residency program. Accordingly, the Court will grant Defendant's Motion with respect to Plaintiff's claims for violation of the ADA and federal and state law claims for disability discrimination. [4]

> 4   Because state law provisions governing disability discrimination, *19 Del. C. § 720 et seq.,* closely mirror the language and requirements of the ADA, the Court concludes that Plaintiff's state law claims fail for the [*19] same reasons that the federal law claims fail under the ADA. *See Testerman v. Chrysler Corp., No. 95-240-GMS, 1997 U.S. Dist. LEXIS 21392, at *43 (D. Del. Dec. 30, 1997)* (concluding that because the definitions in the Delaware statute regarding "handicapped person" mirrored those in the ADA, the holding for summary judgment on the federal claim applied to the state law claim as well).

C. *Whether Defendant Is Entitled To Summary Judgment On Plaintiff's Retaliation Claim*

In her Complaint, Plaintiff alleges that Defendant retaliated against her for her complaints about treatment from her colleagues, supervisors and instructors, complaints about not receiving training, her complaint to the Accreditation Council for Graduate Medical Education ("ACGME"), and her request for accommodation. Plaintiff alleges various retaliatory acts such as being reassigned from surgical duty to triage, being treated differently from her colleagues, and not being offered a third-year contract. In her Answer Brief In Opposition to Defendant's Motion For Summary Judgment, Plaintiff contends she engaged in activity protected by the ADA and ADEA by filing a complaint with the ACGME and for requesting an accommodation [*20] for her medical condition, and that Defendant retaliated by terminating her participation in the residency program.

To establish a prima facie case of retaliation under the ADA or the ADEA, plaintiff must show: "1) protected employee activity; 2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and 3) a causal connection between the employee's protected activity and the employer's adverse action." *Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997).* If an employee establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the alleged retaliatory action. *Id.* If the defendant satisfies the burden, the plaintiff must prove by a preponderance of the evidence that the allegedly legitimate reasons offered by the defendant were a pretext for retaliation. *Id.*

Considering the evidence presented in the light most favorable to Plaintiff, the Court concludes that no factfinder could reasonably find for Plaintiff on her retaliation claim. Specifically, regarding Plaintiff's prima facie case, the Court concludes that Plaintiff has not adduced evidence [*21] to establish a causal link between Plaintiff's allegedly protected employment activity and her termination. To establish a causal link, "the plaintiff must present evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action. Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity." *Ferguson v. E.I. DuPont de Nemours & Co., 560 F.Supp. 1172, 1200 (D. Del. 1983)* (quoting *Cohen v. Fred Meyer, Inc., 686 F.2d 793, 796 (9th Cir. 1982)).* Here, the Court concludes that Plaintiff has not presented facts to establish that Defendant was aware that Plaintiff's complaint to the ACGME alleged discriminatory practices or that Plaintiff was the author of the complaint. The communication between the ACGME and the Defendant about Plaintiff's complaint informed Defendant only that it had received an anonymous complaint about Defendant's treatment of all the residents in

2007 U.S. Dist. LEXIS 47349, *

the program. The information did not include Plaintiff's name or any allegations of discriminatory treatment.

Further, the Court concludes that Plaintiff has not adduced sufficient evidence to support an inference [*22] that her complaint to the ACGME or her request for accommodation were likely reasons for her termination. Plaintiff's request for accommodation was made on or about July 24, 2003 and her complaint to the ACGME was made known to Defendant by letter dated July 28, 2003. (D.I. 55, A-48, A-54). However, as early as October 2002, concerns with Plaintiff's academic level and lack of progress were brought to Plaintiff's attention. The Committee members considered termination of Plaintiff's participation in the program as early as June 16, 2003 but renewed her contract in June 2003 only on the probationary condition that Plaintiff repeat her second-year of the program. Further, the Court notes that the record does not reflect that Plaintiff's academic performance in the program improved between the time the initial concerns with her progress arose and the time of her termination in September 2004. On this evidence, the Court concludes that Plaintiff has not set forth facts showing that retaliation, rather than academic reasons, was the reason for her termination and therefore, the Court concludes that Plaintiff has failed to establish a causal link between her complaint to the ACGME or request [*23] for accommodation and her termination. Accordingly, the Court concludes that no factfinder could reasonably find that Plaintiff has established a prima facie claim for retaliation.

Additionally, even if Plaintiff were able to establish a prima facie case of retaliation, Defendant has articulated a legitimate, non-retaliatory reason for its action and Plaintiff has failed to adduce specific facts to show that Defendant's reason is a pretext for discrimination. Defendant contends that Plaintiff was terminated from the program for academic reasons. Plaintiff contends that Defendant's articulated reason for terminating her is pretext for discrimination because, *inter alia,* a short period of time elapsed between her request for accommodation and her termination, because she was denied the opportunity to learn, and because Defendant refused to accommodate her disability. The Court finds that the record evidence is contrary to Plaintiff's contentions. Plaintiff was given time and opportunity to improve her performance, including specialized attention. In addition, discussions regarding the possibility of termination as a remedy to Plaintiff's failure to progress occurred prior to her request [*24] for accommodation. Thus, the Court concludes that Plaintiff has not presented facts of direct or circumstantial evidence of pretext. Accordingly, the Court concludes that the Plaintiff has not set forth sufficient evidence to enable a jury to reasonably find for

Plaintiff on her retaliation claim, and therefore, will grant Defendant's Motion with respect to this claim.

D. *Whether Defendant Is Entitled To Summary Judgment On Plaintiff's Detrimental Reliance Claim*

In her Complaint, Plaintiff alleges that she "relied to her detriment upon the representations of Defendant that she would be afforded the opportunity to improve her surgical skills, and that Defendant would accommodate her disability" and that these representations caused her to suffer loss of employment and other consequences including damage to her reputation. By its Motion, Defendant contends that Plaintiff's detrimental reliance claim fails as a matter of law because two valid employment contracts govern the parties relationship and encompass all of the parties' obligations.

Although Plaintiff labels her claim as one based on detrimental reliance, it is more appropriately characterized as a claim for promissory estoppel. [*25] To succeed on a claim for promissory estoppel, "a plaintiff must prove: i) the making of a promise; ii) with the intent to induce action or forbearance based on the promise; iii) reasonable reliance; and iv) injury." *Brooks v. Fiore, 2001 U.S. Dist. LEXIS 16345, at *15 (D. Del. Oct. 11, 2001)*. "The asserting party must be able to prove the [] elements of promissory estoppel by clear and convincing evidence. Moreover, the promise, in such a case, must be definite and certain." *Continental Ins. Co. v. Rutledge & Co., Inc., 750 A.2d 1219, 1233 (Del. Ch. 2000)*.

With respect to Defendant's alleged promise to accommodate Plaintiff's medical condition, the Court concludes that Plaintiff's claim is not sustainable as a matter of law. "Promissory estoppel cannot be predicated upon a promise to do that which the promisor is already obliged to do." *Brooks, 2001 U.S. Dist. LEXIS 16345 at *17.* Here, Defendant is legally required under the ADA to accommodate disabled employees, and therefore, the Court concludes that, Plaintiff's claim must fail because Defendant's alleged promise to accommodate her disability is not an actionable promise.

Additionally, the Court concludes that Plaintiff's promissory [*26] estoppel claim fails with respect to Defendant's alleged promise of opportunity to improve her surgical skills. Plaintiff contends that Defendant was aware that her surgical skills were below those of others in her class when she was offered placement in the residency program and that Dr. Sciscione promised Plaintiff she would have ample opportunity to improve her skills. Plaintiff contends that, once she was in the program however, she was unable to gain practical surgical experience because she was reassigned from surgical cases due to the "inherent bias" held against her by the attending physicians and the Chief Resident. The Court finds

2007 U.S. Dist. LEXIS 47349, *

that the record evidence shows that Dr. Sciscione made the statements regarding opportunity to improve her surgical skills in the context of describing to Plaintiff the differences between Defendant's residency program and the programs of other teaching hospitals during the interview process. The Court concludes that, because improving residents' surgical skills was an educational objective of the residency program, Defendant's obligation to provide such opportunity was subsumed in the parties' employment agreement. Because of the Committee's concerns [*27] about Plaintiff's inadequate skill level and Plaintiff's awareness of the Committee members' concerns, the Court concludes that Plaintiff has not presented evidence showing it was reasonable for her to rely on Dr. Sciscione's comment in any other context. Accordingly, the Court concludes that no factfinder could reasonably find for Plaintiff on her detrimental reliance claim, and therefore, will grant Defendant's Motion with respect to this claim.

## IV. CONCLUSION

For the reasons discussed, the Court will grant Defendant's Motion For Summary Judgement on all counts of Plaintiff's Complaint.

An appropriate Order will be entered.

## *ORDER*

At Wilmington, the 26 day of June 2007, for the reasons set forth in the Memorandum Opinion issued this date; IT IS HEREBY ORDERED that Defendant's Motion For Summary Judgment (D.I. 52) is *GRANTED.*

Joseph J. Farnan Jr.

UNITED STATES DISTRICT JUDGE

# **TAB 6**

7 of 1998 DOCUMENTS

**JONATHAN MILTON MONK, Plaintiff, v. WARDEN RAFAEL WILLIAMS and PAM MINOR, Defendants.**

**Civ. No. 04-1358-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2007 U.S. Dist. LEXIS 72226*

**September 27, 2007, Decided**

**COUNSEL:** [*1] Jonathan Milton Monk, Plaintiff, Pro se, Delaware.

Eileen Kelly, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware, Counsel for Defendants Warden Rafael William and Pam Minor.

**JUDGES:** Sue L. Robinson, United States District Judge.

**OPINION BY:** Sue L. Robinson

**OPINION**

**MEMORANDUM OPINION**

**Sue L. Robinson, District Judge**

**I. INTRODUCTION**

Presently before the court is a motion for summary judgment filed by the State defendants Warden Rafael Williams ("Warden Williams") and Pam Minor ("Minor") (collectively "State defendants") against plaintiff Jonathan Milton Monk. (D.I. 25, 26) Pursuant to the court's order dated July 18, 2007, plaintiff's answering brief in response to defendants' motion for summary judgment was due August 17, 2007. (D.I. 34 at P 3) Plaintiff has not filed any responsive papers. (D.I. 35) For the reasons set forth below, the court will grant the State defendants' motion for summary judgment.

**II. PROCEDURAL AND FACTUAL BACKGROUND**

Plaintiff filed this *42 U.S.C. § 1983* lawsuit alleging he was removed from the Key drug treatment program ("the Key Program") on August 15, 2004, at Howard R. Young Correctional Institution ("HRYCI"), Wilmington, Delaware [1] for practicing Muslim prayer, [*2] and was denied re-entry into the program. (D.I. 2) This court summarizes plaintiff's complaint as a claim for retaliation based upon his practice of religion in violation of his *First Amendment* rights. *Id.* Plaintiff seeks monetary damages. *Id.*

> 1 The Key Program is a substance abuse rehabilitation program located in a separate housing unit at HRYCI. (D.I. 26, ex. A at 9) The State court ordered plaintiff to participate in the Key Program due to a drug relapse, which caused him to violate the terms of his probation. (D.I. 26, ex. A at 9-10)

The following facts are related to plaintiff's allegations. On August 15, 2004 at about 8:00 p.m., the plaintiff and fifteen to twenty inmates were praying beside their bunks in the Key Program's separate dormitory housing unit at HRYCI. (D.I. 26, ex. A at 10-14) The dormitory consisted of approximately 100 bunks. (D.I. 26, ex. A at 12) Officer Johnson entered the housing unit in order to perform the 8:00 p.m. head count and observed several inmates in prayer beside their bunks. (D.I. 26, ex. A at 11, 16) Officer Johnson only performs the head count on Sunday. (D.I. 26, ex. A at 11) Prisoners are required to sit on their bunks during the head count. *Id.* [*3] Plaintiff claims that Officer Johnson did not give an order for inmates to sit on their bunks during the head count. (D.I. 26, ex. A at 16, 17) Plaintiff testified that Officer Johnson called a Code 3, which is the signal for an inmate riot in progress. (D.I. 26, ex. A at 11)

Plaintiff alleges that a squad of twenty officers responded to the Code 3. (D.I. 26, ex. A at 17, 18) Plaintiff and several other inmates who continued to pray were instructed to pack their belongings and were removed from the dormitory. *Id.* Plaintiff had "just finished" praying when the officers arrived. (D.I. 26, ex. A at 18) Plaintiff testified that he said to Officer Sabato, who was about to apprehend a praying inmate, "[c]ould you not do

Case 1:06-cv-00486-JJF    Document 64-2    Filed 10/30/2007    Page 47 of 50

Page 2
2007 U.S. Dist. LEXIS 72226, *

that? He is almost done." (D.I. 26, ex. A at 18) According to plaintiff, Key Program inmates had been permitted to pray beside their bunks during the prison head count for the past three months. (D.I. 26, ex. A at 11)

Plaintiff was taken from the Key Program dormitory to a separate holding area. (D.I. 26, ex. A at 21) Plaintiff was then placed in segregation for fifteen days for impermissibly leaving his cell to obtain hot water. *Id.* At some point, Officer Sabato accused plaintiff [*4] of being the "ring leader" of the Key Program incident. *Id.* Plaintiff was found guilty of the disciplinary charge of "demonstrations" in connection with the Key Program incident. (D.I. 26, ex. A at 23) Plaintiff did not appeal the charge, stating that he had time served for "being in the hole," and he desired to return to the prison population. (D.I. 26, ex. A at 24) Plaintiff alleges he was removed from the Key Program due to prejudice stemming from certain Muslim religious sects that give Muslims a "bad wrap." (D.I. 26, ex. A at 35)

Plaintiff served the remainder of his sentence in the regular prison housing unit and never returned to the Key Program. (D.I. 26, ex. A at 24, 25) Plaintiff filed a grievance against his removal from the Key Program on the day of the Key Program incident. (D.I. 26, ex. A at 30) Prison administrators denied plaintiff's grievance and plaintiff did not appeal this decision. *Id.*

On September 14, 2004, defendant Minor approved the Multi-Disciplinary Team's ("MDT") recommendation to rescind the plaintiff's Key Program classification. (D.I. 26, ex. B at P 6) An increased classification level decreases the number of programs in which a prisoner may participate. [*5] (D.I. 26, ex. A at 38) Plaintiff's reclassification disqualified him from continuing the Key Program for two reasons. First, the Key Program Discharge Summary stated that plaintiff "did not respect authority and did not work diligently on his treatment objectives." (D.I. 26, ex. B at P 4) The Key Program Discharge Summary is dated August 20, 2004, five days after the Key Program incident. (D.I. 26, ex. B1 at 3) Second, plaintiff was found guilty of "demonstrations," [2] which "increased his risk assessment points and increased his security level classification." (D.I. 26, ex. B at P 5)

> 2   The increase in plaintiff's classification level is evidenced on the Delaware Department of Correction ("DOC") Reclassification Form. (D.I. 26, ex. B3 at 2)

On September 30, 2004, plaintiff filed this suit in response to the denial of his grievance. (D.I. 26, ex. A at 30; D.I. 2) Plaintiff asserts that his removal from the Key Program postponed his release from prison. (D.I. 2) Initially his release was scheduled for November 11, 2004; plaintiff was released from prison on March 5, 2005. *Id.*

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, [*6] and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c).* The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).* "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995)* (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita, 475 U.S. at 587* (quoting *Fed. R. Civ. P. 56(e)*). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).* The mere existence [*7] of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).* If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).*

A pro se complaint is liberally construed and held to a standard less stringent than formal pleadings. *Erickson v. Pardus, 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007).* When an adverse party fails to respond to a summary judgment motion, *Rule 56(e)* requires the court to grant the motion only "if appropriate." *Anchorage Assoc. v. Virgin Islands Bd. of Tax Review, 922 F.2d 168, 175 (3d Cir. 1990)* (quoting *Fed. R. Civ. P. 56(e)*). The Third Circuit has treated a pro se complaint containing the statement "I declare under penalty of perjury that the foregoing is true and correct" as an affidavit for the purpose of opposing a summary judgment motion. *Reese v. Sparks, 760 F.2d 64, 67 n.3 (3d Cir. 1985).* [*8] The burden remains on the nonmoving party, not the court, to identify sufficient facts from the record that show the existence of a genuine issue for trial. *Childers v. Joseph,*

2007 U.S. Dist. LEXIS 72226, *

*842 F.2d 689 (3d Cir. 1998)*. Summary judgment will be granted if the facts set forth by the moving party support a judgment as a matter of law. *Anchorage Assoc., 922 F.2d at 175*.

State defendants move for summary judgment on several grounds. [3] First, they claim they did not retaliate against plaintiff for practicing his religion in connection with the prison administration's decision to permanently remove him from the Key Program. Second, State defendants move for summary judgment because plaintiff failed to exhaust administrative remedies before filing the instant lawsuit. In addition, defendant Warden Williams moves for summary judgment on the basis that he was not personally involved in, or the moving force behind, plaintiff's allegations.

> 3 State defendants' move for summary judgment based on their immunity from monetary damages when acting in their official capacity. The court will not address this argument, due to the grant of summary judgment on other grounds.

## IV. DISCUSSION

### A. Retaliation

Plaintiff contends [*9] that his permanent removal from the Key Program is an act of retaliation for practicing his religion. Government action that does not violate the Constitution can amount to a constitutional tort if substantially motivated to punish an individual for exercising a constitutional right. *Allah v. Seiverling, 229 F.3d 220, 224 (3d Cir. 2000)*. Proof of a retaliation claim requires that plaintiff demonstrate: (1) constitutionally protected conduct; (2) an adverse action by prison officials "sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights;" and (3) "a causal link between the exercise of his constitutional rights and the adverse action taken against him." *Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003)* (citations omitted). After meeting the first two prongs, a burden-shifting framework is used by a prisoner-plaintiff to prove the causal link between the exercise of his constitutional right and the adverse action taken against him. *Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001)*. Plaintiff bears the initial burden of proving that his constitutionally protected conduct was a "substantial or motivating factor" in the decision to discipline him. [*10] *Id.* (citation omitted). The burden then shifts to the State defendants to prove by a preponderance of the evidence that they would have taken the same disciplinary action even in the absence of the protected activity. *Id.*

Deference is given to decisions made by prison officials. *Rauser, 241 F.3d at 333* (citing *Turner v. Safley, 482 U.S. 78, 89, 107 S. Ct. 2254, 96 L. Ed. 2d 64*

*(1987))*. Even if a prisoner demonstrates that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, prison officials still may prevail by proving they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest. *Id. at 334*.

State defendants do not dispute that praying is a protected constitutional right. (D.I. 26 at 6) Therefore, plaintiff has met the first prong of the retaliation test. State defendants do dispute that plaintiff has satisfied the adverse action prong of *Rauser*. (D.I. 26 at 6-7) Plaintiff claims that when officers responding to the Code 3 entered the Key Program dormitory, he had "just finished" praying. (D.I. 26, ex. A at 18) At that time, plaintiff asked an officer not to disturb another praying inmate. (D.I. [*11] 26, ex. A at 18) It is clear from the record, therefore, that plaintiff's own conduct was not disturbed; he was defending the rights of another inmate to pray and was not deterred from praying himself.

In *Hamilton v. Civigenics, No. 03-826, 2005 U.S. Dist. LEXIS 2625, 2005 WL 418023, at *2 (D. Del. Feb. 22, 2005)*, plaintiff alleged retaliation because he was removed from the Key Program subsequent to filing a lawsuit against the DOC. The *Hamilton* court held plaintiff's removal from the Key Program "would not negatively sway a reasonable prisoner from [the constitutional right of] pursuing redress in the court." *2005 U.S. Dist. LEXIS 2625, [WL] at *3*. Based on this reasoning, the court similarly finds that the prison administrator's decision to remove plaintiff from the Key Program did not constitute an obstacle which would deter a person of ordinary firmness from exercising his constitutional right to practice religion. Therefore, the adverse action of prong of the *Rauser* test is not satisfied, [4] and summary judgment is appropriate.

> 4 Because plaintiff has not satisfied the second prong of *Rauser*, the court will not discuss the third prong of the retaliation test.

### B. Personal Involvement

Defendant Warden Williams moves for summary judgment because [*12] he asserts he had no personal involvement in the conduct that forms the basis for plaintiff's allegations. "It is an established principle that the doctrine of respondeat superior is not an acceptable basis for liability under *42 U.S.C. § 1983*." *Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)*; *Moody v. Kearney, 380 F.Supp.2d 393, 398 (D. Del. 2005)* (citing *Monell v. Dep't of Social Servs., 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978))*. Under Third Circuit case law, "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs" to be liable.

*Sutton v. Rasheed, 323 F.3d 236, 249 (3d Cir. 2003)* (quoting *Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)*). Liability of a supervisor under *§ 1983* occurs when the supervisor was the "moving force" behind the subordinates constitutional tort. *Sample v. Diecks, 885 F.2d 1099, 1117 (3d Cir. 1989).* A supervisory official is the "moving force" behind a cognizable constitutional injury when the "official's conduct [is] evidenced [by] deliberate indifference and . . . a close causal relationship between the identified deficiency and the ultimate injury." *Id. at 1118.* In order to establish supervisory liability, plaintiff must [*13] identify a specific supervisory practice or procedure that defendant failed to employ, that the existing custom or practice without that specific practice or procedure created an unreasonable risk of harm, that defendant was aware that this unreasonable risk existed, that defendant was indifferent to that risk, and that plaintiff's harm resulted from defendant's failure to employ that supervisory practice or procedure. *Id.*

The record is clear that Warden Williams is named as a defendant solely based on his position as the Warden of HRYCI. The court finds that plaintiff has failed to produce sufficient evidence to show Warden Williams' personal involvement or that Warden Williams was the moving force behind the allegation of retaliation. As to Warden Williams, the court grants the motion for summary judgment on the basis of personal involvement.

**C. Exhaustion of Remedies**

State defendants also move for summary judgment because plaintiff did not exhaust all administrative remedies prior to filing the instant lawsuit. The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under *section 1983* or any other Federal law, by a prisoner [*14] confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *42 U.S.C. § 1997e(a); see Porter v. Nussle, 534 U.S. 516, 532, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002)* ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.") Because an inmate's failure to exhaust under PLRA is an affirmative defense, the inmate is not required to demonstrate exhaustion or specially plead in his complaint. *Jones v. Bock, 127 S. Ct. 910, 912, 166 L. Ed. 2d 798 (2007).* Failure to exhaust administrative remedies must be pled and proved by the defendant. *Ray v. Kertes, 285 F.3d 287, 295 (3d Cir. 2002).*

Under *§ 1997e(a)*, "an inmate must exhaust [administrative remedies] irrespective of the forms of relief sought and offered through administrative avenues." *Booth v. Churner, 532 U.S. 731, 741 n.6, 121 S. Ct.* *1819, 149 L. Ed. 2d 958 (2001).* Under *Woodford v. Ngo, 126 S. Ct. 2378, 2382, 165 L. Ed. 2d 368 (2006),* exhaustion means proper exhaustion. That is, "a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition [*15] to bringing suit in federal court." *Id. at 2384.* As long as there is a shared factual basis between the two, perfect overlap between the grievance and a complaint is not required by the PLRA. *See Woodford, 126 S. Ct. at 2388.* The PLRA does not require the grievance and complaint to be identical, because inmates are required to complete the applicable administrative prison (such as a grievance procedure) even when seeking a form of relief that the prison cannot provide, so long as the prison can afford some sort of relief. *See Booth v. Churner, 532 U.S. 731, 736 (2001).*

The exhaustion requirement is absolute, absent circumstances where no administrative remedy is available. *See Spruill v. Gillis, 372 F.3d 218, 227-28 (3d Cir. 2004); Nyhuis v. Reno, 204 F.3d 65, 67 (3d Cir. 2000); Freeman v. Snyder, No. 98-636-GMS, 2001 U.S. Dist. LEXIS 16634, 2001 WL 515258, at *7 (D. Del. Apr. 10, 2001)* (finding that if no administrative remedy is available, the exhaustion requirement need not be met). However, if prison authorities thwart the inmate's efforts to pursue the grievance, administrative remedies may be presumed exhausted, as no further remedies are "available" to him. *Brown v. Croak, 312 F.3d 109, 112-13 (3d Cir. 2002).* [*16] The PLRA exhaustion requirement does not apply to prisoners who file a timely complaint after release from prison, but does apply to prisoners who file a complaint while in prison and are subsequently released. *Ahmed v. Dragovich, 297 F.3d 201, 210 (3d Cir. 2002).*

State defendants rely upon the Standard Operating Procedures of the DOC effective January 1, 2001, to support their position that plaintiff did not follow the grievance procedures. (D.I. 26, ex. E) The DOC procedures provide that "[o]ffenders may apply through the courts for relief but should first exhaust all facility administrative and appeal procedures." (D.I. 26, ex. E) On August 15, 2004, plaintiff submitted a grievance alleging retaliation, which requested his return to the Key Program. (D.I. 26, ex. A1) Prison administrators denied plaintiff's grievance. (D.I. 26, ex. A at 30) Plaintiff failed to appeal the prison administration's decision. (D.I. 26, ex. A at 30) Accordingly, the court will grant the motion for summary judgment on the basis of failure to exhaust administrative remedies as to the August 15, 2004 grievance.

**V. CONCLUSION**

2007 U.S. Dist. LEXIS 72226, *

Based on the aforementioned reasons, the court grants the State defendants' motion [*17] for summary judgment. An appropriate order shall issue.

**ORDER**

At Wilmington this 27th day of September, 2007, for the reasons set forth in the memorandum opinion issued this date;

IT IS HEREBY ORDERED that State defendants' motion for summary judgment (D.I. 26) is granted. The clerk of the court is directed to enter judgment for defendants and against plaintiff.

Sue L. Robinson

United States District Judge