IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

EDITH CHOMA                         )
                                    )
            Plaintiff,              )          C.A. NO.  06-486-JJF
                                    )
        v.                          )          JURY TRIAL DEMANDED
                                    )
BLUE CROSS BLUE SHIELD              )
OF DELAWARE,                        )
                                    )
            Defendant.              )

---

**APPENDIX TO
PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

MARGOLIS EDELSTEIN
Herbert W. Mondros, Esquire (Del. #3308)
750 South Madison Street, Suite 102
Wilmington, Delaware 19801
(302) 888-1112 phone
(302) 888-1119 fax
Attorney for Plaintiff

Dated: October 30, 2007

## TABLE OF CONTENTS

### APPENDIX TO PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Page

Job descriptions Administrative Assistant Grade 7 and Grade 8.......................B0001

Organizational Charts ................................................................................B0007

Letter to Dr. Mannis from Dr. Witt dated April 5, 1995...................................B0010

Letter to Dr. Mannis from Dr. Witt dated October 20, 1995.............................B0012

E-mail from Choma to Kaplan re: Appt. at Johns Hopkins dated April 21, 1999.....B0013

Choma Performance Evaluation for 1999.....................................................B0014

Kaplan meeting with Choma dated March 3, 2000..........................................B0021

E-mail from Carpenter to Kaplan re: Choma Sick time dated May 7, 2001...........B0022

Choma Performance Evaluation for 2000.....................................................B0023

E-mail from Kaplan to Choma re: Financial Seminar dated May 22, 2002............B0031

E-mail from Donna May to Choma re: move dated August 7, 2002....................B0032

Memo from Donna May to File re: Choma Investigation November 11, 2002........B0033

DDOL and EEOC claims filed by Choma dated November 25, 2002..................B0036

Notice of Reasonable Cause Finding from DDOL dated October 31, 2003...........B0040

PTO reports dated December 1, 2003...........................................................B0042

CareFirst Service Award to Choma dated August 9, 2004................................B0044

Doctor's Note dated August 20, 2004..........................................................B0045

Doctor's Note from Dr. Hilton dated August 25, 2004....................................B0047

E-mails between Choma and Sweeney re: typing letters dated August 25, 2004.....B0048

Memo from Sweeney to Choma re: Unscheduled OT dated August 25, 2004.........B0051

Memo from Cathy Quinn to Choma re: Work Restrictions dated August 30, 2004...B0052

E-mails from Sweeney to Choma
re: work not completed dated September 20, 2004......................................B0054

PIP for Choma dated October 29, 2004.....................................................B0056

E-mail from Sweeney to Choma re: arrival time dated November 1, 2004...........B0061

Associate Profile for Choma dated November 1, 2004...................................B0062

Exit Interview of Choma dated February 15, 2005........................................B0063

Charge filed by Choma against BCBSD to DDOL dated October 22, 2004...........B0067

Excerpts from the Deposition Transcript of Timothy J. Toole
Dated June 6, 2007........................................................................B0068

Excerpts from the Deposition Transcript of David J. Martin
Dated September 27, 2007................................................................B0073

Excerpts from the Deposition Transcript of Deborah M. Sweeney
Dated September 7, 2007..................................................................B0083

Deposition Transcript of Paul A. Kaplan, M.D.
Dated October 1, 2007....................................................................B0114

Excerpts from the Deposition Transcripts of Edith Choma
Dated April 19, 2007, April 25, 2007 and June 14, 2007..............................B0185

| Job Title: Medical Administrative Assistant | Pay Grade: 7 |
|---|---|
| Division: Medical Management | Reports To: Director QI |
| Department: QI | Incumbent(s): |
| Departmental Approval: | Date: |
| Approval Signature: | |

## Summary of Position

This position provides research assistance and administrative secretarial duties for the Director, QI and the Medical Director. Under limited supervision the incumbent conducts research and obtains information related to new medical technologies, records and files minutes of various QI committees, assists in the development and maintenance of a filing system to support ongoing NCQA roadmap documentation, prepares and distributes meeting agendas, and assists in the development and distribution of member and provider letters and bulletins as necessary. The incumbent will also provide assistance in coordinating the scheduling of QI Teams. The incumbent must poses a working knowledge of medical terminology, have good written and oral communication skills and must have proficient skills in Microsoft Word, Excel, Power Point, Access, and Front Page. Working knowledge of flowcharting software is desired. The incumbent must be able to work independently, have good organizational skills, and be able to handle confidential matters appropriately.

## Principal Accountabilities

Under the direction of the Medical Director, and the Director of QI the incumbent's accountabilities include but are not limited to the following:

| Accountability No. | Percentage of position responsibilities | Accountability |
|---|---|---|
| 1. | 60% | a. Prepares and distributes minutes and agendas to committee members prior to scheduled meetings for the following committees:<br>• CQIC ✓<br>• CPAC – NO<br>• Confidentiality – ✓<br>• Health Benefits – NO ⟩ Reg<br>• New Technology – NO<br>• Pharmacy & Therapeutics – NO<br>• QI Team meetings as assigned ✓ |

DEPOSITION EXHIBIT
CHOMA-3
CMV-4/19/07

B0001

P0001

| Accountability No. | Percentage of position responsibilities | Accountability |
|---|---|---|
| *not yet done* — | | b. Maintains minute binders with appropriate agendas, minutes of meetings, attendance lists and all reports & attachments. /<br>c. Obtains required signatures on all minutes.<br>d. Performs research as requested for all new medical technologies from CDC, Agency for Healthcare Policy & Research, US Preventive Task Force, Blue Cross Association, CareFirst, and other organizations as requested.  *Do.*<br>e. Completes new technology evaluation form including references and distributes to New Technology Committee members prior to meeting. Provides an overview of existing benefits or lack of benefits to the QI/Project Coordinator.  *Do.*<br>f. Prepares all new Health Benefit Policies and other internal departmental documents as requested in MS Front Page for posting on the intranet. |
| *have not kept up — PB does* | | |
| 2. *have tried* | 20 | a. Develops and maintains a filing system for updating the NCQA Roadmap binders. This includes information such as member newsletters, provider bulletins, physician letters, team minutes, survey results etc.<br>b. Maintains documentation of completion of QI Work Plan activities by responsible parties. Sends reminders as necessary for work that is not completed. |
| *resp. now of Sallys grp.* | | |
| 3. | 20% | a. Manages the schedule of the Director, QI. Receives and screens telephone calls and mail as necessary.  *OK*<br>b. Prepares professional appearing visual aids to be used during various presentations to committees and the Board of Directors.  *OK*<br>c. Maintains departmental electronic attendance calendar.  *OK*<br>d. Assists in the preparation of reports, studies, and projects associated with the QI department.  *OK*<br>e. Communicates effectively and professionally with other Departmental Directors and associates when performing job functions.  *OK* |

| Accountability No. | Percentage of position responsibilities | Accountability |
|---|---|---|
| | | f. Performs other duties as assigned by the Medical Director or the QI Director. |
| | | |

**Supervisory Responsibilities:**
This position does not supervise any other positions

## Qualifications & Requirements

**Required Skills/Abilities:**
The incumbent must poses a working knowledge of medical terminology, have good written and oral communication skills and must have proficient skills in Microsoft Word, Excel, Power Point, Access, and Front Page. Prior experience developing written report formats is required. Working knowledge of flowcharting software is desired. The incumbent must be able to work independently, have good organizational skills, and be able to handle confidential matters appropriately.

This position requires three to five years of comprehensive administrative assistance. Experience with project management is a plus.

**Physical Demands:**
The physical demands described here are representative of those that must be met by an employee to perform the essential duties and responsibilities of the position successfully. Requirements may be modified to accommodate individuals with disabilities.

The employee is primarily seated while performing the duties of the position. Occasional walking or standing is required. The hands are regularly used to write type, key, and handle or feel small controls or objects. The employee must frequently speak and listen. Weights of up to 25 pounds are often lifted.





| Job Title: Medical Administrative Assistant | Pay Grade: 8 |
|---|---|
| Division:  Medical Management | Reports To: Chief Medical Officer |
| Department: Managed Care | Incumbent(s): |
| Departmental Approval: | Date: |
| Approval  Signature: | |

### Summary of Position

This position provides administrative secretarial duties for the Chief Medical Officer, Assistant Medical Director and Director of Behavioral Health.  The incumbent provides support for all NCQA associated activities and coordinates meetings and types minutes for these meetings.  The incumbent also maintains accurate files of all handouts at NCQA related meetings.  The incumbent will also provide assistance in coordinating the scheduling of QI Teams.  The incumbent must poses a working knowledge of medical terminology, have good written and oral communication skills and must have proficient skills in Microsoft Word, Excel, Power Point, Access, and Front Page.  Working knowledge of flowcharting software is desired.  The incumbent must be able to work independently, have good organizational skills, and be able to handle confidential matters appropriately.

### Principal Accountabilities

Under the direction of the Medical Director, and the Director of QI the incumbent's accountabilities include but are not limited to the following:

| Accountability No. | Percentage of position responsibilities | Accountability |
|---|---|---|
| 1. | 60%<br><br>20% | • **General Secretarial Duties**<br><br>• Equipment Operation<br><br>a. Ensures that all the hardware and electronic equipment in the department is operational. Ensures that all supplies necessary for the efficient operation of the equipment are available.<br>b. Has a working knowledge of how to operate the equipment and is responsible for coordinating any repair calls to the equipment vendors. |

B0004

| Accountability No. | Percentage of position responsibilities | Accountability |
|---|---|---|
| | 80% | • Departmental Organization<br>a. keeps all documents and binders for the departmental meetings in a defined area.<br>b. Ensures that all the binders are maintained up to date with appropriate minutes and attachments for every meeting.<br>c. Organizes the departmental monthly birthday cake.<br>d. Maintains an active calendar of CEU activities and interacts with vendors to arrange these CEU sessions.<br>e. Maintains a database of medical staff and their licensure and CEU status.<br>f. Updates the departmental budget binder on a monthly basis.<br>g. Helps maintain the schedule for the use of the HCCB meeting rooms.<br>h. Arranges all the travel for Medical Management associates.<br>i. Schedules all departmental meetings and training sessions.<br>j. Posts all Medical Director letters onto the departmental site on the intranet.<br>k. Maintains the Managed Care Department calendar to track the vacation and medical education time for the staff members.<br>l. Provides assistance to other departmental secretaries as necessary. |
| 2. | 30% | **NCQA Activities**<br>a. maintains all policies and procedures and updates them as necessary.<br>b. Coordinates all NCQA related mailings.<br>c. Assists the Chief Medical Officer in the preparation of professional appearing visual aids to be used in committee meeting presentations, as well as presentations to physician groups and the Board of Directors.<br>d. Manages the schedule of the Chief Medical Officer, screens calls and deals with the mail as necessary.<br>e. Assists departmental staff members with special projects related to NCQA or quality improvement. |

B0005

| Accountability No. | Percentage of position responsibilities | Accountability |
|---|---|---|
| 3. | 10% | a. Communicates effectively and professionally with other Departmental Directors and associates when performing job functions.<br>b. Performs other duties as assigned by the Chief Medical Officer, the Assistant Medical Director, the Director of QI, or the Director of Behavioral Health.<br>c. Abides by the BCBSD confidentiality policy. |
| | | |

**Supervisory Responsibilities:**
This position does not supervise any other positions

## Qualifications & Requirements

**Required Skills/Abilities:**
The incumbent must poses a working knowledge of medical terminology, have good written and oral communication skills and must have proficient skills in Microsoft Word, Excel, Power Point, Access, and Front Page. Prior experience developing written report formats is required. Working knowledge of flowcharting software is desired. The incumbent must be able to work independently, have good organizational skills, and be able to handle confidential matters appropriately.

This position requires three to five years of comprehensive administrative assistance. Experience with project management is a plus.

**Physical Demands:**
The physical demands described here are representative of those that must be met by an employee to perform the essential duties and responsibilities of the position successfully. Requirements may be modified to accommodate individuals with disabilities.

The employee is primarily seated while performing the duties of the position. Occasional walking or standing is required. The hands are regularly used to write type, key, and handle or feel small controls or objects. The employee must frequently speak and listen. Weights of up to 25 pounds are often lifted.

B0006

P0006



# Medical Management 2002

CONFIDENTIAL

D000092

02/27/02

Budget 55
Actual 43
Temps 2

Chief Medical Officer/Medical Director
Paul Kaplan, M.D.
cc: 24000, Ext. 3409

Medical Consulting Expenses
(CPAC, etc)
cc: 42120

Divisional Secretary
Edith Chona
cc: 24000, Ext. 3272

Assistant Medical Director
John Castiglioni, M.D.
cc: 24000, Ext. 3403

Director, Quality Improvement
Jane Israel
cc: 42030, Ext. 3484

Manager, Managed Care
Eileen Brown
cc: 42030, Ext. 3591

Administrative Assistant
Charlene Carpenter
cc: 42030, Ext. 3326

Case Manager
Charlene Collins
cc: 42030, Ext. 8754

Case Manager
Vicki Brown
cc: 42030, Ext. 8763

Case Manager
Barbara Little
cc: 42030, Ext. 2585

Case Manager
Peggy Carroll
cc: 42030, Ext. 8939

Case Manager
Audrey Obick
cc: 42030, Ext. 3347

Case Manager
Sally Coyle
cc: 42030, Ext. 3429

Managed Care Rep
Lisa Hall
cc: 42030, Ext. 8764

Managed Care Rep
Barbara Carter
cc: 42030, Ext. 8652

Managed Care Rep
Priscilla Doherty
cc: 42030, Ext. 8757

Managed Care Rep
Carol Moras
cc: 42030, Ext. 3467

Managed Care Rep
Robin Hendrixson
cc: 42030, Ext. 8946

Managed Care Rep
Kathy Gallagher
cc: 42030, Ext. 8927

Temp: M. Kobosko
cc: 42060, Ext. 8768

Temp: S. Snow
cc: 42060, Ext. 8760

Managed Care Assistant
Thea Blackston-Massey
cc: 42030, Ext. 3412

QI Representative
Charlene Blanchard
cc: 42030, Ext. 8702

QI Representative
Yvonne Locker
cc: 42030, Ext. 3494

David Martin
Data Analyst
cc: 42030, Ext. 8784

Peg Bell
QI Project Coordinator
cc: 42030, Ext. 3261

NCOAQI
cc: 42090

Director, Behavioral Health
Tim Toole
cc: 42180, Ext. 2111

Clinical Case Manager
Joyce James
cc: 42180, Ext.8920

Clinical Case Manager
Anne Kennedy
cc: 42180, Ext. 8923

Clinical Case Manager
Ellen Lafferty
cc: 42180, Ext. 8922

Clinical Case Manager
Margaret McLaughlin
cc: 42180, Ext. 8921

Clinical Case Manager
Kathy Kirwin
cc: 42180, Ext. 8935

Clinical Case Manager
Beth Bussard
cc: 42180, Ext. 8935

Clinical Case Mgr (FEP)
Ruth Whelan
cc: 42190, Ext. 8936

Intake Coordinator
Cindy Zoah
cc: 42180, Ext. 8820

Intake Coordinator
Karen Garneski
cc: 42180, Ext. 8924

Supervisor
Outpatient Referral Center
Nina Frazier
cc: 42060, Ext. 3260

MC Intake Coordinator
Diane Williams
42060, Ext. 3868

MC Intake Coordinator
VACANT
42060, Ext. 2126

MC Intake Coordinator
Theresa Smith
42060, Ext. 3446

MC Intake Coordinator
VACANT
42060, Ext. 3329

MC Intake Coordinator
Kathy Kirwan
42060, Ext. 3473

MC Intake Coordinator
Lidia Hanson
42060, Ext. 3383

MC Intake Coordinator
Ruth Denison
42060, Ext. 8526

MC Intake Coordinator
VACANT
42060, Ext. 3481

MC Intake Coordinator
Lisa Flowers
42060, Ext. 3450

MC Intake Coordinator
Leshia Horne
42060, Ext. 8893

Admin. Assistant
Chris Zakutney
42060, Ext. 8900

MC Intake Coord.
Belinda Bailey
42060, Ext. 3357

B0007



Medical Management

CONFIDENTIAL

11/03/02

D00090

**B0008**



MS100 Managed Care Summary
24000 Medical Director
24010 Admin. Support
24020 Managed Care Data Report
42060 Referral Center
42210 QPAC
42030 Behavioral Summary
A2040 Behavioral Summary
  42180 Behavioral Health
  42190 FEP Behavioral Health
A2040 QI/UM Summary
  42010 QI/UM
  42030 UM/CM
  42090 NCQA/QI
  42095 FEP Medical
B2000 Managed Care, Mgt. Summary
  42000 Managed Care

CONFIDENTIAL

D00222

B0009

ROBERT L. WITT, M.D., F.A.C.S.

EAR, NOSE AND THROAT
HEAD AND NECK SURGERY
PEDIATRIC OTOLARYNGOLOGY
FACIAL PLASTIC SURGERY

THE DEVON - SUITE 112
2401 PENNSYLVANIA AVENUE
WILMINGTON, DELAWARE 19806-1427

TELEPHONE (302) 688-1960

DIPLOMAT - AMERICAN BOARD
OF OTOLARYNGOLOGY

FELLOW - AMERICAN COLLEGE
OF SURGEONS

FELLOW - AMERICAN SOCIETY
FOR HEAD AND NECK SURGERY

FELLOW - AMERICAN ACADEMY
OF FACIAL PLASTIC
AND RECONSTRUCTIVE SURGERY

April 5, 1995

Thomas Mannis, M.D.
1941 Limestone Road
Limestone Medical Center
Suite 218
Wilmington, DE 19808

RE: Edith Choma

Dear Tom:

Back on November 28, 1994, Ms. Edith Choma came into the office for a problem with vertigo. She had requested holding off on testing and finally came in in April for that.

The history on Ms. Edith Choma is that she has had several episodes of vertigo resulting in nausea and vomiting and lasting up to a day or two. She has tinnitus and pressure predominantly in the right ear now. She has a fluctuation in her hearing periodically as well. There is no pain, drainage or history of preceding upper respiratory tract infection or head trauma. She tells me that as recently as a month ago she had another severe episode of vertigo.

Her general health is good, although she has a history of hyperthyroidism and has been treated with Tapisol. She is allergic to codeine. She is a non-smoker.

Physical examination of the ears, including external auditory meati and tympanic membranes, are within normal limits. The nose, upper respiratory tract and neck were all normal.

An audiogram revealed a low frequency sensorineural hearing loss in the right ear down to 50 decibels with good discrimination scores. The tympanograms were normal. The ENG reveals a unilateral weakness on the right side.

Her history, ENG findings and audiogram were very classic for Meniere's disease. I have recommended at that point conservative management with Meclizine. Should her hearing loss progress and her vertigo be intolerable, one could consider a labyrinthotomy for relief of vertigo symptoms. If all of her hearing is lost, then a labyrinthectomy could be carried out a great assurance that this would probably alleviate further vertigo. At this point, again I recommend

EDITH CHOMA
April 5, 1995
Page Two

conservative management and it probably would be worthwhile to have updated thyroid function testing on her as well.

Sincerely,

Robert L. Witt, M.D., F.A.C.S.

RLW/mdk

Dictated But Not Proofread

**B0011**

P0179

# ROBERT L. WITT, M.D., F.A.C.S.

EAR, NOSE AND THROAT
HEAD AND NECK SURGERY
PEDIATRIC OTOLARYNGOLOGY
FACIAL PLASTIC SURGERY

THE DEVON - SUITE 112
2401 PENNSYLVANIA AVENUE
WILMINGTON, DELAWARE 19806-1427

TELEPHONE (302) 668-1980

DIPLOMAT - AMERICAN BOARD
OF OTOLARYNGOLOGY

FELLOW - AMERICAN COLLEGE
OF SURGEONS

FELLOW - AMERICAN SOCIETY
FOR HEAD AND NECK SURGERY

FELLOW - AMERICAN ACADEMY
OF FACIAL PLASTIC
AND RECONSTRUCTIVE SURGERY

October 20, 1995

Thomas Mannis, M.D.
1941 Limestone Road
Limestone Medical Center, Suite 218
Wilmington, DE  19808

RE: Edith Choma

Dear Tom:

Ms. Edith Choma is back in my office. She has Meniere's disease involving the right ear, which is documented by a depressed caloric study via ENG on that right ear. She has low frequency sensorineural hearing loss, down to 50 decibels, with fluctuating hearing and periods of vertigo that last two to three hours with nausea and vomiting. She is classic for Meniere's disease involving the right ear. She complains of tinnitus and fullness in the left ear as well. 40% of patients with Meniere's disease have bilateral involvement.

Examination of the ears, of course, is normal, including external auditory meati and tympanic membranes.

In conclusion, she has vertigo which is altering her quality of life significantly. I would like to repeat her audiogram, ENG and also do a brainstem-evoked response. I think that her choices include continued medical management with Meclizine. I think in her given case, one has to give the thought to surgical intervention. The surgical options include cochleosacculotomy, endolymphatic sac surgery and vestibular nerve section. I have reviewed the various risks, benefits and possible complications of all three procedures. In this particular patient, I would lean towards consideration for a cochleosacculotomy. This would be based on her follow-up audiogram and vestibular testing.

Sincerely,

Robert L. Witt, M.D., F.A.C.S.
Dictated But Not Proofread

**B0012**

## Choma, Edith

| | |
|---|---|
| From: | Choma, Edith |
| Sent: | Wednesday, April 21, 1999 2:03 PM |
| To: | Kaplan, Paul |
| Subject: | Appointment at Johns Hopkins |

Dr. Kaplan, I want you to know that I have made an appointment at Johns Hopkins for July 19, 1999 at 8:30 am. with Dr. John Niparko.

I intend to get this taken care of because I don't want this to affect my health or my job performance in any way. I certainly appreciate your patience and understanding.

| Tracking: | Recipient |
|---|---|
| | Kaplan, Paul |



DEPOSITION EXHIBIT
CHoMA-14
CMV-7/25/07

**B0013**

D00097

CONFIDENTIAL.

1

# PERFORMANCE EVALUATION FORM



DEPOSITION
EXHIBIT
CHomA-4
CmV-4/19/07

| | |
|---|---|
| **Edith Choma** | **May 16, 1999** |
| Employee Name | Effective Date |
| **Cost Containment Programs** | **May 16, 1998** |
| Section/Department/Division | Date of Last Performance Evaluation |
| **Secretary III** | **N/A** |
| Position | Date of Intervening Performance Update |

***DIRECTIONS:***   In completing this Performance Evaluation, the steps listed below should be followed. For additional guidance, please consult the Performance Evaluation policy.

1.    Principal Accountabilities extracted from the employee's Position Description should be paraphrased and identified by number on the Evaluation Sheets. Principal Accountabilities must be weighted in 5% multiples. Key Results expected, within each Principal Accountability, must be weighted in 10% multiples.

2.    If you are evaluating a management employee, it is appropriate to include management accountabilities among the job's Principal Accountabilities. The management accountabilities which are common to all management jobs are those for objectives, planning, budgeting, managing subordinates, controlling against planned-for results, and administering corporate, including Human Resources, policies. The management accountability for preparing Performance Evaluations that are timely and which accurately reflect performance is to be included in evaluating Human Resources policy administration. The degree of participation in these management processes will vary by management level.

3.    The reviewed employee's opinions regarding his/her performance should be solicited by the preparer prior to preparing the Performance Evaluation.

4.    Overall evaluations of Principal Accountabilities will be based on the total weighted average of evaluations of the Key Results expected within each Principal Accountability. The overall performance evaluation will be based on the weighted average evaluation for each Principal Accountability.

5.    The "Development Needs" section should be completed to the extent that needs which would enhance the employee's capabilities to perform can be identified. For management employees, interactive skill development needs may be in the areas of management of subordinates, relations with peers, coordinative skills, communications, or negotiation skills. For professional employees, any other changes in interpersonal behavior which could be made to improve performance should be identified in this section.

6.    The rating categories by which the employee's performance is to be evaluated are:

**B0014**

D00083

CONFIDENTIAL

| RATING | CATEGORY |
|--------|----------|
| 1 | Unacceptable level of performance |
| 2 | Performance needs improvement to meet the standards required for this performance goal. |
| 3 | Performance meets standards set for this goal. |
| 4 | Exceeds standard level of performance in a specific, significant way. |
| 5 | Exceptional level of performance (significantly high productivity or quality delivered consistently over time). |

Once the Performance Evaluation Form has been completed, this form and the resulting PRC should be forwarded to the Preparers next level of management for review and submission to Human Resources.

1. Human Resources will review and sign off on the Performance Evaluation Form. The Payroll Record Change Form (PRC) will be checked for accuracy and then submitted to Payroll for processing. Appropriate copies of the PRC along with the original Performance Evaluation Form will be returned to local management.

2. Management, as soon as possible, should schedule a meeting with the employee to discuss the content of the Performance Evaluation Form.

3. The "Employee Comments" section can be completed at the discretion of the employee. However, the employee is required to sign and date the form.

4. The form is then forwarded to the next level of department management for review. This level of management signs, dates, and returns the form to the originating management who makes a copy for department records and then forwards the original to Human Resources.

**B0015**

**D00084**

CONFIDENTIAL

**Edith Choma**
Performance Evaluation – 05/16/99

| I. | | Principal Accountability:<br><br>Provide secretarial support to the managed care area. | 45% of Total Job |
|---|---|---|---|
| | A. | Key Results Expected:   .<br><br>Prioritize and complete assignments from management and staff on a timely basis. | |
| | | Evaluation:<br><br>Edith provides secretarial support to the Medical Directors and the Director of the QI Program. While she is able to prioritize her work, there are instances when getting denial letters typed has not been given as timely a focus as I would like. | $35 \times 2.5 = .88\%$ |
| | B. | Key Results Expected:<br><br>Maintain a low error rate on word processing assignments. | |
| | | Evaluation:<br><br>Considering the volume and diversity of the work, Edith has a low error rate with word processing. Most voice dictated transcription does contain errors. Edith seems to take a long time on each word processing assignment. | $35 \times 2.5 = .88\%$ |
| | C. | Key Results Expected:<br><br>Complete special projects and assignments as requested. | |
| | | Evaluation:<br><br>Edith works willingly on special assignments and completes these accurately and in a timely manner. | $30 \times 2.5 = .75\%$ |
| | | Job Accountability Total | 2.51% |

**B0016**

CONFIDENTIAL

D00085

Edith Choma
Performance Evaluation – 05/16/99

| II. | | Principal Accountability:<br><br>Provide organization for the department. | 35% of Total Job |
|---|---|---|---|
| | A. | Key Results Expected:<br><br>Maintain organized filing systems. | |
| | | Evaluation:<br><br>Edith has very well organized computerized files. Manual file organization is satisfactory | $\underline{30} \times \underline{3.0} = .90\%$ |
| | B. | Key Results Expected:<br><br>Complete administrative tasks necessary for efficient operations. | |
| | | Evaluation:<br><br>Edith coordinates the calendars for the medical directors, arranges meetings, handles purchasing repairs and time sheets. I would like to see her complete these tasks more rapidly. She seems to spend a lot more time on some of these tasks than necessary.<br><br>Due to her dizzy spells, Edith has missed five (5) days of work and took the days off which were not reflected on her time sheet as she worked from home. This has impacted the department's ability to get denial letters done on time. | $\underline{70} \times \underline{2.5} = 1.75\%$ |
| | | Job Accountability Total | 2.65% |

B0017

D00086

Edith Choma
Performance Evaluation – 05/16/99

| III. | | Principal Accountability:<br><br>Interact professionally with coworkers and all internal and external contacts. | 20 % of Total Job |
| --- | --- | --- | --- |
| | A. | Key Results Expected:   ·<br><br>Answer telephones and take accurate messages. | 70 x 3.0 = 2.10 % |
| | | Evaluation:<br><br>Edith is professional in her interaction with external people. | |
| | B. | Key Results Expected:<br><br>Provide backup to the other secretary in the department. | |
| | | Evaluation:<br><br>There is an obvious source of friction between the secretaries in the department and very little cooperation between them.  If asked, Edith will do work assigned to the secretary if she is overwhelmed.  Because Edith appears to work slowly at the tasks she is given I am unable to utilize her time and skills for all the projects I envision for this department. | 30 x 2.5 = .75% |
| | | Job Accountability Total | 2.85% |

B0018

D00087

CONFIDENTIAL

Edith Choma
Performance Evaluation – 05/16/99

## PERFORMANCE SUMMARY

| Accountability Number | Percent of Total | · X | Accountability Rating | = | Weighted Evaluation Factor |
|---|---|---|---|---|---|
| 1 | 0.45 | X | 2.64 | = | 1.19% |
| 2 | 0.35 | X | 2.65 | = | 0.93% |
| 3 | 0.20 | X | 2.85 | = | 0.57% |
| | 100% | | TOTAL | | 2.69% |

<u>Summary Comments:</u>   That Edith provide me with a list of
I requested  Our daily tasks, as she was unhappy with this
assessment, + she felt I did not understand
what work she does everyday. At This evaluation
was told in the above that I would receive that
documents but @ the time I gave this in to be
<u>Development Needs</u>   typed, I had not received it.

<u>Professional/Technical Skills:  (See Direction #5):</u>

B0019

CONFIDENTIAL

D00088

**Edith Choma**
Performance Evaluation – 05/16/99

_P R R_
_____
Preparer's Signature

_7/16/99_
_____
Date

_____
Next Level of Management – Approval

_____
Date

_____
Human Resources

_____
Date

**Employee Comments:**

_____

_____

_____

_____

_____
Employee Signature

_____
Date

**B0020**

CONFIDENTIAL

D00089

MEETING WITH EDITH CHOMA
MARCH 3, 2000

Edith,

You made a reference to Jane Israel today that you were very unhappy having a temporary worker tell you what to do, and you find this threatening. You said that you intend to complain to HR about this.

Your action today makes it necessary for me to respond, and to point out areas in which you are not performing as well as you should. This has created the situation that requires us to hire additional staff to help with NCQA preparation.

You were given a change in grade because of the fact that you have to do work for multiple Directors. This change in grade has certain responsibilities and expectations associated with it. We are now getting busier due to the fact that the NCQA survey will be taking place within 3 months. Also, the volume of work being handled by the managed care department has increased.

My expectation is that you have to be able to keep up with this increased work load. Your inability to keep up with the volume of work, and the concern amongst some of the Directors you work with that you will not complete your assignments on time, makes it very difficult to plan efficiently.

I would like to highlight some areas of your work that will need improvement.
- You need to follow directions when given to you for NCQA preparatory work. You tend to go to other staff members for confirmation that you have understood the job requirements.
- You need to work more independently and not give updates on the work you have done, and what still needs to be finished. The expectation is that you will complete the work assigned to you within the time period allotted.
- You will need to be more involved in team meetings and assist in the taking of minutes at committee meetings. As we have gotten busier, it is difficult for the medical staff to perform this clerical function.
- It is extremely disruptive for me to have to stop what I am doing and deal with petty issues such as your feeling threatened by another employee asking you to complete work.

As our workload continues to increase, it is imperative that you keep up with the increased volume as well. Failure to do so could jeopardize our meeting NCQA timelines.

If these expectations are not me, we will have to meet again to review these issues in the near future.

**B0021**

CONFIDENTIAL                    D00560

A19

**Kaplan, Paul**

| From: | Carpenter, Pat |
| Sent: | Monday, May 07, 2001 7:50 AM |
| To: | Kaplan, Paul |
| Subject: | FW: EDITH CHOMA's "SICK" TIME |

fyi.

this should be printed and put into her personnel file, Paul.

-----Original Message-----
| From: | Szczepaniak, Albert |
| Sent: | Friday, May 04, 2001 6:37 PM |
| To: | McNair, Harold |
| Cc: | Carpenter, Pat |
| Subject: | RE: EDITH CHOMA's "SICK" TIME |

Thanks!

-----Original Message-----
| From: | McNair, Harold |
| Sent: | Friday, May 04, 2001 5:51 PM |
| To: | Szczepaniak, Albert |
| Subject: | EDITH CHOMA's "SICK" TIME |

AL,

Per your request, according to Payroll's ADP records, Edith Choma's recorded "SICK" TIME is as follows:
77.50 hrs. = Year 2000
20.25 hrs. = Year-to-Date thru April 30, 2001

Please be aware that I have not cross-referenced these recorded hours back to her timesheets. Additionally, I have not checked if there are any "unrecorded" timesheets.

**B0022**

D00096

CONFIDENTIAL

RECEIVED BY

JUL 0 7 2000

HUMAN RESOURCES

# PERFORMANCE APPRAISAL

RECEIVED

JUN 2 0 2000

HUMAN RESOURCES

Edith Chomo
Employee

Medical and Utilization Management
Section/ Department/Division

Secretary IV
Position

May 16, 2000
Effective Date

Date of Last Performance Evaluation
N/A
Date of Intervening Performance Update

**DIRECTIONS:** In completing this Performance Evaluation, the steps listed below should be followed. For additional guidance, please consult the Performance Evaluation policy.

1.  Principal Accountabilities extracted from the employee's Position Description should be paraphrased and identified by number on the Evaluation Sheets. Principal Accountabilities must be weighted in 5% multiples. Key Results expected, within each Principal Accountability, must be weighted in 10% multiples.

2.  If you are evaluating a management employee, it is appropriate to include management accountabilities among the job's Principal Accountabilities. The management accountabilities which are common to all management jobs are those for objectives, planning, budgeting, managing subordinates, controlling against planned-for results, and administering corporate, including Human Resources, policies. The management accountability for preparing Performance Evaluations that are timely and which accurately reflect performance is to be included in evaluating Human Resources policy administration. The degree of participation in these management processes will vary by management level.

3.  The reviewed employee's opinions regarding his/her performance should be solicited by the preparer prior to preparing the Performance Evaluation.

4.  Overall evaluations of Principal Accountabilities will be based on the total weighted average of evaluations of the Key Results expected within each Principal Accountability. The overall performance evaluation will be based on the weighted average evaluation for each Principal Accountability.

5.  The "Development Needs" section should be completed to the extent that needs which would enhance the employee's capabilities to perform can be identified. For management employees, interactive skill development needs may be in the areas of management of subordinates, relations with peers, coordinative skills, communications, or negotiation skills. For professional employees, any other changes in interpersonal behavior which could be made to improve performance should be identified in this section.

B0023



DEPOSITION
EXHIBIT
CHomo-5
CMV- 4/19/07

CONFIDENTIAL

D00645

6.      The rating categories by which the employee's performance is to be evaluated are:

RATING                          CATEGORY

1       Unacceptable level of performance

2       Performance needs improvement to meet the standards required for this performance goal.

3       Performance meets standards set for this goal.

4       Exceeds standard level of performance in a specific, significant way.

5       Exceptional level of performance (significantly high productivity or quality delivered consistently over time).

Once the Performance Evaluation Form has been completed, this form and the resulting PRC should be forwarded to the Preparers next level of management for approval and submission to Human Resources.

1.      Human Resources will review the Performance Evaluation Form and the Payroll Record Change (PRC) for accuracy. Appropriate copies of the PRC along with the original Performance Evaluation Form will be returned to local management.

2.      Management, as soon as possible, should schedule a meeting with the employee to discuss the content of the Performance Evaluation Form.

3.      The "Employee Comments" section can be completed at the discretion of the employee. However, the employee is required to sign and date the form.

4.      The form is then forwarded to the next level of department management for review. This level of management signs, dates, and returns the form to the originating management who makes a copy for department records and then forwards the original to Human Resources.

B0024

D00646

1# **Principal Accountability:** Provide secretary support to the managed care area.

**45%**
of **Total**
Job

A  **Key Results Expected:** Prioritize and complete assignments from management and staff on a timely basis.

10% X 3.0= 0.3

**Evaluation:** Edith completes assignments from management and staff as rapidly as possible.

B  **Key Results Expected:** Maintain a low error rate on word processing assignments.

30%X3.5= 1.05

**Evaluation:** Edith has an extremely low error rate on word processing. Her hearing difficulties sometimes creates a problem for her to hear words while transcribing dictation.

C  **Key Results Expected:** Complete special projects and assignments as requested.

60%X4.5= 2.7

**Evaluation:** Edith completes special projects when requested. She does this willingly, and does her best to complete them according to the instructions given.

She has worked on 2 vision teams, letter writing for special mailings for the NCQA QI work, has coordinated the meetings of health study teams, as well as collating all the data for the credentials subcommittee meetings. She has also worked extensively with PR&C to ensure that the credentials letters being sent to providers are in the Provider files. Edith has also worked hard to type the credentials subcommittee minutes in a timely fashion.

Edith keeps all correspondence and was able to produce lists and excel files within minutes when the NCQA surveyors needed information. She has handled all the special mailings from the Medical Director, and had to learn how to do mail merges for this task.

Edith keeps track of all the department time sheets, illness forms, and handles the department travel needs. She keeps track of the purchase requisitions and handles all special purchase orders for the department. She works hard to ensure that we get the best deal possible when purchasing supplies.

Edith helps the medical director ensure that all workorders are completed in a timely manner.

All external review appeals flow through Edith who photocopies the chart, coordinates the mailing of the chart and follows up to ensure that a reply is

*CONFIDENTIAL*

D00647

B0025

received in a prompt manner.

Edith has gone so far as to make sandwiches herself when the caterers have been too busy to do this for her.

**Job Accountability Total  4.05**

CONFIDENTIAL

D00648

B0026

<u>35%</u>
of Total
Job

#2   Principal Accountability:  Provide organization for department.

A    Key Results Expected:  Maintain organized filing systems.                     50%X3.0=
     Edith creates files for me to file information according to the outline that I give     1.5
     her.

B    Key Results Expected:   Complete administrative tasks necessary for
     efficient operations.

     Evaluation: Edith submits expense reports for the department as well as orders    50%X3.5=
     supplies for the department in an efficient manner.                              1.75

                                        Job Accountability Total      3.25

CONFIDENTIAL

D00649

B0027

#3  Principal Accountability:  Interact professionally with coworkers
    and all internal and external contacts.

                                                                    20%
                                                                  of Total
                                                                    Job

A   Key Results Expected:  Answer telephones and take accurate
    messages.

                                                                  50%X4.0=2

    Evaluation: Edith is pleasant when she is on the phone.  Her messages
    are detailed and accurate.

B   Key Results Expected:  Provide backup to the other secretary in the
    department.

                                                                  50%X4.0=
                                                                  2.0

    Evaluation: Edith has worked very hard to work more efficiently with
    the other secretary.  There has been significantly less conflict between the
    2 secretaries. They have worked cooperatively to ensure that the denial
    letters are sent out on time.

                              Job Accountability Total      4.0

B0028

CONFIDENTIAL

D00650

## *PERFORMANCE SUMMARY*

| Accountability Number | Percent of Total Accountability | X | Accountability Rating | = | Weighted Evaluation Factor |
|---|---|---|---|---|---|
| 1.00 | 0.45 | X | 4.05 | = | 1.82 |
| 2.00 | 0.35 | X | 3.25 | = | 1.13 |
| 3.00 | 0.20 | X | 4.0 | = | 0.80 |
| | 100% | | TOTAL | 3.75 | |

### Summary Comments:

Edith has worked hard to understand the needs of the department and work more efficiently. Her filing mechanism saved the day when we urgently needed some information that had been mailed to the physicians during the NCQA review.

### Development Needs

### *Professional / Technical Skills:* (See Direction #5)

**B0029**

CONFIDENTIAL

D00651

_P kfl_                                          5/ 0-3/00

Signature of Preparer                           Date

_Jwog d Crstaj_                                 6/23/00

Next Level of Management - Approval             Date

_Marylo Jmm_                                    7/3/00

Human Resources                                 Date

__Employee Comments:__

_____

_____

_____

_____

_____

_____

_____

Employee Signature                             Date

**B0030**

CONFIDENTIAL

D00652

Choma, Edith

| | |
|---|---|
| From: | Kaplan, Paul |
| Sent: | Wednesday, May 22, 2002 8:30 AM |
| To: | Choma, Edith |
| Cc: | Carpenter, Pat |
| Subject: | RE:  BOOK FAIR TODAY.... and Financial Planning Seminars |

DEPOSITION
EXHIBIT
CHOMA -9
CMV-4 /19/07

Edith

We will need to see how backed up we are with letters and denials before I say that this is OK.

*He would not permit me to go*

The above information is confidential and is intended solely for the recipient. If you received this message in error, please notify the sender immediately and delete all materials received. Thank you

*However he wanted me to do other secretaries work so she could go. She is 1/2 my age.*

——Original Message——
From:     Choma, Edith
Sent:     Wednesday, May 22, 2002 8:28 AM
To:        Kaplan, Paul
Subject:  FW:  BOOK FAIR TODAY.... and Financial Planning Seminars

Dr. Kaplan, I would like to attend these Financial Planning Seminars.  Thanks.

——Original Message——
From:     Human Resources
Sent:     Monday, May 20, 2002 6:04 PM
Subject:  BOOK FAIR TODAY.... and Financial Planning Seminars

Don't forget to check out the Book Fair today, May 21, from 10:00 to 2:00, at the Downtown location in the Cafeteria Training Room.  Drop by, participate in the raffle, and take advantage of the great discounts!  A portion of the proceeds will go to the United Way.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Also:

Lean how to make your money work for you by attending the upcoming *Financial Planning Seminars*.  This four session program will be offered:

    At the Downtown location on 5/28, 6/4, 6/11 and 6/25

    At HCCB on 5/30, 6/6, 6/13 and 6/27

    From 10:00 AM to 12 Noon.

(Note:  The program consists of four individual sessions.  You would need to attend all four dates not just select one.)  Please coordinate your attendance with your supervisor.

See flyers and posters for more information.  Call Renita Roane to register, X 3237.

CONFIDENTIAL         1

D00357

B0031

## Choma, Edith

| | |
|---|---|
| **From:** | May, Donna |
| **Sent:** | Wednesday, August 07, 2002 2:52 PM |
| **To:** | Choma, Edith |
| **Cc:** | Sweeney, Debbie; Kaplan, Paul; Slaysman, Susan |
| **Subject:** | RE: Information |

*Hi Edith,*

*In our previous conversation I stated that we, as an organization, do not provide any guarantees of employment to any associate and/or contractor.*

*However, in speaking with Dr. Kaplan, he has informed me that with this change of management he intends to make no changes to your salary or 'status' as an Administrative Assistant. The only two changes that are taking place are your reporting structure of which will now be to Debbie Sweeney, Director of QA and your location to the QA department.*

*I hope this assists you with your questions.*
*Thanks and have a great day.*
*Donna May*

> ------Original Message------
> | | |
> |---|---|
> | **From:** | Choma, Edith |
> | **Sent:** | Tuesday, August 06, 2002 11:30 AM |
> | **To:** | May, Donna |
> | **Subject:** | Information |
>
> Donna, after our meeting last Friday, August 2, 2002, you asked me to call you around 11:30 am. When I called, you said you would be putting in writing answers to my questions, including my MRP and give you a couple of hours. As of yet, I have not heard anything from you.
>
> The QI Department is moving this Friday. Please advise.
>
> Thanks.
>
> The above information is confidential and is intended solely for the recipient. If you received this message in error, please notify the sender immediately and delete all materials received. Thank you.

1

**P1792**

**B0032**

A21

# Memorandum

To:     File

CC:     Susan Slaysman

From:   Donna May

Date:   11/11/02

Re:     Choma Investigation

---

On September 29, 2002, Ms. Choma made an allegation of discrimination by Dr. Kaplan based on her age and disability. Below you will find a summary of my findings in the evaluation and recommendation. In addition, you will find a chart outlining the performance evaluations for Ms. Edith Choma for the period of 1995 – 2001.

- Ms. Choma stated that Dr. Kaplan complained about her work being too slow.

    - On November 6, 2002, I spoke with Dr. Kaplan who states that he at no time has made any type of derogatory or disrespectful remark to Ms. Choma.

    - Dr. Kaplan states that there are generally only two (2) times he provides feedback to Ms. Choma: (1) when she is transcribing dictation for him and, (2) during Ms. Choma's performance evaluations.

    - When Dr. Kaplan would provide comments about errors in transcription to Ms. Choma, the two came to an agreement. Ms. Choma would transcribe as best she can and Dr. Kaplan would find and change the errors during his review.

    - Dr. Kaplan stated he made a statement to Ms. Choma that she is not the best person to do transcription because she cannot hear the tape well.

    - On November 5, 2002, I spoke with Theresa Smith who states that at times Dr. Kaplan appears to be rushed and asks Ms. Choma if functions he has asked her to do are done.

    - Ms. Smith stated that she would have to help Ms. Choma's listening of the Dictaphone because Ms. Choma could not hear what was being said.

1

CONFIDENTIAL                              D00513

**B0033**

- Ms. Choma stated that Dr. Kaplan made derogatory and disrespectful remarks about her and her health in public.

    - Ms. Smith states she has never head Dr. Kaplan disrespect Ms. Choma regarding her age or any medical condition.

    - Ms. Smith stated it was she who made the comment to Ms. Choma being a young and spunky girl.

    - Dr. Kaplan stated that Ms. Choma has never presented any concerns to him (Dr. Kaplan) about the way he treats her or speaks to her.

- Ms. Choma states that Dr. Kaplan has treated her poorly since she made appeal of her performance evaluation in 1999.

    - Dr. Kaplan stated that Ms. Choma never presented the information to Dr. Kaplan. She went straight to Human Resources.

    - Dr. Kaplan stated Ms. Choma's behavior towards him (Dr. Kaplan) was short after the event.

    - Dr. Kaplan stated he does not Dr. Kaplan does not treat Ms. Choma any differently now than he did previously.

Findings:

- In review of the information, provided by Ms. Choma, Dr. Kaplan and Ms. Smith, it is my findings that Ms. Choma's charge of discrimination based on age and disabilities are unfounded.

    - Dr. Kaplan has expressed concerns to Ms. Choma about her inability to hear Dictaphone clearly. Dr. Kaplan came to a compromise with Ms. Choma that he would make corrections to her mistakes after she transcribes for him.

    - Dr. Kaplan has not referred to Ms. Choma's age. Dr. Kaplan has asked Ms. Choma to work more quickly, effectively and efficiently.

    - Dr. Kaplan's move of Ms. Carpenter to the Lead Administrative Assistant's position is based on Ms. Carpenter's ability to multi-task; provide leadership and efficient and effective service.

    - Ms. Choma is still performing 60% of her prior responsibilities with the other 40% directed more towards Quality Assurance.

    - There has been no change to Ms. Choma's salary or any other form of compensation by the organization.

    - The change that Ms. Choma has undergone has been location and reporting structure.

2

D00514

B0034

*November 11, 2002*

- All Administrative Assistants now report to Pat Carpenter.

• Ms. Choma stated that she feels she is being retaliated against after she filed a grievance due to her performance evaluation of 1999.

- A review of the below performance evaluations show that Dr. Kaplan actually provided Ms. Choma two (2) of her highest performance evaluations to date.

| Performance Evaluations for Ms. Edith Choma |||
|---|---|---|
| 1995-2001 |||
| Copies of these evaluations are attached. |||
| Date | Rating | Prepared by |
| 05/16/95 | 3.80 | Carol Doohan |
| 05/16/96 | 3.80 | Carol Doohan |
| 05/16/97 | 3.90 | Carol Doohan |
| 05/16/98 | 3.90 | Carol Doohan |
| 05/16/99 | 2.69 | Dr. Paul Kaplan |
| 05/16/00 | 3.75 | Dr. Paul Kaplan |
| 05/31/01 | 4.04 | Dr. Paul Kaplan |

3

CONFIDENTIAL

D00515

**B0035**

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974

Delaware Department of Labor

(State, or local Agency, if any)

ENTER IARGE NUMBER

☐ FEPA 0212750
☐ EEOC 17CA300104

and EEOC

NAME (Indicate Mr., Mrs., Ms)
Edith A. Choma

HOME TELEPHONE NO. (Include Area Code)
(302) 998-4050

STREET ADDRESS
3210 Dunlap Drive

CITY, STATE AND ZIP CODE
Wilmington DE 19808   NCC

COUNTY

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one, list below.)

NAME
Blue Cross Blue Shield of Delaware

NO. OF EMPLOYEES OR MEMBERS 500+

TELEPHONE NUMBER (Incl. Area Code)
(302) 429-0260

STREET ADDRESS
One Brandywine Gateway, PO Box 1991

CITY, STATE AND ZIP CODE
Wilmington DE 19805

NAME

TELEPHONE NUMBER (Include Area Code)

STREET ADDRESS

CITY, STATE AND ZIP CODE

☐ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN ☒ AGE
☐ RETALIATION ☒ DISABILITY ☐ OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE
EARLIEST 5/16/1999    LATEST 11/25/2002
☒ CONTINUING ACTION

DEPOSITION EXHIBIT
CHoma-17
EC MY-4/25/07

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s):

I began my employment with Respondent in 1989. I am a qualified individual with real or perceived disability who is able to perform the essential functions of my position without a reasonable accommodation, who is over the age of forty (dob 3/20/39). P-inning around May of 1999, I have been subjected to disparate treatment by Respondent after an obvious discriminatory ...rmance review, and subequent discriminatory and hostile comments made towards me by Dr. Paul Kaplan, Supervisor, in regard to discussing my performance review. Kaplan informed me that he didn't think that "blood was getting to [my] brain," that I "as too slow," and the he analogized the way he treats me to the act of "kicking the dog." I reported this disparate treatment to Human Resources representatives Vicki Sessoms, and later Donna May, and after this review, I was systematically retaliated against, based on my age and real or perceived disability. The retaliation continued with Kaplan making it known to other employees that he did not want a Secretary in "[my] condition," and I subsequently learned in September of 2001 that at there was a plan afoot to fire me, evidenced by the fact that the QI Director, Jane Israel, requested to know the date of my retirement. I was demoted on January 2, 2002, had demeaning statements made about me at meeting on March 21, 2002 and May 8, 2002 (which included that it was because I was deaf that I made mistakes). I was further demoted on July 26, 2002, when I began working for the new QI Director, Debbie Sweeney. I complained about the discriminatory treatement on August 2, 2002, and Human Resources took no remedial action, and instead I was moved to a smaller cubicle on August 12, 2002. Since that time, I have been subjected to a pattern of demeaning and insulting conduct by Kaplan, in the form of petty duties and hostile yelling. The retaliatory treatment continues through the present. I believe that, in violation of the Age Discrimination in Employment Act, as Amended, the Americans with Disabilities Act, as Amended, Title 19 of the Delaware Code, Chapter 7, as Amended, and the Delaware Handicapped Persons in Employment Protection Act, I was discriminated against based on my age and disability and retaliated against when I was subjected to disparate treatment by Respondent. This disparate treatment was in the form of an unjust performance review, and was used as a pretextual way to attempt to discharge me based on my age and disability. Mr. Kaplan is significantly younger than I am, and the comments he made subsequent to my poor review and retaliation illustrate his discriminatory motivation. Respondent conducted an internal survey, illustrating a consensus of employees who feel that Kaplan discriminates base on age.

CONFIDENTIAL

☒ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

SIGNATURE OF COMPLAINANT

B0036

I declare under penalty of perjury that the foregoing is true and correct.

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

NOTARY - (When necessary to meet State and Local Requirements)

11-25-02
Date

Edith Choma
Charging Party (Signature)

Subscribed and sworn to before me this date

(Day, month, and year)

B00060

( CONTINUATION OF AFFIDAVIT(

1. **COVERAGE/RESPONDENT'S BUSINESS:**
Respondent is an insurance carrier; C/P a Secretary, immediated supervisor is Paul Kaplan

2. **RELEVANT WORK HISTORY:**
C/P employed since 1989, got a poor performance review she felt unjustified, made a complaint, and since that time in 1999 has been retaliated against, with comments made about her age and disability by Kaplan. Since 1999, Kaplan has been providing good performance reviews, but he was compelled to due to my complaint I made in 1999.
I worked under the conditions of being subject to physical violence by other temporary workers.
The 1999 performance review upgraded by Joe Hall, after I spoke to Vicky Sassoms about the review
C/P has Menier's disease, which substantially limits her in the major life activity of hearing

3. **PERSONAL HARM:**
Retaliation, demotions

4. **RESPONDENT'S EXPLANATION FOR THE ALLEGED HARM AND ITS POLICIES AND PRACTICES:**
None provided

5. **DIRECT EVIDENCE:**
please see attached documentation

6. **WITNESSES:**
Theresa Smith, Intake.Coordinator, 429-8817
Tim Toole, Director of Mental Health (told C/P to document instances) 731-5436
Dave Martin, Data Analyst 731-5436

7. **COMPARATIVE DATA:**
n/a

8. **CLASS HARM:**
n/a

9. **REMEDY/RELIEF SOUGHT:**
other damages

_11-25-02_    EC

**DATE AND INITIAL**

PAGE #

**B0037**

CONFIDENTIAL

D00061

## EEOC AFFIDAVIT

Charge #:                                          Date:  11/25/02

### Charging Party Information

Name:    Edith A. Choma

Street:  3210 Dunlap Drive                City:    Wilmington

County:  NCC        State:  DE            Zip:     19808

Tel (H):  (302) 998-4050                  Tel (W):  (302) 421-3272

DOB:     3/20/1939    Sex:  Female     Race:   white

Nat'l Origin: U.S.                        SSN:    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

### Contact Person

Name:    answering machine
Tel (H):
Address:                                  Tel (W):

### Employment Information

Date of Hire: 1989
Date of Termination: n/a
Date of Alleged Violation: ~~1999~~ 11/25/02
Relief Sought: other damages
Check One: ☒ working   ☐ not working   ☐ sought employment at

### Respondent Information

Name:    Blue Cross Blue Shield of Delaware
Address: One Brandywine Gateway, PO Box 1991 Wilmington DE 19805
Type of Business: Insurance Carrier
Size of Business: 500+

### Basic Charge Data

| | |
|---|---|
| Receiving Office: 17C | Intake Unit: 1 |
| Accountable Office: 17C | Intake Officer: la |
| Initial Inquiry: 11/19/02 | Respondent Type: E |
| Received this Office: 11/25/02 | County: 003 |
| Source of Complaint: A | SMSA: 9160 |
| Federal Referral Transfer: | SIC: 610 |
| Alleged Basis: OA, W2 | Federal Agency: |
| | Alleged Issues: H1, T2, OR |

CONFIDENTIAL     B0038

D00062

CONTINUATION OF EEOC AFFIDAVIT

## SIGNATURE PAGE

This Affidavit has been prepared by a representative of the EEOC in an official capacity as part of an investigation. It has been read by me and I agree with the contents. Where changes (if any) were necessary, I have initialed such changes.

If affidavit is signed before a Notary Public, complete the following:

_Colito Chimo_
Signature of Interviewee

State of _____

County of _____

My Commission expires _____

Subscribed and sworn to before me on

This _____ day of _____ ,

20 ___ , at _____    _____
Signature of Notary Public

Sign below if affidavit is signed before an EEO Representative:

| DATE | SIGNATURE OF WITNESS | SIGNATURE OF EEOC REPRESENTATIVE | PAGE OF |
|------|----------------------|----------------------------------|---------|
| I declare under the penalty that the foregoing is true and correct. | | | |
| 5/02 | | | |

PRIVACY ACT STATEMENT: (This form is covered by the Privacy Act of 1974, Public Law 93-579. Authority for requesting and uses of the personal date are given below.)

1. FORM NUMBER/TITLE/DATE: EEOC FORM 133, EEOC AFFIDAVIT, August 1985.

2. AUTHORITY: 42: USC 2000e(9), 29 USC 201, 29 USC 621.

3. PRINCIPAL PURPOSES. Provides a standardized format for obtaining from the Charging Party, Respondent and Witness sworn statements of information relevant to a charge of discrimination.

4. ROUTINE USES. These affidavits are used to: (1) make an official determination regarding the validity of the charge of discrimination; (2) guide the Commission's investigatory activity; and (3) in Title VII, Equal Pay Act, and Age Discrimination in Employment Act litigation, to impeach or substantiate a witness's testimony.

5. WHETHER DISCLOSURE IS MANDATORY OR VOLUNTARY AND EFFECT ON INDIVIDUAL FOR NOT PROVIDING INFORMATION: Voluntary. Failure to provide an affidavit has no effect upon the jurisdiction of the Commission to process a charge. However, sworn statements submitted by the parties are, of course, relied upon more heavily than unsworn statements in making determination as to the existence of unlawful discrimination.

EOC FORM 133 (8/85)

**B0039**

D00063



STATE OF DELAWARE
DEPARTMENT OF LABOR
DIVISION OF INDUSTRIAL AFFAIRS
4425 NORTH MARKET STREET
WILMINGTON, DELAWARE 19802

TELEPHONE (302) 761-8200
FAX (302) 761-6601

## NOTICE OF REASONABLE CAUSE FINDING

RE:  Choma v. Blue Cross Blue Shield of DE              State Case No.: 0212750

On November 25, 2002, Edith Choma filed a charge of discrimination against Blue Cross Blue Shield of Delaware. The Charge of Discrimination is hereby incorporated by reference.

Reasonable Cause Finding:

On October 31, 2003, the Department of Labor concluded its investigation and now finds, based on the following facts, that there is reasonable cause to believe that a violation of the State Discrimination Act has occurred.

I.    Undisputed Facts:
1.  Charging Party began her employment with Respondent in 1989.
2.  In about late 1994, Charging Party became a qualified individual with a disability who is able to perform the essential functions of her position with reasonable accommodation.
3.  Charging Party received a negative performance review in 1999 and as a result, she met with Donna May, Human Resources to discuss her complaints.
4.  On July 26, 2002, during a reorganization, Charging Party, age 63, was reassigned from the Divisional Secretary for Paul Kaplan, Chief Medical Officer to Divisional Secretary for Deborah Sweeney, Quality Improvement. At this time, Patricia Carpenter (age 49) was promoted from administrative assistant to the Director of Quality Improvement to administrative assistant for the department with most of her assignments coming from Dr. Kaplan.

II.   Disputed Facts:
1.  Respondent states that Charging Party had difficulties with transcribing dictation and the timely completion of her work. It also noted that Charging Party was reluctant to help out other assistants and these faults were noted on her 1999 performance review. Respondent states that Charging Party was not considered for the lead administrative assistant position because of this performance review and because Ms. Carpenter had high marks for efficiency, organization, project management and teamwork.
2.  Charging Party states that she was subjected to harassment based on her disability and age when Dr. Kaplan made statements such as, "you are too slow" and "I don't want

CONFIDENTIAL

B0040

D00469

a secretary in your condition." She also alleges that comments were made at a staff meeting insinuating that because Charging Party was disabled, she made mistakes.

III.    Resolution of Material Facts in Dispute:

1.  Charging Party was able to establish that she has a physical impairment, which severely limits the major life activity of hearing. In addition, Charging Party established that she was a qualified individual who was able to perform the essential functions of her position with reasonable accommodation.

2.  Several witnesses were interviewed during the investigation regarding the retaliatory comments made by Dr. Kaplan subsequent to the 1999 performance review and Charging Party's visit to Human Resources. One witness confirmed that Dr. Kaplan made disability-related comments at staff meetings such as, "I wish she could hear better. She is too slow."

3.  In July of 2002, the reporting structure was changed so that Charging Party would report to Ms. Carpenter a younger, less senior, but otherwise comparable employee who, by witness accounts, was less capable than Charging Party. According to witness statements and other evidence gathered during the investigation, Charging Party continued to perform many of Dr. Kaplan's duties, which theoretically should have gone to his new administrative assistant, Ms. Carpenter. This behavior is inconsistent with Respondent's position that Charging Party's performance was poor.

4.  Evidence was gathered which indicated that Ms. Sweeney also subjected Charging Party to disparate treatment with regard to making up missed time. Respondent's policy states that non-exempt employees are entitled to make up missed time during business hours. However, unless her younger similarly situated coworkers, Charging Party was required to give one-day notice for appointments to be used as PTO time.

IV.    Resolution:

1. Charging Party met her burden of showing that she suffered adverse action due to her age and her disability. In addition, Charging Party met her burden of showing that she was subjected to retaliation after voicing her objection to the disparate treatment in 1999.

The Charge of Discrimination, State Case No. 0212750 will be administratively processed and assigned to a conciliation officer in an effort to administratively resolve the complaint pursuant to 19 *Del. C.* Section 712(c).

10/31/03
DATE

*Andrea Cicero /jkc*
INVESTIGATOR
LABOR LAW ENFORCEMENT OFFICER

10/31/03
DATE

*Julie Cutler*
JULIE CUTLER
LABOR LAW ENFORCEMENT SUPERVISOR

CONFIDENTIAL      **B0041**          D00470

## UNSCHEDULED PTO REPORT
Utilization as of 12-1-03

| CO | DIV | SSN | NAME | TYPE | HOURS | PERIOD END DATE | RT NAME |
|----|-----|-----|------|------|-------|-----------------|---------|
| DLW | 24010 | 222241735 | CHOMA,EDITH A | PTO/U | 7.75 | 6/14/2003 | CARPENTER,PATRICK |
| DLW | 24010 | 221401701 | ZAKUTNY,CHRISTINE M | PTO/U | 1.25 | 11/1/2003 | CARPENTER,PATRIC |
| DLW | 24010 | 221401701 | ZAKUTNY,CHRISTINE M | PTO/U | 2.35 | 5/17/2003 | CARPENTER,PATRIC |
| DLW | 24010 | 221401701 | ZAKUTNY,CHRISTINE M | PTO/U | 4.75 | 4/05/2003 | CARPENTER,PATRIC |

CONFIDENTIAL

D01184

B0042

## PTO REPORT
### Utilization as of 12-1-03

| DIV | SSN | NAME | PTO EARNED | PTO TAKEN | PTO REMAINING | PTO-PURCH EARNED | PTO-PURCH TAKEN | PTO-PURCH REMAINING | REPORTS |
|---|---|---|---|---|---|---|---|---|---|
| 24010 | ZZZ241735 | CHOMA,EDITH A | 292.55 | 204.25 | 88.3 | 0 | 0 | 0 | CARPENTER,P/ |
| 24010 | 221401701 | ZAKUTNY,CHRISTINE M | 295.81 | 212.35 | 83.46 | 0 | 0 | 0 | CARPENTER(P) |

CONFIDENTIAL

B0043

D01183

09/06/2009  22:56    3029~~ ~52              GT1AGNA                          PAGE  04

# CareFirst

## Service Award Order Form

Name:    Edith A. Choma                    ID #:     002334

Years of Service:    15                    Anniversary Date:    08/09/2004

Location:    DLW 24010

Immediate Supervisor:    Carpenter,patricia

This order form provides you the opportunity to select a gift in recognition of your service with CareFirst. Enclosed is a brochure with the awards available for your years of service. Please select **one** of the two methods listed below to submit your award selection within 2 weeks.

**Internet Ordering** - To access via the Internet, go to www.awards.tharpe.com when at home. Or, click on the Human Resources icon on the home page of insidecarefirst.com when you're at work. Enter 15104528 as your login, and 178781 as your password. Select your award and enter any additional information requested.

**Postage-Paid Envelope** – To return your award selection via postage-paid envelope, complete this form and use the envelope provided to return your response to the Award Management Center.

> **Please verify your Supervisor's Name. If it is incorrect, please indicate your new Supervisor and mail your order form in the enclosed postage-paid envelope.**

### Select One Item Only:

Item Letter: _____    Item Number: _____

Description: _____

If selecting a Ring from the Jewelry page (10 Years & Above), please provide Ring Size: _____

### Complete This Section Only If Ordering A Framed Print
If Frame Style is not indicated, the Recommended Frame Style (from Art Gallery Portfolio) for the Print you selected will be provided.

Style: 08                    Frame Style: _____    Print Number: _____
(2-digit # from Gift Selection Sheet)    (1-digit # from Art Gallery Portfolio)    (3-digit # from Art Gallery Portfolio)

### Complete This Section Only If Ordering A Ring From The TR7 Page (25 Years ONLY)

Ring Size: _____    Initials To Be Engraved: ____  ____  ____        **B0044**
                                                    First  Middle  Last

_____    _____    _____
Associate Signature          Phone Number (including area code)    Date

Please contact Cindy Bowles, 1-877-849-0007, 8 am – 5 pm (Eastern time) if you have any questions.

CONFIDENTIAL

Vendor Code: B111

D00524

CHRISTIANA CARE HEALTH SERVICES
EMERGENCY DEPT: CHRISTIANA HOSPITAL
4755 Ogletown-Stanton Rd.
Newark, Delaware 19718
(302) 733-1000

Patient:Choma, Edith                    Date:Aug 20, 2004

Off work from Aug 20 thru Aug 22, 2004.
Return to work on Mon Aug 23, 2004.

SIGNATURE:

> Paul Krajewski,PA-C MK1070793
> Dorothy Dixon, M.D.

**B0045**

P0532

..noma, ....

Fri Aug 20, 2004     Page 1
12 44 AM

Discharge Instructions from:
Dorothy Dixon, M.D. / Paul Krajewski, PA-C MK1070793
Christiana Care Health Services - Wilmington Hospital

Christiana Hospital, 4755 Ogletown-Stanton Rd, Newark, DE  302 733 1000
Wilmington Hospital, 14th & Washington St, Wilmington, DE 302 733 1000

Any Concern,.. Return!

DIAGNOSIS:  scaphoid fracture right wrist

contusion head

## WRIST FRACTURE:
You have a fracture in one or more of the bones in your wrist. Immobilization of the injured area is very important  Depending on the fracture and its severity, you may have a splint or a cast, along with a sling. Sometimes a cast is applied later after swelling has gone down.

If a splint was applied, do not remove it until your follow-up doctor has approved it  Don't try to relieve itching under the splint by using any sharp object.  The splint should be loosened a little if it feels too tight or if it seems to interfere with circulation

Elevation of your arm is very important in decreasing the swelling and pain in your wrist  Maintain elevation at the level of the heart or above  If you are experiencing more than mild pain, it may be because of not elevating enough.  Elevation is especially important in the first days after a significant wrist injury

Ice is helpful to reduce swelling and pain for the first 2-3 days. Use ice packs over the splint long enough for the injured part to feel cold for 30-40 minutes several times a day.

Your injury will need close follow-up by your doctor or an orthopedist.

## NOTIFY YOUR DOCTOR or return here in case of the following
- The arm or hand becomes numb, tingly, cold, blue  pale, or weak.
- Increasing swelling.
- Pain is increasing, or not gradually improving.
- Any difficulty in moving the fingers.

## MILD HEAD INJURY:

Many injuries that are encountered may involve a blow to the head or a violent shaking. Either of these may jar or bruise the brain and cause a wide range of symptoms.

A "concussion" is a temporary loss of brain function  with symptoms such as unconsciousness, disturbance of vision or equilibrium, dizziness, or nausea and vomiting.  This results from a blow to or severe shaking of the head  Observation over the next 24 hours is important to make sure there are no complications, although hospital care does not appear necessary at this time. **We strongly recommend that you avoid alcohol or any other sedating drugs during this 24 hour period.**

Rest, and gradually resume your normal activities. Take a break and rest if you become tired  You may find it helpful to take some time off work or school.

Some symptoms may last for several days, but usually clear within a week.  Some headache after this type of injury is to be expected  If symptoms are persistent, you will need to follow-up with your doctor

-- Instructions are continued on next page  --

**B0046**



**CHRISTIANA CARE**
HEALTH SERVICES
Lancaster Pike Center

DEPOSITION
EXHIBIT
CHOMA-32
CMV-4/25/07

3301 Lancaster Pike, Ste. 9
Wilmington, Delaware 19805

302-656-2069 phone
302-656-5611 fax

August 25, 2004

**Re: Edith Choma**

To Whom It May Concern:

I have been asked to comment on the work status of **Edith Choma**. I am her primary care doctor, but I will not be seeing her for her wrist injury since she was diagnosed in the emergency department and will be following-up shortly with an orthopedist.

My recommendation at this time is that she can work if she can be assigned tasks that absolutely do not involve using the right arm, wrist, and hand in any way. If such duties are not feasible with her job, then she should remain out of work. This is my temporary recommendation since the orthopedist scheduled to see Ms. Choma is on vacation this week. Once she sees Dr. Patterson, his recommendations should over ride mine. Any and all questions regarding extended time away from work or disability should be directed to Dr. Patterson.

Sincerely,

Thomas Hilton, MD

B0047

P0108

## Sweeney, Debbie

**From:**    Sweeney, Debbie
**Sent:**    Wednesday, August 25, 2004 9:55 AM
**To:**    Choma, Edith
**Subject:** RE:

I reminded you at 1 PM when I came to your desk to see what you had from a typing perspective to take lunch and we factored lunch into figuring out how many letters you should be able to complete during the remainder of the day. You are then correct that when I came back around 4:25 to see what you had completed I asked whether you had taken lunch and you said "no" that I told you it was state law that you take a lunch.

Debbie Sweeney
Director, Quality Improvement
BCBSD, Inc

p 302-421-3464
f 302-421-8863

*This communication, including any attachments, is confidential and intended for the sole use of the intended recipient(s). If you received this message in error, please notify the sender immediately and delete all materials received. Thank you.*
-----Original Message-----
**From:** Choma, Edith
**Sent:** Wednesday, August 25, 2004 9:42 AM
**To:** Sweeney, Debbie
**Subject:** RE:

Towards the end of the day you came to my desk and counted the letters I had typed and said I was not doing the letters fast enough. You then asked me if I took lunch and I said no because of the time frame you gave to get the letters done. And then you told me I have to take a lunch.

This communication, including any attachments, is confidential and intended for the sole use of the intended recipient(s). If you received this message in error, please notify the sender immediately and delete all materials received. Thank you.

-----Original Message-----
**From:** Sweeney, Debbie
**Sent:** Wednesday, August 25, 2004 9:20 AM
**To:** Choma, Edith
**Subject:** RE:

You worked through lunch on Monday however despite my saying to make sure you took lunch.

Debbie Sweeney
Director, Quality Improvement
BCBSD, Inc

p 302-421-3464
f 302-421-8863

**B0048**

*This communication, including any attachments, is confidential and intended for the sole use of the intended recipient(s). If you received this message in error, please notify the sender immediately and delete all materials received. Thank you.*

CONFIDENTIAL

2/1/2007

D01008

ı                                                                          Page 2 of 3

-----Original Message-----
**From:** Choma, Edith
**Sent:** Wednesday, August 25, 2004 8:58 AM
**To:** Sweeney, Debbie
**Subject:** RE:

Debbie I did not work through lunch yesterday. Also, I do not work through lunch to leave early. You already told me I could not do this, or to cover for late arrivals. We had this discussion earlier about this and I told you I would stay after work to make up for any late arrivals.

This communication, including any attachments, is confidential and intended for the sole use of the intended recipient(s). If you received this message in error, please notify the sender immediately and delete all materials received. Thank you.

-----Original Message-----
**From:** Sweeney, Debbie
**Sent:** Tuesday, August 24, 2004 5:35 PM
**To:** Choma, Edith
**Subject:** RE:

You will be paid despite the fact that you did not obtain prior approval but be sure that what you submit is for what you actually worked. Also as a reminder State law requires that you take a lunch break. Going forward you will not be permitted to work through lunch in order to leave early or to cover for late arrivals or doctors appointments. You will need to use PTO time.

Since you did not take a lunch yesterday despite my telling you that you must take lunch I will have to pay you overtime for that. I will likely need to prepare a formal written warning regarding working overtime without prior approval as this the 2nd instance where this has been an issue in a month.

Debbie Sweeney
Director, Quality Improvement
BCBSD, Inc

p 302-421-3464
f 302-421-8863

*This communication, including any attachments, is confidential and intended for the sole use of the intended recipient(s). If you received this message in error, please notify the sender immediately and delete all materials received. Thank you.*

-----Original Message-----
**From:** Choma, Edith
**Sent:** Tuesday, August 24, 2004 4:42 PM              **B0049**
**To:** Sweeney, Debbie
**Subject:**

Debbie, I need to do my time sheets tomorrow. Just want to check with you for OT starting week of July 7/8 – 7/23 when Pat was out.

Thanks

This communication, including any attachments, is confidential

and intended for the sole use of the intended recipient(s). If you
received this message in error, please notify the sender
immediately and delete all materials received. Thank you.

**B0050**

CONFIDENTIAL

D01010

2/1/2007

**Blue Cross Blue Shield of Delaware**

# Memo

**To:** Edith Choma

**From:** Deborah M. Sweeney

**CC:** Personnel File

**Date:** August 25, 2004

**Re:** Unscheduled Overtime

*She asked me to stop by her office before I leave. I have something for you, then she handed me this*

Edith, on July 28, 2004 we had a discussion regarding the departmental policy of obtaining prior approval for all overtime. On August 23, 2004 you worked through lunch despite being told that you needed to take a lunch. This action necessitates BCBSD paying you overtime and is a violation of the departmental policy since you did not obtain prior approval. Further incidences of this nature, not obtaining prior approval for overtime, will result in disciplinary action.

*— only asked if I could get paid. Other secretary gets as much OT as she wants. I have copies of her time sheets.*

DEPOSITION EXHIBIT
CHOMA-27
CMV-4/25/07

B0051

CONFIDENTIAL

D00532

08/02/2006   09:43    3029471962                    ED1TCHOMA                           PAGE   03

**CareFirst BlueCross BlueShield**
Health and Safety, Human Resources Division
10455 Mill Run Circle
Owings Mills MD  21117

DEPOSITION
EXHIBIT
_CHOMA -31_
_CMV -4 25 07_

# Memo



**CareFirst**
**BlueCross BlueShield**

| | | |
|---|---|---|
| **To:** | **Edith Choma** | via Federal Express |
| **From:** | Cathy Quinn, RN | |
| **Subject:** | **Current Work Restrictions** | |
| **Date:** | **August 30, 2004** | |
| **cc:** | **regular mail** | |

Please be advised that I am in receipt of a letter from your provider, Dr. Hilton dated August 25, 2004, regarding your current job restrictions.  The information from Dr. Hilton, states:

**"My recommendation at this time is that she can work if she can be assigned tasks that absolutely do not involve using the right arm, wrist, and hand in any way.  If such duties are not feasible with her job, then she should remain out of work."**

You are presently employed in the position of Administrative Assistant, II, for BCBSD, Inc., d/b/a  BlueCross BlueShield of Delaware ("Company").  Per the job description (attached), this position requires use of the PC for word processing tasks, database management, and graphic programs, and preparation of executive level presentations.  In that the use of the PC does necessitate use of both arms, wrists, and hands, your management cannot meet the stated job limitations as there are no tasks that "absolutely do not involve using the right arm, wrist, and hand in any way".

At this time, your last day worked was August 27, 2004, and you are presently off work, pursuant to your provider's recommendations.  Additionally, you have been advised to pursue your disability leave options directly with MetLife.  MetLife is the administrator for your employer's short term disability (STD) program and for eligible leave under the Family and Medical Leave Act (FMLA).  **Please contact MetLife immediately upon receipt of this letter to apply for STD and FMLA at 1-800-225-2460.**

Please continue to discuss the job tasks of your position with your provider, using the attached job description.  If and when you are medically released to resume work, please contact your MetLife case manager, and your management, and present a medical release to MetLife.  Please contact my office, in advance of any return to work, to discuss any potential job restrictions in the workplace.

B0052                    P0109

08/02/2006  08:43    3029471962                ED1TCHOMA                              PAGE  04

Please note that the Company will keep any medical information in confidential medical files and disclose this information only to those who need to know, or unless required to do so under federal, state, or local laws

If you have any questions, please contact me at (410)-998-7148.  Thank you.

Enclosure: job description

**B0053**

**P0110**

## Sweeney, Debbie

| | |
|---|---|
| **From:** | Sweeney, Debbie |
| **Sent:** | Monday, September 20, 2004 5:07 PM |
| **To:** | Choma, Edith |
| **Subject:** | FW: |
| **Importance:** | High |

Edith, the file now has 20 letters that were not completed today.

Debbie Sweeney
Director, Quality Improvement
BCBSD, Inc

*p 302-421-3464*
*f 302-421-8863*

*This communication, including any attachments, is confidential and intended for the sole use of the intended recipient(s). If you received this message in error, please notify the sender immediately and delete all materials received. Thank you.*
-----Original Message-----
**From:** Sweeney, Debbie
**Sent:** Monday, September 20, 2004 4:03 PM
**To:** Choma, Edith
**Cc:** Kaplan, Paul; Brown, Eileen; Martin, David
**Subject:** RE:
**Importance:** High

Edith, the 3x3x3 letters were not completed.  Please complete these by the 10/1.

Pat is working on scheduling both the immunization and diabetes study teams. Please move forward with scheduling the laminectomy team. I have attached the minutes form the last laminectomy meeting. Please send these along with the report once ready to the team members. Dave what do you think would be a realistic timeframe?

The nurses begin using new letters today.  Please meet with Eileen Brown to get the specifics in terms of where to find the letters, how to use them and the instructions that she has provided to her staff in terms of how to submit them.

I left a folder on your desk with 16 letters from today that the temp did not complete.  Please complete these. Also all corrections to letters that were typed by the temp will come to you for correction. These letters can be found on the M drive.

Debbie Sweeney
Director, Quality Improvement
BCBSD, Inc

*p 302-421-3464*
*f 302-421-8863*

*This communication, including any attachments, is confidential and intended for the sole use of the intended recipient(s). If you received this message in error, please notify the sender immediately and delete all materials received. Thank you.*
-----Original Message-----
**From:** Choma, Edith

CONFIDENTIAL

**B0054**

D01014

**Sent:** Friday, August 27, 2004 4:37 PM
**To:** Kaplan, Paul; Sweeney, Debbie
**Cc:** Carpenter, Pat
**Subject:**

I have not scheduled the Immunization Study Team Meeting.

Dr. Kaplan has the lunch information. I have contacted the Greenery, Take A Break (received menu) and Pickles and Chips. I have not called Lillian.

All docs have been paid for the appeals up to date. The file that is out is an appeal being reviewed by Dr. Brave

Meeting needs to be scheduled for Dr. Kaplan, Peg and Jan to go to CareFirst with Les Chalmers.

Credentialing docs will need to be called for the Sept Conf call.

Dr. Kaplan, Ambassador called. They want the paperwork I gave you to sign for Debbie's trip by train to Washington.

Pat, please fax this travel auth form to Ambassador ASAP.

Dr.Kaplan,the 3x3x3 report needs to be done.

Pat there is a ceu program on Sept 15th. I have scheduled this in Room 225. Please email all um and cm staff. I also email Tim Toole's Case Managers. Vendor's name is Bob Bird Homestead Senior care. They will bring lunch but will need a count. I usually email the nurses a week before. You can make a sign sheet for their attendance. This program does not offer CEU.I will leave you the folder

This communication, including any attachments, is confidential and intended for the sole use of the intended recipient(s). If you received this message in error, please notify the sender immediately and delete all materials received. Thank you.

CONFIDENTIAL

D01015

2/1/2007

October 29, 2004

**CONFIDENTIAL**
**MEMORANDUM**

TO:        Edith Choma

FROM:      Deborah M. Sweeney

SUBJECT:   Performance Improvement Plan



DEPOSITION
EXHIBIT
CHOMA-44
CMV-6/14/07

Based on counseling sessions we have had over the past three weeks, in which we discussed your performance and how it needs to improve to meet expectations, I am formally providing you with a Performance Improvement Plan. (PIP).

The purpose of this plan is to specifically identify performance expectations, where these expectations are currently not being met, training and/or other support that will be provided to you, feedback you will receive on your progress towards meeting these performance expectations and the timeframe in which these issues will need to be corrected.

PERFORMANCE EXPECTATIONS:

| CURRENT LEVEL OF PERFORMANCE | WHAT IS EXPECTED | HOW IT NEEDS TO BE DONE (QUALITY) (if applicable) | TIMEFRAME IN WHICH IT NEEDS TO BE COMPLETED |
|---|---|---|---|
| New letters from the nurses are taking greater than 8 minutes each to produce | All new letters will be consistently typed within an average of 8 minutes | Error rate consistently less than 20%. | By 11/12 |
| | | Start and end times will be noted on each letter folder. In order to validate the accuracy of self tracking once per day you will be timed by Debbie Sweeney. | |
| New letters from the nurses are taking greater than 8 minutes each to produce | All new letters will be consistently typed within an average of 6.5 minutes | Error rate consistently less than 15% | By 11/26 |
| | | Start and end times will be noted on each letter folder. In order to validate the accuracy of self tracking once per day you will be timed by Debbie Sweeney. | |
| New letters from the nurses are taking greater than 8 minutes each to produce | All new letters will be consistently typed within an average of 5 minutes | Error rate consistently less than 10% | By 12/10 |
| | | Start and end times will be noted on each letter | |

**B0056**

D00380

| | | | |
|---|---|---|---|
| Correction letters from management are taking on average 5 minutes or longer to type | Correction letters from management will be typed within an average of 3 minutes | folder. In order to validate the accuracy of self tracking once per day you will be timed by Debbie Sweeney. Error rate consistently 99% 1 % Start and end times will be noted on each letter folder. In order to validate the accuracy of self tracking once per day you will be timed by Debbie Sweeney. | By 11/12 |
| Overtime has been worked without prior approval | Obtain prior approval from Debbie Sweeney or Paul Kaplan prior to working any overtime. | 100% of all overtime will be prior approved by either Debbie Sweeney or Paul Kaplan | Ongoing |
| Start time for work is flexible but a full 7.75 hour day needs to worked each day unless prior approval was obtained for PTO | A full 7.75 hour day will be worked unless PTO has been approved in advance. The start time can be between 8 and 8:30. A start time of later than 8:30 AM must be approved 24 hours in advance by Debbie Sweeney or Paul Kaplan. | 100% of the time a 7.75 hour day will be worked unless PTO has been approved in advance. Start and end times will be tracked by sending an e-mail as soon as you arrive and just prior to leaving for the day to Debbie Sweeney | Ongoing |
| Lunches have occasionally lasted longer than one hour or used to end the work day early. | One hour is allotted each day for lunch. Any amount of time over that will need to be taken as PTO or made up on the same day as the occurrence. Lunch can be taken between 12 and 2 PM. A lunch hour outside these time frames must be approved 24 hours in advance by either Debbie Sweeney ort Dr. Kaplan | 100% of lunch breaks will be one hour in duration. Lunch time will be tracked by sending an e-mail to Debbie Sweeney when are leaving for lunch and when you return. This will be done on a daily basis. | Ongoing |

B0057

CONFIDENTIAL

D00381

**EXPECTATIONS NOT BEING MET:** The table below provides data tracked since September 30, 2004 regarding average time to type a letter and error rates. This performance is not acceptable and must improve.

| Date Typed | # letters | Letter Type | Min/letter | # errors | Error Rate | Comments |
|---|---|---|---|---|---|---|
| 30-Sep | 28 | | 8.6 | 11* | 39.3%* | |
| 1-Oct | 10 | | | 2* | 20%* | |
| 4-Oct | 34 | | 13 | 5* | 14.7%* | |
| 5-Oct | 37 | | 9.73 | 6* | 16.2%* | |
| 6-Oct | 14 | | 12.85 | 2* | 14.3%* | |
| 8-Oct | 20 | | | 7 | 35% | |
| 8-Oct | 18 | | 6.67+ | 4 | 22% | Correction letters |
| 7-Oct | 17 | | 15 | 9 | 53% | |
| 11-Oct | 22 | | 12.3 | 4 | 18.20% | |
| 12-Oct | 35 | | 5.14 | 7 | 34.3% | 2 new and 33 corrections |
| 12-Oct | 3 | | 20 | 0 | 0.0% | 3 correction letters |
| 13-Oct | 7 | | ? | 2 | 28.60% | Edith did not mark start or end times |
| 13-Oct | 21 | | 15.88 | 14 | 70% | |
| 13-Oct | 31 | | 4.3 | 6 | 28.57% | correction letters |
| 14-Oct | 25 | New | 14.4 | 24 | 96% | min/letter is estimate; Edith did not track start and end times. At 12:15 there were 12 letters that had been completed between 8:15 and 1:30 (Edith did a few other things during this period and took 75 minutes for lunch so it was estimated that took her 3 hours to complete these 12 letters). Between 1:30 and 3:30 she completed 10 letters and between 3:30 and 4:30 she competed 3 letters |
| 15-Oct | 18 | Correction | 15 | 14 | 77.80% | |
| 18-Oct | 4 | Correction | | 0 | 0% | |
| 18-Oct | 8 | Correction | | 1 | 12.50% | Edith did not mark start or end times |
| 18-Oct | 23 | New | | 3 | 13% | Edith did not mark start or end times |
| 19-Oct | 23 | New | 5.22 | 5 | 21.70% | Edith did not mark start or end times |
| 20-Oct | 8 | Correction | | 2 | 25% | Edith did not mark start or end times |
| 20-Oct | 25 | Correction | | 5 | 20% | Edith did not mark start or end times |
| 20-Oct | 7 | New | | 5 | 71.43% | Edith did not mark start or end times |
| 21-Oct | 9 | New | | 2 | 22.22% | Edith did not mark start or end times |
| 22-Oct | 11 | New | | 6 | 54.54% | Edith did not mark start or end times |
| 22-Oct | 22 | Correction | 3.4 | 4 | 18.18% | Edith did not mark start or end times |
| 27-Oct | 16 | New | | 4 | 25% | Edith did not mark start or end times |
| 28-Oct | 20 | Correction | | 8 | 40% | Edith did not mark start or end times |
| 28-Oct | 6 | Correction | | 5 | 83% | Edith did not mark start or end times |

\* = under reported - letters that also contain errors by staff are returned to them and not counted
+ = Edith self reported completion timeframe

**B0058**

CONFIDENTIAL

D00382

BASED ON OUR DISCUSSION, WE HAVE IDENTIFIED THE FOLLOWING ACTIONS TO CORRECT THE PROBLEM(S).

| ACTION | WHO WILL PROVIDE | TIMEFRAME TO BE PROVIDED |
|---|---|---|
| All letters will be placed, by management in folders. The folders will be marked with their contents. | Debbie Sweeney or in her absence her designee | Daily |
| Folder(s) will be on your desk each morning when you arrive. You are to start working on the folders by 9:30. If multiple folders are on the desk you are to complete them in the order in which they are placed. | Debbie Sweeney or in her absence her designee | Daily |
| Each Monday by 9 AM you will provide Debbie with a list of other work related responsibilities that must be completed that week as well as a list of any appointments that will occur during normal business hours. | Edith Choma | Weekly - Monday |
| Between the time you arrive and 9:30 you will work on other job responsibilities such as scheduling meeting and handling appeals. Staring at 9:30 you will begin typing letters. | Edith Choma | Daily |
| Letters will be proofed by management and error rates for the typist will be calculated. | Eileen Brown (new letters and correction letters where staff needed to make changes) | Daily |
| Meeting to review performance | Debbie Sweeney for all other correction letters | |
| | Debbie Sweeney | |
| | Edith Choma | Daily between 10 and 12 and 2 and 4. |

DURING AND AFTER IMPLEMENTATION OF THESE ACTIONS YOU WILL BE EXPECTED TO:

| ACTION | QUALITY/QUANTITY | DATE |
|---|---|---|
| Type letters accurately and within expected timeframes | New letters will be typed within an average of 8 minutes with 80% accuracy | 11/12/04 |
| | New letters will be typed within an average of 6.5 minutes with | 11/26/04 |

B0059

D00383

| | | |
|---|---|---|
| | 85% accuracy | |
| | New letters will be typed within an average of 5 minutes with 90% accuracy | 12/10/04 |
| | Correction letters typed within an average of 3 minutes and with 99% accuracy | 11/12/04 |
| Overtime will be approved in advance | All overtime will be approved in advance | Ongoing |
| A full 7.75 hour day will be worked unless PTO has been approved in advance. | A full 7.75 hour day will be worked unless PTO has been approved in advance | Ongoing |
| Lunch breaks will be limited to 1 hour and will occur between 12 and 2 PM unless prior approval was obtained. | Lunch breaks will be limited to 1 hour | Ongoing |

**I WILL MEET WITH YOU AND YOU WILL RECEIVE WRITTEN FEEDBACK ON YOUR PROGRESS ON THE FOLLOWING TIMEFRAMES:** (once a week, bi-weekly, etc.) – Weekly written feedback in addition to the verbal feedback as noted above

If you feel there is some outside influence that may be affecting your performance, I strongly suggest that you take advantage of the confidential Employee Assistance Program by calling 685-5177 or 1-800-435-8190.

1800-437-0941

Failure to successfully achieve and maintain the performance expectations for all areas of responsibility as specified in your job description, performance expectations and as duties are assigned may lead to corrective action including termination. On the other hand, successful completion of the PIP does not provide any job continuance guarantee.

If you do not agree with the substance or procedures identified in this document, you may request a further review by contacting your Human Resources Generalist.

I have read and understand the actions outlined in this document. My signature on this document does not necessarily indicate that I agree with the information, only that it has been reviewed with me and that I understand it.

Signed _____     Date _____
Employee

Signed _____     Date 10-29-04
Supervisor

Signed _____     Date 10.30.04
Human Resources

Associate has requested to have documents by outside party (lawyer) and has been informed the she must either sign form or communicate refusal by 11/8/04

D Associate has verbally agreed to above

CONFIDENTIAL
B0060

D00334



**BlueCross BlueShield**
**of Delaware**
A CareFirst Company

One Brandywine Gateway
P.O. Box 1991
Wilmington, DE 19899.1991
www.bcbsde.com

**Choma, Edith**

| | |
|---|---|
| From: | Sweeney, Debbie |
| Sent: | Monday, November 01, 2004 8:06 AM |
| To: | Choma, Edith |
| Subject: | RE: checking in |

Thanks. This arrived at 7:56 what did you do between 7:50 and 7:56?

Debbie Sweeney
Director, Quality Improvement
BCBSD, Inc

p 302-421-3464
f 302-421-8863

*This communication, including any attachments, is confidential and intended for the sole use of the intended recipient(s). If you received this message in error, please notify the sender immediately and delete all materials received. Thank you.*
-----Original Message-----
**From:** Choma, Edith
**Sent:** Monday, November 01, 2004 7:56 AM
**To:** Sweeney, Debbie
**Subject:** checking in

I am checking in at 7:50 am

This communication, including any attachments, is confidential and intended for the sole use of the intended recipient(s). If you received this message in error, please notify the sender immediately and delete all materials received. Thank you.

**B0061**

CONFIDENTIAL                                      D00359

11/1/2004          Blue Shield of Delaware and CareFirst, Inc., are independent licensees of the Blue Cross and Blue Shield Association.

# CareFirst.

## ASSOCIATE PROFILE

Run Date: 11/1/2004

Company: DLW  Employee Number: 222241735
Address: 3210 DUNLOP DRIVE
County:
Div: 24010 CC/DSU:
Job Title: ASSISTANT, ADMINISTRATIVE II
Job Code: CAA02            Band: II
Supervisor's Name:  CARPENTER, PATRICIA

Name: CHOMA, EDITH A
City: WILMINGTON
DOH: 08/09/1989   ADOH: 08/09/1989
Department: ADMIN SUPPORT

Clin Code: N/A

Position: 900597
State: DE  ZipCode: 19808
Term: N/A
Location: HCCBW
Targeted Comp:  N/A
MRP: $ 40,625
Supervisor's Position #:910281

## SALARY | SALARY INCREASES GREATER THAN 5% REQUIRE COMPENSATION APPROVAL.

| | Action Reason | Effective Date | New Base Rate | Change Percent | Change Amount |
|---|---|---|---|---|---|
| Proposed: | | | | | |
| Current: | INMRT | 02/22/2004 | $ 36,826.00 | | |
| Prior 1: | INMRT | 02/23/2003 | $ 35,753.00 | Hourly Rate: | Compa-Ratio: |
| Prior 2: | INPRM | 02/10/2002 | $ 34,711.00 | $ 18.2759 | 90.64% |
| Comments: | | | | | |

## JOB CHANGE        ☐ Promotion  ☐ Transfer  ☐ Demotion

Effective Date:_____        Reason Code:

To Position #:_____

NEW POSITION DATA:
JobTitle:_____    Job Code:_____

Band:_____

Div: _____        CC/DSU: _____    Location: _____

Clinical Code: _____

Supervisor's Name: _____    Supervisor's Position #: _____  New Bi-Weekly Hours: _____
Comments:

## STATUS CHANGE ☐ Full Time  ☐ Part Time  ☐ Leave

Current Status:  REGFN            Current Bi-Weekly Hours: 77.50

Effective Date:_____ New Status: _____ New Bi-Weekly Hours: _____    Shift: _____
Comments:

## PERFORMANCE

Last Review Date:   02/22/2004        Rating:  MEETS JOB REQUIRMENTS        Action Code:  N/A

Action Effective Date: _____        New Rating: _____
Comments:

## REQUIRED SIGNATURES

| ORIGINATOR | signature | DATE | NEXT LEVEL MGMT | signature | DATE |
|---|---|---|---|---|---|
| ORIGINATOR | print name | | NEXT LEVEL MGMT | print name | |
| HR APPROVAL | | DATE | ADDITIONAL APPROVAL | | DATE |

## HRIS USE ONLY

| ENTERED BY: | | DATE | AUDITED BY: | | DATE |
|---|---|---|---|---|---|

D00849

CONFIDENTIAL      B0062

## EXIT INTERVIEW

**EMPLOYEE'S NAME:**

Edith        Choma
First    M.I.    Last

**FORWARDING ADDRESS:**

3210 Dunlap Drive
Wilm DE 19808

**SERVICE DATE:**

8 / 9 / 89
Month / Day / Year

**POSITION:**

Admin Asst II

**LAST DAY WORKED:**

2 / 1 / 05 (Retirement
Month / Day / Year    Date)

**CHECK OUT**

Employee I.D. Card Returned

Employee Handbook returned

Employee Check-Out Sheet completed

Deborah Sweeney
SUPERVISOR'S NAME

**PRESENTED TO:**

Donna May
Human Resources Representative

I verify that the material noted above and on the check-out sheet has been presented to the Human Resources representative noted above or the person to who I reported and that I am leaving behind all other assigned company property.

I still have my employee I.O.
card. I assume I was taken
out of the system - will get
I might have a very old lap top
If I find that I have it I
will return. I believe it
was returned.

Edith Choma
Employee Signature

Date: 2-15-05

B0063

CONFIDENTIAL

D00374

Department: People she helped Yvonne + Charlene helped them do audits.

Position: Feels did very well + worked very hard in department.

## WHERE DID THE EMPLOYEE FEEL IMPROVMENTS ARE NEEDED:

Company: Better communications and more timely.

Position: Should have been treated with more respect.

Dept - Harassed quite a lot and should not have been allowed.

B0065

D00376

CONFIDENTIAL

## TO BE COMPLETED BY IMMEDIATE MANAGEMENT

Would you rehire in your department:        ☐ *Yes*   ☐ *No*   ☐ *Conditional*

_____
*Signature (Immediate Management)*

*Date:* _____


_____
*Signature (Next Administrative Level)*

*Date:* _____


## PLEASE RETURN TO HUMAN RESOURCES

**B0066**

CONFIDENTIAL

D00377

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974

Delaware Department of Labor

| ENTER( ) E NUMBER | |
|---|---|
| ☐ FEPA | 04100795 |
| ☐ EEOC | 170A500043 |

and EEOC (if applicable)

NAME (Indicate Mr., Mrs., Ms)
th Choma

HOME TELEPHONE NO. (Include Area Code)
(302) 998-4050

STREET ADDRESS
3210 Dunlap Drive

CITY, STATE AND ZIP CODE
Wilmington DE 19808 NCC

COUNTY

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one, list below.)

NAME
Blue Cross Blue Shield of Delaware

NO. OF EMPLOYEES OR MEMBERS 50+

TELEPHONE NUMBER (Incl. Area Code)
(302) 421-3000

STREET ADDRESS
One Brandywine Gateway

CITY, STATE AND ZIP CODE
Wilmington, DE 19989

NAME

TELEPHONE NUMBER (Include Area Code)

STREET ADDRESS

CITY, STATE AND ZIP CODE

☐ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN ☐ AGE

☒ RETALIATION ☐ DISABILITY ☐ OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE
EARLIEST    6/15/2004
LATEST    10/20/2004
☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s)):

Jurisdiction: Charging Party works for Respondent in Delaware

Charging Party's protected class: Charging Party previously filed a charge of discrimination against Respondent, Disability

Adverse employment action: Harassment, Hostile work environment, Terms & Conditions, Re-assigned in work area

Employment harm: Harassment, Failure to provide accommodations

Applicable law(s): Title VII of the Civil Rights Act, Delaware Discrimination in Employment Action

Respondent's explanation: Not providing an explanation

Comparator(s) or other specific reason(s) for alleging discrimination: Charging party was removed from her assignment and placed in a hostile work environment when she was replaced by a co-worker who is being paid twice as much and is now Charging Party's supervisor, Charging Party's co-workers are not scrutinized and threatened with termination and disciplinary action on a routine basis, Charging Party is routinely harassed when taking one days absence for her disability and instructed to provide medical documentation contrary to company policy which deems three days of absence as the standard to have to provide medical documentation

Additional information and verification of these facts are provided by the attached Affidavit.

☒ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

SIGNATURE OF COMPLAINANT
Edith Choma 10-22-04

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

EEOC FORM 5
REV 6/92    PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED

DEPOSITION EXHIBIT
CHoMA -45
CMV-6/14/07

**B0067**

CONFIDENTIAL

D00001

1.

```
 1          IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF DELAWARE

 3

 4   EDITH CHOMA,                    )
                                     )
 5            Plaintiff,             )
                                     )  Civil Action
 6   v.                              )  No. 06-486-JJF
                                     )
 7   BLUE CROSS BLUE SHIELD OF       )
     DELAWARE,                       )
 8                                   )
              Defendant.             )
 9

10          Deposition of TIMOTHY J. TOOLE taken
     pursuant to notice at the law offices of Margolis
11   Edelstein, 750 South Madison Street, Wilmington,
     Delaware, beginning at 10:37 a.m. on Wednesday,
12   June 6, 2007, before Christina M. Vitale, Certified
     Shorthand Reporter and Notary Public.

13   APPEARANCES:

14        LORI ANN BREWINGTON, ESQUIRE
          MARGOLIS EDELSTEIN
15          750 South Madison Street
            Wilmington, Delaware  19801
16          For the Plaintiff

17        SCOTT A. HOLT, ESQUIRE
          YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
18          The Brandywine Building
            1000 West Street, 17th Floor
19          Wilmington, Delaware  19899
            For the Defendant

20

21

               WILCOX & FETZER
22     1330 King Street -  Wilmington, Delaware 19801
                 (302) 655-0477
23                www.wilfet.com

24
```

**B0068**

2

Timothy J. Toole

1              TIMOTHY J. TOOLE, the deponent herein,

2    having first been duly sworn on oath, was examined and

3    testified as follows:

4    BY MS. BREWINGTON:

5        Q.    Good morning, Mr. Toole.

6        A.    Good morning.

7        Q.    Have you ever had your deposition taken before?

8        A.    No, I never have.

9        Q.    My name is Lori Brewington and I represent

10   Edith Choma in an age, disability and retaliation

11   action against Blue Cross Blue Shield.

12       A.    Um-hum.

13       Q.    Were you aware that Ms. Choma filed a

14   discrimination suit against Blue Cross?

15       A.    Yes.

16       Q.    When did you first become aware of that?

17       A.    I can't say I'm aware of a specific date.    In

18   general I thought it was a couple years ago.

19       Q.    I'm going to ask you a series of questions and

20   I'll make every attempt to ask them one at a time.    If

21   at any time you don't understand something or you need

22   to rephrase it, let me know and I'll do my best to go

23   ahead and do that for you.    If at any time you need to

24   take a break, let me know.    I don't think we'll be

**B0069**

Wilcox & Fetzer, Ltd.          Registered Professional Reporters          (302) 655-0477

18

Timothy J. Toole

1  Q.   We just talked about the leadership meeting.

2  How about in another context outside of the leadership

3  meeting?

4  A.   I've been trying to pinpoint what meeting it

5  was in and I believe it might have been actually in a

6  clinical quality meeting I heard Dr. Kaplan say where

7  Edith was no longer with the company.

8  Q.   That was a clinical quality --

9  A.   Again, we are talking five, six years ago.

10  Q.   I understand.

11  A.   It probably was that meeting, but it could have

12  been another meeting.  It was either in there or the

13  directors meeting because of the people involved.

14  Q.   Can you tell me again what Dr. Kaplan said?

15  A.   My recollection is he said he wished he could

16  get rid of Edith because he said she couldn't hear.

17  Q.   Who was involved in that meeting, if you can

18  remember?

19  A.   Well, the person he said that to was a woman

20  named Jill Macconi and I'm trying to think.  Again,

21  who was in the meeting would depend on what was the

22  context, whether it was a leadership meeting -- not

23  leadership -- if it was a directors meeting, it was

24  the other directors that were there.  If it was a CQ

**B0070**

19

Timothy J. Toole

1    quality improvement meeting, it was some of those same

2    people.

3    Q.    Okay, so, we are not sure of the title of the

4    meeting?

5    A.    Yeah, it's pretty hazy.

6    Q.    Can you tell me a time frame meaning not the

7    time of the meeting, but a year that it occurred or a

8    couple of years?  I know this is difficult to

9    remember.

10   A.    It was probably around 2000, 2001, probably in

11   that time frame.  Probably around 2000, 2001.

12   Q.    Did Dr. Kaplan say anything else about Edith

13   besides what you just indicated?

14   A.    Not that I can recollect, no.

15   Q.    You said he was saying it to Macconi, what is

16   her first name?

17   A.    Jill.

18   Q.    Jill Macconi?

19   A.    Yes.

20   Q.    Who is Jill Macconi?

21   A.    She is the director of stat actuary.

22   Q.    And do you know or if you can remember the

23   context of that conversation?  I'm trying to

24   understand why exactly he said that.

**B0071**

20

Timothy J. Toole

1     A.    As you are asking me the question I'm trying to

2     -- you know, probably -- well, probably, I'm

3     speculating and I don't want to speculate, but I think

4     it was in response to how is your day going?

5     Q.    So, Jill said, How is your day going?

6     A.    I don't know what she said.  I'm assuming.

7     Q.    How are things going?

8     A.    Yeah, How are things going?  And, obviously,

9     Dr. Kaplan was upset about something and he made that

10    remark.

11    Q.    Did anyone else comment that was in the

12    meeting?

13    A.    Not that I can recollect, no.

14    Q.    And you heard Kaplan say that?

15    A.    Um-hum.

16    Q.    Yes?

17    A.    Yes, I did.

18    Q.    What did you do after you heard that comment?

19    A.    Well, probably sat through the meeting and then

20    I at some point during the day I told Edith what had

21    been said.

22    Q.    What did Edith say?

23    A.    I don't remember what she said, but I remember

24    that she was upset about it.

**B0072**

1.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

EDITH CHOMA,                          )
                                      )
            Plaintiff,                )
                                      )  Civil Action
v.                                    )  No. 06-486-JJF
                                      )
BLUE CROSS BLUE SHIELD OF             )
DELAWARE,                             )
                                      )
            Defendant.                )

            Deposition of DAVID J. MARTIN taken
pursuant to notice at the law offices of Margolis
Edelstein, 750 South Madison Street, Wilmington,
Delaware, beginning at 12:00 noon on Thursday,
September 27, 2007, before Christina M. Vitale,
Certified Shorthand Reporter and Notary Public.

APPEARANCES:

        HERBERT W. MONDROS, ESQUIRE
        MARGOLIS EDELSTEIN
          750 South Madison Street
          Wilmington, Delaware  19801
          For the Plaintiff

        SCOTT A. HOLT, ESQUIRE
        YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
          The Brandywine Building
          1000 West Street, 17th Floor
          Wilmington, Delaware  19899
          For the Defendant

ALSO PRESENT:  Donna E. May, Blue Cross Blue Shield
               Matthew Helm
               Edith Choma

            WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
            (302) 655-0477
            www.wilfet.com

**B0073**

2

David J. Martin

1          DAVID J. MARTIN, the deponent herein,

2     having first been duly sworn on oath, was examined and

3     testified as follows:

4     BY MR. MONDROS:

5        Q.    Good afternoon, Dr. Martin, my name is Herb

6     Mondros, I'm an attorney and I represent Edith Choma

7     and we have met for the first time this morning, is

8     that correct?

9        A.    Correct.

10       Q.    And have you ever been a witness at a

11    deposition before?

12       A.    No, I haven't.

13       Q.    Very briefly the way it's going to work is I

14    will ask you a series of questions.  If you don't

15    understand my question or you are not sure you

16    understand it, ask me and I'll be glad to repeat it.

17    Your job is to answer the questions truthfully to the

18    best of your ability and if you don't know the answer,

19    please tell me.

20          The court reporter is here and she'll be

21    taking down every word that I say and every word that

22    you say.  It's important and somehow I have this

23    problem with a lot of witnesses, but I don't think I

24    will have it with you, is that I finish my question

**B0074**

23

David J. Martin

1    Q.    The other two secretaries, who were they?

2    A.    Pat or Patricia Carpenter and Chris Zakutny.

3    I'm not sure of the spelling.

4    Q.    Do you have an understanding of Paul Kaplan

5    having some sort of a head injury?

6    A.    Yes.

7    Q.    What was the nature of that?

8    A.    I understand he fell on cement at a beach house

9    and was in a coma for three weeks.

10    Q.    Did you know him before that injury?

11    A.    Yes, I did.

12    Q.    And did you know him after the injury?

13    A.    Yes.

14    Q.    Did you notice any difference in his

15    personality before and after?

16    A.    I only had limited interaction with him before.

17    I went to school with his wife, Marina Pomarne.  I had

18    dinner at their house once, but, yes, I did see a

19    difference in his personality after the head injury.

20    Q.    And as best you can what was the difference

21    that you noticed?

22    A.    I would have to say he was somewhat more

23    impulsive afterwards.  He seemed more calm before.

24    This is just my percent exception, though.

**B0075**

24

David J. Martin

1    Q.    Are there any specific instances that you can
2    recall?

3    A.    Well, in it was about 2002, 2003 I was working
4    on health care management refund resolution.  HMC was
5    a large disease management company for us and the
6    problem was Dr. Kaplan had promised our accounts
7    disease management benefits without having set up a
8    way to charge the accounts.  This went on for almost
9    two years and I was tasked with recovering that money
10   or setting up a way that we could recover the money
11   from the accounts, which was almost a million dollars.
12   So, I took that as somewhat an impulsive act and not
13   well thought through on his part.

14              There were some other examples as well,
15   but this with the caveat that I'm not a medical
16   director, I'm a health care analyst, so my perceptions
17   may not be the best in the situation.

18   Q.    Fair enough, thanks.  Did you have any
19   knowledge from any source that Edith Choma was unhappy
20   working for Dr. Kaplan?

21   A.    Not when she started.  Toward the end I would
22   say yes.

23   Q.    How did you know she was not happy working for
24   Dr. Kaplan at the end of the period of time that when

**B0076**

31

David J. Martin

1    A.    A verbal tone that is alternating between very
2    condescending to outright hostility.
3    Q.    Is it fair to say that you believed that Deb
4    Sweeney treated Edith Choma harshly?
5    A.    Correct.
6    Q.    Would you say that in your view did Deb Sweeney
7    treat Edith Choma unfairly?
8    A.    Yes.
9    Q.    Do you have any instances on which you thought
10   that you personally witnessed in which Deb Sweeney
11   treated Edith Choma either harshly or unfairly?
12   A.    Yes.
13   Q.    And what do you recall?
14   A.    In one instance the department went out to
15   lunch without Deb Sweeney.  So, this would have been
16   myself, Charlene Blanchard, Yvonne Locker, Peggy Bell,
17   myself and Edith.  We came back, I think we were
18   probably about a half hour late because of service
19   delays.  I believe we went to Lone Star.  When we got
20   back, Edith was dressed down by Debbie Sweeney about
21   being late and it was quite a tirade and it was -- the
22   concern I had is that it was done in the center of the
23   department right in the center of all our cubicles and
24   I felt that that was very inappropriate.

**B0077**

40

David J. Martin

1    A.    I assume as an hourly employee there would be

2    no other reason for her to come in on the weekends.

3    Q.    Was it your understanding then that Edith was

4    being treated differently than Chris was?

5    A.    Correct.

6            MR. HOLT:   Objection to the form of the

7    question.

8    BY MR. MONDROS:

9    Q.    After Edith moved over and started working for

10   Deb Sweeney that required a physical relocation for

11   Edith, is that correct?

12   A.    Correct.

13   Q.    And she had been working in a cubicle near Paul

14   Kaplan's office?

15   A.    Yes.

16   Q.    And she went to another cubicle that was near

17   Deb Sweeney's office, is that correct?

18   A.    Yes, that's correct.

19   Q.    Did you have an opportunity to observe the

20   condition of the cubicle that Edith worked in?

21   A.    Yes, I did.

22   Q.    What was the condition that you observed?

23   A.    It was dismal, it was incredible filthy.

24   Everything was mismatched.   The cabinets were covered

**B0078**

Wilcox & Fetzer, Ltd.            Registered Professional Reporters          (302) 655-0477

David J. Martin

1   in dirt and tape and it was just a horrific cubicle.

2   I've never seen anything that bad.  The part that I

3   thought was odd about this is we had just received new

4   cubicles and the old cubicles that they had moved out

5   were in nowhere near as bad condition as what had been

6   given to Edith.  It was also appreciably smaller than

7   Chris Zakutny's cubicle and Pat Carpenter's cubicle.

8       Q.    To your knowledge did Edith request that her

9   cubicle be improved?

10      A.    Yes.  She expressed her displeasure at the

11  condition of her cubicle cleanliness and the size.

12      Q.    Was that concern addressed?

13      A.    Eventually, yes, the cubicle was replaced.

14      Q.    Did that take a long period of time or short

15  period of time?

16      A.    It took a while, I believe it took a few months

17  for that to come about.

18      Q.    Do you have an understanding as to why Edith

19  was put in a cubicle of such deplorable condition?

20            MR. HOLT:  Objection to the form of the

21  question.

22      A.    Just our conjecture as to why that would be.

23  We hadn't -- when I say "we," I did not have any

24  information as to why that took place.  I could only

**B0079**

42

David J. Martin

1    offer opinions.

2    Q.    What is your opinion?

3    A.    Given the state of the cubicle it appeared to

4    me that someone had gone out of their way to find

5    really dirty, misused pieces of a cubicle.  I've seen

6    cubicles in other departments, other buildings, of

7    Blue Cross and none were that bad.  I don't even know

8    where they obtained that equipment.

9    Q.    Do you have an understanding as to who would

10   have been done that, who would have been responsible

11   for that?

12   A.    I'm assuming Deb Sweeney would have been

13   responsible for that as the director of the

14   department.

15   Q.    In the draft affidavit, paragraph 16, it says

16   there was a blowout between Mrs. Sweeney -- between

17   Ms. Sweeney and Ms. Choma in which Ms. Sweeney began

18   yelling at Ms. Choma for not completing letters fast

19   enough, do you recall that?

20   A.    Yes.

21   Q.    Did you witness that personally?

22   A.    I did not see it.  I was, once again, in my

23   cubicle hearing over the wall and that is one of the

24   incidents I described earlier.

**B0080**

43

David J. Martin

1    Q.    And as best you recall was Ms. Sweeney speaking

2    in a raised voice?

3    A.    Not initially.  It was more of a condescending

4    tone, a lower tone, but telling Edith -- and this is,

5    once again, just memory -- that if she could not

6    finish the letters in a timely fashion, once again,

7    this 20 to 23 number being bantered about, that she

8    should go out on disability.  I recall Edith saying in

9    a very calm voice, I feel like you are harassing me,

10   and Debbie responded by stating, I'm not harassing

11   you, I am directing you.  And it was in that sort of

12   tone of voice perhaps amplified a bit.

13   Q.    Did that discussion continue into Debbie

14   Sweeney's office?

15   A.    Yes, it did.

16   Q.    Was the door open or closed?

17   A.    The door was closed, but the yelling was loud

18   enough to be heard very clearly through the walls.

19   Q.    Do you have an understanding that Edith Choma

20   filed complaints with Blue Cross Blue Shield human

21   resources department?

22   A.    I don't know if she went through the human

23   resources department.

24   Q.    What about any governmental agency, Department

**B0081**

44

David J. Martin

1    of Labor or EEOC?

2      A.    Yes, both.

3      Q.    How do you know that?

4      A.    With the Labor Board Edith told me she was

5    going to the Labor Board and same with the EEOC, she

6    had told me directly.

7      Q.    After Edith complained to the Labor Board and

8    the EEOC to your knowledge did Blue Cross Blue Shield

9    conduct an investigation into whether or not -- into

10   what Edith was complaining about?

11     A.    I don't know if they did or not.  I was never

12   questioned.

13     Q.    Nobody ever came and asked you about how Edith

14   was being treated there?

15     A.    No.

16     Q.    The appeal and denial letters, was that

17   something that was within your sphere of responsi-

18   bility, did you have any involvement in those letters?

19     A.    No.

20     Q.    Did you have any sense in 2002 that there was

21   an increasing number of denial letters going out and

22   increasing number of appeals?

23     A.    Yes, that was my understanding.

24     Q.    What was the basis of your understanding?

**B0082**

1

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF DELAWARE

 3    EDITH CHOMA,                    )
                                      )
 4              Plaintiff,            )   C.A. No. 06-486
                                      )
 5    v.                              )
                                      )
 6    BLUE CROSS BLUE SHIELD OF       )
      DELAWARE,                       )
 7                                    )
                Defendant.            )
 8
                  Deposition of DEBORAH M. SWEENEY
 9    taken pursuant to notice at the law offices of
      Margolis Edelstein, 750 South Madison Street,
10    Suite 102, Wilmington, Delaware, beginning at
      10:05 a.m., on Friday, September 7, 2007, before
11    Patricia L. Shelton, Registered Professional Reporter
      and Notary Public.
12

13    APPEARANCES:

14          HERBERT W. MONDROS, ESQ.
            MARGOLIS EDELSTEIN
15            750 South Madison Street - Suite 102
              Wilmington, Delaware  19801
16            For the Plaintiff

17          SCOTT A. HOLT, ESQ.
            YOUNG CONWAY STARGATT & TAYLOR LLP
18            1000 West Street - 17th Floor
              Wilmington, Delaware  19801
19            For the Defendant

20    ALSO PRESENT:   EDITH CHOMA
                      MATTHEW HELM
21

22
                      WILCOX & FETZER
23      1330 King Street - Wilmington, Delaware 19801
                       (302) 655-0477
24                    www.wilfet.com
```

**B0083**

2

Deborah M. Sweeney

```
 1                    DEBORAH M. SWEENEY,

 2           the deponent herein, having first been

 3           duly sworn on oath, was examined and

 4           testified as follows:

 5                    EXAMINATION

 6    BY MR. MONDROS:

 7     Q.    Good morning, Ms. Sweeney.

 8     A.    Good morning.

 9     Q.    My name is Herb Mondros.  And I'm an attorney.

10    And I represent the plaintiff, Edith Choma, in this

11    case.

12           We met for the first time this morning; is

13    that correct?

14     A.    Yes.

15     Q.    Have you ever been a witness at a deposition

16    before?

17     A.    No, I have not.

18     Q.    This is the time first time?

19     A.    Yes.

20     Q.    Let me just explain the rules, what's going to

21    happen here today.  First of all, we're grateful for

22    your appearance and we're grateful for your attorney

23    making you available today.

24           The way it goes is I get to ask the
```

**B0084**

37

Deborah M. Sweeney

1    Q.    There was a time that one of your direct

2    reports was Edith Choma; is that correct?

3    A.    That is correct.

4    Q.    Of the positions that you just listed and the

5    individuals that you just listed, is there one on that

6    list that corresponds with the position that

7    Edith Choma used to hold?

8    A.    Yes.  Stephanie Kosinski.

9    Q.    So when Edith Choma reported to you, she had

10   the position of QI specialist and admin assistant?

11   A.    Correct.  The titles have changed over the

12   course of time.

13   Q.    Same job description, though?

14   A.    Basically the same job description.  We

15   expanded the job description because we had some

16   additional needs within the department.

17        When we recruited Stephanie to come over,

18   we expanded the job to include some additional data

19   responsibilities, database maintenance and things like

20   that.

21   Q.    When did Stephanie Kosinski start in that

22   position?

23   A.    I do not recall the exact date.  It was several

24   months after Edith left.  So I would say summer, early

**B0085**

48

Deborah M. Sweeney

1    turnover of nurses at Blue Cross Blue Shield?

2    A.    There have been periods of time where, yes, we

3    have had a number of turnovers, predominantly in the

4    utilization management area.

5    Q.    I want to go back to training real quick.   One

6    of the things I expected to hear from you about

7    training was how to handle protected health

8    information, prevent disclosure and how that's done.

9    Do you get trained in that also, HIPAA?

10    A.    Yes.

11    Q.    And how often do you get trained in that?

12    A.    That is an annual on-line training program that

13    all associates...

14            There's privacy, confidentiality.   There

15    are a number of on-line training programs that are

16    mandatory every year.

17    Q.    Your direct report is Dr. Kaplan, correct?

18    A.    I report to Dr. Kaplan, yes.

19    Q.    And he's required to take that class?

20    A.    Yes.

21    Q.    And you're required to take that training?

22    A.    Yes.

23    Q.    And all the people who are under your

24    supervision are required to take that training?

**B0086**

59

Deborah M. Sweeney

```
1    A.    She reports to Dr. Kaplan today.

2    Q.    At that time, who was she working for?

3    A.    I -- it would be an assumption on my part that

4    she was working for Dr. Kaplan.

5    Q.    Back then?

6    A.    That's correct.

7    Q.    At some point, did Edith Choma become your QI

8    specialist/administrative assistant?

9    A.    Yes.

10   Q.    And that was her official title?

11   A.    I don't believe that QI specialist was in the

12   official title at that point in time.  Administrative

13   assistant.  I don't recall that QI specialist was in

14   the title.

15   Q.    Did that become part of the title at a later

16   point in time?

17   A.    When we expanded the role and hired

18   Stephanie Kosinski, the title was adjusted.

19   Q.    So after Edith left, then the title was

20   adjusted?

21   A.    That is correct.

22   Q.    Previously the title was administrative

23   assistant?

24   A.    To my best recollection, yes.
```

**B0087**

Wilcox & Fetzer, Ltd.          Registered Professional Reporters          (302) 655-0477

60

Deborah M. Sweeney

```
 1    Q.    In preparing my outline, I put "secretary" at

 2    certain points.  If I say "secretary" instead of

 3    "administrative assistant," will you know what I'm

 4    talking about?

 5    A.    Yes.

 6    Q.    Is that basically accurate?  Are they synonyms?

 7    A.    Not in my mind.

 8    Q.    Tell me how a secretary and administrative

 9    assistant are different.

10    A.    In my mind, an administrative assistant is at a

11    higher level.

12    Q.    In what way?

13    A.    More independent, showing more initiative, you

14    know, suggesting improvements:  What if we do it this

15    way.

16          Secretary is more -- in my mind, more of a

17    passive role, receiving work from others and doing

18    that work.

19    Q.    Okay.  I'm going to change my outline.

20          At some point, did Edith Choma become your

21    administrative assistant?

22    A.    Yes.

23    Q.    And when was that?

24    A.    I don't recall an exact date.  Within the first
```

**B0088**

61

Deborah M. Sweeney

1    few weeks of my hire, Dr. Kaplan informed me that

2    Edith would be supporting the QI area.

3              And, also, I became aware after my arrival

4    that QI would be moving.  Medical management had

5    outgrown the space that they were in.  And the QI

6    department was contained and small enough that it

7    could fit in the only empty space that was on the

8    floor.

9              So the QI staff, along with the data

10   analysts would be moving to a different area on the

11   same floor.  And that at that point in time, Edith

12   would be coming with us and would be supporting QI.

13   Q.    QI is one of the departments within medical

14   management?

15   A.    That is correct.

16   Q.    And how many others are there?

17   A.    Within medical management, there would be the

18   outpatient referral unit.  There's utilization and

19   case management.  There's behavioral health.

20   Q.    And at this point, what was the address of the

21   building that you were in?

22   A.    1401 Foulk Road, F-O-U-L-K.

23   Q.    Let me make sure I understand.  I don't want to

24   misstate your testimony.  That within a few weeks

**B0089**

62

Deborah M. Sweeney

    1    after July 1st, 2002, Dr. Kaplan came to you and told
    2    you that QI would be moving to another location on the
    3    floor and that data managers would be coming with QI.
    4    And that as part of that move, Edith Choma would be
    5    serving you and QI?
    6    A.    That is correct.
    7    Q.    And as I understand your testimony, the reason
    8    for that was that medical management had outgrown the
    9    space that it was in?
   10    A.    That is correct.
   11    Q.    Was it that floor of the building?
   12    A.    One portion of the floor on that building.
   13    Q.    And what floor was that?
   14    A.    The second floor.
   15    Q.    And is this something that Dr. Kaplan -- the
   16    move of QI, had you and he discussed this previously?
   17    A.    Prior to my start date?
   18    Q.    Yes.
   19    A.    Not that I recall.
   20    Q.    Had you discussed it previous to him informing
   21    you that Edith Choma would be coming to serve you and
   22    QI?
   23    A.    My recollection is that it was all part of the
   24    same.

**B0090**

66

Deborah M. Sweeney

```
 1              Now, when you and Dr. Kaplan had this
 2    conversation about the move and the fact that Edith
 3    Choma was going to be working for you, did you have a
 4    sense as to -- you know at that time that Edith Choma
 5    had previously worked for Dr. Kaplan; is that correct?
 6    A.    That is correct.
 7    Q.    Did you have an understanding of how long she
 8    had worked for Dr. Kaplan?
 9    A.    No, I did not.
10    Q.    Years?  Months?
11    A.    No, I did not.
12    Q.    No sense.  Okay.
13              Did you have an understanding as to whether
14    Dr. Kaplan was happy or unhappy with the performance
15    of Edith Choma in her position?
16    A.    I would be speculating.  I don't know.
17    Q.    That's not something that you and he discussed
18    at all?
19    A.    That is correct.
20    Q.    He just told you that Edith Choma is going to
21    be working for you instead of me?
22    A.    That's is correct.
23    Q.    He didn't tell you what his experience was with
24    her?
```

**B0091**

67

Deborah M. Sweeney

    1     A.    No, he did not.

    2           The one caveat that I will say is that he

    3     did tell me that Pat Carpenter would be supporting the

    4     Performance Improvement Committee by taking the

    5     minutes for that committee; that Edith had a problem

    6     with hearing and was not able to take minutes in a

    7     meeting where there was the potential of multiple

    8     people talking.  So that that duty would be assumed by

    9     Pat Carpenter.  And so Pat would then also be sending

   10     out the reminders and the minutes to the various

   11     committee members.

   12     Q.    Now, that conversation that you had with

   13     Dr. Kaplan, was that at the same time that he told you

   14     about the move of QI and the fact that Edith would be

   15     working for you?

   16     A.    I don't recall the timing.

   17     Q.    And that was an oral conversation?

   18     A.    That is correct.

   19     Q.    Did you have any communications in writing with

   20     him about that through e-mail or memos or any other...

   21     A.    Not that I recall.

   22     Q.    Now, as I understand your testimony previously,

   23     it was your belief that Pat Carpenter was working for

   24     Dr. Kaplan at the same time that Edith Choma was

**B0092**

68

Deborah M. Sweeney

1    working for Dr. Kaplan; is that correct?

2    A.    That is correct.

3    Q.    So he essentially had two administrative

4    assistants working for him at the same time?

5    A.    There was no one in the QI director role.  So

6    he was it.  So Eileen Brown was reporting to him prior

7    to my arrival.

8    Q.    Also, an administrative assistant?

9    A.    No.  Eileen Brown would have been the manager

10   for utilization and case management.

11          All of the QI staff would have been

12   reporting to him prior to my arrival, because there

13   was no one in the position.

14   Q.    Do you know how Edith was chosen to work for

15   you rather than Pat Carpenter?

16   A.    What Dr. Kaplan told me was that Edith had been

17   involved with the NCQA survey processes previously.

18   And he thought that her knowledge of that process

19   would make her a good candidate to support the QI

20   department, since one of the tasks to which we were

21   assigned was NCQA accreditation and there was a NCQA

22   accreditation visit coming up in 2003.

23   Q.    So it was your understanding that Edith Choma's

24   particular skill set suited her to come work for QI in

**B0093**

80

Deborah M. Sweeney

     1    A.    No.

     2    Q.    At the time that Edith Choma began working for

     3    you, did you have an understanding as to how old

     4    Edith Choma was?

     5    A.    No.

     6    Q.    Approximately?

     7    A.    I could have guessed.  But, no.  No information

     8    was shared with me regarding Edith's age.

     9    Q.    And what would your guess have been?

    10    A.    That she was probably in her mid to late 50's.

    11    Q.    And when Edith Choma first began working for

    12    you, did you have an understanding that she had any

    13    disabilities that might interfere with her ability to

    14    complete the work that you expected her to do for you?

    15    A.    I was, as I had mentioned previously, informed

    16    that she had a hearing issue and would not be able to

    17    take minutes in a large group, and that Pat Carpenter

    18    was there for assigned responsibility for the

    19    Performance Improvement Committee, in taking minutes

    20    for that committee.  That was the only thing that I

    21    was made aware of.

    22    Q.    And you were made aware of that in a

    23    conversation you had with Dr. Kaplan?

    24    A.    That is correct.

**B0094**

81

Deborah M. Sweeney

1    Q.    Did you yourself ever observe any impaired

2    hearing on the part of Edith Choma?

3    A.    There were...

4    Q.    Let me ask the question again.

5              As of the date that Edith Choma started

6    working for you, at that time, had you ever observed

7    impaired hearing on the part of Edith Choma?

8    A.    Yes.  Asking to repeat something or, you know,

9    a quizzical look on her face.  You know, when I spoke

10   to her, perhaps she didn't quite hear what I was

11   saying.

12   Q.    And that's prior to her beginning to work for

13   you?

14   A.    Correct.

15   Q.    Prior to her beginning to work for you, did you

16   speak with Edith Choma frequently, infrequently?  And

17   on what subjects would you speak with her?

18   A.    I would have to say it was probably

19   infrequently.  You know, those first couple of weeks

20   were quite busy with just trying to get myself

21   acclimated to the organization and starting to pull

22   together information to prepare for a July

23   accreditation visit.

24              I was hired in July.  The next

**B0095**

143

Deborah M. Sweeney

 1    Q.    Because I do notice several typos in the first
 2    line, fourth line.  Resources is spelled incorrectly.
 3    A.    I know.  That's correct.  Unfortunately the
 4    document is a -- I believe it's a Lodus notes
 5    document, and it doesn't have spell check in it.  And
 6    sometimes when you're in a hurry, you don't go back
 7    and reread it and correct those spelling errors.
 8    Q.    It says in here that Edith was going to need to
 9    cover for Pat Carpenter when Pat is on vacation.  Was
10    it also the other way around?  Did Pat cover for Edith
11    when Edith was on vacation or otherwise out of the
12    office?
13    A.    For certain tasks, that would be correct.
14    There are some tasks that are more time sensitive than
15    others.  An example of something that was Edith's
16    responsibility that Pat would cover would be handling
17    appeals.
18          When an appeal comes in, there's a
19    designated time frame within which we have to respond
20    to that appeal.  If it needs to be sent to an external
21    provider for review because we need a same specialty
22    specialist for that review and Edith is on vacation,
23    Pat would need to do that.
24    Q.    These comments, were they in any way intended

**B0096**

155

Deborah M. Sweeney

1     automate the generation of these letters.

2              But as a result of a Department of Labor

3     regulation, which was then adopted by the National

4     Committee for Quality Assurance as their standard for

5     communicating denials and appeal responses, there were

6     certain components that needed to be in a denial

7     letter.  And those denial letter components were not

8     part of the old automated letters.

9              So we had to revert to a manual process

10    while we were implementing a new system and until we

11    could implement new letters that would be compliant

12    with the new requirements.

13    Q.   Okay.

14    A.   After Pat returned, we identified that there

15    were errors in the letters.  Volume was increasing.  I

16    made the decision after consulting with Dr. Kaplan

17    that we needed to divide up responsibility for the

18    letters; that Pat Carpenter would be responsible for

19    some of the letters and Edith would be responsible for

20    some of the letters; that Edith needed to become

21    proficient with those letters.

22             Failure to comply with the required format

23    and the timing for getting those out could subject the

24    company to fines from the Department of Labor and

**B0097**

Wilcox & Fetzer, Ltd.          Registered Professional Reporters          (302) 655-0477

156

Deborah M. Sweeney

1    could jeopardize our NCQA accreditation status.

2    Therefore, Edith needed to get up to speed and become

3    proficient in these letters so we could make sure that

4    we stayed on top of them.

5    Q.    So we're talking about denial and appeal

6    letters?

7    A.    Correct.

8    Q.    What are denial and appeal letters?  Are they

9    two different types of letters or is it denial and

10    appeal?

11    A.    Two different circumstances would warrant the

12    generation of each type.  When an initial

13    determination is made, if it is decided that the

14    request is deny either in whole or in part -- let's

15    say they requested five inpatient days and we only

16    approved two, that would be considered a denial of

17    three days.  So initial determinations received denial

18    letters.

19            If, subsequent to the issuance of that

20    initial determination, the initial denial, the

21    provider or the member appealed and said, no, I think

22    this should be paid and here's why, there's a response

23    letter that we would call the appeal response letter

24    that would go out in response to that request for the

**B0098**

157

Deborah M. Sweeney

1    rereview, the request for an appeal.

2    Q.   Okay.

3    A.   Confusing.  Sorry.

4    Q.   No.   That's okay.  I'm sure I get the denial

5    letters.

6              The appeal letter is a letter that

7    Blue Cross Blue Shield sends to the insured responding

8    to a request for reconsideration of a denial?

9    A.   Correct.  It goes to the insured individual.

10   It goes to the servicing provider.  An example would

11   be if it's a hospital, a copy would go to the insured,

12   the hospital and to the attending physician.

13   Q.   Okay.  That's great.

14             Now, back in, say, 2003 and 2002, how were

15   the appeal and denial letters handled?

16   A.   In 2002, they were automated.

17             The Department of Labor regulation, to the

18   best of my knowledge, took full effect in January of

19   2003.  So by January of 2003, we realized that the

20   denial and appeal response letters that we had were

21   not compliant and we needed to revert to a manual

22   process.

23             However, the volume was not all that great.

24   I mean, yes, we had denials.  But it was not a volume

**B0099**

159

Deborah M. Sweeney

 1   Q.   But Pat Carpenter didn't report to you either,
 2   correct?
 3   A.   That is correct.  However, utilization
 4   management and case management did report to me.  And
 5   those were the two areas that were under my
 6   responsibility that generated denial and appeal
 7   response letters.
 8   Q.   So you don't have any knowledge of
 9   Chris Zakutny ever doing appeal and denial letters?
10   A.   I do not.  I would not be in a position to
11   respond.
12   Q.   When did the increase occur in the volume of
13   denials?
14   A.   I would say throughout 2004, there was a steady
15   increase.
16   Q.   I have written down your testimony, "In 2004,
17   denial volume increased."  What were the causes of the
18   increase in denial volume?
19   A.   It could have been new medical director.  I
20   don't recall when Dr. Mannis started working with us.
21   He took over doing reviews on the inpatient side.
22   M-A-N-N-I-S, first name Tom.
23        Certainly we were paying more attention to
24   the requests that we were receiving.  I couldn't

**B0100**

160

Deborah M. Sweeney

1    pinpoint something specific outside of -- and, like I

2    said, I don't recall the timing of when Dr. Mannis

3    started to work for us, but...

4      Q.   Are you aware of any company strategy to

5    increase the number of denials?

6      A.   No, I am not.

7      Q.   Now, Dr. Mannis became a new medical director.

8    Was he at an equal level as Dr. Kaplan?

9      A.   No.  He would have been an associate medical

10   director.  He would have been on par with Patt Panzer

11   and --

12     Q.   Ricciardi?

13     A.   Yes.  Sue Ricciardi, R-I-C-C-I-A-R-D-I.

14     Q.   So if you have more denials, as a result of

15   that, you have more denial letters that need to go

16   out?

17     A.   Correct.

18     Q.   And if you have more denial letters going out,

19   is it also fair to assume that you have more people

20   requesting reconsideration and, therefore, more appeal

21   letters going out as well?

22     A.   Yes.

23     Q.   And so when Pat Carpenter went on vacation,

24   Edith Choma was given these appeal and denial letters

**B0101**

162

Deborah M. Sweeney

1    Q.    There came a time when you started timing Edith

2    at the speed at which or how long it took her to turn

3    around appeal and denial letters; is that correct?

4    A.    That is correct.

5    Q.    Was that before or after she broke her arm?

6    A.    It's around the same time.

7          I believe, to the best of my recollection,

8    it is after she broke her arm.  When she came in with

9    her arm in the sling, I asked her -- I confirmed with

10   her that she was right-handed.  I asked her whether

11   she would be able to continue to type.  She indicated

12   that she could type.  In my opinion, she insisted that

13   she could type.

14         I suggested that, perhaps, there were other

15   job duties that would be more appropriate since she

16   did not have access to her right hand, such as

17   distributing the mail, making photocopies, things like

18   that.  She indicated that she would be more

19   comfortable sitting at her desk.  She could keep her

20   arm elevated that way.  And that she could type.

21   Q.    And was this an oral conversation that you had

22   with her in which you asked her whether she could type

23   or would be more comfortable doing other activities or

24   was it in writing?

**B0102**

171

Deborah M. Sweeney

```
 1   put the overtime that she had actually worked on those
 2   and to submit them to me, and that I would sign them.
 3   She never submitted a time sheet with the overtime on
 4   it.
 5      Q.   Had she submitted it, would you have signed it?
 6      A.   Yes, I would have.
 7      Q.   Do you have an understanding as to why she
 8   didn't?
 9      A.   No.
10      Q.   Did you ever ask her?
11      A.   No.
12      Q.   Paragraph 41 says that Edith was written up by
13   Ms. Sweeney on or about August 25th, 2004 because
14   plaintiff worked through her lunch on August 23, 2004
15   without getting permission to catch up on her
16   assignments.  Do you see that?
17      A.   Yes, I do.
18      Q.   And is that a correct allegation?  Is that
19   true?
20      A.   I would have to look at the documents to
21   confirm the time frame.  But, yes, Edith was counseled
22   about working through her lunchtime.  Edith is an
23   hourly associate.  And my understanding of the
24   regulations in Delaware is that hourly associates need
```

**B0103**

172

Deborah M. Sweeney

1    to be given a 30-minute lunch period.

2              Blue Cross Blue Shield of Delaware allows a

3    30-minute lunch and two breaks, 15 minutes each.

4    Associates could combine those to take an hour lunch.

5    However, hourly associates needed to have at least a

6    30-minute break.  Not taking that 30-minute break

7    constituted overtime, and they would need to be paid

8    for that.  We would also be outside of compliance with

9    Delaware law.

10   Q.   So you wrote her up for that?

11   A.   That is correct.

12   Q.   And when you write somebody up, is that a memo

13   to the file?  Memo to human resources?  Do you give a

14   copy to the person who's being written up?  How does

15   that work?

16   A.   I don't recall in this specific instance.  I

17   would have to go back and look at the documents to see

18   whether I sent an e-mail to Edith communicating to

19   her.  There would have been a memo to my file

20   regarding that.  And I likely at least communicated

21   that to human resources verbally.

22   Q.   If you look up at the top of the page,

23   paragraph 36 says that on or about August 23rd, a

24   series of e-mails was sent to the plaintiff by

B0104

173

Deborah M. Sweeney

1    Ms. Sweeney concerning the lack of speed and accuracy

2    of her typing assignments.  Do you see that?

3    A.    Yes.

4    Q.    And this was during the period of time when

5    Ms. Choma was typing with one hand because the other

6    one was in a sling?

7    A.    That is correct.

8    Q.    And do you recall a series of e-mails that you

9    wrote to Ms. Choma?

10    A.    Yes.

11    Q.    And did they express your concern with the lack

12    of speed and accuracy with the typing of the denial

13    and appeal letters?

14    A.    Yes.  Related to the fact that she was

15    insistent that she could type.

16    Q.    Was it obvious to you, though, that she

17    couldn't type?  I mean, you're a nurse.

18    A.    Based on the output that I was seeing, she was

19    not meeting the expectation.  She was not able to

20    fulfill that task.  However, was insistent that she

21    did not want to use short-term disability and that she

22    was noncompliant with my requests to do other duties.

23            MR. MONDROS:  Off the record.

24            (Discussion was held off the record.)

**B0105**

174

Deborah M. Sweeney

1    BY MR. MONDROS:

2    Q.   Let me show you what we'll mark as Sweeney 9.

3            (Sweeney Deposition Exhibit No. 9 was

4    marked for identification.)

5    BY MR. MONDROS:

6    Q.   My question about Sweeney 9 is, have you ever

7    seen this document or these documents?

8    A.   Yes.

9    Q.   And what are they?

10   A.   Series of e-mail communications between Edith

11   and myself.

12   Q.   As I read through these, I don't see any

13   reference to your suggestion that you testified to

14   here today that Edith not do typing while she's

15   injured and, rather, that she do other activities like

16   distributing mail and things like that.  Have I missed

17   that?

18   A.   That is not in this e-mail, you are correct.

19   Q.   Are there other e-mails that would contain that

20   offer to accommodate Edith during her injury?

21   A.   As I believe I said previously, I don't recall

22   whether there was a specific e-mail to Edith regarding

23   that or whether it was a verbal conversation.  It is

24   documented in my notes to file.

**B0106**

176

Deborah M. Sweeney

1    don't know the circumstances or the reason for that.

2    But that she had an active intermittent FMLA order,

3    for lack of a better word.

4    Q.    Who does Ms. Zakutny report to?

5    A.    Today or during this time frame?

6    Q.    During this time period.

7    A.    Nina Frazier, F-R-A-Z-I-E-R.  And Nina reported

8    to Dr. Kaplan.

9    Q.    And Nina's title was at that time?

10   A.    Supervisor of the outpatient referral unit, I

11   believe.

12   Q.    As of the date of the most recent e-mail in

13   Sweeney 9, were you timing Ms. Choma, if you know, on

14   the completion of the D&A letters?

15   A.    It does not appear that I was specifically

16   timing her.  I do state that at 1:00 p.m. when I came

17   to your desk to see what you had from a typing

18   perspective, I reminded her to take lunch.  And we

19   factored lunch into figuring out how many letters

20   should be able to be completed during the remainder of

21   the day.

22   Q.    So that would maybe reflect that you weren't

23   timing her, but you were starting to do some

24   approximations of how long it would take; is that fair

**B0107**

177

Deborah M. Sweeney

1    to say?

2    A.    Correct.

3    Q.    Is it fair to say that this was the beginning

4    of the timing process that eventually matured into a

5    timing of letters?

6            MR. HOLT:  Objection to form.

7            You can answer.

8    A.    Can you repeat the question?

9    Q.    Prior to this time, as I understand it, you

10   were not timing Edith in her completion of denial and

11   appeal letters.  And my question is, does your most

12   recent message on August the 25th, 9:55 when you began

13   to calculate how many letters could be completed

14   during the rest of the day, if that's a fair

15   characterization, does that indicate the beginning of

16   what ultimately matured into the process by which you

17   would time Edith in doing her denial and appeal

18   letters?

19           MR. HOLT:  Same objection.

20   A.    I wouldn't characterize it that way.  At this

21   point in time, Edith is telling me that she can type,

22   despite the fact that her right arm is in a sling.

23   And so at this point in time, what I'm trying to do is

24   to ascertain whether or not she can type.

**B0108**

181

Deborah M. Sweeney

1    when her arm was injured, she was in a sling and
2    possibly a cast?
3      A.    To the best of my recollection, it was not
4    during that week.  It was when she returned after the
5    sling was off.
6      Q.    Do you recall an occasion on which Edith went
7    to lunch with other people in the office, including
8    Peggy Bell, Charlene Blanchard, Dave Martin and
9    Yvonne Locker and they were back late from lunch?
10     A.    Yes.
11     Q.    And do you recall speaking to Edith in a raised
12   voice on that occasion?
13     A.    I recall speaking to Edith.  I don't recall
14   that it was in a raised voice.
15     Q.    Would you say you were berating Edith at that
16   time?
17     A.    No.
18     Q.    Tell us what happened and what you said to
19   Edith.
20     A.    Edith was gone away from her desk for a
21   prolonged period of time.  She would have gotten an
22   hour for lunch.  I don't recall what it is that I
23   needed or that I was looking for and could not find
24   her for that period of time.

**B0109**

182

Deborah M. Sweeney

1          Edith had been informed on more than one
2    occasion that lunchtime was an hour.  She was back
3    late.  The nature of the conversation was, "You get an
4    hour.  You're late coming back."
5    Q.   Were the others gone a similar period of time?
6    A.   Likely, yes.  Edith was an hourly associate;
7    they were salaried associates.  Expectation of the
8    salaried associate is they're there until the work is
9    finished.  If they have to work 12 hours in order to
10   get their assigned duties completed, they're there for
11   12 hours.  Edith is hourly.  Anything over the
12   standard workday is paid at overtime.
13   Q.   Is it fair to say what you said to characterize
14   what you said to Edith as an admonishment for taking
15   too long a lunch?
16   A.   Yes.
17   Q.   But you didn't feel it necessary to admonish
18   Blanchard, Martin, Locker or Bell; is that correct?
19   A.   Correct.
20   Q.   Because they were salaried employees?
21   A.   They were salaried employees.  And they would
22   be there until they got their work done for the day.
23   Q.   But Edith was not a salaried employee; is that
24   your testimony?

**B0110**

226

Deborah M. Sweeney

1    not return to work the following Monday?

2    A.    No.

3    Q.    Did you discuss with Donna May that afternoon

4    how you and the company should go about forcing the

5    terms of the PIP?

6    A.    To the best of my recollection, no.  It was

7    outlined in the plan here what it was that I was to be

8    doing.

9    Q.    All right.  In fact, did Edith Choma return to

10    work the following Monday?

11    A.    To the -- like I said, there was a vertigo

12    issue that comes into play after this is administered.

13    I don't recall the exact time frame.

14    Q.    You don't recall whether she came back the next

15    Monday or not?

16    A.    I do not recall.

17    Q.    Let me show you what we're going to mark as 13.

18          (Sweeney Deposition Exhibit No. 13 was

19    marked for identification.)

20    BY MR. MONDROS:

21    Q.    And my question, since you might anticipate it,

22    is, have you ever seen this document before?

23    A.    Yes.

24    Q.    And what is it?

**B0111**

227

Deborah M. Sweeney

```
 1    A.    It is a communication between Edith and myself

 2    dated November 1st communicating to me that she

 3    arrived to work.

 4    Q.    Is this the next business day after

 5    October 29th, 2004 when you issued the PIP?

 6    A.    Yes, it would be.

 7    Q.    And it looks to me as though Edith wrote to you

 8    and she said, "I'm checking in at 7:50 a.m.," correct?

 9    A.    Correct.

10    Q.    But it looks from the header on that e-mail as

11    though it was -- the time of the e-mail was 7:56 a.m.

12    Do you see that?

13    A.    Yes.

14    Q.    And then it looks to me like at 8:06, you

15    e-mailed back to her; is that correct?

16    A.    Correct.

17    Q.    And what did you e-mail to her?

18    A.    I asked her -- told her that the e-mail arrived

19    at 7:56 and asked what she did between 7:50 and 7:56.

20    Q.    So you said, "Thanks.  This arrived at 7:56.

21    What did you do between 7:50 and 7:56?"  Were you

22    kidding?

23    A.    No.

24    Q.    You were serious?  You wanted to know what she
```

**B0112**

228

Deborah M. Sweeney

 1    had done between 7:50 and 7:56?

 2      A.    Yes.  The expectation was that the first thing

 3    that she would do when she arrived to work would be to

 4    start up her computer and notify me that she had

 5    arrived to work.  That certainly takes a couple

 6    minutes for the computer to boot up and for you to get

 7    into Microsoft Outlook, but not six minutes.

 8      Q.    So that was what you were directing, what had

 9    she been doing for those six minutes between 7:50 and

10    7:56?

11      A.    Correct.

12      Q.    Did she e-mail back to you?

13      A.    I do not recall.

14      Q.    As I look at the PIP back on Exhibit 12, it

15    says that start time is between 8:00 and 8:30.  That's

16    on page 2, Bates No. 69.  Do you see that?

17      A.    Yes.

18      Q.    So she was actually in before the start time?

19      A.    Correct.

20      Q.    Did you consider admonishing her for that?

21      A.    No, I did not.

22      Q.    Why is that?

23      A.    She was there.  She was going to work.  Getting

24    to work sometimes traffic is heavier than at other

**B0113**

Wilcox & Fetzer, Ltd.          Registered Professional Reporters          (302) 655-0477

Choma v. Blue Cross Blue Shield of Delaware

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

EDITH CHOMA,                        )
                                    )
            Plaintiff,              )
                                    )  Civil Action
v.                                  )  No. 06-486-JJF
                                    )
BLUE CROSS BLUE SHIELD OF           )
DELAWARE,                           )
                                    )
            Defendant.              )

            Deposition of PAUL A. KAPLAN, M.D., taken
pursuant to notice at the law offices of Margolis
Edelstein, 750 South Madison Avenue, Wilmington,
Delaware, beginning at 10:00 a.m. on Monday, October
1, 2007 before Christina M. Vitale, Certified
Shorthand Reporter and Notary Public.

APPEARANCES:

        HERBERT W. MONDROS, ESQUIRE
        MARGOLIS EDELSTEIN
          750 South Madison Street
          Wilmington, Delaware  19801
          For the Plaintiff

        SCOTT A. HOLT, ESQUIRE
        YOUNG CONAWAY STARGATT & TAYLOR, LLP
          The Brandywine Building
          1000 West Street, 17th Floor
          Wilmington, Delaware  19899
          For the Defendant

ALSO PRESENT:   Donna E. May, Blue Cross Blue Shield
                Edith Choma
                Matthew Helm

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com

**B0114**

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

**2**

1    PAUL A. KAPLAN, M.D., the deponent herein,
2  having first been duly sworn on oath, was examined and
3  testified as follows:
4  BY MR. MONDROS:
5    Q.  Good morning.
6    A.  Good morning.
7    Q.  Dr. Kaplan, I presume?
8    A.  That's correct.
9    Q.  I've Herb Mondros and as you have probably
10  inferred I'm an attorney and I represent Edith Choma
11  in this case. Do you have an understanding of what
12  this case is generally about?
13    A.  Can you clarify the question?
14    Q.  My question is do you have a general
15  understanding of -- strike that. Let me ask it this
16  way. Do you an understanding that Edith Choma has
17  filed a lawsuit against Blue Cross Blue Shield of
18  Delaware?
19    A.  Yes.
20    Q.  Do you understand that Blue Cross Blue Shield
21  of Delaware is the defendant in that case?
22    A.  Yes.
23    Q.  Do you have an understanding that Edith Choma,
24  my client, is the plaintiff in that case?

**3**

1    A.  Yes.
2    Q.  And do you have an understanding as to the
3  general nature of the allegations that Ms. Choma is
4  making in this case against Blue Cross Blue Shield of
5  Delaware?
6    A.  You will have to clarify what you mean by
7  general understanding.
8    Q.  What do you think that Edith Choma's claim is,
9  if you know? If you don't know, that's fine.
10    A.  I have vague generalities. I don't have
11  specifics.
12    Q.  What is your understanding of the vague
13  generalities?
14    A.  The two major claims, one is age discrimination
15  and the other would be some type of harassment.
16    Q.  And do you have an understanding as to what
17  type of harassment Ms. Choma is claiming?
18    A.  No.
19    Q.  Have you ever been a witness at a deposition
20  before?
21    A.  Yes.
22    Q.  On many occasions?
23    A.  Define many.
24    Q.  Let me ask it this way. How many occasions

**4**

1  have been you a witness at a deposition before?
2    A.  I'm unsure without giving it some thought.
3    Q.  More than ten?
4    A.  No.
5    Q.  More than five?
6    A.  Possibly.
7    Q.  What was the most recent occasion on which you
8  have been a witness at a deposition?
9    A.  There was a lawsuit filed against Blue Cross.
10    Q.  And my question is when was the deposition?
11    A.  I would have to look in my calendar. I don't
12  have specifics.
13    Q.  The reason I'm asking these questions is I want
14  to make sure you understand the process. Let me tell
15  you what the process is. As you see, there is a court
16  reporter here, there is a lawyer here and a witness
17  here and you being the witness. You are represented
18  by counsel here today, is that true?
19    A.  Is that a question or statement?
20    Q.  It's a question.
21    A.  Yes, I am.
22    Q.  Who is your counsel?
23    A.  His name is Scott Holt.
24    Q.  And you understand he is representing you here

**5**

1  today?
2    A.  Define you.
3    Q.  Paul Kaplan.
4    A.  You are going to have to clarify your question
5  for me, please.
6    Q.  Do you understand that you are represented here
7  today, you being Paul Kaplan?
8    A.  No, I don't.
9    Q.  It's your understanding that you are not
10  represented by counsel here today?
11    A.  Blue Cross of Delaware is.
12    Q.  And -- okay, that's fine. The way this process
13  is going to work is I'm going to ask you a series of
14  questions and as you can understand I am going to
15  infer that if you don't understand my question, you
16  can ask me to repeat it. If you are not sure you
17  understand it, I'll do my best to clarify it. Your
18  job is to give the best answer you can to the question
19  I ask.
20    The court reporter will be taking
21  everything down. A couple of general rules are that
22  all your responses have to be audible. In other
23  words, you can't shake your head or grunt um-hum or
24  uh-uh, which I don't think we are going to have that

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

6

1  problem. Another rule is that I have to be able to
2  finish my question before you begin your answer and
3  one of the rules I have to follow is I have to let you
4  finish your answer before I begin my next question.
5  So, I'll do my best to hold up my end if you do your
6  best to hold up your end.
7        Other than that Mr. Holt may object from
8  time to time. If he objects, you are to answer the
9  question unless he tells you not to. Fair enough?
10  A.  Sure.
11  Q.  Are you under the influence of any medications
12  here today that would tend to impair your memory or
13  your ability to testify truthfully in this matter?
14  A.  Can you define under the influence?
15  Q.  Have you taken any medications at all today?
16  A.  Yes, I have.
17  Q.  What medications have you taken?
18  A.  Blood pressure medication, cholesteral
19  medication.
20  Q.  Anything else?
21  A.  No.
22  Q.  The blood pressure medication, what is the name
23  of that medication?
24  A.  Norvasc.

7

1  Q.  What dose did you take today?
2  A.  160 milligrams a day.
3  Q.  And cholesterol medication, what medication is
4  that?
5  A.  That's Lipitor.
6  Q.  And in your view will either of those
7  medications influence your testimony here today or
8  impair your ability to testify?
9  A.  No, they will not.
10  Q.  The occasions on which you testified previously
11  at deposition were they all in cases involving your
12  employer or were they in cases involving you as a
13  defendant or a plaintiff?
14  A.  All of the above.
15  Q.  All of the above?
16  A.  Yes.
17  Q.  Okay. Have you ever been named as a defendant
18  in a lawsuit before?
19  A.  Yes.
20  Q.  And on how many occasions have you been named
21  as a defendant?
22  A.  One.
23  Q.  What was the nature of the allegations against
24  you on that one occasion?

8

1  A.  It was a malpractice lawsuit.
2  Q.  Can you tell me approximately when that mal-
3  practice lawsuit occurred?
4  A.  Approximately 1990, 1991, somewhere around
5  there.
6  Q.  What was the name of the plaintiff in that
7  lawsuit?
8  A.  I have no idea.
9  Q.  What were the nature of the allegations in that
10  lawsuit?
11  A.  The allegation was that I failed to diagnose a
12  patient.
13  Q.  How was that case resolved?
14  A.  The charges or the allegations were dropped and
15  the lawsuit did not go forward with me named as a
16  defendant.
17  Q.  Okay, fair enough. Have you ever been a
18  plaintiff in a lawsuit before?
19  A.  Yes, I have.
20  Q.  On what occasion?
21  A.  After I had suffered a head injury I sued the
22  place where it happened.
23  Q.  And who was the defendant in that case?
24  A.  Sea Colony.

9

1  Q.  And what was the nature of that lawsuit? Was
2  it a negligence lawsuit?
3  A.  That's correct.
4  Q.  Who represented you in that case?
5  A.  Pete Jones.
6  Q.  And did you give a deposition in that case?
7  A.  Yes, I did.
8  Q.  Was there a trial in that case?
9  A.  No.
10  Q.  And was that case revolved?
11  A.  Yes.
12  Q.  What was the nature of the resolution in that
13  case?
14  A.  It was a settlement.
15  Q.  Was Sea Colony the only defendant in that case?
16  A.  No, there were others.
17  Q.  Who were the others?
18  A.  I can't remember. It was holding companies, a
19  corporation held by another corporation issue.
20  Q.  Any other occasions on which you were a
21  plaintiff in a lawsuit?
22  A.  No.
23  Q.  That case against Sea Colony do I understand
24  that was settled before it went to trial?

B0116

3 (Pages 6 to 9)

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

10

1  A. Yes.
2  Q. Have you ever been named as the subject of a
3  complaint in a case that was filed with the EEOC or
4  Department of Labor or any other administrative
5  agency?
6  A. No.
7  Q. And have you ever filed such a case with the
8  EEOC or Department of Labor or any other
9  administrative agency?
10  A. No.
11  Q. Other than Paul Kaplan -- is that your full
12  name, Paul Kaplan?
13  A. No.
14  Q. What is your full name?
15  A. Paul Andrew Kaplan.
16  Q. Have you ever used any other names besides
17  that?
18  A. No.
19  Q. Any other nicknames?
20  A. No.
21  Q. Date of birth?
22  A. April 28, 1961.
23  Q. Where do you currently reside?
24  A. Can you just clarify that question?

11

1  Q. Where do you live?
2  A. As in where my house is?
3  Q. Yes.
4  A. In Pennsylvania.
5  Q. Where in Pennsylvania?
6  A. You want the physical street address?
7  Q. That's the general question.
8  A. 745 Northbrook Road, Kennett Square, P.A.,
9  19348.
10  Q. Up near the Northbrook Orchards?
11  A. Relatively close.
12  Q. And who lives there with you?
13  A. My family.
14  Q. And you are married?
15  A. Correct.
16  Q. Two children?
17  A. Correct.
18  Q. How long have you been married?
19  A. Almost 23 years.
20  Q. And your wife's name?
21  A. Marina.
22  Q. Does she use Kaplan or does she use her maiden
23  name?
24  A. Depends.

12

1  Q. What is her maiden name?
2  A. Pomame.
3  Q. Any prior marriages?
4  A. No.
5  Q. And do you own that house on Northbrook Road?
6  A. Yes.
7  Q. Do you own any other residences?
8  A. Yes.
9  Q. How many other residences do you own?
10  A. Three.
11  Q. Where are they?
12  A. One is in Pennsylvania, one is in Maryland and
13  one is in Delaware.
14  Q. Are these rental properties or do you also live
15  in those properties from time to time?
16  A. Can you clarify the question?
17  Q. You testified that you own three other
18  properties, one in Pennsylvania, one in Maryland and
19  one in Delaware. The one in Pennsylvania, where is
20  that located?
21  A. Also on Northbrook Road.
22  Q. Is that a rental property?
23  A. Yes.
24  Q. You don't live in that property, is that

13

1  correct?
2  A. No.
3  Q. What about the one in Maryland, where is that
4  located?
5  A. You want the address?
6  Q. Street address would be great.
7  A. 910 Bayside Drive in Stevensville, Maryland.
8  Q. Do you live in that property at any time?
9  A. No.
10  Q. Is that a rental property?
11  A. Not yet.
12  Q. The property in Delaware, where is that
13  located?
14  A. In Sea Colony.
15  Q. Do you live in that property from time to time?
16  A. Yes.
17  Q. Is that the property where you suffered the
18  injury that you testified to earlier?
19  A. No.
20  Q. How long have you lived on Northbrook Road?
21  A. Four years. I think it's four years.
22  Q. And before that where did you live?
23  A. You want the street address?
24  Q. Yes.

4 (Pages 10 to 13)

B0117

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

14

1   A.  28 Ridings Way, Chadds Ford, Pennsylvania.
2   Q.  How long had you lived there?
3   A.  Five years.
4   Q.  I would like to ask you some questions about
5   what you did to prepare for your deposition here
6   today.  When did you learn that you would have a
7   deposition today?
8   A.  I don't know the exact date.
9   Q.  And what did you do in order to prepare for
10  your deposition today?  I assume one of the things you
11  did was you met with Mr. Holt, is that fair to say?
12  A.  Yes.
13  Q.  As I ask you the next series of questions and
14  indeed for the rest of the examination I'm not asking
15  you to tell me anything that Mr. Holt said to you or
16  anything that you said to Mr. Holt, but what I do want
17  to know is how long was your meeting with Mr. Holt?
18  A.  About an hour and a half on two separate
19  occasions.
20  Q.  Where did those meetings occur?
21  A.  One in my office and one at his office.
22  Q.  And at that time --
23  A.  Actually, can I correct that, please?  I'm
24  sorry.  There was a third meeting as well.

15

1   Q.  When was that?
2   A.  That way very brief and that was probably about
3   a half hour at my office.
4   Q.  Was that the first meeting?
5   A.  Yes.
6   Q.  At the half hour meeting at your office was
7   anybody else in attendance at that meeting?
8   A.  No.
9   Q.  How about the subsequent two meetings between
10  you and Mr. Holt at his office and your office, was
11  anybody else in attendance at either of those
12  meetings?
13  A.  Yes.
14  Q.  Who was in attendance?
15  A.  Donna May, who is in the room here, at one of
16  them.
17  Q.  Anybody else?
18  A.  No.
19  Q.  She was at one of the meetings?
20  A.  Correct.
21  Q.  Which one?
22  A.  The last one.
23  Q.  Was that the one in Mr. Holt's office?
24  A.  Correct.

16

1   Q.  Dr. Kaplan, I detected a slight accent, where
2   are you from, where were you born?
3   A.  In South Africa.
4   Q.  What city?
5   A.  Cape Town.
6   Q.  And how long did you live in Cape Town?
7   A.  Twenty-four years.
8   Q.  What year did you leave Cape Town?
9   A.  1986.
10  Q.  What was the reason for leaving Cape Town?
11  A.  Came to do a residency program in the States.
12  Q.  Is it fair to say you went to medical school in
13  South Africa?
14  A.  That's correct.
15  Q.  Can you tell me what, if any, documents you
16  reviewed in anticipation of your deposition here
17  today?
18      MR. HOLT:  I'll just make an objection for
19  the record that again we take work product privilege
20  for any document that was provided to Dr. Kaplan by
21  me.
22      MR. MONDROS:  Okay.
23      MR. HOLT:  And if we are going to go into
24  any discussions of those record, I am going to prevent

17

1   the witness from discussing what I gave to him as far
2   as documents.
3       MR. MONDROS:  Okay.
4   BY MR. MONDROS:
5   Q.  My question, though, is what documents did you
6   look at in preparation for your deposition?
7   A.  I looked at a copy of Ms. Choma's testimony and
8   there were some E-mails and a copy of a Blue Cross
9   policy and some of her performance reviews.
10  Q.  You said that you looked at a copy of Ms.
11  Choma's testimony, is that the deposition testimony
12  she gave in this case?
13  A.  Yes.
14  Q.  Did you read her testimony?
15  A.  Yes.
16  Q.  All three volumes of it?
17  A.  Depends how you broke it up.
18  Q.  Did you read the entirety of her deposition
19  testimony?
20  A.  I don't know.
21  Q.  Did you read or review the deposition testimony
22  of anybody else who has testified at deposition in
23  this case?
24  A.  No.

5 (Pages 14 to 17)

B0118

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

18

1    Q.  Do you have an understanding of who else has
2    given deposition testimony in this case?
3    A.  Not a comprehensive list.
4    Q.  What is your understanding, who do you know
5    gave deposition testimony in this case?
6    A.  Debbie Sweeney and Dave Martin.
7    Q.  Anybody else?
8    A.  No.
9    Q.  And Edith Choma?
10   A.  Yes, that's correct.
11   Q.  What about Pat Carpenter, do you know whether
12   she gave deposition testimony in this case?
13   A.  I do not.
14   Q.  What about Christine Zakutny.
15   A.  I do not know.
16   Q.  What about Tim Toole?
17   A.  I do not know.
18   Q.  Do you have an understanding of how long Ms.
19   Choma's deposition lasted in this case?
20   A.  I recall it was three separate days, three
21   separate occasions.  That's the way it seemed to
22   appear.
23   Q.  From your reading of the deposition
24   transcripts?

19

1    A.  That's correct.
2    Q.  Are you aware that Blue Cross Blue Shield of
3    Delaware has requested that Edith Choma be given a
4    forensic psychiatric examination?
5    A.  Yes.
6    Q.  Have you reviewed the results of that
7    examination?
8    A.  No.
9    Q.  Are you aware of what the results are?
10   A.  No.
11   Q.  I understand that you went to high school in
12   South Africa?
13   A.  Correct.
14   Q.  And college in South Africa?
15   A.  Correct.
16   Q.  I'm not really sure how they do higher
17   education in South Africa.  After high school you went
18   to a college and did you obtain a degree, a college
19   degree there?
20   A.  The system is different.  I finished high
21   school and went straight to medical school.  College
22   is built into the medical school curriculum.
23   Q.  That's why I asked the question the way I did.
24   Tell me how long is that education, your combined

20

1    college and medical education.
2    A.  Six years plus one year of an internship.
3    Q.  And what was the name of the university?
4    A.  University of Cape Town.
5    Q.  And what was the degree that you emerged from
6    the University of Cape Town with, what was that degree
7    called?
8    A.  Called the MBCHB.
9    Q.  And what does the MBCHB stand for?
10   A.  Bachelor of medicine and bachelor of surgery.
11   Q.  What year did you obtain that degree?
12   A.  1984.
13   Q.  Any particular honors accompanying that degree?
14   A.  They don't do that type of thing in South
15   Africa.
16   Q.  Was there any type of thesis you needed to
17   produce or anything like that in association with
18   obtaining that degree?
19   A.  No.
20   Q.  And after you obtained that degree in 1984 did
21   you go on and do your internship?
22   A.  Yes.
23   Q.  And where did you do your internship?
24   A.  At the hospital called Groote Schuur Hospital,

21

1    G-R-O-O-T-E, new word, S-C-H-U-U-R.
2    Q.  And that internship lasted one year?
3    A.  Correct.
4    Q.  What was the nature of that internship?  Did
5    you do a series of rotations in the various
6    departments?
7    A.  That's correct.
8    Q.  Was there any specialty that emerged at that
9    time?
10   A.  No.  Again, the training is that you do a
11   rotating internship.
12   Q.  And you completed that in 1985?
13   A.  Correct.
14   Q.  And is it correct that you decided to move to
15   the U.S. to do a residency?
16   A.  Correct.
17   Q.  Where did you do your residency?
18   A.  At the Medical Center of Delaware.
19   Q.  Why did you choose Medical Center of Delaware
20   to do your residency?
21   A.  They accepted me.
22   Q.  Did you apply anywhere else?
23   A.  Yes, I did.
24   Q.  Where else did you apply?

B0119

6  (Pages 18 to 21)

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

22

1    A.  I wouldn't be able to give you a comprehensive
2    list.  There were probably ten other residency
3    programs.
4    Q.  You were accepted to others besides Delaware?
5    A.  Well, it's done on the match system meaning
6    that you just know the one that has chosen you.  I
7    happened to get chosen outside of the match with the
8    Medical Center of Delaware so I know that they had
9    accepted me; but, if I had left my name in the pool,
10   it would have gone through what is called the match
11   system.  I would never know who did and did not accept
12   me.
13   Q.  Where is the Medical Center of Delaware
14   located?
15   A.  Can you clarify the question?
16   Q.  What is the physical location of the Medical
17   Center of Delaware?
18   A.  It has two locations.
19   Q.  What are those two locations?
20   A.  One is in Wilmington itself and one is in
21   Newark.
22   Q.  Is the one in Newark the one generally called
23   Christiana Hospital?
24   A.  That's correct.

23

1    Q.  Is the one in Wilmington generally what we call
2    Wilmington Hospital?
3    A.  Correct.
4    Q.  Where was your residency, where did you perform
5    that, both?
6    A.  Oh, yes.
7    Q.  And what was the nature of your residency, was
8    there any particular specialty?
9    A.  Family medicine.
10   Q.  And what years did you perform your residency
11   at Medical Center of Delaware?
12   A.  1986 through 1989.
13   Q.  And when you completed your residency in 1989,
14   what did you do after that?
15   A.  I went into private practice.
16   Q.  Did you join an existing practice?
17   A.  Can you define join?
18   Q.  When you went in private practice, where was
19   your office?
20   A.  On Silverside Road in Wilmington, Delaware.
21   Q.  What was the exact address on Silverside Road?
22   A.  2700 Silverside Road.
23   Q.  What is across the street on Silverside at
24   2700?  I'm trying to fix it geographically.

24

1    A.  There is no cross street exactly there.
2    Q.  What is the closest one?
3    A.  Probably Silverside and Foulk Road.
4    Q.  Were there any other physicians in the practice
5    except for you?
6    A.  No.
7    Q.  And you opened the practice then in family
8    medicine?
9    A.  I'm unable to answer that question, makes no
10   sense to me.
11   Q.  What was the nature of the practice that you
12   opened in 1989 at 2700 Silverside Road?
13   A.  Can you define open?
14   Q.  Well, the practice that you went into was that
15   a pre-existing practice or was that a new practice?
16   A.  It was pre-existing.
17   Q.  Did you acquire somebody else's practice?
18   A.  That's correct.
19   Q.  Whose practice did you acquire?
20   A.  Dr. Douglas McKelcan.
21   Q.  Did he retire?
22   A.  Correct.
23   Q.  Thank you.  And the nature of the practice was
24   family medicine?

25

1    A.  I'm not sure what he called it.
2    Q.  What did you call it?
3    A.  He took care of families.
4    Q.  And is that what you did when you took over
5    that practice?
6    A.  That's correct.
7    Q.  Any particular specialty that you had there
8    other than?  Taking care of families?  Pediatrics?
9    Adolescents?  Just family medicine?
10   A.  I'm not sure I understand your question.  If
11   you could just rephrase it.
12   Q.  When you took over Dr. McKelcan's practice in
13   1989 did you have any particular specialty which you
14   focused on in that practice?
15   A.  I'm a board certified family physician.
16   Q.  And that was your specialty?
17   A.  That's correct.
18   Q.  And in that capacity did you treat children?
19   A.  Yes.
20   Q.  And did you treat adolescents?
21   A.  Yes.
22   Q.  Did you treat adults?
23   A.  Yes.
24   Q.  Were you doing any surgery at that time?

7 (Pages 22 to 25)

B0120

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

26

1    A. Yes.
2    Q. How long were you in private practice?
3    A. Seven years.
4    Q. All at that location?
5    A. Correct.
6    Q. All as a sole practitioner?
7    A. Yes.
8    Q. While you were operating your practice at 2700
9    Silverside Road were most of your patients' services
10   paid for by health insurance?
11   A. Define health insurance.
12   Q. Providers like Blue Cross Blue Shield, Aetna,
13   who mostly paid you your money? Was it out-of-pocket
14   or was it through health insurance companies?
15   A. Again, you are going to have to be more
16   specific by health insurance companies.
17   Q. When you were a sole practitioner as a
18   physician, did you have an occasion to deal with Blue
19   Cross Blue Shield of Delaware?
20   A. Yes.
21   Q. In what capacity did you deal with Blue Cross
22   Blue Shield of Delaware?
23   A. I was a physician. I would submit claims.
24   They would reimburse me.

27

1    Q. And did you deal with -- would you agree with
2    me that Blue Cross Blue Shield of Delaware is a health
3    insurance company?
4    A. Yes.
5    Q. Did you deal with any other health insurance
6    companies besides Blue Cross Blue Shield of Delaware?
7    A. Yes, I did.
8    Q. Which ones were those?
9    A. The list would be endless. Basically it would
10   be potentially any health insurance company in the
11   country.
12   Q. You were able to get remuneration from a number
13   of different health insurance companies, is that fair
14   to say?
15   A. Yes.
16   Q. Did you ultimately sell your practice?
17   A. Yes.
18   Q. And to whom did you sell?
19   A. Founders, F-O-U-N-D-E-R-S, Health Care.
20   Q. Who were the physicians associated with
21   Founders Health Care?
22   A. I don't know.
23   Q. Is Founders Health Care operating a practice at
24   that location as of today?

28

1    A. No.
2    Q. Did that practice ultimately close?
3    A. Yes.
4    Q. Did you consider your practice successful at
5    2700 Silverside?
6    A. Yes.
7    Q. And approximately how many patients did you
8    have there?
9    A. Six thousand.
10   Q. At any given time or total?
11   A. That was total.
12   Q. Were the majority of those six thousand
13   patients patients who had come to your practice from
14   Dr. McKelcan's practice or were they new patients you
15   had attracted?
16   A. A combination.
17   Q. 50/50 maybe, approximately?
18   A. I can't tell you, I don't have that detail.
19   Q. What year did you sell your practice?
20   A. I can't be sure. It was either 1995 or 1996.
21   Q. And was there any particular reason that you
22   sold your practice?
23   A. Yes.
24   Q. What was that reason?

29

1    A. I thought health care was moving towards being
2    more consolidated and so I wanted to be part of a
3    larger group.
4    Q. And did you join a larger group at that time?
5    A. That was the intent of selling. It never
6    actually happened.
7    Q. When you say you thought health care was
8    becoming more consolidated, what do you mean by that?
9    A. Doctors were joining together so the practice
10   was getting to be more expensive, overhead was rising
11   and people were looking for economies of scale.
12   Q. Do you have any understanding as to why the
13   practice of medicine was getting to be more expensive?
14   A. Yes.
15   Q. And what was your understanding?
16   A. HMO's had started to take hold in the region.
17   They were reducing reimbursement and so a percentage
18   of one's receivables, plus the overhead was rising.
19   Q. And you sought to join a larger practice in
20   order to gain the benefits of an economy of scale by
21   working with other physicians?
22   A. That's correct.
23   Q. But that did not happen?
24   A. Correct.

**B0121**

8 (Pages 26 to 29)

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

30

1   Q. And why is that?
2   A. A few reasons. Number one, I left practice
3   before that happened; and, secondly, Founders Health
4   Care went out of business.
5   Q. Founders Health Care went out of business after
6   they acquired your practice?
7   A. Correct.
8   Q. Do you have an understanding as to why Founders
9   went out of business?
10  A. No. Actually, I can correct that if I can.
11  Q. Yes.
12  A. They ultimately were part of the Allegheny
13  Health System and that collapsed. I cannot give you
14  more specific details than that.
15  Q. Just so I understand Founders went out of
16  business after the acquisition of your practice was
17  complete so you still got paid for your practice, is
18  that correct?
19  A. That is correct. Actually, again, partially
20  paid. There was a final payment that was not made.
21  Q. Why was that payment not made?
22  A. It was the way the settlement was structured
23  that I would get a final payment I think four years
24  after the sale of the practice.

31

1   Q. But four years after that --
2   A. They went bankrupt.
3   Q. Did you file a claim in connection with that?
4   A. Yes, I did.
5   Q. And was that in Delaware or Pennsylvania?
6   Where was that?
7   A. I believe it was Delaware.
8   Q. And was your claim against Allegheny?
9   A. Well, Founders, yeah.
10  Q. Were you represented by counsel in connection
11  with that claim?
12  A. Yes.
13  Q. Who was the attorney?
14  A. I can't remember his name, I'm sorry.
15  Q. We are very forgetful, that's okay, except for
16  Mr. Holt. How did the effect that Founders went out
17  of business how did that impact your ability to join
18  another practice?
19  A. It did not.
20  Q. You also said that you left the practice of
21  medicine, when did you leave the practice of medicine?
22  A. It would be -- I think it was August of 1996.
23  Q. Was that immediately after you sold your
24  practice to Founders?

32

1   A. No.
2   Q. Did you continue to practice medicine after you
3   sold the practice?
4   A. Yes.
5   Q. Where did you practice at that time?
6   A. Same location.
7   Q. Did you anticipate remaining at that location
8   and bringing other physicians in to work with you at
9   that location at that time?
10  A. You asked me multiple questions there, I'm
11  sorry.
12  Q. Was it your anticipation that after you sold
13  your practice to Founders that you would remain at
14  that location and continue to practice medicine?
15  A. That's correct.
16  Q. Was it also your anticipation that you would
17  bring other physicians to that location to practice
18  with you?
19  A. No.
20  Q. How did you anticipate joining other physicians
21  in the manner that you had testified to previously?
22  A. That was going to be Founders' role.
23  Q. And it was their job to find other physicians
24  to join your practice at their location?

33

1   A. That's not accurate, no.
2   Q. Can you explain to me what you anticipated
3   would happen, how additional physicians would join you
4   in your practice after you sold your practice to
5   Founders?
6   A. They wouldn't necessarily join me at that same
7   physical location. There could be multiple locations
8   with doctors all being members of Founders Health Care
9   and we would then function as a group practice.
10  Q. Okay, I understand, thank you. As I understand
11  it after you sold your practice to Founders you
12  continued to practice at the Silverside location until
13  August of 1996?
14  A. That's correct.
15  Q. And is that when you stopped practicing
16  medicine?
17  A. Correct.
18  Q. Why did you stop practicing medicine at that
19  time?
20  A. I had a head injury.
21  Q. Did the head injury occur in August of 1996?
22  A. I believe it was August, yes.
23  Q. And as I understand it that happened in
24  Bethany, Delaware, Bethany Beach?

B0122

9 (Pages 30 to 33)

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

34

1  A. That's correct.
2  Q. At Sea Colony?
3  A. Correct.
4  Q. What were the circumstances of the head injury?
5  A. I fell down a flight of stairs.
6  Q. Were you on vacation at that time?
7  A. Correct.
8  Q. As I understand it you allege that Sea Colony
9  was negligent in connection with your fall, how were
10 they negligent or how were they alleged to be
11 negligent?
12 A. It was a flight of stairs that was completely
13 surrounded by four walls, had a roof and yet water was
14 leaking in, there was a bad storm, and I slipped on a
15 puddle.
16 Q. Hit your head?
17 A. Yes.
18 Q. And what was the nature of the injuries that
19 you suffered in that fall?
20 A. I'm sorry, can you be more specific?
21 Q. You said you had a head injury, could you tell
22 me more specifically what the nature of that head
23 injury was or those head injuries were?
24 A. I hit my head.

35

1  Q. But you are a doctor, what are the medical
2  terms for what happened to your head after you hit it?
3         MR. HOLT: I'll just make an objection to
4  form. You can answer.
5  A. You are going to have to clarify what it is you
6  are actually asking me, please.
7  Q. As I understand it you slipped on the wet
8  stairs and you fell on the stairs and you struck your
9  head, is that correct?
10 A. Correct.
11 Q. After that if I am -- were you unconscious as a
12 result of that fall?
13 A. I think so.
14 Q. And were you transported to a hospital --
15 A. No.
16 Q. -- by emergency?
17 A. No.
18 Q. How did you get to the hospital?
19 A. I did not go.
20 Q. So, ultimately did you go to the hospital?
21 A. I saw a physician yes.
22 Q. Who did you see?
23 A. My family physician.
24 Q. Who is that?

36

1  A. Dr. Bernard King.
2  Q. Is he a pretty good doctor? He is my doctor
3  too.
4  A. Can you clarify the question?
5  Q. I find Dr. King to be an excellent physician,
6  do you agree with my view?
7  A. I think he is fine, yes.
8  Q. And did Dr. King give you a diagnosis for the
9  injuries that you suffered?
10 A. He gave me a preliminary diagnosis, yes.
11 Q. What did he tell you?
12 A. That I had some memory loss.
13 Q. As a result of striking your head?
14 A. I assume as much.
15 Q. How long after your fall did you see Dr. King?
16 A. I think it was seven days.
17 Q. You said that you believe that you were
18 unconscious as a result of the fall, how long were you
19 unconscious do you believe?
20 A. I have no idea. All I can tell you is I was
21 gone for longer than I should have been gone for what
22 I said I was going to do. So, I have no idea.
23 Q. Would you have been unconscious for a day, an
24 hour, a month? Approximately how long?

37

1  A. It definitely wasn't a day. It definitely
2  wasn't a month. I cannot tell you exactly how long.
3  Q. Because you were unconscious at the time, I
4  guess, okay.
5         MR. MONDROS: Strike that?
6         MR. HOLT: Yes, I'll make an objection if
7  you keep that question.
8  BY MR. MONDROS:
9  Q. Was that a consultation that you had with Dr.
10 King in which he told you you were suffering from
11 memory loss?
12 A. Correct.
13 Q. Did Dr. King tell you anything else about the
14 injuries you suffered in the fall?
15 A. I'm not sure what you are looking for.
16 Q. Let me ask it a different way. As a result of
17 your fall did you have any medical imaging done, CAT
18 Scan or X-rays or anything like that?
19 A. Yes, I did.
20 Q. When was that?
21 A. It would have been after seeing him.
22 Q. After seeing Dr. King?
23 A. Correct.
24 Q. Did Dr. King recommend that you have a CAT Scan

10 (Pages 34 to 37)

B0123

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

38

1  taken?
2  A. Yes, he did.
3  Q. What else did Dr. King recommend?
4  A. He recommended I see a specialist.
5  Q. What type of specialist?
6  A. A neurologist.
7  Q. And who did he recommend you see?
8  A. That I see a physician in Neurology Associates.
9  I cannot remember exactly who I saw.
10  Q. How long after seeing Dr. King did you see the
11  neurologist?
12  A. It was probably four or five days.
13  Q. And did a neurologist conduct any tests?
14  A. Yes.
15  Q. What tests did the neurologist conduct?
16  A. A history, a physical exam.
17  Q. Anything else?
18  A. An EEG and an MRI.
19  Q. What were the findings of the EEG?
20  A. It was normal.
21  Q. How about the MRI?
22  A. I believe it was normal, but I cannot remember
23  exactly.
24  Q. And did you receive any additional medical care

39

1  for your head injuries after you saw the neurologist?
2  A. Yes, I did.
3  Q. What was that?
4  A. I saw a neuropsychiatrist and I saw some
5  additional specialists.
6  Q. Who was the neuropsychiatrist?
7  A. Dr. Vernon Neppe.
8  Q. Where is his office?
9  A. In Seattle, Washington.
10  Q. And did you travel to Seattle to see him?
11  A. Yes.
12  Q. And on how many occasions did you see Dr.
13  Neppe?
14  A. I'm sorry, I didn't hear the question.
15  Q. How many occasions did you see Dr. Neppe?
16  A. I believe it was three.
17  Q. On three separate trips to Seattle?
18  A. Correct.
19  Q. What was the reason that you saw Dr. Neppe?
20  A. He is an expert in head injury and head trauma.
21  Q. Was he seeing you for any particular aspect of
22  head trauma?
23  A. Just to assess me, give me advice.
24  Q. What was your principal complaint in seeing Dr.

40

1  Neppe? Was it memory loss?
2  A. That's correct.
3  Q. That memory loss has that continued to this
4  day?
5  A. I don't believe so, no. I better rephrase
6  that, excuse me. There are two aspects to memory
7  loss, short-term and long-term. There are long-term
8  parts of my memory I have lost and never regained. If
9  you are talking short-term memory, i.e, talking to you
10  in conversation, that I believe is intact.
11  Q. Besides Dr. Neppe what other specialists do you
12  see?
13  A. I can't remember their names, I'm sorry.
14  Q. If I ask a question and you respond that you
15  can't remember, is that inability to remember -- is
16  that or could that be as a result of the memory loss
17  that you have testified to here today?
18      MR. HOLT: Objection to form. You can
19  answer if you can.
20  A. It's no different than if I asked you for some
21  details on something that happened to you once, now
22  almost 11 years ago. You can remember broad details.
23  You just can't always remember the exact specific.
24  That's normal behavior for most people.

41

1  Q. A few minutes ago I asked you who were some of
2  the other specialists that you saw besides Dr. Neppe
3  and you told me that you couldn't remember. Do you
4  have a view that your inability to remember the names
5  of the other specialists you saw is as a result of
6  your memory loss from the head injury or just normal
7  lapse of memory because it was insignificant or a
8  non-memorable event from several years ago?
9      MR. HOLT: Same objection to form.
10  BY MR. MONDROS:
11  Q. You can answer.
12  A. It's a normal lapse of memory. I could with
13  some detail tell you which universities they were at,
14  but I just can't give you the exact people's names.
15  Q. Which universities were there specialists that
16  you saw besides Dr. Neppe?
17  A. University of Pennsylvania.
18  Q. Anywhere else?
19  A. That's all I can remember.
20  Q. And what was the area in which these physicians
21  were specialists?
22  A. Again, neurology. If I could be even more
23  specific on the hospital it was the Graduate Hospital
24  if that helps you.

B0124

11 (Pages 38 to 41)

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

42

1    Q.  Okay.  As a result of your head injuries did
2    you receive disability?
3    A.  That's correct, yes.
4    Q.  And for how long did you receive disability?
5    A.  I still do.
6    Q.  To this day?
7    A.  Correct.
8    Q.  Who pays the disability?
9    A.  It's Penn Mutual.
10   Q.  What is the nature of the disability?
11   A.  I was unable to return to my practice of
12   medicine.
13   Q.  As a result of your inability to practice, to
14   return to the practice of medicine, did you file a
15   claim for disability with Penn Mutual?
16   A.  Correct.
17        MR. HOLT:  I make an objection to form, but
18   you can answer.
19   A.  Correct.
20   Q.  Did Penn Mutual contest that claim in any way?
21   A.  Can you define contest?
22   Q.  Did they object to your claim or refuse to pay
23   all or any part of it at any time?
24   A.  No.

43

1    Q.  Will you continue to receive disability until
2    the foreseeable future?
3    A.  I can't predict the future any more than you
4    can.
5    Q.  As I understand it your fall occurred in August
6    of 1996?
7    A.  Correct.
8    Q.  And did there come a time when you were able to
9    return to work although not as a physician?
10   A.  Yes.
11   Q.  When was that time?
12   A.  About October or November '96.
13   Q.  What did you do at that time?
14   A.  I did some part-time work at Blue Cross.
15   Q.  What was the nature of that part-time work?
16   A.  Doing some chart reviews.
17   Q.  When you say Blue Cross, you mean Blue Cross
18   Blue Shield of Delaware?
19   A.  Excuse me, yes, correct.
20   Q.  Where did you conduct that work, at their
21   offices?
22   A.  Yes.
23   Q.  Where were those located?
24   A.  At the Health Care Center at Brandywine, which

44

1    is on Foulk Road.
2    Q.  When you say you were reviewing charts, can you
3    be more specific about what your job responsibilities
4    were?
5    A.  I was doing approximately four hours a day of
6    review of medical records of patients who had been
7    admitted to the hospital.
8    Q.  That was a part-time position?
9    A.  Correct.
10   Q.  And how is it that you obtained that position?
11   A.  I had called Dr. Powell, the medical director,
12   and asked if I could do anything that was centered
13   around patient care as a form of rehabilitation
14   almost.
15   Q.  And he set you up or put you in touch with
16   somebody who could get you involved in this part-time
17   position?
18   A.  Correct.
19   Q.  Who did you report to in that position?
20   A.  Dr. Powell.
21   Q.  And for how long did you hold that position?
22   A.  Which position are we talking about now?
23   Q.  When you were reviewing charts at Blue Cross
24   Blue Shield of Delaware.

45

1    A.  It's still part of my responsibility today.
2    Q.  Okay, fair enough.  What was the compensation
3    you received in that position?
4    A.  I can't remember details.
5    Q.  Did you have a title in that position?
6    A.  Not then, no.
7    Q.  And at that time did you continue to see
8    patients at all?
9    A.  No.
10   Q.  What happened to the patients that you had been
11   seeing?
12   A.  They were absorbed by other practices.
13   Q.  Did you make recommendations to them as to who
14   could fill their needs?
15   A.  Yes, I did.
16   Q.  Generally who did you recommend for that?
17   A.  Predominantly Dr. King and Dr. Ester.
18   Q.  When you first went to Blue Cross Blue Shield
19   of Delaware reviewing charts and reporting to Dr.
20   Powell, was there anybody who you would supervise
21   there?
22   A.  No.
23   Q.  When you were a private practitioner back on
24   Silverside Road before your injury, how many other

B0125

12  (Pages 42 to 45)

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

46

1   employees did you have in your practice?
2       A.  Four.
3       Q.  Who were they?
4       A.  You want names or just their titles?
5       Q.  Names and titles.
6       A.  I'll give that some thought and write it all
7   down and give it to you before we are done today.
8       Q.  Is that something you will be able to remember
9   with some thought?
10      A.  Sure.
11      Q.  And the four employees that you had at the
12  practice were they pretty much consistent, the same
13  four people throughout the period of time there?
14      A.  Yes.
15      Q.  Currently you are employed at Blue Cross Blue
16  Shield of Delaware, correct?
17      A.  Correct.
18      Q.  Could you take me generally through the
19  chronology of how you went from being a part-time
20  person reviewing charts for Dr. Powell to your current
21  position, which as I understand, is the medical
22  director at Blue Cross Blue Shield of Delaware?
23      A.  You asked me two separate questions there.
24  Which one do you want me to answer?

47

1       Q.  Currently you are the medical director at Blue
2   Cross Blue Shield of Delaware in the medical
3   management unit?
4       A.  Do you want my full title?
5       Q.  What is your full title currently?
6       A.  Vice-president of network and medical
7   management and chief medical officer.
8       Q.  Now, could you take me just generally through
9   the chronology of how you went from your first
10  position of Blue Cross Blue Shield of Delaware to your
11  current position?
12      A.  In roughly April of '92 -- excuse me, of 1997 I
13  became an associate medical director.  In early 2000 I
14  became the chief medical officer and then I have just
15  given you my new title.
16      Q.  When did you take your new title?
17      A.  It was roughly seven or eight weeks ago.
18      Q.  Is that a promotion that you received seven or
19  eight weeks ago?
20      A.  Correct.
21      Q.  Comes with an increased pay?
22      A.  Correct.
23      Q.  And you are actually a vice-president of Blue
24  Cross Blue Shield of Delaware as well?

48

1       A.  Correct.
2       Q.  When you went from part-time reviewing of
3   charts to becoming an associate medical director, was
4   the associate medical director a full-time job?
5       A.  Correct.
6       Q.  And you said that you took that job in 1997?
7       A.  Correct.
8       Q.  What month in 1997?
9       A.  April.
10      Q.  Do I understand correctly that you were a
11  part-time employee at Blue Cross Blue Shield of
12  Delaware for about seven, eight months, something like
13  that?
14      A.  I'm not sure what terminology they would have
15  used.
16      Q.  But you didn't work a full day there for about
17  seven, eight months and then in April of 1997 you
18  became a full-time employee there?
19      A.  All I can tell you is my official, quote, hire
20  date, end quote, was April of 1997.  I can't tell you
21  exactly when I started working a full day.
22      Q.  Okay, fair enough.  What were your
23  responsibilities as an associate medical director?
24      A.  Utilization management, oversight of care

49

1   management and assistance with quality improvement.
2       Q.  When you say utilization management, what does
3   that mean?
4       A.  Means concurrent review for patients who are in
5   the hospital to assess whether or not they meet our
6   criteria for continued payment to the hospital.
7       Q.  Other than that, whether or not Blue Cross Blue
8   Shield continues to pay their hospital bills?
9       A.  That's correct.
10          MR. HOLT:  Objection to form, but go ahead.
11          MR. MONDROS:  He likes you to give him a
12  little bit of chance to get his objections in.
13  BY MR. MONDROS:
14      Q.  When you say oversight of care management, what
15  does that mean?
16      A.  Assistance with the opportunities to assist
17  patients with their health care needs.
18      Q.  Would you work directly with patients to assist
19  them in their health care needs?
20      A.  No.
21      Q.  How would you accomplish that objective?
22      A.  By evaluating our claims data to identify
23  trends and opportunities for the care management
24  nurses to have an impact.

B0126

13 (Pages 46 to 49)

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

|  | 50 |
|---|---|
| 1 | Q. And what sort of claims data do you evaluate to |
| 2 | accomplish that? |
| 3 | A. Can you clarify the question, please? |
| 4 | Q. What would you look at in order to help the |
| 5 | nurses manage their patients? |
| 6 | A. Queries we put into the system. |
| 7 | Q. What type of queries? |
| 8 | A. I'm not sure I'm understanding your direction |
| 9 | here. |
| 10 | Q. I agree we are probably not understanding each |
| 11 | other. You testified that you would review data and |
| 12 | give recommendations to the nurses on how to improve |
| 13 | their care management to their patients, is that fair? |
| 14 | A. Would you read back my previous answer, please. |
| 15 | (The following question and answer was read |
| 16 | back by the court reporter: |
| 17 | ("QUESTION: How would you accomplish that |
| 18 | objective?" |
| 19 | ("ANSWER: By evaluating our claims data to |
| 20 | identify trends and opportunities for the care |
| 21 | management nurses to have an impact.") |
| 22 | BY MR. MONDROS: |
| 23 | Q. So, now that the court reporter just read back |
| 24 | your answer at Page 49 my question is can you help |

|  | 51 |
|---|---|
| 1 | explain that to me a little bit better so I understand |
| 2 | the process of what you are trying to accomplish with |
| 3 | the oversight of care management? |
| 4 | A. Case managers are tasked with assisting |
| 5 | patients to receive the optimal care they need in the |
| 6 | most cost-effective setting. By analyzing our claims |
| 7 | data we are able to understand whether or not patients |
| 8 | are receiving that care. |
| 9 | Q. And by analyzing the data you were able to come |
| 10 | to an understanding and you could communicate with the |
| 11 | nurses to how they could improve the care, is that the |
| 12 | objective? |
| 13 | A. Partly correct. |
| 14 | Q. And what other parts are there to it? |
| 15 | A. There are patients that are referred to the |
| 16 | case management staff by doctors and they sometimes |
| 17 | have to ask questions about members benefits. We |
| 18 | communicate those issues as well. |
| 19 | Q. When you were associate medical director at |
| 20 | Blue Cross Blue Shield of Delaware, did you continue |
| 21 | to report to Dr. Powell? |
| 22 | A. Yes. |
| 23 | Q. There came a time as I understand it when you |
| 24 | became the chief medical officer, is that correct? |

|  | 52 |
|---|---|
| 1 | A. Correct. |
| 2 | Q. When was that? |
| 3 | A. It was early in 2000 as I recall. |
| 4 | Q. Prior to you who was the chief medical officer? |
| 5 | A. I have no idea what Dr. Powell's title was, but |
| 6 | he fulfilled that equivalent role. |
| 7 | Q. When you were the associate medical director, |
| 8 | you reported to Dr. Powell, correct? |
| 9 | A. Yes. |
| 10 | Q. And who reported to you? |
| 11 | A. No one. |
| 12 | Q. Nobody reported to you at all? |
| 13 | A. No. |
| 14 | Q. You didn't supervise anybody at that time? |
| 15 | A. Define supervision, please. |
| 16 | Q. Well, did you have any direct reports, any |
| 17 | employees at Blue Cross Blue Shield of Delaware who |
| 18 | directly reported to you? |
| 19 | A. No. |
| 20 | Q. Did you conduct any performance evaluations of |
| 21 | any Blue Cross Blue Shield of Delaware employees? |
| 22 | A. No. |
| 23 | Q. Did you have an administrative assistant who |
| 24 | would assist you in the responsibilities that you have |

|  | 53 |
|---|---|
| 1 | described for us here today? |
| 2 | A. Everyone in the department shared ad min |
| 3 | assistance. |
| 4 | Q. The department you were in was called what? |
| 5 | A. It had multiple names. It was sometimes called |
| 6 | the CURB department. Sometimes called medical |
| 7 | management department. |
| 8 | Q. Do you have a preferred title that you would |
| 9 | use when referring to that department? |
| 10 | A. Medical management. |
| 11 | Q. When you say CURB, is that an acronym? |
| 12 | A. Yes. |
| 13 | Q. What does it stand for? |
| 14 | A. Constant Utilization Review, but I have no idea |
| 15 | what the B stood for. |
| 16 | Q. When you were the associate medical director, |
| 17 | did Blue Cross Blue Shield give you any kind of |
| 18 | training? |
| 19 | A. Can you clarify the question? |
| 20 | Q. In order to fulfill the duties -- you had never |
| 21 | been an associate medical director for a whole |
| 22 | insurance company prior to April of 1997, is that |
| 23 | correct? |
| 24 | A. Correct. |

14 (Pages 50 to 53)

B0127

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

54

1  Q. Did Blue Cross Blue Shield train you so that
2  you could be good at your job?
3  A. Yes.
4  Q. What kind of training did they give you?
5  A. One-on-one training with someone. A mentoring
6  type program is of the best way to describe it.
7  Q. Who did you do your one-on-one training with?
8  A. It was with an organization that they had
9  brought in to do medical management.
10  Q. Do you recall the name of that organization?
11  A. The organization I don't, but I can remember
12  the name of the physician.
13  Q. Who was that?
14  A. Dr. Friedman.
15  Q. And he was not an employee of Blue Cross Blue
16  Shield of Delaware, is that correct?
17  A. I have no idea exactly what Blue Cross Blue
18  Shield's relationship with this company was.
19  Q. Was he a practicing a physician or an employee
20  of a company that didn't practice medicine?
21  A. All I can tell you is he sat with me. I have
22  no idea what his relationship with Blue Cross or his
23  relationship with his own organization was.
24  Q. He sat with you every day for a certain period

55

1  of time?
2  A. Yes.
3  Q. What period of time was that?
4  A. I would be taking a guess. I would say three
5  months.
6  Q. Have you talked with Dr. Friedman since that
7  time?
8  A. No.
9  Q. Aside from your one-on-one training with Dr.
10  Friedman did you have any other training to do your
11  job as an associate medical director at Blue Cross
12  Blue Shield?
13  A. Training for what? If you could clarify.
14  Q. Fair enough. For example, as you know there is
15  a statute that protects the confidentiality of
16  protected health information, did you receive any
17  training in HIPPA, for example?
18  A. I would have to go back and look, but I don't
19  even believe HIPPA existed when I first started there.
20  Q. Did you receive any training in how to manage
21  employees?
22  A. No.
23  Q. Did you receive any training on rules and
24  regulations of the United States government in dealing

56

1  with health care?
2  A. Yes.
3  Q. What sort of training was that?
4  A. I did an MBA.
5  Q. You had an MBA?
6  A. Yes.
7  Q. Where was that?
8  A. Sorry, if you could clarify the question.
9  Q. When I hear "MBA," that's a master in business
10  administration?
11  A. That's correct.
12  Q. Where did you take your MBA?
13  A. Regis University.
14  Q. Is that on-line?
15  A. Yeah, I did mine on-line.
16  Q. Did Blue Cross Blue Shield pay for that?
17  A. Yes.
18  Q. They encouraged you to take that?
19  A. Yes.
20  Q. Was there any particular specialty in your MBA?
21  A. The focus was on health care.
22  Q. So, as part of that MBA education you were
23  instructed on certain rules and regulations of the
24  United States government as they pertain to health

57

1  care?
2  A. Yes.
3  Q. Any other training that you recall while you
4  were an associate medical director?
5  A. I was sent to conferences.
6  Q. What types of conferences?
7  A. Medical conferences, Blue Cross association
8  conferences.
9  Q. In April of 1997 what administrative assistant
10  would you use to help you do your work as an associate
11  medical director?
12  A. Whichever admin assistants were available in
13  the department at the time.
14  Q. Do you remember which ones were there at that
15  time?
16  A. Edith Choma was there and Chris Zakutny was
17  there.
18  Q. So, would you utilize Edith Choma's services in
19  April of 1997 and thereafter?
20  A. I can't be specific that I utilized her
21  services in April of 1997. That was a long time ago.
22  If I needed assistance, I would go to one of the ad
23  min assistants.
24  Q. You would go to Edith or Chris?

15 (Pages 54 to 57)

B0128

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

58

1   A.   That's correct.
2   Q.   What types of work would you ask Edith or Chris
3   to do for you?
4   A.   You are talking about something that happened
5   now ten years ago. I can't remember specifics.
6   Q.   Is it fair to say you would ask them to do
7   general secretarial and administrative work when the
8   occasion arose?
9   A.   That's correct.
10  Q.   When you were an associate medical director at
11  Blue Cross Blue Shield, did you miss being a
12  physician, a practicing physician?
13  A.   Yes.
14  Q.   And as you sit here today do you still have
15  that same feeling?
16  A.   Yes.
17  Q.   The compensation you received as associate
18  medical director was that better or worse than you had
19  received in your private practice?
20  A.   It was worse.
21  Q.   How about the compensation that you received as
22  chief medical officer, was it better or worse than
23  what you had received as a practicing physician?
24  A.   Can you just define compensation so I'm sure we

59

1   are saying the same thing?
2   Q.   Your total remuneration for your services as a
3   physician back when you had your practice on
4   Silverside Road versus your total compensation as
5   chief medical officer of Blue Cross Blue Shield.
6   A.   I need someone to assist me with inflation
7   adjustment on my earnings as a family physician to be
8   able to answer this question accurately.
9   Q.   Okay, fair enough. And what about with your
10  current position, your current position at Blue Cross
11  Blue Shield, your new title, is your compensation
12  better or worse than what it was?
13  A.   Again, I'll need assistance to be able to
14  inflation adjust to be able to answer what I was
15  earning accurately.
16  Q.   When Edith Choma did work for you back when you
17  were associate medical director, were you satisfied
18  with her secretarial services?
19  A.   Can you define satisified.
20  Q.   Did you find she was competent at what she did?
21      MR. HOLT: Objection to form, but you can
22  answer.
23  A.   Can you define competent?
24  Q.   As I understand your testimony back when you

60

1   were associate medical director you would ask Edith
2   Choma to do some generally secretarial and
3   administrative work for you from time to time, is that
4   correct?
5   A.   Correct.
6   Q.   When you would give Edith Choma an assignment,
7   is it your recollection that you were generally
8   satisfied with the work that she did for you?
9   A.   The work was completed, correct.
10  Q.   To your satisfaction?
11  A.   I cannot recall. I would actually have to
12  think of specifics and then go back into each
13  instance.
14  Q.   Do you recall being dissatisfied with the work
15  Edith Choma did for you?
16  A.   I recall being neither supremely satisified or
17  supremely dissatisfied. I really didn't pay any
18  attention to the work that was being given.
19  Q.   Let me ask you the same question for Chris
20  Zakutny. Do you recall being satisified or
21  dissatisfied with the work Chris did for you?
22  A.   I'm going to give the same answer.
23  Q.   Do you have any understanding, do you have any
24  recollection, of there being any substantive

61

1   difference in the work that you would give to Edith
2   Choma as opposed to the work you would give to Chris
3   Zakutny?
4   A.   No, I do not recall; but, again, don't forget I
5   wasn't the primary person giving work to any staff
6   member at that time.
7   Q.   Others in the medical management unit or
8   department would give Chris and Edith work, is that
9   fair to say?
10  A.   Typically, yes.
11  Q.   And you were, in fact, only one of several
12  people who would give them work to do?
13  A.   That's correct.
14  Q.   When you were associate medical director do you
15  have an understanding that Edith Choma had a hearing
16  impairment?
17  A.   I have no idea that -- when I recall that she
18  had one, but I do know she has one.
19  Q.   As you sit here today do you know that she has an
20  impairment in her hearing, correct?
21  A.   Yes.
22  Q.   As I understand your testimony you don't recall
23  exactly when you became aware of that fact?
24  A.   That's correct.

16  (Pages 58 to 61)

B0129

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

62

1  Q. Might have been while you were associate
2  medical director?
3  A. I don't recall exactly when I knew about it,
4  correct.
5  Q. Might have been only when you were a chief
6  medical officer?
7  A. I don't recall exactly when.
8  Q. Aside from Chris Zakutny and Edith Choma did
9  you have anyone else do secretarial or administrative
10 assistant work for you while you were associate
11 medical director?
12 A. Not that I can recall, no.
13 Q. When you were an associate medical director,
14 did you have an understanding of what the
15 administrative assistant's job description was?
16 A. I never read it, no.
17 Q. Did you have a general understanding as to what
18 that job description is despite having not read it?
19 A. Yes.
20 Q. And what was your understanding?
21 A. They assisted with administrative duties.
22 Q. When you were the associate medical director,
23 did you have an understanding as to who Edith Choma
24 reported directly to?

63

1  A. Probably not.
2  Q. What about Chris Zakutny, did you have an
3  understanding as to who Chris reported to?
4  A. No.
5  Q. When you were associate medical director at
6  Blue Cross Blue Shield of Delaware, did you have any
7  secretary take dictation for you?
8  A. I don't believe so, no. I mean, don't forget
9  we are talking ten years ago. Things change. The way
10 we do things, the style we use, I cannot remember.
11 Q. At any time while you were employed at Blue
12 Cross Blue Shield of Delaware did you have Edith Choma
13 do dictation for you?
14 A. Yes.
15 Q. Do you have an understanding as to when that
16 began?
17 A. Not an exact date, no.
18 Q. Was it while you were chief medical officer?
19 Was it while you were associate medical director?
20 A. I cannot remember.
21 Q. Besides Edith Choma what other administrative
22 assistant or secretaries would you have do dictation
23 for you?
24 A. No one.

64

1  Q. Was there any particular reason why you used
2  Edith Choma to do dictation for you?
3  A. At the time that we were going through an NCQA
4  survey we had to keep detailed minutes of the work
5  that we did and the work had to be done by someone.
6  Edith at that time was reporting directly to me and
7  that's why I gave her the work.
8  Q. When you gave her the work, you are referring
9  to dictation, correct?
10 A. Correct.
11 Q. And can you explain the process of dictation
12 for me as you would employ it?
13 A. I would talk into a Dictaphone, enter the tape,
14 she would transcribe it.
15 Q. And she would transcribe it on a computer?
16 A. Correct.
17 Q. And E-mail it back or print it out? How did
18 that work?
19 A. I can't remember exactly. She probably did
20 both.
21 Q. And did Blue Cross Blue Shield of Delaware
22 provide the transcription equipment, tape and tape
23 recorder and earphones, that sort of thing?
24 A. Correct.

65

1  Q. When you gave Edith Choma dictation to do, you
2  were aware that she had impaired hearing?
3  A. I can't recall whether I knew it before or
4  after, I'm sorry.
5  Q. Is there any point in time when you gave Edith
6  dictation to do when you were aware of her hearing
7  impairment?
8  A. Yes.
9  Q. And you continued to give her dictation to do?
10 A. That's correct.
11 Q. Were you generally satisifed with the quality
12 of the work that Edith would do on the dictation
13 projects you gave to her?
14 A. No, I was not.
15 Q. What was the problem that you perceived?
16 A. There were gaps in the dictation that needed to
17 be filled in. I perceived that this was part of her
18 job and she wasn't doing it.
19 Q. Did you discuss that with Edith?
20 A. I'm sure we did.
21 Q. Do you have any independent recollection of
22 discussing it with Edith?
23 A. The only recollection I have is my telling her
24 that if she couldn't hear properly did she need

17 (Pages 62 to 65)

B0130

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

66

1  accommodations from us and she said no and we agreed
2  that she would give me the dictation in the best form
3  she could and I would then have to fill in the blanks.
4      Q.  Was that arrangement satisfactory to you?
5      A.  No.
6      Q.  In testifying about the dictation, your
7  testimony for the past few minutes, does that refresh
8  your recollection as to whether you gave Edith
9  dictation while you were an associate medical director
10 or while you were a chief medical officer?
11     A.  No, it does not.
12     Q.  Is there any particular reason why you did not
13 have Chris Zakutny do the dictation?
14     A.  Having only two ad min assistants, each of
15 which had very different work that they were doing and
16 knowing that Edith was directly reporting to me and
17 knowing that the project that we were working on was
18 very important, I assigned it to Edith.
19     Q.  At what point in time did Edith Choma directly
20 report to you?
21     A.  I can't recall the exact date.
22     Q.  Was it while you were associate medical
23 director or was it while you were chief medical
24 officer?

67

1      A.  Again, I cannot recall the times that they
2  assigned titles. They don't necessarily always fit
3  with who is the most senior person in the department.
4      Q.  Did there come a time when Dr. Powell resigned?
5      A.  I believe he retired as opposed to resigned.
6  I'm not sure if there is a semantic difference in your
7  mind.
8      Q.  What was his last position, Dr. Powell's last
9  position?
10     A.  I don't know his title, I testified to that,
11 but as I said I know that he was the most senior
12 medical person in the medical management department.
13     Q.  And there came a time when he no longer held
14 that position?
15     A.  That's correct.
16     Q.  Do you remember when that was?
17     A.  Not an exact date, no.
18     Q.  Who took over that position when he vacated it?
19     A.  I did.
20     Q.  Was that a promotion for you?
21     A.  Again, at the time it might not have been. By
22 necessity it might have been that I just filled in the
23 vacuum, but the promotion might have come afterwards.
24 Again, I don't have a file in front of me to confirm

68

1  dates.
2      Q.  And when you filled the vacancy left by Dr.
3  Powell is that when Edith Choma directly reported to
4  you?
5      A.  Again, I would have to have a file with dates
6  in front of it -- dates in it to be sure.
7          (Brief recess.)
8  BY MR. MONDROS:
9      Q.  Dr. Kaplan, as I understand your testimony
10 there came a time when Edith Choma came to directly
11 report to you, is that correct?
12     A.  Correct.
13     Q.  And as I understand it you don't recall the
14 date on which that happened, correct?
15     A.  Correct.
16     Q.  And you don't recall whether that happened
17 while your official title was an associate medical
18 director or chief medical officer, is that also
19 correct?
20     A.  That's correct.
21     Q.  Can you recall the circumstances of why Edith
22 became your direct report? Was that your choice? Was
23 that her choice or was it somebody else's choice?
24     A.  The whole department was in a state of flux.

69

1  They offered an early retirement option at Blue Cross.
2  Dr. Powell took it. Carol Doohan who de facto ran the
3  department took it. So, that's how Edith came to
4  report to me.
5      Q.  And that state of flux was there any particular
6  cause for the state of flux there?
7      A.  Yes.
8      Q.  What was the cause?
9      A.  They offered an early retirement option and
10 some people took it.
11     Q.  What was going on at Blue Cross Blue Shield
12 that this offer was made?
13     A.  You would have to ask someone more senior than
14 me. I was not part of the decision-making process.
15     Q.  As I understand it you weren't offered early
16 retirement either, is that correct?
17     A.  No, that's correct.
18     Q.  Did Chris Zakutny also directly report to you?
19     A.  I'm going to have to look at an organizational
20 chart, I just can't remember.
21     Q.  But you do remember that Edith Choma directly
22 reported to you?
23     A.  Yes.
24     Q.  Did you ask to have Edith Choma directly report

18  (Pages 66 to 69)

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

70

1  to you?
2  A. No.
3  Q. Did somebody come to you and tell you that
4  Edith Choma would be directly reporting to you?
5  A. Not that I recall, no.
6  Q. After Dr. Powell took his early retirement and
7  left you took over the responsibilities that had been
8  his position, correct?
9  A. Correct.
10  Q. Who did you report to after that happened?
11  A. Tim Constantine.
12  Q. What was his position?
13  A. He was the vice-president overseeing
14  contracting and medical management.
15  Q. During this period of time, and I'm talking
16  about between 1997 and, say, 1999, did you continue to
17  experience memory loss -- strike that. That's not a
18  good question. During the period of time April 1997
19  through 1999 did you experience memory loss that
20  affected your work in any way?
21  A. I don't believe it did.
22  Q. Did you experience memory loss during that time
23  period?
24  A. I had the initial memory loss that had never

71

1  come back.
2  Q. So, the answer is then that you did experience
3  memory loss during that time period?
4      MR. HOLT: Objection, mischaracterization.
5  You can answer.
6  A. You are going to have to more clearly define
7  your question for me, please.
8  Q. Were there any instances between April of 1997
9  and the end of 1999 when on the job at Blue Cross Blue
10  Shield you experienced memory loss?
11  A. I don't believe any.
12  Q. Did you ever discuss with Tim Constantine
13  whether you had any memory loss on the job during that
14  time period?
15  A. All I can tell you is he was obviously
16  satisfied enough with my work performance that I'm
17  still there.
18  Q. But that wasn't my question. My question was
19  did you ever discuss with Tim Constantine whether or
20  not you had memory loss with Blue Cross Blue Shield of
21  Delaware between '97 and '99?
22  A. I have no idea during those dates or not.
23  Q. Did you discuss with anyone whether or not you
24  had memory loss at that time?

72

1  A. Again, define memory loss.
2  Q. Well, to go back a little bit. I understand in
3  August of '96 you had a head injury?
4  A. Correct.
5  Q. And I understand that as a result of that head
6  injury you suffered memory loss that prevented you
7  from being a practicing physician?
8  A. That's correct.
9  Q. And that you are collecting disability to this
10  very day as a result of that, is that correct?
11  A. That's correct.
12  Q. My question is during the period of time from
13  April 1997 through 1999 did you discuss your memory
14  loss with anyone during that time period?
15  A. I was very open about my injury.
16  Q. And the effects of your injury as well?
17  A. Correct.
18  Q. So, Tim Constantine understood that you
19  suffered from memory loss as a result of your fall?
20      MR. HOLT: Objection to the form of the
21  question. You can answer.
22  A. I have no idea what he understands.
23  Q. Did you ever discuss that with him?
24  A. I cannot recall if I did or not. I know his

73

1  immediate predecessor I discussed it with.
2  Q. Who was his immediate predecessor?
3  A. Jerry Icenogle.
4  Q. When did Tim Constantine take over for Mr.
5  Icenogle?
6  A. You will have to look in his HR record. I have
7  no idea.
8  Q. Besides Jerry Icenogle did you discuss your
9  memory loss with anyone else at Blue Cross Blue
10  Shield?
11  A. Again, I was open with everyone about it.
12  Q. Everyone had an understanding that you suffered
13  from memory loss from time to time?
14      MR. HOLT: Objection to the form of the
15  question, mischaracterization, but you can answer.
16  A. I didn't say I suffered from time to time and I
17  keep asking you to clarify what you mean by memory
18  loss.
19  Q. It's your view as I understand it that the
20  injuries that you received in your August 1996 fall
21  and the results of those injuries being memory loss
22  did not affect your work at Blue Cross Blue Shield
23  between '97 and '99, is that correct?
24  A. I was given compensating skills and I used

B0132

19 (Pages 70 to 73)

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

74

1   them, yes.
2   Q. When you say "compensating skills," what do you
3   mean?
4   A. Note taking.
5   Q. What else?
6   A. Ways to organize myself before and after
7   meetings.
8   Q. Anything else?
9   A. Just associations, if you make associations
10  between things to try and help you remember.
11  Q. And were you taught these skills in some form
12  of therapy sessions?
13  A. Can you define therapy session?
14  Q. Did you have any type of occupational therapy
15  or other physical or psychological therapy as a result
16  of your injury?
17  A. You asked me multiple questions.
18  Q. Did you have any occupational therapy as a
19  result of your injuries?
20  A. I have no idea what the hospital would have
21  called it, but it fits within my understanding of
22  occupational therapy, yes.
23  Q. And who was your therapist or therapists?
24  A. It was done through Moss Rehab. I cannot give

75

1   you exact names.
2   Q. When you say you have no idea what the hospital
3   would call it, what hospital are you referring to?
4   A. Moss Rehab.
5   Q. Is that in Philly?
6   A. Yes.
7   Q. How long did you have occupational therapy, how
8   many sessions?
9   A. I cannot be exact. I'm guessing it was over a
10  period of about seven months.
11  Q. Did you have any psychotherapy as a result of
12  your injuries sustained in that fall?
13  A. No.
14  Q. Did you have any physical therapy?
15  A. No.
16  Q. The occupational therapy that you testified to
17  that you had at Moss is that where you were taught the
18  techniques to organize yourself, take notes, things
19  like that?
20  A. Correct.
21  Q. And do you continue to use those techniques to
22  this day?
23  A. Yes.
24  Q. Does that help you with your memory?

76

1   A. It would help anyone stay organized regardless
2   of a head injury, regardless of memory issues.
3   Q. It's fair to say it does help you?
4          MR. HOLT: Objection to form.
5   BY MR. MONDROS:
6   Q. You can answer.
7   A. I have no way of knowing whether it does or
8   not. All I can tell you is I have a job and I do it
9   to the satisfaction of my boss.
10  Q. And your boss continues to be Tim Constantine?
11  A. Correct.
12  Q. But you have never discussed your memory loss
13  directly with Tim Constantine?
14         MR. HOLT: Objection to form, but he can
15  answer.
16  A. I have no idea if I have or not. Again, it
17  would be a trivial conversation in my mind because
18  I've been open with everyone about it. So, it's
19  nothing that would be that momentous.
20  Q. But if it happened, you don't remember it?
21  A. Correct.
22  Q. When Edith Choma came to directly report to
23  you, at that time were you aware of her age?
24  A. I've never asked her her age. I have no idea

77

1   what her age is now.
2   Q. What do you think her age is?
3   A. I'll give the same facetious answer I would
4   give anyone who asks what a woman's age is, 21. I
5   have no idea what her age is.
6   Q. As you sit here today you have no idea how old
7   she was?
8   A. I have no idea.
9   Q. At any point in time did you have any idea how
10  old Edith Choma was?
11  A. Can you define about how old?
12  Q. At any point in time did you know or believe
13  you knew Edith Choma's age?
14  A. At no time did I know exactly what her age was.
15  I have no idea what her birth date is. I've never
16  done a calculation to work it out.
17  Q. When Edith Choma first came to directly report
18  to you, did you know she suffered from impaired
19  hearing?
20  A. We have been through this before and I cannot
21  tell you exactly when it was.
22  Q. You don't know whether or not you knew at that
23  time or not?
24  A. I can't remember the sequence, no.

20 (Pages 74 to 77)

B0133

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

78

1    Q. Prior to Edith Choma going to work directly for
2    you, reporting directly to you, had you given Edith
3    Choma dictation to do prior to that time?
4        MR. HOLT: Objection, asked and answered.
5        MR. MONDROS: I'm not sure, but if you know
6    help me out.
7    A. I have told you before I can't remember what
8    the sequence was.
9    Q. While Edith Choma directly reported to you you
10   had her do dictation for you, correct?
11   A. Correct.
12   Q. And did there come a time when Edith Choma no
13   longer reported to you?
14   A. Yes.
15   Q. She went to work for somebody else at that
16   point in time?
17   A. She still worked in the medical management
18   department, retained the same title, but was more
19   directly working with someone else, correct.
20   Q. Did you continue to give Edith Choma dictation
21   to do after she reported to someone else?
22   A. Yes, I did.
23   Q. Did you continue to be unhappy with the way
24   Edith Choma did the dictation?

79

1    A. Yes, I did.
2    Q. After you took over the responsibilities of Dr.
3    Powell's job did you have any additional training to
4    assist you in undertaking those responsibilities?
5    A. Yes, I did.
6    Q. And what was that additional training?
7    A. I forget the exact term they use. I think it
8    was MOP training.
9    Q. Do you have an understanding as to what MOP
10   stands for?
11   A. It was management oversight of employees that
12   they manage.
13   Q. And what did that training consist of?
14   A. Basics on how to motivate staff, basics on
15   federal law, discrimination law.
16   Q. And how long was that training?
17   A. Two days.
18   Q. And where was that training held?
19   A. Down in Maryland.
20   Q. And was that sponsored by Blue Cross Blue
21   Shield?
22   A. I have no idea what you mean by sponsored.
23   Q. Was that a Blue Cross Blue Shield program or
24   was that by a vendor who provided management training

80

1    programs?
2    A. Again, you have asked me two different
3    questions there. Which one do you want me to answer?
4    Q. My question to you is, if you know, was that a
5    Blue Cross Blue Shield run program? Was that an
6    internal program of Blue Cross Blue Shield?
7    A. It was organized by Blue Cross and our parent
8    organization, Care First, and to the best of my
9    knowledge there were only Blue Cross people there.
10   Q. Thank you. Did there come a time when you were
11   asked to evaluate the performance of employees who
12   reported directly to you?
13   A. Yes.
14   Q. And which employees were you asked to evaluate
15   the performance of?
16   A. The ones that reported directly to me.
17   Q. Besides Edith Choma who were they?
18   A. I would have to look at an organizational
19   chart.
20   Q. Can you remember anybody besides Edith Choma
21   who directly reported to you?
22   A. There was another medical director, associate
23   medical director.
24   Q. Who was that?

81

1    A. At the time that probably would have been Dr.
2    John Castiglioni.
3    Q. When you say "at the time," what time are you
4    referring to?
5    A. The time that I was first doing performance
6    reviews, that was your initial question to me.
7    Q. Would that be about 1999 or so?
8    A. I'm guessing it is, but, again, I would have to
9    look at organizational charts to know whether it was
10   1999 or 2000.
11       MR. MONDROS: Scott, do we have any charts
12   of that time period?
13       MR. HOLT: Off the record.
14       (Brief discussion off the record.)
15   BY MR. MONDROS:
16   Q. Dr. Castiglioni, what was his title?
17   A. Associate medical director.
18   Q. Is that the same position that you had held
19   previously?
20   A. Correct.
21   Q. And Dr. Castiglioni reported directly to you?
22   A. Yes.
23   Q. And he was in the medical management
24   department?

B0134

21 (Pages 78 to 81)

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

82

1    A.  Correct.
2    Q.  And Edith Choma also reported directly to you?
3    A.  Correct.
4    Q.  Were these the first two employees that you had
5    the opportunity to do employment evaluations for at
6    Blue Cross Blue Shield?
7    A.  I cannot remember the sequence of who would
8    have been first so I'm unable to answer that.
9    Q.  Besides Dr. Castiglioni and Edith was there
10   anybody else who you were evaluating?
11   A.  I would have to go back and look at an old
12   chart.  I can't even remember, I'm sorry.
13   Q.  Do you recall doing Edith Choma's performance
14   evaluation in 1999?
15   A.  Yes, I did.
16   Q.  What do you recall about it?
17   A.  It was contentious because I gave her a bad
18   review.
19   Q.  Did you have an understanding of how Edith
20   Choma's previous performance reviews had been before
21   the one you did for her in 1999?
22   A.  No.
23   Q.  Did you make any effort to look at those
24   performance evaluations?

83

1    A.  No, I did not.
2    Q.  When Edith Choma went to work directly for you,
3    when she went to work for you, did you have an
4    understanding as to how long Edith Choma had been at
5    Blue Cross Blue Shield?
6    A.  No.
7    Q.  As you sit here today do you have an
8    understanding of when Edith Choma began her employment
9    at Blue Cross Blue Shield of Delaware?
10   A.  I've never discussed it with anyone.
11   Q.  Do you have an understanding as to prior to
12   your evaluation of Edith's performance in 1999 who did
13   Edith Choma's performance evaluations?
14   A.  I have no idea who exactly.  I would make the
15   assumption it was Carol Doohan, but that's just
16   assumption.
17   Q.  By the time you did Edith Choma's evaluation in
18   1999 Ms. Doohan had taken early retirement already?
19   A.  Again, I would have to look at the
20   sequence.  I believe that that would probably be
21   correct.
22   Q.  At any time prior to Ms. Doohan leaving Blue
23   Cross Blue Shield of Delaware did you discuss Edith
24   Choma's prior performance evaluations with her?

84

1    A.  No.
2    Q.  Prior to initially completing Edith Choma's
3    performance evaluation in 1999 did you do anything to
4    apprise yourself as to Edith Choma's prior performance
5    evaluations at Blue Cross Blue Shield?
6    A.  No.
7    Q.  You testified a few moments ago that the
8    employment evaluation of Edith Choma in 1999 was
9    contentious.  What do you recall about it that it was
10   contentious?
11   A.  She was unhappy with it.
12   Q.  And did she tell you she was unhappy with it?
13   A.  As I recall not at the time.
14   Q.  And how did you become aware that she was
15   unhappy with it?
16   A.  Again, my recollection is that human resources
17   contacted me to say she was unhappy.
18   Q.  Who at human resources?
19   A.  It would probably have been Vicki Sessoms who
20   was the director of HR at the time.
21   Q.  When you say "probably," is that to indicate
22   you don't recall specifically who it was?
23   A.  I know I definitely had discussions with her.
24   Whether she was the first person to call and tell me I

85

1    don't know.
2    Q.  What was Vicki Sessoms' title?
3    A.  Director of human resources.
4    Q.  Is that the position held by Donna May now?
5    A.  No.
6    Q.  What is Donna May's position?
7    A.  She is a generalist at Blue Cross Blue Shield
8    in the human resources department.
9    Q.  Is Vicki Sessoms still there?
10   A.  No.
11   Q.  When did she depart?
12   A.  You would have to look at her file, I don't
13   have a date.
14   Q.  Do you have an understanding as to the
15   circumstances under which she departed?
16   A.  I believe she left to go to another
17   organization where there was a growth opportunity and
18   a promotion for her.
19   Q.  You had discussions with Vicki Sessoms as I
20   understand it about Edith Choma's employment
21   evaluation?
22   A.  Correct.
23   Q.  What did Vicki Sessoms tell you, what did you
24   tell her?

22 (Pages 82 to 85)

B0135

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

86

1   A. Which question do you want me to answer?

2   Q. Well, why don't you tell me what she told you

3  first.

4   A. She told me to re-do the evaluation.

5   Q. Did she say what parts of the evaluation needed

6  to be re-done?

7   A. I'm sure she did, but I can't remember the

8  exact specifics of which words and sections.

9   Q. Did she say why you needed to re-do the

10  evaluation?

11   A. She felt that she would rather have me re-

12  evaluate it than have a disgruntled employee.

13   Q. What did you tell Vicki Sessoms, if anything?

14   A. I don't recall exact words, but it was along

15  the lines of that if that's what she was ordering me

16  to do, I would do it, but I wasn't happy because I

17  wasn't satisfied with Edith's performance and it

18  needed to be pointed out.

19   Q. And you told Ms. Sessoms that?

20   A. Exactly what my words were I can't remember,

21  but that would have been the flavor of it, correct.

22   Q. And you told Ms. Sessoms you were unhappy about

23  changing Edith's employment evaluation, is that

24  correct?

87

1   A. I told her that what I had done in the

2  performance evaluation was accurate in my mind, yes.

3   Q. Is it true that you were unhappy that she had

4  asked you to change Edith's employment evaluation?

5     MR. HOLT: I'll make an objection to form.

6   A. I'm not sure my emotions are that relevant.

7  What is relevant that is we had an employee who

8  clearly wasn't performing to the standard that I would

9  have hoped she would and that needed to be pointed

10  out.

11   Q. As I understand it Vicki Sessoms contacted you

12  and said Edith Choma had complained to her about her

13  employment evaluation, is that correct?

14   A. Correct.

15   Q. And is it fair to say you weren't happy to get

16  a call from Vikki, that it would have been your

17  preference for Edith Choma to come to you directly?

18     MR. HOLT: I'll make an objection to form.

19     THE WITNESS: Could you read that back?

20     (The last question was read back by the

21  court reporter.)

22   A. My emotions aren't relevant to the fact that

23  there was a process that had been followed and clearly

24  needed to be re-worked.

88

1   Q. I understand that you don't believe your

2  feelings and your emotions are relevant, but unless

3  Scott tells you not to answer question my question is

4  did that make you unhappy to get a call from Vicki

5  Sessoms about Edith Choma's performance evaluation?

6   A. I can't remember what my exact emotion was

7  sitting here today. I'm sure it didn't make me happy

8  to know that I had to go back and re-do work when I

9  was extremely busy focusing on some very important

10  things for the company.

11   Q. So, you were not happy that you had to do

12  additional work, is that correct?

13   A. I'm sure I was not happy to have to do

14  additional work, yes.

15   Q. And you also weren't happy to have to re-do a

16  performance evaluation when you felt your initial

17  performance evaluation was correct, right?

18   A. Again, my emotion doesn't play into that piece

19  of it at all.

20   Q. But I'm not asking you whether it plays into

21  it. I'm asking you whether -- again, I thought you

22  testified you told her that you weren't happy having

23  to change something when you thought it needed to be

24  pointed out that Edith Choma's performance in your

89

1  view was deficient. Is that fair to say?

2   A. Let's read back exactly what I said and we can

3  put that back into the record.

4     (The following question and answer was read

5  backb by the court reporter:

6     ("QUESTION: What did you tell Vicki

7  Sessoms, if anything?

8     ("ANSWER: I don't recall exact words, but

9  it was along the lines of if that's what she was

10  ordering me to do, I would do it, but I wasn't happy

11  because I wasn't satisfied with Edith's performance

12  and it needed to be pointed out.")

13  BY MR. MONDROS:

14   Q. If you like, I will ask a new question; or, if

15  you want to answer that one, that's fine.

16   A. I assigned a vague emotion to the first piece

17  that was read back to us. You are now trying to

18  assign specific emotions. One was vague in the

19  characterization. You are now trying to assign a

20  specific to me and that's what I'm struggling with

21  right now.

22   Q. Let's see if we can narrow it down. Vicki

23  Sessoms asked you to correct or change Edith Choma's

24  employment evaluation, is that correct?

23 (Pages 86 to 89)

B0136

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

90

1    A.  That's correct.
2    Q.  And she told you that you needed to do that or
3    she wanted you to do that because she didn't want to
4    have a disgruntled employee on her hands, is that
5    correct?
6    A.  Again, I cannot testify to the exact words she
7    used, but that was the general message, correct.
8    Q.  And as I understand your testimony you told Ms.
9    Sessoms that you thought that Edith Choma's work was
10   deficient and that needed to be pointed out, correct?
11   A.  Correct.
12   Q.  And you also told Ms. Sessoms that if she was
13   ordering you to change Edith Choma's performance
14   evaluation, you would change it, but you weren't happy
15   about it, is that correct?
16   A.  Yes.
17   Q.  Did you, in fact, change Edith Choma's
18   employment evaluation?
19   A.  Yes, I did.
20   Q.  What changes did you make, if you recall?
21   A.  I'm sure there were changes in words and there
22   was also a change in the overall scoring or rating
23   that she received.
24   Q.  Did you have any discussions with Edith Choma

91

1    about her performance evaluation in 1999?
2    A.  I'm sorry, I didn't hear the last part of the
3    question.
4    Q.  With reference to the 1999 performance
5    evaluation that you did of Edith Choma did you have
6    any discussions with Edith Choma about that?
7    A.  I discuss every performance evaluation with
8    every employee.
9    Q.  What do you recall of discussions that you had
10   with Ms. Choma about her 1999 performance evaluation?
11   A.  Absolutely nothing.  I know it's an important
12   date for an employee, but when I'm busy doing a
13   million other things, it was just one issue that had
14   to get dealt with and I dealt with it.  So, I don't
15   have specific recollections.
16   Q.  Do you recall whether you met privately with
17   Ms. Choma about her performance evaluation in 1999?
18   A.  I meet privately with everyone, yes.
19   Q.  Would that private meeting have occurred in
20   your office?
21   A.  Probably, I'm assuming so, yes.
22   Q.  But you have no independent recollection?
23   A.  No.
24   Q.  At the private meeting that you had with Edith

92

1    Choma was there anybody else present during that
2    meeting?
3    A.  By definition of the private means it's between
4    two people, so, no.
5    Q.  Do you recall that there was nobody else
6    present or is it just your standard practice that it
7    would be a private meeting with no one else present?
8    A.  It's a standard practice there would be no one
9    else present.
10   Q.  Do you recall anything that you said to her
11   during that meeting?
12   A.  You would have to ask me specifics and I'll see
13   if I can recall it or not.
14   Q.  Do you recall anything that Edith said to you
15   during that meeting?
16   A.  Again, if you want to give me specifics I'll
17   see if I recall.
18   Q.  The private meeting that you had with Edith
19   Choma about her 1999 performance evaluation was that
20   before or after you had the conversation with Vicki
21   Sessoms that you testified to earlier?
22   A.  I'm sorry, you lost me on the question.  Would
23   you mind reading it back.
24        (The last question was read back by the

93

1    court reporter.)
2    A.  My discussion with Edith would have been prior
3    to my discussion with Vicki Sessoms.
4    Q.  When you had your discussion with Edith, do you
5    remember her voicing displeasure to you about the
6    employment evaluation that you gave to her?
7    A.  I do not.
8    Q.  You don't know if she told you she was unhappy
9    with it?
10   A.  I don't recall her saying anything that implied
11   she was unhappy.
12   Q.  When you generally do an employment evaluation
13   and you have a private meeting with the employee who
14   you have evaluated, do you generally go through the
15   evaluation point by point and explain that evaluation
16   to that person?
17   A.  Correct.
18   Q.  Approximately how long do you spend with an
19   employee?
20   A.  Usually 45 minutes to an hour.
21   Q.  Did you spend 45 minutes to an hour with Edith
22   Choma in 1999 when you reviewed her evaluation with
23   her?
24   A.  I don't know exactly how long I spent, but I

24 (Pages 90 to 93)

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

94

1  can testify to the fact that I did spend time with
2  her, yes.
3      Q.  Did you employ your practice of going through
4  her evaluation with her point by point?
5      A.  Yes.
6      Q.  And you explained to her what you felt were her
7  deficiencies as an administrative assistant?
8          MR. HOLT:  Objection to form, but you can
9  answer.
10     A.  I'm sure I did.  If I went through it word by
11 word or point by point they would have been pointed
12 out, yes.
13     Q.  Do you recall what those deficiencies were that
14 you communicated to Edith Choma?
15     A.  If you give me a copy I can gladly read it out
16 to you, but I don't have a copy with me.
17     Q.  Do you recall whether you mentioned the fact
18 that you were unhappy with her taking dictation before
19 that performance evaluation?
20     A.  Again, if you give me a copy I'll happily give
21 you an answer.
22         MR. MONDROS:  Please mark this.
23         (Kaplan Deposition Exhibit No. 1 was marked
24 for identification.)

95

1  BY MR. MONDROS:
2      Q.  Let's give you what is marked as Kaplan-1.
3  Take a moment to look through that and I'm going to
4  step out for three minutes.
5          (Brief recess.)
6  BY MR. MONDROS:
7      Q.  Dr. Kaplan, I've given you what has been marked
8  as Kaplan Exhibit 1.  Have you ever seen that document
9  before?
10     A.  Yes.
11     Q.  What is it?
12     A.  It's Edith Choma's performance evaluation.
13     Q.  Is this the performance evaluation for Edith
14 Choma that you did in 1999?
15     A.  It's dated 7/14/1999.
16     Q.  Is that your initials down in the left-hand
17 corner of the first page?
18     A.  I don't see.  Maybe my copy doesn't have it.
19     Q.  Where it says "Approvals"?
20     A.  That's my signature, correct.
21     Q.  And is this Kaplan-1 the original performance
22 evaluation for Edith Choma or is it the one that you
23 re-did after you spoke with Ms. Sessoms?
24     A.  I have no idea.  You would have to give me both

96

1  side-by-side and I would be able to tell you.
2          MR. HOLT:  I just want to make a
3  clarification for the record, Herb.  The first
4  document appears to be the Personnel Record Change and
5  second document appears to be Performance Evaluation.
6  You are marking them in the same document, but just
7  for the record.
8          MR. MONDROS:  Fair enough, I appreciate
9  that.
10 BY MR. MONDROS:
11     Q.  Mr. Holt is correct, the first page of the
12 document is a Personnel Record Change.  Do you have an
13 understanding of what the Personnel Record Change
14 represents?
15     A.  It's the paper that is used to communicate
16 between departments to notify human resources and the
17 payroll department if there has been a change in the
18 person's position in the company, the pay grade.
19     Q.  And this is a Personnel Record Change for Edith
20 Choma, correct?
21     A.  That's correct.
22     Q.  Signed by you?
23     A.  That's correct.
24     Q.  And do you have an understanding as to what the

97

1  nature of Edith Choma's personnel change was at this
2  point in time?
3      A.  It states she got a merit increase.
4      Q.  Would this reflect the date or approximate date
5  of which Edith Choma went to report directly to you?
6      A.  I cannot tell you exactly when she reported to
7  me.  I've testified to that already.  I can tell you
8  this is dated 7/14/99.
9      Q.  Does that date have any independent
10 significance to you as far as why her personnel status
11 was changed as of that date, Edith Choma?
12         MR. HOLT:  Objection to form.
13     A.  I'm not sure I understand your question.
14     Q.  What I'm trying to get at and I think you have
15 answered it and I beg your indulgence one more time
16 for trying to go through, does this document, the
17 first page of Kaplan-1, perhaps refresh your
18 recollection as to the date which Edith Choma became
19 one of your direct reports?
20         MR. HOLT:  I'll make the same objection.
21 BY MR. MONDROS:
22     Q.  You can answer.
23     A.  If I did the performance evaluation the logical
24 inference is that she was already reporting directly

B0138

25  (Pages 94 to 97)

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

98

1    to me at the time, correct.
2        Q.   The second page of Kaplan-1 appears to me to to
3    be the performance evaluation, is that correct?
4        A.   That's the beginning of the Performance
5    Evaluation Form, yes.
6        Q.   And the perform evaluation consists of each of
7    the following pages of the exhibit?
8        A.   Is that a question for me or a statement?
9        Q.   That is a question, is that correct, the rest
10   of this document is Edith Choma's performance
11   evaluation?
12       A.   Assuming you have given me a complete copy of
13   what you have in your file, then, yes.
14       Q.   And the last page of the document reflects what
15   I believe is your signature and, again, the date, July
16   14, 1999, correct?
17       A.   Correct.
18       Q.   So, by that time Edith Choma was reporting
19   directly to you, is that correct?
20       A.   Again, I've testified that by inference if I
21   did the performance review she must have been, yes.
22       Q.   Have you had an opportunity to review Kaplan-1,
23   this document?
24       A.   Yes.

99

1        Q.   In reviewing this document does that refresh
2    your recollection at all as to the conversation you
3    had with Edith Choma during a private meeting between
4    you and Edith that you testified to concerning this
5    performance evaluation?
6        A.   No.
7        Q.   You see at the bottom there are some numbers
8    that are stamped on the document that are not
9    necessarily a part of the document in its original
10   form and if you could refer to the page that has
11   D00088 in the right-hand corner?
12       A.   Yes.
13       Q.   Is that your handwriting that appears in the
14   middle of that?
15       A.   Yes.
16       Q.   Could you please read that into the record.
17       A.   "I requested that Edith provide me with a list
18   of her daily tasks as she was unhappy with this
19   assessment. She felt I did not understand what work
20   she does every day. This evaluation was held in the
21   hope that I would receive that document, but at the
22   time I gave this in to be typed I had not received
23   it."
24       Q.   When did you request that Edith provide you

100

1    with a list of her daily tasks?
2        A.   I'm assuming at the time we discussed this
3    performance review.
4        Q.   When you say she is unhappy with this
5    assessment, what assessment are you referring to?
6        A.   The performance assessment.
7        Q.   Does this refresh your recollection as to
8    whether she expressed to you she was unhappy with her
9    performance evaluation during your private meeting
10   with her?
11       A.   It doesn't change my recollection of the
12   meeting, however, it's quite clear by my words that
13   she expressed unhappiness, yes.
14       Q.   Do you remember having a conversation with
15   Edith Choma about whether you fully understood the
16   work that she was doing?
17       A.   Yes, I did.
18       Q.   And what was the nature of that discussion?
19       A.   In generalities she was concerned that I didn't
20   understand how much work she had to do. I felt I had
21   a very good understanding of the work she did and I
22   asked her to give me a list of her tasks so that I
23   could be sure that what she said she was doing is what
24   I felt she was doing.

101

1        Q.   And that's the list that you had requested from
2    her, but according to this statement she had not yet
3    provided it?
4        A.   That's correct.
5        Q.   Is that as of July 14, 1999 she had not
6    provided it?
7        A.   I'm assuming so based on the date that this was
8    signed.
9        Q.   Would this subject have been one of the
10   subjects that you discussed with Edith during the
11   private meeting you had about the 1999 performance
12   review?
13       A.   It might have been or it might have been
14   shortly thereafter and became a part of this document.
15       Q.   If you could turn -- with the benefit of having
16   read what was on page D00088, does that refresh your
17   recollection as to whether this was the original
18   performance evaluation that you completed for Edith or
19   the one that you revised after you spoke with Ms.
20   Sessoms?
21       A.   I would have to look at both to be sure.
22       Q.   Okay. To your knowledge the revised
23   performance evaluation you did for Edith Choma is that
24   the performance evaluation that became a part of Edith

26 (Pages 98 to 101)

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

102

1  Choma's personnel file?
2    A. I assume as much, yes.
3    Q. Do you have any knowledge as to whether the
4  original performance evaluation you did for Edith
5  Choma became a part of her personnel file?
6    A. You would have to ask someone in human
7  resources. They were sent down there. I have no idea
8  what they did with them.
9    Q. Did you resent the fact that you had to make
10  those changes to Edith Choma's personnel file,
11  personnel evaluation?
12      MR. HOLT: Objection.
13      MR. MONDROS: Question is withdrawn.
14  BY MR. MONDROS:
15    Q. Did you resent the fact that you had to make
16  those changes to Edith Choma's 1999 performance
17  evaluation?
18    A. Define recent.
19    Q. Well, did you believe that it was in-
20  appropriate for you to make those changes when you
21  felt that your original performance evaluation was
22  accurate?
23      MR. HOLT: I would like an objection to
24  form.

103

1    A. I believe that my original performance review
2  was accurate, otherwise, I wouldn't have done it.
3    Q. And yet even though you believe it was accurate
4  you made changes to it pursuant to Ms. Sessoms'
5  request, correct?
6    A. That's correct.
7    Q. And did you find that -- did that disturb you
8  in any way making those changes?
9    A. Yes, it did.
10    Q. So, why did you do it?
11    A. Because the company asked me to. They felt it
12  was an appropriate action to take.
13    Q. Do you regret it, do you wish you hadn't made
14  those changes?
15      MR. HOLT: Objection to form.
16    A. The goal of a performance assessment is to
17  allow someone to see where they are doing well and
18  where they have opportunities to grow. I tried to
19  give Edith the opportunity or the document that showed
20  her where she had opportunities to improve and my
21  ultimate goal was achieved in that I did show her that
22  document.
23    Q. Do you recall what sort of salary increase
24  Edith Choma received after the 1999 performance

104

1  evaluation?
2    A. No.
3    Q. Do you recall what salary increase was
4  generally given by Blue Cross Blue Shield to its staff
5  after that in 1999?
6    A. No.
7    Q. Do you recall Edith Choma being unhappy with
8  the salary increase that she received after the 1999
9  evaluation?
10    A. I recall her being unhappy about something with
11  a bonus, but I don't recall anything about a salary
12  increase itself based on merit.
13    Q. What do you recall her being unhappy with with
14  respect to her bonus?
15    A. The issue that I believe if I'm right she got a
16  one percent bonus and she felt she deserved more.
17    Q. Did you have a discussion with her about that?
18    A. I'm sure we did.
19    Q. And what did she tell you?
20    A. I cannot remember any specifics.
21    Q. Do you remember her saying generally that she
22  was unhappy with the one percent bonus?
23    A. I've got a vague recollection of that and I
24  have a vague recollection of my response to her.

105

1    Q. What was your response to her?
2    A. That bonuses are not a guarantee. Your merit
3  increase as part of your salary is guaranteed, but a
4  bonus is something that you earn; and, if it had been
5  up to me, I would not have given her one.
6    Q. Did you have that conversation with her in your
7  office?
8    A. Something of that type of private nature I'm
9  sure we did.
10    Q. Was that the same conversation in which you had
11  the performance evaluation or was that a separate
12  conversation?
13    A. Usually they're separate conversations, so I
14  must assume it was in this instance.
15      (Kaplan Deposition Exhibit No. 5 was marked
16  for identification.)
17  BY MR. MONDROS:
18    Q. I'm going to hand you what has been marked as
19  Kaplan-5, skipping ahead a little bit, because I'm
20  disorganized, and ask you if you have ever seen that
21  document before? Have you ever seen that document
22  before?
23    A. No.
24    Q. Do you have an understanding as to what that

B0140

27 (Pages 102 to 105)

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

106

1  document represents?
2    A. I would like my legal counsel to explain it to
3  me.
4    Q. And he will have an ample opportunity to do so.
5  I'll just represent to you for present purposes that
6  is the legal document, it's called the Complaint, and
7  in the American judicial system a plaintiff commences
8  a legal action against a defendant by filing the
9  complaint with the court and essentially the
10  allegations of the plaintiff, the allegations of fact
11  of the plaintiff, in this case that's the case called
12  Edith Choma versus Blue Cross Blue Shield of Delaware.
13  Have you had an opportunity to review that document?
14    A. Yes.
15    Q. I would like to ask you a few questions. If
16  you could turn to page four of the document. Let's
17  turn to page three, please. I'm going to read from
18  paragraph 13 and then I'll ask you to comment on the
19  allegations in paragraph 13. "During a meeting to
20  discuss the plaintiff's first performance review with
21  Dr. Kaplan in 1999, Dr. Kaplan made several
22  discriminatory and inappropriate statements to
23  plaintiff such as, I can't stand the way you lift up
24  your glasses to see the screen." My question to you,

108

1    Q. It also says, "You know the saying kick the
2  dog, that's why I treat you have the way I do." Do
3  you recall saying that to Ms. Choma during that
4  meeting to discuss her performance review?
5    A. No.
6    Q. What is that saying kick the dog, do you have
7  an understanding of what that saying is?
8    A. I have no idea. It's not part of my
9  vernacular.
10    Q. Is it possible that you said these things to
11  Ms. Choma during that meeting and you just don't
12  recall them because of your memory loss or is that not
13  possible?
14    A. It's not possible.
15    Q. Why do you say that?
16    A. Because I would never say things like this to
17  anyone.
18    Q. Has anybody ever told you that your personality
19  has changed since before the accident and after the
20  accident, that there has been a change in your
21  personality?
22    A. Yes.
23    Q. Anybody at work say that to you?
24    A. No.

107

1  Dr. Kaplan, did you say to Ms. Choma during that
2  meeting or at any other time, I can't stand the way
3  you lift up your glasses to see the screen?
4    A. No.
5    Q. Do you recall that or is that something that
6  you just wouldn't have said?
7    A. Something I would never have said.
8    Q. The paragraph continues, "Maybe it's your
9  thyroid." Do you recall saying that to Ms. Choma?
10    A. No.
11    Q. Is that because you recall not saying that or
12  that's something that you just wouldn't say?
13    A. There are often times any Blue Cross employee
14  can come and ask me questions about medical issues.
15  Did I ever use the words maybe it's your thyroid?
16  It's highly unlikely. I have no recollection of
17  saying it. Taken out of context perhaps I've said
18  those exact words, but I have no recollection of
19  saying that to her.
20    Q. The paragraph continues and it says that you
21  said to her, "Maybe the blood isn't getting to your
22  brain." Do you recall saying that to Ms. Choma during
23  a performance review?
24    A. No.

109

1    Q. Who has said that to you?
2    A. My wife.
3        MR. MONDROS: You can instruct him on the
4  spousal privilege:
5  BY MR. MONDROS:
6    Q. Besides your wife anybody else said that to
7  you?
8    A. No.
9    Q. Paragraph 14 says, "Shortly after this meeting
10  with Dr. Kaplan, plaintiff contacted Vicki Sessoms and
11  advised her of the remarks made to plaintiff by Dr.
12  Kaplan." As I understand your testimony it's your
13  understanding that Ms. Choma, in fact, did contact
14  Vicki Sessoms, correct?
15    A. That's correct.
16    Q. And do you recall Vicki Sessoms discussing
17  those comments that were reported in paragraph 13 with
18  you during the period of time in which you spoke to
19  Vicki Sessoms?
20    A. No, I don't.
21    Q. The very last paragraph 15 it says that Vicki
22  Sessoms met with Ms. Choma and they had a meeting and
23  it says, "Ms. Sessoms immediately went into Dr.
24  Kaplan's office," that's your office, "and slammed the

28 (Pages 106 to 109)

B0141

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

110

1   door." Do you recall having a meeting in which you
2   met with Vikki in your office –
3     A.   Yes.
4     Q.   -- about Edith Choma's performance review?
5     A.   Yes.
6     Q.   Do you recall Ms. Sessoms slamming the door?
7     A.   No.
8     Q.   A little while ago you testified about a
9   conversation that you and Ms. Sessoms had about Edith
10  Choma's performance evaluation, is that the meeting
11  that is referred to there -- that's a bad question,
12  strike that. The meeting that you testified – the
13  discussion that you testified to previously between
14  you and Vikki concerning Edith Choma's 1999
15  performance review did that meeting occur in your
16  office?
17    A.   Yes.
18    Q.   With the door closed?
19    A.   I have no recollection. I assume as much.
20    Q.   And that would be the meeting in which Vikki
21  Sessoms asked you or told you to change Edith Choma's
22  performance review?
23    A.   Vikki Sessoms and I met to have a discussion to
24  have her change the performance review. Whether or

111

1   not you are referring to the same meeting I am I
2   cannot testify to that.
3     Q.   Did Vikki Sessoms ask you to change the review
4   or tell you to change the review?
5     A.   Tell me to.
6     Q.   And that's why you did it?
7     A.   That's correct.
8     Q.   Did you meet with Edith Choma to discuss the
9   new employment evaluation, the revised employment
10  evaluation?
11    A.   I have to assume I did. I cannot tell you
12  exact date, time.
13    Q.   Paragraph 18 of the complaint that is on page
14  four says, "Although the normal pay increase was at
15  least three percent, plaintiff received a one percent
16  raise." Do you see that?
17    A.   Um-hum, yes.
18    Q.   Is it your testimony here today that the three
19  percent and one percent refer to a bonus rather than a
20  pay increase?
21    A.   I could be wrong. I always remembered it as
22  being a bonus issue, not a pay increase issue. If I'm
23  wrong, I'm wrong.
24    Q.   You are not sure one way or the other?

112

1     A.   I'm not sure.
2     Q.   Who is Mr. Joe Hall?
3     A.   He worked in human resources.
4     Q.   Did you tell Mr. Hall that one percent was all
5   the increase that you would approve for Edith Choma?
6     A.   I believe the records will show if I can see
7   them that I did sign off on a one percent increase,
8   yes.
9     Q.   And as I understand it you had a discussion
10  with Ms. Choma about the size of the pay increase?
11    A.   I have a recollection of discussing that, yes.
12    Q.   If you read paragraph 19 it says, "When
13  plaintiff addressed her concern that she was only
14  receiving a one percent raise when the normal pay
15  increase was at least three percent, Dr. Kaplan
16  explained that if it was up to him plaintiff would not
17  have received any increase in her salary." Do you see
18  that?
19    A.   I see that.
20    Q.   And, in fact, as I understand your testimony
21  you, in fact, did say that to Edith Choma, correct?
22    A.   No, I did not. That's her complaint against
23  Blue Cross. Those are her words, not mine.
24    Q.   Did you, in fact say, if it was up to you Edith

113

1   Choma would not have received any increase?
2           MR. HOLT: Herb, objection. Off the
3   record.
4           (Brief discussion off the record.)
5   BY MR. MONDROS:
6     Q.   When Edith Choma came to you and complained
7   that she was only getting a one percent and the normal
8   was three percent, did you tell her if it was up to
9   you you wouldn't get anything at all?
10    A.   Are we talking about salary increase or bonus
11  now?
12    Q.   I think there is some misunderstanding or we're
13  not exactly sure of what that is so that's why I
14  framed the question the way it is. Be it salary
15  increase or bonus did you tell her if it was up to you
16  she wouldn't get anything?
17    A.   My recollection is that discussion occurred
18  around a bonus. Bonus is just that, you have done
19  exceptional work and you deserve additional money
20  above your increase and she did not deserve a bonus.
21    Q.   That discussion did it occur around the one
22  percent or three percent issue?
23    A.   I have no idea. That's what she is alleging in
24  her complaint. I'm just telling you what I recall.

B0142

29 (Pages 110 to 113)

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

114

1    Q.  Do you have an understanding as to what grade,
2    pay grade, Edith Choma was at this point in time?
3    A.  I would have to look at her records. I believe
4    it was an eight, but I would have to refresh my
5    memory.
6    Q.  Dr. Castiglioni, he was another fellow who you
7    did the performance evaluation for in 1999, is that
8    correct?
9    A.  I would have to look at my records to see the
10   exact year, but I'm assuming if he was working there I
11   would have done it, yes.
12   Q.  Do you recall whether Dr. Castiglioni had any
13   issues concerning his employment, his performance
14   evaluation by you, that year?
15   A.  He did not.
16   Q.  Is there a standard increase in salary when an
17   employee of Blue Cross Blue Shield goes up from, say,
18   a grade seven to an eight?
19   A.  You are going to have to reask the question,
20   I'm not sure I understand you.
21   Q.  When employees at Blue Cross Blue Shield –
22   this may be not within the scope of your understanding
23   or duties and just let me know if that's the case.
24   When an employee of Blue Cross Blue Shield goes from

115

1    one pay grade to another pay grade, is there a
2    standard salary increase that goes along with that
3    ascension?
4    A.  We no longer use pay grades.
5    Q.  Back in 1999 at that point in time you did use
6    pay grades, correct?
7    A.  Correct.
8    Q.  In or about 1999 if an employee went from a
9    grade seven to an eight, was there a standard increase
10   that would accompany that promotion?
11   A.  You would have to ask human resources.
12   Q.  After the 1999 performance evaluation Edith
13   Choma continued to report directly to you, correct?
14   A.  Correct.
15   Q.  You continued to assign her secretarial
16   responsibilities?
17   A.  Correct.
18   Q.  And among them were dictation?
19   A.  Yes, correct.
20   Q.  And what other sorts of things did you have
21   Edith Choma do for you?
22   A.  She did the typical administrative assistant
23   duties of the department, some of which was assisting
24   with travel arrangements, making sure all the supplies

116

1    we needed were in the department, assisting with
2    typing of denial letters that went out to members.
3    There was a general range of duties.
4    Q.  In fact, Edith Choma would do these duties for
5    you as well as other people within the medical
6    management unit?
7    A.  That's correct. She reported to me, but I
8    wasn't the only person that assigned work to her.
9    Q.  Who else would assign work to Edith Choma
10   during the 1999-2000 time period?
11   A.  Any of the other directors. In fact, any of
12   the staff that needed assistance with anything would
13   turn to the ad min staff to help them.
14   Q.  For instance, Dr. Castiglioni he would turn to
15   Edith when he needed help?
16   A.  Yes.
17   Q.  How about Dave Martin, who is he?
18   A.  Dave Martin was a data analyst at Blue Cross.
19   Q.  And would he be somebody who might ask Edith to
20   help him out with secretarial or administrative
21   duties?
22   A.  That's hypothetically the answer is yes.
23   However, in reality the answer is he wouldn't have had
24   much work that he had to give her, but I'm sure there

117

1    was some.
2    Q.  Did you work with Dave Martin?
3    A.  Yes, I did.
4    Q.  And did you find him to be generally competent
5    at the job that he did?
6    A.  We can pull his perform reviews if you like and
7    we can turn them into testimony.
8    Q.  Did you review his performance?
9    A.  Yes, I did.
10   Q.  We can pull them, but Mr. Holt might object
11   because those things are sometimes confidential. What
12   is your recollection of Dave Martin's performance?
13   Did he generally get favorable reviews from you?
14   A.  Yes.
15   Q.  Did you generally find him to have a reputation
16   for veracity and truthfulness?
17   A.  I have no idea. I don't follow him around 24
18   hours a day so I can't answer that.
19   Q.  In your experience did you find him to be a
20   truthful person and a trustworthy person?
21   A.  There are two separate things. Can you ask two
22   separate questions?
23   Q.  Did you find Dave Martin to be a truthful
24   person in your dealings with him?

Wilcox and Fetzer, Ltd.    Registered Professional Reporters

B0143

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

118

1   A.  Not always.
2   Q.  On what occasions did you find him to be not
3   truthful?
4   A.  I think there were times when he would look to
5   ferment problems in the department and if I went and
6   talked to him about it, he would deny any knowledge
7   about the issue; but, it would be obvious from things
8   I would see or things people would say that he was
9   obviously part of the problem.
10  Q.  Can you give me any specific instances?
11  A.  Not right now I can't.
12  Q.  What about a trustworthy person?
13  A.  I would have hoped by trustworthy you mean that
14  you can know that someone is always truthful, be honest
15  with you and there were times I think he had his own
16  agenda and he hid things or, you know, misled people.
17  Q.  We heard last week about an instance in which
18  Dave Martin created a picture of you with – that made
19  you appear to be a Moslem.  Do you remember that
20  instance?
21  A.  Yes.
22  Q.  What do you recall about that?
23  A.  It was after 9/11 and he brought a picture
24  where he had taken a picture or a photocopy, a piece

119

1   of paper where he had put a picture of me with a
2   turban on my head and caption at the bottom of it.
3   Q.  What was the caption?
4   A.  I don't recall the exact words, something along
5   the lines of someone must be foreign and something
6   else derogatory, but I can't remember exactly.
7   Q.  And he gave it to you?
8   A.  That's correct.
9   Q.  What was your reaction to that?
10  A.  I smiled and went on my way.
11  Q.  Did you ask him for another copy of that?
12  A.  I think I must have, yes, in fact, yes, I did.
13  Q.  Because you thought it was funny, is that fair
14  to say?
15  A.  No.
16  Q.  Were you offended by it?
17  A.  Yes.
18  Q.  Did you file a report with human resources
19  about that?
20  A.  No, I decided to leave it be, not get anyone
21  into trouble and trust he would use better judgment in
22  the future.
23  Q.  Did you tell him you were offended by what he
24  had done?

120

1   A.  I did not.
2   Q.  Did you tell anybody else that you were
3   offended by what Dave had done?
4   A.  I don't recall that I did.  I'm going to say
5   no.  As far as I was concerned it was something he did
6   and it was a private matter.
7   Q.  Do you have an understanding that someone did
8   report Dave Martin to human resources for the turban
9   picture incident?
10  A.  Yes.
11  Q.  Who was that?
12  A.  That was me.
13  Q.  You did report Dave Martin?
14  A.  Not at the time.
15  Q.  When did you do that?
16  A.  It was approximately a year later.
17  Q.  Why did you wait a year?
18  A.  Because there were nurses at one of the
19  hospitals that now had copies and it became an issue
20  that now Blue Cross name was being besmirched and I
21  felt I had to report the issues so the company was
22  aware of it.
23  Q.  Which nurses had copies?
24  A.  I don't have their names.

121

1   Q.  Which hospital?
2   A.  Christiana Care Hospital.
3   Q.  Do you have an understanding as to how those
4   nurses got copies of that picture?
5   A.  No, I do not.
6   Q.  You don't know if it was Dave Martin or
7   somebody else gave it to them?
8   A.  Seeing how Dave was the one that created this
9   it must have come from him.  Maybe indirectly because
10  the only way other people besides myself could have
11  gotten a copy would be if he gave it to them.
12  Q.  It was about a year later that you filed a
13  complaint with human resources?
14  A.  I can check the file and give you the exact
15  date.
16      MR. MONDROS:  Let's take a break.
17      (Brief recess.)
18  BY MR. MONDROS:
19  Q.  Just to re-trace a few quick things, your head
20  injury, I understand I asked you if you lost
21  consciousness and you said it wasn't a day and it
22  wasn't a month.  Do I understand you lost
23  consciousness for less than a day then?
24  A.  Correct.

31 (Pages 118 to 121)

B0144

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

122

1　Q.　And is Dr. King still your physician?
2　A.　Yes.
3　Q.　When we broke we were going over some of the
4　other people who assigned Edith Choma secretarial work
5　back in the 1999, 2000 frame and we talked about you
6　and Dr. Castiglioni, Dave Martin. Was Yvonne Locker
7　working there at that point in time?
8　A.　I'm going to have to ask you to re-characterize
9　what Dave Martin gave to Ms. Choma in the way of work.
10　Q.　I actually get to ask the questions. I think
11　your testimony was that he may have been somebody who
12　gave her work, but the kind of work that Dave Martin
13　did he probably wouldn't have given her very much
14　work, something along those lines. I was just going
15　over some of the people who we had discussed in
16　connection with that conversation.
17　A.　By implication you implied he was giving her a
18　lot or that was my understanding of your implication
19　and I just wanted to correct that.
20　Q.　Dave Martin probably did not give Edith a lot
21　of work to do during that time frame, is that correct?
22　A.　That's correct.
23　Q.　Besides yourself and Dr. Castiglioni and to the
24　limited extent that Dave Martin might have given Edith

123

1　work to do who else would Edith have been working for
2　at that point in time?
3　A.　Anyone in the department who needed assistance
4　would typically go to her or Chris Zakutny and explain
5　what they needed.
6　Q.　Who were some of the other people in the
7　department at that time?
8　A.　If you give me an old chart I'll help you out
9　with the names.
10　Q.　Was Tim Toole working there at that point in
11　time?
12　A.　Yes, he was.
13　Q.　Who is Tim Toole?
14　A.　He was the director of behavioral health.
15　Q.　What about Jane Israel, was she working there
16　at that time?
17　A.　Yes, she was.
18　Q.　What was her position?
19　A.　He was director of quality improvement.
20　Q.　And what about Pat Carpenter, was she working
21　there at that time?
22　A.　I don't recall the exact time that she
23　officially moved over from the headquarters to our
24　department. I can get you a date, I don't know right

124

1　now.
2　Q.　Fair enough. What about Yvonne Locker, do you
3　know who that is?
4　A.　Yes, I do.
5　Q.　Was she working there at that point in time?
6　A.　Working where?
7　Q.　In the medical management department.
8　A.　Yes.
9　Q.　Is she somebody who might have been giving
10　Edith Choma work to do?
11　A.　As I said, I'll read off the names of every
12　single person in the department and they could have
13　all potentially given her her work.
14　Q.　Is Yvonne Locker still working there?
15　A.　Yes.
16　Q.　What is her position?
17　A.　She is a quality improvement nurse.
18　Q.　Do you work closely with her?
19　A.　Can you define closely?
20　Q.　Do you deal with her on a weekly basis
21　face-to-face?
22　A.　No.
23　Q.　Have you had an opportunity to form a view as
24　to Yvonne Locker's competence in the job that she

125

1　does?
2　A.　I don't do her performance assessments if
3　that's what you are asking, no.
4　Q.　I'm just asking if you formed a view, not
5　whether you do her performance assessment?
6　A.　She works in my department so I'm aware of her,
7　yes.
8　Q.　Do you hve a view whether she is competent at
9　the job she is asked to do?
10　A.　Can you define competent.
11　Q.　Is that a label you would put on Yvonne Locker
12　in performance of her work duties?
13　A.　Yes.
14　Q.　And do you have a view as to her reputation for
15　truthfulness?
16　A.　No, I don't.
17　Q.　Have you ever found an occasion on which Yvonne
18　Locker was not truthful?
19　A.　No.
20　Q.　Who does Yvonne Locker report to directly?
21　A.　Debbie Sweeney.
22　Q.　Jane Israel is no longer working there,
23　correct?
24　A.　Correct.

32 (Pages 122 to 125)

**B0145**

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

126

1    Q.  What were the circumstances of her departure
2    from the medical management unit at Blue Cross Blue
3    Shield?
4    A.  She left to go work for another organization
5    where he was getting a high level position.
6    Q.  She resigned to take that new position?
7    A.  Correct.
8    Q.  And Tim Toole, what is his job?
9    A.  I've testified that he is the director of
10   behavioral health.
11   Q.  And does he report directly to you?
12   A.  No.
13   Q.  Who does he report directly to?
14   A.  Dr. Patt Panzer.
15   Q.  Do you have a view as to Tim Toole's competence
16   at the job which he is tasked to do?
17   A.  Yes.
18   Q.  What is that view?
19   A.  He does an adequate job.
20   Q.  When you say "adequate," is that to reflect a
21   distinction from competence for his position?
22   A.  Yes.
23   Q.  And can I infer that adequate is somewhat less
24   than competent?

127

1    A.  Yes.
2    Q.  And what is the basis for your view about Tim
3    Toole's adequacy versus competence to do his job?
4    A.  I don't think he fully understands the
5    magnitude or scope of the potential for the work he
6    could do.
7    Q.  Can you amplify that?
8    A.  Medical management keeps changing and he is
9    still practicing medical management the way it would
10   have been practiced in the past as opposed to looking
11   for the opportunities to embrace the future.
12   Q.  How do future opportunities differ from the
13   past medical management?
14   A.  In the degree of engagement with members and
15   degree of engagement with physicians.
16   Q.  When you say the degree of engagement with
17   members and physicians, is that engagement of Blue
18   Cross Blue Shield with members and physicians?
19   A.  That's correct.
20   Q.  Has there ever been a time when Tim Toole has
21   reported directly to you?
22   A.  Yes.
23   Q.  And when was that?
24   A.  I can't give you the exact years.  I can go

128

1    back into a file and look.
2    Q.  Until was it a year ago that he started
3    reporting directly to Patt Panzer or more than a year
4    ago?
5    A.  More than a year ago.
6    Q.  And your assessment of Tim Toole as adequate,
7    but not competent would that be based upon your
8    experience as a direct supervisor of Tim Toole?
9    A.  Correct.
10   Q.  Have you had any discussions with Patt Panzer
11   about Tim Toole's adequacy or competence to do his
12   job?
13   A.  As the leader of the department I'm constantly
14   talking with everyone about the opportunities to
15   embrace the future to change our direction and I've
16   had those discussions in terms of what we should be
17   doing as opposed to what the person is doing.
18   Q.  Okay.  And have you had discussions with Patt
19   Panzer about what Tim Toole is doing?
20   A.  No.  It has been more directional for the
21   department.
22   Q.  What I'm really trying to get at is to your
23   knowledge does Patt Panzer share your view that Tim
24   Toole is adequate at his job rather than competent?

129

1    A.  You would have to ask her.
2    Q.  You don't have any knowledge as to that?
3    A.  No.
4    Q.  What is your view of Tim Toole's reputation for
5    telling the truth, for truthfulness?
6    A.  I've never had an opportunity to see whether or
7    not he tells the truth or lies so I can't answer that.
8    Q.  Have you ever had an experience where Tim Toole
9    was not truthful with you?
10   A.  No.
11   Q.  Do you know if Tim Toole were to have a more
12   forward-looking view as you define it with respect to
13   doing his job and embrace the opportunities that are
14   available to him, what benefits would flow from that?
15        MR. HOLT:  I'll make an objection to form,
16   but you can answer.
17   A.  You are going to have to define the question
18   more carefully.  I'm sorry.
19   Q.  As I understand your testimony you believe that
20   Tim Toole does not fully take advantage of the
21   opportunities available to him in his job as director
22   of behavioral health at Blue Cross Blue Shield, is
23   that correct?
24   A.  I said that, correct.

B0146

33 (Pages 126 to 129)

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

130

1    Q.  Do you believe that?
2    A.  Yes.
3    Q.  What benefits could be realized by Blue Cross
4    Blue Shield of Delaware if Tim Toole were to take
5    advantage of those opportunities in your view?
6    A.  We would have a better medical management
7    process.
8    Q.  In what ways?
9    A.  Are you asking about members?  Are you asking
10   about physicians?  Are you asking about contracting?
11   Q.  Let's take it with respect to members first.
12   A.  We would have better outcomes for our members.
13   Q.  How would that get better outcomes for members?
14   A.  You would have more people adhering to the
15   appropriate medications, more people getting
16   appropriate treatment according to national
17   guidelines, therefore, better outcomes.
18   Q.  Specifically what actions can Tim Toole take to
19   achieve these benefits?
20   A.  With respect to what?
21   Q.  With respect to doing his job.  What is it that
22   you think he should be doing to achieve these
23   benefits?
24   A.  Again, are we talking members, providers.

131

1    Q.  Members, we are still on the members that you
2    just testified as to a series of very substantial
3    benefits in your view and I assume the view of Blue
4    Cross Blue Shield that could be achieved and what I'm
5    asking is what should Tim Toole be doing to achieve
6    these benefits?
7    A.  He needs to embrace the concept that it's okay
8    to have his staff proactively reach out and talk
9    directly to members as opposed to relying on
10   communication through the psychiatrist or psychologist
11   to the member.
12   Q.  When you say "his staff," are you referring to
13   the case managers who work for Tim Toole?
14   A.  That's correct.
15   Q.  People like Joyce James, Ellen Lafferty, Ann
16   McGonigle, people like that?
17   A.  Correct.
18   Q.  Have you shared this view with Tim Toole?
19   A.  Yes.
20   Q.  Has he accepted this view?
21   A.  For the most part, yes.
22   Q.  Has he followed through and deployed his case
23   managers to have these conversations?
24   A.  Changes are occurring.

132

1    Q.  After the 1999 performance evaluation that you
2    did of Edith Choma you continued to work with Edith
3    Choma, correct?
4    A.  Correct.
5    Q.  Another way to put it would be Edith Choma
6    continued to directly report to you, correct?
7    A.  Correct.
8    Q.  And was there any tension left over from that
9    experience relating to the 1999 performance evaluation
10   between you and she?
11   A.  Not in my mind.
12   Q.  And you didn't hold a grudge against her for
13   going to human resources?
14   A.  Not at all.
15   Q.  And you didn't hold a grudge against her for
16   having to change her employment evaluation when asked
17   to do so by Ms. Sessoms?
18   A.  Not at all.
19   Q.  As a result of that performance evaluation did
20   Edith Choma's -- strike that.  After 1999 and after
21   that performance evaluation that you did of Edith
22   Choma in 1999 did Edith Choma's performance improve?
23   A.  She definitely put in more effort and I was
24   pleased to reward her for that, yes.

133

1    Q.  In your view she had responded to some of your
2    concerns?
3    A.  Yes.
4    Q.  Were you fully satisified with her performance
5    after that time?
6    A.  Not fully, but I was very pleased that she was
7    trying hard, yes.
8    Q.  Did you ever tell anyone that you would like to
9    get rid of Edith Choma because she couldn't hear?
10   A.  Not in that many words, no.
11   Q.  Did you say that in substance to anybody?
12   A.  I've definitely said it to people she couldn't
13   hear, yes.
14   Q.  And that you would like to get rid of her?
15   A.  That part I don't recall, but there were
16   definitely times I was frustrated by her and her
17   inability to do her job.
18   Q.  And that was after the 1999 performance review?
19   A.  I don't recall exactly the date.
20   Q.  Is it fair to say that you had that view that
21   sometimes you got frustrated with her before and after
22   the performance evaluation?
23   A.  Yes, she wasn't performing the job that was
24   assigned to her and that was very frustrating to me.

34 (Pages 130 to 133)

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

134

1   Q. Was it also frustrating that she couldn't hear
2   as well as somebody with perfect hearing?
3   A. I don't have an issue with what a person's
4   disabilities. Inabilities are what I have an issue
5   with is if they are employed in the job and they're
6   unable to perform that job and then I have to come and
7   do part of the job for them. That's frustrating, yes.
8   Q. Then, you were frustrated that Edith couldn't
9   do her job because she couldn't hear as well as a
10  person with perfect hearing, correct?
11      MR. HOLT: Objection to the form of the
12  question.
13  BY MR. MONDROS:
14  Q. You can answer.
15  A. I was frustrated she couldn't do her job. The
16  why's were irrelevant.
17  Q. And you do agree that you expressed your
18  frustration to others in the medical management unit?
19  A. At some point I'm sure I must have, yes.
20  Q. Told people that you would like to get rid of
21  her as a secretary?
22  A. I didn't say that. I said I had expressed my
23  frustration. I know I have. I wouldn't be able to
24  tell you exactly where or when.

135

1   Q. Did you express your frustration that Edith's
2   hearing was impaired to others in the medical
3   management department?
4   A. I don't recall exactly. It's very possible I
5   could have, but I don't recall an exact instance.
6   Q. If Tim Toole testified under oath that he heard
7   you say that in words or in substance that you would
8   like to get rid of Edith Choma because she couldn't
9   hear, would you have any reason to dispute that?
10      MR. HOLT: I'll make an objection to the
11  form of the question.
12  A. I have no problem with the fact that anyone who
13  can't do their job shouldn't be filling that job and
14  Edith clearly wasn't filling part of her job duties.
15  Q. And that's even after the '99 performance
16  evaluation, correct?
17  A. To the best of my recollection, yes. She was
18  doing better, but she still had issues.
19  Q. My question a couple questions ago was a little
20  different than what your answer was so let me ask it
21  again. I'm going to hand to you a deposition, a piece
22  of a deposition transcript of Tim Toole, and I'm going
23  to read into the record part of a question and
24  answer -- an entire question and answer on page 18.

136

1       The question, "Can you tell me again what
2   Dr. Kaplan said?" The answer is, "My recollection is
3   he said he wished he could get rid of Edith because he
4   said she couldn't hear." Take a look.
5       MR. HOLT: Objection just to the fact that
6   you are reading one portion of the deposition
7   testimony and I take it you don't want him to review
8   the entire transcript?
9       MR. MONDROS: I don't think it's necessary.
10  I'm going to ask if that refreshes his recollection as
11  to what I said.
12      THE WITNESS: You've given it to me and I'm
13  going to read it.
14      (Brief recess.)
15  BY MR. MONDROS:
16  Q. Dr. Kaplan, have you had an opportunity to read
17  those parts of the deposition that were handed to you?
18  A. Yes, I have.
19      MR. HOLT: Let me just make a
20  clarification. For the record it's page 1 through 18
21  of --
22      MR. MONDROS: It's page 1 through 25.
23      MR. HOLT: -- of Tim Toole's deposition
24  transcript.

137

1       MR. MONDROS: Correct.
2   BY MR. MONDROS:
3   Q. What I would like to direct you to is that
4   portion of the testimony where Tim Toole stated that
5   he recalled you saying that you wished you could get
6   rid of Edith because she couldn't hear. Did you see
7   that part on page 18?
8   A. Yes.
9   Q. And my question to you is did you ever say that
10  in words or substance?
11  A. I have no recollection of exactly saying that,
12  but I'm sure at some point I was frustrated by her
13  ability to do that job that I did say it.
14  Q. But at least after the 1999 performance
15  evaluation Edith Choma continued to work at Blue Cross
16  Blue Shield of Delaware, correct?
17  A. Correct.
18  Q. And continued to report directly to you,
19  correct?
20  A. I've already testified to that fact, yes.
21  Q. And as I understand it you had no grudge
22  against Edith Choma for what had happened around the
23  1999 performance evaluation, you already testified to
24  that, correct?

B0148

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

138

1    A.  Correct.
2    Q.  And you don't know whether or not she had a
3    grudge against you after that, is that fair to say?
4    A.  I have no idea.
5    Q.  She didn't say anything to you that would
6    indicate she had a grudge, did she?
7    A.  No.
8    Q.  But yet after the 1999 performance evaluation
9    although there was some improvement as I understand
10   from you she still had some deficiencies in her
11   performance, correct?
12   A.  Correct.  Actually, if I can clarify that
13   answer?  There was an improvement in her effort to try
14   and improve.
15   Q.  That's fair.  As I understand it she was trying
16   harder, although not necessarily performing better, is
17   that fair to say?
18   A.  She was definitely trying harder and we worked
19   on a bar she was trying to reach and we would have to
20   look at her subsequent performance reviews to see if
21   she reached all of those goals.
22   Q.  With respect to her effort were there any
23   particular tasks that she was trying harder with?
24   A.  I would have to look at her performance

139

1    reviews, I'm sure it's documented in there.
2         (Kaplan Deposition Exhibit No. 4 was marked
3    for identification.)
4    BY MR. MONDROS:
5    Q.  I would like to show you something that is
6    marked as Kaplan-4 and ask you if you recognize that.
7    That's the only copy I have.  Have you ever seen that
8    before?
9    A.  I have no idea.
10   Q.  Do you have an understanding of what that
11   document represents?
12   A.  Well, it's an E-mail.
13   Q.  Who is the author of the E-mail?
14   A.  Edith Choma.
15   Q.  Who is the recipient of the E-mail?
16   A.  Paul Kaplan.
17   Q.  And that would be you?
18   A.  I assume as much.
19   Q.  You don't have any independent recollection of
20   receiving that E-mail?
21   A.  No, I don't, and I don't believe that we as
22   part of everything to do with this lawsuit had given
23   any E-mails.  So, to me this is like stolen property.
24   Q.  Do you have any reason to believe that this

140

1    E-mail is not authentic?
2    A.  I've got no reason to know one way or the
3    other.  I have to assume it's authentic.
4    Q.  In reviewing what has been marked as Kaplan-4
5    do you recall the issue being discussed by Ms. Choma
6    with you and your response to her?
7    A.  No.
8    Q.  Does the exchange that is reflected on Kaplan-4
9    reflect the overall tone of the communications between
10   you and Ms. Choma as of that time?
11         MR. HOLT:  I'll make an objection.  You can
12   answer.
13   A.  Different people have different E-mail styles.
14   When someone asks me a question, I'll give them a
15   quick answer.  If you are asking me whether or not my
16   sentences were all as short, words weren't
17   capitalized, there were spelling mistakes, I'm sure
18   those things constantly happen, but, I typically
19   respond to all people with short brief E-mails if I
20   can.
21   Q.  At that point in time were you the chief
22   medical officer or were you still the associate
23   medical director?
24   A.  I have no idea.  I would have to go back and

141

1    look at Blue Cross records to be sure.  I don't
2    remember the exact dates of promotions.
3         (Kaplan Deposition Exhibit No. 2 was marked
4    for identification.)
5    BY MR. MONDROS:
6    Q.  Let me show you a different document and we'll
7    call it Kaplan-2.  Have you had an opportunity to
8    review what has been marked as Kaplan-2?
9    A.  I have.
10   Q.  Have you ever seen that document before?
11   A.  Yes, I have.
12   Q.  The title of the document is "Meeting with
13   Edith Choma March 3, 2000."  Do you have an
14   understanding as to who the author of this document
15   is?
16   A.  That was me.
17   Q.  So, did you, in fact, have a meeting with Edith
18   Choma on March 3, 2000?
19   A.  It was documented date of March 3rd.  Whether
20   we actually met to discuss it on that date I don't
21   know.
22   Q.  On or around that date is it fair to say?
23   A.  I would have to look at my calendar and try to
24   find out the exact date.

36 (Pages 138 to 141)

B0149

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

142

1    Q.  And do you recall what the subject of that
2    meeting that you had was?
3    A.  It was -- the memo implies that the issue was
4    two-fold.  Number one, her ability to keep up with the
5    work that was being required of her and second was a
6    feeling that she felt threatened by the fact that we
7    had temporary assistants telling her what to do or
8    assigning work to her.
9    Q.  Aside from this document, Kaplan-2, do you have
10   any independent recollection of your meeting with
11   Edith Choma?
12   A.  Some, yes.
13   Q.  And do you have an understanding -- do you
14   recall where the meeting occurred?
15   A.  I'm sure it occurred in the Health Care Center
16   at Brandywine.
17   Q.  In your office there?
18   A.  Again, I'm making that assumption.  I can't
19   tell you as fact.
20   Q.  Aside from you and Ms. Choma anybody else
21   participate or attend that meeting?
22   A.  Not that I recall, but I might be blurring two
23   meetings.  There was another meeting with Edith where
24   Jane Israel was present.  So, it might have been this

143

1    one.
2    Q.  As I read this E-mail its purpose is to point
3    out certain areas in which you still believe that
4    Edith Choma was not performing as well as she should
5    be performing, is that fair to say?
6    A.  That's correct.
7    Q.  And does this memo reflect some of the
8    frustration that you testified to earlier about Edith
9    Choma's performance?
10   A.  This memo reflects the fact that she wasn't
11   performing all her job duties.
12   Q.  The fact that that was your perception,
13   correct?
14   A.  As her boss that's correct.
15   Q.  Do you recall what the issue was with the
16   temporary worker, what happened between Edith and a
17   temporary worker?
18   A.  My recollection is that the temporary worker
19   had been given work assignments.  This temporary
20   worker went and told Edith to do part of it or some
21   part thereof and Edith did not like the fact that
22   someone who was a temporary worker was telling her
23   what work needed to be done.
24   Q.  And did Edith complain to you about that?

144

1    A.  As I recall she went to Jane Israel, she didn't
2    come directly to me, and Jane came to me and told me
3    about it.
4    Q.  What did Jane tell you specifically?
5    A.  I can't give you the exact words if you are
6    trying to get specifically to mean the exact words
7    Jane Israel used, but it was along the lines that
8    Edith had come to her unhappy that a temporary worker
9    was giving her work assignments and that wasn't the
10   role of a temp. and this was extremely disruptive to
11   us with an NCQA survey coming up in the very near
12   future.
13   Q.  Edith shouldn't be bringing these type of
14   issuess to you?
15   A.  We work as a team and if someone is not going
16   to like the fact that a team member is assigning work
17   to another team member, that's a waste of time.
18   Q.  Is that fair to say that's how you viewed this
19   exercise in writing this memo and writing to Edith as
20   a waste of time?
21        MR. HOLT:  Objection to form.
22   A.  The writing of the memory was not a waste of
23   time.  The writing of the memo was instructive to
24   Edith she needed to become a team player.

145

1    Q.  Down the last bullet point on there it says,
2    "It is extremely disruptive for me to have to stop
3    what I'm doing and deal with petty issues such as your
4    feeling threatened by another employee asking you to
5    complete work."  Do you see that?
6    A.  I do.
7    Q.  Is that a fair statement of how you felt at the
8    time you wrote this?
9    A.  You are going to have to clarify, what emotion
10   are you asking me about?
11   Q.  Did you believe it was extremely disruptive for
12   Edith to bring this issue up at this point in time?
13   A.  Yes.
14   Q.  You are were a pretty busy guy, right?
15   A.  Yes.
16   Q.  And you didn't want Edith to bring these issues
17   to your attention anymore, is that fair to say?
18   A.  The board of directors at Blue Cross had given
19   me a mandate to pass NCQA and get an excellent
20   accreditation level and we were just a few months out
21   at this point from having the survey and to complain
22   that someone else had come and assigned work to you
23   just seemed to be something disruptive when there were
24   much more important things that had to be done.

B0150

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

146

1    Q.  As of the time of writing this memo on or about
2    March 3rd, 2000 was it your view you would like to get
3    rid of Edith Choma?
4    A.  Anyone who doesn't perform all their job
5    functions needs to either improve or leave.  Edith was
6    trying to improve.  I was very pleased she was trying
7    hard to improve.
8    Q.  But as of the date of this writing would you
9    have liked to have gotten rid of Edith Choma as your
10   secretary or your administrative assistant in the
11   medical management department?
12   A.  At no time did I specifically look for excuses
13   to want to get rid of Edith Choma.
14   Q.  Did you want to get rid of Edith Choma as Tim
15   Toole said in his sworn testimony that you stated to
16   he and other people in medical management?
17   A.  I was frustrated with her inability to actually
18   perform her work.
19   Q.  Did you ever discuss with Edith what the
20   interaction was between her and the temporary
21   employee?
22   A.  That much I cannot recall.  I don't know.
23       (Kaplan Deposition Exhibit No. 3 was marked
24   for identification.)

147

1    BY MR. MONDROS:
2    Q.  I would like to show you what is marked as
3    Kaplan Exhibit 3.  Sorry, only copy.  Take a moment
4    and look that over, please.
5    A.  (Witness complies.)
6    Q.  Have you had an opportunity to review what has
7    been marked as Kaplan-3?
8    A.  Yes.
9    Q.  And what is that document?
10   A.  It's a performance appraisal.
11   Q.  Whose performance was being apprised?
12   A.  Edith Choma.
13   Q.  And who was doing the appraising?
14   A.  I was.
15   Q.  Is that your signature on the last page?
16   A.  Yes, it is.
17   Q.  And is there a date?
18   A.  5/23/2000.
19   Q.  Is that Edith Choma's 2000 performance
20   evaluation?
21   A.  Yes.
22   Q.  In looking at that document does that refresh
23   your recollection as to the specific issues in which
24   you viewed Edith Choma in needing improvement in her

148

1    performance?
2    A.  It helps to remind me, yes.
3    Q.  Having reviewed that document what are those
4    specific areas?
5    A.  Well, she was still slow with completing
6    assignments in a timely manner.  I tried to be as
7    polite as I could in the way I assessed her.  She was
8    still making mistakes with her transcription.  And
9    even though not said in here she was creating files
10   for me to file information, but she was relying on me
11   to get organized as opposed to her just keeping me
12   organized.
13   Q.  Anything else that you can recall?
14   A.  No.
15   Q.  The last issue that you mentioned, creating
16   files, but relying on you to organize the files, are
17   you referring to computer files or hard paper files?
18   A.  Hard paper files.
19   Q.  And you said that's not reflected in the 2000
20   performance evaluation, any particular reason why you
21   didn't put that in there?
22   A.  Partly there was no doubt that Edith was
23   putting out great effort to try and improve and partly
24   I wasn't prepared to have a repeat of the previous

149

1    year's difficulties with the perform eval with her.
2    So, I sugarcoated the bad, openly admitted where
3    things were improved and gave her a performance
4    evaluation.
5    Q.  Did you make any other changes in order to
6    sugarcoat the performance evaluation from what you
7    thought should be written?
8    A.  Not that I can recall.
9    Q.  When you said just a moment ago that Edith was
10   still making mistakes with transcription, is that the
11   voice transcription where you would record tapes and
12   she would type them up for you?
13   A.  I'm assuming as much.
14   Q.  And you were continuing to give Edith
15   transcription even though you knew she was not doing a
16   good job with that?
17   A.  Her bad job was still more time efficient for
18   me than me doing it all myself.  We had no one else
19   that could do it.  It was part of her job description.
20   She just wasn't doing her job correctly.
21   Q.  Was it your understanding she was not doing her
22   transcription job correctly because of her hearing
23   impairment?
24   A.  She told me as much.  We offered to make

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

150

1  accommodations and she said there was nothing that
2  Blue Cross could do to help her. It was still part of
3  her job, though.
4      Q. What sort of accommodations did you offer to
5  make?
6      A. I made it an open-ended question to her
7  offering her whatever she needed. The assumption was
8  by having headphones on your head you are blocking out
9  extraneous noise which would make it easier. She had
10 as much time as she needed to do transcription and it
11 was up to her to come and tell us that she needed
12 accommodations. We made the offer, she told us there
13 was nothing she needed.
14     Q. So, there were no specific recommendations you
15 made, you just said is there something we can do to
16 make it better for you?
17     A. It wasn't my job to give a specific
18 recommendation. It was her job to ask after I had
19 offered.
20     Q. Was it your testimony a moment ago that Edith
21 had as much time as she needed to do the
22 transcription?
23     A. That was a poor choice of words and I need to
24 rephrase that. She obviously could stop a tape,

151

1  listen and then carry on. Obviously, with everything
2  we were doing we were extremely busy. She needed to
3  complete her projects in a timely manner and that was
4  an area of weakness for her. So, that was a poor
5  choice of my words and I apologize. However, she was
6  able as opposed to a conversation that carries on and
7  you have no opportunities to go back with a
8  transcription you can stop the tape and re-listen.
9      Q. The other deficiency that you noted in this
10 performance appraisal that is Exhibit 3 was that Edith
11 continued to be slow at completing her assignments?
12     A. That's correct.
13     Q. Did you have a private meeting with Edith to
14 discuss the 2000 performance evaluation with her?
15     A. I have private meetings with each staff member
16 to discuss performance evaluations.
17     Q. Did you have a private meeting with Edith to
18 discuss this performance evaluation?
19     A. Yes.
20     Q. In your office?
21     A. Yes.
22     Q. Anybody else present?
23     A. No.
24     Q. Subsequent to the 2000 performance evaluation

152

1  that we just discussed as Kaplan-3 did Edith Choma
2  continue to report directly to you?
3      A. Yes, I forget the exact date that that
4  reporting structure changed. I believe it was two
5  years later.
6      Q. And did she continue to perform work for you?
7      A. Yes.
8      Q. And did she continue to perform work for other
9  people in the medical management department?
10     A. Yes.
11     Q. And did you continue to find that she was
12 completing her assignments too slowly for you?
13     A. That was always a concern, yes.
14     Q. Always, even after the 2000 performance
15 evaluation?
16     A. Correct. Again, she put forth great effort to
17 do her best to improve, but it never reached the level
18 that I would have expected in terms of efficiency.
19     Q. And did you continue to give her dictation
20 after the 2000 performance evaluation?
21     A. Yes.
22     Q. And did she continue to struggle with that as
23 she had in the past?
24         MR. HOLT: Objection to the form of the

153

1  question. You can answer.
2  BY MR. MONDROS:
3      Q. In your view.
4      A. I have no idea if she struggled or not. I can
5  tell you that the dictation came back incomplete or
6  with errors.
7      Q. Did you discuss Edith Choma's performance with
8  anyone else in the medical management department?
9      A. Yes.
10     Q. With whom?
11     A. Probably Jane Israel, who was the other primary
12 person providing work to her.
13     Q. And what did you discuss about Edith Choma's
14 performance?
15     A. I would not discuss her performance as much as
16 ask for feedback so I could be sure to include it in
17 the performance evaluations.
18     Q. What was Jane Israel's view when you had those
19 discussions with her?
20     A. You would have to ask Jane for her exact
21 impression.
22     Q. But let me ask it this way. What did Jane
23 Israel tell you about her views of Edith Choma's
24 performance?

39 (Pages 150 to 153)

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

154

1    A.  She expressed the same concerns about Edith
2    being slow, slightly disorganized for some tasks, not
3    others, and, again, the transcription issue.
4    Q.  Did you discuss Edith Choma's performance with
5    anyone else for whom Edith Choma did work?
6    A.  No.
7    Q.  Dr. Castiglioni?
8    A.  Not as I recall, no.
9    Q.  Tim Toole?
10   A.  No.
11   Q.  Dave Martin?
12   A.  No.
13   Q.  Yvonne Locker?
14   A.  No.
15   Q.  Were you interested in the views of others and
16   how they were being satisified by Edith Choma?
17   A.  Within reason, yes, but you cannot go and ask
18   every single person to do a performance appraisal on
19   one person.  I would typically go to the key people
20   that I thought could provide input.
21   Q.  With respect to Edith Choma the key person was
22   Jane Israel?
23   A.  Correct.
24   Q.  And no one else?

155

1    A.  Correct.
2    Q.  You don't know if, for example, John
3    Castiglioni was unhappy with Edith Choma's performance
4    back then?
5    A.  I have no idea.
6    Q.  And the same would go with everyone else in the
7    medical management unit, is that fair to say?
8    A.  That's correct.
9    Q.  Except for Jane Israel?
10   A.  Correct.
11   Q.  Who is Joan Macconi?
12   A.  She is the director of the statistics area.
13   Q.  Is she in medical management?
14   A.  No.
15   Q.  Is she still employed at Blue Cross Blue
16   Shield?
17   A.  Yes.
18        (Kaplan Deposition Exhibit No. 6 was marked
19   for identification.)
20   BY MR. MONDROS:
21   Q.  Let me show you what has been marked as Kaplan
22   Exhibit 6.  Kaplan-6, have you ever seen that document
23   before?
24   A.  I have.

156

1    Q.  And, Doctor, what is it?
2    A.  It's Edith Choma's performance appraisal.
3    Q.  Who did that performance appraisal?
4    A.  I did.
5    Q.  Is that your signature on the back?
6    A.  Yes.
7    Q.  Is there a date there?
8    A.  June 4th, 2001.
9    Q.  Is it fair to say that is Edith Choma's 2001
10   performance evaluation at Blue Cross Blue Shield of
11   Delaware?
12   A.  That's correct.
13   Q.  And does that performance evaluation fairly
14   reflect how you apprised Edith Choma's performance in
15   the previous year?
16   A.  For everything except principal accountability
17   number 1A, yes.
18   Q.  What is principal accountability 1A?
19   A.  "Prioritize and complete assignments from
20   management and staff on a timely basis."
21   Q.  How does that differ from what your true view
22   was?
23   A.  Again, it's not that my true view was
24   necessarily any different, but, again, I used the

157

1    words that she is completing her work as rapidly as
2    possible, which for me is my code of she still has
3    room to improve.  Other than that this is a very fair
4    reflection of how hard she was trying to do
5    everything.
6    Q.  It's fair to say Edith continued to put forth
7    substantial effort to do a good job?
8    A.  Yes, she was trying very hard.
9    Q.  Did you continue to perceive deficiencies in
10   her work?
11   A.  I've already testified I did.
12   Q.  The same ones you perceived in the 2000
13   performance evaluation did they hold true in the 2001
14   evaluation?
15   A.  Clearly if you read both of them some of the
16   areas of concern had resolved, but, again, her speed
17   of doing her work was a concern.
18   Q.  And dictation remained a concern as well?
19   A.  I'm just looking.  Please bear with me.
20   Q.  Sure.
21   A.  She has worked extremely hard on her
22   transcription this year I say, which again implies
23   that there was still problems, but, again, she was
24   working as hard as she could.  Her turnaround time had

40 (Pages 154 to 157)

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

158

1    improved.
2    Q. During 2001 were there any other administrative
3    assistants who were working in the medical management
4    department?
5    A. Yes.
6    Q. Who were they?
7    A. I would have to look at the old chart to know
8    exactly who was where, when. The years blur together.
9    Q. Was Christine Zakutny one of them?
10   A. Yes.
11   Q. What about Pat Carpenter, was she there?
12   A. I have no idea when she joined us.
13   Q. Can you compare Edith Choma's competence at the
14   position of administrative assistant with that of
15   Christine Zakutny?
16   A. Yes.
17   Q. What is your comparison?
18   A. They have different strengths, different skills
19   and we put them into areas where we could utilize
20   their strengths and skills.
21   Q. You put Edith Choma in an area where you could
22   utilize her strength and skills and you put Christine
23   Zakutny in an area where you could utilize her
24   strength and skills?

159

1         MR. HOLT: I'll make an objection to the
2    form of the question, but you can answer.
3    A. You are never going to have a perfect person
4    for a perfect job, but you make tradeoffs knowing that
5    people's imperfections could cause big problems in one
6    area and not such big problems in another. We used
7    that tradeoff process to decide who would be assigned
8    what work.
9    Q. Did you at any time consider having Christine
10   Zakutny do the transcription?
11   A. I don't recall, no.
12   Q. Did you discuss with anyone whether it would be
13   a good idea to try to have Christine Zakutny do the
14   transcription?
15   A. I don't recall having those discussions with
16   anyone, no.
17   Q. Did you ever consider that since Edith Choma
18   had impaired hearing that it might be a good idea to
19   try to use Christine Zakutny with the transcription?
20   A. Chris was busy with other jobs. She had no
21   room on her plate to take on more. Edith was the
22   person directly supporting me. This was a role that
23   required my direct involvement so it was a natural
24   flow for Edith to have the work.

160

1    Q. And Chris as I understand it directly reported
2    to Jane Israel during that period of time, 2000, 2001?
3    A. I would have to look at an old chart.
4         MR. HOLT: I was just going to make an
5    objection to the form of the question, but that's
6    fine.
7    BY MR. MONDROS:
8    Q. Did you discuss with anyone the competence of
9    Christine Zakutny at her job?
10   A. When?
11   Q. 2000, 2001.
12   A. Are you talking about for her performance
13   appraisal?
14   Q. Let's stay with that for purposes of her
15   performance appraisal. At that point in time do you
16   know who was doing her perform appraisal?
17   A. I would have to look at the old chart to see.
18   Q. Did you discuss Christine Zakutny's performance
19   with anyone during 2000, 2001 time period?
20   A. What aspects?
21   Q. Any aspect.
22   A. Every single staff member at some time or
23   another has had something spoken about them when it
24   comes to assigning jobs and assigning duties. So, at

161

1    some point I'm sure I've spoken about Chris Zakutny
2    and her strengths and the way we are going to assign
3    work, but that's no different than any other person as
4    we are designing work flows.
5    Q. A little while ago I believe you testified,
6    correct me if I'm wrong, that you discussed Edith
7    Choma's work performance with Jane Israel with an eye
8    toward getting feedback for you to complete Edith
9    Choma's performance evaluation, is that generally a
10   fair characterization of what you told me?
11   A. Yes.
12   Q. Did you have a similar discussion with anyone
13   about Christine Zakutny's performance?
14   A. I would have to go back and look and see if or
15   when I ever even did a performance appraisal on Chris
16   Zakutny.
17   Q. You don't recall anybody coming to you and
18   saying something in words or substance, I'm about to
19   do Christine Zakutny's performance evaluation, what
20   has been your experience when she has done work for
21   you?
22   A. No.
23   Q. Let's take a look at the complaint. If you
24   could look at Kaplan-5 and turn to page four,

41 (Pages 158 to 161)

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

162

1  paragraph 21. Have you had a chance to look at that?
2  A.  Yes.
3  Q.  Do you recall the medical management department
4  using a new payroll system beginning in or about
5  January 2002?
6  A.  Yes.
7  Q.  And did that new payroll system require that
8  time sheets be turned into a woman named Jean Runyan
9  in payroll?
10  A.  Time sheets had to be turned in and I don't
11  know the specifics of who they were turned into.
12  Q.  The last sentence of that paragraph says, "Dr.
13  Kaplan advised plaintiff that he did not know whether
14  he would have enough time to sign the time sheets and
15  proceeded to yell at plaintiff because he thought the
16  time sheets were stupid work." Do you see that?
17  A.  I do.
18  Q.  Do you recall that?
19  A.  That never occurred.
20  Q.  And was one of your duties as Edith Choma's
21  supervisor to sign time sheets of Edith Choma?
22  A.  Yes, but this instance never happened. The
23  only thing that would even be close was when we had
24  changed our short-term or long-term disability carrier

163

1  and we had been given forms to fill out on someone and
2  I filled out the forms only to be told they were
3  filled out on the wrong piece of paper and the exact
4  same information needed to be re-transcribed onto a
5  different piece of paper. That is stupid work. I
6  know that instance happened.
7  Q.  And you said that it was stupid work?
8  A.  Absolutely.
9  Q.  In that instance?
10  A.  In that instance.
11  Q.  To you know who Theresa Smith is?
12  A.  I do.
13  Q.  Who is she?
14  A.  She works in the medical management area.
15  Q.  Is she still there?
16  A.  Yes.
17  Q.  Paragraph 22 says, "One of the associates,
18  Theresa Smith, overheard that Dr. Kaplan yelling at
19  plaintiff and Theresa Smith went into Dr.
20  Castiglioni's office, the associate director, and
21  asked why does Kaplan treat her that way." Do you
22  have any independent knowledge of that having
23  occurred?
24  A.  No.

164

1  Q.  Do you have a view as to Teresa Smith's
2  reputation for truthfulness?
3  A.  No.
4  Q.  One way or the other you have no view?
5  A.  No view.
6  Q.  Have you ever known her to be untruthful?
7  A.  No.
8  Q.  What about Dr. Castiglioni, do you have a view
9  as to his reputation for truthfulness?
10  A.  I do.
11  Q.  What is that view?
12  A.  I'm going to have to ask for counsel.
13      MR. HOLT:  I can't talk to you during the
14  deposition, Dr. Kaplan, so --
15      MR. MONDROS:  Let me just say I have no
16  problem marking this part of the transcript as
17  confidential or asking my client to excuse herself if
18  that's --
19      MR. HOLT:  Why don't we go ahead and seal
20  this aspect if you are going to ask him questions
21  about Dr. Castiglioni.
22      MR. MONDROS:  That's fair and we'll mark it
23  on the transcript when we file it and publish it, we
24  just won't publish that part.

165

1      MR. MONDROS:  What was the question again?
2      (The pending question was read back by the
3  court reporter.)
4  A.  He was let go for sexual harassment and he
5  always denied it, but we believe we have proof that it
6  actually occurred.
7  Q.  Was there a claim or a lawsuit filed in
8  connection with that?
9  A.  Not that I know.
10  Q.  Based upon that experience you formed a view as
11  to Dr. Castiglioni's reputation for truthfulness?
12  A.  That's correct.
13  Q.  And as I understand your testimony in your view
14  Dr. Castiglioni at least on one occasion or possibly
15  more has not been truthful, is that fair to say?
16  A.  On one occasion we felt that he was not being
17  truthful, correct.
18  Q.  When you say "we," it's you and who else?
19  A.  I'm talking for Blue Cross Blue Shield as a
20  corporation.
21  Q.  What is Dr. Castiglioni doing now?
22  A.  I don't know.
23  Q.  When is the last time you spoke with him?
24  A.  The day I terminated him.

42 (Pages 162 to 165)

B0155

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

166

1    Q. And when was that?
2    A. I would have to look back at the files. I
3    think it was 2002.
4    Q. Did Blue Cross Blue Shield ever run financial
5    planning seminars for its employees?
6    A. Yes.
7    Q. And do you recall an instance where Edith Choma
8    wanted to attend one of those seminars, but you did
9    not permit her to do that?
10   A. I remember two instances, one where she came to
11   me for advice wondering whether she should retire or
12   not and I encouraged her to go see a financial advisor
13   and gave her the name of my financial advisor. I also
14   remember an instance where there were people on-site
15   at Blue Cross and she had asked to go and participate
16   in that seminar.
17   Q. She asked you if you she could participate in
18   that seminar?
19   A. Correct.
20   Q. What did you tell her?
21   A. I told her we would have to see how backed up
22   we were with paperwork, letters that had to be done on
23   a timeline, before I could give an answer and she
24   asked me probably four days out from the date of the

167

1    event.
2    Q. And was Ms. Choma ultimately permitted to
3    attend that seminar?
4    A. She never came back to me to ask or give me an
5    update on her work status. So, I didn't get an
6    opportunity to say yes or no.
7    Q. Is it fair to say you discouraged her from
8    attending that seminar?
9    A. No. It's fair to say I told her if the work
10   was up-to-date or reasonably under control, we would
11   discuss it.
12   Q. If you would take a look at paragraph 23 of the
13   complaint on the bottom of page four. The last
14   sentence of that paragraph states, "Plaintiff pointed
15   out to Dr. Kaplan that her work had been completed,
16   however, Dr. Kaplan would still not allow her to
17   attend the training." Do you see that?
18   A. I do.
19   Q. Do you dispute that allegation?
20   A. I do.
21   Q. It's your position that Edith never came back
22   to you with an update as to the status of work that
23   needed to be completed?
24   A. As best I can recall that part never happened.

168

1    I know she has stolen a lot of E-mails from the
2    company and if she has an E-mail, I'm happy to look at
3    it.
4    Q. That's the second time you raised that, you say
5    that Edith Choma has stolen E-mails from the company?
6    A. The E-mail system is an internal process and
7    the staff are not allowed to take E-mails off the
8    site. As part of the discovery you were fully
9    entitled to ask and we would have produced anything we
10   could, but she took stuff off-site without permission.
11   That's theft.
12   Q. And have you discussed this alleged theft with
13   anyone at Blue Cross Blue Shield?
14   A. No.
15   Q. Is that your independent viewpoint or is that
16   something that you have discussed with anybody outside
17   of Blue Cross Blue Shield?
18   A. It's my independent viewpoint after seeing some
19   of these E-mails.
20   Q. Have you filed any complaints with anybody, a
21   police agency or anything like that?
22   A. I'm just seeing it today.
23   Q. Through 2001, after the 2001 evaluation that
24   you did of Edith Choma, did you continue to be

169

1    frustrated with her performance?
2    A. I have no recollection of being frustrated or
3    not.
4    Q. Did you continue to feel from time to time that
5    you would like to get rid of Edith Choma because of
6    her performance?
7    A. I have no recollection of that either.
8    Q. Prior to 2001 you did have that feeling,
9    correct?
10   A. We were working under intense pressure to pass
11   through the first NCQA survey. Clearly that was when
12   she was having difficulty keeping up with the volume
13   of work, the new process of doing medical management.
14   As you can see from her performance reviews she was
15   working hard to improve. I have no recollection of a
16   sense of frustration or lack thereof.
17   Q. What is the NCQA survey?
18   A. National Committee For Quality Assurance.
19   Q. And is that a rather important survey for Blue
20   Cross Blue Shield?
21   A. It is.
22   Q. And what is it and why is it so important?
23   A. It's essentially the Good Housekeeping seal of
24   approval that managed health care plans will get which

43 (Pages 166 to 169)

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

---

170

1    demonstrates that they have a good process to be fair
2    to members and doctors.
3        Q.   And when was that scheduled to occur?
4        A.   I believe it was the first survey was 2000.
5        Q.   And when was the second survey?
6        A.   Three years later, so 2003.
7        Q.   How is that survey conducted?
8        A.   People come on-site, review our policies, our
9    procedures, minutes of meetings, copies of
10   correspondence we have sent to doctors and members,
11   interviews with various staff members.
12       Q.   Is there a period of preparation at Blue Cross
13   Blue Shield in anticipation of the survey?
14       A.   Yes.
15       Q.   And what is that preparation involving?
16       A.   Understanding the standards which are the rules
17   that they're going to judge you by, collecting all the
18   appropriate paperwork, which confirms that you adhere
19   to their standards, putting it in a presentable
20   fashion and then having the actual survey.
21       Q.   In connection with that survey are you
22   interviewed by anybody from the NCQA?
23       A.   Yes.
24       Q.   And you were interviewed in 2000 for the first

---

171

1    survey?
2        A.   Correct.
3        Q.   And you were interviewed in 2003 for the second
4    survey?
5        A.   Correct.
6        Q.   Has there been a subsequent survey since then?
7        A.   Yes.
8        Q.   And that would be the third survey?
9        A.   Yes.
10       Q.   When did that occur?
11       A.   It would have been 2006.
12       Q.   Is it fair to say the fourth survey will be in
13   2009?
14       A.   Correct.
15       Q.   How did Blue Cross Blue Shield of Delaware fare
16   on the 2000 survey?
17       A.   We passed.
18       Q.   And are there levels of passing, different
19   grades that an insurance company gets or you get the
20   seal of approval or you don't?
21       A.   There are levels.
22       Q.   What is the system?  Is it A, B, C, D, E, F, G?
23       A.   We received the highest level which is called
24   excellent accreditation.

---

172

1        Q.   In 2000 you received the highest level?
2        A.   Correct.
3        Q.   How about in 2003?
4        A.   Same thing.
5        Q.   And I assume that you aspire to the same thing
6    for 2006, is that correct?
7        A.   We have had that survey.
8        Q.   And how did you do?
9        A.   We scored the same.
10       Q.   And when Blue Cross Blue Shield of Delaware
11   scores excellent on the NCQA survey, is it fair to say
12   that that reflects positively on your work
13   performance?
14       A.   Myself, plus the rest of the company.
15       Q.   Everybody in the medical management division it
16   reflects well upon, correct?
17       A.   Not only medical management, all the
18   departments of the company.
19       Q.   And does that also reflect well on Edith Choma?
20       A.   Anyone who is part of the medical management
21   team that works for me would be basking in the glory
22   of a job well done.  Different people perform
23   differently in terms of how well they did their piece
24   to achieve that excellent accreditation and as we have

---

173

1    been through Edith's performance reviews she had some
2    deficiencies.
3        Q.   The excellent grade that Blue Cross Blue Shield
4    obtained on the NCQA survey did that impact your
5    compensation in any way?
6        A.   Yes.
7        Q.   And how?
8        A.   First year I was given a bonus for obtaining
9    that.
10       Q.   What size bonus?
11       A.   I forget the details.  I think $10,000.00.
12       Q.   What about the 2003 NCQA?
13       A.   No.
14       Q.   2006?
15       A.   No.
16       Q.   Did there come a time when Blue Cross Blue
17   Shield demoted Edith Choma?
18       A.   No.
19       Q.   Did there come a time when Blue Cross Blue
20   Shield reassigned Edith Choma?
21       A.   Yes.
22       Q.   And what was the reason for reassigning Edith
23   Choma?
24       A.   I wanted to make the most of her strengths and

---

44 (Pages 170 to 173)

**B0157**

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

174

1    Pat Carpenter's strengths and put them in the part of
2    the medical management area where I felt they could
3    best support the department.
4        Q.  And when did that occur?
5        A.  I would have to look at my notes.  I don't have
6    an exact date.
7        Q.  Sometime after Pat Carpenter came on board?
8        A.  Yes.
9        Q.  Is Pat Carpenter older or younger than Edith
10   Choma?
11       A.  I have no idea.
12       Q.  That was your decision to reassign Edith Choma?
13       A.  Yes.
14       Q.  Is it fair to say you reassigned her to work
15   for Deborah Sweeney?
16       A.  Correct.
17       Q.  Deborah Sweeney became -- Edith became -- Edith
18   reported directly to Deborah Sweeney?
19       A.  Correct.  Can I just interrupt?  You asked me a
20   few questions ago do I know how old Pat Carpenter is?
21   One of these documents listed her age.  I know now her
22   age.  I never have asked.
23       Q.  Are you referring to Pat Carpenter or Edith
24   Choma?

175

1        A.  Excuse me, Pat Carpenter's age is listed in one
2    of these documents you gave me.
3            MR. HOLT:  Is that the complaint you were
4    looking at that had her age?
5            THE WITNESS:  It might have been the
6    complaint or might have been Tim Toole's testimony.  I
7    am not sure which.  I can find it for you if you want.
8            MR. MONDROS:  I don't need it.
9    BY MR. MONDROS:
10       Q.  My question actually a few questions before is
11   who was older, Pat Carpenter or Edith Choma?  Does the
12   information that you saw in these papers, does that
13   bear on the answer to that question?
14       A.  Now I'm not sure I'm understanding you.
15       Q.  Let me reask the question.  Do you have an
16   understanding as to whether Pat Carpenter is older or
17   younger than Edith Choma?
18       A.  Now I do.  I didn't up until a few hours ago.
19       Q.  What is your understanding?
20       A.  Now my understanding is that Pat Carpenter is
21   younger than Edith Choma.
22       Q.  And until you saw that paper here in this room
23   you didn't know that?
24       A.  I never asked.

176

1        Q.  Did you make any assumptions as to who was
2    older or younger?
3        A.  I don't make assumptions based on what people
4    look like, how long they have been with the company.
5        Q.  And how old did you learn that Pat Carpenter
6    is?
7        A.  According to something I just saw and I can
8    find the exact source at the time this document was
9    created, whenever that was, it said she was 49.  Then
10   we go, I just found it.  It's the complaint of Edith
11   Choma versus BCBSD, page five, line 25, whatever you
12   would call the numbers on the left and says at this
13   time Patricia Carpenter, age 49.
14       Q.  From that you assume that Pat Carpenter is
15   younger than Edith Choma?
16       A.  Well, in the statement just above that it says,
17   "On or about July 26, '02 during the reorganization
18   plaintiff, age 63."  So, just doing the math.
19       Q.  Sixty-three is a bigger number than 49?
20       A.  Yes.
21       Q.  You decided to reassign Edith Choma over to
22   work for Deborah Sweeney and have Pat Carpenter
23   directly report to you, is that fair to say?
24       A.  That's correct.

177

1        Q.  Who had Pat Carpenter been directly reporting
2    to prior to that time?
3        A.  She was in the QI area with Jane Israel.
4        Q.  Did Deborah Sweeney take over Jane Israel's
5    position?
6        A.  That's correct.
7        Q.  And so when that happened you decided that Pat
8    Carpenter would work for you and Edith Choma would go
9    to work for Deborah Sweeney?
10       A.  We were exactly a year away from our next NCQA
11   survey and it made sense to take someone with a good
12   institutional history of all our committees, all our
13   meetings, where all the binders were, what the general
14   sense was of what had happened in the reorganization
15   and have them support Deb Sweeney who was new so that
16   she could get up to speed as fast as possible.  At the
17   same time Pat Carpenter was more efficient, more
18   organized, I felt did a better job as a general ad min
19   assistant and so it made logical sense to me to switch
20   the roles.
21       Q.  Had you discussed Pat Carpenter's job
22   performance with anyone prior to making that decision?
23       A.  No.
24       Q.  So, how is it that you determined that Pat

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

178

1 Carpenter was more efficient, more competent than
2 Edith Choma?
3   A.  She had a history of working within the
4 organization for one of the executive vice-presidents
5 who is extremely organized.  Always had a neat desk,
6 knew exactly where everything was in his office.  So,
7 I had seen firsthand her work from my interaction with
8 that EVP.  I had seen her working in the brief time
9 she was in the medical management area and I had a
10 sense of her reputation.
11   Q.  That was Jerry Icenogle who Pat Carpenter used
12 to work with, is that correct?
13   A.  That's correct.
14   Q.  Did you ever discuss Pat Carpenter's
15 performance with Jerry Icenogle?
16   A.  No.
17   Q.  It's also your testimony that you felt that
18 Edith Choma with the experience that she had would be
19 better suited to helping Deborah Sweeney, is that
20 correct?
21   A.  She had an institutional memory, that's
22 correct.
23   Q.  When you say "institutional memory," what are
24 you referring to?

179

1   A.  She knew what the various committees were, what
2 they were tasked to do, who the people were that
3 typically served on those committees, where the
4 minutes were.  She had transcribed a lot of the
5 minutes.
6   Q.  Anything else?
7   A.  Not right now.
8   Q.  Did you consider at any time while Jane Israel
9 was still working at Blue Cross Blue Shield having Pat
10 Carpenter come work for you and having Edith Choma go
11 work for Jane Israel?
12   A.  I don't recall the time sequence, I'm sorry.  I
13 mean, we are talking about something that is five, six
14 years ago.
15   Q.  Did you ever discuss with Jane Israel the
16 possibility that maybe you and she could switch
17 administrative assistants?
18   A.  No.
19   Q.  Did you discuss with Deborah Sweeney when she
20 came on board at Blue Cross Blue Shield of Delaware
21 that you were going to reassign Edith Choma to her and
22 have her predecessor, Jane Israel's secretary, work
23 for you?
24   A.  Yes, I did.

180

1   Q.  What did you tell Deborah Sweeney?
2   A.  That I was reassigning Edith for all the
3 reasons I've just mentioned and that I was taking Pat
4 for all the reasons I just mentioned.
5   Q.  Anything else?
6   A.  No.
7   Q.  Did you tell Deborah Sweeney that you were
8 frustrated with Edith because she was slow in
9 completing assignments?
10   A.  No, not that I recall.
11   Q.  Did you tell Deborah Sweeney that you were
12 frustrated with Edith Choma because she didn't do a
13 very good job in taking dictation?
14   A.  No, not that I recall.
15   Q.  It was true that you were frustrated with Edith
16 because she was slow, correct?
17       MR. HOLT:  Objection to form.
18   A.  I've already answered that I was frustrated,
19 that I don't have any recollection of specifically
20 talking with Deb Sweeney about that.
21   Q.  And you were frustrated with her not only
22 because she was slow, but because of her problems
23 taking dictation, correct?
24   A.  I've testified to the fact that I didn't feel

181

1 she was doing her job correctly because she was unable
2 to do the dictation, yes.
3   Q.  But you didn't tell any of that to Deb Sweeney?
4   A.  I have no recollection of saying that at all.
5   Q.  Did you tell Deb Sweeney that you were unhappy
6 with Edith Choma in any way?
7   A.  No.
8   Q.  Did you discuss with Deborah Sweeney the
9 circumstances that had transpired back in 1999 when
10 you gave Edith Choma her first performance evaluation?
11   A.  No.
12   Q.  Any particular reason why you didn't discuss
13 these things with Deborah Sweeney?
14   A.  I just don't think that it's always appropriate
15 to be discussing other people in a way that is unfair.
16 I like people to form their own opinions.
17   Q.  You didn't think it might be helpful to Deborah
18 Sweeney to help train Edith Choma to work for her if
19 she knew about these issues?
20   A.  No, because Debbie was astute enough she would
21 discover any deficiencies and deal with them in her
22 own way at her own time.
23   Q.  Did you discuss with Deborah Sweeney the fact
24 that Edith Choma had a hearing impairment?

46 (Pages 178 to 181)

B0159

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

182

1    A.  No.
2    Q.  In your view did Edith Choma's hearing
3    impairment contribute to her problem getting the work
4    done that you have described?
5    A.  I don't know.  You would have to ask Edith.
6    Q.  I'm asking in your view, though.  We have had
7    testimony that in your view your issues with memory
8    haven't impaired your function at work, is that fair
9    to say?
10        MR. HOLT:  Objection to form.
11   A.  I've already answered all this.
12   Q.  So, is that correct?
13   A.  We can go back and find my exact answer at the
14   beginning of my testimony and I'll have you read it
15   back in.
16   Q.  It's my recollection of that testimony that you
17   testified that in your view your memory issues didn't
18   give you any problems completing your work at Blue
19   Cross Blue Shield of Delaware, is that fair to say?
20   A.  Again, we'll find the exact words I used.  If
21   you would like to have consistency I can do that for
22   you.
23   Q.  Is that a fair statement of what you said?  If
24   it's not, tell me.

183

1        MR. HOLT:  Same objection, it's asked and
2    answered, but you can answer it.
3    A.  Let's go back to the original testimony.
4    Q.  Let me ask you a different question.  In your
5    view did Edith Choma's hearing impairment interfere
6    with her ability to do her work?
7    A.  Edith told me that she was unable to do her
8    work because she couldn't hear properly.  So, my
9    opinion is not as relevant as the fact that she told
10   me that it happened.  I offered to give her any
11   reasonable accommodation she needed and she told me
12   she didn't need any.
13   Q.  When did Edith tell you that her hearing
14   impairment prohibited her from doing her work?
15   A.  As I testified earlier, I cannot remember an
16   exact date.
17   Q.  On many occasions?
18   A.  I can think of one and it's the one where I
19   offered her an accommodation or assistance and she
20   said there was nothing that Blue Cross could do to
21   help her.
22   Q.  So, and that was with respect to the hearing
23   impairment, correct -- I'm sorry, that was with
24   respect to the dictation, correct?

184

1    A.  What was with respect --
2    Q.  The conversation that you had with Edith about
3    her telling you that her hearing impairment prevented
4    her from doing her work, that was with respect to her
5    doing dictation, correct?
6    A.  Yes.
7    Q.  And it's your testimony that you offered to --
8    well, strike that.
9        THE WITNESS:  Can we take a break?
10       MR. MONDROS:  Sure.
11       (Brief recess.)
12   BY MR. MONDROS:
13   Q.  My understanding from your earlier testimony,
14   and correct me if I'm wrong, is that you don't recall
15   when you became aware of Edith's hearing impairment,
16   is that fair to say?
17   A.  In terms of an exact date, yes, correct.
18       (Kaplan Deposition Exhibit No. 7 was marked
19   for identification.)
20   BY MR. MONDROS:
21   Q.  Let me show you Exhibit 7.  My question will be
22   have you ever seen that document before?
23   A.  It clearly looks like it came off the Blue
24   Cross E-mail system again and I wonder how Edith had

185

1    it without it being given to you in discovery.
2    Q.  But that doesn't answer my question.  Let me
3    ask a new question and we'll get back to the old
4    question.  Is that a stolen E-mail in your view?
5    A.  Again, Blue Cross associates are told that
6    anything on our E-mail system belongs to the company
7    and not to them and if Edith provided this to you,
8    that means she walked out of the company with
9    something that didn't belong to her.
10   Q.  In your view is that a stolen E-mail?
11   A.  By definition if you take something that
12   doesn't belong to you that's a theft.
13   Q.  So, in your view that's a stolen E-mail?
14   A.  Correct.
15   Q.  Have you ever seen this document before?
16   A.  I'm sure I have is as it is addressed to me.
17   Q.  What is it?
18   A.  It's an E-mail.
19   Q.  Who is the author of the E-mail?
20   A.  Edith Choma.
21   Q.  Who is the recipient of the E-mail?
22   A.  Paul Kaplan.
23   Q.  And that's you?
24   A.  Yes.

47 (Pages 182 to 185)

B0160

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

186

1    Q.  Is there a date on that?
2    A.  April 21, 1999.
3    Q.  What was your position at Blue Cross Blue
4    Shield of Delaware at that time?
5    A.  I'm assuming at this point in time I was still
6    an associate medical director as opposed to having the
7    title of chief medical officer, but I would have to go
8    back and look at old charts to be sure.
9    Q.  What was Edith Choma communicating to you in
10   that E-mail message?
11   A.  It says she had made an appointment at Johns
12   Hopkins for July 19, 1999 with a Dr. John Niparko.
13   Q.  What was the purpose of that appointment?
14   A.  Says, "I intend to get this taken care of
15   because I don't want this to affect my health or my
16   job performance in any way."
17   Q.  When she says this "taken care of," what is she
18   referring to?
19   A.  You will have to ask her.
20   Q.  As you sit here today you have no idea?
21   A.  I'm assuming she was meaning her either dizzy
22   spells or her hearing, but I don't know which.
23   Q.  Do you have an understanding -- did you suggest
24   that Edith go to Johns Hopkins?

187

1    A.  I can't recall.  So many staff members come and
2    ask me where should they go and what should they do
3    that I can't remember.
4    Q.  Do you know Dr. Niparko?
5    A.  No.
6    Q.  Who is Eileen Brown, do you know Eileen Brown
7    is?
8    A.  She is a case manager at Blue Cross Blue Shield
9    of Delaware.
10   Q.  Is she still there?
11   A.  Yes.
12   Q.  Do you have an understanding as to her
13   reputation for truthfulness?
14   A.  Yes.
15   Q.  And what is your understanding?
16   A.  She is truthful.
17          (Kaplan Deposition Exhibit No. 8 was marked
18   for identification.)
19   BY MR. MONDROS:
20   Q.  Let me show you what I'm about to mark as
21   Kaplan-8.  I'm going to hand it to you and ask you
22   have you ever seen that document before?
23          MR. HOLT:  Herb, just for the record I
24   notice that's not Bates stamped.

188

1          MR. MONDROS:  That's a good point, I'll
2    find out if it has been produced or not.
3          MR. HOLT:  It's in the record now.
4          MR. MONDROS:  It's in the record now and
5    we'll consider it a supplemental production to any and
6    all motions you want to make.  We'll figure it out.
7    BY MR MONDROS:
8    Q.  Have you had a chance to look at that?
9    A.  Yes.
10   Q.  As you might have expected my next question is
11   going to be have you ever seen this document before?
12   A.  No.
13   Q.  A while back when we were asking you about
14   Kaplan-1 and your comments on page D00088 of Kaplan-1.
15   Where your written comments are you requested that
16   Edith provide you with a list of her daily tasks and
17   that she did not provide that to you, it's not your
18   understanding that she gave you Kaplan-8 in response
19   to that request?
20   A.  I have no idea.  There are a few things that
21   are a little odd to me.  I cannot remember when Carol
22   Doohan left the company, but I would think she was no
23   longer there, but I could be wrong about that.  Also,
24   we were using Word when I was at Blue Cross, not

189

1    Amipro, whatever that is.  So, it seems like something
2    that doesn't fit with anything I recall and there seem
3    to be some inconsistencies, I could be wrong.
4    Q.  I'm sorry?
5    A.  I could be wrong.
6    Q.  You don't recall receiving that document at or
7    around the time that you completed Edith's 1999
8    performance review?
9    A.  No, I don't.
10   Q.  Do you have a view as to Edith Choma's
11   reputation for truthfulness?
12   A.  No, I don't.
13   Q.  Have you known her to be untruthful on any
14   occasion?
15   A.  Reading her testimony, yes.
16   Q.  Prior to reading her testimony?
17   A.  The file about age discrimination, again, there
18   were things in there I didn't believe were accurate.
19   Q.  And you had reviewed that complaint?
20   A.  I just did now.
21   Q.  I understand, and the complaint filed in this
22   case?
23   A.  Yes.
24   Q.  I asked you a while ago whether Edith Choma had

48  (Pages 186 to 189)

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

190

1  been demoted while -- after she became -- was
2  reporting to you and you replied she was not demoted,
3  is that correct?
4      A.  That's correct.
5      Q.  But she was reassigned to work for Deb Sweeney,
6  is that correct?
7      A.  Correct.
8      Q.  But in your view that's not a demotion?
9      A.  That's correct.
10     Q.  And you are the medical director, though,
11  correct?
12     A.  Yes.
13     Q.  And Deb Sweeney is the director of quality
14  improvement, is that fair to say?
15     A.  That's correct.
16     Q.  And Deb Sweeney reports to you?
17     A.  That's correct.
18     Q.  So, Edith Choma went from administrative
19  assistant reporting directly to the medical director
20  to administrative assistant reporting directly to the
21  person who reports to the medical director, is that
22  true?
23     A.  That's correct.
24     Q.  But you don't perceive that as a demotion?

191

1      A.  Not at all.
2      Q.  Do you think it's reasonable for Edith Choma to
3  perceive that as a demotion?
4          MR. HOLT:  Objection to the form of the
5  question.
6      A.  I have no idea what Edith does or does not
7  think.  All I can tell you is our board of directors
8  tasked us with maintaining NCQA accreditation, it was
9  the top priority of my department.  She got given the
10  task of supporting the top priority for her
11  department.
12     Q.  And Deb Sweeney had the top priority for your
13  department?
14     A.  She was the one leading that, correct.
15     Q.  And in your view is there a certain prestige
16  that comes with being the administrative assistant to
17  the chief medical officer of the company?
18     A.  I have no idea.  You would have to ask the
19  people who fill that job, not me.  I would perceive
20  more of a prestige of getting the tasks that were
21  perceived as most important in the company done.
22     Q.  Did you intend to demote Edith Choma when you
23  transferred her to work for Deb Sweeney?
24     A.  No.

192

1      Q.  Is it your understanding that Edith Choma
2  supported Deb Sweeney's NCQA functions?
3      A.  Yes.
4      Q.  And what functions specifically did she
5  support?
6      A.  She, again, came with the institutional memory
7  of knowing all the committees, who was on them, when
8  they met, how they met, how to arrange for the various
9  external physicians that would come in for meetings,
10  where our binders were, where our minutes were kept,
11  that type of administrative support for NCQA.
12     Q.  Did Edith Choma support Jane Israel when she
13  was doing the NCQA?
14     A.  I don't recall, but Edith supported me and at
15  the time even though Jane Israel had the title of
16  director of QI, many, but not all of the minutes in
17  the binders were things that I was generating because
18  I was very heavily involved in getting us through the
19  first time.
20     Q.  In this case -- and I'll make a representation
21  to you there has been some testimony about Edith's
22  generation of denial and appeal letters, do you have
23  an understanding what denial and appeal letters are?
24     A.  Yes.

193

1      Q.  What is that?
2      A.  If Blue Cross says we are not going to pay for
3  care that's a denial and we then send a letter to the
4  patient and their doctor notifying them of that fact.
5      Q.  And how about the appeal letters?
6      A.  If a patient or their physician subsequently
7  appealed that decision, we then re-review the case and
8  notify them of the outcome.
9      Q.  Is the generation of denial and appeal letters
10  related to the NCQA process?
11     A.  Yes.
12     Q.  How so?
13     A.  In order to be NCQA compliant we have certain
14  timelines we have to complete for getting a letter out
15  to the patient or doctor and the same for the appeal
16  letters.
17     Q.  Is it fair to say then that the generation of
18  denial and appeal letters is an NCQA function?
19     A.  It's one of the many functions.
20     Q.  Okay.  Did you ever tell anyone that you wish
21  you could get rid of all the administrative staff and
22  hire the people that you wanted?
23     A.  No.
24     Q.  To your knowledge did Edith Choma complain

49 (Pages 190 to 193)

B0162

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

194

1    about being transferred from working for you to
2    working for Deb Sweeney?
3      A.  Yes, she did.
4      Q.  And to whom did she complain?
5      A.  I know she complained to me.  I have no idea if
6    she complained to others as well.
7      Q.  What did she say to you?
8      A.  She wanted a justification.
9      Q.  She came to you when it was announced and said
10   why am I being sent over to Deb Sweeney?
11     A.  Yes.
12     Q.  Did she tell you she thought it was a demotion?
13     A.  I don't recall if she used those words or not.
14     Q.  What did you tell her?
15     A.  I gave her the same reasons I've just
16   enunciated as to why it was important and why it was
17   the most important function within medical management
18   at the time.
19     Q.  Did Edith ask that you reconsider reassigning
20   her to Deb Sweeney?
21     A.  I can't remember the exact words she used, but
22   I know she wanted justification.  I'm sure implicit in
23   that was her request to reconsider.
24     Q.  Did you reconsider?

195

1      A.  I gave it thought, but I was very comfortable
2    that I was making the right decision for the needs of
3    the organization or my part of the organization at the
4    time.
5         (Kaplan Deposition Exhibit No. 9 was marked
6    for identification.)
7    BY MR. MONDROS:
8      Q.  Let me show you what has been marked as Kaplan-
9    9.  Have you ever seen that document before?
10     A.  No.
11     Q.  Do you have an understanding of what that
12   document is?
13     A.  It looks like an E-mail.
14     Q.  And as I read it it looks like two E-mails to
15   me, is that fair to say, an E-mail and a reply or an
16   E-mail and a forward?
17     A.  An E-mail and a response, correct.
18     Q.  And the original E-mail who was that from?
19     A.  Edith Choma.
20     Q.  And who is it to?
21     A.  Says to Donna May.
22     Q.  Donna May is an HR representative?
23     A.  That's correct.
24     Q.  And what is the subject of that?

196

1      A.  Information.
2      Q.  Does that relate to the reassignment to use
3    your word or demotion to use our word of Edith Choma
4    to Deb Sweeney, to work for Deb Sweeney?
5      A.  I have no idea.
6      Q.  And did Donna May reply to that E-mail?
7      A.  Yes, she did.
8      Q.  To whom was the reply sent?
9      A.  To Debbie Sweeney, myself and Susan Slaysman.
10     Q.  What did Donna May say?
11     A.  "Hi Edith, In our previous conversation I
12   stated that we, as an organization, do not provide
13   guarantees of employment to any associate and/or
14   contractor.  However, in speaking with Dr. Kaplan, he
15   has informed me with this change of management he
16   intends to make no changes to your salary or status as
17   an admin assistant.  The only two changes that are
18   taking place are your reporting structure of which
19   will now be to Debbie Sweeney, director of QA, and
20   your location to the QA department."
21     Q.  Do you recall having a conversation with Donna
22   May about the reassignment of Edith Choma?
23     A.  I don't, but, again, in the broad scheme of
24   things where I'm extremely busy trying to keep

197

1    everything moving I'm sure it happened and I just
2    don't have a recollection of it.
3      Q.  And is it correct to say that you did not
4    intend to change Edith Choma's salary when she moved
5    from reporting directly to you to reporting directly
6    to Debbie Sweeney?
7      A.  That's correct.
8      Q.  There was never an intent to change her salary?
9      A.  Not that I'm aware of.
10     Q.  After Edith Choma went to work for Debbie
11   Sweeney Pat Carpenter began reporting directly to you,
12   is that correct?
13     A.  Correct.
14     Q.  And were you satisfied with Pat Carpenter's
15   performance?
16     A.  Yes, very.
17     Q.  And she always received excellent performance
18   evaluations from you?
19     A.  I would have to look at them to be sure, but,
20   yes, I think so.
21     Q.  In your view was this a vast improvement in the
22   work Edith Choma had done for you before?
23     A.  In many areas, yes.
24     Q.  But not in every area?

B0163

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

198

1    A. No. There were things that Edith performed
2    equivalently to Pat.
3    Q. Like what?
4    A. Some of the organization for computer files and
5    where things were kept was to my mind equivalent. Pat
6    was more superior in her ability to multi-task to get
7    work done fast, to understand the scope of work being
8    asked of her, but you asked is it in all areas that it
9    was a vast improvement? No, there were some areas and
10   I've given you one where it was equivalent.
11   Q. What about dictation, was Pat Carpenter better
12   than Edith had been?
13   A. Edith carried on doing the dictation even when
14   she moved because it was an NCQA function.
15   Q. Do I understand then that Pat Carpenter did not
16   do any dictation for you?
17   A. Again, I would have to check with Pat in case
18   I'm wrong, but I don't think she did, no.
19   Q. And Edith Choma continued doing dictation for
20   you?
21   A. That's correct.
22   Q. Even though she had a hearing impairment issue
23   that made it difficult for her to do dictation?
24   A. We offered her every accommodation and she said

199

1    she did not need any.
2    Q. You offered her every accommodation, was this a
3    subsequent offer or was this the same offer that you
4    referred to?
5    A. It was probably the same offer. I don't think
6    she ever brought it up again.
7    Q. And when you say you offered her every
8    accommodation, again what were those accommodations
9    that you offered her?
10   A. Again, that's a phrase of speech. We said is
11   there anything you need to be able to do your job more
12   effectively if you have a problem and she said, no,
13   there is nothing Blue Cross can do.
14   Q. Do you recall a time after Pat Carpenter began
15   reporting directly to you when confidential patient
16   information was sent to doctors who were not supposed
17   to get that information with respect to the patient
18   that was being referred to?
19   A. Yes.
20   Q. Tell me what you recall about that.
21   A. There was a mass mailing that was going out
22   with a letter and attached to it was going to be
23   confidential information that was specific to each
24   unique doctor. The information got sent down to the

200

1    mailroom in two separate piles with instructions on
2    how to collate it and a mistake occurred in the mail-
3    room and the wrong patient information went to the
4    wrong doctor.
5    Q. Who sent it down to the mailroom?
6    A. Probably Pat Carpenter at that time.
7    Q. Prior to Pat Carpenter reporting to you Edith
8    Choma reported to you and was it Edith Choma who was
9    in charge of getting that informatin down to the mail-
10   room?
11   A. Typically, yes. I'm sure there were other
12   instances were other people sent stuff down, but that
13   sounds like one of her functions.
14   Q. Was that a serious breech in confidentiality in
15   your view?
16   A. Any breech in confidentiality could be termed
17   serious.
18   Q. So, it was a fairly serious event when this
19   happened?
20   A. It was a breech of confidentiality. We had to
21   respond and apologize to the physicians, yes.
22   Q. You blame the mailroom for this breech, is that
23   correct?
24   A. It's not a matter of blame. When we traced

201

1    what went wrong that's where we identified how the
2    problem occurred.
3    Q. In your view was the mailroom personnel
4    adequately instructed on how to dispense this
5    information?
6    A. Yes.
7    Q. And who would have instructed the mailroom on
8    how to dispense the information?
9    A. Typically a combination of Pat Carpenter with
10   maybe again depending on each individual instance
11   instructions on the mailing labels.
12   Q. Had there ever been such a breech in
13   confidentiality when Edith Choma was the person
14   instructing the mailroom on how to get the information
15   out?
16   A. I don't recall any, however, to be fair the
17   complexity of our mailings did change, but I don't
18   recall any.
19   Q. When you say "the complexity of the mailings
20   changed," what do you mean?
21   A. That we went from a lot of one off word
22   processing merging within a Word document and then
23   printing the individual document and putting it in an
24   envelope type of work to much more complicated work

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

202

1    that would go down to the mailroom where you were
2    merging letters and information that would be
3    generated off of that system.
4        Q.  Did the problem with the mailroom sending
5    confidential information to the wrong doctors happen
6    more than once?
7        A.  I can't recall.  I would have to go back and
8    search and search.  I have no idea.  Again, we deal
9    with these issue if they happen.
10       Q.  After Edith Choma went to work reporting
11   directly to Deb Sweeney she continued to do work for
12   you, correct?
13       A.  Correct.
14       Q.  Aside from the dictation did she do other work
15   for you?
16       A.  Anything that was NCQA related, that was her
17   primary function.
18       Q.  Anything that was NCQA related you needed
19   administrative help for which you would give to Edith
20   to do?
21       A.  Again, I'm using generalities because I cannot
22   remember specifics, but that's a fair assumption, yes.
23       Q.  Did there come a time when a survey was
24   conducted into your efficacy as chief medical officer?

203

1        A.  You are going to have to restate the question,
2    I'm sorry.
3        Q.  In the fall of 2002 did Care First Associates
4    do a survey into the job you were doing as chief
5    medical officer?
6        A.  Are you referring to the Gelfond survey?
7        Q.  What is the Gelfond survey?
8        A.  It's a survey of all Blue Cross associates
9    where they rate their immediate manager, people above
10   them, senior staff within Blue Cross or Care First on
11   multiple different issues.
12       Q.  And is that an annual event?
13       A.  It occurs every other year for all the
14   associates and on the off year about 50 percent of the
15   associates participate.
16       Q.  And was there such a Gelfond survey conducted
17   in 2002?
18           MR. HOLT:  I'll make an objection on the
19   record on that document.  I'm going to preserve my
20   objection on that document.
21           MR. MONDROS:  What is the objection?
22           MR. HOLT:  The objection is to the hearsay
23   value of that document, but you can go ahead and ask
24   questions.

204

1    BY MR. MONDROS:
2        Q.  Who is Gelfond?
3        A.  I assume they're a group of consultants that do
4    surveys.
5        Q.  And do you have an understanding as to how the
6    survey is conducted?
7        A.  Yes.
8        Q.  How is it conducted?
9        A.  Over the Internet.
10       Q.  So, associates are instructed to go to an
11   Internet site and open a form and click off boxes to
12   get feedback that is requested?
13       A.  That's correct.
14       Q.  Do I understand that all supervisors at Blue
15   Cross Blue Shield are subject to such a survey?
16       A.  Well, everyone is subject to the survey.
17       Q.  Everyone, sorry, you are subject to the survey,
18   correct?
19       A.  I am one of the everyones, yes.
20       Q.  Edith Choma would also be subject to the
21   survey?
22       A.  She would take the survey.  If she had people
23   reporting to her, they would rank her.
24       Q.  Is Debbie Sweeney subject to the survey?

205

1        A.  Yes.
2        Q.  Who would be the people who would take the
3    survey responding to you?
4        A.  I believe 2002 was the first year the survey
5    was done and there was a lot of confusion about what
6    it meant to rank your immediate supervisor, whether
7    they were talking about ranking the person that they
8    saw face-to-face and they reported to or whether they
9    were talking about Care First as a company who had
10   recently affiliated with us.  So, your question is
11   loaded with all types of potential for interpretation
12   by the individual takers of the test.
13       Q.  I can assure there is no intent to load that
14   question.  I realize this is strictly discovery at
15   this point.  Let me show you have the survey, maybe
16   that will help or a survey and I'll mark it as 10.
17           MR. MONDROS:  Let me mark this.
18           (Kaplan Deposition Exhibit No. 10 was
19   marked for identification.)
20   BY MR. MONDROS:
21       Q.  I'm going to hand you what has been marked as
22   Kaplan-10 and ask you to review it.
23       A.  (Witness complies.)
24       Q.  Have you ever seen what has been marked as

52 (Pages 202 to 205)

B0165

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

206

1   Kaplan-10 before?
2       A.  There are pages missing, but, yes.
3       Q.  Let me ask you, Dr. Kaplan, we have seen some
4   exhibits which reflect your performance evaluations of
5   Edith Choma.  Do you go through a similar process,
6   does somebody conduct a performance evaluation of you?
7       A.  Yes.
8       Q.  Who does your performance evaluations?
9       A.  The person I report to.
10      Q.  Who is that right now?
11      A.  Tim Constantine.
12      Q.  Dr. Constantine does a yearly evaluation of
13  your performance as well?
14      A.  I'm not sure if he is a doctor or not.
15      Q.  I'm sorry, Mr. Constantine or how about just
16  Tim Constantine, he does a performance evaluation of
17  you annually?
18      A.  Yes.
19      Q.  Do you have an understanding of what the
20  purpose of the Gelfond Group survey is, one example of
21  which is there as Kaplan-10?
22      A.  Was that a question?
23      Q.  Do you have an understanding of what the
24  purpose of this document is?

207

1       A.  Yes, I do.
2       Q.  What is the purpose?
3       A.  The purpose is to provide anonymous feedback to
4   management so they can look for areas of opportunity
5   to improve the way that they interact with staff,
6   provide information to staff, make the place -- the
7   work environment better.
8       Q.  This particular survey, which seems to me to be
9   it's marked fall of 2002, so I infer that it was
10  conducted in the fall of 2002, is that a correct
11  inference?
12      A.  I would imagine so, but, again, I must say
13  there are pages missing and one of the pages that are
14  missing contains some very important information.
15      Q.  What information does that page contain that is
16  missing?
17      A.  Stamped confidential and this is clearly
18  addressed to me and I did not give this to anyone to
19  provide, I do worry about how this information
20  was given to you and about theft of company documents.
21      Q.  Now that you pointed it out I do see that it
22  begins with page three, is there any other important
23  information that is missing from this document?
24      A.  I would have to look at the original, which

208

1   clearly, not the whole thing, was stolen.
2       Q.  Do you have an understanding of how much
3   associates contributed the information that is
4   compiled in this exhibit?
5       A.  You can look at an individual question and the
6   bar graph gives you the percent of respondents and the
7   column just to the left of that which has "Valid N" as
8   the heading shows the number of respondents for each
9   individual question.
10      Q.  It's a relatively small sample of associates
11  having input, is that fair to say?
12      A.  That's correct.
13      Q.  Was this document provided to you at any time?
14      A.  Yes.
15      Q.  Aside from here today did Blue Cross Blue
16  Shield give you this document?
17      A.  Yes.
18      Q.  And was it helpful to you to see how you were
19  being perceived by the associates at Blue Cross Blue
20  Shield of Delaware?
21      A.  Yes.
22          MR. HOLT:  I'll make a note for the record
23  that it's a Care First document.  I'm not sure if
24  that's in the record or not.

209

1   BY MR. MONDROS:
2       Q.  And Care First, what is the relationship
3   between Care First and Blue Cross Blue Shield of
4   Delaware?
5       A.  We affiliated with them in March of 2000.
6       Q.  When you say you affiliated with them, what do
7   you mean?
8       A.  We joined together.
9       Q.  As a merger?
10      A.  They use the word affiliated as opposed to
11  merger.  I guess one can split hairs as to what the
12  different is.
13      Q.  Fair enough.  You said the first page of this
14  document "Confidential," the one that is missing?
15      A.  I believe it does, yes.
16      Q.  Is it the intent of Gelfond or Care First to
17  publish the information that is contained here?
18      A.  You are going to have to rephrase your question
19  and be more specific, I'm sorry.
20      Q.  When associates take a survey such as this one
21  is it the intent of Care First to publish the results
22  to the associates who take the survey?
23      A.  The intent is to provide feedback to their
24  direct management who can then use the survey to speak

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

210

1  with their direct reports to identify opportunities to
2  improve.
3      Q.  As I look at page five it says, "I have been
4  kept well informed of the proposed merger between
5  WellPoint and Care First."  Is that something
6  different than the affiliation between Blue Cross Blue
7  Shield and Care First?
8      A.  Yes.
9      Q.  And that one was a merger and the other one an
10 affiliation, is that fair to say or is it just
11 semantics?
12     A.  I don't know, you will have to ask the lawyers.
13     Q.  Did you review the results of the survey in
14 2002 after it was completed?
15     A.  Yes.
16     Q.  And did you discuss the results of the survey
17 with anyone?
18     A.  Yes.
19     Q.  And with whom did you discuss the results of
20 the survey?
21     A.  The people that reported to me.
22     Q.  Did you have a discussion with -- who were
23 those people?
24     A.  I would have to look at an organization chart

211

1  and give you the names.
2      Q.  Can you think of anybody?
3      A.  Associate medical directors, the data people.
4  I think Deb Sweeney was there by then, but I need to
5  stop and think.  If it wasn't her, Jane Israel would
6  have been there.  Tim Toole.
7          (Kaplan Deposition Exhibit No. 11 was
8  marked for identification.)
9  BY MR. MONDROS:
10     Q.  Finally, I have an organization chart I can
11 give you.  We'll call it Kaplan-11.  Kaplan-11, the
12 first page of that exhibit appears to state the
13 organizational structure as of February 2, 2002 and
14 the second page appears to reflect the organizational
15 structure of the medical management unit as of October
16 3, 2002.  Do you have an understanding as to which of
17 those two pages is more accurate with respect to the
18 period of time when this survey was conducted?
19     A.  No, I don't.
20     Q.  With reference to Kaplan-11 can you tell me the
21 individuals with whom you discussed Kaplan-10.
22     A.  I can tell you with certainty that Dave Martin
23 and Bill Slentz would have been in the group.  Tim
24 Toole would have been in the group.  Nina Frazier

212

1  would have been in the group.  And it all depends of
2  timing on when the survey was actually done as to
3  whether it would have been Jane Israel or Debbie
4  Sweeney, whether it could have been John Castiglioni
5  or Patt Panzer.
6      Q.  And what about Edith Choma, would she be
7  somebody who would have responded to the survey?
8      A.  Again, depends on when the exact date that the
9  survey was taken.
10     Q.  You mentioned Bill Slentz, who is that?
11     A.  He is a data analyst.
12     Q.  Is he still employed there?
13     A.  No.
14     Q.  Did he directly report to you when he was
15 employed there?
16     A.  Yes.
17     Q.  And how did you view his competency for the job
18 for which he was performing?
19     A.  It was fine.
20     Q.  And how would you view his reputation for
21 truthfulness?
22     A.  He was truthful.
23     Q.  Never had any occasion in which you observed
24 him being untruthful?

213

1      A.  No.
2      Q.  And John Castiglioni, was he replaced by Patt
3  Panzer?
4      A.  Correct.
5      Q.  After he was dismissed for sexual harassment?
6      A.  Are we going back onto the secret testimony?
7          MR. HOLT:  We'll just stipulate that
8  anything referring to that dismissal or harassment
9  that we keep under seal.
10         MR. MONDROS:  That's fine, that works.
11 BY MR. MONDROS:
12     Q.  My question was -- it's actually two questions.
13 As I understand your testimony Dr. Castiglioni was
14 dismissed or terminated due to allegations of sexual
15 harassment, correct?
16     A.  Correct.
17     Q.  And Patt Panzer, Dr. Panzer, replaced Dr.
18 Castiglioni?
19     A.  That's correct.
20     Q.  Patt Panzer is that male or female?
21     A.  Female.
22     Q.  And that change from Castiglioni to Panzer
23 happened between February and October of 2002?
24     A.  According to this, yes.

Wilcox and Fetzer, Ltd.    Registered Professional Reporters

**B0167**

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

214

1  Q. And you have no reason to dispute that?
2  A. I have no reason to dispute that.
3  Q. On page eight of this exhibit, Bates numbered
4  P0753, do you see the second question there, says -- I
5  guess it's a question, it's not really -- it says,
6  "Associates are treated fairly without regard to age."
7  Do you see that?
8  A. Yes, I do.
9  Q. And it says that 57 percent gave a favorable
10 response and 43 percent gave an unfavorable response.
11 My question -- and to me I read that as being four
12 gave a favorable response and three of seven gave an
13 unfavorable response. Is that a fair reading of this
14 document?
15 A. I would have to sit with a calculator to do the
16 math and confirm your math, but assuming your math is
17 correct, yes.
18 Q. Did you discuss that question with any of the
19 people who you have met to discuss this survey with?
20 A. I'm sure I would have seeing as all the other
21 discrimination-type questions I scored -- they scored
22 me much better. So, that would have come up, yes.
23 Q. Who did you discuss that question with?
24 A. I'm assuming the same people that I discussed

215

1  everything on the survey with.
2  Q. With respect to that question what did you say
3  to them and what did they say to you?
4  A. Every question was open-ended with does anyone
5  want to comment or why they scored or ranked me this
6  way.
7  Q. Do you remember any of the details of what was
8  said with respect to that particular question?
9  A. Nothing.
10 Q. Do I understand that the meetings that you
11 described with the associates were conducted privately
12 one-on-one with the various associates?
13 A. No, it would have been in a group.
14 Q. Thank you. That question, "Associates are
15 treated fairly without regard to age," has that been
16 repeated in subsequent Gelfond surveys?
17 A. Yes, it has.
18 Q. What has been the result of the subsequent
19 surveys?
20 A. As I recall, 100 percent say it's a favorable
21 response.
22 Q. Do you have an understanding of who the
23 respondents were who gave unfavorable responses?
24 A. No.

216

1  Q. Could you venture a guess?
2  MR. HOLT: Objection to the form of the
3  question.
4  A. No, because, as I recall, no one answered me on
5  the issue. Again, you have to understand there was a
6  lot of confusion within the organization as to whether
7  they were rating me as a person or Care First
8  management. I prefaced this when we first started
9  having discussion about this document and that did
10 come out over and over again as we discussed some of
11 the questions that people say I didn't realize who
12 I was meant to be ranking. So, I can't comment more
13 than that on many of these.
14 Q. That's fair. As I understand it then there may
15 have been some confusion among the respondents in this
16 survey as to whether they were rating Paul Kaplan,
17 M.D., or Blue Cross Blue Shield Delaware management
18 generally?
19 A. Or Care First management generally. I believe
20 this was the first year of the survey so there was
21 confusion amongst many people about this.
22 Q. When 43 percent said that they gave an
23 unfavorable response that associate are treated fairly
24 without regard to age, they might have been referring

217

1  to Care First as opposed to you?
2  A. They might have.
3  Q. Let me ask you about page 11. There is a
4  question, a third question down on page 11. It says,
5  "Rate immediate manager on: Dealing fairly with
6  everyone."
7  A. I don't have page 11.
8  Q. Take mine.
9  MR. HOLT: I have page 11.
10 BY MR. MONDROS:
11 Q. We are going to look at page 11, third
12 question, "Rate immediate manager on: Dealing fairly
13 with everyone," and I read the results that you got 43
14 percent favorable, 14 percent neutral and 43 percent
15 unfavorable. Looks to me like a 3-1, 3-1, split
16 assuming my math is correct. Did you discuss the
17 response to that question with any of the associates
18 who responded to the survey?
19 A. Yes, I did.
20 Q. What was the feedback that you got from those
21 associates?
22 A. Some of the associates, one in particular, felt
23 that Jane Israel got more of my time than this
24 individual did and that that was unfair. Another

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

218

1    associate that we were having some performance issues
2    with and we were dealing with him, slash, he felt that
3    it was unfair that we were dealing with those issues,
4    but those were the two pieces of feedback I got. That
5    probably accounts to some of the 43 percent
6    unfavorable.
7        Q. The first person who you referred to who
8    thought that Jane Israel was getting more of your
9    time, who was that?
10       A. If I remember correctly, it was Dave Martin.
11       Q. And the second person who was having some
12   personnel issues, who was that?
13       A. Nina Frazier.
14       Q. And is it my understanding that Edith Choma was
15   not one of the associates who responded to this
16   questionnaire?
17       A. I can't remember. I'm sure if we get the
18   opportunity we can ask her that question, but I don't
19   remember.
20       Q. Do you recall her being in the meeting at which
21   you and the associates who responded discussed the
22   responses?
23       A. No, no, I don't.
24           MR. MONDROS: It's four o'clock and let's

219

1    take five.
2            (Brief recess.)
3            (Kaplan Deposition Exhibit No. 12 was
4    marked for identification.)
5    BY MR. MONDROS:
6        Q. Dr. Kaplan, let me show you what has been
7    marked as Kaplan-12 and I ask you to take a look at
8    that.
9        A. (Witness complies.)
10       Q. And my question is have you ever seen that
11   document before?
12       A. No.
13       Q. Having read it do you have an understanding of
14   what it is?
15       A. No.
16       Q. Do you have an understanding as to who the
17   author of the document is?
18       A. No.
19       Q. Do you have an understanding as to who the
20   recipient of the document is?
21       A. Jane Israel.
22       Q. Do you have any understanding as to the date on
23   which the document was written and transmitted?
24       A. No.

220

1        Q. You testified earlier, and it's a segue to
2    another area I want to get into, that you did not
3    discuss with Deb Sweeney the issues that you had with
4    Edith Choma's performance, is that fair to say?
5            MR. HOLT: Object to form, but you can
6    answer.
7        A. I have no recollection of having discussions
8    like that, that's correct.
9        Q. Did there come a time when Deb Sweeney
10   discussed with you concerns she had with Edith Choma's
11   performance?
12       A. Yes.
13       Q. And when did that happen?
14       A. The time I'm thinking about was before Edith
15   left the company and she wasn't able to perform her
16   functions efficiently and effectively.
17       Q. And was that when Edith broke her arm or was
18   that on a different occasion?
19       A. I'm thinking of the time she broke her arm,
20   correct.
21       Q. Did Deb Sweeney have that discussion with you
22   after Edith broke her arm?
23       A. Again, I'll have to go back and look at
24   calendars, but my recollection is that is the case.

221

1        Q. And as best you recall what was the
2    conversation between you and Deb Sweeney about Edith
3    Choma's job performance?
4        A. Edith had come back to work. She had no
5    restrictions put on her by her doctor. We were behind
6    with getting letters created and Edith wasn't putting
7    out the number of letters that we needed to have
8    created and had no job restrictions.
9        Q. And when you say you were getting behind in
10   letters, are you talking about denial and appeal
11   letters?
12       A. It might have been others as well, but those
13   were the predominant issues I'm sure, yes.
14       Q. We have had testimony in this case previously
15   that in beginning in early 2004 the number of denial
16   and appeal letters that needed to be sent, generated
17   and sent, had increased, is that consistent with your
18   recollection?
19       A. Blue Cross as a company was growing membership
20   so that would make sense.
21       Q. More members meant more denial, more denial
22   letters meant more appeals and then more appeal
23   letters, is that generally fair to say?
24       A. I'm not sure that there is a linear

56 (Pages 218 to 221)

**B0169**

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

222

1  relationship between the number of members and the
2  number of denials or appeals.
3      Q. Why in your view was there an increase in the
4  number of denial and appeal letters?
5      A. Again, the opportunity was there that medical
6  management may have denied more. I can't stipulate to
7  fact the exact number of them and your response back
8  to me seemed to imply there was a linear relationship
9  on that and I'm correcting you on that.
10     Q. When you say "linear relationship," do you mean
11 a mathematical linear relationship?
12     A. That's correct.
13     Q. I'm sorry, I did not mean to infer any sort of
14 mathematical relationship. I meant to say if there
15 are more members there would be more denials and
16 appeals without any kind of mathematical formula which
17 you can compute what that relationship is?
18     A. That's a fair statement.
19     Q. In 2004 membership at Blue Cross Blue Shield
20 was increasing?
21     A. As best I can recall, yes.
22     Q. And were there any causes for the increase of
23 enrollment of members at Blue Cross Blue Shield of
24 Delaware?

223

1      A. You would have to talk to our marketing
2  department to get their input, but I'm sure that from
3  my perspective as having NCQA accreditation was a big
4  driver.
5      Q. Who were the largest employers who participated
6  in the Blue Cross Blue Shield Delaware program in
7  early 2004?
8      A. Are you talking self-insured members, fully
9  insured members, a mixture of the two?
10     Q. A mixture of the two.
11     A. MBNA, State of Delaware. I would have to go
12 back to our marketing people to find the list to give
13 you a full breakdown.
14     Q. But those are very substantial employers?
15     A. Correct.
16     Q. And how long had MBNA been a member at Blue
17 Cross Blue Shield of Delaware?
18     A. I would have to ask the marketing people to
19 give me the exact date, I don't know.
20     Q. What about the State of Delaware?
21     A. Same response.
22     Q. Had they been members, State of Delaware and
23 MBNA, been members prior to 2004?
24     A. Yes.

224

1      Q. Are they both still members as of today?
2      A. No.
3      Q. Is State of Delaware still a member?
4      A. Yes.
5      Q. And is MBNA still a member?
6      A. No.
7      Q. When did MBNA cease being a member?
8      A. I believe it was 2005. Dates seem to run
9  together, but I believe it was 2005.
10     Q. Did the number of denial and appeal letters
11 decrease after MBNA was no longer a member?
12     A. No.
13     Q. So, whatever the reason as I understand in
14 early 2004 the number of denial and appeal letters
15 increased and, therefore, the need for administrative
16 assistance to generate and send those letters
17 increased?
18     A. I can attest to the fact that the number
19 increased. I cannot give you an exact number.
20     Q. And if there was more letters needed to be
21 sent, folks like Edith Choma need to write and send
22 more letters, correct?
23     A. More letters would have to be sent, yes.
24     Q. Was there a time when Deb Sweeney consulted

225

1  with you and told you that Edith Choma was not getting
2  the letters out quickly enough?
3      A. Yes.
4      Q. And do you recall about when that was?
5      A. No, I don't. I have no recollection of the
6  exact date.
7      Q. Tell me as best you recall what Deb Sweeney
8  told you.
9      A. She told me that she was concerned that Edith
10 was back at work with no restrictions and the number
11 of letters that she was generating seemed low. We
12 spoke about the need to involve human resources to
13 come up with a fair performance improvement plan and
14 she went talking to them.
15     Q. During that discussion did you relate to Deb
16 Sweeney the problems that you had with Edith Choma
17 when she had reported directly to you previously?
18     A. No.
19     Q. Did you tell her about what had happened
20 between you and Edith Choma back in 1999 when you had
21 done your performance evaluation of Edith Choma?
22     A. No.
23     Q. At any time did you share that with Deb
24 Sweeney?

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

| 226 | 228 |
|---|---|
| 1   A. No.<br>2   Q. So, you and Deb Sweeney had a discussion about<br>3   Edith Choma and her inability to get out denial and<br>4   appeal letters quickly enough and the two of you<br>5   agreed that it would be a good idea to get human<br>6   resources involved and put a performance improvement<br>7   plan into place?<br>8       MR. HOLT: I'll make an objection to form.<br>9   You can answer.<br>10   A. I advised Debbie that would be an appropriate<br>11   thing to do.<br>12   Q. Was it your understanding based upon what<br>13   Debbie told you that reason Edith couldn't get the<br>14   letters out quickly enough was because of the injury<br>15   that she had sustained?<br>16       MR. HOLT: Another objection to form.<br>17   A. I don't recall that we discussed the why's. We<br>18   just discussed the production needs and we discussed<br>19   the fair way of assigning a reasonable production<br>20   standard for people who were going to do this work.<br>21   Q. Correct me if I'm wrong, but you and Debbie did<br>22   discuss the fact that Edith Choma had come back to<br>23   work and there were no restrictions, correct?<br>24   A. I was aware of that, yes. | 1   A. (Witness complies.)<br>2   Q. That one says beginning in the middle of the<br>3   paragraph says, "On August 19, 2004 plaintiff was<br>4   involved in a non work-related accident resulting in<br>5   her right hand being injured and placed in a cast in a<br>6   sling." Do you see that?<br>7   A. Yes.<br>8   Q. Do you have any reason to dispute the date that<br>9   is set forth on there as to when Edith Choma became<br>10   injured?<br>11   A. I've got no reason to.<br>12   Q. Do you believe it was before or after this date<br>13   that you had your conversation with Deb Sweeney about<br>14   Edith Choma's inability to get the appeal letters and<br>15   denial letters done quickly and the discussion about<br>16   putting plaintiff on a PIP with HR?<br>17   A. I believe it would have been after, but if you<br>18   allow me to look at the PIP write-up I could give you<br>19   an exact date.<br>20   Q. When you say that Edith Choma came back to work<br>21   without restrictions, is it your understanding that<br>22   she had an injury when she came back to work without<br>23   restrictions?<br>24       MR. HOLT: Same objection as I had before. |

| 227 | 229 |
|---|---|
| 1   Q. Was that something that you and Debbie<br>2   discussed?<br>3   A. I'm sure we did. I cannot remember an exact<br>4   circumstance, but I'm sure she would have told me that<br>5   Edith was back with no restrictions.<br>6   Q. Do you have an understanding as to the nature<br>7   of the injury Edith suffered?<br>8   A. Yes, I did.<br>9   Q. What was the injury?<br>10   A. She had apparently broke her arm.<br>11   Q. When she came back to work, did she have a cast<br>12   on her arm?<br>13       MR. HOLT: I'll make an objection on the<br>14   record. I think there is ambiguity with when she came<br>15   back to work after the arm and the short-term<br>16   disability. I want to put that objection on the<br>17   record because I think it's misleading.<br>18       MR. MONDROS: Okay, fair enough, let me see<br>19   if I can clear that up.<br>20   BY MR. MONDROS:<br>21   Q. If you would look at the complaint, Dr. Kaplan,<br>22   I think it's Exhibit 2.<br>23   A. (Witness complies.)<br>24   Q. If you would look at page seven, paragraph 37. | 1       MR. MONDROS: I'm trying to get there.<br>2   A. According to this complaint October 29, '04 we<br>3   put the plaintiff on a performance improvement plan.<br>4   So, I'm not sure at this point which episode of sore<br>5   arm or hurt arm or injured arm you are talking about.<br>6   Q. Is it your understanding that Edith had more<br>7   than one injury to her arm?<br>8   A. I know there were separate issues where she was<br>9   at work, not at work. Whether it was all one injury I<br>10   don't know.<br>11   Q. When you say "without restrictions," what do<br>12   you mean?<br>13   A. Usually without restrictions means that the<br>14   patient's doctor has told them they can come back to<br>15   work without having to modify their work or work space<br>16   or work environment or their duties in any way.<br>17   Q. When Edith Choma was working at Blue Cross Blue<br>18   Shield, who provided her health insurance?<br>19   A. I assume Blue Cross of Delaware. I've never<br>20   bothered to look in the system to find out. That<br>21   would be a violation of her privacy.<br>22   Q. Does Blue Cross Blue Shield of Delaware<br>23   generally insure its employees?<br>24   A. They are offered the option. |

**B0171**

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

230

1      (Kaplan Deposition Exhibit No. 13 was
2   marked for identification.)
3   BY MR. MONDROS:
4      Q.  Let me show you what is marked as Kaplan-13.
5   Have you ever seen that document before that is marked
6   as Kaplan-13?
7      A.  No.
8      Q.  Do you have an understanding as to what that
9   document is?
10      A.  Yes.
11      Q.  And what is it?
12      A.  That's a memo from Care First advising us that
13   Ms. Choma's doctor had job restrictions on her and she
14   was unable therefore to fulfill her job function and
15   she was told to contact our short-term disability
16   carrier.
17      Q.  Okay.  So, is it fair to say that your
18   conversation with Deb Sweeney about plaintiff coming
19   back to work without job restrictions occurred before
20   that letter?
21      MR. HOLT:  Objection to form.
22      A.  Again, I need you to be more specific with each
23   instance, if you don't mind.
24      Q.  Do you have a view as to how long it should

231

1   take an administrative assistant to generate a denial
2   letter?
3      A.  No.
4      Q.  Does Blue Cross Blue Shield of Delaware have a
5   view as to how long it should take an associate to
6   type an appeal or denial letter?
7      A.  We didn't, no.
8      Q.  Do you as of now?
9      A.  I think we have a sense of the average amount
10   of time it should take based on observing all the
11   people in the department who were doing this function,
12   yes.
13      Q.  When were those observations made and when was
14   that sense formed?
15      A.  I can't remember the exact date, I'm sorry.
16      Q.  What is the time period that is appropriate for
17   an associate to type a denial letter?
18      A.  I would have to go back and look at our files.
19   I have no idea off the top of my head.
20      Q.  How about an appeal letter?
21      A.  Same answer.
22      Q.  And how was the performance of the associates
23   determined to come to the conclusion as to what
24   appropriate time to do a denial or appeal letter would

232

1   be?
2      A.  I suggested that we work with human resources
3   and get a sense from looking at the people who were
4   assigned this function and getting a sense of the
5   average amount of time it took them to do a letter.
6      Q.  And how was that done?
7      A.  I didn't get involved in the minutia.  I stayed
8   looking at the bigger picture of just give me some
9   guidance.  I have no idea.
10      Q.  Do you have any knowledge of administrative
11   assistants being timed as far as how long it took them
12   to complete denial and appeal letters?
13      A.  Well, that was the general sense was that you
14   would give them a certain defined number and see how
15   long it took to do them and you would get an average
16   sense of how long it takes to do a letter.
17      Q.  Was that completed?
18      A.  To the best of my knowledge it was, yes.
19      Q.  Who was the person responsible for making that
20   determination?
21      A.  I had spoken with Deb Sweeney about it.  Who
22   she actually assigned to do the actual task I have no
23   idea.
24      Q.  Who were the secretaries who were observed to

233

1   make that determination?
2      A.  I'm assuming it would have been the ad min
3   assistants in the department at the time, which would
4   have been Chris Zakutny, Pat Carpenter.  I cannot
5   remember if Mary Lou Kobosko who is a temp. was still
6   working in the department at the time or not, but she
7   would probably have been involved and any other
8   assistant that we had that were doing letters at the
9   time.
10      Q.  What about Edith Choma?
11      A.  She would have been one of them if she was at
12   work at the time, yes.
13      Q.  To your knowledge was she one of them who was
14   at work at the time who was used to determine the
15   appropriate time to complete a denial or appeal
16   letter?
17      A.  I know we measured her the same way we did
18   everyone else.
19      Q.  You did measure Edith Choma?
20      A.  I'm not sure what time frame you are talking
21   about, but I know we did at some point get a sense of
22   her performance, yes.
23      Q.  You don't know if she was measured to set the
24   standard or to determine whether she satisified the

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

234

1  standards?
2  A.  Standards were set as an average of the people
3  in the department that were doing this task.
4  Q.  When secretaries type a denial letter, is it
5  fair to say that they use both hands in doing that?
6  A.  Depends on the secretary I guess.  People have
7  different typing styles.
8  Q.  Have you ever seen a secretary at Blue Cross
9  Blue Shield of Delaware type with one hand when
10  they're doing a denial letter?
11  A.  I know we have got an associate who only had
12  one hand and I've watched him type.
13  Q.  Did you watch him type a denial letter?
14  A.  I have no idea what he was typing.
15  Q.  My question is have you ever seen an associate
16  do a denial or appeal letter using only one hand?
17  A.  By denial or appeal letter in which department
18  are you talking about?
19  Q.  Medical management.
20  A.  Because the letters are generated in multiple
21  departments.
22  Q.  But I'm referring to medical management
23  department.
24  A.  I have to assume no.  I can't remember an

235

1  instance.
2  Q.  And you said that you have an associate who
3  only has one hand, is that correct?
4  A.  We did have, yes.
5  Q.  And who was that?
6  A.  He is not in my department.  He used to be in
7  the company.
8  Q.  Do you remember his name?
9  A.  John -- it will come to me, I'm sorry.
10  Q.  Was he an amputee or was there a birth defect?
11  A.  You would have to ask him.  I don't know, I
12  didn't ask him.
13  Q.  One of his responsibilities was as a typist?
14  A.  He didn't work in my department.  I have no
15  idea what his responsibilities were.  You were asking
16  me if I ever saw anybody type with one hand and I
17  have.
18  Q.  But not in your department?
19  A.  Not in my department.
20  Q.  Do you believe that it's reasonable to ask an
21  administrative assistant in your department to type
22  letters with one -- with a broken arm?
23      MR. HOLT:  Object to form.
24  A.  That person's name is John Barrett.

236

1  Q.  Okay.
2  A.  I think it's reasonable to expect if someone
3  comes to work they will do the job assigned to them.
4  Q.  Okay.  Whether they have a broken hand or not?
5  A.  It's reasonable to assume that if the doctor
6  does not want them doing the job assigned to them,
7  they will put them on restrictions.
8  Q.  Do you have any knowledge as to the emergency
9  room doctor who treated Edith Choma when she suffered
10  her hand injury or arm injury directing in the
11  paperwork that Edith take it easy when she went back
12  to work?
13  A.  No, I do not.
14  Q.  Deb Sweeney didn't share that with you?
15  A.  I don't recall seeing emergency room papers.
16      (Kaplan Deposition Exhibit No. 14 was
17  marked for identification.)
18  BY MR. MONDROS:
19  Q.  I'm going to show you what we marked as
20  Kaplan-14 and take a moment and look over that.
21  A.  (Witness complies.)
22  Q.  And my question is have you ever seen Kaplan-14
23  before?
24  A.  No.

237

1  Q.  Did you ever discuss with Debbie Sweeney the
2  substance of the events that are reflected in
3  Kaplan-14?
4      MR. HOLT:  I'll just make an objection, are
5  you referring to every event in this?
6      MR. MONDROS:  Any of the events reflected
7  in there.
8  A.  I do believe at some point, but I can't say
9  when, Debbie and I did talk about the concern that
10  Debbie had that Edith was working through lunch, which
11  was a violation of state and I believe also federal
12  law and that we had to make sure she did get a lunch
13  break.
14  Q.  Was that during the same conversation where you
15  discussed Edith's issues in completing the denial and
16  appeal letters quickly enough or was that a different
17  conversation?
18  A.  I doubt it.  I meet with Debbie for a staff
19  meeting once a week and it could come up at any point.
20  Q.  Is it fair to say during this time in the fall
21  of 2004 the subject of Edith Choma was coming up
22  weekly?
23      MR. HOLT:  I'll object to the form of the
24  question.  You can answer.

60 (Pages 234 to 237)

B0173

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

238

1  A.  No.
2  Q.  To your knowledge did Debbie Sweeney ever offer
3  Edith Choma the opportunity to do work other than
4  draft denial and appeal letters while her arm was
5  injured?
6  A.  Yes.
7  Q.  What is the basis for that knowledge?
8  A.  Debbie had told me that she came back and she
9  was -- if I remember correctly, I don't remember which
10  arm it was -- sitting with her arm in the air while
11  she tried to work and Debbie offered for her to do
12  other work and apparently Edith said no.
13  Q.  Was it within Debbie's authority to request,
14  demand, that Edith do other work besides typing when
15  she had only one arm that was useful to her?
16       MR. HOLT:  I'll object to the form.  You
17  can answer.
18  A.  I think it's any manager's role to optimize the
19  use of their employees and if someone is at work and
20  unable to perform one task efficiently, but they may
21  be able to perform something else efficiently that you
22  move staff around and take advantage of that.
23  Q.  But in this case Debbie Sweeney did not do
24  that, is that fair to say?

239

1       MR. HOLT:  I object to form.
2  A.  I have no idea.
3  Q.  Did Debbie Sweeney tell you what other jobs she
4  offered to have Edith do while her arm was injured?
5  A.  The only thing I recall was something with
6  photocopying.  What the details were I do not know.
7       (Kaplan Deposition Exhibit No. 15 was
8  marked for identification.)
9  BY MR. MONDROS:
10  Q.  Let me show you what we are going to call
11  Kaplan-15 and I ask you if you have ever seen that one
12  before?
13  A.  I'm afraid this is cut off, I wonder if you
14  could give me a new copy.
15       MR. MONDROS:  Off the record.
16       (Brief discussion off the record.)
17  BY MR. MONDROS:
18  Q.  I'll ask some general questions.  Have you ever
19  seen this document before?
20  A.  Well, part of it is cut off so I'm not sure if
21  I have or not.  I'm not sure if this is the same
22  document I have seen or not.
23  Q.  Except for the part that is cut off does it
24  appear to be the same document that you have seen

240

1  before?
2  A.  No.
3  Q.  How is the one that you have seen before
4  different from this one?
5  A.  What is labeled as page P0070 I've not seen
6  before.
7  Q.  What about pages P0068 and P0069, have you seen
8  those before?
9  A.  Yes.
10  Q.  Do you have an understanding that P0068 and
11  P0069 are the performance improvement plan for Edith
12  Choma?
13  A.  Yes.
14  Q.  Do you have an understanding as to what the
15  last three pages of the document are?
16  A.  Page P0070 would be the tracking of the work
17  done by Edith with her speed average number of letters
18  she did, minutes per letter, her error rate and her
19  error percentage.
20  Q.  Had you seen that P0070 before?
21  A.  No.
22  Q.  How about P0071, have you seen that document
23  before?
24  A.  It's part of the performance improvement plan.

241

1  Q.  And have you seen that before?
2  A.  Yes.
3  Q.  What about P0079?
4  A.  Yes.
5  Q.  Have you seen that before?
6  A.  Yes.
7  Q.  Is that also part of the performance
8  improvement plan?
9  A.  Yes.
10  Q.  Correct me if I'm wrong, but it sounds like
11  P0070 is a document that is not part of the
12  performance improvement plan, it has been inserted
13  somewhere in the middle of the performance improvement
14  plan?
15       MR. HOLT:  I make an objection as to form.
16  You can answer.
17  A.  Clearly relates to it in terms of the tracking
18  that was done.  The time sequence is wrong because
19  these letters start being tracked from the 30th of
20  September and end being tracked on the 28th of October
21  and the performance improvement plan is dated October
22  29th.
23  Q.  Why is the sequencing wrong?
24  A.  The sequencing is wrong in that this is not

61 (Pages 238 to 241)

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

242

1  tracking after the performance improvement plan was
2  put into place. It appears to be tracking before it
3  was put into place.
4      Q. Did you have any role in developing this
5  performance improvement plan?
6      A. No.
7      Q. Were you consulted at all before October 29th,
8  2004 with respect to the performance improvement plan?
9      A. I was aware of it. I was aware that Debbie
10 Sweeney was working with human resources.
11     Q. About how long did Debbie Sweeney work with
12 human resources to come up with a performance
13 improvement plan?
14     A. I have no idea. I felt like it was a felt
15 weeks. Could have been slightly longer.
16     Q. As I look at page P0070 the first date
17 reflected at the top is September 30th and as I
18 understand it that's the date on which Edith Choma
19 began being tracked as far as her speed at getting
20 letters out. Could that also be the date of when they
21 began the performance improvement plan process?
22         MR. HOLT: Objection to form.
23     A. It's speculation on my part. I wasn't
24 involved.

243

1      Q. But you were aware that Debbie Sweeney and
2  human resources were working on this plan?
3      A. Yes.
4      Q. And who with human resources was working on the
5  plan?
6      A. I assume our generalist person assigned to
7  assist us with HR issues.
8      Q. And that's Donna May?
9      A. Might have been or it could have been Brian
10 McMullen.
11     Q. Is there a signature of a human resources
12 representative on the last page?
13     A. There is.
14     Q. Who is that?
15     A. Says Donna May.
16     Q. Seeing Donna May's signature on the last page
17 does that help you determine who at human resources
18 was involved in developing this plan with Deb Sweeney?
19     A. It might not have been her alone, but she
20 signed the document, I can attest to that.
21     Q. Do you have any knowledge of Brian McMullen
22 being involved in the development of this PIP?
23     A. No.
24     Q. Did you review this PIP or any draft of this

244

1  PIP before October 29th, 2004?
2      A. I did, yes.
3      Q. Was that a draft or the final PIP?
4      A. I can't remember exactly. I would imagine I
5  was given the final to be aware of.
6      Q. Who gave it to you?
7      A. Deb Sweeney.
8      Q. Did you discuss it with Deb Sweeney at all?
9      A. The only thing we discussed was whether the
10 metrics that were being used to track Edith's
11 performance relative to the departmental average were
12 fair.
13     Q. When you say metrics, what are you talking
14 about?
15     A. Speed of tracking letter generation, number of
16 mistakes per letter.
17     Q. And was there some concern that they might not
18 be fair?
19         MR. HOLT: Hold on, let me make an
20 objection to form, but you can go ahead and answer.
21     A. There was no concern in that we try to be fair.
22 There is always the importance of just being sure you
23 are applying the same standard to everyone.
24     Q. I'm sorry, I'm having a hard time with metrics,

245

1  maybe because it's late in the day. Can you point to
2  me a place in Exhibit-15 that is relevant to the
3  metrics?
4      A. If we look at the first line of the table it
5  says, "New letters from the nurses are taking greater
6  than eight minutes each to produce," P0068 on the far
7  left-hand column.
8      Q. Okay, got you.
9      A. Now I move over to the third column, "How it
10 needs to be done, Error rate consistently less than 20
11 percent," that's a metric.
12     Q. How was that metric determined?
13     A. I believe from my recollection of the
14 discussions we looked at what the departmental average
15 was, we looked at what an average number of mistakes
16 were and we looked at where Edith was and came up with
17 a tiered performance plan to slowly move her towards
18 the departmental average.
19     Q. Did you form an opinion as to whether the
20 incremental increase in performance was reasonable,
21 was something that Edith could reasonably achieve in
22 the time period set forth here?
23     A. I thought it was attainable, yes.
24     Q. Did you discuss with Deb Sweeney whether it was

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

246

1  attainable?
2     A.  Yes, I'm sure we did.
3     Q.  And did she also concur, did she concur with
4  you that it was attainable?
5     A.  I'm sure she did, otherwise, she wouldn't have
6  put it in the document.
7     Q.  On the very last page of Exhibit-15 there is
8  some handwriting at the bottom of the page, which as
9  you observed and testified has been cut off.  Do you
10  an understanding as to whose handwriting that is?
11    A.  I recognize Debbie Sweeney's handwriting as
12  being the first three lines and I'm not sure if this
13  is also her handwriting for the next what looks like
14  two lines or not.  I think it is.
15    Q.  It looks like that handwriting at the top says,
16  "Associate has requested to have documents by outside
17  party (lawyer) and has informed that she must either
18  sign form or communicate refusal by 11/8/04."  Did I
19  read that correctly?
20    A.  No, you didn't.
21    Q.  Why don't you give it a shot?
22    A.  I believe it says, "Associate has requested to
23  have documented by outside party (lawyer) and has been
24  informed that she must either sign form or communicate

247

1  refusal by 11/8/04."
2     Q.  Does that look like Debbie Sweeney's signature
3  under that part?
4     A.  Yes, it does.
5     Q.  Read the next part.
6     A.  "All I can remember is --" unintelligible
7  letter or word or symbol "-- associate has verbally
8  agreed to above," and then I cannot make out the final
9  -- possibly final word.
10    Q.  This performance improvement plan was given
11  to Edith Choma on October 29, 2004?
12    A.  It's dated October 29th, 2004.  I have no idea
13  exactly what date it was given.
14    Q.  Is it your understanding it was, in fact, given
15  to Edith Choma?
16    A.  There is every reference to the fact that it
17  was given to her on October 29th, '04 and that Debbie
18  Sweeney and Donna May signed it on that date and they
19  make reference to the fact that Edith Choma refused to
20  sign it on that day.
21    Q.  Did you have any discussions with Debbie
22  Sweeney or Donna May or anyone else about enforcing
23  the performance improvement plan that Edith Choma was
24  given?

248

1     A.  We always enforce them.
2     Q.  And was it discussed who would enforce it?
3     A.  Her direct supervisor or manager would be the
4  one to ensure that it was being enforced.
5     Q.  I understand they're always enforced and the
6  direct supervisor enforces it, but were there any
7  discussions between you and anyone else about the
8  enforcement of the performance improvement plan?
9     A.  I don't understand your question or direction.
10    Q.  When you discussed this performance improvement
11  plan with Deb Sweeney, did you say, well, how are we
12  going to enforce this or something to that effect?
13         MR. HOLT:  Objection to form, but you can
14  answer.
15    A.  The document speaks to itself as to how it was
16  going to be enforced.
17    Q.  Did you envision Debbie Sweeney timing Ms.
18  Choma to see if she was meeting the goals set forth in
19  Kaplan-15?
20         MR. HOLT:  Same objection.
21    A.  On page P0068 the first metric, again, talks to
22  the fact and I quote, "You will be timed by Debbie
23  Sweeney."  So, the document talks to how this would be
24  enforced.

249

1     Q.  Did you have an understanding about how
2  frequently Debbie Sweeney would time Edith Choma in
3  doing these letters?
4     A.  No, I don't, but the document talks about once
5  a day.
6     Q.  And do you know whether, in fact, Debbie
7  Sweeney timed Edith Choma once a day?
8     A.  I do not know as fact, but if you look at page
9  P0070 you can see that there was significant activity
10  occurring intermittently.  So, I would imagine that
11  Debbie would have followed the letter of the
12  performance improvement plan and done it on a daily
13  basis.
14    Q.  Is it your understanding that Debbie Sweeney
15  compiled this information as reflected on P0070?
16    A.  I have no idea who did it.
17    Q.  When we speak of Debbie Sweeney timing Edith
18  Choma in doing denial and appeal letters, is it your
19  understanding that Debbie Sweeney had a stopwatch and
20  was timing how long it would take Edith to do each
21  letter?
22    A.  No.  My understanding was that she asked Edith
23  to provide the start time and stop time for doing
24  letters and then Debbie would do the math of knowing

**B0176**

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

250

1    how many letters were in a folder, what time it
2    started and what time she stopped and, therefore, the
3    total elapsed time.
4        Q.  And what is that understanding based upon?
5        A.  A discussion that I had had with Debbie as to
6    exactly how she was going to do it.
7        Q.  She explained it to you?
8        A.  That was the methodology that she had used for
9    coming up with a standard in the first place.
10       Q.  And same question with respect to the error
11   rate, how did Debbie Sweeney go about determining what
12   the error rate was?
13       A.  The manager for each individual area reviews
14   the letters before they're mailed out to the patient
15   or to the doctor.  So, any time a correction needed to
16   be made I guess they kept a note of that so that they
17   could come up with an error rate.
18       Q.  And what exactly is the error rate?  Is that 20
19   percent error rate?  If that a letter that has 100
20   words, there is only five errors or less?
21       A.  If you have 100 letters and less than 20 of
22   them have an error in it.  If you have multiple errors
23   in a letter, my assumption is that still counts as one
24   error rate.  Again, I didn't design this specifically

251

1    and that could be subject to interpretation, but
2    whatever was done was consistently done when we came
3    up with a standard for all staff in the department.
4        Q.  Do you have an understanding as to -- did Pat
5    Carpenter get evaluated against the standard?
6        A.  Yes.
7        Q.  And how often was Pat Carpenter evaluated
8    against that standard?
9        A.  I have no idea.
10       Q.  And were the results of Pat Carpenter's
11   evaluation given to you?
12       A.  Yes, they were.
13       Q.  And what was Pat Carpenter's error rate?
14       A.  I have no idea.  Again, all I looked at was if
15   you looked at all the other ad min assistants doing
16   this work what was the average that they were having
17   for an error rate for an average speed of generating a
18   letter.
19       Q.  Do you recall Edith Choma being asked to
20   correct the error in Pat Carpenter's denial and appeal
21   letters?
22       A.  I'm sure there were instances where every ad
23   min assistant was given other people's work to correct
24   when they weren't there doing some other important

252

1    function.
2        Q.  Do you recall Edith Choma being asked to
3    correct the errors from Pat Carpenter's denial and
4    appeal letters?
5        A.  Again, I'm sure it happened.
6        Q.  But you don't specifically recall it?
7        A.  No, but I'm sure there were times that Pat
8    Carpenter corrected Edith's errors as well.
9        Q.  And do you recall that?
10       A.  No, I'm just saying I'm sure based on knowing
11   the work flow.
12       Q.  Are you aware that Edith Choma filed a charge
13   of discrimination on October 22 with the Department of
14   Labor?
15       A.  Not at the time I wasn't aware, no.
16       Q.  Are you aware now?
17          MR. HOLT:  Which year are we talking about?
18          MR. MONDROS:  2004.
19   BY MR. MONDROS:
20       Q.  Did you ultimately became aware that Edith
21   Choma filed a charge of discrimination with the
22   Department of Labor on August 22, 2004?
23       A.  Yes, I am aware.
24       Q.  And that was exactly one week before the

253

1    performance improvement plan set forth in Kaplan-15,
2    is that correct?
3          MR. HOLT:  Objection, clarify when he
4    became aware and when the charge was filed.  Is that
5    fair?
6          MR. MONDROS:  Yes.
7    BY MR. MONDROS:
8        Q.  She filed a charge exactly one week before the
9    PIP was given to her, is that fair to say?
10       A.  I don't have the exact document with the exact
11   date.  I'll take your word for it if you like.
12          (Kaplan Deposition Exhibit No. 16 was
13   marked for identification.)
14   BY MR. MONDROS:
15       Q.  Let me show you what has been marked as
16   Kaplan-16.  Have you ever seen that document before?
17       A.  No, I have not.
18       Q.  When did you first be become aware that Edith
19   Choma had filed a discrimination charge with the
20   Department of Labor?
21       A.  I don't know the exact date, but it would have
22   been probably related to my deposition.
23       Q.  In preparing for your deposition you learned
24   that?

64  (Pages 250 to 253)

B0177

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

254

1    A.  I think that was the case.  I mean, it was
2    clearly years after all this occurred.
3    Q.  Did you ever discuss the charge of
4    discrimination with Debbie Sweeney?
5    A.  No, I did not.
6    Q.  Do you understand that the charge of
7    discrimination that Edith Choma filed was directed at
8    your actions?
9         MR. HOLT:  Objection, clarify, are you
10   referring to Exhibit Number 16?
11        MR. MONDROS:  Yes.
12   A.  Ask your question again.  I'm sorry, I lost
13   you.
14   Q.  The charge of discrimination that Edith Choma
15   filed with the Department of Labor what is your
16   understanding of what the claim was in that charge?
17   A.  I believe there are two charges she has filed.
18   Which one are you referring to?
19   Q.  I'm referring to that one.
20   A.  Is this the first or second?
21   Q.  October 22, 2004.
22   A.  When was the second one filed?  Don't forget
23   I'm not a lawyer, I'm not familiar with the difference
24   between Department of Labor, you know, Delaware and

255

1    federal.  So, you are going to have to help me out.
2    Q.  Do you an understanding of what the subject of
3    that charge was?
4    A.  I don't understand which one this is.  Can you
5    clarify that for me, please.
6    Q.  Kaplan-16.
7    A.  Can you clarify what this is that I'm holding?
8    Q.  That's my question to you.  The charge that was
9    filed one week before the PIP do you have an under-
10   standing what the nature of Edith Choma's claim was?
11   A.  Again, I keep asking you I know she has filed
12   two, I'm not sure which one you are referring to.
13        MR. MONDROS:  Okay, let's mark this as
14   Kaplan 17.
15        (Kaplan Deposition Exhibit No. 17 was
16   marked for identification.)
17   BY MR. MONDROS:
18   Q.  And I ask you if you have ever seen that
19   before?  My question is the document that is marked
20   Kaplan-17 have you ever seen that before?
21   A.  No.
22   Q.  Do you have an understanding of what that is
23   having seen it for the first time now?
24   A.  Yes, I do.

256

1    Q.  What is it?
2    A.  She is complaining to someone, but I'm not sure
3    who someone is that Blue Cross discriminated against
4    her and she worked in a hostile environment.
5    Q.  Does she mention any specific Blue Cross
6    employees who discriminated against her in that
7    complaint?
8    A.  Yes, she does.
9    Q.  Who is that?
10   A.  I see my name, Paul Kaplan.
11   Q.  Anyone else?
12   A.  I see Jane Israel's name.  I see Debbie
13   Sweeney's name.
14   Q.  Is it fair to say that you disagree with the
15   allegations made in what is marked Kaplan-17?
16        MR. HOLT:  Object to the form of the
17   question.
18   A.  Which allegation are you talking about?
19   Q.  Are there any in there that you agree with?
20   A.  I have no idea what it means to say.  I am not
21   a qualified individual so I don't know if I can agree
22   or disagree with that.  I don't understand what the
23   words with real or perceived disability means.  My
24   testimony earlier today about the words that I used

257

1    clearly are wrong.  I have no idea whether she is
2    accurate saying that there was discriminatory
3    treatment that she complained about on August 22, '02
4    and that human resources took no remedial action.  I
5    have no idea what petty dealings and hostile yelling
6    is referring to.
7         She says there is unfair treatment in the
8    form of an unjust performance review.  I have no idea
9    what performance review she is talking about.
10   Q.  Did you ever hear Debbie Sweeney address Edith
11   Choma in a raised voice?
12   A.  No.
13   Q.  Did you ever hear Debbie Sweeney yell at Edith
14   Choma?
15   A.  No.
16   Q.  Are you aware of an incident in which Debbie
17   Sweeney -- strike that.  Are you aware of an incident
18   in which Edith Choma went to lunch with other
19   associates including Dave Martin, Charlene Blanchard,
20   Yvonne Locker and maybe some others in which after
21   they returned late from lunch Debbie Sweeney publicly
22   berated Edith Choma?
23   A.  I've heard of the incident, yes.
24   Q.  How did you hear of that incident?

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

258

1   A. I believe Debbie told me about it.
2   Q. What did Debbie tell you about it?
3   A. What you have just said.
4   Q. Debbie told you that Edith came back from lunch
5   late?
6   A. That's correct.
7   Q. And that she publicly berated Edith for coming
8   back to lunch late?
9   A. She reminded Edith she was entitled to an hour
10  for lunch. She didn't say she publicly berated Edith.
11  Q. What was the context of Debbie Sweeney telling
12  you that?
13  A. I have no idea. I can't remember.
14  Q. Are you aware of any arguments that Debbie
15  Sweeney had with Edith Choma that were overheard by
16  others in the medical management department at Blue
17  Cross?
18       MR. HOLT: I'll make an objection to form.
19  A. No, I'm not.
20  Q. As part of her performance improvement plan was
21  Edith Choma to your knowledge required to report to
22  Debbie Sweeney when she came in in the morning and
23  when she went to lunch and when she came back from
24  lunch and when she left in the evening?

259

1   A. On page P0069 of her performance improvement
2   plan it states exactly that.
3   Q. Were you aware of that when you reviewed the
4   performance improvement plan for the first time?
5   A. Yes.
6   Q. Was that performance improvement plan designed
7   to force Edith Choma to retire or resign?
8   A. No.
9   Q. Did you anticipate that it would have that
10  effect?
11  A. No.
12  Q. Did you intend for it to have that effect?
13  A. No.
14  Q. And did you discuss whether that might happen
15  with Debbie Sweeney?
16  A. No.
17  Q. Did you discuss whether that might happen with
18  anyone else?
19  A. No.
20  Q. Was that a new requirement that Edith report
21  her comings and goings to Debbie Sweeney, was that a
22  new requirement with the PIP or had that been a
23  pre-existing requirement for Edith?
24  A. Why get involved if I can help it in day-to-day

260

1   management of stuff. I get involved if there are
2   major issues. It could have been going on and I
3   hadn't had it brought to my attention. Edith was an
4   hourly paid employee who was entitled to an hour for
5   lunch. It's reasonable that a manager will require
6   that they take an hour and no longer.
7   Q. But you don't know if prior to the PIP Edith
8   was required to report her comings and goings to
9   Debbie Sweeney?
10  A. I can't remember.
11       (Kaplan Deposition Exhibit No. 18 was
12  marked for identification.)
13  BY MR. MONDROS:
14  Q. Let me show you what has been marked as Kaplan-
15  18. My question as you probably suspect is have you
16  ever seen that document before?
17  A. No.
18  Q. As you sit here today you are seeing it for the
19  first time?
20  A. Yes.
21  Q. Do you have an understanding as to what that
22  document is?
23  A. Yes.
24  Q. What is it?

261

1   A. It's an E-mail.
2   Q. And the E-mail is from whom to whom?
3   A. From Edith Choma to Debbie Sweeney.
4   Q. What is the date on that?
5   A. November 1, 2004.
6   Q. Would that be the first working day after the
7   implementation of the PIP on August 29th, 2004?
8   A. If you would be so kind to give me a calendar I
9   can tell you.
10  Q. If I were to represent to you that October 29th
11  was a Friday, it would be fair to infer November 1st
12  was the first workday?
13  A. Yes.
14  Q. And what is the time of Edith's E-mail to
15  Debbie Sweeney?
16  A. 7:56 a.m.
17  Q. And she writes to Debbie, "I'm checking in at
18  7:50 a.m.," do you see that?
19  A. Yes.
20  Q. What time does the workday begin at Blue Cross
21  Blue Shield of Delaware?
22  A. Anywhere between typically seven and eight.
23  Depends on the work that people do. Various functions
24  have different start times.

B0179

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

262

1    Q.  Do you have an understanding as to what time
2    Edith was to report to work?
3    A.  She might have made special arrangements, but
4    typically people would come in at eight.
5    Q.  Is there something in the PIP that talks about
6    Edith's general working hours?  Maybe not.  Here it is
7    on page P0069, middle paragraph, and I'll read it into
8    the record.  "The start time can be between eight and
9    8:30."  Do you see that?
10   A.  Yes, I do now, yes.
11   Q.  As I read Kaplan-18 it looks as though Edith is
12   reporting to work on the first Monday after her
13   performance improvement plan at 7:50 a.m., is that a
14   fair interpretation of this document?
15   A.  The appropriate interpretation would be that
16   she sent the E-mail at 7:56 a.m.
17   Q.  And it says, "I am checking in at 7:50 a.m.,"
18   is that fair?
19   A.  That's what the words say, correct.
20   Q.  And what did Debbie write back to Edith?
21   A.  Says, "Thanks.  This arrived at 7:56.  What did
22   you do between 7:50 and 7:56?"
23   Q.  Do you know whether Edith Choma responded to
24   that question?

263

1    A.  I have no idea.
2    Q.  Do you think Debbie Sweeney's note there was
3    written in jest or was that a serious inquiry?
4         MR. HOLT:  Objection to form.
5    BY MR. MONDROS:
6    Q.  If you know.
7    A.  I have no idea what Debbie Sweeney was
8    thinking.
9    Q.  What were the circumstances of MBNA no longer
10   being a member of Blue Cross Blue Shield of Delaware?
11   A.  They got bought out by Bank of America and
12   there was a consolidation of their health insurance
13   benefits to Bank of America who used Blue Cross of
14   Georgia.
15   Q.  The former MBNA members are now at Blue Cross
16   Blue Shield of Georgia, are now members there?
17   A.  I'm sorry, your question actually seemed to
18   imply two different things.
19   Q.  Let me try it again.  Those individuals who
20   were members of Blue Cross Blue Shield by virtue of
21   their employment at MBNA are now members at Blue Cross
22   Blue Shield of Delaware, is that fair to say?
23   A.  No.
24   Q.  Maybe I'm not understanding what the

264

1    circumstances are then.
2    A.  The people who used to work at -- who work at
3    MBNA and which is now owned by Bank of America have
4    their health insurance now provided by Blue Cross of
5    Georgia.
6    Q.
7    Q.  Who is Valerie Starrett?
8    A.  Can you clarify the question?
9    Q.  Do you recognize the name Valerie Starrett?
10   A.  Yes, I do.
11   Q.  Who is Valerie Starrett?
12   A.  She is an ex-employee at Blue Cross Blue Shield
13   of Delaware.
14   Q.  What was her job at Blue Cross Blue Shield of
15   Delaware?
16   A.  She was essentially the manager of the quality
17   improvement area.  I cannot give you her exact title
18   right now.
19   Q.  When did she work at Blue Cross Blue Shield of
20   Delaware?
21   A.  I would need her personnel file to answer that
22   for you.
23   Q.  Who did she report to at Blue Cross Blue Shield
24   of Delaware?

265

1    A.  I assume it was Carol Doohan.
2    Q.  Was she in the medical management department?
3    A.  That's correct.
4    Q.  When is it that she left Blue Cross Blue Shield
5    of Delaware?
6    A.  I would have to look at her personnel file to
7    find out.
8    Q.  It was while Carol Doohan was still there,
9    correct?
10   A.  I can't remember without looking at the file.
11   Q.  What were the circumstances under which she no
12   longer was employed at Blue Cross Blue Shield?
13   A.  We reorganized the department and her job and
14   job function was eliminated.
15   Q.  Did she take early retirement?
16   A.  We'll have to look at her personal file to see
17   what the exact HR details were.
18   Q.  Was she terminated?
19   A.  Again, what do you mean by terminated?
20   Q.  Was she fired?
21   A.  Her job was eliminated.
22   Q.  Did she get severance?
23   A.  You would have to look in her HR file to find
24   out.

67 (Pages 262 to 265)

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

266

1    Q.  Were you involved in some sort of tape
2    recording of a conversation with Valerie Starrett?
3    A.  Yes, I was.
4    Q.  What were the circumstances of that?
5    A.  All I can recall is we were discussing
6    something and what exactly that was I don't know and
7    we were recording it.
8    Q.  Why were you recording it?
9    A.  I forget what the performance issue was, but
10   that is why we were doing it.
11   Q.  Was there any adverse action taken against you
12   for --
13   A.  I was reminded one shouldn't do that and I gave
14   her the tape. So, that was the adverse action.
15   Q.  Did something go in your personnel file about
16   that?
17   A.  I have no idea. You would have to look.
18   Q.  When you say you were reminded, who reminded
19   you?
20   A.  I would assume whoever was involved in HR at
21   the time.
22   Q.  Was that Donna May?
23   A.  I think it was before Donna May's time. I have
24   no idea.

267

1    Q.  Mr. McCullen?
2    A.  It would have been before his time as well.
3    Q.  Ms. Starrett, did she file any sort of
4    complaint or lawsuit in connection with that episode?
5    A.  Not that I'm aware of.
6    Q.  Did she receive any sort of payment from Blue
7    Cross Blue Shield in connection with that episode?
8    A.  Not that I'm aware of.
9    Q.  Can you tell me what are your job responsi-
10   bilities as the medical director of Blue Cross of
11   Delaware?
12   A.  I'm no longer the medical director so I can't
13   answer that.
14   Q.  When you were, what were your responsibilities?
15   A.  At which phase?
16   Q.  2002.
17   A.  I would have overseen the utilization
18   management, the case management, the disease
19   management, pharmacy activities. I would would have
20   obviously interacted with the physicians and reported
21   on our quality improvement activities.
22   Q.  How are your duties and responsibilities now
23   different from what they were then?
24   A.  They're not that much different other than I

268

1    now also oversee provider contracting.
2    Q.  And what does that entail?
3    A.  Doing contracts with doctors and hospitals.
4    Q.  Whether they could be members of the Blue Cross
5    Blue Shield of Delaware?
6    A.  That's credentialing. Contracting is how we
7    would pay them.
8    Q.  Do you still have the duties and responsi-
9    bilities that you had as medical director?
10   A.  Yes.
11   Q.  And in addition you have these extra contract-
12   ing responsibilities?
13   A.  Yes, but I have also shifted some responsi-
14   bilities to other medical directors.
15   Q.  Are you the guy at Blue Cross Blue Shield of
16   Delaware who makes the ultimate determination as to
17   whether to approve or deny payment for medical
18   services to members?
19   A.  No.
20   Q.  Who is the ultimate person?
21   A.  The ultimate person would actually be an
22   external review panel.
23   Q.  Tell me how that works.
24   A.  If we feel something should not be paid for,

269

1    we'll notify the member and the doctor. If they
2    appeal it and we don't believe we have the expertise
3    to adjudicate the appeal, we send it out to an
4    external physician that is unrelated to Blue Cross.
5    Q.  If Blue Cross Blue Shield makes a determination
6    that something should not be paid, do you advise the
7    member and is that -- is that when the denial letter
8    goes out?
9    A.  Correct.
10   Q.  Then, if they appeal it, they send you a letter
11   saying I'm going to appeal or something along those
12   lines?
13   A.  Yes.
14   Q.  And then an appeal letter is sent out, correct?
15   A.  The outcome of the adjudication is sent out,
16   correct.
17   Q.  And that's the appeal letter, the outcome of
18   the adjudication?
19   A.  What we have been talking about as appeal
20   letters today, yes, that's correct.
21   Q.  The denial letter, who is the person at Blue
22   Cross Blue Shield who ultimately decides whether
23   something is going to be denied in a denial letter?
24   A.  One or the other of the medical directors.

68 (Pages 266 to 269)

B0181

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

270

1    Q.  Somebody under your supervision?
2    A.  Or myself.  Depends.
3    Q.  How is that determined?
4    A.  There is a stack of work.  We each pick up work
5    and whoever is handling that particular issue at that
6    particular moment will make the decision.
7    Q.  The other medical directors right now are
8    Debbie Sweeney – no?
9    A.  No.
10    Q.  Tell me who they are.  Sorry.
11    A.  Dr. Patt Panzer and Dr. Sue Ricciardi.
12    Q.  And how about the mental health side, is that
13    Tim Toole?
14    A.  That's correct.
15    Q.  Is he the guy who makes those determinations of
16    denials with respect to mental issue or behavioral
17    health?
18    A.  No.
19    Q.  Who does that?
20    A.  Either Dr. Patt Panzer or we'll use an outside
21    psychiatric consultant.
22    Q.  Let me ask you the same questions with respect
23    to the appeal.  As I understand it in some cases you
24    refer the appeal out to an independent physician?

271

1    A.  That's correct.
2    Q.  And in other cases the appeal is handled
3    in-house?
4    A.  Usually the psychiatric ones are all sent out
5    because we don't have the expertise.
6    Q.  What about the medical ones?
7    A.  If we have the expertise, we'll deal with them.
8    If not, we'll send them out.
9    Q.  When you say "we'll deal with them," who
10    specifically deals with the appeals on which Blue
11    Cross Blue Shield of Delaware has the expertise?
12    A.  Typically they will come to me.
13    Q.  And you are the one who ultimately makes the
14    decision whether an appeal is granted or denied?
15          MR. HOLT:  Objection to form.  You can
16    answer.
17    A.  I have said already if I have the expertise and
18    I did not make the original determination, I would
19    look at it.  If I do not have the expertise, we send
20    it out.
21    Q.  There was something in the News Journal
22    yesterday and let me show you.
23          MR. MONDROS:  I guess we can mark it.
24          (Kaplan Deposition Exhibit No. 19 was

272

1    marked for identification.)
2    BY MR. MONDROS:
3    Q.  I don't know if you saw this or not, it's the
4    article in the middle of Blue Cross Blue Shield of
5    Delaware fined for tardy payments.  Do you see that?
6          MR. HOLT:  I'll make an ongoing objection
7    about the relevance and hearsay part of it and a few
8    other objections I could think of along the way.
9          MR. MONDROS:  I bet you can.
10    BY MR. MONDROS:
11    Q.  What is that article pertaining to, if you
12    know?
13    A.  I don't know the regulation number, but there
14    is a state regulation that requires that health
15    insurers pay clean health insurance claims that are
16    submitted to them within 30 days.
17    Q.  And is this a violation in which Blue Cross
18    Blue Shield failed to do that in a timely fashion?
19          MR. HOLT:  Again, I make an objection to
20    form.
21    A.  That's what Mr. Denn, the insurance
22    commissioner, concluded.
23    Q.  And is this in your medical management unit
24    that this pertains to?

273

1    A.  No.
2    Q.  What unit of Blue Cross Blue Shield of Delaware
3    does this pertain to?
4    A.  Well, we are one company, but we are divided
5    into functional units.  The company name is on this.
6    Q.  But what functional unit is this a violation
7    directed to if not the medical management unit?
8    A.  The allegation is that claims weren't paid
9    correctly, therefore, I would infer it's the claims
10    department.
11    Q.  But you don't know for sure?
12    A.  No.
13    Q.  This is not something that is in your daily
14    work, fair to say?
15    A.  No.
16    Q.  Was there an occasion on which Blue Cross Blue
17    Shield of Delaware placed a mass denial on paying for
18    the use of scanning laser ophthalmoscopy?
19          MR. HOLT:  Objection to the form of the
20    question.
21    BY MR. MONDROS:
22    Q.  Do you understand the question?
23    A.  Why don't you rephrase it just to be sure.
24    Q.  Was there a time when Blue Cross Blue Shield of

Choma v. Blue Cross Blue Shield of Delaware
Paul A. Kaplan, M.D.

274

1   Delaware refused to pay claims for scanning laser
2   ophthalmoscopy?
3       MR. HOLT: Same objection.
4   A. Re-define the question.
5   Q. Do you have an understanding of what scanning
6   laser ophthalmoscopy, SLO, is? Do you have an
7   understanding of what that is?
8   A. We could be using different terms. I'm not
9   going to venture a guess as to what you think the term
10  means.
11  Q. Are you familiar with the technology called
12  scanning laser ophthalmoscopy?
13  A. Again, I could be thinking of a totally
14  different technology. So, I don't want to put words
15  into your mouth.
16  Q. Well, what is that technology that I'm
17  referring to?
18  A. I have no idea.
19  Q. You have never heard of that before?
20  A. I've heard of things that are similar, but the
21  exact thing you are asking about --
22  Q. Tell me what similar things you heard.
23  Basically I'm saying help me out a little bit.
24  A. Are you asking about GDX ophthalmoscopy?

276

1   claim or lawsuit filed about that?
2   A. I believe it was voluntary.
3   Q. Are you sure?
4   A. No. Most of our decisions are voluntary.
5       MR. MONDROS: Let's go off for just a
6   minute. I think I am done, I want to look at the
7   notes.
8       (Brief recess.)
9   BY MR. MONDROS:
10  Q. Dr. Kaplan, I'm having a hard time finding it,
11  but at some point in my notes from earlier in the case
12  I had read that after your fall you were in a coma for
13  a period of days or weeks, is that incorrect?
14  A. That's incorrect.
15  Q. Dr. King, does he also go by the name of Biff?
16  A. Yes.
17      MR. MONDROS: That's all I have.
18      MR. HOLT: I don't have any questions.
19  Thanks, we'll read.
20      (The deposition was concluded at 5:30 p.m.)
21
22
23
24

275

1   Q. No, I'm asking about scanning laser
2   ophthalmoscopy.
3   A. It's the same thing.
4   Q. Does Blue Cross Blue Shield pay claims for GDX?
5   A. Yes.
6   Q. Has Blue Cross always paid claims for GDX?
7   A. No.
8   Q. Was there a point in time when Blue Cross Blue
9   Shield refused to pay claims for GDX?
10  A. Yes.
11  Q. And what happened?
12  A. Can you repeat the last question?
13  Q. Why did that change?
14  A. With any new technology we evaluate the
15  technology against five criteria and if it meets the
16  five criteria that we have as a standard, it gets paid
17  for. If it does not meet the five criteria, we don't
18  pay for it. Clearly, what happened with what you are
19  calling scanning laser ophthalmoscopy is new research
20  became available and new publications became available
21  demonstrating that it was equivalent to or better than
22  current therapies. So, we shifted our payment policy
23  and started to pay for it.
24  Q. Was that voluntary or was there some sort of

277

1       INDEX
2
DEPONENT: Paul A. Kaplan, M.D.          PAGE
3
Examination by Mr. Mondros          2
4
        EXHIBITS
5   KAPLAN DEPOSITION EXHIBITS          MARKED
6   1  Document Bates stamped D00082
7      through D00089          94
8
    2  Document Bates stamped D00560          141
9
    3  Document Bates stamped D00645
10     through D00652          146
11  4  Document Bates stamped P0745          139
12  5  Document entitled "Complaint"          105
13  6  Document Bates stamped D00653
       through D00660          155
14
    7  Document Bates stamped P0353          184
15
    8  Document entitled "Responsibilities"          187
16
    9  Document Bates stamped P1792          195
17
    10 Document Bates stamped P0748
18     through P0762          205
19  11 Document Bates stamped D00091,
       D00092, P0394 and D00222          211
20
    12 Document Bates stamped P0381          219
21
22  13 Document Bates stamped P1692
       through P1694          230
23
24

Wilcox and Fetzer, Ltd.    Registered Professional Reporters

B0183

Choma v. Blue Cross Blue Shield of Delaware

278

```
 1      E X H I B I T S (Continued)
 2   KAPLAN DEPOSITION EXHIBITS          MARKED
 3   14  Document Bates stamped P1597
        through P1599              236
 4
     15  Document Bates stamped P0068
 5      through P0072             239
 6   16  Document Bates stamped P0499     253
 7   17  Document Bates stamped P0301     255
 8   18  Document Bates stamped P0042     260
 9   19  Article from Sunday News Journal,
        dated 9/30/07             272
10
11   ERRATA SHEET/DEPONENT'S SIGNATURE   PAGE 279
12   CERTIFICATE OF REPORTER         PAGE 280
13
14
15
16
17
18
19
20
21
22
23
24
```

280

```
 1   State of Delaware   )
                         )
 2   New Castle County   )
 3
 4           CERTIFICATE OF REPORTER
 5
 6       I, Christina M. Vitale, Certified Shorthand
     Reporter and Notary Public, do hereby certify that
     there came before me on Monday, October 1, 2007, the
 7   deponent herein, PAUL A. KAPLAN, M.D., who was duly
     sworn by me and thereafter examined by counsel for the
 8   respective parties; that the questions asked of said
     deponent and the answers given were taken down by me
 9   in Stenotype notes and thereafter transcribed by use
     of computer-aided transcription and computer printer
10   under my direction.
11       I further certify that the foregoing is a true
     and correct transcript of the testimony given at said
12   examination of said witness.
13       I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
14   interested in the event of this suit.
15
16
17           Christina M. Vitale, CSR
             Certification            RPR
18           (Expires January        2008)
19
     DATED:
20
21              Christina M Vitale
22
23
24
```

279

```
 1
 2
 3        REPLACE THIS PAGE
 4        WITH THE ERRATA SHEET
 5        AFTER IT HAS BEEN
 6        COMPLETED AND SIGNED
 7        BY THE DEPONENT.
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| EDITH CHOMA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action |
| v. | ) | No. 06-486-JJF |
| | ) | |
| BLUE CROSS BLUE SHIELD OF | ) | - VOLUME I - |
| DELAWARE, | ) | |
| | ) | |
| Defendant. | ) | |

Deposition of EDITH A. CHOMA taken
pursuant to notice at the law offices of Young,
Conaway, Stargatt & Taylor, LLP, The Brandywine
Building, 1000 West Street, 17th Floor, Wilmington,
Delaware, beginning at 9:00 a.m. on Thursday, April
19, 2007, before Christina M. Vitale, Certified
Shorthand Reporter and Notary Public.

APPEARANCES:

     LORI ANN BREWINGTON, ESQUIRE
     MARGOLIS EDELSTEIN
       750 South Madison Street
       Wilmington, Delaware  19801
       For the Plaintiff

     SCOTT A. HOLT, ESQUIRE
     YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
       The Brandywine Building
       1000 West Street, 17th Floor
       Wilmington, Delaware  19899
       For the Defendant

ALSO PRESENT:  Donna E. May, Blue Cross Blue Shield

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com

**B0185**

Edith A. Choma                    2

```
 1              EDITH A. CHOMA, the deponent herein, having
 2      First been duly sworn on oath, was examined and
 3      testified as follows:
 4      BY MR. HOLT:
 5        Q.    Good morning, Ms. Choma, my name is Scott Holt,
 6      I'm an attorney and I represent Blue Cross Blue Shield
 7      of Delaware and we are here this morning to take your
 8      deposition.  Let me first start by asking you have you
 9      ever been involved in a lawsuit before?
10        A.    No.
11        Q.    This is the first lawsuit you have been
12      involved in?
13        A.    (Nod of head.)
14        Q.    Yes?
15        A.    Yes.
16        Q.    Let me explain.  The court reporter here cannot
17      type down nods or shrugs.
18        A.    Okay.
19        Q.    You need to answer verbally when I ask you a
20      question.
21        A.    Okay.
22        Q.    Have you ever had your deposition taken before?
23        A.    No.
24        Q.    Let me explain some of the ground rules behind
```

**B0186**

```
 1    A.   Yes.
 2    Q.   Any other jobs you can think of before Blue
 3   Cross?
 4    A.   No.  Oh, I worked for the telephone company
 5   when I graduated, I mean, if you want to put that
 6   down.
 7    Q.   After you graduated from high school?
 8    A.   Yes.  Then, I worked -- actually, I worked
 9   part-time in my senior year I worked for the DuPont
10   Company as a secretary and then I went to the
11   telephone company.  Then, I worked for Beneficial Bank
12   for Mr. Strofman.  He was a wonderful person.  He died
13   since.  He was the vice-president or secretary of the
14   bank.  He is no longer there and I don't even know if
15   it's called Beneficial Finance anymore.
16    Q.   Let's talk a little bit about your employment
17   with Blue Cross.  You began working there in 1989, is
18   that correct?
19    A.   Yes.
20         MR. HOLT:  Would you mark this as Choma-1.
21         (Choma Deposition Exhibit No. 1 was marked
22   for identification.)
23   BY MR. HOLT:
24    Q.   Ms. Choma, I've handed you what has been marked
```

**B0187**

Edith A. Choma                27

1    Q.   And you performed general secretarial work?

2    A.   Yes, I did everything.

3    Q.   After Mr. Hill did you have another job at Blue

4    Cross?

5    A.   I got promoted to cost containment under Carol

6    Doohan, D-O-O-H-A-N.

7    Q.   And what position did you hold for Ms. Doohan?

8    A.   I was the secretary to the director.  She was a

9    director.  So, that was a bump up.  Carl Hill was a

10   manager, she is a director.

11   Q.   What was Ms. Doohan the director of?

12   A.   Cost containment at the time.

13   Q.   And after that?

14   A.   I worked for Dr. Kaplan, K-A-P-L-A-N.

15   Q.   What was your position for Dr. Kaplan?

16   A.   Divisional secretary.

17   Q.   What was Dr. Kaplan's title when you first

18   started working for him?

19   A.   Medical director.

20   Q.   Why did you leave supporting Ms. Doohan and

21   start supporting Dr. Kaplan?

22   A.   She retired.  And he told me he wanted me as a

23   secretary.

24   Q.   Were you still in the cost containment unit

**B0188**

Edith A. Choma                28

1      when Dr. Kaplan came on board?

2         A.    Yes.   Carol Doohan had already left.

3         Q.    The cost containment unit, did that name change

4      at all when you were employed there?

5         A.    Yes.   I believe it is now called the quality

6      improvement department.

7         Q.    Did that change occur while you were still

8      employed at Blue Cross?

9         A.    Yes.

10        Q.    Was that part of the medical management

11     division?

12        A.    Yes.

13        Q.    Can you give me a brief description about your

14     job duties as divisional secretary for Dr. Kaplan?

15        A.    I scheduled his meetings.  I scheduled his

16     travel.  I took his dictation, which was quite a bit.

17     I kept all his time records, all of the budget

18     binders, all of his meeting binders, setting up of

19     meetings.  I did a multitude -- I mean, I'm just

20     thinking of these things as we are talking.  There is

21     probably a lot more.  Oh, I set up vendor meetings

22     when the vendors would come in and give presentations

23     so that the nurses could get credit.  I did that under

24     him.

**B0189**

1           I also worked for all of the case managers

2    that worked under him for presentations.  I also did

3    presentations for him.  I did a presentation for the

4    State of Delaware, which Jerry Icenogle, the

5    vice-president of Blue Cross thanked me for doing such

6    a good job.  I did time sheets for the entire

7    department.  I did data -- confidential reports for

8    Dr. Kaplan.  Gosh, so many things that I did for him.

9    Set up telephone conferences.  Set up lunches.

10          I worked on the QIC committee where I took

11   dictation.  Set up the meetings.  I set up -- there

12   was a special group of doctors for each disease.  For

13   example, cardiac, anything to do with the heart, I had

14   special lists that would meet on that.  I would set up

15   those meetings, meetings with -- there was a group of

16   maybe seven or eight titled groups and for the NCQA

17   accreditation I assumed that's why I would set up

18   these meetings.  These doctors are very hard to get

19   ahold of and it took quite a bit of work, but I got it

20   all done and that was one of the things I did as well.

21   Q.   You stated that Dr. Kaplan was the medical

22   director, is that correct?

23   A.   Yes.

24   Q.   Who reported directly to Dr. Kaplan?  Were

**B0190**

1    there people directly below him?

2    A.   Yes.  He had a medical director assistant, Dr.

3    Castiglioni.  Eileen Brown, who he promoted to the

4    manager of the department.  Everybody reported to him

5    basically.  I mean, even the woman that I worked for,

6    Deborah Sweeney, reported to him.  There are charts

7    that show who reports to who.  I believe you have

8    copies of those.

9    Q.   I think you testified earlier that you

10   supported other people in addition to Dr. Kaplan, is

11   that correct?

12   A.   Um-hum, yes.

13   Q.   Again, this is when you first started working

14   for him, is that correct?

15   A.   Yes.  I was even doing some work -- he would

16   ask me to do work for him before he even became my

17   boss.  He would come over and ask me to help him out

18   with presentations and things when he was working

19   under Dr. Powell.  Dr. Powell left.

20   Q.   For these other individuals in the medical

21   management group you would provide basic secretarial

22   support for them as well?

23   A.   Yes.

24   Q.   Who else was providing secretarial support for

B0191

1        Q.    At some point during your employment did your

2    title change from divisional secretary to administra-

3    tive assistant?

4        A.    I never knew because they would never tell me.

5        Q.    It's your testimony you didn't know what your

6    job title was at Blue Cross?

7        A.    I didn't know whether it was -- for instance,

8    this is medical administrative assistant.  This had

9    changed to working under Debbie Sweeney.  I was

10   supposed to have been her secretary.  So, I was

11   supposed to have been the secretary to the QI

12   department.  So, looking at this it's just confusing.

13   Is this supposed to be the latest one?

14       Q.    Let me ask you, Ms. Choma, you reviewed the

15   document, is there anything on the Principal

16   Accountabilities sections beginning on Page One and

17   continuing to Page Three that you performed as part of

18   your functions as divisional secretary for Dr. Kaplan?

19       A.    I'm going to have to get back to you on this.

20   This document does not look like my job description

21   that I have.  I'm going to have to pull mine.

22       Q.    Well, Ms. Choma, let me just ask you some

23   questions about this document and maybe we can work

24   this through.  If you look at the bottom of Page One,

**B0192**

1      A.    In other words, here is a policy for the

2      provider relations department, this is ready to be

3      keyed in, this is ready to be put into the policy and

4      procedure manual.  So, that's what I would do.

5      Q.    You said that the medical management group was

6      partly responsible for sending out claim letters, is

7      that correct?

8      A.    Well, they're not -- I wouldn't say claim

9      letters, but they were letters.  You know, when

10     patients would write in or doctors would even write in

11     that they think something should be approved.  If they

12     would review it and think differently, they would

13     correspond and write a letter.

14     Q.    Who would review these letters coming in from

15     doctors?

16     A.    Dr. Kaplan.

17     Q.    Anyone else?

18     A.    The nurses.

19     Q.    Would they respond to these letters?

20     A.    Yes.

21     Q.    Can you give me an example of some of the

22     responses that might be sent to these letters from

23     doctors?

24     A.    Well, sometimes they would write on behalf of a

**B0193**

Edith A. Choma                46

1    patient saying this patient needs a surgery and I

2    think it should be approved, whatever.  It was an

3    appeal from a doctor asking for that and the patient

4    would also do the same, write in and say you are

5    denying this and I believe it should be paid for.

6    That's what the process is.  They went through a

7    process of appeal.

8        Q.   The insurance claim had originally been denied,

9    is that correct?

10       A.   Yes.

11       Q.   And then the doctor was writing in to your

12   group asking that the procedure be allowed, is that

13   correct?

14       A.   Um-hum.

15       Q.   Yes?

16       A.   Yes.

17       Q.   Either Dr. Kaplan or some of the nurses would

18   review the letter from the doctor?

19       A.   Yes.

20       Q.   And what would happen next?

21       A.   A letter would be sent out to the doctor or

22   patient depending upon their decision.

23       Q.   And the decision could be what, for example?

24       A.   For example, if there was something like it was

**B0194**

Edith A. Choma                47

1      cosmetic and they would state this is not -- it's not

2      under our policy to pay for this.  They also had the

3      option of going to an outside doctor to have him look

4      it over.

5          Q.    Essentially they could say that we're denying

6      the claim because it's not covered within our policy?

7          A.    Um-hum, um-hum, yes.

8          Q.    Could they say that the claim -- they would

9      approve the claim in some instances?

10         A.    Yes.

11         Q.    These NCQA requirements that Blue Cross had to

12     meet did they cover these letters that were sent back

13     from Blue Cross to the various physicians?

14         A.    Yes, there was a time frame.

15         Q.    What do you mean "a time frame"?

16         A.    Well, I can't remember the exact time frames,

17     but, for instance, if a certain appeal was sent in

18     they had so many days to answer and those time frames

19     could have changed.  I don't know exactly what they

20     are.

21         Q.    So, these letters that Blue Cross had to send

22     back out to the doctors they had to sent them out

23     within a certain time under these standards?

24         A.    Yes.

**B0195**

Wilcox & Fetzer, Ltd.          Registered Professional Reporters          (302) 655-0477

1      start at nine, you have to put when you came in.  You

2      had to put at the end of the day when your day was

3      over.

4          Q.    Let's go back to Dr. Kaplan for a minute.

5      Again, Dr. Kaplan was the medical director?

6          A.    Yes.

7          Q.    Was he also the chief medical officer?

8          A.    They made him a chief medical officer I think

9      after I left.  I guess, I don't know.

10         Q.    Was he chief medical officer when you were

11     employed there or do you know?

12         A.    I don't know.  There was rumors going around

13     that he was chief.  I did his work, I just put medical

14     director and that's what I put on his letters.

15         Q.    Can you kind of give me a general description

16     of what his responsibilities were as medical director?

17         A.    Well, I know that he headed a lot of these

18     committees and he was very busy doing that.  He

19     traveled a lot.  He did a lot of presentations.  I'm

20     trying to think of what else he did.  That's all I can

21     think of for now.

22         Q.    And you said he was usually very busy?

23         A.    He is busy, but, you know, he gave me a lot of

24     dictation.  That's one thing he did.  He gave me a lot

**B0196**

Edith A. Choma                62

1    of dictation.  He would dictate while he was in a car

2    or whatever and come back and give me the tapes.

3        Q.    Do you know who he reported to?

4        A.    Tim Constantine.

5        Q.    And he is the CEO?

6        A.    Yes.

7        Q.    You stated Dr. Kaplan traveled a lot, is that

8    correct?

9        A.    Not constantly, but he did his share.  Medical

10   directors, I know when Dr. Powell, he traveled, that's

11   part of their job.

12       Q.    How often would you say he was out of the

13   office?  Half of the time?  Quarter of the time?

14       A.    I really couldn't say.  Half the time he would

15   just say, I'll see you.  So, I really don't know

16   whether he was around at another meeting in another

17   building or what.

18       Q.    You don't know whether he was traveling or how

19   much he was traveling outside of the office?

20       A.    Well, I know when I set up his trips he was

21   traveling quite a bit at one time and then he kind of

22   slowed down on his travels.  Then, when I was over at

23   the other department I don't know.

24       Q.    Do you think that medical director position was

**B0197**

Edith A. Choma                70

1              (Chomas Deposition Exhibit No. 4 was marked

2       for identification.)

3       BY MR. HOLT:

4          Q.   Ms. Choma, I've handed you what has been marked

5       as Exhibit 4.  I just want you to tell me whether you

6       recognize this document.

7          A.   Yes.

8          Q.   And this is your performance evaluation?

9          A.   Yes.

10         Q.   Was this administered by Dr. Kaplan?

11         A.   Yes.

12         Q.   Was this the first written evaluation you

13      received from Dr. Kaplan?

14         A.   Yes.

15         Q.   Looking at the second to last page, Ms. Choma,

16      Dr. Kaplan appears to have given you a combined

17      ranking of 2.69 percent, do you see that?

18         A.   Yes.

19         Q.   Was that average, below average, above average?

20         A.   It was below average.

21         Q.   Was Dr. Kaplan not happy with your performance?

22         A.   Apparently not.

23         Q.   Did you meet with Dr. Kaplan to discuss this

24      review?

**B0198**

Edith A. Choma                71

1    A.    Yes.

2    Q.    Did he provide you a copy before you met with

3    him?

4    A.    No.

5    Q.    Did he give you a copy when you met with him?

6    A.    Yes.

7    Q.    Did you meet alone with Dr. Kaplan to go over

8    this?

9    A.    Yes.

10   Q.    Where was that at?

11   A.    In his office.

12   Q.    On the first page, Ms. Choma, it has an

13   effective date of May 16, 1999?

14   A.    Yes.  That was our anniversary date so that's

15   always a given.  You just put that in there on that.

16   Q.    That was the period that he was reviewing your

17   performance, is that correct?

18   A.    Yeah, from 1998 to 1999.

19   Q.    Now, was Dr. Kaplan your supervisor, were you

20   supporting him throughout that entire period, or had

21   you also done work for Ms. Doohan during that period?

22   A.    Well, Ms. Doohan had already left the company

23   and he went and took her office over.  He just went in

24   there.  So, I worked -- he asked me to be a secretary

**B0199**

1    so I started working for him.

2    Q.    But Dr. Kaplan prepared this report as far as

3    you are aware, is that correct?

4    A.    I guess.

5    Q.    You don't know whether anyone else had any --

6    A.    I really don't know.

7    Q.    He is the one you met with to go over the

8    performance review, is that correct?

9    A.    Yes.

10    Q.    On the last page it appears to have his

11    initials on it, do you see that?

12    A.    Oh, yeah.

13    Q.    Just so we have that that document is not

14    stapled so let me make certain we put that together.

15    A.    Okay.

16    Q.    But the date on Dr. Kaplan's signature is July

17    14, 1999.  Is that about when he met with you to go

18    over this performance evaluation?

19    A.    I don't know.  There was a lot of confusion

20    over this.  There was quite a bit of confusion over

21    this.

22    Q.    Ms. Choma, when you went over this job

23    evaluation in front of you, did you disagree with any

24    part of it?

**B0200**

1    A.    Yes.

2    Q.    Did you disagree with any or just parts of it?

3    A.    All of it.

4    Q.    You disagreed with every part of Dr. Kaplan's

5    evaluation, is that correct?

6    A.    Except for the good parts.

7    Q.    Can you tell me what the not good parts are of

8    this evaluation?

9    A.    Well, I'm looking at the last page, I don't

10   know what this page number is, it's Number Two on

11   here, performance evaluation.

12              MS. BREWINGTON:   D-86.

13   BY MR. HOLT:

14   A.    The last paragraph, "Due to her dizzy spells,"

15   you see that one?

16   Q.    Yes.

17   A.    That's not true.

18   Q.    What part is not true?

19   A.    The first thing that is not true I was getting

20   vertigo.   I have Meniere's Disease.   I went into his

21   office and explained this to him that I'm not feeling

22   that -- now, this is 1999 so I'm trying to remember

23   this the best I can -- and told him I wasn't feeling

24   well and when you have these dizzy spells, you could

**B0201**

1     just look up or down and the room just spins.  Instead
2     of sitting there going through this and throwing up I
3     went in to him and said, you know, I'm getting this
4     vertigo.  Don't worry about it, that's fine, just do
5     your work at home.

6            Then, I get this, these were reflected on
7     my time sheets, those five days, and I actually put
8     them on my time sheet as being out sick.  I didn't
9     leave them blank like I was there.  I put them down as
10    five days.  They're all on my time sheet.  So -- and
11    the denial letters on time, the other secretary, that
12    was her main function to do these letters and I helped
13    her as much as I could besides doing all my other work
14    for other people.

15    Q.   Who was the other secretary you are referring
16    to?

17    A.   Christine Zakutney.  I do have a document
18    showing her work pace for a two-week period.  I have a
19    document that states what she did during those two
20    weeks.

21    Q.   The denial letters he is referencing in this
22    evaluation are those the claim denial letters you were
23    talking about --

24    A.   Yes, these are the letters --

**B0202**

1    Q.    Those are the claim denial letters we had
2    referenced before?
3    A.    Yes.
4    Q.    Ms. Zakutney did these letters?
5    A.    Yes.
6    Q.    And you also did these letters with Ms.
7    Zakutney?
8    A.    Yes.
9    Q.    Just to summarize, you basically disagree that
10   you had missed these five days of work, is that
11   correct, or are you disagreeing --
12   A.    Well, that's a lie.  What he said in there
13   that's not true.
14   Q.    That you missed five days of work?
15   A.    I missed five days of work, but he is saying
16   here that they were not reflected on my time sheet.
17   They were reflected on my time sheet.  I put them down
18   as sick days.  I have my time sheet as proof.  When he
19   states, "This has impacted the department's ability to
20   get denial letters done on time," that certainly
21   wasn't a concern to him.  He said, No problem, just go
22   home, do what you can from there.  That was not an
23   issue at all.  Now all of a sudden it was.
24   Q.    Do you know if the department had a problem

**B0203**

1    correct?

2        A.    I requested -- yes, and I gave it to him.  So,

3    it should have been in with this stuff, but it's not.

4        Q.    He should have amended or supplemented this

5    review?

6        A.    Yes.  As a matter of fact, he did amend it.

7    There is another document that says that -- he gave

8    another performance review.  Do you have the next one

9    that he gave me where he gave me -- and he would come

10   to my desk and say, Is this good enough?  Because he

11   would bump it up.  I think he changed it a couple

12   times.

13       Q.    Let's talk about your meeting with Dr. Kaplan

14   for a minute.

15       A.    Okay.

16       Q.    After you sat down with him and read through

17   your evaluation did you two have any discussions?

18       A.    Yes.

19       Q.    What did you two talk about?

20       A.    Well, he gave me my evaluation and I read it.

21   Then, he started saying to me, you know, I don't like

22   the way you lift up your glasses to look at the

23   screen, it annoys me.  When you go to the copy

24   machine, it should take you one second to copy a page.

**B0204**

Edith A. Choma                96

1    I don't think the blood is getting to your brain.

2    Maybe it's your thyroid.  You know why, you know the

3    saying kick the dog, that's why I treat you the way I

4    do.  I remember everything he said to me.  I told him

5    I would not accept that behavior and I would not

6    accept this performance review.

7    Q.    When you sat down with Dr. Kaplan I assume you

8    first read the review before you started talking with

9    him, correct?

10   A.    Yeah, I sat there and -- yeah, I told him, I

11   totally disagree with this.

12   Q.    Is that when he made these comments?

13   A.    Yes.

14   Q.    Did you say anything to him before he made

15   these comments?

16   A.    Well, actually, I just got done reading this

17   and said to him, "I disagree with this evaluation."

18   Then, he just started right in on me.

19   Q.    Again, your recollection is he said he doesn't

20   like the way you lift up your glasses?

21   A.    Yeah, when I look at something close-up I have

22   to lift up my glasses.  Between nearsightedness and

23   whatever you call it.

24   Q.    Did you ask him at that meeting why he said

**B0205**

Edith A. Choma                97

1    that or why he doesn't like the way --

2    A.    When he got done --

3              MS. BREWINGTON:  Let's pause for one second

4    here.  I'm going to have to instruct you to wait until

5    he finishes the whole question.

6              THE WITNESS:  I always think you are done

7    because of my hearing.  I think when you ask the first

8    thing and then you like hesitate or something I think

9    you are done.  I'm sorry.

10             MS. BREWINGTON:  Take your time.  Okay.

11   BY MR. HOLT:

12   Q.    After he made this comment about the way he

13   doesn't like the way you lift up your glasses did you

14   ask him why he made that comment or why?

15   A.    Yes.

16   Q.    What did you say to him?

17   A.    I said, "Dr. Kaplan," I said, "You are way out

18   of line."  I said, "I just cannot believe that you

19   would make these statements to me especially when you

20   are a doctor."

21   Q.    Had he ever made any statements like this to

22   you before?

23   A.    Yes.  He told me -- this is the instance I just

24   have to tell you, I guess.  I went into his office and

**B0206**

```
 1    he asked me to do something and I said, "I'm sorry,

 2    but I didn't hear what you said."  He got up from his

 3    chair and he literally yelled in my face.

 4    Q.   Why did you go into his office?

 5    A.   He called me in there.  He was giving me

 6    instructions and part of the thing I didn't hear.

 7    Q.   So, he was giving you instructions when he

 8    called you into the office, is that correct?

 9    A.   Yes.

10    Q.   And you couldn't hear him?

11    A.   I couldn't hear part of it.

12    Q.   What happened next?

13    A.   He yelled in my face and I heard it then.  I

14    turned around and walked out.  Actually, I was really

15    getting concerned about his behavior towards me.

16    Q.   And that incident occurred before you received

17    your performance appraisal, is that correct?

18    A.   The one I just told you about?

19    Q.   Yes.

20    A.   No.  Afterwards.

21    Q.   My question before was prior to the statements

22    he made to you at this meeting to review your

23    evaluation did he ever say anything similar to you in

24    that respect?
```

**B0207**

Edith A. Choma          101

1    work slowly at tasks you were given.  Do you think Dr.

2    Kaplan was concerned that you took too long to do

3    these various assignments?

4    A.    No.

5    Q.    Why did he write those statements in there?

6              MS. BREWINGTON:  Objection calls for

7    speculation.  You can answer.

8    BY MR. HOLT:

9    A.    He wanted me to leave.  He decided he didn't

10   want me in the position.  I guess that was his

11   ulterior motive.

12   Q.    So, your testimony is that he did not believe

13   that you were too slow at some of your tasks?

14   A.    He didn't even know.

15   Q.    He didn't know --

16   A.    He didn't know what I did every day.  He had no

17   idea what I did.  When I met with Joe Hall he made

18   that very statement to me and I told him everything I

19   did.  He said, "He has no idea what you did."  I asked

20   Joe Hall for that memo and when he left the company,

21   he never gave it to me.  I don't know whether human

22   resources has it.  It was a memo somewhere floating

23   around.

24   Q.    Isn't it possible, Ms. Choma, since Dr. Kaplan

**B0208**

1    didn't know what you were doing he didn't really have

2    an idea that you were doing as much work as you

3    actually had on your plate, isn't that a possibility?

4        A.   Well, I discussed that with him after he gave

5    me the review.

6        Q.   But he didn't know that before this review, is

7    that correct?

8        A.   Yes, he did because I gave him that form that

9    showed everything that I did like he requested of the

10   other secretary.  I said, "Here, this is basically

11   what I do every day," and I handed it to him.  Oh,

12   this is great, this gives me more input.

13       Q.   Didn't that occur after this evaluation?

14       A.   No.  It occurred -- don't forget, he personally

15   came up to me and said, "I want you to make a list of

16   everything you do."  I probably have that E-mail too.

17       Q.   You don't think it's possible that Dr. Kaplan

18   thought you were too slow on projects?

19       A.   No, not when he made a statement to me you

20   could work circles around everybody in here.

21       Q.   When did he make that statement?

22       A.   Well, he made it to me after all this stuff.

23       Q.   Well, do you recall what date?

24       A.   No, I don't.

**B0209**

1    Q.    Was it after you left employment with Blue

2    Cross?

3    A.    What?

4    Q.    Was it after you left employment with Blue

5    Cross?

6    A.    No.

7              MS. BREWINGTON:  Do you know when we are

8    going to take a break?  It's noon.

9              MR. HOLT:  Let's go ahead and take a lunch

10   break now.

11             (Lunch recess.)

12   BY MR. HOLT:

13   Q.    Good afternoon, Ms. Choma, we are picking up

14   where we left off before lunch and we were discussing

15   your meeting with Dr. Kaplan regarding your first

16   evaluation.

17   A.    Yes.

18   Q.    We were going through some of the remarks Dr.

19   Kaplan you said he had made during the meeting and I

20   believe one of them was that you stated that he said

21   that blood was not getting to your brain, is that

22   correct?

23   A.    Yes.

24   Q.    Yes?

**B0210**

1    A.    Yes.

2    Q.    And, by the way, did just repeat all of these

3    statements one after the other or was this in the

4    series of conversations you were having with him at

5    this meeting?

6    A.    He just said one after the other.  It all came

7    out what he didn't like about me.  Just started and

8    kept going.

9    Q.    He basically made a list of things that he

10   didn't like about you?

11   A.    Yes.

12   Q.    One after the other?

13   A.    Yes.

14   Q.    And you didn't really comment until after he

15   finished going through all these things?

16   A.    Yeah, because he was still --

17   Q.    Was he reading off a list that he had or doing

18   it off the top of his head?

19   A.    He was doing it off the top of his head, I

20   believe.  I mean, he had the performance evaluation in

21   front of him.  So, I don't know if he had his own

22   notes or what.

23   Q.    Did you ask him what he meant by I don't think

24   the blood is getting to your brain?

**B0211**

1    A.    I was so shocked and so dumbfounded by the

2    things he was saying I just told him -- my statement

3    back to him was, "I just cannot accept this behavior

4    from you.  I can't accept these statements and your

5    behavior and I cannot accept this performance review."

6    Q.    After he went through the list of various

7    comments about you that's when you basically said I

8    cannot accept this about this type of --

9    A.    Well, I waited until he was finished, yes.

10   Q.    Did he respond?

11   A.    No, he didn't answer me at all.

12   Q.    And was that the end of the meeting?

13   A.    Yes.

14   Q.    How long was the meeting, would you say?

15   A.    I have no idea.

16   Q.    Would it be longer than five minutes?

17   A.    Yes.

18   Q.    More than ten minutes?

19   A.    Yes.

20   Q.    Was it a half hour?

21   A.    Approximately.

22   Q.    What happened after the meeting?

23   A.    Well, I called human resources and scheduled an

24   appointment with Vicki Sessoms.

**B0212**

1    Q.    Who is Vicki Sessoms?

2    A.    She was the human resources director at the

3    time.

4    Q.    Did you call immediately after leaving the

5    meeting with Dr. Kaplan?

6    A.    You know, I can't remember.  I was so upset.  I

7    can't remember if it was right after.  I just cannot

8    remember.

9    Q.    Did you talk to anyone else before calling Ms.

10   Sessoms about the meeting with Dr. Kaplan?

11   A.    Before I met with Dr. Kaplan about my review?

12   Q.    Did you talk to anyone else about that meeting

13   prior to calling Ms. Sessoms?

14   A.    No.  I told my husband, though.

15   Q.    Did you talk to him before you called Ms.

16   Sessoms?

17   A.    No, after.

18   Q.    Again, my question, did you talk to anyone

19   about that meeting with Dr. Kaplan before you went and

20   called Ms. Sessoms?

21   A.    I'm trying to go backwards and see exactly what

22   happened.  I know that I talked to Diane Coates, who

23   worked for Tim Constantine at the time, and she said

24   she could not believe the review that he gave me.  She

**B0213**

1     said he is actually saying that you committed fraud by

2     doing your time sheet and not putting those days down.

3     She said, "I don't know what is going on, I can't

4     believe he gave you that kind of a review."  I think

5     -- this is as far as I can remember, it has been so

6     long.   Then, I believe I called Ms. Sessoms, I don't

7     know the time frame of this, and she came and --

8     Q.    You spoke to Ms. Coates about your review?

9     A.    Yes.

10    Q.    And, again, that's the CEO's --

11    A.    She was the vice-president's secretary at that

12    time.   I don't know who she works for now.  She wasn't

13    his secretary, I don't think, when he was a CEO.

14    Q.    And you talked to her about the comments in the

15    review?

16    A.    And I cannot remember if she called me or I

17    called her, but the conversation went like I told you.

18    Q.    But based on what you just testified you did

19    talk to her about the comments in your review?

20    A.    Yes.

21    Q.    Is that correct?

22    A.    Yes.

23    Q.    Did you him talk about the comments Dr. Kaplan

24    made to you in this meeting?

**B0214**

Edith A. Choma          108

1    A.   I cannot remember.

2    Q.   When you contacted Ms. Sessoms, did you talk to

3    her by phone or in person?

4    A.   By phone.

5    Q.   What did you say to Ms. Sessoms when you spoke

6    to her on the phone?

7    A.   I told her about the things that he had said to

8    me and I told her about my performance review.

9    Q.   Did she have any response?

10   A.   She came out and met with me.

11   Q.   Where did she meet with you?

12   A.   I believe it was in -- I can't remember if it

13   was one of the offices in a hallway, one of the

14   meeting rooms, I think we went in there.  I just can't

15   remember.  I know we were by ourselves.

16   Q.   Had you ever made any complaints to Ms. Sessoms

17   prior to this event?

18   A.   About Dr. Kaplan?

19   Q.   Or anyone else.

20   A.   I can't think of any.

21   Q.   What was said at this meeting with Ms. Sessoms?

22   A.   Well, I had my notes and I was reading

23   everything off to her and told her what happened.

24   Q.   Before you go any further, what notes were

**B0215**

1    these?

2    A.    I just wrote myself notes about the date, you

3    know, and the things he was saying to me.

4    Q.    When did you write these notes?

5    A.    After I met with him, after this evaluation.

6    Q.    Right after the meeting?

7    A.    Um-hum.

8    Q.    Yes?

9    A.    Yes.

10    Q.    What did you write down on these notes?

11    A.    I wrote down the things that he said and I

12    wrote down what he said in my evaluation and what I

13    told him that I could not accept his behavior.  I also

14    showed her time sheets that were done by the other

15    secretary where she was getting comp. time and the law

16    forbids that.

17    Q.    Before you go any further on Ms. Sessoms I want

18    to talk a little bit more about those notes that you

19    made right after the meeting with Dr. Kaplan.

20    A.    Okay.

21    Q.    You testified that you made these notes right

22    after you left the meeting with Dr. Kaplan, is that

23    right?

24    A.    Yes.

**B0216**

Edith A. Choma          110

1    Q.    And these were handwritten notes?

2    A.    Yes.

3    Q.    About how many pages were these?

4    A.    They could have been two or three, I'm not

5    sure, it was a legal tablet.

6    Q.    Do you still have copies of these notes?

7    A.    I don't know if I do.  That was way --

8    Q.    You don't know if these notes are in your file

9    or not?

10   A.    They're somewhere, I'll put it that way, but I

11   don't know where.

12   Q.    If they're not in your file, where else could

13   they be?

14   A.    Well, they could be in a box, I have a box of

15   things, they could be in there.

16   Q.    Did you ever provide a copy of these notes to

17   anyone?

18   A.    I asked her if she wanted copies.  I said, "Do

19   you want to make a copy of this stuff for you?"  She

20   said, "No, never mind."  She went in his office and

21   slammed the door.

22   Q.    The notes you took after the meeting did you

23   ever provide a copy of those notes to anyone?

24   A.    No.  I offered them to her and she said never

**B0217**

1    mind.

2        Q.    How about did you provide a copy to the

3    Department of Labor?

4        A.    I don't think so.

5              MR. HOLT:  Lori, I'm going to ask to see if

6    we can check and find these notes.

7    BY MR. HOLT:

8        Q.    When you met with Ms. Sessoms, did you show a

9    copy of these notes to her?

10       A.    Yes, yes.  Yeah, that's what I just stated.  I

11   showed her a copy of the notes because actually she

12   was sitting with me and we were going over everything.

13   I said, "Would you like a copy of everything?"  She

14   said, "Never mind."  She went into his office and

15   slammed the door.

16       Q.    Did Ms. Sessoms read the notes that you gave to

17   her?

18       A.    Yes, her and I were both sitting there looking

19   at them together just like we are doing with this one.

20       Q.    Was there anything else that you gave to her

21   besides those notes at this meeting?

22       A.    I cannot remember.  I was so concerned about --

23   focused on that.

24       Q.    The only thing that you remember giving to Ms.

**B0218**

1    Sessoms was a copy of these notes that you took after

2    being with Dr. Kaplan?

3      A.    No, I didn't give her a copy because she said,

4    "Never mind, I don't want a copy."

5      Q.    The only thing that you brought to that meeting

6    was a copy of these notes that you took after the

7    meeting with Dr. Kaplan?

8      A.    Yeah, it was the original of notes, yes.

9      Q.    And then she read these notes?

10     A.    Yes.

11     Q.    You don't remember bringing any other documents

12   to that meeting?

13     A.    I probably did have time sheets showing where

14   comp. time was given where it wasn't allowed for a

15   non-exempt person.

16     Q.    Why did you bring those notes to this meeting?

17     A.    I just had everything together and I just

18   grabbed everything and just had everything in that one

19   particular binder -- not binder -- file and that was

20   in the back and I just said that here is another

21   thing.

22     Q.    What else was in that file that you brought?

23     A.    I think just those two things.  I really cannot

24   remember everything, but if and when I find it, I will

**B0219**

Edith A. Choma          113

1      definitely produce it.

2      Q.    But you don't know why you brought these comp.

3      time sheets?

4      A.    No.  No, I don't.  It was just in there

5      together, everything was in the file.  Picked up the

6      file and brought it.

7      Q.    Did they relate to anything that Dr. Kaplan

8      said to you in this meeting?

9      A.    Well, in a way it did, but I can't be sure

10     about this, but I believe she was using comp. time and

11     he might have signed a couple of her time sheets.  I'm

12     not sure.

13     Q.    Who is "she"?

14     A.    The other secretary, Christine Zakutney.

15     Q.    And you believe these time sheets reflected

16     what?

17     A.    It reflected that she was using comp. time

18     instead of getting paid for working overtime.

19     Q.    Was this something that you discussed with Dr.

20     Kaplan at this meeting after the interview --

21     A.    No, no, because this was like --

22     Q.    Just wait until I finish the question.

23     A.    Okay.

24     Q.    Why did you think it was important for Ms.

**B0220**

Edith A. Choma          114

1    Sessoms to see these time records?

2        A.    Well, I'm not really saying it was important.

3    I'm just saying it was in the file with the other

4    documents.

5        Q.    So, it really wasn't material or important?

6        A.    Well, in fact it's important, but as far as

7    what I was concerned with was my evaluation and things

8    that he said to me.

9        Q.    Why was it important?

10       A.    What was what important?

11       Q.    Why were the comp. time reports important at

12   the time?

13       A.    Why were they at the time?

14       Q.    Yes.

15       A.    I think there is a law that you cannot pay

16   someone -- you have to pay someone overtime, you can't

17   give them comp. time when they're non-exempt.

18       Q.    You thought this was important for Ms. Sessoms

19   to know at the time?

20       A.    I didn't say it was important for her to know.

21   I said it was in the file with my other papers and

22   when I was going through my papers that was behind my

23   papers and I just pointed it out to her.

24       Q.    And, correct me if I'm wrong, you testified a

**B0221**

1    few minutes ago that the only thing in that file was

2    your notes from the meeting with Dr. Kaplan and these

3    time sheets, is that correct?

4        A.    I believe so.  I would have to find that

5    information to be able to answer you more thoroughly

6    on that.

7        Q.    You don't know if you still have that file or

8    not?

9        A.    Well, you are talking about almost ten years

10   ago so I would have to look and see.

11       Q.    Were you concerned Ms. Zakutney was getting

12   comp. time?

13       A.    No.

14       Q.    You didn't have a problem with her getting

15   comp. time?

16       A.    Well, actually, I know it's against the company

17   policy, that's it.  That's it, period.

18       Q.    And that's why it was in your file?

19       A.    Probably.

20       Q.    After Ms. Sessoms reviewed these documents did

21   she say anything to you before she left the meeting?

22       A.    Yes.  She said she was going to look into this.

23   She had a talk with Dr. Kaplan.

24       Q.    Did she meet with Dr. Kaplan?

**B0222**

1      A.    Yes, that's what I told you previously.  After

2    she talked to me, went over these, I asked her if she

3    wanted a copy and she said, "Never mind."  She seemed

4    to be irritated and she went in his office and slammed

5    the door.

6      Q.    Was there anyone else in the office besides Dr.

7    Kaplan?

8      A.    Oh, in his office?  No, he was there by

9    himself, I believe.

10      Q.    Along with Ms. Sessoms, correct?

11      A.    Yes.

12      Q.    Did you see her go into his office?

13      A.    Yeah, I sat right outside his office.

14      Q.    Do you know how long they met for?

15      A.    Maybe an hour.

16      Q.    What happened next?

17      A.    She came out of his office and told me -- we

18    had a discussion and she told me that she was going to

19    get my job re-evaluated and she told me Joe Hall would

20    call me and set up the meeting.

21      Q.    Did you ever have any subsequent discussions

22    with Ms. Sessoms about that evaluation?

23      A.    Yeah, she said because of the evaluation that

24    he gave me that if that -- if that stayed lower than a

**B0223**

1    3.0 average that he could get rid of me.

2    Q.    When did she have that conversation with you?

3    A.    Right when we were going over all the notes.

4    We were discussing after she --

5    Q.    At your first meeting with Ms. Sessoms?

6    A.    Yes.

7    Q.    Again, after she left the meeting with Dr.

8    Kaplan she came to you and told you that Mr. Hall

9    would be contacting you?

10    A.    Yes.

11    Q.    After that did Ms. Sessoms ever have any

12    further communications with you regarding this

13    evaluation?

14    A.    I can't recall.  I could have some notes, I'm

15    not sure.

16    Q.    Who is Joe Hall?

17    A.    He worked for human resources.  I believe he

18    was -- he might have been -- I can't remember -- I

19    think what he does is he grades jobs at the time.  I

20    think he looks at the facts and --

21    Q.    Did Mr. Hall contact you?

22    A.    Yes, he did.

23    Q.    About how long after your meeting with Ms.

24    Sessoms did he contact you?

**B0224**

1      A.    I think it was sometime in September.  I think
2    I was going to go on vacation, I believe.  I really
3    cannot be positive about that, his schedule versus
4    mine, but I think it was about September sometime we
5    met.
6      Q.    It was really a few months after your first
7    meeting with Dr. Kaplan, is that about right?
8      A.    About four or five months.
9      Q.    What happened in this meeting with Joe Hall?
10     A.    He asked me about my job, what I did, and I
11   told him.  He made the statement to me that, "You do
12   all this work for everybody?  I don't think he has a
13   clue about what you do in the department.  I'm going
14   to see about getting you an upgrade."
15     Q.    Mr. Hall explained to you that he didn't think
16   Dr. Kaplan really knew what you did?
17     A.    Exactly.
18     Q.    That he wasn't really aware that you did all
19   this work for the whole department?
20     A.    Right, yes.
21     Q.    What happened next?
22     A.    I think I gave him copies of the stuff that I
23   did, I just cannot remember, and he said, "You'll be
24   hearing from me."  Then, I believe they contacted Dr.

**B0225**

1     Kaplan and he was told to do my review over again.

2        Q.   Do you know who contacted Dr. Kaplan?

3        A.   I think I'm pretty sure it was Vicki Sessoms

4     that asked him to do my review over.  She must have

5     said something before she left because Dr. Kaplan says

6     to me, "I was told I had to do your review over."

7     That's how he worded it so I'm assuming it was her.

8        Q.   Based upon what Dr. Kaplan told you you assume

9     someone said, You need to do Ms. Choma's review over?

10       A.   Yes.  She said I could go to the Labor Board

11    because of the way he treated me.

12       Q.   Who said that?

13       A.   Vicki Sessoms.

14       Q.   Did she recommend that you go to the Labor

15    Board?

16       A.   No.

17       Q.   What happened next?  Did Dr. Kaplan review your

18    evaluation?

19       A.   Yes.  There should be copies.  You guys should

20    have copies of that where I think he did it a couple

21    times.  That's why I'm saying there is so many things

22    floating around and he would give it to me to read and

23    say, Check this over, is this good enough?  It was

24    like, Is this good enough?  I think he did it twice.

**B0226**

1    people and, yes, I did work for all the directors and

2    I was doing that before they even upgraded me.  That's

3    why I got an upgrade.  I was told that that upgrade

4    was not a promotion, it was a re-evaluation.

5        Q.    Did you not, in fact, receive a bump in your

6    salary because of the increase in grade?

7        A.    $12.00, one percent.  And I asked Dr. Kaplan, I

8    asked -- first of all, I called Joe Hall and I said,

9    you know, my understanding is that when you -- because

10   I thought it was a promotion.  I understand that when

11   you got a promotion bottom line is you at least get a

12   three percent increase, that's what everybody else

13   gets.  I know this because I see their things, I see

14   what they get.  He said, "Well, that's all Dr. Kaplan

15   wanted to give you."  I said, "That's all he wanted to

16   give me was one percent?"  So, this is where the

17   conflict comes in.

18              He is giving me a 4 point something, but on

19   the other end he is conflicting himself by -- when I

20   asked him, I said, "Dr. Kaplan," I said, "Friday you

21   told me that I would be so happy with what I was going

22   to get and," I said, "I notice this one percent on

23   there."  He said, "If it was up to me you would have

24   gotten nothing."  That was his answer to me.

**B0227**

Edith A. Choma        138

1      Q.    And you weren't happy with that one percent

2   increase?

3      A.    No, I was not because I don't think it was fair

4   because the general policy is a three percent if you

5   get a promotion, but since it was a re-evaluation and

6   the fact that he said you are really going to be happy

7   with the raise you are going to get, Dr. Kaplan said

8   this, then he turned around and that's what I got.

9      Q.    You notice in that paragraph Dr. Kaplan also

10  stated that as a result of the NCQA survey the volume

11  of work is going to be increasing for the department?

12     A.    Yes.

13     Q.    Do you see that?

14     A.    Um-hum.

15            MS. BREWINGTON:   Yes?

16            THE WITNESS:   Yes.

17  BY MR. HOLT:

18     Q.    That, in fact, was occurring, the volume of

19  work --

20     A.    Yes, it was very heavy.

21     Q.    Everybody was working a lot?

22     A.    Yes.

23     Q.    Including yourself?

24     A.    Yes, day and night.

**B0228**

Edith A. Choma          145

 1    and get the work out?

 2    A.    Yes, and it got done, it got down on time and

 3    we got accredited, we got a four star.  I think we got

 4    the highest.  It got done.

 5    Q.    Ms. Choma, you testified before that you did

 6    dictation for Dr. Kaplan?

 7    A.    Yes.

 8    Q.    He would transcribe a lot of tapes while

 9    traveling, for instance, and you would have to --

10    excuse me, strike that.  He would dictate a lot of

11    tapes while traveling and you would have to transcribe

12    them later on, is that correct?

13    A.    Yes.

14    Q.    Tell me how you would transcribe these tapes.

15    A.    No, he did not make a deal with me.  He did not

16    make a deal with me.  He gave me tape after tape after

17    tape and I would transcribe them.  I would put them on

18    his desk for him to sign.  He would cross out some

19    words that were wrong, you know, the words that he

20    didn't want to use, some of them -- sentences he would

21    cross out because he would change his train of

22    thought.  Never had a deal.  I did work for him until

23    the day I left the company.

24    Q.    Were these microcasettes or full size casettes?

**B0229**

1    A.    They're little ones.

2    Q.    Would you put them into a machine?

3    A.    Yes.

4    Q.    Would you have headphones to listen?

5    A.    Yes.

6    Q.    And you could back-up the tapes and listen to

7    them?

8    A.    Yes.

9    Q.    After you transcribed the contents of the tapes

10   you would take the letter that you typed and put it on

11   his desk for review?

12   A.    Yes.

13   Q.    Ms. Choma, I think you testified earlier you

14   have been diagnosed with Meniere's Disease, is that

15   correct?

16   A.    Yes.

17   Q.    Does that affect your ability to hear?

18   A.    Yes, this left ear here is bad.

19   Q.    What do you mean by "bad"?

20   A.    Well, I cannot hear.  Today is worse because of

21   the weather.  It makes it worse.  You don't get that

22   hearing back.  Every time you have an episode it makes

23   your hearing more diminished.

24   Q.    Would that hearing impairment affect your

**B0230**

1    ability to transcribe those tapes?

2    A.    Apparently it didn't seem to.  He still gave me

3    dictation knowing what I had so it didn't bother him.

4    He just seemed okay with it.

5    Q.    I guess my question to you was did your hearing

6    condition affect your ability to hear what Dr. Kaplan

7    was dictating on these tapes?

8    A.    What I would do is -- of course, I turned the

9    volume up, number one.  If I couldn't make out a word

10    because he does have an accent, if he said a word in

11    there that I couldn't make out, then I would ask

12    someone, but basically I just typed everything and

13    just gave it to him.

14    Q.    It's your testimony that your hearing condition

15    did not affect your ability to do transcription of his

16    tapes?

17                MS. BREWINGTON:  I'm going to object, asked

18    and answered, but you can answer the question.

19                THE WITNESS:  What did you say?

20                MS. BREWINGTON:  I objected, I said asked

21    and answered, but you can answer the question.

22                THE WITNESS:  Which is?

23                MR. HOLT:  Read the question back.

24                (The pending question was read back by the

**B0231**

1    court reporter.)

2    BY MR. HOLT:

3        A.    Well, to answer that I would say yes and no.

4    It's hard to say because sometimes he would give me a

5    tape to dictate and I could turn the volume up and

6    because of repeated ways he would talk I got to know

7    the words and I got to know what he would say and I

8    was okay.  There were times when I was not okay.  So,

9    it's kind of a, you know, thing that I mentioned.

10            I mentioned this to someone and they said,

11   You mean he gives you dictation when you can't hear

12   it?  I have that disability, but I'm still able to

13   function and work and if I can hear out of this one

14   side and just turn it up or go backwards, go forward

15   and try to get it done, but at times it was a

16   hindrance I would say.  I guess you could say it was.

17   He kept giving me dictation so it didn't seem like --

18   he must not have thought it was a problem.  I don't

19   know.  I don't know how to answer that.

20       Q.    Let me see if I can clarify that with a few

21   follow-up questions.  Was it that sometimes you could

22   hear his dictation and sometimes you could not?

23       A.    I could like hear it, but it wasn't clear

24   sometimes.  I don't know how else to explain it.  I

**B0232**

1    don't know how to --

2       Q.    Sometimes you could hear what Dr. Kaplan was

3    saying on the tapes and sometimes you couldn't?

4       A.    Sometimes I needed help.

5       Q.    By help what do you mean?

6       A.    I would ask someone to come over and say, What

7    is this word he is saying or what is this sentence?

8       Q.    Would they be able to understand what he is

9    saying?

10      A.    Yes.

11      Q.    All the time?

12      A.    Yup.

13      Q.    So, on those instances where you could not

14   understand what he was saying was that because of your

15   hearing condition?

16      A.    Oh, yeah, yeah.  And sometimes I would just

17   leave it blank there if there was nobody around and

18   then he would fill in the word when he gave the letter

19   back to me.

20      Q.    Would it be just, for instance, one word you

21   couldn't hear or a whole sentence?

22      A.    It depends.  Sometimes it was just a sentence

23   and sometimes it was a couple words.

24      Q.    What there certain parts of the tape or

**B0233**

1    sometimes you couldn't understand the entire tape?

2    A.    Both.   There were times I got a tape and I had

3    to give it back to him.  I said, "I don't know what is

4    wrong with this tape, you can't even make it out at

5    all."  He agreed.  He said there was something wrong

6    with the tape.

7    Q.    But when you asked people to come over and

8    listen to the tape to understand what he was saying,

9    would they listen to the entire tape or just certain

10   parts of it?

11   A.    I would usually run it back to the part where I

12   couldn't get it and then I would hit play and they

13   would listen.  Then, you know, with the earphones and

14   they would say, Oh, this is what he said.

15   Q.    Again, they would be able to understand what he

16   said?

17   A.    Most of the time.  If they did not, I would

18   leave it blank.  I'm sorry, I don't know what else to

19   tell you.

20   Q.    There were sometimes even when you asked

21   someone else to listen to it they would not be able to

22   understand what he was saying?

23   A.    I'm going to say 99 percent of the time they

24   knew what he was saying because they're medical people

**B0234**

Edith A. Choma          151

1     and they knew the gist of the thing.

2         Q.    Was it because they understood the terminology

3     that he was talking about?

4         A.    I don't know.  I mean, I never asked them, the

5     people.  If I asked somebody to help me, I would

6     say -- for instance, I would say to Teresa Smith, I

7     can't hear this too good, can you tell me what he is

8     saying?  I would run it back and put the earphones on

9     and she would say he is saying this, this and this.

10        Q.    Would that be because she was familiar with the

11    medical terminology?

12        A.    I don't know whether it was that or because she

13    could hear it better.  I don't know how to answer

14    that.

15        Q.    As you testify here today are you sure the

16    reason you couldn't hear the -- those instances where

17    you couldn't understand what he was saying is because

18    of your hearing condition?

19        A.    Yeah.

20        Q.    So, just so I'm clear your hearing condition

21    prevented you from understanding what Dr. Kaplan said

22    on certain portions of those tapes?

23        A.    Yes.

24        Q.    It's my understanding, Ms. Choma, that you

**B0235**

Edith A. Choma                152

1    could not wear a hearing aid to correct this

2    condition?

3      A.    Correct, every doctor that I went to a hearing

4    aid was not an option.

5      Q.    There was nothing that could have been done to

6    help you hear better on this dictation?

7      A.    Unless I had an operation.

8      Q.    Putting aside operation there was --

9      A.    No.

10     Q.    -- there was nothing that could be done to help

11   you hear better on this dictation?

12     A.    Not that I was aware of.

13     Q.    Again, doing transcription of dictation was

14   part of your job requirements as a secretary for Dr.

15   Kaplan?

16     A.    He did not tell me that when he asked me to

17   work for him.  He didn't lay out a criteria, this is

18   what you are going to have to do, he did not specify.

19   I think I might have stated before that when you are a

20   secretary that is probably a divisional secretary or

21   go up and work for a VP, they mostly do the meetings

22   and taking care of those type of things.  I wasn't

23   aware I was going to have constant dictation like

24   that.  I was never told that.

**B0236**

```
 1              I was never shown a -- I was never given
 2    a -- what do you call that -- a curriculum and said
 3    this is what you are going to have to do if you are
 4    going to work for me.  No, never told.
 5    Q.    But you were constantly asked by Dr. Kaplan to
 6    do dictation, correct?
 7    A.    Yes.
 8    Q.    So, that was part of your job, correct?
 9    A.    Well, what can I tell you?  Anytime somebody
10    asks me something to me it's part of my job.
11    Q.    Dr. Kaplan was your supervisor?
12    A.    Yeah.
13    Q.    What he asked you to do you had to do?
14    A.    I guess so.
15    Q.    Did you explain to Dr. Kaplan that you couldn't
16    hear his dictation because you had a hearing
17    condition?
18    A.    Well, Dr. Kaplan knows about my condition
19    because after all he had to let me go to Johns Hopkins
20    Hospital so he had to refer me there.  So, he knows
21    what Meniere's Disease is.  He is a doctor so he knows
22    all about that.  So, when he was giving me these tapes
23    to dictate he knew fully well the hearing situation.
24    When I would even go into his office and explain to
```

**B0237**

```
 1    your medical records, I mean, everything is right

 2    there.  I'm sure they all knew I had -- it goes down

 3    the line when I had to go to John Hopkins.  One of the

 4    nurses told me to go to John Hopkins.

 5       Q.   Did the employees who worked with you have

 6    access to your medical records?

 7       A.   Everybody in there does.  When you go into the

 8    screen where you can see the doctors that you go to

 9    and you are referred to you can kind of figure it out.

10    It's all private, I mean, it's all protected.

11       Q.   Could you access other people's medical records

12    when you worked?

13       A.   Their medical records, no.  No, not their

14    medical records.

15       Q.   Just so I'm clear you couldn't access other

16    employees' records while you worked there?

17       A.   No.

18       Q.   And they couldn't access yours?

19       A.   No.

20       Q.   I guess I'm going back to my original question,

21    how do they know you had these hearing difficulties?

22    Was it because you told them?

23       A.   It was because when I kept telling them I can't

24    hear you and it was the fact that they were visually
```

**B0238**

1    seeing me going into an attack.  That's how they knew.

2    Q.    Going into an attack?

3    A.    Yeah, when you have Meniere's Disease you get

4    vertigo attacks and do you know anything about

5    Meniere's Disease?

6    Q.    I guess my question to you is the hearing

7    aspect and how people knew.

8    A.    Yeah.

9    Q.    And you said that you would go into an attack.

10   A.    Um-hum.

11   Q.    Based on the fact that you went into an attack

12   that's how people knew you had a hearing condition?

13   A.    Well, that would lead them to suspect that

14   that's what it was.

15   Q.    Is it your testimony you are assuming they

16   suspected you had a hearing problem?

17   A.    They knew I had a hearing problem.  They knew I

18   had a hearing problem.

19   Q.    Again, that's how they just all knew it.  I

20   worked with these people.  They knew I went to these

21   doctors.  One of the nurses told me to go to John

22   Hopkins.

23   Q.    Which nurse was that?

24   A.    That Eileen Brown.  She said, "Make an

**B0239**

```
 1    appointment with Johns Hopkins because Dr. Kaplan does
 2    not want you working -- he was just in a meeting and
 3    saying he does not want anybody in your condition
 4    working for him.  Make an appointment with Johns
 5    Hopkins," and so I did.
 6        Q.    How did the other employees besides Eileen
 7    Brown know that you had a hearing condition?
 8        A.    It was just obvious.
 9        Q.    How was it obvious?
10        A.    They would ask me something and I couldn't
11    hear.  I would ask them to repeat something.
12        Q.    So, you would tell them that you couldn't hear
13    them?
14        A.    Sure.
15        Q.    And that's how these people knew that you had a
16    hearing problem?
17        A.    I believe it could be other factors involved.
18    I mean, that I'm not aware of.
19        Q.    So, there could be other factors, but you are
20    just not aware of what they could be?
21        A.    I don't know.  All I could do is tell you what
22    I know.  They would ask me something and I would say,
23    "I'm sorry, I can't hear you."  Then, I would have
24    these spinning attacks and they had to drive me home
```

**B0240**

1   retire, is that correct?

2   A.    I was eligible to retire when they offered the

3   first early out.

4   Q.    And how old were you at the time when

5   Ms. Israel talked to you?

6   A.    Sixty-five.  I'm 68 now.  I can't remember.  In

7   my 60's.  I could retire.

8   Q.    Were a lot of people taking early retirement at

9   that time frame for Blue Cross?

10  A.    I know a lot of people left and I don't know

11  whether it was an ERO or they got some kind of a

12  severance package.  I don't know exactly the count.  I

13  don't know how many people took it.  Seemed like in

14  our area it seemed like they needed medical management

15  because of the new phase of things coming in.  So,

16  didn't see too much in there.

17  Q.    But for the rest of Blue Cross there was a lot

18  of turnover, is that correct?

19  A.    I would imagine.  I mean, I'm off-site.  I

20  would imagine in Wilmington a lot of those people did

21  leave.  A lot of them stayed.

22  Q.    Ms. Choma, did Blue Cross Blue Shield hold any

23  type of financial planning seminars --

24  A.    Yes.

**B0241**

1    Q.    -- for its employees?

2    A.    Yes.

3    Q.    What were these seminars for?

4    A.    The financial planning seminar was for people

5    that wanted to arrange for their finances -- if you

6    were planning on retiring or if you wanted to -- it

7    wasn't, quote, a retirement seminar.  It was a

8    financial planning seminar and given my age it was

9    appropriate I thought for me to go to that.

10   Q.    Why was it appropriate given your age?

11   A.    Because I was getting old and I needed help

12   with my finances to see what I could do and, besides,

13   it sounded like a great program.  It sounded like it

14   was something that I should go to.

15   Q.    How many financial planning seminars did Blue

16   Cross hold while you were an employee there?

17   A.    That particular financial seminar was a group

18   of so many sessions.  I'm going to say maybe ten under

19   this one financial planning thing.  The others, I

20   don't recall any others.  There could have been.

21   Q.    I'm just asking to kind of give me a ballpark,

22   was it frequent they held financial planning seminars?

23   A.    I'm just going to say offhand because I'm not

24   positive, I don't know if they were every two weeks.

**B0242**

```
 1    It was only for an hour, that's all I could tell you.

 2    Q.   Did Blue Cross have these types of seminars for

 3    employees on an annual basis?

 4    A.   I've never seen a financial seminar, I've never

 5    gotten information on them having that.

 6    Q.   Is it your testimony that Blue Cross only held

 7    one series of financial planning seminars while you

 8    were employed at Blue Cross?

 9    A.   I really couldn't tell you, I don't know.

10    Q.   Was the attendance at the seminars voluntary,

11    by the way?

12    A.   Yes.

13    Q.   You didn't have to go?

14    A.   No.

15    Q.   Do you know if Fidelity ever held any seminars

16    for Blue Cross?

17    A.   They might have.  I really -- I just can't

18    remember.

19    Q.   Did you have a 401 K plan?

20    A.   Yes.

21    Q.   But you wouldn't know whether they held one or

22    not?

23    A.   I just can't recall.

24              MR. HOLT:  This is Number 9.
```

B0243

```
 1              (Choma Deposition Exhibit No. 9 was marked
 2     for identification.)
 3     BY MR. HOLT:
 4     Q.    You have been handed what has been marked as
 5     Exhibit 9 and this appears to be a series of E-mails
 6     between you and Dr. Kaplan?
 7     A.    Yes.
 8     Q.    Do you recognize these?
 9     A.    Yes.
10     Q.    There is some handwriting on the right-hand
11     side of this, is that your handwriting?
12     A.    Yes, it is.
13     Q.    And there is an E-mail that purports to be from
14     you on May 22nd to Dr. Kaplan in which you state you
15     would like to attend these financial planning
16     seminars, do you see that?
17     A.    Yes.
18     Q.    Below there is a reference to these financial
19     planning seminars?
20     A.    Yes, there is.
21     Q.    It appears these were held at two different
22     locations on four different dates?
23     A.    Yes.
24     Q.    Which one of these seminars did you want to
```

**B0244**

1    attend, the downtown or the HCCB one?

2       A.    The HCCB is where I was located or where I was

3    working so I wanted to go to that.

4       Q.    And you sent this E-mail again on May 22nd?

5       A.    Yes.

6       Q.    And Dr. Kaplan responded that in the E-mail

7    above that he needed to see how backed up you were

8    with the letters and denials before he could say okay,

9    is that correct?

10      A.    Yes.

11      Q.    Were you, in fact, backed up on letters and

12   denials?

13      A.    No.

14      Q.    Is there an E-mail where you respond to Dr.

15   Kaplan informing him you were not backed up?

16      A.    No.   I physically took him over to the bins to

17   show him there was maybe three letters in the bin.

18      Q.    Was that the date this E-mail was sent?

19      A.    No.   It was probably after that.   I had asked

20   him again verbally if I could attend those because

21   nurses were coming back and telling me how great they

22   were and he said, "Well, I'll have to see how backed

23   up we are."   He made the statement to me something

24   like he said here.   I said, "The letters are just

**B0245**

 1    about done, there is only a couple in the bin."  He
 2    said, "Take me over there and show me."
 3            I had to physically walk him over there and
 4    show him there is only like two or three letters in
 5    the bin.  They were stationed at her cubicle, the
 6    other secretary that was working on them, because
 7    that's her main function.
 8    Q.    And was it the first date that you wanted to
 9    attend?
10    A.    Yeah, you cannot -- it says here that you can
11    not miss, you have to go to them all or none.  Four
12    sessions, you need to attend all four, not just one.
13    Q.    And it was the first session, was that the
14    session that you missed?
15    A.    Yes.
16    Q.    Did you go to any of the other sessions?
17    A.    The last one I guess you are going to say on
18    6-27 I popped my head in the door because I wanted a
19    book, they were giving out these big books.  The guy
20    said, "Come on in."  And I said, "I can't attend, but
21    do you have any information?"  He gave me a binder and
22    I took that.
23    Q.    So, you popped your head in on the last date on
24    June 27th and got a binder, is that correct?

**B0246**

1      A.    I believe, if I'm correct in my memory.  I

2   really can't remember if he wanted me to sign a slip

3   saying I was there to get the book, I don't know.  I

4   do know I went in there and said, "I can't attend

5   these, but can you give me information?  Everybody has

6   been telling me how good this is."  So, I had the

7   book.

8      Q.    On the date of May 30th, which was the first

9   session, did you talk to Dr. Kaplan about going on

10  that date?

11     A.    Yes.

12     Q.    I believe this is what the E-mail was

13  referencing to go to these seminars and the first one

14  starts on the 30th and then he replies, "We'll have to

15  see how backed up we are."

16     Q.    And when did you take Dr. Kaplan to see the

17  bins of letters?  Was that on May 30th?

18     A.    I can't recall, I really can't recall.

19     Q.    But you stated you did take him over to the

20  bins and show him?

21     A.    Yes, I did.

22     Q.    But it could have been several days before the

23  May 30th seminar, is that correct?

24     A.    No, it was after the 30th because I couldn't

**B0247**

1    data base and reading the scripts in there and you can

2    see.

3           Then, they determine what type of letter it

4    was, whether it was a denial, denial approved, an

5    appeal, an appeal denied, appeal approved.  And now

6    are you asking me just for the nurses right now?

7    Q.    I would like to get a picture of the whole

8    process starting from the nurses all the way up

9    through you.

10   A.    It's basically the same.  A template is put

11   into place and basically the nurses have to pick out

12   the template and they would actually make a copy of

13   that and put it in the bin or on your desk and they

14   would fill in the information.  If they didn't have it

15   all filled in you would have to go back and ask them.

16   Usually they sent a letter back to them and they were

17   working at the hospital and so that would hold it up a

18   lot.

19           Then, you would fill that in.  They would

20   circle the paragraph that would go in there and you

21   would go into another template and see what that

22   paragraph was and you would cut and paste it in and

23   you change the dates accordingly.

24   Q.    So, let me summarize, and correct me if I'm

**B0248**

 1    wrong, the nurses would take a template of a letter

 2    and then handwrite, fill in the blanks, of what

 3    information needed to be in the letter and then

 4    provide the template to you by putting it into a bin?

 5    A.    Yeah, they put it in my in-bin or came up to

 6    me, the nurses.

 7    Q.    Would you take the template and then type in

 8    the information that was handwritten into the letter

 9    and then print out a copy of that letter and give it

10    back to the nurses?

11    A.    Yes.

12    Q.    And that's essentially the process, is it not?

13    A.    Yes.

14    Q.    What happened to it after the nurses got it

15    back from you?

16    A.    Well, there is a lot of things that happen.

17    Sometimes -- the manager, Eileen Brown, had to review

18    these letters and sometimes she would put a note on

19    for the nurse to see her.  The nurse would use the

20    wrong template or put in the wrong information so she

21    would have to talk to them and say you have to correct

22    this.  If the nurse had 10 or 15 letters that were

23    incorrect and they were working at the hospital, they

24    had to be sent over there for those nurses to fix and

**B0249**

1    then they had to mail them back to our department and

2    then we would go from there and it would just go on

3    and on, if there is corrections or whatever needed to

4    be done to get it out.

5        Q.    To make sure the letter was correct before it

6    went out?

7        A.    Yes.

8        Q.    You said that Ms. Brown would review these

9    letters, is that correct?

10       A.    She would review the letters and I believe that

11   Deborah Sweeney was reviewing the letters.  If someone

12   was out the supervisor would -- Nina Frazier and

13   Barbara Little reviewed them as well.

14       Q.    And was this review done after you finished

15   typing in --

16       A.    Yes.

17       Q.    They would review it and then it would either

18   go out or go back to the nurses?

19       A.    Yes.

20       Q.    What if there was an error made by someone like

21   you or Ms. Carpenter, what would happen then?

22       A.    Well, it would be given back to us to correct,

23   which was a very easy thing.  It would be returned

24   back to the supervisor.

**B0250**

1    Q.   Once this entire process was done the letters

2    would be mailed out?

3    A.   Yes.

4    Q.   Again, this whole process had to be done within

5    the guidelines set by the NCQA?

6    A.   Yes.

7    Q.   And you stated there were a lot of letters

8    going out?

9    A.   Yes, there were.

10   Q.   Sound like the letters were kind of a

11   monotonous job?

12   A.   They were, but they were important.  They had

13   to get done.

14   Q.   In addition to the letters that Ms. Zakutney

15   did do you know what kind of duties she performed for

16   Nina Frazier?

17   A.   You would have to check with her on that.  I

18   don't know.

19              MR. HOLT:  Mark that 11.

20              (Choma Deposition Exhibit No. 11 was marked

21   for identification.)

22   BY MR. HOLT:

23   Q.   Ms. Choma, I've handed you what has been marked

24   as Exhibit 11 and this purports to be another

**B0251**

```
 1    organizational chart for the medical management group.

 2    The only difference I see other than some changes is

 3    that the date now, of course, is October 3rd, 2002.

 4    Do you see that at the very top?

 5       A.   Yes, I do.

 6       Q.   And I know we are going back on a number of

 7    years, but does this seem accurate to you as far as

 8    the people who worked there and positions they held at

 9    this time period?

10       A.   Yes, it does.

11       Q.   There are some changes that had been made based

12    on this organizational chart from the one we just

13    looked at, do you see those?

14       A.   Yes.

15       Q.   This new chart has Ms. Carpenter as

16    administrative assistant reporting directly to Mr.

17    Kaplan, do you see that?

18       A.   Yes.

19       Q.   And you are now reporting to the director of

20    quality improvement, Deborah Sweeney?

21       A.   Yes.

22       Q.   The chart also has David Martin -- by the way,

23    who is David Martin?

24       A.   He is with William Slentz.  They're two
```

**B0252**

218

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

EDITH CHOMA,                        )
                                    )
              Plaintiff,            )
                                    )   Civil Action
v.                                  )   No. 06-486-JJF
                                    )
BLUE CROSS BLUE SHIELD OF           )   - VOLUME II -
DELAWARE,                           )
                                    )
              Defendant.            )

              Deposition of EDITH A. CHOMA taken
pursuant to notice at the law offices of Young,
Conaway, Stargatt & Taylor, LLP, The Brandywine
Building, 1000 West Street, 17th Floor, Wilmington,
Delaware, beginning at 9:12 a.m. on Wednesday, April
25, 2007, before Christina M. Vitale, Certified
Shorthand Reporter and Notary Public.

APPEARANCES:

        LORI ANN BREWINGTON, ESQUIRE
        MARGOLIS EDELSTEIN
          750 South Madison Street
          Wilmington, Delaware  19801
          For the Plaintiff

        SCOTT A. HOLT, ESQUIRE
        YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
          The Brandywine Building
          1000 West Street, 17th Floor
          Wilmington, Delaware  19899
          For the Defendant


ALSO PRESENT:  Donna E. May, Blue Cross Blue Shield


              WILCOX & FETZER
  1330 King Street -  Wilmington, Delaware 19801
              (302) 655-0477
              www.wilfet.com

**B0253**

Edith A. Choma

1              EDITH A. CHOMA, having been previously

2    sworn as a witness, was resumed on examination and

3    testified further as follows:

4    BY MR. HOLT:

5    Q.   Good morning, Ms. Choma.  We are reconvening on

6    your depositon that we had started last week and I

7    just want to remind you you are still sworn under

8    oath.  Do you agree with that?

9    A.   Yes, I do.  I would also like to ask for a

10   question to be repeated to me about my hearing from

11   the last deposition.  You asked me a question I

12   believe it was how I knew -- how people knew I

13   couldn't hear?

14   Q.   Go ahead.

15   A.   I think it was something like that.  One of the

16   reasons that I can tell you is the manager of the

17   department would come up to me and she would ask

18   lip-synch words and when I would ask her what she was

19   saying or to repeat because I couldn't hear, she would

20   laugh at me.

21              Another time she asked me to come into her

22   office and put on headphones.  She said she was going

23   to test the headsets that the intake coordinators use.

24   She would be out of the office with a headset on and

**B0254**

Edith A. Choma

1    A.    Yes.

2    Q.    The next sentence starting with, "CMO has made

3    remarks," do you see that?

4    A.    Yes.

5    Q.    Could you read that for me.

6    A.    "CMO has made remarks at meeting such as she

7    makes mistakes because she is deaf," and I have the

8    witnesses written there that were at this meeting and

9    told me this.

10   Q.    There was a meeting where Dr. Kaplan referenced

11   that you make mistakes at the meeting because you are

12   deaf?

13   A.    Yes.

14   Q.    Who told you that he made this comment?

15   A.    Tim Toole.

16   Q.    Anyone else?

17   A.    I went to Judy Charles in provider relations

18   because she was at this meeting and her statement to

19   me was that, yes, he did say that and would you

20   believe it and he is a doctor too?

21   Q.    Did she say anything else to you about this

22   meeting or what he said?

23   A.    No.    She just repeated that he did make a

24   statement referring that I make mistakes because I'm

**B0255**

243

Edith A. Choma

1    deaf.

2        Q.    Did Mr. Toole make the same statement to you?

3        A.    Yes.

4        Q.    Do you know who else attended this meeting

5    where Mr. Kaplan made these statements?

6        A.    There is quite a few people that attended that.

7    I believe that was a CQIC meeting and I have the date,

8    but I can't recall it.

9        Q.    Do you know the names of anyone else who

10   attended that meeting?

11       A.    Let's see.  It depends on who was in.  I

12   believe Dr. Castiglioni was in on that.  I would have

13   to go look at my notes and see who was there and the

14   date.  I can get you that.

15       Q.    But Dr. Castiglioni might have been there?

16       A.    He could have been because it's medical

17   directors and people that have things to do with the

18   CQIC committee.

19       Q.    Did you ever speak to Dr. Castiglioni about

20   this statement that Dr. Kaplan made?

21       A.    No.

22       Q.    Dr. Kaplan knew that you had a hearing problem,

23   is that correct?

24       A.    He yelled at me enough.  He should have.

**B0256**

244

Edith A. Choma

1    Q.    I guess my question is --

2    A.    Yes, he knew, he would go in my face, yes.

3    Q.    It's true also that he had an issue about your

4    ability to take minutes for these meetings, is that

5    correct?

6    A.    No.    It was just that one meeting that I went

7    to that I told him I couldn't.

8    Q.    Other than the one statement that was made in

9    the meeting where you didn't attend were there any

10    other meetings where Dr. Kaplan made any comments

11    about your hearing?

12    A.    I'm sorry, would you repeat that.

13    Q.    Other than that one meeting where Mr. Toole and

14    Ms. Charles attended were there any other meetings

15    where Dr. Kaplan made any other statements referencing

16    your hearing that you are aware of?

17    A.    Yes.    This is at a directors meeting and he at

18    the meeting discussed a project he was working on and

19    he needed help.    Sorry, but this is not related to my

20    hearing, but this is another incident where he talked

21    about me.    Is that all right to explain this at this

22    time?

23    Q.    Go ahead, but this doesn't relate to your

24    hearing?

**B0257**

245

Edith A. Choma

1    A.    See, I don't have everything that was said

2    there so it could have been said.

3    Q.    Just so I'm clear, you are not sure what was

4    said there, but it might have been something related

5    to your hearing, correct?

6    A.    There could have been an additional thing said

7    about my hearing, but this is what I'm telling you now

8    that I know that he said.  This is a directors

9    meeting, Jill Macconi was there, Susan Slaysman was

10   there, she is a director of human resources, and he is

11   talking about a project that he needs done and Jill

12   Macconi said, Why don't you ask Edith, you go around

13   telling everybody that she doesn't do anything?  And

14   Susan Slaysman stood up and said, This is not the time

15   or the place to discuss this.

16   Q.    Was Dr. Kaplan actually going around telling

17   people that you don't do anything?

18   A.    He probably was since Jill Macconi made that

19   statement, she is a director.

20   Q.    In fact, that was the issue that led to your

21   position being reevaluated because he really didn't

22   understand what you did there, is that correct?

23   A.    Yes.

24            MR. HOLT:  Do you want to take a five-

**B0258**

246

Edith A. Choma

1    minute break?

2                MS. BREWINGTON:    Sure.

3                (Brief recess.)

4    BY MR. HOLT:

5    Q.    Ms. Choma, at your last deposition we were

6    talking a little bit about Pat Carpenter and I want to

7    go back to kind of where we left off with our

8    discussion.  When Ms. Carpenter first started working

9    in your department she was reporting directly to Jane

10   Israel, is that correct?

11   A.    Yes.

12   Q.    And at some point that reporting structure was

13   changed, is that correct?

14   A.    Yes.

15   Q.    In that she began reporting to Dr. Kaplan and

16   you started reporting to the director of quality

17   improvement?

18   A.    Yes.

19   Q.    When that change was made, was Ms. Israel still

20   working there?

21   A.    No, she had gone.

22   Q.    And she was replaced by Deborah Sweeney, is

23   that correct?

24   A.    Yes.

**B0259**

247

Edith A. Choma

1    Q.    So, when you and Pat Carpenter kind of switched

2    places you were reporting after that to Ms. Sweeney,

3    is that correct?

4    A.    Yes.

5    Q.    Do you know whether Ms. Carpenter was just

6    given your old position or was she actually given a

7    new position when this change was made?

8    A.    I don't know.  All I know is we switched

9    positions.

10    Q.    Did you switch physically offices as well?

11    A.    Yes.

12    Q.    And you had previously been sitting near Dr.

13    Kaplan's office, is that correct?

14    A.    Correct.

15    Q.    When the switch was made, Ms. Carpenter took

16    your old spot?

17    A.    At that time they were re-doing the area and

18    Pat Carpenter was outside of Jane Israel's office

19    still.  Jane Israel got a brand-new office and Pat

20    Carpenter was right outside her office and she just

21    stayed there.

22              MR. HOLT:  Mark this as 16.

23              (Choma Deposition Exhibit No. 16 was marked

24    for identification.)

**B0260**

248

Edith A. Choma

1    BY MR. HOLT:

2      Q.    Ms. Choma, you have been handed what has been

3    marked as Exhibit-16 and these purport to be your

4    answers to Blue Cross' Interrogatories?

5      A.    Yes.

6      Q.    Have you seen this document before?

7      A.    Yes.

8      Q.    I want to ask you and direct your attention to

9    your response to Question Number Six.  In your answer

10   and looking at the second sentence of that you stated

11   that Ms. Carpenter was made your supervisor because

12   Dr. Kaplan wanted her to take your position, is that

13   correct?

14     A.    Yes.

15     Q.    You go on to state that Dr. Kaplan felt that

16   Carpenter was smarter and faster and he liked the fact

17   that she worked for a senior vice-president.

18     A.    Yes.

19     Q.    Did Dr. Kaplan ever say this to you --

20     A.    Yes, that's why --

21           MS. BREWINGTON:  Wait.  I just want to

22   instruct you to wait until he is finished.  It's hard,

23   I know.

24

**B0261**

249

Edith A. Choma

1    BY MR. HOLT:

2      Q.    That was the reason that Dr. Kaplan moved the

3    reporting structure so Ms. Carpenter was reporting

4    directly to him?

5      A.    Yes, that's what he told me.

6      Q.    Prior to this change in reporting structure

7    it's true that Ms. Carpenter had provided some support

8    to Dr. Kaplan, is that correct?

9      A.    I'm not aware of that, I don't know.

10     Q.    She might have, she might not have, you are not

11   certain?

12     A.    Yes.  I do know that he gave her the mailings

13   to do that I was doing.

14     Q.    When this switch was made did Ms. Carpenter

15   take over a lot of your old functions when she was

16   moved close to his office?

17     A.    When I was still in my position they gave her

18   the mailings to do.  When she did the mailings they

19   were so -- she made so many mistakes on these mailings

20   to doctors, they were getting confidential

21   information, and I'm talking about almost 200 doctors.

22   They were calling me, expressing this to me, that they

23   were concerned because they got doctor so and so's

24   information.  That happened not once, but three times.

**B0262**

250

Edith A. Choma

1    So, eventually I got the mailings back because I never
2    had that when I was doing them.
3        Q.    And this occurred when Ms. Carpenter first took
4    over your old position, is that correct?
5        A.    Well, one of the mailings happened when I was
6    still working for him.  Then, he gave her others to do
7    and she repeated and nothing was ever done.  That's
8    breaking confidentiality, that's what the doctors were
9    telling me.
10       Q.    But it's still your testimony that Dr. Kaplan
11   told you that he was moving Ms. Carpenter because he
12   thought she was smarter and faster than you?
13       A.    He did make that statement.
14       Q.    So, he thought she would be a better secretary
15   for him?
16       A.    He didn't say.  He just said she is faster and
17   smarter than you, just what I have there, and he liked
18   the way she treated me.
19       Q.    Dr. Kaplan was the head of the medical
20   management group at that time, correct?
21       A.    Yes.
22       Q.    So, he was the top guy, is that correct?
23       A.    Yes.
24       Q.    So, if Dr. Kaplan wanted to have what he

**B0263**

Edith A. Choma

1    believed was the best secretary reporting to him was

2    that his prerogative?

3       A.    Not when they're for those reasons because he

4    thinks somebody is smarter and he talks to somebody

5    like that and he doesn't want me there because I'm

6    deaf.

7       Q.    If Dr. Kaplan believed Ms. Carpenter was a

8    better fit for him and would provide better

9    secretarial support, would it be his option to use her

10   instead of you?

11      A.    I don't know.  I don't think that's how it's

12   done.  I don't know of someone calling you into his

13   office and saying she is smarter than you.  He does

14   not like the fact that I can hear.  He does not like

15   the fact that -- he states that I can't work fast

16   enough and I was working for maybe ten people.

17      Q.    Well, if Dr. --

18      A.    That's the reason I got.

19      Q.    If Dr. Kaplan believed that Ms. Carpenter was

20   faster at doing her job than you, would that be a

21   reason for him to make the switch?

22      A.    I don't know.

23      Q.    I don't think making statements like that gives

24   someone -- I don't think that's the right thing to say

**B0264**

Edith A. Choma

1    to someone.  I think that's humiliating and

2    embarrassing to say that to someone especially when he

3    goes like this, slams his fist down on his desk, and I

4    like the way she treats you.

5    Q.    Was this all the same meeting when he made

6    these comments to you?

7    A.    These comments here, yes, they're right in this

8    document.

9    Q.    Is that when Dr. Kaplan told you that he was

10   moving you and using Ms. Carpenter as his secretary?

11   A.    No.  He actually -- actually, he called me into

12   his office in -- well, I don't want to get mixed up

13   with these dates here because so much has happened.  I

14   know he called me into his office in July before the

15   move and told me I had to move over there.

16   Q.    And this is July 2002?

17   A.    I believe, I believe it was July something.

18   Q.    What did he tell you when he called you into

19   his office on that occasion?

20   A.    Well, that's when he repeated these things,

21   that's when he repeated it again.

22   Q.    What things?

23   A.    She is faster than you, she is smarter than you

24   and he said, I could schmooze, whatever that is, with

**B0265**

Wilcox & Fetzer, Ltd.          Registered Professional Reporters          (302) 655-0477

253

Edith A. Choma

1   people, I was good at that, but because I said to him,

2   Why are you -- why are you doing this?  Why are you

3   putting her in my position?  Because he made a

4   statement that Pat Carpenter knew all about NCQA

5   because he did give her some of that work to do.  I

6   said she has been working under Jane, she has been

7   hired under Jane to do the NCQA work, take it over

8   from me, and since she is so familiar why doesn't she

9   stay with the QI director which she initially worked

10  for, she should stay there.

11          These were the answers he gave me and then

12  he said because I could schmooze and she could help

13  with NCQA.  I said, Well, why doesn't she stay where

14  she is then?  There was really no reason to put me

15  over there.  I went home, talked to my husband and I

16  told Dr. Kaplan I would let him know, I would get back

17  to him.  I was so shocked.  For almost two of those

18  weeks when I was sitting at my desk he was furious

19  because I would not move over there fast enough.

20  Q.   Let me back you up.  In this meeting in July

21  when Dr. Kaplan announced that he wanted you to move

22  over to support the quality improvement director you

23  had to think about that?

24  A.   Well, I told him -- I think my last statement

**B0266**

254

Edith A. Choma

1    was to him was, "I will let you know."

2      Q.    What were you going to let him know?

3      A.    I didn't know what to do, I didn't know what to

4    say.  So, I said, "I'll let you know."  He wanted me

5    to move over there and he gave me the reasons why and

6    I said, "I'll let you know."

7      Q.    Was he giving you a choice whether to move or

8    not?

9      A.    I don't know.  He wanted me to move over there

10   and all I can tell you is my last statement was to

11   him, "I'll let you know."  I was under a lot of

12   stress, I was very upset and that was my answer.  I

13   didn't know what to say.  I said, "I will let you

14   know."

15     Q.    But you are not sure whether he was going to

16   give you a choice to move or not?

17     A.    No, he wasn't giving me any choice.

18     Q.    So, you had to move?

19     A.    Yes, I did, I had no choice.

20     Q.    What were you going to let him know about?

21     A.    Well, like I said, I went home and talked to my

22   husband about it.  I said, you know, "He wants me to

23   move over there."  He said, "You have got to be

24   kidding."  I said, "No."  I told him what he said and

**B0267**

Edith A. Choma

1    That cubicle they put me in, the walls are ripped, the
2    metal stuff was off all the walls.  It had dust mites
3    in it.  I started scratching.  They put me over there
4    knowing that that was the situation and they took all
5    my equipment away.  Don't need a fax machine, don't
6    need a printer.  So, that's where I was.  I had all my
7    boxes and things around my new -- old cubicle and Dr.
8    Kaplan would walk in there and go, Egh.  This is right
9    the next day when I was just putting my boxes --
10   bringing them over there.

11           So, then Sweeney would come out and say I
12   want that picked up and I want it put away.  I told
13   her okay.  I did, I put it in my cabinets best I could
14   because they told me I was going to be getting a new
15   furniture -- new cubicle, just the walls and then the
16   thing going around it.  I think it was like two months
17   later I got it and I stayed in that situation for two
18   months.

19   Q.    Was this during a process when Blue Cross was
20   remodeling the whole office?

21   A.    No, it was after.

22   Q.    When you first moved over into this new cubicle
23   area, wasn't Blue Cross in the process of building a
24   new office for your section group that Deb Sweeney was

**B0268**

258

Edith A. Choma

1    in?

2    A.    It was already built.  They already had their

3    cubicles.  They just threw up something for me to be

4    in.

5    Q.    How long were you in this cubicle for?

6    A.    Until I left.

7          THE WITNESS:  Do you mind if I take a

8    break?

9          MR. HOLT:  That's fine.

10         (Brief recess.)

11    BY MR. HOLT:

12    Q.    Ms. Choma, before the break we were talking

13    about your meeting with Dr. Kaplan when he explained

14    about this move to a new position and I believe you

15    stated that Dr. Kaplan said that you would be good at

16    schmoozing, is that correct?

17    A.    Yeah.

18    Q.    Is that a yes?

19    A.    Yes.

20    Q.    Now, at that meeting did Dr. Kaplan explain

21    that you would be supporting Ms. Sweeney going

22    forward?

23    A.    Yes.

24    Q.    And Ms. Sweeney was new to the organization, is

**B0269**

Edith A. Choma

1    that correct?

2    A.    Yes.

3    Q.    Did Dr. Kaplan say anything to you about your

4    ability to help Ms. Sweeney understand the workings of

5    the medical management group?

6    A.    Could you repeat that, please.

7    Q.    My question is did Dr. Kaplan also explain that

8    he thought it might be helpful that you could show Ms.

9    Sweeney the ropes, so to speak?

10    A.    No.

11    Q.    So, it's your testimony that he didn't state

12    that your support of Ms. Sweeney would be helpful

13    since she is new to the organization?

14    A.    No.

15    Q.    And you had worked in the medical management

16    group for a number of years, is that correct?

17    A.    Yes.

18    Q.    Longer than Ms. Carpenter, is that correct?

19    A.    Yes.

20    Q.    Do you think that you understood how the

21    department was run and knew who the people were better

22    than Ms. Carpenter?

23    A.    Yes.

24    Q.    Now, Ms. Choma, eventually you did move to your

**B0270**

260

Edith A. Choma

1    cubicle, is that correct?

2    A.    Broken down cubicle, yes.

3    Q.    Well, I guess, let me clarify.  Eventually you

4    did move from your cubicle that was located near Dr.

5    Kaplan's office to a cubicle that was located near Ms.

6    Sweeney's office, is that correct?

7    A.    Yes.

8    Q.    And during this time the medical management

9    group was expanding, was it not?

10   A.    Yes.

11   Q.    It was adding a lot of people?

12   A.    Yes.

13   Q.    And they needed to have more office space, is

14   that correct?

15   A.    Yes, they did.

16   Q.    You stated when you moved to your new cubicle

17   the walls were ripped and the cubicle was not in good

18   condition?

19   A.    No, it was not.

20   Q.    Was your cubicle eventually remodeled, though?

21   A.    About three months to four months later, yeah.

22   Q.    Was this during the time that the offices for

23   the medical management group were being remodeled?

24   A.    No, they were already done.

**B0271**

286

Edith A. Choma

1   Blue Cross?

2   A.   No.

3   Q.   No?

4   A.   No.

5   Q.   Dr. Kaplan's superior was Tim Constantine, is

6   that correct?

7   A.   Yes.

8   Q.   Did you report it to him?

9   A.   No.

10  Q.   Ms. Choma, was Ms. Carpenter ever your

11  supervisor?

12  A.   Yes.

13  Q.   When was she your supervisor?

14  A.   I don't know because I was never told.

15  Q.   So, you were never informed that Ms. Carpenter

16  was your supervisor?

17  A.   No.

18  Q.   Were you ever given any kind of discipline by

19  Ms. Carpenter?

20  A.   No.

21  Q.   Was she responsible for giving you your raises?

22  A.   I do not know what role she played because I

23  found out she was my supervisor.

24  Q.   Did she ever review your performance?

**B0272**

Edith A. Choma

1    A.    I don't know.

2    Q.    Did you have performance reviews at Blue Cross?

3    A.    Yes.

4    Q.    Did she ever participate in those reviews?

5    A.    She could have.  I don't know.

6    Q.    When you had your performance review, did you

7    sit down normally with your direct supervisor?

8    A.    My direct supervisor who was Debbie Sweeney she

9    -- the employees were told to do your own performance

10   review, put down what you think about this, this, what

11   you do and all that.  I wasn't allowed to do that.

12   She would not permit me to do that.  She typed my

13   performance review for me.

14   Q.    Well, back to my question.  Isn't it true that

15   you would meet with your direct supervisor when you

16   had your performance evaluation?

17   A.    I don't know because there was so much going on

18   and so much as far as Carpenter when I didn't know who

19   was doing what or who was -- all I know is I was still

20   doing his work and Debbie Sweeney told me that she was

21   going to type up my performance review and if I felt

22   there was anything that needed to be added to let her

23   know.

24   Q.    It's true that Dr. Kaplan when he did your

**B0273**

Edith A. Choma

1    performance evaluation had met with you in the past,

2    is that correct?

3       A.    What he would do is type my review and just

4    hand it to me to read the same day that he was going

5    to -- to sign it.  He never discussed anything

6    previous, no.

7       Q.    Did you ever meet with Deb Sweeney to review

8    your performance?

9       A.    I tried to.

10      Q.    Well, did you?

11      A.    Yes, eventually.

12      Q.    Did you ever meet with Ms. Carpenter to review

13   your performance?

14      A.    No.  Can I retract?  Can I go over something

15   when you asked me about Deb Sweeney and my performance

16   review?

17      Q.    Go ahead.

18      A.    After she typed my performance review I did go

19   to her and said, you know, "You left out everything I

20   do for Dr. Kaplan.  I don't hardly do anything for

21   you.  I'm doing all of his work."  And she -- I think

22   I was standing in her doorway talking to her and she

23   said, "Well, I'm not changing it."  I wanted that put

24   in my review.  I called human resources and talked to

**B0274**

Edith A. Choma

1    Susan Slaysman and she said -- Susan Slaysman made a

2    remark to me, "Does it really matter who you did work

3    for?"  I said, "Yes, in this case it does because I

4    was put over there because Debbie Sweeney needed a

5    secretary and I'm there doing Dr. Kaplan's work."

6           Sweeney doesn't even -- your E-mail when

7    you are out of the office it says please contact so

8    and so.  I was never put in there as a contact.  She

9    is always telling them to call somebody else.  She

10   would give them a list of names, but she never put my

11   name down.  So, when someone would come to me and ask

12   me where she was I would have to check her calendar.

13   When I went to her -- when she did my review over

14   again I put in a few things Dr. Kaplan -- I'm sorry,

15   I'm getting confused about this, but I do know when I

16   went to her and asked her about changing my review or

17   putting something in, she slammed the door in my face.

18          First statement she made on one incident

19   was screaming in my face, "I'm not changing it."

20   Slammed her door.  Was in her office.  Second instance

21   I asked her something else about my performance review

22   and I have notes about this and she slammed the door

23   in my face right while I was talking to her.  I called

24   human resources.  I believe I left a message on Susan

**B0275**

290

Edith A. Choma

 1    Slaysman's voicemail and never got a response.  I

 2    should have E-mailed her so I would have that

 3    document, but I did not.

 4            Towards the end of the day Sweeney came out

 5    and said, "Call Susan Slaysman and tell her I want her

 6    to get back to me."  It was towards the end of the

 7    day.  So, I E-mailed Susan and I think I have an

 8    E-mail about that.

 9    Q.    Going back to Ms. Carpenter, Ms. Choma, what

10    evidence do you have that she was your supervisor?

11    A.    Well, at one point in time she changed --

12            MS. BREWINGTON:  Did you say Ms. Choma was

13    her supervisor?

14            MR. HOLT:  What evidence does Ms. Choma

15    have that Ms. Carpenter was her supervisor.

16            MS. BREWINGTON:  Thank you.

17    BY MR. HOLT:

18    A.    She sent me an E-mail and told me to change my

19    cost center and I E-mailed her back and said -- and I

20    have an E-mail regarding this -- "Why aren't I under

21    Debbie Sweeney's cost center?  That's who I report

22    to."  She said, "Dr. Kaplan did some reorganization

23    and just put that down on your time sheet."

24    Q.    What is a call center?

**B0276**

Wilcox & Fetzer, Ltd.          Registered Professional Reporters          (302) 655-0477

291

Edith A. Choma

1    A.    A cost center is a cost center for payroll,

2    like who you work under.  Like you always have a cost

3    center, right?

4    Q.    Is that call center or cost center?

5    A.    Cost.

6    Q.    I'm sorry, I misunderstood you.

7          MS. BREWINGTON:  Me too.

8    BY MR. HOLT:

9    Q.    So, this is essentially what Blue Cross uses to

10   designate for payroll purposes, is that correct?

11   A.    Yes.

12   Q.    Go ahead.

13   A.    And I have the E-mail where I E-mailed Pat

14   Carpenter and I said, "Does this change who I report

15   to?"  First I E-mailed and asked her why because

16   Debbie Sweeney I work for her.  She said, "He did some

17   reorganization and that's why you have to use this

18   cost center."  Then, I set another E-mail and said,

19   "Does this change who I report to?"  I never got an

20   answer back.

21   Q.    Either way?

22   A.    No, never, never got an answer.

23   Q.    Anything else?

24   A.    No, that's what happened.

**B0277**

292

Edith A. Choma

1        MS. BREWINGTON:   When you say "anything
2   else," do you mean anything else in that conversation?
3        MR. HOLT:   I'll clarify.
4   BY MR. HOLT:
5   Q.    Anything else that you believe constitutes
6   evidence that Ms. Carpenter was your direct supervisor
7   at some point?
8   A.    Oh, yes, I have evidence.  I got a 15-year old
9   gift for my 15 years being there from Care First and
10  they sent me a letter to pick out what I wanted and
11  they had immediate supervisor on this piece of paper,
12  Pat Carpenter.  When I was out on disability I got an
13  E-mail from Met Life asking Pat Carpenter, since she
14  was my supervisor, if I returned back to work yet
15  because apparently she never told them I was back at
16  work.  You don't get paid unless that's reported.
17  That's how I knew.
18  Q.    Any other evidence?
19  A.    Well, I was never told, I was never told that
20  she was my supervisor.  It was just done behind my
21  back.
22  Q.    Based on this evidence you concluded that Ms.
23  Carpenter was your supervisor?
24  A.    Well, the fact that she wouldn't answer my

**B0278**

Wilcox & Fetzer, Ltd.          Registered Professional Reporters          (302) 655-0477

Edith A. Choma

1    just outside doctors that we gave these appeals to so

2    that they could confirm whether it should be denied or

3    approved.

4    Q.    In the sentence following that Ms. Sweeney also

5    makes reference to you becoming proficient in terms of

6    sending denial/approval letters for the UM and CM

7    staff.  Do you see that?

8    A.    Yes, I see that.

9    Q.    And these are the claim denial letters you are

10   referring to?

11   A.    Yes.

12   Q.    Were you not at that point doing some of these

13   claim and denial letters?

14   A.    I was always helping with those.

15   Q.    But she wanted you to become more proficient in

16   doing that, is that correct?

17   A.    That's what she is stating and she is stating

18   receiving these communications by E-mail.  We had a

19   meeting about that to discuss these letters getting

20   done and I believe Nina Frazier was there, Lisa

21   Flowers I believe was there.  Apparently they had some

22   temps in there.  I'm at the other end of the building

23   and they're over here.  So, I was doing some by E-mail

24   from the reps, intake coordinators, themselves.

**B0279**

298

Edith A. Choma

1    Q.    When you say you are doing them by E-mail,

2    describe what they were doing or how they were sending

3    these letters.

4    A.    They would send me by E-mail the patient's name

5    and the kind of letter and like the number it was.

6    Like I would have to fill in number nine and that kind

7    of thing.

8    Q.    It's a little different than the way you used

9    to do it where they used to hand you a kind of marked-

10   up paper draft?

11   A.    In a way, but it wasn't anything major that

12   bothered me doing it.  It wasn't like I couldn't do

13   it.

14   Q.    It was just in E-mail format instead of a paper

15   hard copy?

16   A.    Yeah, yes, yes.

17   Q.    And were there more of these type of claim

18   letters coming by E-mail instead of paper draft?

19   A.    They were both.  I know at one time she

20   complained at this meeting that there was like 200

21   letters that needed to be done and, in fact, there was

22   only six or seven letters.

23   Q.    Who was complaining?

24   A.    Sweeney and I was at the meeting and I said,

**B0280**

Edith A. Choma

1    "Well, how come it changed from 200 to these six or
2    seven letters that you are accusing me of not doing?"
3    It was, "Oh, well, you know what happened?  The temp.
4    didn't have access to the LAN so she couldn't send
5    them to you.  Sorry about that."  Well, she didn't
6    even say sorry about that.  I'm thinking sorry about
7    that to myself.  Pat Carpenter spoke up and said,
8    "That's no big deal."  I said, "It is to me because
9    you are having this meeting for this reason, you are
10   accusing me of not doing these 200 letters when, in
11   fact, I had no access to them -- the girl had no
12   access to give them to me."
13              I believe that's why it was done by E-mail
14   because I was sitting all the way on the other end of
15   building and they were over there.
16   Q.    The number of these deny and approval letters
17   was it increasing?
18   A.    We would have times when it would just be
19   unbelievable.  There were always some letters there.
20   When we hired temps that did help to get them caught
21   up because you had extra people doing them.
22   Q.    And at this time also the medical management
23   group was growing in size, was it not?
24   A.    A lot of people were leaving because they were

**B0281**

Edith A. Choma

1    A.    Yes, I see that.

2    Q.    Was that an accurate statement about your

3    responsibilities?

4    A.    Yes, it is.  As I said before, I work for

5    everybody.  Whoever asked me to work for them I try to

6    help them.

7    Q.    Turning to Page Nine for a minute.

8    A.    (Witness complies.)

9    Q.    Do you see the section entitled "Final

10   Assessment"?

11   A.    Yes.

12   Q.    On the third to last sentence there is a

13   comment in there that states, "Edith needs to be

14   cognizant of the amount of time she takes for lunch

15   and to adhere to the one hour allotted."  Do you see

16   that?

17   A.    Yes.

18   Q.    Do you know what that is referencing?

19   A.    That could be in reference to the time that I

20   and the auditors were out at lunch and we came back

21   and she started pointing her finger at me and started

22   yelling, "You're late, you're late."  I turned around

23   to one of the auditors and said, "We're not late, are

24   we?"  She started yelling, "You only get an hour for

**B0282**

318

Edith A. Choma

1    lunch," and on and on.  The other people, Yvonne

2    Locker and Dave Martin -- I stayed after work.  I just

3    stayed because it got her so upset.  She said she went

4    in my desk and looked for my purse and couldn't see

5    it.  She went and checked all around to see where I

6    was.

7        Q.    Let me ask you about that instance.  Were you,

8    in fact, late from returning to lunch?

9        A.    That day?

10       Q.    Yes.

11       A.    I really don't know.  I asked them, "What time

12   did we go, are we late?"  The point is her singling me

13   out in front of everyone.  That was embarrassing.

14       Q.    Who else was with you at that time?

15       A.    Dave Martin and Yvonne Locker and I think

16   Charlene Blanchard was there.

17       Q.    Did you all leave for lunch at the same time?

18       A.    Yes.

19       Q.    How long are you allotted for lunch break?

20       A.    An hour.

21       Q.    In that hour lunch break you have to kind of

22   keep track of how long you take for lunch on your time

23   records?

24       A.    Yes.

**B0283**

Edith A. Choma

1    Q.    In this E-mail there is reference to the hours

2    that you worked during that July time frame when Ms.

3    Carpenter is out?

4    A.    Yes.

5    Q.    And you submitted the overtime to Ms. Sweeney

6    on this occasion, is that correct?

7    A.    I believe I did.

8    Q.    Were you paid for those hours that you

9    submitted?

10   A.    I don't even know.  I really don't know.

11   Q.    In the second sentence of this E-mail from Ms.

12   Sweeney to you on August 24th she also states and

13   reminds you about the state law requiring you to take

14   a lunch break, do you see that?

15   A.    Yes.

16   Q.    Were there any issues regarding you working

17   through lunch during this time frame?

18   A.    Yes.  I had just come back from the emergency

19   room.  They said I had a scaphoid fracture in my

20   primary hand that I use to type with.  So, I come back

21   to work that I think it was Monday, whatever it was.

22   The doctor put me out.  I hurt my arm on Thursday

23   night and I was in there all morning in the emergency

24   room still.  So, I didn't get out until the next day

**B0284**

Edith A. Choma

1   and they told me to stay out Friday and go back to

2   work Monday.  That Monday is when I had this cast on

3   my arm and I had to keep my arm elevated.  I could

4   only type with my left hand.

5           She gives me a pile of work like this and

6   says, I want to get this done by the end of the day.

7   I'm typing with one hand and that's my left hand.

8   Q.   Before you go any further on that did you have

9   to work through your lunch on that particular day?

10  A.   I ate my lunch at my desk.

11  Q.   Did you work while you were eating your lunch

12  at your desk?

13  A.   I can't remember.

14  Q.   If you look at the second paragraph of Ms.

15  Sweeney's E-mail she references that, "Since you did

16  not take a lunch yesterday despite my telling you that

17  you must take lunch I will have to pay you overtime

18  for that."

19  A.   Yes.

20  Q.   Were you paid overtime for working through your

21  lunch period?

22  A.   I probably was paid overtime because I did as

23  she instructed, but you probably know yourself when

24  you are busy and you are working on something and you

**B0285**

380

Edith A. Choma

1    have a sandwich sitting there you will eat your

2    sandwich and you go back to your work.  So, I had a

3    lunch, I had something to eat.

4        Q.    But you were working?

5        A.    After I ate my sandwich.  I couldn't eat -- I

6    only had one hand available, I couldn't type and eat

7    at the same time.  I was typing with my left hand.

8        Q.    Do you know why Ms. Sweeney references in her

9    E-mail that you did not take a lunch that day?

10       A.    I explained to her -- when she gave me all that

11   work to get done I explained to her that I only had

12   one typing hand as she could see.  I'm typing as fast

13   as I can.  She said, "That's not good enough."

14       Q.    As far as lunch do you know why she is

15   referencing that you had to work through your lunch?

16       A.    She just put that in there, I guess.

17       Q.    Is it your testimony that you actually did not

18   work through your lunch --

19       A.    I stayed through my lunch hour to get this work

20   done.

21       Q.    So, in fact, you worked through your lunch on

22   that day?

23       A.    But I also ate my lunch so I did take a break

24   to eat my lunch.  I continued working.  I had to get

**B0286**

Edith A. Choma

1    this work done.  She wanted it done by the end of the

2    day.

3      Q.    And you didn't get permission from her to work

4    through your lunch?

5      A.    I didn't ask for permission.  I just ate my

6    lunch at my desk like hundreds of other employees that

7    do and they work and they just do their work.

8      Q.    The answer is no?

9      A.    I was doing it on my own time to get the work

10   done.

11     Q.    My question to you --

12     A.    No, I didn't ask her because I was doing it on

13   my own time.

14             MR. HOLT:   Number 27, please.

15             (Choma Deposition Exhibit No. 27 was marked

16   for identification.)

17   BY MR. HOLT:

18     Q.    You have been handed what has been marked as

19   Exhibit 27 and this purports to be a memo from Ms.

20   Sweeney to you on August 25, 2004.  Do you recognize

21   this?

22     A.    Yes, I do.

23     Q.    And this purports to be a memo to you regarding

24   obtaining prior approval before working overtime, do

**B0287**

453

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

EDITH CHOMA,                          )
                                      )
              Plaintiff,              )
                                      )  Civil Action
v.                                    )  No. 06-486-JJF
                                      )
BLUE CROSS BLUE SHIELD OF             )  - VOLUME III -
DELAWARE,                             )
                                      )
              Defendant.              )

          Deposition of EDITH A. CHOMA taken
pursuant to notice at the law offices of Young,
Conaway, Stargatt & Taylor, LLP, The Brandywine
Building, 1000 West Street, 17th Floor, Wilmington,
Delaware, beginning at 10:12 a.m. on Thursday, June
14, 2007, before Christina M. Vitale, Certified
Shorthand Reporter and Notary Public.

APPEARANCES:

          LORI ANN BREWINGTON, ESQUIRE
          MARGOLIS EDELSTEIN
            750 South Madison Street
            Wilmington, Delaware  19801
            For the Plaintiff

          SCOTT A. HOLT, ESQUIRE
          YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
            The Brandywine Building
            1000 West Street, 17th Floor
            Wilmington, Delaware  19899
            For the Defendant


          WILCOX & FETZER
1330 King Street -  Wilmington, Delaware 19801
            (302) 655-0477

          www.wilfet.com


**B0288**

454

Edith A. Choma

```
1              EDITH A. CHOMA, the deponent herein,
2    having first been duly sworn on oath, was examined and
3    testified as follows:
4    BY MR. HOLT:
5       Q.   Good morning, Ms. Choma, we are reconvening
6    your deposition today.  I want to start by asking you
7    have you talked with anyone about your case against
8    Blue Cross Blue Shield since our last meeting for your
9    deposition?
10      A.   No.
11      Q.   Have you talked to your attorney at all?
12      A.   Yeah.
13      Q.   Anyone else besides your attorney about your
14   case?
15      A.   No.  I talked -- I called Dave Martin because
16   he had raccoons in his attic and I wanted to know how
17   he was doing.
18      Q.   When did you call Mr. Martin?
19      A.   Probably a couple months ago.  I can't recall
20   the exact date.
21      Q.   And you called him because you had raccoons in
22   your attic?
23      A.   I called him to see how he was because Dr.
24   Kaplan had fired him and he was in the process -- he
```

**B0289**

Edith A. Choma

1    Q.    Which is October 22nd --

2    A.    Yes.

3    Q.    -- 2004?  Do you know when Blue Cross received

4    a copy of this charge?

5    A.    I don't know when they received their copy.  I

6    don't know how long they usually take to do this, I

7    really don't know, but on this day she actually came

8    up to me and stuck a finger in my face and started

9    yelling at me.

10   Q.    What was she yelling at you about?

11   A.    You better learn to do what I tell you to do.

12   You better learn to do this and that and this and

13   that.  She had her finger right in my face and

14   touching my nose and everybody is around there and can

15   see this.  I mean, these people are shocked.

16   Q.    Who was around there that witnessed this event?

17   A.    I don't know if Dave Martin -- there is people

18   around that come in there.  There is people that hear

19   this.  There is people -- I wasn't looking around to

20   see who was watching us.

21   Q.    You said that everyone was around.  I want you

22   to identify to the best of your recollection who was

23   around to witness that event?

24   A.    I think Dave Martin might have been.

**B0290**

Edith A. Choma

1    Q.    Anyone else?

2    A.    I don't know if Yvonne and Char were in that

3    day.   They would have definitely seen it if they were

4    there.   I can't remember if they were in.

5    Q.    Is that Yvonne Locker?

6    A.    Yes.

7    Q.    And the other one is Charlene Blanchard?

8    A.    Yes.

9    Q.    Anyone else who might have been around for that

10   event?

11   A.    Peggy Bell might have been around.

12   Q.    Do you know if they were around or are you just

13   guessing that they may have been there?

14   A.    I'm pretty sure Dave Martin was there because

15   he would say to me, "She is trying to get you to say

16   something back to her so she can write you up.   This

17   is what this is leading --" you know "-- she is just

18   doing this to you to make you explode."   So, I was

19   upset.   I wasn't looking around to see who was there.

20   I'm just telling you what happened.

21   Q.    Why was Ms. Sweeney upset with you?

22   A.    I think this is the time she came to my desk.

23   I had an appointment with hand therapy after work and

24   Eileen gave me letters to do and I got them all done

**B0291**

607

Edith A. Choma

1   and she is always yelling at me.  She was yelling at

2   me because why didn't you give these to Eileen or

3   something?  I even forget what it was.  It was

4   something very minute that she was yelling.

5   Q.   When you say she is yelling --

6   A.   Yelling.

7   Q.   How loud was she?  Could the whole office hear

8   her?

9   A.   If they were all there, yes, sir.

10  Q.   And she did this on more than one occasion?

11  A.   Yes, sir.

12  Q.   How many times?

13  A.   I can't tell you.

14  Q.   More than ten?

15  A.   Yes.

16  Q.   More than 20?

17  A.   I'm not going to put a number on it because all

18  I can tell you is this woman constantly harassed me

19  and it was awful going to work under those conditions.

20  I cannot put it any plainer.

21  Q.   You have testified on numerous occasions, Ms.

22  Choma, that you were being harassed and I'm trying to

23  get a quantification of the number of times that Ms.

24  Sweeney yells at you as you testified and you are

**B0292**

Edith A. Choma

1    saying it's more than ten, but you are not sure if

2    it's more than 20?

3      A.    Did you get a copy of the EEOC report?  Tells

4    you how she would come to my desk --

5      Q.    Ms. Choma, let me ask you questions as you

6    testify here today.  I know you have produced many

7    documents.  You testified just a moment ago that Ms.

8    Sweeney would yell at you so loud that the entire

9    office could hear you, correct?

10     A.    Yes.

11     Q.    And that she did this on at least ten

12    occasions, correct?

13     A.    I would say at least ten.  I can't tell you

14    every occasion.  You know, I'm trying to put this in

15    the back of my mind not thinking about this every day.

16     Q.    Well, Ms. Choma, you have brought this lawsuit

17    and we need to understand the basis for your

18    allegations so I need to ask you these questions.  Did

19    this yelling start in August of 2004 when Ms. Sweeney

20    was timing you?

21     A.    Yes.  Yes.

22     Q.    So, on at least ten occasions from August of

23    2004 until the time you retired Ms. Sweeney would come

24    out and would she come out to your cubicle and yell at

**B0293**

635

Edith A. Choma

1          MR. HOLT:  Objection, leading.

2     BY MS. BREWINGTON:

3        Q.    You can answer.

4        A.    She never asked me.  She E-mailed me one time

5     and she just listed all the days she was taking off.

6     Didn't even ask me if I was there or not.

7        Q.    One final question.  One of the things that you

8     said today.  You said that you were forced out and you

9     were forced to retire?

10       A.    Yes.

11       Q.    Can you explain to me what you meant by that?

12       A.    The things that they were doing to me were

13    uncalled for.  To be monitored and to be yelled at and

14    to be timed especially when your hand is in a cast,

15    that is something that I don't think an employee

16    should be subjected to.  I never had any problems

17    before doing letters for them.  Nobody ever complained

18    and now all of a sudden it was an issue.  So, I

19    definitely feel as though they wanted me out, Kaplan

20    and Sweeney wanted me out.

21             MS. BREWINGTON:  I don't have anything

22    further.

23    BY MR. HOLT:

24       Q.    Just one follow-up question.  On the instance

**B0294**