IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| EDITH CHOMA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-486-JJF |
| | ) | |
| BLUE CROSS BLUE SHIELD | ) | JURY TRIAL DEMANDED |
| OF DELAWARE, | ) | |
| | ) | |
| Defendant. | ) | |


**PLAINTIFF'S AMENDED OPENING BRIEF
IN SUPPORT OF HER MOTION FOR PARTIAL SUMMARY JUDGMENT**


MARGOLIS EDELSTEIN
Herbert W. Mondros, Esq. (Del Bar No. 3308)
750 South Madison Street, Suite 102
Wilmington, DE 19801
302.888.1112
Attorneys for Plaintiff

Dated: November 1, 2007

## TABLE OF CONTENTS

Table of Authorities..................................................................................ii

Nature and Stage of Proceedings..............................................................1

The Undisputed Facts..............................................................................2

Argument.............................................................................................8

    A.    Standard of Review ....................................................................8

    B.    The Undisputed Facts Establish That Plaintiff is Entitled to Summary

        Judgment On Her Disability Discrimination and Retaliation Claims..............8

        1.    Plaintiff Has a Disability.......................................................9

        2.    Plaintiff is a Qualified Individual............................................9

        3.    BCBSD Inflicted Adverse Employment Actions Upon Edith Choma.....10

Conclusion..........................................................................................12

## TABLE OF AUTHORITIES

CASE LAW

    <u>U.S. Supreme Court</u>

*Sutton v. United Airlines, Inc.*, 527 U.S. 471, 482 (1999).....................................9

*Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)...........................11

    <u>U.S. Courts of Appeal</u>

*Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001).......................................11

*Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1126 (9th Cir. 2000).............12

*Collins v. Illinois*, 830 F.2d 692, 703 (7th Cir. 1987)......................................11

*Deane v. Pocono Medical Center*, 142 F.3d 138 (3d Cir. 1998)...............................8

*Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995)..................................8

*Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004)...........................11

*Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296 (3d Cir. 1999)...............................8


    <u>U.S. District Courts</u>

*Cole v. Del. Tech. & Cmty. College*, 459 F. Supp. 2d 296, 304 (D. Del. 2006).................11

*Davis v. Mountaire Farms, Inc.*, 2005 U.S. Dist. LEXIS 12543, 23-24 (D. Del. 2005)........11

*Zechman v. Christiana Care Health Sys.*, 2007 U.S. Dist. LEXIS 47349 (D. Del. 2007).......8

STATUTES

42 U.S.C. § 12111(8)...........................................................................9

OTHER

http://www.mayoclinic.com/health/menieres-disease/DS00535............................2

Plaintiff, Edith Choma, through her undersigned counsel, respectfully moves, pursuant to Rule 56 (a) and (c), Fed.R.Civ.P., for entry of summary judgment in this matter because the undisputed facts demonstrate that Plaintiff is entitled to judgment as a matter of law on her claims for disability discrimination as alleged in Count III (violation of 19 Del. C. §723, §724, §726); Count IV (Violation of the Americans with Disabilities Act (the "ADA")); Count V (Disability Discrimination); and Count VI (Retaliation).[1]  The grounds for this motion are set forth below.

## I.    NATURE AND STAGE OF PROCEEDINGS

Plaintiff filed her Complaint on August 7, 2006 [Exhibit 1].  Defendant's Answer was filed on August 28, 2006.  This is Plaintiff's Motion for Partial Summary Judgment.

## II.    THE UNDISPUTED FACTS

The following undisputed facts demonstrate that Edith Choma is entitled to judgment as a matter of law on Counts III, IV and V of the Complaint:

1.        Plaintiff Edith Choma ("Edith") began her employment with Defendant, Blue Cross Blue Shield of Delaware ("BCBSD") in 1989. [Choma 23].

2.        In 1995 Edith was diagnosed with Meniere's Disease, an inner ear disease that causes, among other things, hearing loss and vertigo. [Exhibit 2; http://www.mayoclinic.com /health/menieres-disease/DS00535].

3.        In early 2000, Dr. Paul Kaplan became the new Chief Medical Officer at Blue Cross Blue Shield. [Kaplan 47].  Kaplan, a South Africa-born and educated doctor, had

---

[1] Disputed issues of fact may exist which could reasonably be deemed to preclude summary judgment on the remaining counts in Plaintiff's Complaint.

been a practicing physician until 1996, when he suffered a serious head injury. The injury left him with impaired memory that forced him to retire as a practicing physician, and for which he continues to receive disability payments [Kaplan 33-42, 70-74]. The injury also resulted in changes in Dr. Kaplan's personality.[2] [Kaplan 108-109; Martin 23-24].

4.        In 1999 Edith became the administrative assistant to Dr. Kaplan. [Choma 27-29, 71-72].

5.        Dr. Kaplan and Edith worked in the Medical Management Division at BCBSD, which, among other things, advised BCBSD's health insurance subscribers that BCBSD was denying coverage on health insurance claims made by subscribers. Such denials were made in what BCBSD called "Denial Letters." [Kaplan 192-193; Choma 45-47, 202-205; Sweeney 156-157]. Dr. Kaplan was (and is) the official at BCBSD who makes the ultimate decision as to whether a particular claim is denied. [Kaplan 269, 270]. Edith was the BCBSD employee who was responsible for typing the Denial Letters. [Kaplan 115-116 ; Choma 74-75, 297-299; Sweeney 155-157].

6.        In addition to having Edith draft Denial Letters, Dr. Kaplan required Edith to take dictation. [Kaplan 63-66 , 78-79, 115, 152-153; Choma 28, 61-62, 145]. Dr. Kaplan would dictate onto microcassettes, and Edith would transcribe from the microcassettes. [Kaplan 64; Choma 145-146]. As a result of her impaired hearing, Edith struggled with the dictation. Edith advised Dr. Kaplan, who was well-aware of Edith's hearing disability, that her hearing impairment impeded her ability to take dictation. [Kaplan 63-66, 180-181; Choma 146-153]. Dr. Kaplan was extremely dissatisfied with the dictation work Edith did for him.

---

[2] Dr. Kaplan's impaired memory was evident at his deposition where he testified that he could "not remember" on at least 39 occasions. [Kaplan 9, 31, 38, 40, 45, 54, 58, 63, 64, 67, 69, 76, 77, 78, 82, 86, 88, 104, 119, 141, 183, 187, 188, 194, 202, 218, 227, 231, 233, 234, 238, 244, 258, 260, 265]

[Kaplan 65-66 , 78-79 , 157-158; Choma 146-153 ].   There were other secretaries to whom Dr. Kaplan could have assigned the dictation duties, but Dr. Kaplan continued to assign dictation to Edith. [Kaplan 66].

7.          In or around July 1999, Dr. Kaplan evaluated Edith's employment performance for the first time. [Exhibit 3].  Kaplan gave Edith a very poor review.  Among other things, Edith received a poor review for her performance of her dictation duties.  [Kaplan 94].

8.          Edith was unhappy with Kaplan's review of her performance.  [Choma 71]. She confronted Kaplan about her review.  [Kaplan 101-103;  Choma 70-73].  During their meeting, Kaplan made several discriminatory and inappropriate statements to Edith.  He told her: (1) "I can't stand the way you lift up your glasses to see the screen!"; (2) "Maybe it's your Thyroid"; (3) "Maybe the blood isn't getting to your brain!"; and (4) "You know the saying "Kick the Dog", that's why I treat you the way I do!"  [Complaint at ¶13; Choma 95-98, 101-119].  Although Kaplan denies making these statements [Kaplan 106-108], after their meeting, Edith reported Kaplan to the BCBSD the Human Resources Department. [Choma 101-119; Kaplan 84-89]

9.          The Human Resources Department at BCBSD directed Dr. Kaplan to revise Edith's 1999 Performance Evaluation. [Kaplan 86].   Kaplan was unhappy that Human Resources had interceded, and he was unhappy that he was directed to change Edith's Performance Evaluation. [Kaplan 86-90 ]. Nevertheless, he made the changes, improving Edith's Performance  Evaluation. [Kaplan 86-103].

10.         In or around September 2, 1999, BCBSD's Human Resources Department contacted Edith to schedule a meeting to discuss the content of her job.  Upon completion of

3

that meeting, Edith's position was reevaluated and Edith was promoted from a grade 7 to a grade 8. Edith was only given a 1% increase for her change in grade. When Edith protested this meager increase, Kaplan stated to Edith that if it was up to him, she would not have received anything. [Kaplan 111-114].

11.    Dr. Kaplan admitted he was unhappy about Edith's having reported him to Human Resources and that Human Resources had ordered him to make changes to Edith's Performance Evaluation. Nevertheless, Kaplan testified that he had no grudge against Edith. [Kaplan 132].

12.    Kaplan, however, admitted to being extremely frustrated with Edith. [Kaplan 133-137, 146, 180].

13.    In a leadership meeting after the confrontation over the 1999 performance evaluation, Kaplan told BCBSD managers that he wanted to get rid of Edith because she couldn't hear. [Kaplan 133-135, 137, 146; Choma 242-245 Toole 18-20].

14.    Tim Toole, then and still Director of Behavioral Health at BCBSD testified: "My recollection is [Dr. Paul Kaplan] said he wished he could get rid of Edith because he said she couldn't hear." [Toole 18-20]. Kaplan admitted that he said that he wanted to get rid of Edith because she couldn't hear, and admitted that he said that because he was frustrated with Edith. [Kaplan 133-135, 137, 146, 180-181].

15.    After the 1999 Performance Evaluation, and indeed, until Edith was forced to retire from BCBSD, [Exhibit 4], Kaplan continued to make Edith do dictation, despite knowing that Edith's disability impeded her ability to do dictation and despite Kaplan's remaining dissatisfied with Edith's dictation work. In Kaplan's 2000 Performance Evaluation

4

of Edith, he complained that Edith's hearing difficulties sometimes creates [sic] a problem for her to hear words while transcribing dictation. [Exhibit 13].

16.     Ultimately, Kaplan made good on his wish to get rid of Edith because of her hearing. On or around August 12, 2002, Edith was *"demoted"* (Plaintiff's word) or *"transferred"* (Defendant's word), from Administrative Assistant to Medical Director Paul Kaplan to Administrative Assistant to the new Quality Improvement ("QI") Director, Debbie Sweeney. [Kaplan173-174 ; Sweeney 59-62; Choma 34, 206, 246-247 ]. In connection with that move, Patricia Carpenter, a younger, and non-hearing impaired secretary in the Medical Management Department at BCBSD became Kaplan's secretary. [Kaplan 174, 176-178; Sweeney 66-68;Choma 206, 246-253]. After the change, instead of reporting directly to BCBSD's Chief Medical Officer, Kaplan, Edith reported to Sweeney, who reported to Kaplan. [Kaplan 174, 176, 190; Sweeney 37, 48; Choma 29-30, 34, 206, 246]. Later, in 2003 or 2004, BCBSD changed Edith's direct report to Patricia Carpenter. [Choma 247-248, 286-292, Exhibits 5 & 6].

17.     When Edith was transferred to the QI Department, to work for Sweeney, the condition of her cubicle was deplorable. The walls were mismatched, it was much smaller than her previous cubicle and the cubicles of Carpenter and Zakutny, it was covered in dirt and dust mites. It took about 2 months for BCBS to replace her cubicle. [Martin 40-42; Choma 257-260].

18.     After demoting Edith, Kaplan and BCBSD continued to discriminate her and to retaliate against her for complaining to Human Resources and later to the EEOC and Delaware Department of Labor. [Exhibit 9].

5

19.      Sweeney publicly berated Edith when she returned a half hour late from lunch. Although four other BCBSD employees were also late, Sweeney singled Edith out for a very public tongue-lashing. [Sweeney 181-182; Choma 317-318; Martin 31].

20.      Beginning in 2004, BCBSD experienced a sharp increase in the number of health insurance claims it was denying, and hence a sharp increase in the number of Denial Letters that needed to be typed. [Sweeney 159].As a result of the increase in denials and Denial Letters, there was also an increase in the number of BCBSD subscribers who appealed BCBSD's denial of benefits. [Sweeney 160] This caused a sharp increase in the number of "Appeal Letters" BCBSD sent, and Edith was responsible for typing those Appeal Letters, as well as the Denial Letters. [Sweeney 143]. On August 19, 2004, Edith suffered a broken wrist, and went to work with a cast on her right (primary) wrist. Notwithstanding Edith's broken wrist, Sweeney required Edith to type the Denial and Appeal Letters, and timed Edith to assess the rate at which Edith was typing the Denial and Appeal Letters. [Sweeney 162]. Edith typed the Denial and Appeal Letters with one hand. Sweeney then complained because Edith was not typing the Denial and Appeal Letters quickly enough. [Sweeney 162; Exhibit 7]. When Edith attempted to work through lunch to type the letters informing the BCBSD subscribers their claims were being denied, Sweeney reprimanded her for working through lunch. [Exhibits 7 & 8; Sweeney 171-174]. When Edith stayed late to get the work done, Sweeney refused to authorize overtime. [Exhibit 8].

21.      On October 22, 2004, Edith filed a complaint with the Delaware Department of Labor and the EEOC complaining of BCBSD's discriminatory treatment. [Exhibit 9]. On October 29, 2004, BCBSD placed Edith on a Performance Improvement Plan ("PIP"). [Exhibit 10]. Among other things, the PIP (i) set unreasonable expectations for the rate at which Edith

6

would type Denial and Appeal Letters[3]; (2) established Edith's official hours as starting between 8:00 and 8:30 AM; and (3) required Edith to notify Sweeney when she arrived in the morning, when she left for and returned from lunch and when she departed work in the evening.

22.     On November 1, 2004, the very first day after BCBSD implemented Edith's PIP, Edith arrived in the morning and emailed Sweeney that she had arrived at 7:50 AM. Sweeney responded by email that while Edith had claimed to have arrives at 7:50 AM, Sweeney did not receive the email until 7:56 AM.  Sweeney demanded to know what Edith had been doing for the previous six minutes. [Sweeney 226-228; Exhibit 11].

23.     On February 1, 2005, Edith retired from BCBSD, in her exit interview, Edith wrote "Had to retire because of retaliation and constant harassment." [Exhibit 12; Choma 635].

---

[3] For example, as of the date of the PIP, Edith's Denial Letter rate, as timed by Sweeney was greater than 8 minutes.  The PIP required Edith to improve her rate of typing Denial Letters to an average of 5 minutes, a 40% improvement within 6 weeks.

DB02:5651303.1                                                                                                                    000000.0

## III.    ARGUMENT

### A.    Standard of Review

The standards for Summary Judgment are well-established. Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered" where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).

The undisputed material facts and the reasonable inferences drawn pursuant to this standard demonstrate that Plaintiff is entitled to Summary Judgment on her claims for disability discrimination as asserted in Counts III, IV, V and VI.

### B.    The Undisputed Facts Establish That Plaintiff Is Entitled to Summary Judgment On Her Disability Discrimination and Retaliation Claims.

"To prove a prima facie case of discrimination under the ADA, the employee must demonstrate that he or she 1) has a disability, 2) is a qualified individual; and 3) has suffered an adverse employment action." *Zechman v. Christiana Care Health Sys.*, 2007 U.S. Dist. LEXIS 47349 (D. Del. 2007)(citing *Deane v. Pocono Medical Center*, 142 F.3d 138, 142 (3d Cir. 1998)); *see also Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999).[4]

---

[4] Because state law provisions governing disability discrimination, 19 Del. C. § 720 *et seq.*, closely mirror the language and requirements of the ADA, the same reasons that support summary judgment on Plaintiff's ADA claims support summary judgment on her state law claims. *See Zechman;* (citing *Testerman v. Chrysler Corp.*, No. 95-240-GMS, 1997 U.S. Dist. LEXIS 21392, at *43 (D. Del. Dec. 30, 1997)(concluding that because the definitions in the Delaware statute regarding "handicapped person" mirrored those in the ADA, the holding for summary judgment on the federal claim applied to the state law claim as well)).

8

1.    Plaintiff Has A Disability

A disability, for purposes of the ADA, "is a physical or mental impairment that substantially limits a major life activity, taking into account any measures needed to correct for or mitigate the impairment." *Id.* (citing *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 482 (1999)). There can be no question that Edith Choma's hearing impairment qualifies as a disability under the ADA. *See* 29 C.F.R. § 1630.2(i) (term "major life activities" includes hearing). BCBSD, Kaplan and Sweeney all were well-aware of Edith's hearing impairment. [Kaplan 65; Sweeney 67, 80-81].

2.    Plaintiff is a Qualified Individual

Under the ADA, a "qualified individual" is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* (citing 42 U.S.C. § 12111(8)). The EEOC regulations require the court to first determine whether the individual satisfies the requisite skill, experience, education and other job-related requirements of the position. 29 C.F.R. pt. 1630, app. § 1630.2(m), and then to determine whether the individual can perform the essential functions of the job with or without accommodation. *Id.*

Edith Choma is a "qualified individual." That Edith was able to perform the essential functions of her job and possessed the requisite skill, experience, education and other job-related requirements of the position, is evident from Kaplan's testimony that he knew Edith struggled with dictation due to her hearing impairment but he nevertheless had her do these and other duties in her position of administrative assistant. BCBSD could have had another secretary do dictation, but failed to make this small accommodation in favor of its mean-spirited and retaliatory policy of requiring Edith to take dictation and then complaining about her dictation abilities giving her a poor performance evaluation. The evidence demonstrates that Edith Choma was fit for the position of

DB02:5651303.1                                                                                                    000000.0

Administrative Assistant to the Chief Medical Officer, and that she was able to perform the essential functions of her job.

       3.      <u>BCBSD Inflicted Adverse Employment Actions Upon Edith Choma</u>

BCBSD inflicted multiple adverse employment actions upon Edith Choma due to her disability and in retaliation for her complaints about the disability discrimination BCBSD imposed upon her.

First, BCBSD refused to accommodate Edith by having another secretary do the dictation for Dr. Kaplan. There were other secretaries available to do the dictation. Kaplan gave dictation only to Edith. [Kaplan 63-65 (Christine Zakutney and Patricia Carpenter could have done the dictation)].

Second, BCBSD denied Edith the three percent raise the other employees received, in part, because Edith could not take dictation. When Edith questioned her one percent raise, Kaplan told Edith that if it was up to him, Edith would have received no raise. [Choma 137-138; Kaplan 111-114]

Third, BCBSD's Chief Medical Officer, Paul Kaplan, publicly stated to other BCBSD managers that he wanted to get rid of Edith because she couldn't hear. [Toole 18-20].

Fourth, Kaplan did, in fact, get rid of Edith by transferring or demoting her from Administrative Assistant to the Chief Medical Officer to Administrative Assistant to Director of Quality Improvement who reported to the Chief Medical Officer.

10

Fifth, BCBSD further demoted Edith by making her report directly to Kaplan's new secretary, the younger Patricia Carpenter. [Choma 247-248, 286-292, Exhibits 5 & 6].

Sixth, and, for present purposes, finally, BCBSD subjected Edith to additional outrageous mistreatment such as a public berating by Sweeney, timing Edith's Denial and Appeal Letter production rate, harassing Edith when she typed the letters too slowly with a broken arm, placing Edith on a Performance Improvement Plan which set unreasonable goals for typing Denial and Appeal Letters, and questioning what Edith had been doing for six minutes on the morning of November 1, 2005, before her official workday had even started. (See paragraphs 19, 20, 21 and 22)

An adverse employment action has been defined by the Supreme Court as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Davis v. Mountaire Farms, Inc.*, 2005 U.S. Dist. LEXIS 12543, 23-24 (D. Del. 2005)(quoting *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).

"The definition of adverse employment action goes beyond firing to reach conduct that 'alter[s] an employee's compensation, terms, conditions, or privileges of employment.'" *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004) (quoting *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001)). An adverse job impact has been found when an employer, without reducing salary or benefits, moved an employee's office to an undesirable or isolated location. See *Cole v. Del. Tech. & Cmty. College*, 459 F. Supp. 2d 296, 304 (D. Del. 2006)(citing *Collins v. Illinois*, 830 F.2d 692, 703 (7th Cir. 1987)). "In particular, substantial interference with work facilities that are important to the performance of an employee's job can constitute a material

11

change in the terms and conditions of employment and thereby qualify as an adverse employment action." *Id.* (citing *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1126 (9th Cir. 2000)). Therefore, depending on the circumstances, an office relocation, alone, may constitute an adverse employment action.

Edith Choma has met her burden with the above-referenced evidence demonstrating at least six adverse employment actions against her by BCBSD, and on her disability discrimination claim.

## CONCLUSION

For all the foregoing reasons, Edith Choma respectfully requests that summary judgment be entered on Counts III through VI of the Complaint.

MARGOLIS EDELSTEIN

/s *Herbert W. Mondros*

Herbert W. Mondros, Esq. (Del Bar No. 3308)
750 South Madison Street, Suite 102
Wilmington, DE 19801
302.888.1112
Attorneys for Plaintiff

Dated: November 1, 2007

12