IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| EDITH CHOMA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-486-JJF |
| | ) | |
| BLUE CROSS BLUE SHIELD | ) | |
| OF DELAWARE, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S REPLY BRIEF IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

Scott A. Holt, Esquire (No. 3399)
Adria B. Martinelli, Esquire (No. 4056)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6623; 571-6613
Facsimile: (302) 576-3299; 576-3314
Email: sholt@ycst.com; amartinelli@ycst.com
Attorneys for Defendant

DATED: November 12, 2007

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ ii

PRELIMINARY STATEMENT ........................................................................ 1

ARGUMENT ...................................................................................................... 1

   I.     PLAINTIFF'S AGE CLAIM FAILS AS A MATTER OF LAW. ...........................1

      A.   Choma's Age Discrimination Claim With Regard to Her 1999
           Employment Evaluation Is Time-Barred. .................................................1

      B.   Plaintiff Does Not Make A Prima Facie Case of Age Discrimination. .....................2

      C.   There Is No Evidence That Defendant's Stated Reasons Were Pretextual................3

   II.    PLAINTIFF'S DISABILITY CLAIMS FAIL............................................................6

      A.   Plaintiff Fails To Show She Was "Disabled" Under the ADA.................................6

      B.   Plaintiff Was Not "Qualified" Under the ADA. .......................................................8

      C.   Plaintiff Cannot Show She Was Denied A Reasonable Accommodation. ..............10

      D.   Plaintiff Has Failed To Point To Direct Or Indirect Evidence of
           Discrimination.......................................................................................................12

   III.   PLAINTIFF'S RETALIATION CLAIM FAILS AS A MATTER OF LAW.........15

      A.   Plaintiff Has Failed to Prove A Prima Facie Case of Retaliation. ...........................15

      B.   Plaintiff Failed to Rebut Defendant's Legitimate Reasons with Evidence
           of Pretext.............................................................................................................18

   IV.   THERE IS NO EVIDENCE  TO SUPPORT CONSTRUCTIVE DISCHARGE...19

CONCLUSION................................................................................................... 20

# TABLE OF AUTHORITIES

<u>**Page**</u>

## Cases

<u>AMTRAK v. Morgan</u>,
  537 U.S. 101 (2002) .................................................................................................... 1, 2

<u>Bailey v. Commerce Nat'l Ins. Servs</u>.,
  474 F. Supp. 2d 577 (D. Del. 2007) ................................................................................ 17

<u>Clary v. Marley Cooling Tower Co</u>.,
  1997 U.S. Dist. LEXIS 4125
  (D. Kan. March 12, 1997) ................................................................................................ 3

<u>Clemente v. Exec. Airlines, Inc</u>.,
  213 F.3d 25 (1st Cir. 2000) ............................................................................................. 7

<u>Cleveland v. Policy Mgmt. Sys. Corp</u>.,
  526 U.S. 795 (1999) ......................................................................................................... 8

<u>Cole v. Del. Tech. & Cmty. College</u>,
  459 F. Supp. 2d 296 (D. Del. 2006) ............................................................................ 2, 19

<u>Davis v. Gen'l Accident Ins. Co. of Am</u>.,
  2000 U.S. Dist. LEXIS 17356
  (E.D. Pa. Dec. 1, 2000) .................................................................................................... 2

<u>Dowd v. SEPTA</u>,
  2006 U.S. Dist. LEXIS 30619
  ( E.D. Pa. May 16, 2006) ................................................................................................. 2

<u>Fuentes v. Perski</u>,
   32 F.3d 759 (3d Cir. 1994) ........................................................................................ 5, 18

<u>Glanzman v. Metro. Mgmt. Corp</u>.,
  391 F.3d 506 (3d Cir. 2004) .......................................................................................... 14

<u>Hammel v. Eau Galle Cheese Factory</u>,
  407 F.3d 852 (7th Cir. 2005) ......................................................................................... 11

<u>Hoechstetter v. City of Pittsburgh</u>,
  248 F. Supp. 2d 407 (W.D. Pa. 2003) .............................................................................. 5

Hummel v. County of Saginaw,
    40 Fed. Appx. 965 (6th Cir. 2002) ................................................................. 11

Jenkins v. Northwood Rehab. & Extended Care Facility,
    267 F. Supp. 2d 282 (S.D.N.Y. 2003) ............................................................. 11

Jones v. Leavitt,
    454 F. Supp. 2d 459 (M.D. N.C. 2006) ........................................................... 14

Kelly v. Drexel Univ.,
    94 F.3d 102 (3d Cir. 1996) ................................................................................ 6

Kennedy v. Schoenberg, Fisher & Newman, Ltd.,
    140 F.3d 716 (7th Cir. 1998) .......................................................................... 14

Krouse v. American Sterilizer Co.,
    126 F.3d 494 (3d Cir. 1997) ........................................................................... 16

Manessis v. N.Y. City DOT,
    2003 U.S. Dist. LEXIS 1921
    (S.D.N.Y. Feb. 10, 2003) .................................................................................. 7

Price Waterhouse v. Hopkins,
    490 U.S. 228 (1989) .................................................................................. 14, 15

Roge v. NYP Holdings, Inc.,
    257 F.3d 164 (2d Cir. 2000) .............................................................................. 5

Rush v. Scott Specialty Gases, Inc.,
    113 F.3d 476 (3d Cir. 1997) .......................................................................... 1, 2

Schoch v. First Fid. Bancorporation,
    912 F.2d 654  (3d Cir. 1990) ............................................................................. 1

Skerski v. Time Warner Cable Co.,
    257 F.3d 273 (3d Cir. 2001) ........................................................................... 10

Spencer v. Wal-Mart Stores, Inc.,
    469 F.3d 311 (3d Cir. 2006) ........................................................................... 19

Stewart v. Happy Herman's Cheshire Bridge, Inc.,
    117 F.3d 1278 (11th Cir. 1997) ...................................................................... 11

Sutton v. United Air Lines, Inc.,
    527 U.S. 471 (1999) ........................................................................................... 7

Taylor v. Phoenixville Sch. Dist.,
    184 F.3d 296 (3d Cir. 1999) ........................................................................... 12

<u>Tidwell v. Carter Prods.</u>,
   135 F.3d 1422 (11th Cir. 1998) ...................................................................... 5

<u>Toyota Motor Mfg, Ky., Inc. v. Williams</u>,
   534 U.S. 184 (2002) ............................................................................... 6, 7

<u>Viggiano v. New Jersey</u>,
   2005 U.S. App. LEXIS 12616
   (3d Cir. June 23, 2005) ............................................................................. 17

<u>Woodson v. Scott Paper</u>,
   109 F.3d 913 (3d Cir. 1997) .................................................................. 16, 18

<u>Zaffuto v. Wal-Mart Sores, Inc.</u>,
   130 Fed. Appx. 566 (3d Cir. 2005) .............................................................. 5

## Other Authorities

29 C.F.R. § 1620.2 (n)(3)(iii) ........................................................................ 9

29 C.F.R. § 1630.2 (n)(3)(iv) ........................................................................ 8

29 C.F.R. § 1630.2(j)(3)(1) ........................................................................... 7

29 C.F.R. § 1630.2(n)(3)(i) ........................................................................... 8

42 U.S.C. § 12102(2)(A) .............................................................................. 6

## PRELIMINARY STATEMENT

Defendant Blue Cross Blue Shield of Delaware hereby submits its Reply Brief in further support of its motion for summary judgment. As Defendant showed in its initial Opening Brief, there is insufficient evidence under Rule 56 standards to create a triable issue of material fact as to any of Plaintiff's claims. Plaintiff's Answering Brief offers nothing to change this result. She essentially restates the same diatribe of speculative assertions, vague commentaries, and immaterial and unsupported assertions of fact as recited in her Opening Brief in Support of her Motion for Partial Summary Judgment. This is insufficient to meet her burden to come forward with specific, admissible and credible evidence supporting each element of her case.[1] Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990). Defendant's motion should be granted.

## ARGUMENT

### I.      PLAINTIFF'S AGE CLAIM FAILS AS A MATTER OF LAW.

### A.      Choma's Age Discrimination Claim With Regard to Her 1999 Employment Evaluation Is Time-Barred.

Plaintiff claims she was discriminated by virtue of Dr. Paul Kaplan's negative performance evaluation in 1999. Significantly, she testified that at the time of the performance evaluation she believed it was discriminatory; nevertheless, she failed to file a charge regarding this discrete action. (A229-30).[2] As held in Rush v. Scott Specialty Gases, Inc., 113 F.3d 476, 483-84 (3d Cir. 1997) and AMTRAK v. Morgan, 537 U.S. 101, 114 (2002), Plaintiff must file a charge within the applicable statutory time period for discrete acts. The fact that the Eastern District of Pennsylvania would not hold as a matter of law that a written reprimand could not be

---

[1] Plaintiff lists four (4) items she claims are "material facts in dispute." D.I. 64 at 9. As set forth *infra*, none of these items create a triable material issue of fact to any of her claims.

[2] "A___" refers to citations in the Sealed Appendix filed in support of Defendant's Opening Brief.

part of a continuing violation, does not affect the fact that the Third Circuit held just that in

<u>Rush</u>.[3]  Notably, Plaintiff chose to disregard key language of the Third Circuit's holding:

> Rush's failure to promote and train claim addresses discrete instances of alleged
> discrimination that are not susceptible to a continuing violation analysis.  We
> reiterate that Scott's promotion of Knoll and hiring of Carpenter were
> independent events that put Rush on notice to file a charge of discrimination.

<u>Rush</u>, 113 F.3d at 483-84.  Thus, Plaintiff cannot rely on the continuing violation theory to

resuscitate her claim.

**B.    Plaintiff Does Not Make A Prima Facie Case of Age Discrimination.**

In its Opening Brief, Defendant produced evidence to show that Plaintiff's reassignment

in July 2002 from one supervisor to another did not constitute an adverse employment action.

D.I. 54 at 24-25.  Indeed, Plaintiff testified that her job status, pay, benefits, grade and duties

essentially remained unchanged. (A226-27; A263).[4]

Nor does the fact Plaintiff's cubicle was not remodeled until several months after she

moved constitute an adverse employment action.  Plaintiff was not transferred to some isolated

part of the office - she was moved along with everyone else in the QI Department and given the

administrative assistant cubicle right outside Sweeney's office.  She does not offer any evidence

that this temporary inconvenience "substantial[ly] interfere[d] with [her] work facilities that

[were] important to the performance of [her] job."  <u>See</u> <u>Cole v. Del. Tech. & Cmty. College</u>, 459

F. Supp. 2d 296, 304 (D. Del. 2006) (citation omitted).  The inconvenience of having an

---

[3] Plaintiff cited to <u>Dowd v. SEPTA</u>, 2006 U.S. Dist. LEXIS 30619 ( E.D. Pa. May 16, 2006) for the
proposition that discrete acts may be deemed part of a continuing violation.  The <u>Dowd</u> case relied on
<u>Davis v. Gen'l Accident Ins. Co. of Am.</u>, 2000 U.S. Dist. LEXIS 17356, at *6-8 (E.D. Pa. Dec. 1, 2000),
which preceded the U.S. Supreme Court's seminal decision on continuing violations in <u>Morgan</u>.

[4] Plaintiff also asserts that she was "demoted" when Carpenter allegedly was made her supervisor. D.I. 64
at 9.  Her sworn testimony belies this assertion.  She testified that Carpenter had no supervisory duties
over her whatsoever. (<u>See</u> Exh. 1, Choma 286-287).  Indeed, her mistaken belief was based on several
documents that designated Carpenter as her supervisor, but Sweeney confirmed this designation was only
done for budgetary reasons. (Exh. 5, Sweeney 149-51).

unfinished cubicle for several months is simply insufficient to constitute an adverse employment action. See e.g., Clary v. Marley Cooling Tower Co., 1997 U.S. Dist. LEXIS 4125 at *61-63 (D. Kan. March 12, 1997) (holding that plaintiff's assignment to an undesirable cubicle for a period of three or four months was a "trivial inconvenience" that cannot "remotely be described as adverse employment action.")

Plaintiff does not refute any of this evidence in her brief. In fact, she does not address her prima facie case. Thus, Plaintiff has failed to prove a necessary element of her age claim and summary judgment is appropriate.

**C.    There Is No Evidence That Defendant's Stated Reasons Were Pretextual.**

Defendant's legitimate non-discriminatory reasons for reassigning Plaintiff are two-fold: (1) Kaplan believed that Carpenter's superior organization and time management skills were better suited to his needs; and (2) he believed that Plaintiff's knowledge of the NCQA accreditation process could be better utilized to support Sweeney, who had recently assumed that function. D.I. 54 at 23. Notably, Plaintiff completely disregards the first reason in her opposition brief. She does not refute that Kaplan, the decisionmaker, believed that Carpenter's skills were better suited to the position—the evidence of which is well-supported in the record.

Instead, she focuses on the NCQA responsibilities alleging that (1) transcription was not part of her responsibilities; (2) She did not have NCQA expertise; and (3) Carpenter had NCQA expertise. These allegations are simply unsupported, and at times contradicted, by the record.

Plaintiff's claim that transcribing dictation was never a part of her job responsibilities disregards her previous testimony on this subject. When asked about her job responsibilities as Kaplan's assistant, Plaintiff responded: "I scheduled his meetings. I scheduled his travel. *I took his dictation, which was quite a bit.*" (A151). She described dictation as a major component of her job, testifying "[Kaplan] gave me *a lot of dictation*. That's the one thing he did. *He gave me*

*a lot of dictation*." (A162-63). When asked whether transcription duties were her responsibilities, she responded that it was "part of her job." (A187-88). Thus, Plaintiff's testimony on this issue is clear, and her attempt now to walk away from this testimony must be rejected.[5]

Contrary to Plaintiff's assertion, there is ample evidence in the record to show that she had extensive experience with the NCQA accreditation process. She testified that she was heavily involved in the NCQA survey. (Exh. 1, Choma 39-40). She worked extensively with Kaplan during the 2000 accreditation process, and was familiar with the policies and procedures of NCQA accreditation. (A19); (A154). Kaplan testified that Plaintiff's knowledge was one of the reasons he reassigned her to support Sweeney. (A410). Again, Plaintiff offers nothing but a conclusory assertion to contradict the record and her sworn testimony.

Plaintiff also offers no evidence that Carpenter had experience with the NCQA accreditation. Indeed, Plaintiff cannot claim to know what experience Carpenter possessed because Plaintiff repeated testified that she had no idea what Carpenter's job responsibilities were or what she did in the Medical Management Division. (Exh. 1, Choma 52-53; Choma 264-65). More importantly, Carpenter did not begin working in the Medical Management Division until 2001. (Exh. 1, Choma 626-27). It defies logic that Carpenter could have experience in the NCQA accreditation process when she was not even working in the division when the 2000 accreditation occurred. It is yet another example which confirms Plaintiff's case is based on pure conjecture – not fact.

Nevertheless, whether or not Carpenter could have handled the NCQA accreditation support for Sweeney is irrelevant. Indeed, the relevant inquiry is not whether Kaplan's decision

---

[5] There can be no dispute that transcription was an essential function of Choma's job. See Section II.B., <u>infra</u>.

was a wise or prudent one, but whether he honestly believed in his reasons at the time.  See, e.g., Fuentes v. Perski, 32 F.3d 759, 765 (3d Cir. 1994) (issue is not "whether the employer is wise, shrewd, prudent, or competent" but whether its proffered reasons are vulnerable to a finding of pretext; Zaffuto v. Wal-Mart Sores, Inc., 130 Fed. Appx. 566, 571 (3d Cir. 2005) ("Our inquiry is not whether [employer's] justification for terminating [plaintiff] was based on accurate information, but only whether a reasonable factfinder could believe that the company is using the justification to hide a [discriminatory] motive").

Lastly, Plaintiff suggests that "no one attempted to justify Plaintiff's transfer on NCQA grounds at the time" is somehow evidence of pretext.  The fact that Kaplan may have not specifically mentioned this to Plaintiff does not make it inconsistent with Defendant's reason. See, e.g., Hoechstetter v. City of Pittsburgh, 248 F. Supp. 2d 407, 410 (W.D. Pa. 2003) ( holding that where City's initial justification was vague and overbroad, but the decisionmaker's testimony was clear and consistent with prior explanations, no pretext is shown); Tidwell v. Carter Prods., 135 F.3d 1422, 1427 (11th Cir. 1998) (additional, previously undisclosed reason for adverse employment decision does not establish pretext).

The same is true of the August 7, 2002 email from Donna May of the Human Resources Department which confirmed that Plaintiff's reassignment would not effect her salary, benefits or status as an administrative assistant. B0032. The fact that the email did not state the reason for the transfer raises no inference of pretext. See Roge v. NYP Holdings, Inc., 257 F.3d 164, 169 (2d Cir. 2000) (no proof of pretext where communication did not purport ot state a reason for employee's termination).  Indeed, there was no reason for Ms. May to include the reason for the reassignment, since she was merely responding to Plaintiff's inquiry as to whether her pay would be affected by the move. (Exh. 1, Choma 271-73).

5

In sum, Defendant is entitled to summary judgment on Plaintiff's age discrimination claim.   Plaintiff has failed to produce direct evidence of age discrimination and there is nothing in the record to discredit Defendant's legitimate, non-discriminatory reasons for her reassignment.[6]

## II.     PLAINTIFF'S DISABILITY CLAIMS FAIL.

### A.     Plaintiff Fails To Show She Was "Disabled" Under the ADA.

The burden rests with the Plaintiff to show that her hearing difficulty was a "disability" as defined by the ADA. <u>Kelly v. Drexel Univ</u>., 94 F.3d 102 (3d Cir. 1996).   In order to qualify as a "disability," the physical impairment must substantially limit one or more of the major life activities. 42 U.S.C. § 12102(2)(A).  In her brief, Plaintiff points to three things which she claims demonstrate she has a "disability":  1) she has been diagnosed with Miniere's Disease; 2) Defendant knew of this diagnosis and that it caused hearing loss; and 3) Kaplan knew her hearing loss impeded her ability to take dictation.  D.I. 64 at 17-18.  This evidence, however, is insufficient to meet her burden.

At most, Plaintiff has merely shown that she had a hearing impairment.  She does not show that the impairment *substantially* limited a major life activity. <u>Toyota Motor Mfg, Ky., Inc. v. Williams</u>, 534 U.S. 184, 195-97 (2002) ("To qualify as disabled, a claimant must … show that the limitation on the major life activity is 'substantia[l]'").  In order to prove that her alleged hearing impairment was substantially limiting, Plaintiff must point to evidence that it "*preventd[ed]* or *severely restrict[ed]* [her] from doing activities that are of central importance to most people's daily lives."  <u>Id.</u> at 198. (emphasis added).

---

[6] Plaintiff does not argue that Defendant's dissatisfaction with her performance, including the 1999 performance evaluation, was a pretext to mask unlawful discrimination.

Here, Plaintiff fails to point to any evidence that her hearing *prevented* or *severely restricted* her ability to perform everyday activities of those engaged in by the average person. There is no evidence that it severely restricted her ability to hear and converse with others. Indeed, Plaintiff was able to hear and respond to all questions during her deposition.

Plaintiff identifies only one activity in which she was severely restricted -- her ability to perform Kaplan's transcription. However, a narrow limitation on an ability to do one aspect of a job is not substantially limiting. Plaintiff must show that her inability to perform this one function substantially limited her ability to perform a *class of jobs* or a *broad range of jobs*. Sutton v. United Air Lines, Inc., 527 U.S. 471, 491 (1999) ("when the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs..."); 29 C.F.R. § 1630.2(j)(3)(1) ("The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity or working.")

In sum, "merely having an impairment does not make one disabled for purposes of the ADA." Toyota Motor, 534 U.S. at 198. The plaintiff must show that the impairment *substantially* limited a major life activity. Here, Plaintiff has failed to meet her burden on this essential element of her claim. Summary judgment is therefore appropriate. See, e.g., Manessis v. N.Y. City DOT, 2003 U.S. Dist. LEXIS 1921 (S.D.N.Y. Feb. 10, 2003) (summary judgment granted to employer where plaintiff failed to produce evidence that hearing impairment was substantially limiting within the meaning of the ADA); Clemente v. Exec. Airlines, Inc., 213 F.3d 25, 31 (1st Cir. 2000) (affirming summary judgment to employer where employee produced evidence that she suffered from hearing impairment, but failed to submit evidence that her hearing impairment substantially interfered with her ability to speak or hear).

7

B.    **Plaintiff Was Not "Qualified" Under the ADA.**

Another reason Plaintiff is not protected under the ADA is because she has not

demonstrated she was qualified under the ADA. "An ADA plaintiff bears the burden of proving

that she is a 'qualified individual with a disability' -- that is, a person 'who, with or without

reasonable accommodation, can perform the essential functions' of her job." Cleveland v. Policy

Mgmt. Sys. Corp., 526 U.S. 795, 806 (1999).  In its Opening Brief, Defendant demonstrated that

transcribing dictation was an essential function of Plaintiff's position which she was unable to

adequately perform.  The overwhelming evidence of the record supports this conclusion.

First, Kaplan testified that Plaintiff's transcription duties were a vital component of her

job. (A377; A397).  The ADA itself  mandates that this testimony must be given significant

deference when evaluating whether transcription duties were an essential function of plaintiff's

job.  42 U.S.C. § 12111 (8) ("[C]onsideration shall be given to the employer's judgment as to

what functions of a job are essential").  The EEOC's regulations require similar deference to

employer's judgment. 29 C.F.R. § 1630.2(n)(3)(i) (evidence to be considered in determining

whether a particular function is essential includes the "employer's judgment as to which

functions are essential").  Plaintiff does not contest this fact in her brief.

The consequences of a plaintiff not performing a function also must be considered in

evaluating whether that function is essential. 29 C.F.R. § 1630.2 (n)(3)(iv)   ("Evidence of

whether a particular function is essential includes … (iv) The consequences of not requiring the

incumbent to perform the function").  Here, Kaplan testified that the transcription of his dictation

constituted part of the record needed to obtain NCQA accreditation. (A407-408).  Thus, the

importance of this function supports the essential nature of Plaintiff's transcription duties.

Finally, Plaintiff's own testimony confirms that transcription of dictation was one of her

essential functions.  The amount of time spent on a function is a factor used to determine if it is

8

essential.  29 C.F.R. § 1620.2 (n)(3)(iii)  .  Plaintiff testified throughout her deposition that transcription was one of her primary functions.

> Q.    Can you give me a brief description about your job duties as divisional secretary to Dr. Kaplan?
>
> A.    I scheduled his meetings.  I scheduled his travel.  I took his dictation, which was quite a bit.
>
> * * *
>
> A.    . . . [Kaplan] gave me a lot of dictation.  That's one thing he did.  He gave me a lot of dictation.
>
> * * *
>
> Q.    But you were constantly asked by Dr. Kaplan to do dictation, correct.
>
> A.    Yes.
>
> Q.    So that was part of your job, correct?
>
> A.    Well, what can I tell you?  Anytime somebody asks me something [] it's part of my job.

(A151; A162-63; A187-88).

All of these factors demonstrate that transcription was one of the essential functions of Plaintiff's job.

In response, Plaintiff points to only one piece of purported evidence.  She contends that transcription is not referenced in her written "job description" and therefore cannot be one of her job functions. D.I. 64 at 18.  This argument fails for several reasons.

First, Plaintiff testified that the purported "job description" was not an accurate reflection of her job duties.  During her deposition, Plaintiff testified that she did not even recognize the document (even though it was produced during discovery by her), and stated there may be others with "more information on it." (Exh. 1, Choma 32).  When asked whether the document contained a description of her job duties, Plaintiff testified "[t]his document does not look like my job description that I have." (Exh. 1, Choma 34).  Thus, Plaintiff's own testimony contradicts her contention that the purported "job description" is an accurate reflection of her job duties.

9

In any event, the fact that a certain function is not explicitly described in a written job description is not dispositive to the issue of whether it is an essential function. <u>Skerski v. Time Warner Cable Co.</u>, 257 F.3d 273, 279 (3d Cir. 2001) (contents of job description only one factor in determining essential functions). Given the overwhelming number of other factors which demonstrate transcription was one of her essential duties, and Plaintiff's testimony that the document is inaccurate, this factor should be given little, if any, weight.

In sum, Defendant has established through its testimony and that of the Plaintiff that transcription was an essential function of her position. There is no dispute that Plaintiff was unable to perform this function in a satisfactory manner.[7] She was thus not "qualified" under the ADA and her claim must be dismissed.

## C.    Plaintiff Cannot Show She Was Denied A Reasonable Accommodation.

Plaintiff asserts in her brief that Defendant's duty to provide a reasonable accommodation was triggered when it became aware of "both [her] disability and her desire for accommodations for her disability." D.I. 64 at 22.[8] What is conspicuously absent from Plaintiff's conclusory assertion is any evidence that Plaintiff requested an accommodation. The undisputed fact is she did not.

Kaplan testified that he asked Plaintiff if there was any accommodation Defendant could make regarding her job and she said "no." (A378-79). Plaintiff testified there was "nothing that could be done" that would allow her to perform her transcription duties. (A187). The record,

---

[7] Kaplan testified that she had difficulty keeping up with the high volume of work related to the NCQA survey, and that Plaintiff continued to make mistakes on transcription. (A350; A397). Plaintiff, who often left blanks in her transcription, admitted that Kaplan was not satisfied with her performance of this function of her position. (A186; A190).

[8] Plaintiff also makes a baseless assertion that her fractured wrist constituted a disability. As explained in Defendant's Opening Brief, this non-chronic, temporary injury is insufficient to constitute a protected disability. D.I. 54 at 29.

then, is undisputed. Plaintiff never requested or even articulated a form of accommodation, even when Defendant asked if anything could be done to help her perform her job. Thus, Plaintiff has not satisfied her burden of establishing that she requested a reasonable accommodation and that it would allow her to perform the essential functions of her position. Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1286 (11th Cir. 1997).

Plaintiff next argues that Defendant should have accommodated her by reassigning her transcription duties to someone else. D.I. 64 at 22. This argument also fails. Even assuming, arguendo, that Plaintiff had made such a request (as is her burden under the ADA), Defendant had no obligation to reassign her transcription duties because they were part of her essential functions. 29 C.F.R. pt. 1630, App. § 1630(o) ("An employer or other covered entity is not required to reallocate essential functions."); Hummel v. County of Saginaw, 40 Fed. Appx. 965, 970 (6th Cir. 2002) (the ADA does not require employers to accommodate individuals by shifting an essential job function onto others"); Hammel v. Eau Galle Cheese Factory, 407 F.3d 852, 867 (7th Cir. 2005) ("[T]he courts have been reticent, as they should be, to require employers to provide accommodations that necessitate the enlistment of another employee to assist an ADA claimant in performing the essential functions of the job."); Jenkins v. Northwood Rehab. & Extended Care Facility, 267 F. Supp. 2d 282, 287 (S.D.N.Y. 2003) (omitting citations) ("[T]he ADA does not require an employer to eliminate or relocate essential functions of a position in order to provide accommodation."). As set forth supra, transcription was one of Plaintiff's essential functions. Her own testimony confirms this undisputed fact. Defendant thus had no obligation to find someone else to perform the duties for her.

Oddly enough, Plaintiff also argues that Defendant did in fact accommodate her when Kaplan allowed her to do the transcription as best she could. D.I. 64 at 22. Of course, this

argument runs contrary to Plaintiff's previous position that she was denied any form of accommodation.  Nevertheless, the fact that Kaplan permitted Plaintiff to do the transcription as best she could cannot be construed as a "reasonable" accommodation.  A reasonable accommodation under the ADA is one that *allows* the individual to *perform* the *essential functions* of the position. <u>Taylor v. Phoenixville Sch. Dist.,</u> 184 F.3d 296 , 311 (3d Cir. 1999) ("the plaintiff must be able to 'perform the essential functions of the position held or desired, with or without reasonable accommodations.'") (citations omitted).  The record is undisputed that even Plaintiff's best effort was still inadequate.  Kaplan essentially had to do part of Plaintiff's job by filling in gaps and correcting her errors on the transcription. (A378-379).  Needless to say, the fact that Defendant allowed Plaintiff to continue to work even though she was not adequately performing part of her job is not evidence of discrimination.[9]

In sum, Plaintiff has failed to prove that she requested or was denied a reasonable accommodation.  Her reasonable accommodation claim therefore has no merit.

**D.    Plaintiff Has Failed To Point To Direct Or Indirect Evidence of Discrimination.**

Plaintiff's failure to prove that she had a "disability" or was "qualified" is dispositive of her ADA claim.  Thus, the Court need not even address this part of the analysis.  Yet even assuming Plaintiff had made a prima facie case her claim still must be dismissed.

Plaintiff makes two arguments that she states evidence disability discrimination.  She claims that Defendant's reasons for reassigning her to support Sweeney  were pretextual.  This is the same argument she makes for her age claim and thus it fails for the reasons set forth in Section I.C. of this brief.  Plaintiff also contends that Kaplan's alleged statement that he wanted

---

[9] Kaplan stated that even though Plaintiff's transcription was unsatisfactory it was still easier than having to perform it all himself. (A379; A397).

to get rid of her because she could not hear is direct evidence of discrimination. As set forth

below, this argument also must be rejected.

Plaintiff's assertion that Kaplan "wanted to get rid of Plaintiff" because of her hearing is

essentially a distortion of the record. Here is what the record reflects. Plaintiff testified that

Timothy Toole told her he overheard Kaplan remark, on one occasion, that he wanted to "get rid

of her" because she was *making mistakes* because she could not hear. (Exh. 1, Choma 133-34).

Toole's testimony confirmed that Kaplan's alleged remark was that Plaintiff *made mistakes* as a

result of her hearing difficulties. Indeed, Toole testified to the following:

> Q.    Did you ever recall Kaplan making a statement that Edith made mistakes because she was deaf?
>
> A.    The incident I heard was the only time I heard about that.
>
> * * *
>
> Q.    Now, going back to your testimony on the statement by Dr. Kaplan at CQIC meeting, you referenced that Dr. Kaplan said Ms. Choma made mistakes, is that correct.
>
> A.    Yes.
>
> Q.    Do you know what he was referring to, what kind of mistakes?
>
> A.    No. At that time it was just his frustration over something, I don't know what the something was.
>
> Q.    Again, that she was making mistakes because she couldn't hear?
>
> A.    Yes.

(Exh. 3, Toole 34; 48).

Thus, even viewing the record in a light most favorable to Plaintiff, it was her admitted

mistakes that prompted Kaplan to supposedly state he wanted to get rid of her.[10] "[S]tatements

that note problems with plaintiff's performance which were *related to her disabilities* are not

actually direct evidence of discrimination." Jones v. Leavitt, 454 F. Supp. 2d 459, 464 (M.D.

---

[10] Kaplan denied that he said he wanted to "get rid" of Plaintiff because she could not hear, but admitted he was frustrated with her inability to perform her job. (Exh. 2, Kaplan 133-34).

N.C. 2006) (emphasis added). Kaplan's alleged statement would simply be a statement of fact that plaintiff's ability to hear adversely affected her job performance.

Of course, Plaintiff does not dispute that she could not adequately perform her transcription duties and this was a result of a hearing problem. It goes without saying that poor job performance is a perfectly legitimate, legal reason for taking disciplinary action, including terminating or "getting rid" of an employee.

In any event, Kaplan never "got rid" of Plaintiff. At most, he merely reassigned her to support another supervisor – with no change in pay, title, benefits, grade or duties. Nor is there any evidence the statement, allegedly made in a meeting in 2000 or 2001, was contemporaneous with Plaintiff's reassignment in August 2002. B0070-71. Kennedy v. Schoenberg, Fisher & Newman, Ltd., 140 F.3d 716, 723 (7th Cir. 1998) (To rise to the level of direct evidence of discrimination, the comments "must be contemporaneous with the [adverse action] or causally related to the applicable decision-making process.").

Yet even if Plaintiff could prove Kaplan's alleged statement was direct evidence that Kaplan "got rid" of her because of her disability, Defendant has met its burden under Price Waterhouse to show that that it would have reassigned her even if it had not considered her alleged disability. The uncontested record demonstrates Kaplan believed Carpenter was better organized and more efficient than Plaintiff and thus better suited to support him directly. Plaintiff had more experience in the NCQA accreditation process and thus was more suited to support Sweeney (who had assumed responsibility for that project). Thus, Defendant had a surfeit of legitimate reasons to reassign Plaintiff even if it had not considered her disability. No reasonable jury could conclude otherwise based on the record before this Court. See Glanzman v. Metro. Mgmt. Corp., 391 F.3d 506, 514-15 (3d Cir. 2004) (affirming summary judgment on the

14

grounds that defendant had met its burden to show that it would have fired plaintiff even if it had

not considered her age, even though plaintiff had presented direct evidence of discrimination)

(citing <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228 (1989)).

In short, there is insufficient evidence in the record to show direct or indirect evidence of

disability discrimination.  Plaintiff has failed to meet her burden under <u>Price Waterhouse</u> or point

to evidence that Defendant's reasons were a pretext to mask unlawful disability discrimination.

Summary judgment should be granted in favor of Defendant.

**III.    PLAINTIFF'S RETALIATION CLAIM FAILS AS A MATTER OF LAW.**

**A.    Plaintiff Has Failed to Prove A Prima Facie Case of Retaliation.**

In its Opening Brief, Defendant pointed out that at least twenty (20) months passed

between the time Plaintiff filed her charge of discrimination and when she claimed Sweeney

began to unfairly monitor her work. <u>See</u> D.I. 54 at 33-34; (A288).  This lengthy gap, combined

with the lack of any evidence suggesting retaliatory motive,[11] demonstrated that no causal link

could be established between the protected activity and the alleged discriminatory act.

In response, Plaintiff claims for the first time that her "complaint" in July 1999 about her

performance evaluation also constituted protected activity. D.I. 64 at 24.  Plaintiff overlooks

several fundamental flaws with this hastily fashioned argument.   First, it should be evident that

the July 1999 complaint about her performance evaluation is even *more remote* in temporal

proximity than her November 2002 charge.  It is over five years from the time Plaintiff claims

she was forced to retire, and three years before she was reassigned to support Sweeney.  Plaintiff

provides no explanation as to how something even more remote in time establishes a causal link.

---

[11] Plaintiff only identifies one "incident" of alleged antagonism between November 2002 and August 2004 – the occasion where she returned late from lunch and was verbally reprimanded by Sweeney.

Nor does Plaintiff offer any evidence of a pattern of intervening retaliatory animus.  On the contrary, the record shows that Plaintiff believed the relationship between she and Kaplan actually improved.  Plaintiff stated that after her 1999 complaint she and Kaplan worked more efficiently together. (A179). She admitted she was happy with Kaplan's evaluations of her work in 2000 and 2001. (A178-79).  Her duties remained the same with no changes whatsoever to the terms or conditions of her employment. See Krouse v. American Sterilizer Co., 126 F.3d 494, 504 (3d Cir. 1997) (employer's decision to allow plaintiff to work in his original position following his complaint supported finding that there was no intervening retaliatory animus). Plaintiff offers nothing in the record that would support a pattern of retaliatory antagonism.[12]

Plaintiff also asserts that her October 22, 2004 charge of discrimination constituted protected activity.  Again, the timing on this charge dooms her argument.  The charge was filed with the Delaware Department of Labor on October 22, 2004, but it was not received by Defendant *until November 10, 2004*. (Exh. 4, Donna May Verification).  By that time, Plaintiff had already announced her intention to retire and had worked her last day on November 2, 2004. Thus, this argument fails as well, since Plaintiff cannot prove Defendant took adverse action against her either after, or contemporaneously with, her protected activity. Woodson v. Scott Paper, 109 F.3d 913, 920 (3d Cir. 1997).

What is notably absent from Plaintiff's brief is any attempt to causally link her minor workplace gripes to the protected activity.  She merely asserts, in conclusory fashion, that the isolated events occurred and thus are evidence of "antagonism and retaliatory animus" without

---

[12] Plaintiff references just two insignificant events that occurred from 1999 – 2002, a memo from Kaplan in 2000 that her performance needed improvement, and an email from Kaplan in May 2002 where he informed that he would have to see how busy they were before she could attend a financial planning seminar.  Notably, she provides nothing to suggest that the reasons for these two trivial decisions contained procedural irregularities, inconsistencies, or other evidence of non-temporal retaliatory animus.

16

ever providing any explanation of how she reaches that conclusion. She fails to even rebut Defendant's showing that Sweeney was not aware that she had filed a charge of discrimination or complained about Kaplan until October 27, 2004, after the supposed retaliatory events had occurred.(A355). See Bailey v. Commerce Nat'l Ins. Servs., 474 F. Supp. 2d 577, 584-85 (D. Del. 2007) (finding plaintiff failed to show a nexus between her participation in a protected activity and her discharge based on a pattern of antagonism by supervisor, since there was no evidence the supervisor knew of her protected activity.)   The bottom line is Plaintiff has not shown a nexus between her participation in a protected activity and the alleged retaliatory acts – either by temporal proximity or a pattern of retaliatory antagonism.

Another element missing from Plaintiff's prima facie case is the lack of any adverse employment action. In her brief, Plaintiff recites the following list of trivial workplace issues that she alleges occurred during a five (5) year span of employment: being required to perform her transcription duties; a 2000 e-mail documenting how much sick time she had available; an instance in 2002 when she claims she was not allowed to attend a financial planning seminar; a "disagreement" over her 2003 evaluation; and the one occasion when she was verbally reprimand by her Sweeney for returning late for lunch. D.I. 64 at 26.   The Third Circuit Court of Appeals has found similar types of alleged "retaliatory acts" do not rise to the level of adverse employment actions.

In Viggiano v. New Jersey, for instance, the plaintiff alleged he had been retaliated against by his employer when he was verbally reprimanded for wearing an improper belt; ordered to wear a protective vest which exacerbated a skin condition; denied time off for personal and medical reasons; verbally reprimanded in front of other officers; and disciplined for failing to call off duty. 2005 U.S. App. LEXIS 12616 *7 (3d Cir. June 23, 2005).   The Third

17

Circuit affirmed the grant of summary judgment, concluding that the acts did not effect the terms or conditions of his employment and thus did not constitute "adverse employment actions." Id. at *8. The same is true here. Plaintiff cannot simply recite a hodgepodge of minor or inconsequential acts over a five (5) year term of her employment to satisfy her burden.

In short, Plaintiff has failed to meet her burden to prove a prima facie case of retaliation. She has not pointed to evidence necessary to establish a causal link to her purported protected activity or shown that any of Defendant's acts constituted adverse employment actions.

**B.    Plaintiff Failed to Rebut Defendant's Legitimate Reasons with Evidence of Pretext.**

Even if Plaintiff could establish a prima facie case, a factfinder could not reasonably conclude that Defendant's reasons for its decision were pretextual. In its Opening Brief, Defendant set forth the legitimate nondiscriminatory reasons for its actions, including Plaintiff's reassignment in 2002 and the PIP in October 2004. D.I. 54 at 34-35.

To withstand summary judgment, a plaintiff cannot rely on her prima facie case to withstand summary judgment. She must come forward with evidence to demonstrate that defendant's proffered reasons were a pretext for unlawful retaliation. Woodson, 109 F.3d 913 at 920 & n. 2. This requires a showing of evidence which either discredits an employer's articulated reason or shows that retaliation was more likely than not a motivating or determinative cause of the employer's actions. Fuentes, 32 F.3d at 762. Plaintiff makes no such showing.

In fact, Plaintiff's brief lacks any argument or analysis on the pretext issue whatsoever. See D.I. 64 at 23-26. Her failure to point to any evidence of pretext is dispositive of her retaliation claim. Summary judgment must be granted in favor of Defendant.

IV.     THERE IS NO EVIDENCE  TO SUPPORT CONSTRUCTIVE DISCHARGE.

Finally, Plaintiff has not met her burden to show her retirement in 2005 at age 65 constituted constructive discharge.  "Constructive discharge occurs when an employer knowingly permit[s] conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." See Spencer v. Wal-Mart Stores, Inc., 469 F.3d 311, 317 n.4 (3d Cir. 2006).  "Stated another way, the plaintiff must show that the alleged discrimination goes beyond a 'threshold of intolerable conditions.'" Embrico v. United States Steel Corp., 2007 U.S. App. LEXIS 19663 at *7 (3d Cir. Aug. 16, 2007) (citation omitted).

In its Opening Brief, Defendant demonstrated that a reasonable person in Plaintiff's position would not have resigned.  At most, her complaints were that she felt she was being unfairly criticized by her supervisor. See Cole, 459 F. Supp. 2d at 309 ("Mere dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions" do not constitute grounds for constructive discharge).  She cannot claim her PIP forced her to retire.  Indeed, she testified that *each and every goal* in her PIP, including keeping track of her work hours, was reasonable. (A284-296).  The bottom line is no jury could ever conclude that these incidents went beyond the threshold of intolerable conditions so much so that a reasonable person would have no choice but to resign.

Plaintiff offers nothing in response to this argument.  She fails to rebut Defendant's evidence that other employees, not just her, had their work monitored for accuracy and efficiency.  She fails to rebut the fact that she admitted that the goals in her PIP were reasonable and attainable.  She even fails to address why, when she announced her intention to retire, she requested to work another two months in such "intolerable conditions" merely to be eligible for a nominal year end bonus. See D.I. 54 at 37.

Alas, Plaintiff merely repeats in conclusory fashion her all-too familiar mantra that everything that happened to her from 1999 through 2004 was justification for her to retire, conveniently at the age of 65, when she became entitled to her full pension and retiree medical coverage. No evidence is provided to link these incidents, most of which allegedly occurred years earlier, to her decision to retire. In sum, Plaintiff has not satisfied her burden to point to evidence that a triable issue of fact exists regarding a claim of constructive discharge.

## CONCLUSION

For the reasons set forth above and in Defendant's Opening Brief, there are no genuine issues of material fact and the Court should therefore grant summary judgment to Defendant with respect to Plaintiff's complaint in its entirety.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/  Scott A. Holt*
_____
Scott A. Holt, Esquire (No. 3399)
Adria B. Martinelli, Esquire (No. 4056)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware  19899-0391
Telephone: (302) 571-6623; 571-6613
Facsimile: (302) 576-3299; 576-3314
Email:  sholt@ycst.com; amartinelli@ycst.com
Attorneys for Defendant

DATED:  November 12, 2007

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

EDITH CHOMA,                            )
                                        )
            Plaintiff,                  )
                                        )   Civil Action
v.                                      )   No. 06-486-JJF
                                        )
BLUE CROSS BLUE SHIELD OF               )    - VOLUME I -
DELAWARE,                               )
                                        )
            Defendant.                  )

            Deposition of EDITH A. CHOMA taken
pursuant to notice at the law offices of Young,
Conaway, Stargatt & Taylor, LLP, The Brandywine
Building, 1000 West Street, 17th Floor, Wilmington,
Delaware, beginning at 9:00 a.m. on Thursday, April
19, 2007, before Christina M. Vitale, Certified
Shorthand Reporter and Notary Public.

APPEARANCES:

        LORI ANN BREWINGTON, ESQUIRE
        MARGOLIS EDELSTEIN
           750 South Madison Street
           Wilmington, Delaware  19801
           For the Plaintiff

        SCOTT A. HOLT, ESQUIRE
        YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
           The Brandywine Building
           1000 West Street, 17th Floor
           Wilmington, Delaware  19899
           For the Defendant

ALSO PRESENT:  Donna E. May, Blue Cross Blue Shield

                WILCOX & FETZER
    1330 King Street -  Wilmington, Delaware 19801
                  (302) 655-0477
                  www.wilfet.com



**WILCOX & FETZER LTD.**
Registered Professional Reporters

ORIGINAL

Edith A. Choma

32

1          MR. HOLT:  No, they weren't.  So, we took

2    the liberty of Bates stamping them.  These are the

3    documents I will represent were produced by your

4    office.

5    BY MR. HOLT:

6     Q.    Ms. Choma, I've handed you what has been marked

7    as Exhibit 2.  Do you recognize this document?

8     A.    The only thing I don't recognize on the top of

9    this document says, "Pay Grade."  I never saw a pay

10   grade block up there.

11    Q.    Other than the pay grade block is this document

12   familiar to you?

13    A.    What this is is basically a job -- actually, a

14   job description-type thing, this summary.  So, I

15   couldn't say if there is another one that has more

16   information in it than this.  I have so many of these.

17    Q.    Let me ask you, Ms. Choma, have you ever seen

18   this document before today?

19    A.    Not this particular one.  I have so many -- I

20   really can't answer you on that.  I have so many.  I

21   would have to go through all my stuff and look and see

22   if I have that exact same one.

23    Q.    Is that your handwriting in the upper

24   right-hand corner, "Edith"?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Edith A. Choma

33

1    A.    No, that's Pat Carpenter's.

2    Q.    You recognize the handwriting as Pat's?

3    A.    It's either Pat's or Debbie Sweeney's.

4    Q.    Could you take a minute and go through this job

5    description.

6    A.    Sure, (witness complies).  I don't recall this

7    exact document.  I would have to go through my

8    paperwork to see.  Some of the jobs are very close --

9    you know, they're basically what I do, but some of

10   these things I -- I would have to check.  I would have

11   to check with my documents, my attorneys, to see about

12   this one.

13   Q.    Let me refer you to the top of the first page

14   where it says, "Job Title:  Medical Administrative

15   Assistant," do you see that?

16   A.    Yes.

17   Q.    Are you familiar with that job title?

18   A.    Yes, but I've never seen that up there like

19   that.

20   Q.    Would that be the same as divisional secretary?

21   A.    If this is referring to when I first started

22   working for Dr. Kaplan as his secretary it should have

23   said divisional secretary up there.  This doesn't look

24   like the same exact thing that I have.

Edith A. Choma

34

1    Q.    At some point during your employment did your

2    title change from divisional secretary to administra-

3    tive assistant?

4    A.    I never knew because they would never tell me.

5    Q.    It's your testimony you didn't know what your

6    job title was at Blue Cross?

7    A.    I didn't know whether it was -- for instance,

8    this is medical administrative assistant.  This had

9    changed to working under Debbie Sweeney.  I was

10   supposed to have been her secretary.  So, I was

11   supposed to have been the secretary to the QI

12   department.  So, looking at this it's just confusing.

13   Is this supposed to be the latest one?

14   Q.    Let me ask you, Ms. Choma, you reviewed the

15   document, is there anything on the Principal

16   Accountabilities sections beginning on Page One and

17   continuing to Page Three that you performed as part of

18   your functions as divisional secretary for Dr. Kaplan?

19   A.    I'm going to have to get back to you on this.

20   This document does not look like my job description

21   that I have.  I'm going to have to pull mine.

22   Q.    Well, Ms. Choma, let me just ask you some

23   questions about this document and maybe we can work

24   this through.  If you look at the bottom of Page One,

Edith A. Choma

39

1    A.    (Witness complies.)

2    Q.    Near the bottom there is a column titled "NCQA

3    Activities," do you see that?

4    A.    Yes.

5    Q.    Do you know what NCQA stands for?

6    A.    National Committee of Quality Assurance.

7    Q.    What is that?  Do you know?

8    A.    That's -- let me see if I can explain this.

9    It's almost like getting a Good Housekeeping seal of

10   approval.  It's like your company when you win

11   accreditation, when you file all the procedures and

12   file their rules and produce documents and produce

13   things that they request you get certified under NCQA,

14   which is a very powerful thing for any company to

15   have.

16   Q.    So, was Blue Cross certified under NCQA

17   standards?

18   A.    Yes.

19   Q.    Had they always been certified or was that

20   something that happened during your employment?

21   A.    Well, when I was working for Carol I was in the

22   process of working on it and then she left and they

23   really needed someone.  Valerie Starrett was working

24   on it next because she was the manager of the

Edith A. Choma

40

1    department and then he hired Jane Israel.  You

2    definitely have to have a person in charge.

3        Q.    Just so I'm clear, when you were working for

4    Ms. Doohan Blue Cross had not yet obtained its NCQA

5    certification?

6        A.    No, I don't believe, no.

7        Q.    But you were in the process of working on it?

8        A.    Yes, I did many documents on that.

9        Q.    After she left people were brought in to help

10   get that certification?

11       A.    Yes.

12       Q.    You said you did many documents about the NCQA,

13   is that correct?

14       A.    Yes.  I did all the policies and procedures for

15   the company.  Each department would have their own

16   policy and procedures and I obtained those documents

17   from different departments and I would create the

18   major NCQA book, so to speak, that has all this

19   information in it.  You are talking about provider

20   relations, human relations.  Every department head had

21   policies and procedures that they had to produce.

22       Q.    Every department within Blue Cross Blue Shield?

23       A.    Yes.

24       Q.    Including the medical management group?

Edith A. Choma

52

1    Q.    Did your job functions as divisional secretary

2    for Dr. Kaplan include any of these functions?

3    A.    Yes.

4    Q.    Did it, in fact, include all these functions?

5    A.    Yes.

6          MR. HOLT:  Let's mark this 3.

7          (Choma Deposition Exhibit No. 3 was marked

8    for identification.)

9    BY MR. HOLT:

10   Q.    Ms. Choma, I've handed you what has been marked

11   as Exhibit 3.  Take a minute to look at that.

12   A.    Um-hum.

13   Q.    Do you recognize this document, Ms. Choma?

14   A.    The only thing I have a problem with is the

15   headings on these.  Her job title, Pat Carpenter's job

16   title, was a secretary to the QI director, not a

17   medical administrative assistant.

18   Q.    Ms. Choma, have you seen this document before

19   today?

20   A.    I don't recall seeing this.

21   Q.    Again, the writing at the top is that Ms.

22   Carpenter's writing at the top?

23   A.    I believe that is hers.  However, I was never

24   given this.

Edith A. Choma

53

1    Q.    There are certain handwritten notes after that,

2    is that your writing?

3    A.    No.

4    Q.    Do you know whose writing that is?

5    A.    I don't know.  I'm not sure.

6    Q.    Do you believe this to be the job description

7    for Ms. Carpenter?

8    A.    I don't know what her job description was.

9    Q.    So, you don't know whether this was her job

10   description or not?

11   A.    No.

12   Q.    Could you take a minute and look through the

13   Principal Accountabilities section on the first page

14   through the third page.

15   A.    (Witness complies.)

16   Q.    Ms. Choma, do you know if Ms. Carpenter

17   performed any of these functions that are identified

18   on this document?

19   A.    I'm not sure because she -- are these the job

20   descriptions right before I left?  Is this what you

21   are showing me now are these exhibits or is this --

22   Q.    The only thing I'm asking --

23   A.    The reason why I'm asking you this is because

24   there are so many changes in these and on the charts

Edith A. Choma

133

1    A.    Yes.

2    Q.    -- and left Dr. Kaplan came out later in the

3    day and handed you this memo, is that correct?

4    A.    Well, let me clarify this.  I went to lunch, it

5    was a late lunch with Mary Lou Kobosko.  We were in

6    the cafeteria.  He kept coming out and looking and she

7    says, "Does he want you?"  I said, "Do you need me?"

8    He said, "Oh, no, no."  He came out several times.  He

9    had called human resources and when I got back to my

10   desk they were sitting in his office and he called me

11   in his office and then he handed me this.  Then, he

12   handed me this and he said, "I want you to read that."

13   So, I read it.  I explained my side, explained what

14   happened.  Went nowhere.  That was it.  They put it in

15   my personnel file.

16   Q.    What did you explain to Dr. Kaplan, what was

17   your side?

18   A.    I explained to him exactly what she did,

19   exactly what I explained to Jane Israel, that she was

20   coming up to my face and saying, "I want it now," and

21   wasn't giving me enough time to -- you know, I said,

22   "Just a minute, I'll be right with you."  I told them

23   exactly what happened and there was no response from

24   anybody.  There was no feedback, no nothing.  I told

Edith A. Choma

134

1  my side of the story, in other words.

2      Q.    Looking at this memo from Dr. Kaplan in the

3  first sentence there Dr. Kaplan states that you made a

4  reference to Ms. Israel that you were unhappy having a

5  temporary worker tell you what to do and that you find

6  it threatening, is that true?

7      A.    Absolutely a lie.  Absolutely a lie.

8      Q.    You did not have a problem with this temporary

9  worker telling you what to do?

10     A.    Yeah, because I don't talk that way.  I didn't

11 go in there to talk to her -- to do that.  I went to

12 her to explain what happened.  She said, "That's all

13 right, I'll take care of it.  No problem."

14     Q.    Did you tell Ms. Israel that you intended to

15 complain to human resources about this?

16     A.    No.  What I previously stated to you was that I

17 said to Jane Israel -- I explained to her what

18 transpired between this temp. and me and I said to

19 her, "I was going to contact human resources, but I

20 decided just to come in here and talk to you about

21 it."  If I was going to contact human resources, I

22 would just do it on my own.  I mean, I'm an employee,

23 if somebody threatens me that way or talks to me that

24 way, I can make a phone call.  I thought, you know,

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

EDITH CHOMA,                        )
                                    )
            Plaintiff,              )
                                    )   Civil Action
v.                                  )   No. 06-486-JJF
                                    )
BLUE CROSS BLUE SHIELD OF           )   - VOLUME II -
DELAWARE,                           )
                                    )
            Defendant.              )

            Deposition of EDITH A. CHOMA taken
pursuant to notice at the law offices of Young,
Conaway, Stargatt & Taylor, LLP, The Brandywine
Building, 1000 West Street, 17th Floor, Wilmington,
Delaware, beginning at 9:12 a.m. on Wednesday, April
25, 2007, before Christina M. Vitale, Certified
Shorthand Reporter and Notary Public.

APPEARANCES:

        LORI ANN BREWINGTON, ESQUIRE
        MARGOLIS EDELSTEIN
          750 South Madison Street
          Wilmington, Delaware  19801
          For the Plaintiff

        SCOTT A. HOLT, ESQUIRE
        YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
          The Brandywine Building
          1000 West Street, 17th Floor
          Wilmington, Delaware  19899
          For the Defendant

ALSO PRESENT:  Donna E. May, Blue Cross Blue Shield

            WILCOX & FETZER
   1330 King Street - Wilmington, Delaware 19801
            (302) 655-0477
            www.wilfet.com



**WILCOX & FETZER LTD.**
Registered Professional Reporters

ORIGINAL

Edith A. Choma

264

1    Q.   Were you still taking minutes for meetings?

2    A.   No.

3    Q.   Had that function been taken away from you?

4    A.   I don't know.  I just wasn't asked.

5    Q.   So, you were no longer asked to take minutes

6  for meetings?

7    A.   Well, I was asked to do it one more time and

8  Dr. Kaplan -- there was an E-mail that went through

9  and Dr. Kaplan said something about me -- Peg Bell

10  said to Dr. Kaplan, "Do you want Edith to take notes

11  on this meeting?"  And he said, "Yes."  So, I went to

12  Peg Bell and said, "I'll do the best I can, but, you

13  know, I can't hear that well."  She said, "Oh, that's

14  right, I forgot."  So, she -- I don't know what

15  happened, but I didn't take them.

16    Q.   Do you know who was taking the meeting minutes?

17    A.   No.

18    Q.   Were you still maintaining Dr. Kaplan's

19  calendar?

20    A.   Yes.  Oh, when I was moved over to the QI

21  department?

22    Q.   Yes.

23    A.   No.  I believe Pat Carpenter took it over.

24    Q.   But, again, you are not really sure what she

Edith A. Choma

265

1    did?

2        A.    Nobody knew what she did.

3        Q.    You mentioned that Ms. Carpenter made a

4    statement to you, "For God sakes, why don't you get an

5    operation?  So what if it makes you deaf?"

6        A.    Yes.

7        Q.    Is that what she said?

8        A.    Yes.

9        Q.    When was that statement?

10       A.    I do have the date at home, but I cannot recall

11   it right now, but it was done over the phone.

12       Q.    And you were having difficulty hearing her?

13       A.    I just asked her to repeat what she said.  It

14   was, What did you say?

15       Q.    Was it because you were having difficulty?

16       A.    I don't remember, it was so far back.  Just

17   like you would, Could you repeat that, please?  "For

18   God sakes, why don't you get an operation?  So what if

19   it makes you deaf?"

20       Q.    Was this before you kind of switched places

21   with Ms. Carpenter?

22       A.    Yes.

23       Q.    Ms. Carpenter was aware that you were

24   considering surgery at Johns Hopkins?

Edith A. Choma

271

1    Q.    What is a mid-range point?

2    A.    Well, if you make 35,000 and your mid-range

3    point is 40 and you are getting close to that, your

4    raises -- it affects your raises.  I don't know how

5    they do that because I've never had to do a

6    performance review with that happening.  That's why

7    they always needed your mid-range point.  When you got

8    close to that, I believe they stopped giving

9    exorbitant raises.

10   Q.    The closer you got to your mid-range point the

11   smaller your raises would be, is that fair to say?

12   A.    Well, I'm not saying they're smaller.  They

13   might just stay the same.  I'm not familiar with how

14   that works exactly.

15   Q.    But there was some form of cap on the salary

16   for positions?

17   A.    I believe so.

18   Q.    And you wanted to know this information when

19   you met with Ms. May?

20   A.    Yes.

21   Q.    Why was that important to you?

22   A.    Just getting things in writing, what I needed

23   to know.

24   Q.    Why did you think you needed to know this

Edith A. Choma

272

1    information?

2    A.    Everybody wants to know what their mid-point

3    is, any employee.

4    Q.    This is just general information?

5    A.    Yeah, I wanted to know this, this and this and

6    one of the things was my mid-range point.

7    Q.    What else did you discuss with Ms. May when you

8    went to her at this first meeting?

9    A.    What was changed about who I report to I think

10   for my performance eval, I think.   I have the E-mail.

11   I have to look it over.

12   Q.    Was this an E-mail you sent to Ms. May?

13   A.    Yes, I have that E-mail.

14   Q.    And in that E-mail you had certain questions?

15   A.    Yes.

16   Q.    Did you meet with Ms. May in her office?

17   A.    No.   She came to our building.

18   Q.    Where did you meet with Ms. May?

19   A.    I can't recall whether it was one of the

20   meeting rooms we walked in or whether it was in a

21   hallway.

22   Q.    Do you remember how long this meeting was?

23   A.    It wasn't that long at all.

24   Q.    More than ten minutes?

Edith A. Choma

273

1    A.    Can't recall.

2    Q.    Do you recall discussing anything else with Ms.

3    May at this meeting besides what you mentioned

4    earlier?

5    A.    I do know I wanted it put in writing and it

6    never was put in writing for me.  It was getting close

7    to me moving over to that department and I E-mailed

8    her and expressed my concern about I have to move over

9    there the end of this week, could you please get back

10   to me with the information.  I never got anything in

11   writing and the only time I believe she got back to me

12   was when she came over to the building and she saw me.

13   She said, "By the way, Dr. Kaplan said there will be

14   no change in your salary and benefits," and that's all

15   I can recall.

16   Q.    How many meetings did you have with Ms. Choma

17   regarding this complaint that you made?

18   A.    I didn't have any with myself.

19   Q.    How many meetings did you have with Ms. May

20   regarding your complaint?  Was it just this once?

21   A.    No, it was the two times.  It was -- the first

22   time I believe I told you I said I wanted to E-mail

23   her or called her and said I wanted to speak with her.

24   Then, the second time was when I asked her about my --

Edith A. Choma

286

```
 1   Blue Cross?

 2      A.    No.

 3      Q.    No?

 4      A.    No.

 5      Q.    Dr. Kaplan's superior was Tim Constantine, is

 6   that correct?

 7      A.    Yes.

 8      Q.    Did you report it to him?

 9      A.    No.

10      Q.    Ms. Choma, was Ms. Carpenter ever your

11   supervisor?

12      A.    Yes.

13      Q.    When was she your supervisor?

14      A.    I don't know because I was never told.

15      Q.    So, you were never informed that Ms. Carpenter

16   was your supervisor?

17      A.    No.

18      Q.    Were you ever given any kind of discipline by

19   Ms. Carpenter?

20      A.    No.

21      Q.    Was she responsible for giving you your raises?

22      A.    I do not know what role she played because I

23   found out she was my supervisor.

24      Q.    Did she ever review your performance?
```

Edith A. Choma

287

1    A.    I don't know.

2    Q.    Did you have performance reviews at Blue Cross?

3    A.    Yes.

4    Q.    Did she ever participate in those reviews?

5    A.    She could have.  I don't know.

6    Q.    When you had your performance review, did you

7    sit down normally with your direct supervisor?

8    A.    My direct supervisor who was Debbie Sweeney she

9    -- the employees were told to do your own performance

10   review, put down what you think about this, this, what

11   you do and all that.  I wasn't allowed to do that.

12   She would not permit me to do that.  She typed my

13   performance review for me.

14   Q.    Well, back to my question.  Isn't it true that

15   you would meet with your direct supervisor when you

16   had your performance evaluation?

17   A.    I don't know because there was so much going on

18   and so much as far as Carpenter when I didn't know who

19   was doing what or who was -- all I know is I was still

20   doing his work and Debbie Sweeney told me that she was

21   going to type up my performance review and if I felt

22   there was anything that needed to be added to let her

23   know.

24   Q.    It's true that Dr. Kaplan when he did your

453

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

EDITH CHOMA, )
)
       Plaintiff, )
) Civil Action
v. ) No. 06-486-JJF
)
BLUE CROSS BLUE SHIELD OF ) - VOLUME III -
DELAWARE, )
)
      Defendant. )

      Deposition of EDITH A. CHOMA taken pursuant to notice at the law offices of Young, Conaway, Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, Delaware, beginning at 10:12 a.m. on Thursday, June 14, 2007, before Christina M. Vitale, Certified Shorthand Reporter and Notary Public.

APPEARANCES:

        LORI ANN BREWINGTON, ESQUIRE
        MARGOLIS EDELSTEIN
          750 South Madison Street
          Wilmington, Delaware  19801
          For the Plaintiff

        SCOTT A. HOLT, ESQUIRE
        YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
          The Brandywine Building
          1000 West Street, 17th Floor
          Wilmington, Delaware  19899
          For the Defendant

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477

www.wilfet.com



**WILCOX & FETZER LTD.**
Registered Professional Reporters

ORIGINAL

Edith A. Choma

626

1    were mismatched and they were filthy dirty.  I think

2    they had a couple tears in them.

3        Q.    Were there dust mites?

4        A.    Yes, I got dust mites.  I started scratching

5    all over.

6        Q.    Did anyone else have a cubicle like that?

7        A.    No.

8        Q.    How about your equipment, did you have all the

9    same equipment that you had in your previous cubicle?

10       A.    They took it all away after my first week that

11   I moved there.  They took away my printer and they

12   took away my color printer and they took away the fax

13   machine.  They took away my printer saying I didn't

14   need it.

15       Q.    Who said you didn't need it?

16       A.    Sweeney.

17       Q.    Do you know who received your equipment, if

18   anyone?

19       A.    Pat Carpenter.

20       Q.    So, Pat Carpenter came over to the medical

21   management group at some point?

22       A.    Yes.

23       Q.    And that was in 2002?

24       A.    Actually, she came over to the medical

Edith A. Choma

627

```
 1   management group in 2001.

 2      Q.   Okay, 2001?

 3      A.   Um-hum.

 4      Q.   And you mentioned earlier that she refused to

 5   move?

 6      A.   Yes.

 7      Q.   What did you mean by that?

 8      A.   What I meant by that was Dr. Kaplan wanted her

 9   to take my place as his secretary.  So, she had

10   already had her promotion and already had a nine

11   percent increase in her pay to work for Dr. Kaplan and

12   so, therefore, she refused to move because she had

13   already been given this promotion and -- or raise and

14   was working for Dr. Kaplan.  So, she wasn't about to

15   move over to the QI department.  So, I was told to

16   move over there.

17      Q.   Who were you told to move over there by?

18      A.   Dr. Kaplan.

19      Q.   And you also mentioned during your deposition

20   that Pat Carpenter was your boss or your supervisor,

21   was that correct?

22      A.   Yes.

23      Q.   How do you know that Pat Carpenter was your

24   supervisor or boss?
```

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

EDITH CHOMA,                          )
                                      )
            Plaintiff,                )
                                      )   Civil Action
v.                                    )   No. 06-486-JJF
                                      )
BLUE CROSS BLUE SHIELD OF             )
DELAWARE,                             )
                                      )
            Defendant.                )

            Deposition of PAUL A. KAPLAN, M.D., taken
pursuant to notice at the law offices of Margolis
Edelstein, 750 South Madison Avenue, Wilmington,
Delaware, beginning at 10:00 a.m. on Monday, October
1, 2007 before Christina M. Vitale, Certified
Shorthand Reporter and Notary Public.

APPEARANCES:

        HERBERT W. MONDROS, ESQUIRE
        MARGOLIS EDELSTEIN
          750 South Madison Street
          Wilmington, Delaware  19801
          For the Plaintiff

        SCOTT A. HOLT, ESQUIRE
        YOUNG CONAWAY STARGATT & TAYLOR, LLP
          The Brandywine Building
          1000 West Street, 17th Floor
          Wilmington, Delaware  19899
          For the Defendant

ALSO PRESENT:   Donna E. May, Blue Cross Blue Shield
                Edith Choma
                Matthew Helm

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com



WILCOX & FETZER LTD.
Registered Professional Reporters



Paul A. Kaplan, M.D.

133

1   Q.   In your view she had responded to some of your

2   concerns?

3   A.   Yes.

4   Q.   Were you fully satisified with her performance

5   after that time?

6   A.   Not fully, but I was very pleased that she was

7   trying hard, yes.

8   Q.   Did you ever tell anyone that you would like to

9   get rid of Edith Choma because she couldn't hear?

10   A.   Not in that many words, no.

11   Q.   Did you say that in substance to anybody?

12   A.   I've definitely said it to people she couldn't

13   hear, yes.

14   Q.   And that you would like to get rid of her?

15   A.   That part I don't recall, but there were

16   definitely times I was frustrated by her and her

17   inability to do her job.

18   Q.   And that was after the 1999 performance review?

19   A.   I don't recall exactly the date.

20   Q.   Is it fair to say that you had that view that

21   sometimes you got frustrated with her before and after

22   the performance evaluation?

23   A.   Yes, she wasn't performing the job that was

24   assigned to her and that was very frustrating to me.

Paul A. Kaplan, M.D.

134

1    Q.   Was it also frustrating that she couldn't hear

2  as well as somebody with perfect hearing?

3    A.   I don't have an issue with what a person's

4  disabilities.  Inabilities are what I have an issue

5  with is if they are employed in the job and they're

6  unable to perform that job and then I have to come and

7  do part of the job for them.  That's frustrating, yes.

8    Q.   Then, you were frustrated that Edith couldn't

9  do her job because she couldn't hear as well as a

10  person with perfect hearing, correct?

11           MR. HOLT:  Objection to the form of the

12  question.

13  BY MR. MONDROS:

14    Q.   You can answer.

15    A.   I was frustrated she couldn't do her job.  The

16  why's were irrelevant.

17    Q.   And you do agree that you expressed your

18  frustration to others in the medical management unit?

19    A.   At some point I'm sure I must have, yes.

20    Q.   Told people that you would like to get rid of

21  her as a secretary?

22    A.   I didn't say that.  I said I had expressed my

23  frustration.  I know I have.  I wouldn't be able to

24  tell you exactly where or when,

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


EDITH CHOMA,               )
                              )
        Plaintiff,     )
                              )   Civil Action
v.                      )   No. 06-486-JJF
                              )
BLUE CROSS BLUE SHIELD OF    )
DELAWARE,               )
                              )
        Defendant.    )

        Deposition of TIMOTHY J. TOOLE taken pursuant to notice at the law offices of Margolis Edelstein, 750 South Madison Street, Wilmington, Delaware, beginning at 10:37 a.m. on Wednesday, June 6, 2007, before Christina M. Vitale, Certified Shorthand Reporter and Notary Public.

APPEARANCES:

      LORI ANN BREWINGTON, ESQUIRE
      MARGOLIS EDELSTEIN
        750 South Madison Street
        Wilmington, Delaware  19801
        For the Plaintiff

      SCOTT A. HOLT, ESQUIRE
      YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
        The Brandywine Building
        1000 West Street, 17th Floor
        Wilmington, Delaware  19899
        For the Defendant


WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com



WILCOX & FETZER LTD.
Registered Professional Reporters



Timothy J. Toole

34

1   that Edith makes mistakes because she is deaf?

2       A.    The incident I heard was the only time I heard

3   about that.

4       Q.    Do you know whether Kaplan ever said anything

5   to you or anyone else that Edith never did anything?

6       A.    He never said that to me.

7       Q.    Did Kaplan ever tell you that he wanted to fire

8   everyone and pick who he wanted?

9       A.    Yes.

10      Q.    When did he say that?

11      A.    You know, it has been many years.  It was

12  probably in a leadership meeting and I'm putting

13  probably because when did this start all over again.

14      Q.    What was the context of that conversation?

15      A.    We were going through a lot of changes, there

16  was a lot of reorganization in the department,

17  changing of roles and activities and goals took place

18  in that context.

19      Q.    Was anybody's name mentioned in the context of

20  those conversations?

21      A.    It was more of a general, I wish I could get

22  rid of everybody and start all over again.

23      Q.    When you heard him say that, did you tell

24  anyone that you heard him say that?

Timothy J. Toole

48

1      Q.   Do you know if Ms. Choma did dictation for Dr.

2  Kaplan?

3      A.   I don't know for sure, no.

4      Q.   Did you ever see Ms. Choma doing dictation?

5      A.   I'm trying to think.  No, I can't recollect her

6  specifically doing dictation.

7      Q.   Do you know if Ms. Choma ever took meetings or

8  minutes at meetings for Dr. Kaplan or anyone else?

9      A.   I would say my understanding was that she had

10  that responsibility.

11     Q.   Now, going back to your testimony on the

12  statement by Dr. Kaplan at the CQIC meeting, you

13  referenced Dr. Kaplan said Ms. Choma made mistakes, is

14  that correct?

15     A.   Yes.

16     Q.   Do you know what he was referring to, what kind

17  of mistakes?

18     A.   No.  At that time it was just his frustration

19  over something, I don't know what the something was.

20     Q.   Again, that was she was making mistakes because

21  she couldn't hear?

22     A.   Yes.

23     Q.   But you don't know what mistakes he was

24  referring to?

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

EDITH CHOMA,                        )
                                    )
              Plaintiff,            )
                                    )
         v.                         )    C.A. No. 06-486-JJF
                                    )
BLUE CROSS BLUE SHIELD              )    JURY TRIAL DEMANDED
OF DELAWARE,                        )
                                    )
              Defendant.            )

## SWORN STATEMENT OF DONNA MAY

I, Donna May, submit the following sworn statement and state the following:

1. I am employed as a Human Resource Generalist at Blue Cross Blue Shield
   of Delaware (BCBSD).  I was assigned to provide human resources
   support for the Medical Management Division where Edith Choma was
   employed.  As a Human Resource Generalist, I am familiar with Edith
   Choma's personnel file and have knowledge of her dates of employment.

2. Ms. Choma officially retired from BCBSD on February 1, 2005 at age 65.
   Her last day of actually working at BCBSD was on November 2, 2004.
   On November 3, 2004 she left work on a medical leave of absence.

3. On November 10, 2004, I received on behalf of BCBSD the attached copy
   of Ms. Choma's charge of discrimination dated October 22, 2004.

I, Donna May, hereby verify under penalty of perjury that the foregoing is true and
correct.

DONNA MAY

Executed on November 5, 2007

DB02:6345604.1                                                        000000.0



STATE OF DELAWARE, DEPARTMENT OF LABOR
DIVISION OF INDUSTRIAL AFFAIRS
4425 NORTH MARKET STREET
WILMINGTON, DE 19802
(302) 761-8200/ FAX: (302) 761-6601



**CERTIFIED MAIL - RETURN RECEIPT REQUESTED**

October 25, 2004

Personnel Manager
**Blue Cross Blue Shield of Delaware**
1 Brandywine Gateway
Wilmington, DE 19989

RE:   **Choma v. Blue Cross Blue Shield of Delaware, Case No: 04100795/17CA500043**

Dear Respondent:

Enclosed please find a NOTICE OF CHARGE OF DISCRIMINATION, along with the following documents:

1.   Verified Charge of Discrimination filed against the above-named Respondent;
2.   Mediation interest form;
3.   Copy of 19 <u>Del.</u> <u>Code</u> § 712 (c), describing the administrative process.

Pursuant to 19 <u>Del.</u> <u>Code</u> § 712 (c), the named Respondent has an opportunity at this time to "file **an answer within twenty (20) days of the receipt of the Charge of Discrimination**, certifying that a copy of the answer was mailed to the Charging Party at the address provided." **If you are interested in mediation, please check the appropriate provisions of the "Invitation to Mediation" form and return with your answer.**

This Charge of Discrimination has been filed under the following law(s), and as indicated by the case numbers referenced above.

      ☒ Title VII              ☒ DE Discrimination in Employment Act
      ☐ ADA                ☐ DE Handicapped Persons Employment Protection Act
      ☐ ADEA

We anticipate your full cooperation. If you intend to retain legal representation at any time throughout this process, please have your attorney enter his or her appearance so that future contact will be made through him or her.

Julie Cutler

Julie Cutler, Supervisor/Administrator,
Office of Labor Law Enforcement

cc:  Charging Party (w/o enclosures)

DOL Form B-10W : 8/04

| CHARGE OF DISCRIMINATION | ENTER CHARGE NUMBER |
|---|---|
| This form is affected by the Privacy Act of 1974 | ☐ FEPA  04100795 |
| | ☐ EEOC  17CA500043 |
| **Delaware Department of Labor** | and **EEOC** (if applicable) |

| NAME (Indicate Mr., Mrs., Ms) | HOME TELEPHONE NO. (Include Area Code) |
|---|---|
| Edith Choma | (302) 998-4050 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 3210 Dunlap Drive | Wilmington DE 19808   NCC | |

**NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME** (If more than one, list below.)

| NAME | NO. OF EMPLOYEES OR MEMBERS 50+ | TELEPHONE NUMBER (Incl. Area Code) |
|---|---|---|
| Blue Cross Blue Shield of Delaware | | (302) 421-3000 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|
| One Brandywine Gateway   Wilmington, DE   19989 | |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|
| | |

| ☐ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN ☐ AGE<br><br>☒ RETALIATION  ☐ DISABILITY  ☐ OTHER (Specify) | DATE DISCRIMINATION TOOK PLACE<br>**EARLIEST**  6/15/2004<br>**LATEST**  10/20/2004<br>☒ CONTINUING ACTION |
|---|---|

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s):

Jurisdiction: Charging Party works for Respondent in Delaware

Charging Party's protected class: Charging Party previously filed a charge of discrimination against Respondent, Disability

Adverse employment action: Harassment, Hostile work environment, Terms & Conditions, Re-assigned in work area

Employment harm: Harassment, Failure to provide accommodations

Applicable law(s): Title VII of the Civil Rights Act, Delaware Discrimination in Employment Action

Respondent's explanation: Not providing an explanation

Comparator(s) or other specific reason(s) for alleging discrimination: Charging party was removed from her assignment and placed in a hostile work environment when she was replaced by a co-worker who is being paid twice as much and is now Charging Party's supervisor, Charging Party's co-workers are not scrutinized and threatened with termination and disiciplinary action on a routine basis, Charging Party is routinely harassed when taking one days absence for her disability and instructed to provide medical documentation contrary to company policy which deems three days of absence as the standard to have to provide medical documentation

Additional information and verification of these facts are provided by the attached Affidavit.

| ☒ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | SIGNATURE OF COMPLAINANT<br><br>*Edith Choma*   10-22-04 |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |

EEOC FORM 5
REV 6/92

PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

EDITH CHOMA,                          )
                                      )
              Plaintiff,              )   C.A. No. 06-486
                                      )
v.                                    )
                                      )
BLUE CROSS BLUE SHIELD OF             )
DELAWARE,                             )
                                      )
              Defendant.              )

          Deposition of DEBORAH M. SWEENEY
taken pursuant to notice at the law offices of
Margolis Edelstein, 750 South Madison Street,
Suite 102, Wilmington, Delaware, beginning at
10:05 a.m., on Friday, September 7, 2007, before
Patricia L. Shelton, Registered Professional Reporter
and Notary Public.


APPEARANCES:

        HERBERT W. MONDROS, ESQ.
        MARGOLIS EDELSTEIN
          750 South Madison Street - Suite 102
          Wilmington, Delaware  19801
          For the Plaintiff

        SCOTT A. HOLT, ESQ.
        YOUNG CONWAY STARGATT & TAYLOR LLP
          1000 West Street - 17th Floor
          Wilmington, Delaware  19801
          For the Defendant

ALSO PRESENT:    EDITH CHOMA
                 MATTHEW HELM



            WILCOX & FETZER
  1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477
              www.wilfet.com



WILCOX & FETZER LTD.
Registered Professional Reporters



Deborah M. Sweeney

149

1    A.    To my knowledge, there is not a job title.

2    Q.    Tell me again what Patricia Carpenter's title

3    is now.

4    A.    I honestly don't know what her title is right

5    now.  She doesn't report directly to me, so I don't do

6    her performance appraisal.  I don't see her associate

7    profiles.

8    Q.    And Dr. Kaplan does that?

9    A.    That is correct.

10    Q.    So he should know?

11    A.    Yes.

12    Q.    How long has Patricia Carpenter worked at

13    Blue Cross Blue Shield?

14    A.    I don't know.

15    Q.    At some point in time, did Patricia Carpenter

16    become Edith Choma's direct supervisor?

17    A.    At a point in time, Dr. Kaplan and I had a

18    conversation regarding the fact that we had three

19    administrative assistants, and that we needed to get a

20    sense of what each one of those administrative

21    assistants was doing.

22          And I did make the suggestion that perhaps

23    we would want work funneled through one person who

24    would be able to identify which of the three

Deborah M. Sweeney

150

1    individuals had the capacity to work on special

2    projects, special mailings that might need to be done.

3              For example, if we were doing a letter to

4    women who appeared to be noncompliant with getting a

5    mammogram, who would be the best person to do that?

6    Who would have the capacity?

7              So there was a conversation between

8    Dr. Kaplan and I regarding that.  And we did collect

9    information from all of the administrative assistants

10   in terms of the responsibilities that they had.

11             To my knowledge, there was never anyone

12   formally placed in the supervisor role, although that

13   was something that was discussed.

14             We also did create a separate cost center

15   for administrative services so that we could record

16   things such as pens and paper and office supplies that

17   were being used by the entire medical management

18   department, instead of having whomever was ordering

19   the supplies say, okay, which department am I going to

20   charge this to.  Am I going to charge it to the

21   outpatient referral unit, to behavioral health, to

22   utilization management, to quality improvement, to

23   quality -- well, to any of the various departments.

24   All office supplies could then be allocated to a

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Deborah M. Sweeney

151

1    single cost center.

2                    I do not know whether the associate --

3    whether associates were assigned to that cost center.

4                    MR. MONDROS:  I'm sorry.  Can you tell me

5    what my question was?

6                    (The reporter read back as instructed.)

7    BY MR. MONDROS:

8      Q.    Is there a yes or no answer to that question?

9      A.    To my knowledge, no.

10     Q.    You said during your testimony that you and

11   Dr. Kaplan had a meeting and you discussed whether it

12   made sense to put one of the administrative assistants

13   in charge.  Is that an accurate characterization of

14   your testimony?

15     A.    Yes.

16     Q.    When was that meeting?

17     A.    Some time in, to the best of my recollection,

18   2003.

19     Q.    Late 2003?  Early 2003?

20     A.    Mid 2003.

21     Q.    And who was the person you chose to be the

22   administrative assistant in charge?

23     A.    There was, to my knowledge, no decision made

24   that there would be.  It was a suggestion.