IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| EDITH CHOMA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-486-JJF |
| | ) | |
| BLUE CROSS BLUE SHIELD | ) | JURY TRIAL DEMANDED |
| OF DELAWARE, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S REPLY BRIEF IN SUPPORT OF HER

## MOTION FOR PARTIAL SUMMARY JUDGMENT

MARGOLIS EDELSTEIN
Herbert W. Mondros, Esq. (Del No. 3308)
750 South Madison Street, Suite 102
Wilmington, DE 19801
302.888.1112
Attorneys for Plaintiff

Dated: November 12, 2007

## TABLE OF CONTENTS

Table of Authorities……………………………………………………………………ii

I. Introduction………………………………………………………………..…………..1

II. Argument..………………………………………………………………………..2

    A. Why Kaplan's Memory Loss and Personality Change are Relevant…………..2

    B. Edith is Clearly Protected Under the ADA….…………………………………5

        1.  Edith Is Disabled Under the ADA……………………..……………5

        2.  Edith Was Qualified..……………………………….………………6

    C.  Ample Direct Evidence of BCBSD's Discrimination

        and Retaliation Against Edith Entitles Edith to Summary

        Judgment on These Claims..…………………………………………..…7

Conclusion…………………………………………………………………………14

## TABLE OF AUTHORITIES

CASE LAW

    U.S. Supreme Court

*Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)…………..……………9

*Sutton v. United Airlines, Inc.*, 527 U.S. 471, 482 (1999))……………………………….6

    U.S. Courts of Appeal

*Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001)…………………………………..9

*Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1126 (9th Cir. 2000)………10

*Collins v. Illinois*, 830 F.2d 692, 703 (7th Cir. 1987)……………………………...……….10

*De La Cruz v. New York City Human Resources Admin.*

*Dep't of Social Servs.*, 82 F.3d 16, 21 (2d Cir. 1996)…………………………..……..10

*Fakete v. Aetna, Inc.*, 308 F.3d 335 (3d Cir. 2002)……………………………………….2

*Langley v. Merck & Co.*, 2006 U.S.App. LEXIS 14958 (3d Cir. 2006)…….…….…..……10

*Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004)………….…….……9

*Torre v. Casio, Inc.*, 42 F.3d 825, 831 n.7 (3d Cir. 1994)……………………………….10

    U.S. District Courts

*Cole v. Del. Tech. & Cmty. College*, 459 F. Supp. 2d 296, 304 (D. Del. 2006)…...……..9

*Davis v. Mountaire Farms, Inc.*, 2005 U.S. Dist. LEXIS 12543, 23-24 (D. Del. 2005).....9

Plaintiff, Edith Choma, respectfully submits this Reply Brief in Support of Her Motion for Partial Summary Judgment.

## I.    **INTRODUCTION**

BCBSD protests that Edith's Motion for Partial Summary Judgment (i) is "virtually unprecedented"; (ii) "defies logic"; (iii) is "dumbfounding"; (iv) "is based upon the flimsiest of records"; (v) "is brimming with speculative assertions, vague commentaries, and outright mischaracterizations of the record"; (vi) is "confounding"; (vii) is devoid of any substantive analysis…";  and (viii) is intended to "distract" and "dupe" the Court.[1]

BCBSD doth protest way too much, Edith thinks.[2]

In her opening brief, Edith meticulously cites the record to demonstrate that BCBSD, through its Chief Medical Officer and Edith's primary antagonist, Paul Kaplan, and others, intentionally discriminated and retaliated against Edith because she had a disabling hearing impairment.

Specifically, (i) Kaplan admitted under oath that he told others at BCBSD that he was frustrated that Edith couldn't hear; and (ii) past and present BCBSD employees testified that Kaplan told them he wanted to "get rid of Edith because she couldn't hear.'  In conjunction with these statements Kaplan and BCBSD took multiple adverse employment actions against Edith, including the (i) poor performance evaluation; (ii) proven verbal abuse; (iii) demotion; (iv) banishment to a cubicle in deplorable condition; (v) imposition of an unreasonable PIP; (vi)

---

[1] All of these charges are leveled in page one of Defendant's Answering Brief.  The reader must advance deeper into BCBSD's papers to reach its allegations that Edith's claims are "fantasy," "ludicrous," "distortions," "hyped up allegations," "mischaracterizations" (again), *etc.*  Having been subjected to and having endured several years of discriminatory and retaliatory treatment by BCBSD, followed by three full days of deposition by BCBSD's lawyers, and then a full day-long "forensic psychiatric examination" by BCBSD's shrink, Edith fully expected this most recent onslaught.

[2] *See* Shakespeare, William, HAMLET, Act 3, scene 2, line 230.

unreasonable enforcement of that PIP; and (vii) constructive termination, all of which are meticulously cited in Edith's Statement of Undisputed Material Facts.

Thus, this is the rare, (although hardly "unprecedented"), case in which the plaintiff has produced *direct evidence of discrimination,* sufficient to obviate the burden shifting analysis BCBSD recites in its Answering Brief. *See Fakete v. Aetna, Inc.,* 308 F.3d 335 (3d Cir. 2002).

That Kaplan is himself disabled due to an injury to his brain that has affected his memory and his personality to the extent that he may no longer practice medicine is indeed ironic. No less ironic in the context of the instant controversy is the business in which BCBSD, Kaplan and Edith were all engaged—the decision-making process over the approval and denial of health insurance benefits and the issuance of Denial and Appeal Letters. Against this background, it is the undisputed facts – not speculation, commentary or mischaracterization – which demonstrate that it is time for BCBSD to reap what it has sown,[3] and that summary judgment should be entered on behalf of Edith Choma.

II.    **ARGUMENT**

A.    WHY KAPLAN'S MEMORY LOSS AND PERSONALITY
        CHANGE ARE RELEVANT

BCBSD's Chief Medical Officer, and Edith's Chief Antagonist testified as to the following facts:

- In 1996 he slipped and fell at the Sea Colony resort in Bethany Beach Delaware.

- Among the sequelae from that slip and fall injury was a loss of memory.

- Among the sequelae from that slip and fall injury was a change in personality.

- These injuries rendered Kaplan unable to function as a practicing physician, a disability which continues to this day.

---

[3] *See* The King James Bible, Galatians, 6:7-8.

- Kaplan is officially disabled as a result of the brain injuries he sustained.

- To this day, Kaplan collects monthly payments from Penn Mutual Insurance Company as a result of these injuries which continue to prevent him from practicing medicine.

BCBSD wonders why this is relevant:

Why this would be relevant to Plaintiff's claim is anyone's guess, especially since

it occurred more than three (3) years before Kaplan even worked with Plaintiff. [DAB at 2,

n.2].[4]

This evidence is relevant – and admissible – for a number of reasons:

Kaplan admits that his memory loss persists to this day, a concession that flows from the

fact – also admitted to by Kaplan – that Kaplan presently continues to collect disability payments as

a result of his injuries. Thus, although Kaplan sustained his unfortunate injuries three years before

Edith became his secretary, the fact that Kaplan experienced memory loss and personality changes

during the time period Edith worked for him, and continues to experience these symptoms, is

highly relevant to his conduct as alleged in the Complaint.

For example, although Kaplan readily admitted that he was frustrated with Edith because

she could not hear [Kaplan 133-135, 137, 146; Choma 242-245; Toole 18-20] and that he told

others at BCBSD that he was frustrated with Edith because she could not hear, he claimed at his

deposition that he could not remember telling others at BCBSD that he wanted to get rid of Edith

because she could not hear.  Yet, Tim Toole, then and still Director of Behavioral Health at

BCBSD testified:

---

[4] BCBSD also accuses Edith of "gross exaggeration" in her characterization of Kaplan's injuries and personality change and suggests that this is one of "many efforts by Plaintiff to embellish the facts." BCBSD is silent, however, as to where the precise exaggeration lies and nowhere points to a single specific embellishment of the facts.  Each paragraph in Plaintiff's Statement of Facts contains pinpoint cites, and in some cases multiple pinpoint cites to the record testimony and documentary evidence to support each statement in Edith's brief.

> My recollection is [Dr. Paul Kaplan] said he wished he could get rid of
> Edith because he said she couldn't hear.

[Toole 18-20]. Kaplan had no specific recollection of making this statement, but conceded that he was sure he did:

> Q. What I would like to direct you to is that portion of the testimony where Tim
> Toole stated that he recalled you saying that you wished you could get rid of Edith
> because she couldn't hear. Did you see that part on page 18?
>
> A. Yes.
>
> Q. And my question to you is did you ever say that in words or substance?
>
> A. **I have no recollection of exactly saying that, but I'm sure at some point I
> was frustrated by her ability to do that job that I did say it.**

[Kaplan at 137 (emphasis supplied)].

Furthermore, as alleged in the Complaint, and testified to by Edith during her three days of sworn deposition testimony in this case that in 1999, when Edith was unhappy with Kaplan's review of her performance, she met with Kaplan about her review,[5] and that during their meeting, Kaplan made several discriminatory and inappropriate statements to Edith. For example, Kaplan told Edith:

> (1) "I can't stand the way you lift up your glasses to see the screen!";
>
> (2) "Maybe it's your Thyroid";
>
> (3) "Maybe the blood isn't getting to your brain!"; and
>
> (4) "You know the saying "Kick the Dog", that's why I treat you the way I do!"

[Complaint at ¶13; Choma 95-98, 101-119].

Kaplan does not remember making these statements, any more than he remembers making the statement reported by Toole, that he wanted to get rid of Edith because she could not hear.[6]

---

[5] [Kaplan 101-103; Choma 70-73].

[6] There was much that Kaplan could not recall at his deposition. *See* POB at 2, n.2.

Each of these statements is at the heart of Plaintiff's case, as they are *the direct evidence* of BCBSD's and Kaplan's discriminatory animus toward Edith. Kaplan's memory loss and personality changes are highly relevant to the instant motion and admissible as substantive evidence and for impeachment at trial because this evidence tends to make the existence of the disputed facts as to whether Kaplan made these statements, much more likely. *See* Del. R. Evid. 401.

A finder of fact, be it this Court or a jury, could reasonably find it more likely than not that Kaplan did make these outrageous statements because of the documented fact that Kaplan's experienced personality changes, which were noticed by Kaplan's wife [Kaplan 109], and which David Martin described as "he tended to be somewhat more impulsive" after his injury [Martin 23].

Likewise, this Court and a jury could reasonably find that Kaplan did, in fact, make the statements that he wanted to get rid of Edith because she couldn't hear, and about treating Edith like a dog, Edith's glasses, thyroid and brain, but that, consistent with his disabling memory loss, Kaplan simply does not remember making these statements.

So, for BCBSD's benefit, that is the relevance.

B.    EDITH IS CLEARLY PROTECTED UNDER THE ADA

BCBSD next denies that Edith is a protected individual under the ADA. [DAB at 3-6]. Thus, BCBSD argues that Edith was not disabled, and was not a qualified individual under the ADA. The overwhelming evidence is contrary to BCBSD's argument.

1.    **Edith Is Disabled Under the ADA**

Edith was diagnosed with Meniere's Disease. BCBSD and Kaplan knew of this diagnosis and of the debilitating symptoms, including permanent hearing loss and vertigo that accompanied Meniere's Disease. [Kaplan 186; Choma 73-74, 152-153; Exhibit B]. Kaplan knew that Edith's hearing loss impeded her ability to do transcription. [Kaplan 63-66, 180-181]. Indeed, Edith

sought treatment for her hearing loss at Johns Hopkins at Kaplan's suggestion. [Choma 152-153, 160-162; Kaplan 186].

Edith has "a physical or mental impairment that substantially limits a major life activity, taking into account any measures needed to correct for or mitigate the impairment." *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 482 (1999)); *see also See* 29 C.F.R. § 1630.2(i). There can be no question that Edith Choma's hearing impairment qualifies as a disability under the ADA.

### 2.    Edith Was "Qualified."

BCBSD, in its brief, spends considerable time arguing that Edith was not a qualified individual because transcribing dictation was an essential part of Edith's job, and Edith could not satisfactorily perform this task. [DAB4-6].

Transcribing dictation, however, was not an essential part of Edith's job description. In fact, it was not a part of her job description at all. [B0001-6]. That Edith was a team player and dutifully did the transcription, despite her shortcomings does not mean she was not a qualified individual. Ample evidence in the record supports the conclusion that BCBSD generally, and Kaplan specifically, assigned transcription duties to Edith, knowing that her hearing impairment impeded her ability to do transcription, and refused to reassign these duties to another secretary with the specific intent to discriminate against Edith.

Likewise, the record reflects that Edith did request an accommodation, and that Kaplan even purported to accommodate her: According to Kaplan, he and Edith "agreed that she would do the transcription in the best form she could and [Kaplan] would then have to fill in the blanks." [Kaplan 65-66; B0033-35]. Despite this "accommodation," Kaplan and BCBSD continued to complain about Edith's transcription and continued to harass and discriminate against Edith for her struggles with transcription.

6

Edith has adequately demonstrated that she is protected by the provisions of the

ADA.

      C.     AMPLE DIRECT EVIDENCE OF BCBSD'S DISCRIMINATION AND
RETALIATION AGAINST EDITH ENTITLES EDITH TO SUMMARY
JUDGMENT ON THESE CLAIMS

      The remainder of BCBSD's Answering Brief is devoted to its second argument, that Edith

has provided "no evidence or analysis to support her disability or retaliation claims." [DAB 6-13].

The stream of consciousness following this heading appears to argue that Edith did not suffer an

adverse employment action at the hands of BCBSD. The evidence shows otherwise.

      For the record, Edith reported Kaplan to BCBSD's Human Resources Division in July,

1999, after Kaplan gave her a poor performance evaluation and made a series of inappropriate and

discriminatory remarks to her. Kaplan was angered that Edith reported him to HR, and that HR had

ordered him to change Edith's performance evaluation. In the ensuing months, Kaplan, admittedly

frustrated by Edith's hearing impairment, told other BCBSD managers that he wanted to get rid of

Edith because she couldn't hear, yet still ordered Edith to do transcription, despite the facts that (i)

transcription was not a part of Edith's job description; and (ii) other, non-hearing impaired

secretaries were available to do transcription. In addition, Kaplan refused to sign Edith's and the

whole departments timesheets [Choma 281-283], and refused to permit her to participate in

BCBSD financial planning seminars. [Choma 175-180].

      Subsequently, in the summer of 2002, Kaplan got his wish, and did get rid of Edith, by

transferring or demoting Edith to report to Debbie Sweeney, the new Quality Improvement ("QI")

Director, who reported to Kaplan. [Kaplan 173-174; Sweeney 59-62; Choma 34, 206, 246-247].

BCBSD's Director of Behavioral Health Tim Toole understood that it was Kaplan's decision to

replace Edith with the younger and non-disabled Pat Carpenter and Kaplan did so because he had wanted Edith to go because she could not hear. [Toole 30-31].

This transfer from secretary to the Chief Medical Officer to the Chief Medical Officer's underling was reasonably perceived by Edith and everyone else at BCBSD as a demotion. Moreover, as part of that demotion, Edith was banished to a cubicle that was in "deplorable condition." The walls were mismatched, it was much smaller than her previous cubicle and the cubicles of the younger and non-disabled secretaries Carpenter and Zakutny, and it was covered in dirt and dust mites. [Martin 40-42; Choma 257-260]. Notwithstanding that a loss in pay did not accompany her demotion, Edith understood she was being demoted, co-worker Dave Martin understood Edith was being demoted [Martin 26], and even Debbie Sweeney had to admit that working for her might be perceived as less prestigious than working for the Chief Medical Officer. [Sweeney 84].

Subsequently, in November 2002, Edith filed her discrimination complaints with the Delaware Department of Labor and the Equal Opportunity Commission. Subsequently, on October 31, 2003, the Delaware Department of Labor issued its reasonable cause finding in Edith's favor. [Exhibit A]. Following these events, (i) Kaplan continued to require Edith to do transcription for him, despite the facts that Edith no longer worked for him, still struggled with transcription due to her hearing impairment, and others were available to do Kaplan's transcription; (ii) Sweeney publicly excoriated Edith, (iii) Sweeney treated Edith "harshly" and addressed Edith in a tone that alternated "between very condescending to outright hostility" [Martin 31-32]; (iv) Sweeney censured Edith for typing Denial and Appeal letters too slowly, even when Edith had a broken wrist and was limited to typing with one hand; and (v) Sweeney refused to allow Edith to complete the

8

Denial and Appeal letters during lunch and refused to approve overtime for Edith to complete those letters.

On October 22, 2004, after a particularly nasty public tongue-lashing by Sweeney [Choma 604-607; Martin 42-44][7] , Edith filed her retaliation claim with the Delaware Department of Labor and the Equal Opportunity Employment Commission. The very next week, on October 29, 2004, BCBSD gave Edith the Performance Improvement Plan requiring Edith to improve the speed and accuracy of her typing of Denial and Appeal Letters and re-establishing Edith's formal work hours. The day after it issued the PIP, Sweeney found fault with Edith's apparent failure to account for a measly six minutes before her work day had even started. [Sweeney 226-228; B0061]. All of these events led to Edith's constructive termination as evidenced by her statement at the time of her retirement. [B0063-66].

The Supreme Court has defined "adverse employment action" as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Davis v. Mountaire Farms, Inc.*, 2005 U.S. Dist. LEXIS 12543, 23-24 (D. Del. 2005)(quoting *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). "The definition of adverse employment action goes beyond firing to reach conduct that 'alter[s] an employee's compensation, terms, conditions, or privileges of employment.'" *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004) (quoting *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001)). An adverse job impact has been found when an employer, without reducing salary or benefits, moved an employee's office to an undesirable or isolated location. See *Cole v. Del. Tech. & Cmty. College*, 459 F. Supp. 2d 296, 304

---

[7] Sweeney's hostility toward Edith in the days following that October 22, 2004 blow-up and before the October 29, 2004 PIP is apparent from the email Sweeney sent to Edith regarding the triggers for Edith's vertigo, and Edith's correspondence with the Human Resourced Department concerning Edith's being forced into retirement by this harassment. [Exhibits B and C].

(D. Del. 2006)(citing *Collins v. Illinois*, 830 F.2d 692, 703 (7th Cir. 1987)). "In particular,

substantial interference with work facilities that are important to the performance of an employee's

job can constitute a material change in the terms and conditions of employment and thereby qualify

as an adverse employment action." *Id.* (citing *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d

1115, 1126 (9th Cir. 2000)).

In an attempt to argue that Edith has failed to demonstrate any adverse employment actions,

BCBSD points to several authorities that are inapposite and cites snippets from Edith's three-day

deposition that are taken out of context and irrelevant.

For example, BCBSD cites *Langley v. Merck & Co.*, 2006 U.S.App. LEXIS 14958 (3d Cir.

2006), for the proposition that BCBSD took no adverse employment action against Edith because

"there is no evidence that the reassignment affected her opportunities for advancement. In *Langley*,

however, the Court noted that "whether an action constitutes an adverse employment action

depends on the attendant circumstances," *id. at* *9, and stated that "moving a person's office to an

undesirable location could, under certain circumstances, constitute an adverse employment action.

*Id.* (citing *Collins v. State of Illinois*, 830 F.2d 692, 703 (7th Cir. 1987) (stating in dictum that

relegating an employee to an undesirable office location would constitute an adverse employment

action); also citing *De La Cruz v. New York City Human Resources Admin. Dep't of Social Servs.*,

82 F.3d 16, 21 (2d Cir. 1996) (proof of diminution in prestige and less opportunity for professional

growth, could be deemed an adverse employment action); *Torre v. Casio, Inc.*, 42 F.3d 825, 831

n.7 (3d Cir. 1994) (proof of a transfer to a dead-end job could be deemed an adverse employment

action). Here of course, the evidence demonstrates that the transfer, the poor performance, the

public harassment, the unreasonable PIP, and unreasonable enforcement of the PIP were all adverse

employment actions individually and part of a continuing pattern of actions intended to

discriminate against Edith for her disability and to retaliate against her for reporting that discrimination.

BCBSD also cites to a few lines from the three volumes of Edith's deposition testimony to suggest that her PIP was reasonable because, claims BCBSD, Edith "admitted that each and every goal in her PIP was reasonable and readily attainable." [DAB at 12]. This is hardly an accurate summary of the testimony elicited by BCBSD late on the third day of its deposition of Edith. Not quoted by BCBSD are the following relevant passages from that colloquy:

Q. What is expected and how it needs to be done and when she wants you to complete that. Do you see that?

A. Yes.

Q. Now, the first category, at least the first row, she talks about new letters from nurses that are taking greater than eight minutes to produce. Do you see that?

A. Yes.

Q. And do you agree that was your current level of performance that was taking you longer than eight minutes to produce those letters?

A. No.

Q. How long was it taking you to produce those letters?

A. I didn't time myself, but the nurses would come to me and hand me these letters. I didn't have any nurses coming up to me and saying you are taking too long to do these. They appreciated the fact that I did them because the other secretary refused.

Q. So, you weren't timing yourself when you did these letters?

A. I wasn't looking at my watch. I was just trying to get the work done as correctly and as fast as I could.

[Choma at 566].

Q. As far as an error rate of less than 20 percent is that something you could achieve or are you testifying because you didn't know what the errors

11

were you couldn't achieve that?

A.  I don't think that's true, that's what I'm testifying. I don't think what she is saying is my error rate is true. I don't think it's fair or true because I think or I know that when I got a letter to type and they were giving it back to me for minute things, back and forth, back and forth. Somebody tells you to take it out and then put it in, then tells you to take it out again, that's like back and forth over that one little thing.

[Choma at 568].

Thus, since Edith vehemently denied the very premise for the PIP – that she was typing the Denial and Appeal letters as slowly and inaccurately as Sweeney claimed, she naturally agreed the written requirements of the PIP were attainable—in the real world. In a vacuum, the PIP was not unreasonable, but in the context of the rigged game BCBSD was playing with Edith, the PIP was patently unreasonable. This is evident from the following exchange between Edith and BCBSD's lawyer:

Q.  In the next column over she indicates she would like you to have an error rate consistently less than 20 percent. Do you see that?

A.  Yes.

Q.  Is that something you could do is type letters with a 20 percent error rate?

A.  Well, sure, but what I was referring to in the past is that when somebody sets you up, so to speak, so that they're giving you something to type and they say, Put that in there and you give it back, take it out, unbold that, this is different font, this is this, now it's fixed go in there and use that, it's mind-boggling. I never had this problem before in all the years I was doing these letters. How come all of a sudden they decided to monitor me like this, all of a sudden I was to be monitored and timed after working on these letters from 1998 to 2000 and ….

[Choma at 567]. Even more suspicious and revealing were the very circumstances under which BCBSD decided to begin timing Edith's Denial and Appeal Letter output in the first place:

Q.  Was it September of 2004 when Ms. Sweeney started timing you on these letters?

A. No. She timed me when my hand was in a cast. She actually came over to me when my hand was in a cast.

Q. And that was in August of 2004?

A. Yes.

Q. That's when she started timing you?

A. Yes.

\*   \*   \*

Q. Again, that occurred starting in August of 2004?

A. When I had my hand in a cast. Who in their right mind would do that to you, come up to you and I'm typing with one hand, Stop, I'm going to time you. I like turned around like, What? That's right. So, sure, she is going to put those -- well, this is from October, but it started way back when I broke my wrist, when they thought I had a scaphoid fracture.

Q. Do you think she started timing you because you had broken your wrist?

A. I don't know what her reason was except for I think she wanted me to leave. I think she was putting pressure on me to leave the company.

[Choma at 568, 570]. Edith's inference is the same one that any reasonable and objective fact finder would draw, and, when viewed in the context of all the other evidence, including Paul Kaplan's statements that he wanted to get rid of Edith because she could not hear, provides direct evidence of discrimination sufficient to obviate the need for the *McDonnell Douglas* burden shifting analysis and sufficient to support the entry of summary judgment for Edith.

13

## CONCLUSION

For all the foregoing reasons, Edith Choma respectfully requests that summary judgment be entered on Counts III through VI of the Complaint.

MARGOLIS EDELSTEIN

/s *Herbert W. Mondros*

Herbert W. Mondros, Esq. (Del Bar No. 3308)
750 South Madison Street, Suite 102
Wilmington, DE 19801
302.888.1112
Attorneys for Plaintiff

Dated: November 12, 2007

14

# EXHIBIT A



STATE OF DELAWARE
DEPARTMENT OF LABOR
DIVISION OF INDUSTRIAL AFFAIRS
4425 NORTH MARKET STREET
WILMINGTON, DELAWARE 19802

TELEPHONE (302) 761-8200
FAX (302) 761-6601

## NOTICE OF REASONABLE CAUSE FINDING

RE:  Choma v. Blue Cross Blue Shield of DE          State Case No.: 0212750

On November 25, 2002, Edith Choma filed a charge of discrimination against Blue Cross Blue Shield of Delaware. The Charge of Discrimination is hereby incorporated by reference.

Reasonable Cause Finding:

On October 31, 2003, the Department of Labor concluded its investigation and now finds, based on the following facts, that there is reasonable cause to believe that a violation of the State Discrimination Act has occurred.

I.    Undisputed Facts:
   1.  Charging Party began her employment with Respondent in 1989.
   2.  In about late 1994, Charging Party became a qualified individual with a disability who is able to perform the essential functions of her position with reasonable accommodation.
   3.  Charging Party received a negative performance review in 1999 and as a result, she met with Donna May, Human Resources to discuss her complaints.
   4.  On July 26, 2002, during a reorganization, Charging Party, age 63, was reassigned from the Divisional Secretary for Paul Kaplan, Chief Medical Officer to Divisional Secretary for Deborah Sweeney, Quality Improvement. At this time, Patricia Carpenter (age 49) was promoted from administrative assistant to the Director of Quality Improvement to administrative assistant for the department with most of her assignments coming from Dr. Kaplan.

II.   Disputed Facts:
   1.  Respondent states that Charging Party had difficulties with transcribing dictation and the timely completion of her work. It also noted that Charging Party was reluctant to help out other assistants and these faults were noted on her 1999 performance review. Respondent states that Charging Party was not considered for the lead administrative assistant position because of this performance review and because Ms. Carpenter had high marks for efficiency, organization, project management and teamwork.
   2.  Charging Party states that she was subjected to harassment based on her disability and age when Dr. Kaplan made statements such as, "you are too slow" and "I don't want

a secretary in your condition." She also alleges that comments were made at a staff meeting insinuating that because Charging Party was disabled, she made mistakes.

III.    Resolution of Material Facts in Dispute:

1.  Charging Party was able to establish that she has a physical impairment, which severely limits the major life activity of hearing. In addition, Charging Party established that she was a qualified individual who was able to perform the essential functions of her position with reasonable accommodation.

2.  Several witnesses were interviewed during the investigation regarding the retaliatory comments made by Dr. Kaplan subsequent to the 1999 performance review and Charging Party's visit to Human Resources. One witness confirmed that Dr. Kaplan made disability-related comments at staff meetings such as, "I wish she could hear better. She is too slow."

3.  In July of 2002, the reporting structure was changed so that Charging Party would report to Ms. Carpenter a younger, less senior, but otherwise comparable employee who, by witness accounts, was less capable than Charging Party. According to witness statements and other evidence gathered during the investigation, Charging Party continued to perform many of Dr. Kaplan's duties, which theoretically should have gone to his new administrative assistant, Ms. Carpenter. This behavior is inconsistent with Respondent's position that Charging Party's performance was poor.

4.  Evidence was gathered which indicated that Ms. Sweeney also subjected Charging Party to disparate treatment with regard to making up missed time. Respondent's policy states that non-exempt employees are entitled to make up missed time during business hours. However, unless her younger similarly situated coworkers, Charging Party was required to give one-day notice for appointments to be used as PTO time.

IV.    Resolution:

1. Charging Party met her burden of showing that she suffered adverse action due to her age and her disability. In addition, Charging Party met her burden of showing that she was subjected to retaliation after voicing her objection to the disparate treatment in 1999.

The Charge of Discrimination, State Case No. 0212750 will be administratively processed and assigned to a conciliation officer in an effort to administratively resolve the complaint pursuant to 19 *Del. C.* Section 712(c).

10/31/03
DATE

*Andrea Ciara /jkc*
INVESTIGATOR
LABOR LAW ENFORCEMENT OFFICER

10/31/03
DATE

*Julie Cutler*
JULIE CUTLER
LABOR LAW ENFORCEMENT SUPERVISOR

# EXHIBIT B

**May, Donna**

From:    Sweeney, Debbie
Sent:    Wednesday, October 27, 2004 9:09 AM
To:    Choma, Edith
Cc:    May, Donna
Subject: RE: Vertigo

```
DEPOSITION
  EXHIBIT
CHOMA-30
CMN - 4/25/07
```

And I responded that I still needed a list of what the likely triggers were so we could determine a course of action. Please have this on my desk by noon.

Debbie Sweeney
Director, Quality Improvement
BCBSD, Inc

p 302-421-3464
f 302-421-8863

*This communication, including any attachments, is confidential and intended for the sole use of the intended recipient(s). If you received this message in error, please notify the sender immediately and delete all materials received. Thank you.*
-----Original Message-----
**From:** Choma, Edith
**Sent:** Wednesday, October 27, 2004 8:19 AM
**To:** Sweeney, Debbie
**Subject:** RE: Vertigo

Debbie, when we spoke, I said anything can trigger vertigo, and I will not be able to know this until I do start doing these tasks.

This communication, including any attachments, is confidential and intended for the sole use of the intended recipient(s). If you received this message in error, please notify the sender immediately and delete all materials received. Thank you.
-----Original Message-----
**From:** Sweeney, Debbie
**Sent:** Tuesday, October 26, 2004 6:49 PM
**To:** Choma, Edith
**Cc:** May, Donna
**Subject:** Vertigo
**Importance:** High

Edith, when we spoke early this afternoon I asked you to provide me with a list of activities that are causing dizziness/vertigo so we could assess whether this limitation was going to impact your current duties. I asked that this list be provided to me before you left today. I do not see a list in my in-box, on my desk or in my e-mail. Please complete this list as soon as you arrive on 10/27 and leave it on my desk.

Also as a reminder you need to also discuss this new limitation with MetLife as it might necessitate you going on disability or qualify you for intermittent FMLA.

Debbie Sweeney

CONFIDENTIAL

D00751

Director, Quality Improvement
BCBSD, Inc

p 302-421-3464
f 302-421-8863

*This communication, including any attachments, is confidential and intended for the sole use of the intended recipient(s). If you received this message in error, please notify the sender immediately and delete all materials received. Thank you.*

D00752

# EXHIBIT C

## May, Donna

From:     Slaysman, Susan
Sent:     Wednesday, October 27, 2004 11:26 AM
To:       Choma, Edith
Cc:       May, Donna
Subject: RE:

If you plan to retire on January 3, I would strongly suggest that if you have not already done so you contact Jennifer Wildesen in Corporate Benefits at 410-998-5642 as soon as possible. There is a four to six week processing period before this can be effective. There are usually a lot of decisions that need to be made during this period so if Donna or I can be of any help let us know.

However, I am concerned about your statement that you feel you are being harassed and that that has prompted your decision to retire. I am asking Donna May to contact you today to look into this.

The above information is confidential and is intended for the recipient. If you have received this message in error, please notify me immediately at 302-421-3192 and delete the materials received. Thank you.

-----Original Message-----
From: Choma, Edith
Sent: Wednesday, October 27, 2004 9:45 AM
To: Slaysman, Susan
Subject:

I am retiring on January 3rd. I understand that if you work on January 3rd you will receive your incentive for the year.

I feel I am being harassed and have no other option but to retire.

This communication, including any attachments, is confidential and intended for the sole use of the intended recipient(s). If you received this message in error, please notify the sender immediately and delete all materials received. Thank you.

10/27/2004

D00753

# EXHIBIT D

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

EDITH CHOMA,                          )
                                      )
            Plaintiff,                )
                                      ) Civil Action
v.                                    ) No. 06-486-JJF
                                      )
BLUE CROSS BLUE SHIELD OF             )
DELAWARE,                             )
                                      )
            Defendant.                )

            Deposition of DAVID J. MARTIN taken
pursuant to notice at the law offices of Margolis
Edelstein, 750 South Madison Street, Wilmington,
Delaware, beginning at 12:00 noon on Thursday,
September 27, 2007, before Christina M. Vitale,
Certified Shorthand Reporter and Notary Public.

APPEARANCES:

        HERBERT W. MONDROS, ESQUIRE
        MARGOLIS EDELSTEIN
          750 South Madison Street
          Wilmington, Delaware  19801
          For the Plaintiff

        SCOTT A. HOLT, ESQUIRE
        YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
          The Brandywine Building
          1000 West Street, 17th Floor
          Wilmington, Delaware  19899
          For the Defendant

ALSO PRESENT:  Donna E. May, Blue Cross Blue Shield
               Matthew Helm
               Edith Choma

                WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                 (302) 655-0477
                 www.wilfet.com

26

David J. Martin

1  improvement department moved from the main floor, the

2  main area over the other side of the atrium to the

3  small QI department, Pat Carpenter stayed on the

4  medical management side and Edith was moved over to

5  quality improvement and at that point she began

6  reporting to Deborah Sweeney.

7            It was a suprise I think to all of the

8  employees that this had taken place.

9    Q.   What part of it was surprising?

10   A.   I think a lot of the affect surrounding it was

11 surprising.  Pat Carpenter announced she was not going

12 to move and we thought, she just came over here,

13 that's a rather brash statement to make that I'm not

14 moving.  You know, everybody can move, but I'm staying

15 here, but that ended up being -- we took it as maybe

16 bravado on her part, but it became true, that she did

17 not move.  She became the secretary to Dr. Kaplan and

18 Edith was demoted to QI secretary.

19   Q.   And that suprised you?

20   A.   Yes.

21   Q.   Would it suprise you that Edith was demoted?

22   A.   It suprised me Edith was demoted and suprised

23 me also that Pat Carpenter that had no experience in

24 medical management was then moved into that position.

31

David J. Martin

 1    A.    A verbal tone that is alternating between very
 2    condescending to outright hostility.
 3    Q.    Is it fair to say that you believed that Deb
 4    Sweeney treated Edith Choma harshly?
 5    A.    Correct.
 6    Q.    Would you say that in your view did Deb Sweeney
 7    treat Edith Choma unfairly?
 8    A.    Yes.
 9    Q.    Do you have any instances on which you thought
10    that you personally witnessed in which Deb Sweeney
11    treated Edith Choma either harshly or unfairly?
12    A.    Yes.
13    Q.    And what do you recall?
14    A.    In one instance the department went out to
15    lunch without Deb Sweeney.  So, this would have been
16    myself, Charlene Blanchard, Yvonne Locker, Peggy Bell,
17    myself and Edith.  We came back, I think we were
18    probably about a half hour late because of service
19    delays.  I believe we went to Lone Star.  When we got
20    back, Edith was dressed down by Debbie Sweeney about
21    being late and it was quite a tirade and it was -- the
22    concern I had is that it was done in the center of the
23    department right in the center of all our cubicles and
24    I felt that that was very inappropriate.

David J. Martin

 1          The tone with which Debbie used when
 2   confronting Edith about her letters -- I did not see
 3   this, but I heard it because I was on the other side
 4   of the cubicle and I was very uncomfortable being in
 5   this environment -- by telling Edith she had to
 6   produce I believe it was 23 letters an hour; and, if
 7   she could not do that, then she should go out on
 8   disability and Edith's response was, Well, my hand is
 9   in a cast.  She had broken her or sprained her wrist.
10   Her hand was in a cast at the time.

11          I guess I should probably end it there.
12   Those are a couple of the direct things I witnessed.
13   Q.    Let me go back and ask you a few questions
14   about those two things.  The lunch at Lone Star, do
15   you recall approximately the time frame that occurred?
16   A.    It would have been noon to 1:30.
17   Q.    I'm sorry, the date?  I apologize.
18   A.    The date?  I don't recall.
19   Q.    It was sometime after Edith switched over and
20   began working for Deb Sweeney?
21   A.    Correct.
22   Q.    As I understand it you and Charlene and Yvonne
23   and Peg and Edith went to lunch at Lone Star at
24   lunchtime and because of the poor service at Lone

# EXHIBIT E

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF DELAWARE

 3

 4    EDITH CHOMA,                      )
                                       )
 5              Plaintiff,             )
                                       )  Civil Action
 6    v.                               )  No. 06-486-JJF
                                       )
 7    BLUE CROSS BLUE SHIELD OF        )
      DELAWARE,                        )
 8                                     )
                Defendant.             )
 9
                     Deposition of TIMOTHY J. TOOLE taken
10    pursuant to notice at the law offices of Margolis
      Edelstein, 750 South Madison Street, Wilmington,
11    Delaware, beginning at 10:37 a.m. on Wednesday,
      June 6, 2007, before Christina M. Vitale, Certified
12    Shorthand Reporter and Notary Public.

13    APPEARANCES:

14         LORI ANN BREWINGTON, ESQUIRE
           MARGOLIS EDELSTEIN
15            750 South Madison Street
              Wilmington, Delaware  19801
16            For the Plaintiff

17         SCOTT A. HOLT, ESQUIRE
           YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
18            The Brandywine Building
              1000 West Street, 17th Floor
19            Wilmington, Delaware  19899
              For the Defendant
20

21
                     WILCOX & FETZER
22         1330 King Street - Wilmington, Delaware 19801
                      (302) 655-0477
23                    www.wilfet.com

24
```

Timothy J. Toole

1    "Medical Management," do you see all that?

2    A.    Yes.

3    Q.    This is a different organizational chart?

4    A.    Right.

5    Q.    And based on your review of this document and

6    your observation in the department what was Pat

7    Carpenter's role in October of 2002?

8    A.    She became primary administrative assistant to

9    Dr. Kaplan.

10    Q.    Did Pat Carpenter replace Edith Choma?

11    A.    Yes.

12    Q.    Do you have an understanding of why Pat

13    Carpenter replaced Edith Choma?

14    A.    I think that's because it was Dr. Kaplan's

15    decision to rearrange the department.

16    Q.    Do you think that goes back to what you heard

17    earlier that Dr. Kaplan wanted Edith to go because she

18    couldn't hear?

19              MR. HOLT:  Object to the form of the

20    question.

21    BY MS. BREWINGTON:

22    A.    Yes, that was my understanding at the time.

23    Q.    Take a look at the next one, it's D222.  Do you

24    see that?

Timothy J. Toole

1    A.    Yes.

2    Q.    And this is another organizational chart,

3    right?  I don't see a date on here, do you see a date?

4    A.    No, I don't see a date.

5    Q.    Okay, and I looked and I didn't see one.  In

6    this organizational chart it looks to me that both

7    Edith Choma and Chris Zakutney reported to Pat

8    Carpenter.  Is that what it looks like to you?

9    A.    Yes.

10    Q.    Do you know whether this would be consistent

11    with your understanding that Pat Carpenter distributed

12    work?

13    A.    Yes, it would be.

14    Q.    Take a look at the last one, which is the first

15    one here.  It's D226.  Do you see where Edith is to

16    the left?

17    A.    Yes, okay.

18    Q.    At some point, and I don't see a date on here,

19    did she become the support for Deborah Sweeney?

20    A.    Yes, that was my understanding.

21    Q.    And that was based on your understanding that

22    you saw that she did at some point begin to support

23    her?

24    A.    Right.

# EXHIBIT F

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF DELAWARE

 3   EDITH CHOMA,                  )
                                   )
 4             Plaintiff,          )  C.A. No. 06-486
                                   )
 5   v.                            )
                                   )
 6   BLUE CROSS BLUE SHIELD OF     )
     DELAWARE,                     )
 7                                 )
               Defendant.          )
 8
                  Deposition of DEBORAH M. SWEENEY
 9   taken pursuant to notice at the law offices of
     Margolis Edelstein, 750 South Madison Street,
10   Suite 102, Wilmington, Delaware, beginning at
     10:05 a.m., on Friday, September 7, 2007, before
11   Patricia L. Shelton, Registered Professional Reporter
     and Notary Public.
12

13   APPEARANCES:

14        HERBERT W. MONDROS, ESQ.
          MARGOLIS EDELSTEIN
15           750 South Madison Street - Suite 102
             Wilmington, Delaware  19801
16           For the Plaintiff

17        SCOTT A. HOLT, ESQ.
          YOUNG CONWAY STARGATT & TAYLOR LLP
18           1000 West Street - 17th Floor
             Wilmington, Delaware  19801
19           For the Defendant

20   ALSO PRESENT:   EDITH CHOMA
                     MATTHEW HELM
21

22
                     WILCOX & FETZER
23       1330 King Street - Wilmington, Delaware 19801
                     (302) 655-0477
24                   www.wilfet.com
```

Deborah M. Sweeney

1    BY MR. MONDROS:

2       Q.    If you know.

3       A.    Again, a promotion would be -- and it would be

4    HR that would have to answer that.  I don't know what

5    her salary, grade or any of that was.  I don't know

6    whether there was any change in that as a result of

7    the move.

8       Q.    Is it reasonable that it was perceived that it

9    was increased prestige for the position that she had

10   after the move than the position before the move?

11            MR. HOLT:    Same objection as before.

12      A.    Certainly there could have been that perception

13   on the part of individuals.

14      Q.    Did you have that perception?

15      A.    I never thought about it until now.

16            The duties didn't necessarily change.  You

17   know, but certainly perhaps because it was reporting

18   to the chief medical officer as opposed to the

19   director of quality improvement.  So perhaps I would

20   have.  I never thought about it until you asked the

21   question.

22      Q.    Fair enough.  I appreciate that.

23            By the time the move had been made, was the

24   accreditation process -- had that past or were you

# EXHIBIT G

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

EDITH CHOMA,                          )
                                      )
              Plaintiff,              )
                                      )  Civil Action
v.                                    )  No. 06-486-JJF
                                      )
BLUE CROSS BLUE SHIELD OF             )   - VOLUME I -
DELAWARE,                             )
                                      )
              Defendant.              )

              Deposition of EDITH A. CHOMA taken
pursuant to notice at the law offices of Young,
Conaway, Stargatt & Taylor, LLP, The Brandywine
Building, 1000 West Street, 17th Floor, Wilmington,
Delaware, beginning at 9:00 a.m. on Thursday, April
19, 2007, before Christina M. Vitale, Certified
Shorthand Reporter and Notary Public.

APPEARANCES:

        LORI ANN BREWINGTON, ESQUIRE
        MARGOLIS EDELSTEIN
          750 South Madison Street
          Wilmington, Delaware  19801
          For the Plaintiff

        SCOTT A. HOLT, ESQUIRE
        YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
          The Brandywine Building
          1000 West Street, 17th Floor
          Wilmington, Delaware  19899
          For the Defendant

ALSO PRESENT:  Donna E. May, Blue Cross Blue Shield

              WILCOX & FETZER
  1330 King Street -  Wilmington, Delaware 19801
              (302) 655-0477
              www.wilfet.com

1    attend the 30th because he sent me that E-mail and so

2    I didn't go to the 30th.  See, you have to attend all

3    four to really get into it like I stated.  So, that's

4    why I just asked those people for a handbook.

5        Q.    Let me just make sure I'm clear.  You received

6    this E-mail from Dr. Kaplan on Wednesday, May 22nd, is

7    that correct?

8        A.    Yes.

9        Q.    And then the next time you spoke with him is

10   when you took him over to see the letters in the bins,

11   is that correct?

12       A.    Yeah, because I asked him again and, you know,

13   I see what you are saying because of May 30th they

14   started and even though this transpired on the 20th

15   and 22nd, but I cannot recall -- I believe I did take

16   him over before the 30th, before the first session, so

17   I could get my name in and I showed him there were no

18   letters in the bins, only like two or three.

19       Q.    Was that before the 30th or after?

20       A.    I believe that was before the 30th so I would

21   have had time to attend.

22       Q.    But you don't know?

23       A.    Well, again, it has been a while, but I'll have

24   to look at my paperwork to really, you know, what do

1    they say?  I don't want to incriminate myself and say

2    yes or whatever when I'm not positive.

3        Q.    Do you have additional paperwork that would

4    help refresh your recollection as to what the date

5    was?

6        A.    I don't know because my handwriting here

7    doesn't have a date on it, but him answering me on the

8    22nd I would assume that that was before the 30th.  I

9    just have to find my document and see if there is any

10   other information.

11       Q.    You may have other --

12       A.    Well, I guess what I'm trying to say is he

13   would not let me go to these seminars.  He did -- he

14   said, "No, we're too backed up."  I asked him several

15   times before the 30th.  I E-mailed and I verbally

16   asked.  So, finally, it was getting close to the 30th

17   and I said -- I think Renita Roane was setting this up

18   so that if I had to -- her name is right at the bottom

19   of the form there, Renita Roane, that if I could get

20   in just to give her a call.  I believe that's how it

21   worked.  I asked him again.  Went over to the bins,

22   saw there was only three letters and he still refused

23   to let me go.

24       Q.    Did you register for the seminar?

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EDITH CHOMA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action |
| v. | ) No. 06-486-JJF |
| | ) |
| BLUE CROSS BLUE SHIELD OF | ) - VOLUME II - |
| DELAWARE, | ) |
| | ) |
| Defendant. | ) |

Deposition of EDITH A. CHOMA taken
pursuant to notice at the law offices of Young,
Conaway, Stargatt & Taylor, LLP, The Brandywine
Building, 1000 West Street, 17th Floor, Wilmington,
Delaware, beginning at 9:12 a.m. on Wednesday, April
25, 2007, before Christina M. Vitale, Certified
Shorthand Reporter and Notary Public.

APPEARANCES:

LORI ANN BREWINGTON, ESQUIRE
MARGOLIS EDELSTEIN
  750 South Madison Street
  Wilmington, Delaware  19801
  For the Plaintiff

SCOTT A. HOLT, ESQUIRE
YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
  The Brandywine Building
  1000 West Street, 17th Floor
  Wilmington, Delaware  19899
  For the Defendant


ALSO PRESENT:  Donna E. May, Blue Cross Blue Shield

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com

281

Edith A. Choma

1   statement?

2   A.   Um-hum.

3   Q.   Where was Ms. Smith?

4   A.   Actually, she went into his office and asked

5   why does he treat her that way.

6   Q.   Where were you?

7   A.   At my desk, which is right outside Dr. Kaplan's

8   office.

9   Q.   You were sitting at your desk, is that correct?

10  A.   Um-hum, yes.

11  Q.   And Ms. Smith was in Dr. Castiglioni's office?

12  A.   She was in her cubicle, but she heard Dr.

13  Kaplan yelling and she came out of her cubicle.

14  Q.   So, Dr. Kaplan was yelling, what was he upset

15  about?

16  A.   He was calling my work stupid.

17  Q.   Was this referring to time sheets?

18  A.   Yes.

19  Q.   Did this involve Dr. Kaplan having to sign some

20  time sheets that had to be turned in?

21  A.   Yes.

22  Q.   And Dr. Kaplan was not happy about doing that?

23  A.   I asked Dr. Kaplan in the morning because they

24  had to be turned in by Friday and he said, "I'm not

Edith A. Choma

1   going to have enough time, I'm not going to have

2   enough time for that."

3      Q.   He didn't want to be bothered by it?

4      A.   I don't know.  He just said, "I don't have

5   enough time, I can't sign them."  So, I asked the next

6   person in charge.

7      Q.   Who was that?

8      A.   Dr. Castiglioni.

9      Q.   And what did he say?

10     A.   He said, "Sure, I'll sign them."

11     Q.   And did he sign them?

12     A.   When Dr. Castiglioni was signing them, Dr.

13  Kaplan walked by and I said -- you know, because he

14  came back a little early and I said, "Don't worry, Dr.

15  Castiglioni is signing the time sheets."  Something

16  less he had to worry about.  I don't care -- he didn't

17  say I don't care.  He said, "That is stupid work,

18  stupid."  And Theresa Smith heard.  She came out of

19  her cubicle, I'm sitting at my desk, and said, "Who

20  does he think he is calling our time sheets stupid?"

21  She was on disability and she had to have her -- I

22  believe she had to have something faxed over right

23  away to Care First.

24     Q.   Dr. Kaplan thought that the signing of time

Edith A. Choma

1  sheets was stupid work?

2    A.   That's what he said to me, "That's stupid

3  work," after I told him about the time sheets.  Just

4  blew his stack.

5    Q.   Did he say anything else at that point?

6    A.   I can't recall.

7    Q.   Did he leave after he made this statement?

8    A.   I believe he went in his office and slammed the

9  door.

10   Q.   And that's when Ms. Smith came over to you?

11   A.   Yes.

12   Q.   And was this when she made the statement to you

13  that if you were younger he would not treat you that

14  way?

15   A.   Yes.

16   Q.   While you were sitting at your desk?

17   A.   That was -- when the incident first happened,

18  she went into Dr. Castiglioni's office and said, "Why

19  does he treat her that way?"  Then, as I recall, this

20  is on a Friday when the time sheets had to be in and I

21  believe it was the following Monday where she came up

22  to me and said, you know, "If you were younger he

23  wouldn't treat you that way."

24   Q.   Did she say anything else that you recall?

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

EDITH CHOMA,                         )
                                     )
            Plaintiff,               )
                                     )  Civil Action
v.                                   )  No. 06-486-JJF
                                     )
BLUE CROSS BLUE SHIELD OF            )  - VOLUME III -
DELAWARE,                            )
                                     )
            Defendant.               )

            Deposition of EDITH A. CHOMA taken
pursuant to notice at the law offices of Young,
Conaway, Stargatt & Taylor, LLP, The Brandywine
Building, 1000 West Street, 17th Floor, Wilmington,
Delaware, beginning at 10:12 a.m. on Thursday, June
14, 2007, before Christina M. Vitale, Certified
Shorthand Reporter and Notary Public.

APPEARANCES:

        LORI ANN BREWINGTON, ESQUIRE
        MARGOLIS EDELSTEIN
          750 South Madison Street
          Wilmington, Delaware  19801
          For the Plaintiff

        SCOTT A. HOLT, ESQUIRE
        YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
          The Brandywine Building
          1000 West Street, 17th Floor
          Wilmington, Delaware  19899
          For the Defendant

                WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477

            www.wilfet.com

Edith A. Choma

1  looking at her --

2         MS. BREWINGTON:  Wait, can I object?  Calls

3  for speculation.  Go ahead and answer.

4  BY MR. HOLT:

5   A.   I really don't know.  I can't tell you what she

6  was thinking or what she was trying to do.  I know

7  what she was trying to do, but I can't tell you what

8  she was thinking.

9   Q.   Let's look at Exhibit Number 44 for a minute.

10  In the first page of this document, Ms. Choma, Ms.

11  Sweeney talks about performance expectations.  Do you

12  see that?

13   A.   Yes.

14   Q.   And in that she is outlining your current level

15  of performance?

16   A.   Yes.

17   Q.   What is expected and how it needs to be done

18  and when she wants you to complete that.  Do you see

19  that?

20   A.   Yes.

21   Q.   Now, the first category, at least the first

22  row, she talks about new letters from nurses that are

23  taking greater than eight minutes to produce.  Do you

24  see that?

Edith A. Choma

1    A.    Yes.

2    Q.    And do you agree that was your current level of

3    performance that was taking you longer than eight

4    minutes to produce those letters?

5    A.    No.

6    Q.    How long was it taking you to produce those

7    letters?

8    A.    I didn't time myself, but the nurses would come

9    to me and hand me these letters.  I didn't have any

10   nurses coming up to me and saying you are taking too

11   long to do these.  They appreciated the fact that I

12   did them because the other secretary refused.

13   Q.    So, you weren't timing yourself when you did

14   these letters?

15   A.    I wasn't looking at my watch.  I was just

16   trying to get the work done as correctly and as fast

17   as I could.

18   Q.    In that same row, what is expected, Ms. Sweeney

19   is informing you she wants all new letters to be typed

20   within an average of eight minutes.  Do you see that?

21   A.    Yes.

22   Q.    Could that be done, could letters be typed in

23   an average of eight minutes?

24   A.    They could be done sooner than that.

Edith A. Choma

1   Q.   Could you do the letters consistently typed

2   with an average of eight minutes?

3   A.   Yes, I could do it in four minutes.

4   Q.   So, that goal would be a reasonable goal for

5   her to set for you, is that correct?

6   A.   Yes, it would be.

7   Q.   In the next column over she indicates she would

8   like you to have an error rate consistently less than

9   20 percent.  Do you see that?

10  A.   Yes.

11  Q.   Is that something you could do is type letters

12  with a 20 percent error rate?

13  A.   Well, sure, but what I was referring to in the

14  past is that when somebody sets you up, so to speak,

15  so that they're giving you something to type and they

16  say, Put that in there and you give it back, take it

17  out, unbold that, this is different font, this is

18  this, now it's fixed go in there and use that, it's

19  mind-boggling.

20        I never had this problem before in all the

21  years I was doing these letters.  How come all of a

22  sudden they decided to monitor me like this, all of a

23  sudden I was to be monitored and timed after working

24  on these letters from 1998 to 2000 and -- when I left,

Edith A. Choma

 1  five.

 2    Q.   Was it September of 2004 when Ms. Sweeney

 3  started timing you on these letters?

 4    A.   No.  She timed me when my hand was in a cast.

 5  She actually came over to me when my hand was in a

 6  cast.

 7    Q.   And that was in August of 2004?

 8    A.   Yes.

 9    Q.   That's when she started timing you?

10    A.   Yes.

11    Q.   As far as an error rate of less than 20 percent

12  is that something you could achieve or are you

13  testifying because you didn't know what the errors

14  were you couldn't achieve that?

15    A.   I don't think that's true, that's what I'm

16  testifying.  I don't think what she is saying is my

17  error rate is true.  I don't think it's fair or true

18  because I think or I know that when I got a letter to

19  type and they were giving it back to me for minute

20  things, back and forth, back and forth.  Somebody

21  tells you to take it out and then put it in, then

22  tells you to take it out again, that's like back and

23  forth over that one little thing.

24    Q.   Is that the comma thing you are referring to?

Edith A. Choma

1    A.   Yes.

2    Q.   And that was the occasion when Ms. Sweeney told

3    you to put in the comma and then asked you after that

4    to take it out?

5    A.   Yeah, I have a copy of that.

6    Q.   You have a copy of the actual letter?

7    A.   Yes.

8    Q.   Did you hold on to all the letters she told you

9    to replace commas on for?

10   A.   No, I did not.  I just did not.  I just took

11   that particular one where she said to take it out or

12   she tells me to put it in and tells me to take it out,

13   I have that.

14   Q.   Did she do that on more than one occasion?

15   A.   I'm sure she did.  I mean, I can't recall

16   because it has been a while ago, but I'm sure she did.

17   Some of the things she was giving me back were things

18   that I seen go through there that nobody else was

19   taken to task for.  It was just centered on me.

20   Q.   You mean your previous supervisors wouldn't

21   have made you correct a letter with a comma?

22   A.   I was happy to correct a letter if I made a

23   mistake and I did so, but what I'm saying is nobody

24   ever complained that -- nobody ever called me in their

Edith A. Choma

1    office or timed me on my work or told me I was too
2    slow.  They thanked me for helping Chris Zakutny and
3    they thanked me for doing her work.  That's it for the
4    whole time I was working for that company, for the
5    whole time I was in that department, I mean, until
6    Sweeney decided to monitor me.  Now, why did she
7    decide all of a sudden to monitor my work?
8        Q.   Again, that occurred starting in August of
9    2004?
10       A.   When I had my hand in a cast.  Who in their
11   right mind would do that to you, come up to you and
12   I'm typing with one hand, Stop, I'm going to time you.
13   I like turned around like, What?  That's right.  So,
14   sure, she is going to put those -- well, this is from
15   October, but it started way back when I broke my
16   wrist, when they thought I had a scaphoid fracture.
17       Q.   Do you think she started timing you because you
18   had broken your wrist?
19       A.   I don't know what her reason was except for I
20   think she wanted me to leave.  I think she was putting
21   pressure on me to leave the company.
22       Q.   Back to this Exhibit 44 and error rate, I think
23   I asked you and I'm not sure if I got an answer, but
24   do you agree that an error rate consistently less than

Edith A. Choma

1    20 percent is an achievable goal?

2    A.    Yes.

3    Q.    Ms. Choma, that same document, next row down,

4    looks like -- by the way, those performance

5    expectations, the time frame in which Ms. Sweeney

6    wanted you to achieve them was by November 12, 2004?

7    A.    Yes.

8    Q.    Was that a time frame that you could have

9    achieved those goals?

10    A.    I don't know.  I was taken out of work because

11    my therapist took me out and I believe that was that

12    month, November.

13    Q.    Assuming that you weren't taken out of work by

14    your therapist, could you have achieved those goals by

15    that date?

16    A.    Sure.

17    Q.    Now, next row, looks like Ms. Sweeney has made

18    new goals that she wanted you to achieve by November

19    26.  Do you see that?

20    A.    Yes.

21    Q.    And the new goal would be typing letters within

22    an average of 6.5 minutes?

23    A.    Yes.

24    Q.    And, again, is that something that you could

Edith A. Choma

1   have achieved?

2   A.   Yes.

3   Q.   And the error rate of consistently less than 15

4   percent, is that something you could have achieved?

5   A.   Yes.

6   Q.   Finally, she has as a goal to consistently type

7   letters of an average of five minutes.  Do you see

8   that below?

9   A.   Yes.

10   Q.   And, again, that's something you could have

11   achieved?

12   A.   Yes.

13   Q.   And the error rate of less than ten percent, is

14   that something you could have achieved?

15   A.   Yes.

16   Q.   Again, she wanted you to do those by December

17   10, 2004?

18   A.   Yes, but I wasn't there either.

19   Q.   You weren't there as well.  On the second page

20   on the top there is a row referring to correction

21   letters.  Do you see that?

22   A.   Yes.

23   Q.   Did it typically take less time to do a

24   correction letter?

573

Edith A. Choma

1    A.    Yes.

2    Q.    In this row she indicates that your correction

3    letters were taking an average of five minutes or

4    longer to type, is that an accurate statement by her?

5    A.    No, that's her opinion.

6    Q.    Were you timing how long it took you to do

7    correction letters?

8    A.    No, I wasn't timing myself, but if you get five

9    letters to correct and you do that within like 15

10   minutes you figure, oh, okay, well, they're done.

11   Q.    And now in her expectation column she wanted

12   you to have correction letters typed consistently

13   within an average of three minutes.  Do you see that?

14   A.    Yes.

15   Q.    Is that a goal you could have achieved?

16   A.    Yes.

17   Q.    And she wanted an error rate consistently at 99

18   percent accuracy?

19   A.    Yes.

20   Q.    Is that something you could have achieved?

21   A.    Yes.

22   Q.    In addition to the letters, Ms. Choma, Ms.

23   Sweeney also had set out some goals for overtime and

24   start and stop times.  Do you see those?

Edith A. Choma

1  A.  Yes.

2     Q.  In her first row on the second page she says,

3  "Overtime has been worked without prior approval."  Do

4  you see that?

5     A.  Yes.

6     Q.  And you had, in fact, worked some overtime

7  without pre-approval, is that correct?

8     A.  What happened there was when you do your time

9  sheets on that time sheet at the bottom it tells you

10  to put your time in.  It truthfully puts your time

11  down so I did.  When you do that it creates a formula

12  and anything over that many hours -- I think we

13  discussed this before -- puts it down as automatically

14  overtime.  I mean, I was being truthful on my time

15  sheets.

16     Q.  In those instances you actually had worked

17  overtime and you were just trying to get your work

18  done, is that correct?

19     A.  Yes, I guess you could say I worked overtime.

20  I was staying to get my work done and she -- the

21  situation was I had so much work to do that she

22  demanded after I even had my therapy to come back and

23  work on this stuff.

24     Q.  Isn't it the case, Ms. Choma, that she wanted

Edith A. Choma

1   you to get all your work done during the normal

2   workday, in the normal allotted time without really

3   working any overtime, is that correct?

4       A.   Nobody can with these letters.  If they want

5   all those letters done on a daily basis you have to

6   stay.  There is nobody -- I don't remember ever -- I

7   mean, those bins are almost always full except the one

8   time Chris was on vacation and she cleaned up the bins

9   and one time when I asked to go to that financial

10  seminar I think there were two or three letters in the

11  bin, but it's very rare that there is -- I mean, you

12  can imagine.  I think now they have a system generated

13  for these.

14      Q.   But back then there were a lot of letters that

15  had to be produced, is that correct?

16      A.   Yes.

17      Q.   And you had to do these manually, correct?

18      A.   Yes.

19      Q.   Isn't it fair to say Ms. Sweeney wanted you to

20  get all that work done during your normal hours?

21      A.   And I tried to get it done.

22      Q.   The answer is yes?

23      A.   She wanted me to get it done.  If I saw that I

24  had ten letters left to do, she wanted them done by

Edith A. Choma

1   the end of the day, I would have stayed and got them
2   done.
3      Q.   What you testified earlier is that in some
4   cases you had to stay late or work overtime in order
5   to get those letters done, is that correct?
6      A.   Well, most of the time I stayed late is because
7   I had to get my hand therapy done and she wanted me to
8   come back.  She was putting me in a situation where
9   here is your work for today, I want it done by the end
10  of the day.
11     Q.   In those situations you would get your hand
12  therapy done at your doctor and then come back and
13  resume working?
14     A.   Yes.
15     Q.   And Ms. Sweeney allowed you to do that?
16     A.   I don't know.  I mean, I was just getting my
17  work done.
18     Q.   Did Ms. Sweeney know that you were going to
19  medical appointments during the middle of the day?
20     A.   She told me to I had to stop, I wasn't allowed
21  to do it, I had to make other arrangements.  That's
22  why I made my appointments after work for my hand
23  because she told me I couldn't use my lunch hour.
24     Q.   I thought you just testified, Ms. Choma, and

Edith A. Choma

1    correct me if I'm wrong, that you would go to your
2    medical appointment with your hand during the day and
3    then come back after hours to complete your work?
4        A.    I'm sorry if I said it that way. I meant I
5    changed my appointments to after work and she would
6    tell me, she would say to me, Where are you going?
7    It's like quarter of five, I don't get done until
8    4:30. I have a hand therapy appointment. I want you
9    to come back when you are done and I want you to
10   finish this work.
11       Q.    She was telling you to come back and work
12   overtime?
13       A.    She wouldn't pay me overtime. She said, "I'm
14   not paying you overtime." She made that perfectly
15   clear. I'm thinking she wants me to get this work
16   done, but she doesn't want me to ask for overtime,
17   which I do, I'll get the work done. That was more
18   important to get the work done and, believe me, I was
19   tired. I was sometimes getting home at nine, ten
20   o'clock at night.
21       Q.    Is it your testimony Ms. Sweeney told you to
22   come back after your appointment to continue working
23   on the letters?
24       A.    Yes.

Edith A. Choma

1   Q.   And that was after your regular working hours,

2   correct?

3   A.   Yes.

4   Q.   And you had already worked a full shift that

5   day, is that correct?

6   A.   Yes.

7   Q.   How many times did this occur?

8   A.   I don't know.

9   Q.   More than once?

10   A.   Yes.

11   Q.   More than ten times?

12   A.   I don't know because it depends on how much --

13   I'll give you one example.  I had to have all my tests

14   done for my cardiac cath and I called her up when I

15   got home and I said, you know, I just didn't feel

16   well.  They were taking X-rays and I was scared to

17   death because I didn't know what was going to happen

18   to me.  She said, "You have to come in.  You have to

19   come in.  There is so much work for you to do you have

20   to come in."

21           Here I'm hearing like four or five hours at

22   six o'clock in the morning I had to be at St.

23   Francis.  I went back to my job after having all that

24   work done and being scared to death and I sat at my

Edith A. Choma

1   desk and I worked until nine or ten o'clock at night.

2       Q.   And this was after you had your appointment

3   earlier in the day?

4       A.   That was when I was getting all my bloodwork

5   done and all my X-rays and everything done and I came

6   back to work --

7       Q.   Let me stop you there.  You were getting your

8   bloodwork and X-rays during the morning, correct?

9       A.   Morning and part of the afternoon, yes.

10      Q.   And then after you were done at the request of

11  Ms. Sweeney you came back in to work, is that correct?

12      A.   Yes.

13      Q.   And then you worked until nine o'clock?

14      A.   Well, let me take that back because I think it

15  was until nine, but she told me that there were

16  meetings I had to set up and she told me, "You have to

17  come in."  When I came in there I went to the people

18  whose meetings I had to set up and they said, "That's

19  all right, we took care of it, know you are going

20  to the hospital tomorrow, that's okay."  So, I sat

21  there and I said, "Why did you tell me to come in,

22  there is nothing to do?"  She said, "Well, I'll find

23  you something to do."  So, she found me something to

24  do.

Edith A. Choma

1    Q.    What did you do until nine o'clock?

2    A.    I have no idea.  Some thing she had.

3    Q.    Did you have any PTO time left at that point?

4    A.    I have no idea.  To get out of that environment

5    I took a lot of my PTO time to get away from that

6    constant harassment.

7    Q.    At the time that incident happened you are not

8    sure whether you had any PTO time left?

9    A.    I'm pretty sure I did not.  Whatever PTO time I

10   had I had to take it to get away from that.  She would

11   even tell me she was watching me.  She would even tell

12   me -- I walked by a meeting room and it was like 9:30

13   so she saw me.  So, she comes back to my desk after

14   the meeting and she says, "What time did you come in?"

15   I said, "I was here by eight."  She said, "I hope so

16   because I'm watching everything you do."

17   Q.    Now, Ms. Choma, before I was asking you about

18   the incidents where you said you would work the full

19   shift, go to your medical appointment after your shift

20   and be required by Ms. Sweeney to come back in and

21   work later that day?

22   A.    Yes.

23   Q.    Do you recall that?

24   A.    Yes.

Edith A. Choma

1    statistics were accurate that Ms. Sweeney had kept an

2    accurate count of the letters and number of errors

3    that you were making would you consider this

4    performance to be acceptable?

5    A.    If it was true?

6    Q.    Yes.

7    A.    No.

8    Q.    It would be unacceptable?

9    A.    Well, to take that long to do a letter, sure.

10   I mean, I was doing these for years and I never had

11   any complaints, I never had anybody come up to me and

12   do that to me, so.

13            MR. HOLT:  Please mark this.

14            (Choma Deposition Exhibit No. 45 was marked

15   for identification.)

16   BY MR. HOLT:

17   Q.    Now, Ms. Choma, you have been handed what has

18   been marked as Exhibit 45 and this purports to be the

19   charge of discrimination that you filed on October

20   22nd, 2004.  Do you see that?

21   A.    Yes.

22   Q.    Your signature below that is the date you filed

23   this?

24   A.    Yes, yes.

Edith A. Choma

1    Q.    Which is October 22nd --

2    A.    Yes.

3    Q.    -- 2004?  Do you know when Blue Cross received

4    a copy of this charge?

5    A.    I don't know when they received their copy.  I

6    don't know how long they usually take to do this, I

7    really don't know, but on this day she actually came

8    up to me and stuck a finger in my face and started

9    yelling at me.

10    Q.    What was she yelling at you about?

11    A.    You better learn to do what I tell you to do.

12    You better learn to do this and that and this and

13    that.  She had her finger right in my face and

14    touching my nose and everybody is around there and can

15    see this.  I mean, these people are shocked.

16    Q.    Who was around there that witnessed this event?

17    A.    I don't know if Dave Martin -- there is people

18    around that come in there.  There is people that hear

19    this.  There is people -- I wasn't looking around to

20    see who was watching us.

21    Q.    You said that everyone was around.  I want you

22    to identify to the best of your recollection who was

23    around to witness that event?

24    A.    I think Dave Martin might have been.

Edith A. Choma

1    Q.    Anyone else?

2    A.    I don't know if Yvonne and Char were in that

3    day.  They would have definitely seen it if they were

4    there.  I can't remember if they were in.

5    Q.    Is that Yvonne Locker?

6    A.    Yes.

7    Q.    And the other one is Charlene Blanchard?

8    A.    Yes.

9    Q.    Anyone else who might have been around for that

10   event?

11   A.    Peggy Bell might have been around.

12   Q.    Do you know if they were around or are you just

13   guessing that they may have been there?

14   A.    I'm pretty sure Dave Martin was there because

15   he would say to me, "She is trying to get you to say

16   something back to her so she can write you up.  This

17   is what this is leading --" you know "-- she is just

18   doing this to you to make you explode."  So, I was

19   upset.  I wasn't looking around to see who was there.

20   I'm just telling you what happened.

21   Q.    Why was Ms. Sweeney upset with you?

22   A.    I think this is the time she came to my desk.

23   I had an appointment with hand therapy after work and

24   Eileen gave me letters to do and I got them all done

Edith A. Choma

1    and she is always yelling at me.  She was yelling at

2    me because why didn't you give these to Eileen or

3    something?  I even forget what it was.  It was

4    something very minute that she was yelling.

5    Q.    When you say she is yelling --

6    A.    Yelling.

7    Q.    How loud was she?  Could the whole office hear

8    her?

9    A.    If they were all there, yes, sir.

10   Q.    And she did this on more than one occasion?

11   A.    Yes, sir.

12   Q.    How many times?

13   A.    I can't tell you.

14   Q.    More than ten?

15   A.    Yes.

16   Q.    More than 20?

17   A.    I'm not going to put a number on it because all

18   I can tell you is this woman constantly harassed me

19   and it was awful going to work under those conditions.

20   I cannot put it any plainer.

21   Q.    You have testified on numerous occasions, Ms.

22   Choma, that you were being harassed and I'm trying to

23   get a quantification of the number of times that Ms.

24   Sweeney yells at you as you testified and you are