# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

EDITH CHOMA,                           )
                                       )
                    Plaintiff,         )
                                       )
            v.                         )   C.A. No. 06-486-JJF
                                       )
BLUE CROSS BLUE SHIELD                 )   JURY TRIAL DEMANDED
OF DELAWARE,                           )
                                       )
                    Defendant.         )


## PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITIES

Plaintiff, Edith Choma, through her undersigned counsel and pursuant to Local

Rule 7.1.2(b), respectfully refers the Court to the recent decisions of the United States Supreme

Court in *Gomez-Perez v. Potter*, 553 U.S. ____; 2008 U.S. LEXIS 4518 (U.S. May 27, 2008)

(Exhibit A) and *CBOCS West, Inc. v. Humphries*, 553 U.S. ____; 2008 U.S. LEXIS 4516 (U.S.

May 27, 2008) (Exhibit B). Plaintiff respectfully submits these decisions are relevant to, and

support Plaintiff's position in, the pending cross-motions for summary judgment in the above-

referenced matter.

MARGOLIS EDELSTEIN


*/s/ Herbert W. Mondros*_____
Herbert W. Mondros, Esq. (Del Bar No. 3308)
750 Shipyard Drive, Suite 102
Wilmington, DE 19801
302.888.1112
Attorneys for Plaintiff

# EXHIBIT A

(Slip Opinion)            OCTOBER TERM, 2007                    1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## GOMEZ-PEREZ *v.* POTTER, POSTMASTER GENERAL

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

No. 06–1321.  Argued February 19, 2008—Decided May 27, 2008

Petitioner, a 45-year-old postal worker, filed suit claiming that her em-
ployer had violated the federal-sector provision of the Age Discrimi-
nation in Employment Act of 1967 (ADEA), 29 U. S. C. §633a(a)—
which requires that "[a]ll personnel actions affecting employees . . . at
least 40 years of age . . . be made free from any discrimination based
on age"—by subjecting her to various forms of retaliation after she
filed an administrative ADEA complaint.  The District Court granted
respondent summary judgment.  The First Circuit affirmed on the
ground that §633a(a)'s prohibition of "discrimination based on age"
does not cover retaliation.

*Held:* Section 633a(a) prohibits retaliation against a federal employee
who complains of age discrimination.  Pp. 3–16.

   (a) In so concluding, the Court follows the reasoning of two prior
decisions ruling that retaliation is covered by similar language in
other antidiscrimination statutes.  First, in *Sullivan* v. *Little Hunting
Park, Inc.,* 396 U. S. 229, 237, the Court held that a retaliation claim
could be brought under 42 U. S. C. §1982, which provides that "[a]ll
citizens . . . shall have the same right . . . as is enjoyed by white citi-
zens . . . to inherit, purchase, lease, sell, hold, and convey real and
personal property."  While §1982 does not use the phrase "discrimi-
nation based on race," that is its plain meaning.  See, *e.g., Jackson* v.
*Birmingham Bd. of Ed.,* 544 U. S. 167, 177.  Second, the *Jackson*
Court, *id.,* at 173–174, relied on *Sullivan* in holding that Title IX of
the Education Amendments of 1972, 20 U. S. C. §1681(a), which pro-
hibits "discrimination" "on the basis of sex" in educational programs
receiving federal aid, reached retaliation against a public school
teacher for complaining about sex discrimination in his school's ath-
letic program.  544 U. S., at 176–177.  The ADEA language at issue

2                    GOMEZ-PEREZ *v.* POTTER

Syllabus

("discrimination based on age") is not materially different from the
language at issue in *Jackson* and is the functional equivalent of the
language at issue in *Sullivan,* see *Jackson, supra,* at 177. And the
context in which the statutory language appears is the same in all
three cases: remedial provisions aimed at prohibiting discrimination.
Respondent neither asks the Court to overrule *Sullivan* or *Jackson*
nor questions those decisions' reasoning, and the Government, both
in *Jackson* and in *CBOCS West, Inc.* v. *Humphries, ante,* p. ___, has
specifically urged the Court to follow *Sullivan's* reasoning. Pp. 3–6.

(b) The three grounds on which the First Circuit sought to distin-
guish *Jackson* in support of the Circuit's perception that there is a
clear difference between causes of action for discrimination and for
retaliation are not persuasive. Pp. 6–9.

(1) The Circuit places too much reliance on the fact that the
ADEA expressly creates a private right of action, whereas the right of
action under Title IX, the statute at issue in *Jackson,* is implied and
not express, see *Cannon* v. *University of Chicago,* 441 U. S. 677. The
assertion that this distinction allowed the *Jackson* Court greater
leeway to adopt an expansive interpretation of Title IX improperly
conflates the analytically distinct questions whether a statute confers
a private right of action and whether the statute's substantive prohi-
bition reaches a particular form of conduct. Moreover, confusing
these questions would lead to exceedingly strange results. For exam-
ple, Title IX's prohibition of " discrimination" "on the basis of sex" ei-
ther does or does not reach retaliation, and the presence or absence of
another statutory provision expressly creating a private right of ac-
tion cannot alter §1681(a)'s scope. Pp. 6–7.

(2) Also unavailing is the Circuit's attempt to distinguish *Jack-
son* on the ground that retaliation claims play a more important role
under Title IX than under the ADEA. This argument ignores the ba-
sis for *Jackson,* which did not hold that Title IX prohibits retaliation
because such claims are important as a policy matter, but, instead,
relied on an interpretation of the "text of Title IX." 544 U. S., at 173,
178. *Jackson's* statement that "teachers . . . are often in the best po-
sition to vindicate [student] rights," *id.,* at 181, did not address the
question whether the statutory term "discrimination" encompasses
retaliation, but was made in response to the school board's argument
that only a "victim of the discrimination," not third parties, should be
allowed to assert a retaliation claim, *id.,* at 179–182. P. 8.

(3) Finally, the Circuit's attempt to distinguish *Jackson* on the
ground that Title IX was adopted in response to *Sullivan,* whereas
there is no evidence in the ADEA's legislative history that §633a was
adopted in a similar context, is rejected. *Jackson* did not identify any
legislative history evidence, but merely observed that because "Con-

Syllabus

gress enacted Title IX just three years after *Sullivan*," it was " 'realistic to presume that Congress was thoroughly familiar with *[Sullivan]* and . . . expected [Title IX] to be interpreted in conformity with [it]." 544 U. S., at 176. What *Jackson* said about the relationship between *Sullivan* and Title IX's enactment can also be said about the relationship between *Sullivan* and §633a's enactment, since the latter provision was enacted just five years after *Sullivan* was decided and two years after Title IX was enacted. Pp. 8–9.

(c) Respondent's other arguments supporting the contention that §633a(a) does not encompass retaliation claims are rejected. Pp. 10–16.

(1) Respondent places too much reliance on the presence of an ADEA provision specifically prohibiting retaliation against individuals complaining about private-sector age discrimination, §623(d), and the absence of a similar provision in §633a. Because §§623 and 633a were enacted seven years apart rather than simultaneously, see *Lindh* v. *Murphy*, 521 U. S. 320, 330, and because they are couched in very different terms—with §§623(a)(1)–(3) listing specific forbidden employer practices in contrast to §633a(a)'s broad prohibition of "discrimination"—the absence of a federal-sector provision similar to §623(d) does not provide a sufficient reason to depart from *Sullivan* and *Jackson*. Pp. 10–12.

(2) There is even less merit in respondent's reliance on §633a(f), which provides that personnel actions by a federal entity covered by §633a "shall not be subject to, or affected by, any provision of this chapter" other than §633a and §631(b), which restricts ADEA coverage to persons at least 40 years old. Respondent's contention that recognizing federal-sector retaliation claims would make §623(d) applicable to federal-sector employers in contravention of §633a(f) is unsound because the Court's holding today is not based on §623(d) but on §633a(a) itself, "unaffected by other [ADEA] sections," *Lehman* v. *Nakshian*, 453 U. S. 156, 168. P. 13.

(3) Also unavailing is respondent's argument that the history of congressional and Executive Branch responses to discrimination in federal employment demonstrates that when Congress enacted §633a, it anticipated that the pre-existing reprisal regulations of the Civil Service Commission (CSC) would be extended to cover federal-sector age discrimination and be the exclusive avenue for asserting retaliation claims. This argument is not supported by direct evidence, but rests on unsupported speculation, and, in any event, is self-contradictory in that, if §633a(a) does not confer an antiretaliation right, there is no reason to assume that Congress expected the CSC to issue new regulations prohibiting retaliation. Pp. 13–14.

(4) Respondent's final argument—that sovereign immunity prin-

4    GOMEZ-PEREZ *v.* POTTER

Syllabus

ciples require that §633a(a) be read narrowly as prohibiting substantive age discrimination but not retaliation—is unpersuasive. The rule of construction requiring that "[a] waiver of the Federal Government's sovereign immunity . . . be unequivocally expressed in statutory text" and "strictly construed . . . in favor of the sovereign," *Lane* v. *Peña*, 518 U. S. 187, 192, is satisfied here by §633a(c), which unequivocally waives sovereign immunity for a claim brought by "[a]ny person aggrieved" by a §633a violation. Unlike §663a(c), §633a(a) is not a waiver of sovereign immunity; it is a substantive provision outlawing "discrimination." That the §633a(c) waiver applies to §633a(a) claims does not mean that §633a(a) must surmount the same high hurdle as §633a(c). Pp. 15–16.

476 F. 3d 54, reversed and remanded.

ALITO, J., delivered the opinion of the Court, in which STEVENS, KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined. ROBERTS, C. J., filed a dissenting opinion, in which SCALIA and THOMAS, JJ., joined as to all but Part I. THOMAS, J., filed a dissenting opinion, in which SCALIA, J., joined.

Cite as: 553 U. S. \_\_\_\_ (2008)          1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 06–1321

MYRNA GOMEZ-PEREZ, PETITIONER *v.* JOHN E.
POTTER, POSTMASTER GENERAL

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT

[May 27, 2008]

JUSTICE ALITO delivered the opinion of the Court.

The question before us is whether a federal employee who is a victim of retaliation due to the filing of a complaint of age discrimination may assert a claim under the federal-sector provision of the Age Discrimination in Employment Act of 1967 (ADEA), as added, 88 Stat. 74, and amended, 29 U. S. C. §633a(a) (2000 ed., Supp. V). We hold that such a claim is authorized.

I

Petitioner Myrna Gómez-Pérez was a window distribution clerk for the United States Postal Service. In October 2002, petitioner, then 45 years of age, was working full time at the Post Office in Dorado, Puerto Rico. She requested a transfer to the Post Office in Moca, Puerto Rico, in order to be closer to her mother, who was ill. The transfer was approved, and in November 2002, petitioner began working at the Moca Post Office in a part-time position. Later that month, petitioner requested a transfer back to her old job at the Dorado Post Office, but her supervisor converted the Dorado position to part-time, filled it with

2                    GOMEZ-PEREZ *v.* POTTER

another employee, and denied petitioner's application.

After first filing an unsuccessful union grievance seek-
ing a transfer back to her old job, petitioner filed a Postal
Service equal employment opportunity age discrimination
complaint.    According to petitioner, she was then sub-
jected to various forms of retaliation.  Specifically, peti-
tioner alleges that her supervisor called her into meetings
during which groundless complaints were leveled at her,
that her name was written on antisexual harassment
posters, that she was falsely accused of sexual harass-
ment, that her co-workers told her to "'go back'" to where
she "'belong[ed],'" and that her work hours were drasti-
cally reduced. 476 F. 3d 54, 56 (CA1 2007).

Petitioner responded by filing this action in the United
States District Court for the District of Puerto Rico, claim-
ing, among other things, that respondent had violated the
federal-sector provision of the ADEA, 29 U. S. C. §633a(a)
(2000 ed., Supp. V), by retaliating against her for filing her
equal employment opportunity age discrimination com-
plaint.  Respondent moved for summary judgment, argu-
ing that the United States has not waived sovereign im-
munity for ADEA retaliation claims and that the ADEA
federal-sector provision does not reach retaliation.   The
District Court granted summary judgment in favor of
respondent on the basis of sovereign immunity.

On appeal, the United States Court of Appeals for the
First Circuit held that the Postal Reorganization Act, 39
U. S. C. §401(1), unequivocally waived the Postal Service's
sovereign immunity, see 476 F. 3d, at 54, 57, but the
Court affirmed the decision of the District Court on the
alternative ground that the federal-sector provision's
prohibition of "discrimination based on age," §633a(a)
(2000 ed., Supp. V), does not cover retaliation, *id.*, at 60,
creating a split among the Courts of Appeals.  Compare
*Forman* v. *Small*, 271 F. 3d 285, 296 (CADC 2001) (ADEA
federal-sector provision covers retaliation).   We granted

Opinion of the Court

certiorari. 552 U. S. ___ (2007).

## II

The federal-sector provision of the ADEA provides that "[a]ll personnel actions affecting employees or applicants for employment who are at least 40 years of age . . . shall be made free from any discrimination based on age." §633a(a) (2000 ed., Supp. V). The key question in this case is whether the statutory phrase "discrimination based on age" includes retaliation based on the filing of an age discrimination complaint. We hold that it does.

In reaching this conclusion, we are guided by our prior decisions interpreting similar language in other antidiscrimination statutes. In *Sullivan* v. *Little Hunting Park, Inc.*, 396 U. S. 229 (1969), we considered whether a claim of retaliation could be brought under Rev. Stat. §1978, 42 U. S. C. §1982, which provides that "[a]ll citizens of the United States shall have the same right . . . as is enjoyed by white citizens . . . to inherit, purchase, lease, sell, hold, and convey real and personal property." While §1982 does not use the phrase "discrimination based on race," that is its plain meaning. See *Tennessee* v. *Lane*, 541 U. S. 509, 561 (2004) (SCALIA, J., dissenting) (describing §1982 as "banning public or private racial discrimination in the sale and rental of property"); *Jones* v. *Alfred H. Mayer Co.*, 392 U. S. 409 (1968).

In *Sullivan*, a white man (Sullivan) held membership shares in a nonstock corporation that operated a park and playground for residents of the area in which he owned a home. Under the bylaws of the corporation, a member who leased a home in the area could assign a membership share in the corporation. But when Sullivan rented his house and attempted to assign a membership share to an African-American (Freeman), the corporation disallowed the assignment because of Freeman's race and subsequently expelled Sullivan from the corporation for protest-

4                    GOMEZ-PEREZ *v.* POTTER

Opinion of the Court

ing that decision. Sullivan sued the corporation, and we held that his claim that he had been expelled "for the advocacy of Freeman's cause" was cognizable under §1982. 396 U. S., at 237. A contrary holding, we reasoned, would have allowed Sullivan to be "punished for trying to vindicate the rights of minorities" and would have given "impetus to the perpetuation of racial restrictions on property." *Ibid.*

More recently, in *Jackson* v. *Birmingham Bd. of Ed.,* 544 U. S. 167 (2005), we relied on *Sullivan* in interpreting Title IX of the Education Amendments of 1972, 86 Stat. 373, as amended, 20 U. S. C. §1681 *et seq.* (2000 ed. and Supp. V). Jackson, a public school teacher, sued his school board under Title IX, "alleging that the Board retaliated against him because he had complained about sex discrimination in the high school's athletic program." 544 U. S., at 171. Title IX provides in relevant part that "[n]o person in the United States shall, *on the basis of sex,* . . . be subjected to *discrimination* under any education program or activity receiving Federal financial assistance." §1681(a) (2000 ed.) (emphasis added). Holding that this provision prohibits retaliation, we wrote:

> "Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination . . . . Retaliation is, by definition, an intentional act. It is a form of 'discrimination' because the complainant is being subjected to differential treatment. Moreover, retaliation is discrimination 'on the basis of sex' because it is an intentional response to the nature of the complaint: an allegation of sex discrimination. We conclude that when a funding recipient retaliates against a person *because* he complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex,' in violation of Title IX." *Id.,* at 173–174 (citations omitted).

Opinion of the Court

This interpretation, we found, flowed naturally from *Sullivan:* "Retaliation for Jackson's advocacy of the rights of the girls' basketball team in this case is 'discrimination' 'on the basis of sex,' just as retaliation for advocacy on behalf of a black lessee in *Sullivan* was discrimination on the basis of race." 544 U. S., at 176–177.

Following the reasoning of *Sullivan* and *Jackson*, we interpret the ADEA federal-sector provision's prohibition of "discrimination based on age" as likewise proscribing retaliation. The statutory language at issue here ("discrimination based on age") is not materially different from the language at issue in *Jackson* ("'discrimination'" "'on the basis of sex'") and is the functional equivalent of the language at issue in *Sullivan*, see *Jackson, supra,* at 177 (describing *Sullivan* as involving "discrimination on the basis of race"). And the context in which the statutory language appears is the same in all three cases; that is, all three cases involve remedial provisions aimed at prohibiting discrimination.

The *Jackson* dissent strenuously argued that a claim of retaliation is conceptually different from a claim of discrimination, see 544 U. S., at 184–185 (opinion of THOMAS, J.), but that view did not prevail.[1] And respondent in this case does not ask us to overrule *Sullivan* or *Jackson.* Nor does respondent question the reasoning of those decisions.

---

[1] Suggesting that we have retreated from the reasoning of *Sullivan* and *Jackson,* THE CHIEF JUSTICE, citing *Burlington N. & S. F. R. Co.* v. *White,* 548 U. S. 53, 63–65 (2006), states that "we have since explained that antidiscrimination and antiretaliation provisions are indeed conceptually distinct, and serve distinct purposes." *Post,* at 4 (dissenting opinion). But as the Court explains today in *CBOCS West, Inc.* v. *Humphries, ante,* at 13, "[i]n *Burlington* . . . we used the status/conduct distinction to help explain why Congress might have wanted its explicit Title VII antiretaliation provision to sweep more broadly (*i.e.,* to include conduct *outside* the workplace) than its substantive Title VII (status-based) antidiscrimination provision. *Burlington* did not suggest that Congress must separate the two in all events."

Indeed, in *Jackson*, the Government contended that "[t]he text . . . of Title IX demonstrate[s] that it encompasses protection against retaliation" since "retaliation against a person because that person has filed a sex discrimination complaint is a form of intentional sex discrimination." Brief for United States as *Amicus Curiae* 8, in *Jackson* v. *Birmingham Bd. of Ed.*, O. T. 2004, No. 02–1672. Similarly, in another case this Term, the Government has urged us to follow the reasoning of *Sullivan* and to hold that a claim of retaliation may be brought under Rev. Stat. §1977, 42 U. S. C. §1981. In that case, the Government argues that §1981's prohibition of "'discrimination' . . . quite naturally includes discrimination on account of having complained about discrimination." Brief for United States as *Amicus Curiae* 10, in *CBOCS West, Inc.* v. *Humphries*, O. T. 2007, No. 06–1431.

### III

The decision of the Court of Appeals, which respondent defends, perceived a "clear difference between a cause of action for discrimination and a cause of action for retaliation" and sought to distinguish *Jackson* on three grounds. 476 F. 3d, at 58–59. We are not persuaded, however, by any of these attempted distinctions.

### A

The Court of Appeals first relied on the fact that the ADEA expressly creates a private right of action whereas Title IX, the statute at issue in *Jackson*, does not. See 476 F. 3d, at 58. The Court of Appeals appears to have reasoned that, because the private right of action under Title IX is implied and not express, see *Cannon* v. *University of Chicago*, 441 U. S. 677 (1979), the *Jackson* Court had greater leeway to adopt an expansive interpretation of Title IX's prohibition of discrimination on the basis of sex.

This reasoning improperly conflates the question

whether a statute confers a private right of action with the question whether the statute's substantive prohibition reaches a particular form of conduct. These questions are analytically distinct, and confusing them would lead to exceedingly strange results.

For example, under the Court of Appeals' reasoning, Title IX's prohibition of "discrimination" "on the basis of sex," in 20 U. S. C. §1681(a), might have a narrower scope and might not reach retaliation if Title IX contained a provision expressly authorizing an aggrieved private party to bring suit to remedy a violation of §1681(a). We do not see how such a conclusion could be defended. Section 1681(a)'s prohibition of "discrimination" either does or does not reach retaliation, and the presence or absence of another statutory provision expressly creating a private right of action cannot alter §1681(a)'s scope. In addition, it would be perverse if the enactment of a provision explicitly creating a private right of action—a provision that, if anything, would tend to suggest that Congress perceived a need for a strong remedy—were taken as a justification for narrowing the scope of the underlying prohibition.

The Court of Appeals' reasoning also seems to lead to the strange conclusion that, despite *Jackson*'s holding that a private party may assert a retaliation claim under Title IX, the Federal Government might not be authorized to impose upon an entity that engages in retaliation the administrative remedies, including the termination of funding, that are expressly sanctioned under §1682. It would be extremely odd, however, if §1681(a) had a broader scope when enforced by a means not expressly sanctioned by statute than it does when enforced by the means that the statute explicitly provides. For these reasons, we reject the proposition that *Jackson* may be distinguished from the present case on the ground that Title IX's private right of action is implied.

Opinion of the Court

### B

The Court of Appeals next attempted to distinguish *Jackson* on the ground that retaliation claims play a more important role under Title IX than they do under the ADEA. The Court of Appeals pointed to our statement in *Jackson* that "'teachers and coaches . . . are often in the best position to vindicate the rights of their students because they are better able to identify discrimination and bring it to the attention of administrators.'" 476 F. 3d, at 58 (quoting *Jackson,* 544 U. S., at 181). The Court of Appeals suggested that third parties are not needed to "identify instances of age discrimination and bring it to the attention of supervisors" and that, consequently, there is no need to extend §633a(a) (2000 ed., Supp. V) to reach retaliation. 476 F. 3d, at 58.

This argument ignores the basis for the decision in *Jackson. Jackson* did not hold that Title IX prohibits retaliation because the Court concluded as a policy matter that such claims are important. Instead, the holding in *Jackson* was based on an interpretation of the "text of Title IX." 544 U. S., at 173, 178.

Moreover, the statements in *Jackson* on which the Court of Appeals relied did not address the question whether the statutory term "discrimination" encompasses retaliation. Instead, those statements addressed the school board's argument that, even if Title IX was held to permit some retaliation claims, only a "victim of the discrimination"— and not third parties—should be allowed to assert such a claim. *Id.,* at 179–182. It was in response to this argument that the Court noted the particular importance of reports of Title IX violations by third parties such as teachers and coaches. *Id.,* at 181.

### C

Finally, the Court of Appeals attempted to distinguish *Jackson* on the ground that "Title IX was adopted in re-

Opinion of the Court

sponse to the Court's holding in *Sullivan*," whereas "there
is no evidence in the legislative history that the ADEA's
federal sector provisions were adopted in a similar con-
text." 476 F. 3d, at 58–59. *Jackson*'s reliance on *Sullivan*,
however, did not stem from "evidence in the legislative
history" of Title IX. *Jackson* did not identify any such
evidence but merely observed that "Congress enacted Title
IX just three years after *Sullivan* was decided." 544 U. S.,
at 176. Due to this chronology, the Court concluded, it
was "'not only appropriate but also realistic to presume
that Congress was thoroughly familiar with *[Sullivan]* and
that it expected its enactment [of Title IX] to be inter-
preted in conformity with [it].'" *Ibid.* (quoting *Cannon*, 441
U. S., at 699). See also 544 U. S., at 176 ("Title IX was
enacted in 1972, three years after *[Sullivan]*"); *id.*, at 179–
180 ("*Sullivan* . . . formed an important part of the back-
drop against which Congress enacted Title IX").

What *Jackson* said about the relationship between
*Sullivan* and the enactment of Title IX can be said as well
about the relationship between *Sullivan* and the enact-
ment of the ADEA's federal-sector provision, 29 U. S. C.
§633a (2000 ed. and Supp. V). *Sullivan* was decided in
1969 and §633a was enacted in 1974—five years after the
decision in *Sullivan* and two years after the enactment of
Title IX. We see no reason to think that Congress forgot
about *Sullivan* during the two years that passed between
the enactment of Title IX in 1972 and the enactment of
§633a in 1974. And if, as *Jackson* presumed, Congress
had *Sullivan* in mind when it enacted Title IX in 1972, it
is "appropriate" and "realistic" to presume that Congress
expected its prohibition of "discrimination based on age" in
§633a(a) "'to be interpreted in conformity with'" its simi-
larly worded prohibition of "discrimination" "on the basis
of sex" in 20 U. S. C. §1681(a), which it had enacted just
two years earlier. 544 U. S., at 176 (quoting *Cannon*,
*supra*, at 699).

Opinion of the Court

IV

A

In arguing that §633a(a) (2000 ed., Supp. V) does not encompass retaliation claims, respondent relies principally on the presence of a provision in the ADEA specifically prohibiting retaliation against individuals who complain about age discrimination in the private sector, §623(d), and the absence of a similar provision specifically prohibiting retaliation against individuals who complain about age discrimination in federal employment. According to respondent, "the strong presumption is that [the] omission reflects that Congress acted intentionally and purposely in including such language in Section 623 of the Act and excluding it from Section 633a." Brief for Respondent 17 (internal quotation marks omitted).

"[N]egative implications raised by disparate provisions are strongest" in those instances in which the relevant statutory provisions were "considered simultaneously when the language raising the implication was inserted." *Lindh* v. *Murphy*, 521 U. S. 320, 330 (1997). Here, the two relevant provisions were not considered or enacted together. Section 623(d), which specifically prohibits private sector retaliation, was enacted in 1967, see §4(d), 81 Stat. 603, but the federal-sector provision, §633a, was not added until 1974, see §28(b)(2), 88 Stat. 74.[2]

Respondent's argument is also undermined by the fact that the prohibitory language in the ADEA's federal-sector provision differs sharply from that in the corresponding

---

[2] The situation here is quite different from that which we faced in *Lehman* v. *Nakshian*, 453 U. S. 156 (1981), where both the private and federal-sector provisions of the ADEA already existed and a single piece of legislation—the 1978 amendments to the ADEA—added a provision conferring a jury-trial right for private-sector ADEA suits but failed to include any similar provision for federal-sector suits. See Age Discrimination in Employment Act Amendments of 1978, §4(a)(2), 92 Stat. 189.

ADEA provision relating to private-sector employment. In the private-sector provision, Congress set out a specific list of forbidden employer practices. See 29 U. S. C. §623(a).[3] The omission from such a list of a specific prohibition of retaliation might have been interpreted as suggesting that Congress did not want to reach retaliation, and therefore Congress had reason to include a specific prohibition of retaliation, §623(d), in order to dispel any such inference.

The ADEA federal-sector provision, however, was not modeled after §623(d) and is couched in very different terms. The ADEA federal-sector provision was patterned "directly after" Title VII's federal-sector discrimination ban. *Lehman* v. *Nakshian,* 453 U. S. 156, 167, n. 15 (1981). Like the ADEA's federal-sector provision, Title VII's federal-sector provision, contains a broad prohibition of "discrimination," rather than a list of specific prohibited practices. Compare 118 Stat. 814, as amended, 42 U. S. C. §2000(e)–16(a) (2000 ed., Supp. V) (personnel actions affecting federal employees "shall be made free from any discrimination based on race, color, religion, sex, or national origin") with 29 U. S. C. §633a(a) (2000 ed., Supp. V) (personnel actions affecting federal employees who are at least 40 years of age "shall be made free from any discrimination based on age"). And like the ADEA's federal-

---

[3] Section 623(a) provides:

"(a) Employer practices

"It shall be unlawful for an employer—

"(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;

"(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or

"(3) to reduce the wage rate of any employee in order to comply with this chapter."

Opinion of the Court

sector provision, Title VII's federal-sector provision incorporates certain private-sector provisions but does not incorporate the provision prohibiting retaliation in the private sector. See 42 U. S. C. §2000e–16(d) (incorporating §§2000e–5(f) to (k) but not §2000e–3(a), which forbids private-sector retaliation).[4]

When Congress decided not to pattern 29 U. S. C. §633a(a) after §623(a) but instead to enact a broad, general ban on "discrimination based on age," Congress was presumably familiar with *Sullivan* and had reason to expect that this ban would be interpreted "in conformity" with that precedent. *Jackson,* 544 U. S., at 176. Under the reasoning of *Sullivan,* retaliation for complaining about age discrimination, is "discrimination based on age," "just as retaliation for advocacy on behalf of [the] black lessee in *Sullivan* was discrimination on the basis of race." *Id.,* at 176–177. Thus, because §§623(d) and 633a were enacted separately and are couched in very different terms, the absence of a federal-sector provision similar to §623(d) does not provide a sufficient reason to depart from the reasoning of *Sullivan* and *Jackson.*[5]

---

[4] While the federal-sector provision of Title VII does not incorporate §2000e–3(a), the federal-sector provision of Title VII does incorporate a remedial provision, §2000e–5(g)(2)(A), that authorizes relief for a violation of §2000–3(a). Petitioner argues that this remedial provision shows that Congress meant for the Title VII federal-sector provision's broad prohibition of "discrimination based on race, color, religion, sex, or national origin" to reach retaliation because otherwise there would be no provision banning retaliation in the federal sector and thus no way in which relief for retaliation could be awarded. Brief for Petitioner 20. The Federal Government, however, has declined to take a position on the question whether Title VII bans retaliation in federal employment, see Tr. of Oral Arg. 31, and that issue is not before us in this case.

[5] The Government's theory that the absence of a provision specifically banning federal-sector retaliation gives rise to the inference that §633a(a) (2000 ed., Supp. V) does not ban retaliation would lead logically to the strange conclusion that §633a(a) also does not forbid age-

Opinion of the Court

### B

We see even less merit in respondent's reliance on 29 U. S. C. §633a(f), which provides that personnel actions by a federal department, agency, or other entity covered by §633a "shall not be subject to, or affected by, any provision of this chapter" other than §§633a and 631(b), the provision that restricts the coverage of the ADEA to persons who are at least 40 years of age.  Respondent contends that recognizing federal-sector retaliation claims would be tantamount to making §623(d) applicable to federal-sector employers and would thus contravene §633a(f).

This argument is unsound because our holding that the ADEA prohibits retaliation against federal-sector employees is not in any way based on §623(d).  Our conclusion, instead, is based squarely on §633a(a) (2000 ed., Supp. V) itself, "unaffected by other sections" of the Act.  *Lehman, supra,* at 168.

### C

Respondent next advances a complicated argument concerning "[t]he history of congressional and executive branch responses to the problem of discrimination in federal employment." Brief for Respondent 27.  After Title VII was made applicable to federal employment in 1972, see Equal Employment Act, §11, 86 Stat. 111, the Civil Service Commission issued new regulations that prohibited discrimination in federal employment based on race, color, religion, sex, and national origin (but not age), see 5 CFR §713.211 (1973), as well as "reprisal[s]" prompted by complaints about such discrimination, §713.262(a).  When Congress enacted the ADEA's federal-sector provisions in 1974, respondent argues, Congress anticipated that the enactment of §633a would prompt the Civil Service Com-

---

discriminatory job notices and advertisements because §633a(a), unlike §623(e) (2000 ed.), fails to mention such practices expressly.

Opinion of the Court

mission to "extend its existing reprisal regulations" to
cover age discrimination complaints and that Congress
intended for the civil service process to provide the exclu-
sive avenue for asserting retaliation claims.  Brief for
Respondent 27, 33, and n. 7.  Respondent suggests that
Congress took this approach because it believed that the
Civil Service regulations "reflect[ed] a distinct set of public
policy concerns in the civil service sector."  *Id.*, at 27.

Respondent cites no direct evidence that Congress actu-
ally took this approach;[6] respondent's argument rests on
nothing more than unsupported speculation.  And, in any
event, respondent's argument contradicts itself.  If, as
respondent maintains, "[s]ection 633a(a) does not confer
an anti-retaliation right," *id.*, at 9, then there is no reason
to assume that Congress expected the Civil Service Com-
mission to respond to the enactment of §633a(a) by issuing
new regulations prohibiting retaliation.  On the contrary,
if, as respondent maintains, Congress had declined to
provide an antiretaliation right, then Congress presuma-
bly would have expected the Civil Service Commission to
abide by that policy choice.

---

[6]Respondent asks us to infer that §633a(a) (2000 ed., Sup. V) does not
proscribe retaliation because, when Congress made the ADEA applica-
ble to the Federal Government, Congress did not simply subject the
Federal Government to the ADEA's private-employment provisions by
amending the definition of "employer" to include the United States.
Respondent contends that a similar inference may be drawn from the
fact that in 1974 Congress added to the Fair Labor Standards Act of
1938 (FLSA) a provision specifically making it unlawful to retaliate
against an employee for attempting to vindicate FLSA rights.  See
§215(a)(3).  These arguments fail to appreciate the significance of
§633a(a)'s broad prohibition of "discrimination based on age."  Because
Congress had good reason to expect that this broad ban would be
interpreted in the same way that *Sullivan* v. *Little Hunting Park, Inc.*,
392 U. S. 657 (1968), had interpreted the broad ban on racial discrimi-
nation in 42 U. S. C. §1982, the inference that respondent asks us to
draw is unfounded.

Opinion of the Court

## D

Respondent's final argument is that principles of sovereign immunity "require that Section 633a(a) be read narrowly as prohibiting substantive age discrimination, but not retaliation." *Id.*, at 44. Respondent contends that the broad waiver of sovereign immunity in the Postal Reorganization Act, 39 U. S. C. §401(1), is beside the point for present purposes because, for many federal agencies, the only provision that waives sovereign immunity for ADEA claims is contained in §633a, and therefore this waiver provision "must be construed strictly in favor of the sovereign." Brief for Respondent 44 (quoting *United States* v. *Nordic Village, Inc.*, 503 U. S. 30, 34 (1992); internal quotation marks omitted).

Respondent is of course correct that "[a] waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text" and "will be strictly construed, in terms of its scope, in favor of the sovereign." *Lane* v. *Peña*, 518 U. S. 187, 192 (1996). But this rule of construction is satisfied here. Subsection (c) of §633a unequivocally waives sovereign immunity for a claim brought by "[a]ny person aggrieved" to remedy a violation of §633a. Unlike §663a(c), §633a(a) (2000 ed., Supp. V) is not a waiver of sovereign immunity; it is a substantive provision outlawing "discrimination." That the waiver in §633a(c) applies to §633a(a) claims does not mean that §633a(a) must surmount the same high hurdle as §633a(c). See *United States* v. *White Mountain Apache Tribe*, 537 U. S. 465, 472–473 (2003) (where one statutory provision unequivocally provides for a waiver of sovereign immunity to enforce a separate statutory provision, that latter provision "'need not . . . be construed in the manner appropriate to waivers of sovereign immunity'" (quoting *United States* v. *Mitchell*, 463 U. S. 206, 218–219 (1983))). But in any event, even if §633a(a) must be construed in the same manner as §633a(c), we hold, for the reasons

16                GOMEZ-PEREZ *v.* POTTER

Opinion of the Court

previously explained, that §633a(a) prohibits retaliation with the requisite clarity.

*        *        *

For these reasons, we hold that §633a(a) prohibits retaliation against a federal employee who complains of age discrimination. The judgment of the Court of Appeals is reversed, and this case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

ROBERTS, C. J., dissenting

# SUPREME COURT OF THE UNITED STATES

No. 06–1321

## MYRNA GOMEZ-PEREZ, PETITIONER v. JOHN E. POTTER, POSTMASTER GENERAL

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

[May 27, 2008]

CHIEF JUSTICE ROBERTS, with whom JUSTICE SCALIA and JUSTICE THOMAS join as to all but Part I, dissenting.

The Court today holds that the federal-sector provision of the Age Discrimination in Employment Act encompasses not only claims of age discrimination—which its language expressly provides—but also claims of retaliation for complaining about age discrimination—which its language does not. Protection against discrimination may include protection against retaliation for complaining about discrimination, but that is not always the case. The separate treatment of each in the private-sector provision of the ADEA makes that clear. In my view, the statutory language and structure, as well as the fact that Congress has always protected federal employees from retaliation through the established civil service process, confirm that Congress did not intend those employees to have a separate judicial remedy for retaliation under the ADEA. I respectfully dissent.

I

Congress enacted the Age Discrimination in Employment Act of 1967, 81 Stat. 602, which at the time applied only to private employers, with the purpose of "promot[ing] employment of older persons based on their ability rather than age; . . . [of] prohibit[ing] arbitrary age

GOMEZ-PEREZ *v.* POTTER

ROBERTS, C. J., dissenting

discrimination in employment; [and of] help[ing] employers and workers find ways of meeting problems arising from the impact of age on employment." 29 U. S. C. §621(b). The 1967 Act implemented this purpose in two principal ways. First, the statute made it unlawful for an employer to "discriminate against any individual . . . because of such individual's age." §623(a)(1). Second, Congress enacted a specific antiretaliation provision, which made it "unlawful for an employer to discriminate against any of his employees or applicants for employment . . . because such individual . . . has opposed any practice made unlawful by this section, or because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under" the ADEA. §623(d).

In the Fair Labor Standards Amendments of 1974 (FLSA Amendments), §28(b)(2), 88 Stat. 74, Congress (among other things) extended the ADEA to most Executive Branch employees by adopting 29 U. S. C. §633a. Like its private-sector counterpart, this federal-sector provision includes a ban on discrimination on the basis of age. Unlike its private-sector counterpart, the federal-sector provision does *not* include a separate ban on retaliation. The federal-sector provision specifies only that "[a]ll personnel actions affecting employees or applicants for employment who are at least 40 years of age [in various federal agencies] shall be made free from any discrimination based on age." §633a(a).

Despite the absence of an express retaliation provision in §633a(a), the Court finds that the statute encompasses both discrimination and retaliation claims. To support this proposition, the Court principally relies on our decisions in *Sullivan* v. *Little Hunting Park, Inc.*, 396 U. S. 229 (1969), and *Jackson* v. *Birmingham Bd. of Ed.*, 544 U. S. 167 (2005). In my view, the majority reads these cases for more than they are worth.

Cite as: 553 U. S. ____ (2008)    3

ROBERTS, C. J., dissenting

As the majority correctly states, we held in *Sullivan* that 42 U. S. C. §1982, which prohibits race discrimination in the sale or rental of property, also provides a cause of action for retaliation.[1] 396 U. S., at 237. More recently, we held in *Jackson* that Title IX of the Education Amendments of 1972, 86 Stat. 373—which provides in relevant part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance," 20 U. S. C. §1681(a)—encompasses claims of retaliation for complaints about sex discrimination. 544 U. S., at 173–174.

To the extent the majority takes from these precedents the principle that broad antidiscrimination provisions may also encompass an antiretaliation component, I do not disagree. That is why I am able to join today's opinion in *CBOCS West, Inc.* v. *Humphries, ante,* at 14 (holding that a retaliation claim is cognizable under 42 U. S. C. §1981). But it cannot be—contrary to the majority's apparent view—that *any* time Congress proscribes "discrimination based on X," it means to proscribe retaliation as well. That is clear from the private-sector provision of the ADEA, which includes a ban on "discriminat[ion] against any individual . . . because of such individual's age," 29 U. S. C. §623(a)(1), but *also* includes a separate (and presumably not superfluous) ban on retaliation, §623(d).

Indeed, we made this precise observation in *Jackson*

---

[1] To the extent there was any disagreement about whether *Sullivan* v. *Little Hunting Park, Inc.,* 396 U. S. 229 (1969), was really a retaliation case, or whether it dealt only with third-party standing, the view put forth by the Court won the day in *Jackson* v. *Birmingham Bd. of Ed.,* 544 U. S. 167 (2005). Compare *id.,* at 176, and n. 1, with *id.,* at 194 (THOMAS, J., dissenting). Whatever the merits of this disagreement, I accept *Jackson's* (and the Court's) interpretation as a matter of *stare decisis.* See *CBOCS West, Inc.* v. *Humphries, ante,* at 3.

itself. The respondent in that case argued that Title IX's ban on discrimination could not include a cause of action for retaliation because Title VII of the Civil Rights Act of 1964, like the private-sector provision of the ADEA, includes discrete discrimination and retaliation provisions. See 42 U. S. C. §§2000e–2 (discrimination), 2000e–3 (retaliation). We distinguished Title VII on the ground that "Title IX is a broadly written general prohibition on discrimination," while "Title VII spells out in greater detail the conduct that constitutes discrimination in violation of that statute." 544 U. S., at 175. Thus, while we distinguished Title VII from Title IX in *Jackson*, we also acknowledged that not every express ban on discrimination must be read as a ban on retaliation as well.

What is more, although the majority asserts that *Jackson* rejected the view that "a claim of retaliation is conceptually different from a claim of discrimination," *ante*, at 5, we have since explained that antidiscrimination and antiretaliation provisions are indeed conceptually distinct, and serve distinct purposes. In *Burlington N. & S. F. R. Co.* v. *White*, 548 U. S. 53 (2006), we considered whether the antiretaliation provision in the Title VII private-sector provision, 42 U. S. C. §2000e–3(a)—which is materially indistinguishable from that in the ADEA—applies "only [to] those employer actions and resulting harms that are related to employment or the workplace." 548 U. S., at 61. In answering that question in the negative, we explained:

> "The antidiscrimination provision seeks a workplace where individuals are not discriminated against because of their [protected] status. The antiretaliation provision seeks to secure that primary objective by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees. The substantive provision seeks to prevent injury to indi-

ROBERTS, C. J., dissenting

viduals based on who they are, *i.e.*, their status. The antiretaliation provision seeks to prevent harm to individuals based on what they do, *i.e.*, their conduct." *Id.*, at 63 (citation omitted).[2]

While I take from *Sullivan* and *Jackson* the proposition that broad bans on discrimination, standing alone, may be read to include a retaliation component, the provision at issue here does not stand alone. And, as *Jackson* itself makes clear, see 544 U. S., at 173, 175, "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis* v. *Michigan Dept. of Treasury*, 489 U. S. 803, 809 (1989). Here the text and structure of the statute, the broader statutory scheme of which it is a part, and distinctions between federal- and private-sector employment convince me that §633a(a) does not provide a cause of action for retaliation.

## II

We have explained that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello* v. *United States*, 464 U. S. 16, 23 (1983) (internal quotation marks omitted). If, as the majority holds, the ban on "discrimina-

---

[2] The Court views this discussion of *Burlington* as "[s]uggesting that [the Court has] retreated from the reasoning of *Sullivan* and *Jackson.*" *Ante*, at 5, n. 1. Not a bit. The discussion simply points out what *Burlington* plainly said: that there is a distinction between discrimination and retaliation claims. That does not mean Congress cannot address both in the same provision, as we held it did in *Sullivan* and *Jackson* and as we hold today it did in *CBOCS West, Inc.*, *ante*, at 14. But it does confirm that Congress may choose to separate the two, as the private-sector provision of the ADEA, as well as the portion of Title VII interpreted in *Burlington*, makes clear.

ROBERTS, C. J., dissenting

tion based on age" in §633a(a) encompasses both discrimi-
nation and retaliation claims, it is difficult to understand
why Congress would have felt the need to specify in §623
separate prohibitions against *both* "discriminat[ion]"
"because of [an] individual's age," *and* retaliation.

The majority responds by noting that "'[n]egative impli-
cations raised by disparate provisions are strongest' in
those instances in which the relevant statutory provisions
were 'considered simultaneously when the language rais-
ing the implication was inserted.'" *Ante*, at 10 (quoting
*Lindh* v. *Murphy*, 521 U. S. 320, 330 (1997)). Here, the
majority notes that §623 was enacted in 1967, while §633a
was not passed until 1974. *Ante*, at 10. Fair enough, but
while I do not quarrel with this principle as a general
matter, I do not think it does the work the majority thinks
it does. Congress obviously had the private-sector ADEA
provision prominently before it when it enacted §633a,
because the same bill that included §633a also amended
the private-sector provision. See, *e.g.,* §28(a)(2), 88 Stat.
74 (amending the definition of "employer" in 29 U. S. C.
§630(b) to include States and their political subdivisions).
Indeed, it is quite odd to assume, as the majority does, see
*ante*, at 9, 12, that the Congress that enacted §633a was
aware of and relied upon our decision in *Sullivan*—which
interpreted 42 U. S. C. §1982, a wholly unrelated provi-
sion—but was not attuned to its own work reflected in the
differences between 29 U. S. C. §§623 and 633a. Even if
the negative implication to be drawn from those differ-
ences may not be at its "strongest" under these circum-
stances, it is certainly strong enough.

Moreover, and more to the point, we have relied on the
differences in language between the federal- and private-
sector provisions of the ADEA specifically in our interpre-
tation of §633a. In *Lehman* v. *Nakshian*, 453 U. S. 156
(1981), we faced the question whether a person bringing
an action under §633a(c), alleging a violation of §633a(a),

ROBERTS, C. J., dissenting

was entitled to a trial by jury. In holding that there was no jury-trial right available against the Federal Government, we relied on the fact that while the ADEA's federal-sector provision did not include a provision for a jury trial, the analogous grant of a right of action in the private-sector provision, §626(c), "*expressly* provides for jury trials." *Id.,* at 162. We reasoned that "Congress accordingly demonstrated that it knew how to provide a statutory right to a jury trial when it wished to do so elsewhere in the very 'legislation cited.' . . . But in [§633a(c)] it failed explicitly to do so." *Ibid.* (quoting *Galloway* v. *United States,* 319 U. S. 372, 389 (1943)). So too here. "Congress . . . demonstrated that it knew how to" provide a retaliation cause of action "when it wished to do so elsewhere in the very 'legislation cited,'" but "failed explicitly to do so" in §633a(a).

The majority argues that this inference is weakened by the fact that, in "the private-sector provision, Congress set out a specific list of forbidden employer practices," *ante,* at 11, while §633a(a) is a "broad, general ban on 'discrimination based on age,'" *ante,* at 12. This point cuts against the majority. Section 623 drew a distinction between prohibited "employer practices" that discriminate based on age, and retaliation). See §§623(a) (discriminatory "[e]mployer practices"), 623(d) (retaliation). Section 633a(a) phrased the prohibited discrimination in terms of "personnel actions." Just as Congress did not regard retaliation as included within "employer practices," but dealt with it separately in §623(d), the counterpart to "employer practices" in §633a—discriminatory "personnel actions"—should similarly not be read to include retaliation.

The argument that some meaning ought to attach to Congress's inclusion of an antiretaliation provision in §623 but not in §633a is further supported by several other factors. To begin with, Congress *expressly* made clear that the ADEA's private-sector provisions should not apply to

8                   GOMEZ-PEREZ *v.* POTTER

ROBERTS, C. J., dissenting

their federal-sector counterpart, by providing that "[a]ny
personnel action . . . referred to in subsection (a) of this
section shall not be subject to, or affected by, any provision
of" the ADEA, except for one provision not relevant here.
§633a(f).    The majority sees no "merit in respondent's
reliance on 29 U. S. C. §633a(f)." *Ante*, at 13.   But again,
we relied on this very provision in *Lehman.*   We explained
that this subsection "clearly emphasize[s] that [§633a] was
self-contained and unaffected by other sections" of the
ADEA, 453 U. S., at 168, a fact that we used to support
our holding that the federal-sector provision does not
provide a right to a jury trial, even though the private-
sector provision does.   In short, Congress was aware that
there were significant differences between the private-
and federal-sector portions of the ADEA, and specified
that no part of the former should be understood to have
been implicitly imported into the latter.

Other actions Congress took at the same time that it
enacted §633a in 1974 further underscore the point that
Congress deliberately chose to exclude retaliation claims
from the ADEA's federal-sector provision.   The Fair Labor
Standards Amendments of 1974, as the Act's name sug-
gests, dealt for the most part not with the ADEA, but with
the Fair Labor Standards Act of 1938, extending that
statute's protections to federal employees.   See FLSA
Amendments, §6(a)(2), 88 Stat. 58.   In doing so, Congress
explicitly subjected federal employers to the FLSA's ex-
press antiretaliation provision, 29 U. S. C. §215(a)(3).
Congress did *not* similarly subject the Federal Govern-
ment to the express antiretaliation provision in the ADEA,
strongly suggesting that this was a conscious choice.

The majority responds that this "inference . . . is un-
founded" because "Congress had good reason to expect
that this broad ban would be interpreted in the same way
that *Sullivan* . . . had interpreted the broad ban on racial
discrimination in 42 U. S. C. §1982." *Ante*, at 14, n. 6.

ROBERTS, C. J., dissenting

Anything is possible, but again, it seems far more likely that Congress had its eye on the private-sector provision of the ADEA in crafting the federal one, rather than on one of our precedents on a different statute. See *supra*, at 6.

But whatever the merits of this argument, it does not rebut the import of other probative provisions of the FLSA Amendments. In particular, Congress specifically chose in the FLSA Amendments to treat States and the Federal Government differently with respect to the ADEA itself. It subjected the former to the ADEA's private-sector provision, see FLSA Amendments, §28(a)(2), 88 Stat. 74—including the express prohibition against retaliation in §623(d)—while creating §633a as a stand-alone prohibition against discrimination in federal employment, without an antiretaliation provision, see §28(b)(2), *ibid.* This decision evinces a deliberate legislative choice *not* to extend those portions of the ADEA's private-sector provisions that are not expressly included in §633a, as of course Congress specified in §633a(f).

Given all this, it seems safe to say that the text and structure of the statute strongly support the proposition that Congress did not intend to include a cause of action for retaliation against federal employees in §633a(a).

## III

But *why* would Congress allow retaliation suits against private-sector and state employers, but not against the Federal Government? The answer is that such retaliation was dealt with not through a judicial remedy, but rather the way retaliation in the federal workplace was typically addressed—through the established civil service system, with its comprehensive protection for Government workers. Congress was quite familiar with that detailed administrative system—one that already existed for most federal employees, but not for private ones. This approach, unlike the Court's, is consistent with the fact that

10          GOMEZ-PEREZ *v.* POTTER

ROBERTS, C. J., dissenting

Congress has recognized that regulation of the civil service is a complex issue, requiring "careful attention to conflicting policy considerations" and "balancing governmental efficiency and the rights of employees," *Bush* v. *Lucas,* 462 U. S. 367, 388, 389 (1983). The resulting system often requires remedies different from those found to be appropriate for the private sector (or even for the States).

A

Before Title VII was extended to federal employees in 1972, discrimination in federal employment on the basis of race, color, religion, sex, or national origin was prohibited by executive order. See Exec. Order No. 11478, 34 Fed. Reg. 12985 (1969). Civil service regulations implemented this policy by authorizing Executive Branch employees to bring administrative complaints for allegedly discriminatory acts, including "personnel action[s]," 5 CFR §§713.211, 713.214(a)(1)(i) (1972). These regulations further provided that such complainants, their representatives, and witnesses "shall be free from restraint, interference, coercion, discrimination, or reprisal" for their involvement in the complaint process. §§713.214(b) (complainants and representatives), 713.218(e) (witnesses).

The Civil Service Commission (CSC) promulgated a detailed scheme through which federal employees could vindicate these rights, including the express antiretaliation protections. More serious personnel actions, known as "adverse actions," could be challenged before the employing agency and appealed to the CSC, see §§713.219(a) and (b), 752.203, 771.202, 771.208, 771.222, while less serious personnel actions and "any [other] matter of concern or dissatisfaction" could be challenged under alternative procedures that were also appealable to the CSC, see §§713.217(b), 713.218, 713.219(a) and (c), 713.231(a), 771.302(a). Retaliation was proscribed in all events. See,

ROBERTS, C. J., dissenting

*e.g.*, §§713.219(a) and (c) (incorporating Part 771 antire-
taliation provisions to complaint procedures except certain
appeals to CSC); §§771.105(a)(1) and (b)(1), 771.211(e)
(antiretaliation provisions for CSC appeals).

In 1972, Congress applied Title VII to the federal-sector,
Equal Employment Opportunity Act of 1972 (EEO Act),
§11, 86 Stat. 111, mandating that "[a]ll personnel actions"
with respect to federal employees "shall be made free from
any discrimination based on race, color, religion, sex, or
national origin." 42 U. S. C. §2000e–16(a). Congress
empowered the CSC "to enforce the provisions of subsec-
tion (a) through appropriate remedies," and to "issue such
rules, regulations, orders and instructions as it deems
necessary and appropriate to carry out its responsibilities
under this section." §2000e–16(b).

Under this grant of authority, as well as its prior au-
thority under statute and executive order, the CSC revised
its regulations both "to implement the [EEO Act] and to
strengthen the system of complaint processing." 37 Fed.
Reg. 22717 (1972) (Part 713 Subpart B). As with its prior
system of administrative enforcement, the CSC distin-
guished between "complaints of discrimination on grounds
of race, color, religion, sex, or national origin," 5 CFR
§713.211 (1973), on the one hand, and charges by a "com-
plainant, his representative, or a witness who alleges
restraint, interference, coercion, discrimination, or repri-
sal in connection with the presentation of a complaint,"
§713.262(a), on the other. The regulations imposed upon
employing agencies the obligation of "timely investigation
and resolution of complaints including complaints of coer-
cion and reprisal," 37 Fed. Reg. 22717; see also 5 CFR
§713.220, and made clear the procedures for processing
retaliation claims, §§713.261, 713.262. The regulations
further mandated that the CSC "require the [employing]
agency to take whatever action is appropriate" with re-
spect to allegations of retaliation if the agency itself has

"not completed an appropriate inquiry," §713.262(b)(1).

Thus, leading up to the enactment of 29 U. S. C. §633a in 1974, the CSC's comprehensive regulatory scheme set forth a broadly applicable remedy for retaliation against federal employees for filing complaints or otherwise participating in the EEO process. And when Congress empowered the CSC in 1974 to "enforce the provisions of [§633a(a)] through appropriate remedies," and to "issue such rules, regulations, orders, and instructions as it deems necessary and appropriate to carry out its responsibilities" under that statute, §28(b)(2), 88 Stat. 75, the assumption that Congress expected the CSC to create an administrative antiretaliation remedy, just as it had for complaints of discrimination under Title VII, is compelling. And sure enough, the CSC did just that promptly after §633a was enacted. See 39 Fed. Reg. 24351 (1974); 5 CFR §713.511 (1975).

Given this history of addressing retaliation through administrative means, combined with the complicated nature (relative to the private sector) of federal personnel practices, it is therefore by no means anomalous that Congress would have dealt with the "primary objective" of combating age discrimination through a judicial remedy, *Burlington,* 548 U. S., at 63, but left it to expert administrators used to dealing with personnel matters in the federal work force to "secure that primary objective by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees," *ibid.*

                              B

The majority discounts the above argument as "unsupported speculation." *Ante,* at 14. It seems to me that the fact that the Executive Branch had always treated discrimination and retaliation as distinct, and that it enacted administrative remedies for retaliation almost immedi-

ROBERTS, C. J., dissenting

ately after the passage of the Title VII and ADEA federal-sector provisions, provide plenty of support.  But even if the majority is right, the view that Congress intended to treat retaliation for age discrimination complaints as a problem to be dealt with primarily through administrative procedures, rather than through the judicial process in the first instance, is confirmed by Congress's passage of the Civil Service Reform Act of 1978 (CSRA), 92 Stat. 1111.

The CSRA, as amended, has a detailed comprehensive antiretaliation provision, which generally makes it unlawful for Executive Branch employers to

> "take or fail to take, or threaten to take or fail to take, any personnel action against any employee or applicant for employment because of . . . (A) the exercise of any appeal, complaint, or grievance right granted by any law, rule, or regulation [or] (B) testifying for or otherwise lawfully assisting any individual in the exercise of any right referred to in subparagraph (A)." 5 U. S. C. §2302(b)(9).[3]

This antiretaliation provision, which plainly applies to retaliation for exercising rights under the civil rights statutes, including the ADEA, is supported by a host of administrative remedies.  If the alleged retaliation results in adverse actions such as removal, suspension for more than 14 days, or reduction in pay, see §7512, an appeal can be taken directly to the Merit Systems Protection Board (MSPB), §§7513(d), 7701, with judicial review in the United States Court of Appeals for the Federal Circuit,

---

[3]Neither 29 U. S. C. §633a nor the CSRA cover employees of Congress or of the Executive Office of the President and Executive Residence of the White House.  See §633a(a); 5 U. S. C. §2302(a)(2)(B).  But Congress has expressly extended the protections of the ADEA to such employees, 2 U. S. C. §1311(a)(2) (Congress); 3 U. S. C. §411(a)(2) (White House), and provided them with an express retaliation remedy, 2 U. S. C. §1317; 3 U. S. C. §417(a).

14           GOMEZ-PEREZ *v.* POTTER

ROBERTS, C. J., dissenting

§7703(b)(1). Retaliation claims based on less serious
allegations are first investigated by the Office of Special
Counsel. If the Office finds that there are reasonable
grounds supporting the retaliation charge, it must report
its determination to, and may seek corrective action from,
the MSPB. §§1214(a)(1)(A), (b)(2)(B), (C), and 1214(c).
Again, judicial review in the Federal Circuit is available.
§7703(b)(1). In all events, upon a finding that retaliation
has in fact occurred, the MSPB has the authority to order
corrective action, §§1214(b)(4), 7701(b)(2), to order attor-
ney's fees on appeal, §7701(g), and to discipline federal
employees responsible for retaliatory acts, §1215.[4]

To be sure, the CSRA was enacted after §633a. Never-
theless, we have explained, in the same context of federal
employee remedies, that the "classic judicial task of recon-
ciling many laws enacted over time, and getting them to
'make sense' in combination, necessarily assumes that the
implications of a statute may be altered by the implica-
tions of a later statute." *United States* v. *Fausto*, 484 U. S.
439, 453 (1988). That is precisely the situation here.

Indeed, this is particularly true with respect to Con-
gress's regulation of federal employment. We have ex-
plained that the CSRA is an "integrated scheme of admin-
istrative and judicial review, designed to balance the
legitimate interests of the various categories of federal
employees with the needs of sound and efficient admini-
stration." *Id.*, at 445. Perhaps the CSRA's "civil service
remedies [are] not as effective as an individual damages
remedy" that can be obtained in federal court, *Bush*, 462
U. S., at 372, or perhaps a quicker and more familiar
administrative remedy *is* more effective as a practical

---

[4] The Postal Service—Gomez-Perez's employer—operates under its
own personnel system. But the Postal Service's Employee and Labor
Relations Manual (ELM) prohibits "any action, event, or course of
conduct that . . . subjects any person to reprisal for prior involvement in
EEO activity." ELM §665.23, pp. 681–682 (June 2007).

ROBERTS, C. J., dissenting

matter. That is not the issue. Cf. *id.*, at 388 (the question
whether a judicial remedy against a federal employer for a
First Amendment violation should be implied "obviously
cannot be answered simply by noting that existing reme-
dies do not provide complete relief for the plaintiff"). The
CSRA establishes an "elaborate, comprehensive scheme
that encompasses substantive provisions forbidding
arbitrary action by supervisors and procedures—
administrative and judicial—by which improper action
may be redressed." *Id.*, at 385. Retaliation as a general
matter was already addressed for federal employees. I
would not read into §633a a judicial remedy for retaliation
when Congress—which has "developed considerable fa-
miliarity with balancing governmental efficiency and the
rights of employees," *id.*, at 389—chose to provide a de-
tailed administrative one.

                    *        *        *

The question whether a ban against "discrimination
based on" a protected status such as age can also be read
to encompass a ban on retaliation can be answered only
after careful scrutiny of the particular provision in ques-
tion. In this case, an analysis of the statutory language of
§633a and the broader scheme of which it is a part con-
firms that Congress did not intend implicitly to create a
judicial remedy for retaliation against federal employees,
when it did so expressly for private-sector employees.
Congress was not sloppy in creating this distinction; it did
so for good reason: because the federal workplace is gov-
erned by comprehensive regulation, of which Congress
was well aware, while the private sector is not.

For these reasons, I would affirm the judgment of the
Court of Appeals.

Cite as: 553 U. S. ____ (2008)    1

Thomas, J., dissenting

# SUPREME COURT OF THE UNITED STATES

No. 06–1321

## MYRNA GOMEZ-PEREZ, PETITIONER *v.* JOHN E. POTTER, POSTMASTER GENERAL

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

[May 27, 2008]

JUSTICE THOMAS, with whom JUSTICE SCALIA joins, dissenting.

I join all but Part I of THE CHIEF JUSTICE's dissent. I write separately to reiterate my view that *Jackson* v. *Birmingham Bd. of Ed.*, 544 U. S. 167 (2005), incorrectly conflated the concepts of retaliation and discrimination. The text of the federal-sector provision of the Age Discrimination in Employment Act of 1967 is clear: It prohibits only "discrimination based on age." 29 U. S. C. §633a(a) (2000 ed., Supp. V). If retaliation is not "discrimination on the basis of sex," *Jackson, supra,* at 185 (THOMAS, J., dissenting), or "discrimination based on race," *CBOCS West, Inc.* v. *Humphries, ante,* at 4 (THOMAS, J., dissenting), it is certainly not "discrimination based on age." Because §633a(a) provides no basis for implying a private right of action for retaliation claims, and its context only reaffirms its plain meaning, see *ante,* at 5–9 (opinion of ROBERTS, C. J.), I would affirm the judgment below.

# EXHIBIT B

(Slip Opinion)          OCTOBER TERM, 2007          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.*, 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CBOCS WEST, INC. *v.* HUMPHRIES

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 06–1431.  Argued February 20, 2008—Decided May 27, 2008

Claiming that petitioner CBOCS West, Inc., dismissed him because he is black and because he complained to managers that a black co-employee was also dismissed for race-based reasons, respondent Humphries filed suit charging that CBOCS' actions violated both Title VII of the Civil Rights Act of 1964 and 42 U. S. C. §1981, the latter of which gives "[a]ll persons . . . the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens."  The District Court dismissed the Title VII claims for failure to timely pay filing fees and granted CBOCS summary judgment on the §1981 claims. The Seventh Circuit affirmed on the direct discrimination claim, but remanded for a trial on Humphries' §1981 retaliation claim, rejecting CBOCS' argument that §1981 did not encompass such a claim.

*Held:* Section 1981 encompasses retaliation claims.  Pp. 2–14.

   (a) Because this conclusion rests in significant part upon *stare decisis* principles, the Court examines the pertinent interpretive history.  (1) In 1969, *Sullivan* v. *Little Hunting Park, Inc.*, 396 U. S. 229, 237, as later interpreted and relied on by *Jackson* v. *Birmingham Bd. of Ed.*, 544 U. S. 167, 176, recognized that retaliation actions are encompassed by 42 U. S. C. §1982, which provides that "[a]ll citizens . . . shall have the same right, . . . , as is enjoyed by white citizens . . . to inherit, purchase, lease, sell, hold, and convey real and personal property."  (2) This Court has long interpreted §§1981 and 1982 alike because they were enacted together, have common language, and serve the same purpose of providing black citizens the same legal rights as enjoyed by other citizens.  See, *e.g.*, *Runyon* v. *McCrary*, 427 U. S. 160, 183, 197, 190.  (3) In 1989, *Patterson* v. *McLean Credit Union*, 491 U. S. 164, 177, without mention of retaliation, narrowed §1981 by excluding from its scope conduct occurring after formation

2              CBOCS WEST, INC. *v.* HUMPHRIES

Syllabus

of the employment contract, where retaliation would most likely be found. Subsequently, Congress enacted the Civil Rights Act of 1991, which was designed to supersede *Patterson,* see *Jones* v. *R. R. Donnelley & Sons Co.,* 541 U. S. 369, 383, by explicitly defining §1981's scope to include post-contract-formation conduct, §1981(b). (4) Since 1991, the Federal Courts of Appeals have uniformly interpreted §1981 as encompassing retaliation actions. *Sullivan,* as interpreted by *Jackson,* as well as a long line of related cases where the Court construes §§1981 and 1982 similarly, lead to the conclusion that the view that §1981 encompasses retaliation claims is well embedded in the law. *Stare decisis* considerations strongly support the Court's adherence to that view. Such considerations impose a considerable burden on those who would seek a different interpretation that would necessarily unsettle many Court precedents. Pp. 2–8.

   (b) CBOCS' several arguments, taken separately or together, cannot justify a departure from this well-embedded interpretation of §1981. First, while CBOCS is correct that §1981's plain text does not expressly refer to retaliation, that alone is not sufficient to carry the day, given this Court's long recognition that §1982 provides protection against retaliation; *Jackson*'s recent holding that Title IX of the Education Amendments of 1972 includes an antiretaliation remedy, despite Title IX's failure to use the word "retaliation," 544 U. S., at 173–174, 176; and *Sullivan*'s refusal to embrace a similar argument, see 396 U. S., at 241. Second, contrary to CBOCS' assertion, Congress' failure to include an *explicit* antiretaliation provision in its 1991 amendment of §1981 does not demonstrate an intention not to cover retaliation, but is more plausibly explained by the fact that, given *Sullivan* and the new statutory language nullifying *Patterson,* there was no need to include explicit retaliation language. Third, the argument that applying §1981 to employment-related retaliation actions would create an overlap with Title VII, allegedly allowing a retaliation plaintiff to circumvent Title VII's detailed administrative and procedural mechanisms and thereby undermine their effectiveness, proves too much. Precisely the same kind of Title VII/§1981 "overlap" and potential circumvention exists in respect to employment-related direct discrimination, yet Congress explicitly and intentionally created that overlap, *Alexander* v. *Gardner-Denver Co.,* 415 U. S. 36, 48–49. Fourth, contrary to its arguments, CBOCS cannot find support in *Burlington N. & S. F. R. Co.* v. *White,* 548 U. S. 53, 63, and *Domino's Pizza, Inc.* v. *McDonald,* 546 U. S. 470. While *Burlington* distinguished discrimination based on status (*e.g.,* as women or black persons) from discrimination based on conduct (*e.g.,* whistleblowing that leads to retaliation), it did not suggest that Congress must separate the two in all events. Moreover, while *Domino's Pizza*

Syllabus

and other more recent cases may place greater emphasis on statutory language than did *Sullivan,* any arguable change in interpretive approach would not justify reexamination of well-established prior law under *stare decisis* principles. Pp. 9–14.

474 F. 3d 387, affirmed.

BREYER, J., delivered the opinion of the Court, in which ROBERTS, C. J., and STEVENS, KENNEDY, SOUTER, GINSBURG, and ALITO, JJ., joined. THOMAS, J., filed a dissenting opinion, in which SCALIA, J., joined.

Cite as: 553 U. S. ____ (2008)    1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 06–1431

### CBOCS WEST, INC., PETITIONER *v.* HEDRICK G. HUMPHRIES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[May 27, 2008]

JUSTICE BREYER delivered the opinion of the Court.

A longstanding civil rights law, first enacted just after the Civil War, provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." Rev. Stat. §1977, 42 U. S. C. §1981(a). The basic question before us is whether the provision encompasses a complaint of retaliation against a person who has complained about a violation of another person's contract-related "right." We conclude that it does.

I

The case before us arises out of a claim by respondent, Hedrick G. Humphries, a former assistant manager of a Cracker Barrel restaurant, that CBOCS West, Inc. (Cracker Barrel's owner) dismissed him (1) because of racial bias (Humphries is a black man) and (2) because he had complained to managers that a fellow assistant manager had dismissed another black employee, Venus Green, for race-based reasons. Humphries timely filed a charge with the Equal Employment Opportunity Commission

Opinion of the Court

(EEOC), pursuant to 42 U. S. C. §2000e–5, and received a "right to sue" letter. He then filed a complaint in Federal District Court charging that CBOCS' actions violated both Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. §2000e *et seq.*, and the older "equal contract rights" provision here at issue, §1981. The District Court dismissed Humphries' Title VII claims for failure to pay necessary filing fees on a timely basis. It then granted CBOCS' motion for summary judgment on Humphries' two §1981 claims. Humphries appealed.

The U. S. Court of Appeals for the Seventh Circuit ruled against Humphries and upheld the District Court's grant of summary judgment in respect to his direct discrimination claim. But it ruled in Humphries' favor and remanded for a trial in respect to his §1981 retaliation claim. In doing so, the Court of Appeals rejected CBOCS' argument that §1981 did not encompass a claim of retaliation. 474 F. 3d 387 (2007). CBOCS sought certiorari, asking us to consider this last-mentioned legal question. And we agreed to do so. See 551 U. S.___ (2007).

II

The question before us is whether §1981 encompasses retaliation claims. We conclude that it does. And because our conclusion rests in significant part upon principles of *stare decisis,* we begin by examining the pertinent interpretive history.

A

The Court first considered a comparable question in 1969, in *Sullivan* v. *Little Hunting Park, Inc.,* 396 U. S. 229. The case arose under 42 U. S. C. §1982, a statutory provision that Congress enacted just after the Civil War, along with §1981, to protect the rights of black citizens. The provision was similar to §1981 except that it focused, not upon rights to make and to enforce contracts, but

Opinion of the Court

rights related to the ownership of property. The statute provides that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." §1982.

Paul E. Sullivan, a white man, had rented his house to T. R. Freeman, Jr., a black man. He had also assigned Freeman a membership share in a corporation, which permitted the owner to use a private park that the corporation controlled. Because of Freeman's race, the corporation, Little Hunting Park, Inc., refused to approve the share assignment. And, when Sullivan protested, the association expelled Sullivan and took away his membership shares.

Sullivan sued Little Hunting Park, claiming that its actions violated §1982. The Court upheld Sullivan's claim. It found that the corporation's refusal "to approve the assignment of the membership share . . . was clearly an interference with Freeman's [the black lessee's] right to 'lease.'" 396 U. S., at 237. It added that Sullivan, the white lessor, "has standing to maintain this action," *ibid.*, because, as the Court had previously said, "the white owner is at times 'the only effective adversary' of the unlawful restrictive covenant." *Ibid.* (quoting *Barrows* v. *Jackson*, 346 U. S. 249 (1953)). The Court noted that to permit the corporation to punish Sullivan "for trying to vindicate the rights of minorities protected by §1982" would give "impetus to the perpetuation of racial restrictions on property." 396 U. S., at 237. And this Court has made clear that *Sullivan* stands for the proposition that §1982 encompasses retaliation claims. See *Jackson* v. *Birmingham Bd. of Ed.*, 544 U. S. 167, 176 (2005) ("[I]n *Sullivan* we interpreted a general prohibition on racial discrimination [in §1982] to cover retaliation against those who advocate the rights of groups protected by that prohibition").

While the *Sullivan* decision interpreted §1982, our
precedents have long construed §§1981 and 1982 simi-
larly. In *Runyon* v. *McCrary*, 427 U. S. 160, 173 (1976),
the Court considered whether §1981 prohibits private acts
of discrimination. Citing *Sullivan*, along with *Jones* v.
*Alfred H. Mayer Co.*, 392 U. S. 409 (1968) and *Tillman* v.
*Wheaton-Haven Recreation Assn., Inc.*, 410 U. S. 431
(1973), the Court reasoned that this case law "necessarily
requires the conclusion that §1981, like §1982, reaches
private conduct." 427 U. S., at 173. See also *id.*, at 187
(Powell, J., concurring) ("Although *[Sullivan* and *Jones]*
involved §1982, rather than §1981, I agree that their
considered holdings with respect to the purpose and mean-
ing of §1982 necessarily apply to both statutes in view of
their common derivation"); *id.*, at 190 (STEVENS, J., con-
curring) ("[I]t would be most incongruous to give those two
sections [§§1981 and 1982] a fundamentally different
construction"). See also *Shaare Tefila Congregation* v.
*Cobb*, 481 U. S. 615, 617–618 (1987) (applying to §1982
the discussion and holding of *Saint Francis College* v. *Al-
Khazraji*, 481 U. S. 604, 609–613 (1987), a case interpret-
ing §1981).

As indicated in *Runyon*, the Court has construed §§1981
and 1982 alike because it has recognized the sister stat-
utes' common language, origin, and purposes. Like §1981,
§1982 traces its origin to §1 of the Civil Rights Act of 1866,
14 Stat. 27. See *General Building Contractors Assn., Inc.*
v. *Pennsylvania*, 458 U. S. 375, 383–384 (1982) (noting
shared historical roots of the two provisions); *Tillman,
supra*, at 439–440 (same). Like §1981, §1982 represents
an immediately post-Civil War legislative effort to guaran-
tee the then newly freed slaves the same legal rights that
other citizens enjoy. See *General Building Contractors
Assn., supra*, at 388 (noting strong purposive connection
between the two provisions). Like §1981, §1982 uses
broad language that says "[a]ll citizens of the United

Opinion of the Court

States shall have the same right, in every State and Territory, as is enjoyed by white citizens . . . ." Compare §1981's language set forth above, *supra*, at 1. See *Jones*, *supra*, at 441, n. 78 (noting the close parallel language of the two provisions). Indeed, §1982 differs from §1981 only in that it refers, not to the "right . . . to make and enforce contracts," 42 U. S. C. §1981(a), but to the "right . . . to inherit, purchase, lease, sell, hold, and convey real and personal property," §1982.

In light of these precedents, it is not surprising that following *Sullivan*, federal appeals courts concluded, on the basis of *Sullivan* or its reasoning, that §1981 encompassed retaliation claims. See, *e.g., Choudhury* v. *Polytechnic Inst. of N. Y.*, 735 F. 2d 38, 42–43 (CA2 1984); *Goff* v. *Continental Oil Co.*, 678 F. 2d 593, 598–599 (CA5 1982), overruled, *Carter* v. *South Central Bell*, 912 F. 2d 832 (CA5 1990); *Winston* v. *Lear-Siegler, Inc.*, 558 F. 2d 1266, 1270 (CA6 1977).

B

In 1989, 20 years after *Sullivan*, this Court in *Patterson* v. *McLean Credit Union*, 491 U. S. 164, significantly limited the scope of §1981. The Court focused upon §1981's words "to make and enforce contracts" and interpreted the phrase narrowly. It wrote that the statutory phrase did not apply to "conduct by the employer *after the contract relation has been established*, including breach of the terms of the contract or imposition of discriminatory working conditions." *Id.,* at 177 (emphasis added). The Court added that the word "enforce" does not apply to post-contract-formation conduct unless the discrimination at issue *"infects the legal process* in ways that prevent one from enforcing contract rights." *Ibid.* (emphasis added). Thus §1981 did not encompass the claim of a black employee who charged that her employer had violated her employment contract by harassing her and failing to

6              CBOCS WEST, INC. *v.* HUMPHRIES

Opinion of the Court

promote her, all because of her race. *Ibid.*

Since victims of an employer's retaliation will often have opposed discriminatory conduct taking place *after* the formation of the employment contract, *Patterson's* holding, for a brief time, seems in practice to have foreclosed retaliation claims. With one exception, we have found no federal court of appeals decision between the time we decided *Patterson* and 1991 that permitted a §1981 retaliation claim to proceed. See, *e.g., Walker* v. *South Central Bell Tel. Co.*, 904 F. 2d 275, 276 (CA5 1990) *(per curiam); Overby* v. *Chevron USA, Inc.*, 884 F. 2d 470, 473 (CA9 1989); *Sherman* v. *Burke Contracting, Inc.*, 891 F. 2d 1527, 1534–1535 (CA11 1990) *(per curiam).* See also *Malhotra* v. *Cotter & Co.*, 885 F. 2d 1305, 1312–1314 (CA7 1989) (questioning without deciding the viability of retaliation claims under §1981 after *Patterson*). But see *Hicks* v. *Brown Group, Inc.*, 902 F. 2d 630, 635–638 (CA8 1990) (allowing a claim for discriminatory discharge to proceed under §1981), vacated and remanded, 499 U. S. 914 (1991) (ordering reconsideration in light of what became the Eighth Circuit's en banc opinion in *Taggart* v. *Jefferson Cty. Child Support Enforcement Unit*, 935 F. 2d 947 (1991), which held that racially discriminatory discharge claims under §1981 are barred).

In 1991, however, Congress weighed in on the matter. Congress passed the Civil Rights Act of 1991, §101, 105 Stat. 1071, with the design to supersede *Patterson. Jones* v. *R. R. Donnelley & Sons Co.*, 541 U. S. 369, 383 (2004). Insofar as is relevant here, the new law changed 42 U. S. C. §1981 by reenacting the former provision, designating it as §1981(a), and adding a new subsection, (b), which, says:

"'Make and enforce contracts' defined
"For purposes of this section, the term 'make and enforce contracts' includes the making, performance,

Opinion of the Court

modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

An accompanying Senate Report pointed out that the amendment superseded *Patterson* by adding a new subsection (b) that would "reaffirm that the right 'to make and enforce contracts' includes the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." S. Rep. No. 101–315, p. 6 (1990). Among other things, it would "ensure that Americans may not be harassed, *fired* or otherwise discriminated against in contracts because of their race." *Ibid.* (emphasis added). An accompanying House Report said that in "cutting back the scope of the rights to 'make' and 'enforce' contracts[,] *Patterson* . . . has been interpreted to eliminate retaliation claims that the courts had previously recognized under section 1981." H. R. Rep. No. 102–40, pt. 1, pp. 92–93, n. 92 (1991). It added that the protections that subsection (b) provided, in "the context of employment discrimination . . . would include, but not be limited to, claims of harassment, discharge, demotion, promotion, transfer, *retaliation*, and hiring." *Id.*, at 92 (emphasis added). It also said that the new law "would restore rights to sue for such retaliatory conduct." *Id.*, at 93, n. 92.

After enactment of the new law, the Federal Courts of Appeals again reached a broad consensus that §1981, as amended, encompasses retaliation claims. See, *e.g., Hawkins* v. *1115 Legal Serv. Care,* 163 F. 3d 684, 693 (CA2 1998); *Aleman* v. *Chugach Support Servs., Inc.,* 485 F. 3d 206, 213–214 (CA4 2007); *Foley* v. *University of Houston System,* 355 F. 3d 333, 338–339 (CA5 2003); *Johnson* v. *University of Cincinnati,* 215 F. 3d 561, 575–576 (CA6 2000); 474 F. 3d, at 403 (case below); *Manatt* v. *Bank of America, NA,* 339 F. 3d 792, 800–801, and n. 11 (CA9 2003); *Andrews* v. *Lakeshore Rehabilitation Hospital,* 140

F. 3d 1405, 1411–1413 (CA11 1998).

The upshot is this: (1) in 1969, *Sullivan*, as interpreted by *Jackson*, recognized that §1982 encompasses a retaliation action; (2) this Court has long interpreted §§1981 and 1982 alike; (3) in 1989, *Patterson*, without mention of retaliation, narrowed §1981 by excluding from its scope conduct, namely post-contract-formation conduct, where retaliation would most likely be found; but in 1991, Congress enacted legislation that superseded *Patterson* and explicitly defined the scope of §1981 to include post-contract-formation conduct; and (4) since 1991, the lower courts have uniformly interpreted §1981 as encompassing retaliation actions.

                                    C

   *Sullivan*, as interpreted and relied upon by *Jackson*, as well as the long line of related cases where we construe §§1981 and 1982 similarly, lead us to conclude that the view that §1981 encompasses retaliation claims is indeed well embedded in the law. That being so, considerations of *stare decisis* strongly support our adherence to that view. And those considerations impose a considerable burden upon those who would seek a different interpretation that would necessarily unsettle many Court precedents. See, *e.g.*, *Welch* v. *Texas Dept. of Highways and Public Transp.*, 483 U. S. 468, 494–495 (1987) (plurality opinion) (describing importance of *stare decisis*); *Patterson*, 491 U. S., at 172 (considerations of *stare decisis* "have special force in the area of statutory interpretation"); *John R. Sand & Gravel Co.* v. *United States*, 552 U. S. ___, ___ (2008) (slip op., at 8–9) (same).

                                   III

   In our view, CBOCS' several arguments, taken separately or together, cannot justify a departure from what we have just described as the well-embedded interpreta-

Opinion of the Court

tion of §1981. First, CBOCS points to the plain text of §1981—a text that says that "*[a]ll persons* . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by *white citizens.*" 42 U. S. C. §1981(a) (emphasis added). CBOCS adds that, insofar as Humphries complains of retaliation, he is complaining of a retaliatory action that the employer would have taken against him whether he was black or white, and there is no way to construe this text to cover that kind of deprivation. Thus the text's language, CBOCS concludes, simply "does not provide for a cause of action based on retaliation." Brief for Petitioner 8.

We agree with CBOCS that the statute's language does not expressly refer to the claim of an individual (black or white) who suffers retaliation because he has tried to help a different individual, suffering direct racial discrimination, secure his §1981 rights. But that fact alone is not sufficient to carry the day. After all, this Court has long held that the statutory text of §1981's sister statute, §1982, provides protection from retaliation for reasons related to the *enforcement* of the express statutory right. See *supra*, at 3.

Moreover, the Court has recently read another broadly worded civil rights statute, namely, Title IX of the Education Amendments of 1972, 86 Stat. 373, as amended, 20 U. S. C. §1681 *et seq.*, as including an antiretaliation remedy. In 2005 in *Jackson*, the Court considered whether statutory language prohibiting "discrimination [on the basis of sex] under any education program or activity receiving Federal financial assistance," §1681(a), encompassed claims of retaliation for complaints about sex discrimination. 544 U. S., at 173–174. Despite the fact that Title IX does not use the word "retaliation," the Court held in *Jackson* that the statute's language encompassed such a claim, in part because: (1) "Congress enacted Title IX just three years after *Sullivan* was decided"; (2) it is

"'realistic to presume that Congress was thoroughly famil-
iar'" with *Sullivan;* and (3) Congress consequently "'ex-
pected its enactment'" of Title IX "'to be interpreted in
conformity with'" *Sullivan. Jackson, supra,* at 176. The
Court in *Jackson* explicitly rejected the arguments the
dissent advances here—that *Sullivan* was merely a stand-
ing case, see *post,* at 8–11 (opinion of THOMAS, J.). Com-
pare *Jackson,* 544 U. S., at 176, n. 1 ("*Sullivan*'s holding
was not so limited. It plainly held that the white owner
could maintain his *own* private cause of action under
§1982 if he could show that he was 'punished for trying to
vindicate the rights of minorities'" (emphasis in original)),
with *id.,* at 194 (THOMAS, J., dissenting).

   Regardless, the linguistic argument that CBOCS makes
was apparent at the time the Court decided *Sullivan.* See
396 U. S., at 241 (Harlan, J., dissenting) (noting the con-
struction of §1982 in *Jones,* 392 U. S. 409 was "in no way
required by [the statute's] language,"—one of the bases of
Justice Harlan's dissent in *Jones*—and further contending
that the Court in *Sullivan* had gone "yet beyond" *Jones*).
And we believe it is too late in the day in effect to overturn
the holding in that case (nor does CBOCS ask us to do so)
on the basis of a linguistic argument that was apparent,
and which the Court did not embrace at that time.

   Second, CBOCS argues that Congress, in 1991 when it
reenacted §1981 with amendments, intended the reen-
acted statute *not* to cover retaliation. CBOCS rests this
conclusion primarily upon the fact that Congress *did not*
include an *explicit* antiretaliation provision or the word
"retaliation" in the new statutory language—although
Congress has included explicit antiretaliation language in
other civil rights statutes. See, *e.g.,* National Labor Rela-
tions Act, 29 U. S. C. §158(a)(4); Fair Labor Standards Act
of 1938, 29 U. S. C. §215(a)(3); Title VII of the Civil Rights
Act of 1964, 42 U. S. C. §2000e–3(a); Age Discrimination
in Employment Act of 1967, 29 U. S. C. §623(d); Ameri-

Opinion of the Court

cans with Disabilities Act of 1990, 42 U. S. C. §§12203(a)–
(b); Family and Medical Leave Act of 1993, 29 U. S. C.
§2615.

We believe, however, that the circumstances to which
CBOCS points find a far more plausible explanation in the
fact that, given *Sullivan* and the new statutory language
nullifying *Patterson,* there was no need for Congress to
include explicit language about retaliation. After all, the
1991 amendments themselves make clear that Congress
intended to supersede the result in *Patterson* and embrace
pre-*Patterson* law. And pre-*Patterson* law included *Sulli-
van.* See Part II, *supra.* Nothing in the statute's text or in
the surrounding circumstances suggests any congressional
effort to supersede *Sullivan* or the interpretation that
courts have subsequently given that case. To the contrary,
the amendments' history indicates that Congress intended
to restore that interpretation. See, *e.g.,* H. R. Rep. No.
102–40, at 92 (noting that §1981(b) in the "context of
employment discrimination . . . would include . . . claims of
. . . retaliation").

Third, CBOCS points out that §1981, if applied to em-
ployment-related retaliation actions, would overlap with
Title VII. It adds that Title VII requires that those who
invoke its remedial powers satisfy certain procedural and
administrative requirements that §1981 does not contain.
See, *e.g.,* 42 U. S. C. §2000e–5(e)(1) (charge of discrimina-
tion must be brought before EEOC within 180 days of the
discriminatory act); §2000e–5(f)(1) (suit must be filed
within 90 days of obtaining an EEOC right-to-sue letter).
And CBOCS says that permitting a §1981 retaliation
action would allow a retaliation plaintiff to circumvent
Title VII's "specific administrative and procedural mecha-
nisms," thereby undermining their effectiveness. Brief for
Petitioner 25.

This argument, however, proves too much. Precisely the
same kind of Title VII/§1981 "overlap" and potential cir-

cumvention exists in respect to employment-related direct
discrimination. Yet Congress explicitly created the over-
lap in respect to direct employment discrimination. Nor is
it obvious how we can interpret §1981 to avoid *employ-
ment*-related overlap without eviscerating §1981 in respect
to *non*-employment contracts where no such overlap
exists.

Regardless, we have previously acknowledged a "neces-
sary overlap" between Title VII and §1981. *Patterson*, 491
U. S., at 181. We have added that the "remedies available
under Title VII and under §1981, although related, and
although directed to most of the same ends, are separate,
distinct, and independent." *Johnson* v. *Railway Express
Agency, Inc.*, 421 U. S. 454, 461 (1975). We have pointed
out that Title VII provides important administrative
remedies and other benefits that §1981 lacks. See *id.*, at
457–458 (detailing the benefits of Title VII to those ag-
grieved by race-based employment discrimination). And
we have concluded that "Title VII was designed to sup-
plement, rather than supplant, existing laws and institu-
tions relating to employment discrimination." *Alexander*
v. *Gardner-Denver Co.*, 415 U. S. 36, 48–49 (1974). In a
word, we have previously held that the "overlap" reflects
congressional design. See *ibid.* We have no reason to
reach a different conclusion in this case.

Fourth, CBOCS says it finds support for its position in
two of our recent cases, *Burlington N. & S. F. R. Co.* v.
*White*, 548 U. S. 53 (2006), and *Domino's Pizza, Inc.* v.
*McDonald*, 546 U. S. 470 (2006). In *Burlington*, a Title
VII case, we distinguished between discrimination that
harms individuals because of "who they are, *i.e.*, their
status," for example, as women or as black persons, and
discrimination that harms "individuals based on what
they do, *i.e.*, their conduct," for example, whistle-blowing
that leads to retaliation. 548 U. S., at 63. CBOCS says
that we should draw a similar distinction here and

Opinion of the Court

conclude that §1981 only encompasses status-based discrimination. In *Burlington*, however, we used the status/conduct distinction to help explain why Congress might have wanted its explicit Title VII antiretaliation provision to sweep more broadly (*i.e.*, to include conduct *outside* the workplace) than its substantive Title VII (status-based) antidiscrimination provision. *Burlington* did not suggest that Congress must separate the two in all events.

The dissent argues that the distinction made in *Burlington* is meaningful here because it purportedly "underscores the fact that status-based discrimination and conduct-based retaliation are distinct harms that call for tailored legislative treatment." *Post*, at 5. The Court's construction of a general ban on discrimination such as that contained in §1981 to cover retaliation claims, the dissent continues, would somehow render the separate antiretaliation provisions in other statutes "superfluous." *Ibid.* But the Court in *Burlington* did not find that Title VII's antiretaliation provision was redundant; it found that the provision had a broader reach than the statute's substantive provision. And in any case, we have held that "legislative enactments in this area have long evinced a general intent to accord parallel or overlapping remedies against discrimination." *Alexander, supra*, at 47. See *Great American Fed. Sav. & Loan Assn.* v. *Novotny*, 442 U. S. 366, 377 (1979) ("[S]ubstantive rights conferred in the 19th century [civil rights acts] were not withdrawn, *sub silentio*, by the subsequent passage of the modern statutes"). Accordingly, the Court has accepted overlap between a number of civil rights statutes. See *ibid.* (discussing interrelation of fair housing provisions of the Civil Rights Act of 1968 and §1982; between §1981 and Title VII). See also *supra*, at 11–12 (any overlap in reach between §1981 and Title VII, the statute at issue in *Burlington*, is by congressional design).

14          CBOCS WEST, INC. *v.* HUMPHRIES

Opinion of the Court

CBOCS highlights the second case, *Domino's Pizza*, along with *Patterson*, and cites *Cort* v. *Ash*, 422 U. S. 66 (1975) and *Rodriguez* v. *United States*, 480 U. S. 522 (1987) *(per curiam)*, to show that this Court now follows an approach to statutory interpretation that emphasizes text. And that newer approach, CBOCS claims, should lead us to revisit the holding in *Sullivan*, an older case, where the Court placed less weight upon the textual language itself. But even were we to posit for argument's sake that changes in interpretive approach take place from time to time, we could not agree that the existence of such a change would justify reexamination of well-established prior law. Principles of *stare decisis,* after all, demand respect for precedent whether judicial methods of interpretation change or stay the same. Were that not so, those principles would fail to achieve the legal stability that they seek and upon which the rule of law depends. See, *e.g., John R. Sand & Gravel Co.,* 552 U. S., at ___ (slip op., at 8–9).

IV

We conclude that considerations of *stare decisis* strongly support our adherence to *Sullivan* and the long line of related cases where we interpret §§1981 and 1982 similarly. CBOCS' arguments do not convince us to the contrary. We consequently hold that 42 U. S. C. §1981 encompasses claims of retaliation. The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

THOMAS, J., dissenting

# SUPREME COURT OF THE UNITED STATES

No. 06–1431

## CBOCS WEST, INC., PETITIONER *v.* HEDRICK G. HUMPHRIES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[May 27, 2008]

JUSTICE THOMAS, with whom JUSTICE SCALIA joins, dissenting.

The Court holds that the private right of action it has implied under Rev. Stat. §1977, 42 U. S. C. §1981, encompasses claims of retaliation. Because the Court's holding has no basis in the text of §1981 and is not justified by principles of *stare decisis,* I respectfully dissent.

I

It is unexceptional in our case law that "'[s]tatutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.'" *Engine Mfrs. Assn.* v. *South Coast Air Quality Management Dist.,* 541 U. S. 246, 252 (2004) (quoting *Park 'N Fly, Inc.* v. *Dollar Park & Fly, Inc.,* 469 U. S. 189, 194 (1985)). Today, that rule is honored in the breach: The Court's analysis of the statutory text does not appear until Part III of its opinion, and then only as a potential reason to depart from the interpretation the Court has already concluded, on other grounds, must "carry the day." *Ante,* at 9. Unlike the Court, I think it best to begin, as we usually do, with the text of the statute. Section 1981(a) provides:

"All persons within the jurisdiction of the United

2                  CBOCS WEST, INC. *v.* HUMPHRIES

Thomas, J., dissenting

States shall have the same right in every State and
Territory to make and enforce contracts, to sue, be
parties, give evidence, and to the full and equal bene-
fit of all laws and proceedings for the security of per-
sons and property as is enjoyed by white citizens, and
shall be subject to like punishment, pains, penalties,
taxes, licenses, and exactions of every kind, and to no
other."

Section 1981(a) thus guarantees "[a]ll persons ... the
same right ... to make and enforce contracts ... as is
enjoyed by white citizens." It is difficult to see where one
finds a cause of action for retaliation in this language. On
its face, §1981(a) is a straightforward ban on racial dis-
crimination in the making and enforcement of contracts.
Not surprisingly, that is how the Court has always con-
strued it. See, *e.g.*, *Domino's Pizza, Inc.* v. *McDonald*, 546
U. S. 470, 476 (2006) ("Section 1981 offers relief when
racial discrimination blocks the creation of a contractual
relationship, as well as when racial discrimination impairs
an existing contractual relationship"); *Patterson* v.
*McLean Credit Union*, 491 U. S. 164, 171 (1989) ("[Section]
1981 'prohibits racial discrimination in the making and
enforcement of private contracts'" (quoting *Runyon* v.
*McCrary*, 427 U. S. 160, 168 (1976))); *Johnson* v. *Railway
Express Agency, Inc.*, 421 U. S. 454, 459 (1975) (Section
1981 "on its face relates primarily to racial discrimination
in the making and enforcement of contracts").

Respondent nonetheless contends that "[t]he terms of
section 1981 are significantly different, and broader, than
a simple prohibition against discrimination." Brief for
Respondent 15. It is true that §1981(a), which was en-
acted shortly after the Civil War, does not use the modern
statutory formulation prohibiting "discrimination on the
basis of race." But that is the clear import of its terms.
Contrary to respondent's contention, nothing in §1981

THOMAS, J., dissenting

evinces a "concer[n] with protecting individuals 'based on what they do,'" as opposed to "'prevent[ing] injury to individuals based on who they are.'" *Ibid.* (quoting *Burlington N. & S. F. R. Co.* v. *White*, 548 U. S. 53, 63 (2006)). Nor does §1981 "affirmatively guarante[e]" freestanding "rights to engage in particular conduct." Brief for Respondent 16. Rather, §1981 is an *equal-rights* provision. See *Georgia* v. *Rachel*, 384 U. S. 780, 791 (1966) ("Congress intended to protect a limited category of rights, specifically defined in terms of racial equality"). The statute assumes that "white citizens" enjoy certain rights and requires that those rights be extended equally to "[a]ll persons," regardless of their race. That is to say, it prohibits discrimination based on race.[1]

---

[1] The United States, appearing as *amicus curiae* in support of respondent, contends that §1981 prohibits not only racial discrimination, but also any other kind of "discrimination" that "impair[s]" the rights guaranteed by §1981(a). Brief for United States 17. In support of this argument, the United States points to §1981(c), which provides that "[t]he rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law." Thus, the argument goes, retaliation is prohibited because it is discrimination (differential treatment for those who complain) and it impairs the right granted in §1981(a) to be free from racial discrimination in the making and enforcement of contracts (by penalizing assertion of that right).

Although I commend the United States for at least attempting to ground its position in the statutory text, its argument is unconvincing. Section 1981(c) simply codifies the Court's holding in *Runyon* v. *McCrary*, 427 U. S. 160 (1976), that §1981 applies to private, as well as governmental, discrimination. Nothing in §1981(c) indicates that Congress otherwise intended to expand the scope of §1981. To the contrary, §1981(c) refers to "[t]he rights protected by this section," *i.e.*, the rights enumerated in §1981(a) to make and enforce contracts on the same terms as white citizens. Moreover, the word "discrimination" in §1981(c) does not refer to "all discrimination," as the United States would have it. See Brief for United States as *Amicus Curiae* 16, n. 4. Rather, it refers back to the type of discrimination prohibited by §1981(a), *i.e.*, discrimination based on race. Thus, §1981 is violated

4                CBOCS WEST, INC. *v.* HUMPHRIES

THOMAS, J., dissenting

Retaliation is not discrimination based on race. When an individual is subjected to reprisal because he has complained about racial discrimination, the injury he suffers is not on account of his *race;* rather, it is the result of his *conduct.* The Court recognized this commonsense distinction just two years ago in *Burlington* when it explained that Title VII's antidiscrimination provision "seeks to prevent injury to individuals based on who they are, *i.e.,* their status," whereas its "antiretaliation provision seeks to prevent harm to individuals based on what they do, *i.e.,* their conduct." 548 U. S., at 63. This distinction is sound, and it reflects the fact that a claim of retaliation is both logically and factually distinct from a claim of discrimination—logically because retaliation based on conduct and discrimination based on status are mutually exclusive categories, and factually because a claim of retaliation does not depend on proof that any status-based discrimination actually occurred. Consider, for example, an employer who fires any employee who complains of race discrimination, regardless of the employee's race. Such an employer is undoubtedly guilty of retaliation, but he has not discriminated on the basis of anyone's race. Because the employer treats all employees—black and white—the same, he does not deny any employee "the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens."[2]

---

only when racial discrimination impairs the right to make and enforce contracts.

[2] Of course, if an employer had a *different* retaliation policy for blacks and whites—firing black employees who complain of race discrimination but not firing similarly situated white employees—a black employee who was fired for complaining of race discrimination would have a promising §1981 claim. But his claim would not sound in retaliation; rather, it would be a straightforward claim of racial discrimination. In his briefs before this Court, respondent attempts to shoehorn his claim into this category, asserting that petitioner "retaliated against [him] because he was a black worker who exercised his right" to lodge a

THOMAS, J., dissenting

The Court apparently believes that the status/conduct distinction is not relevant here because this case, unlike *Burlington*, does not require us to determine whether §1981's supposed prohibition on retaliation "sweep[s] more broadly" than its antidiscrimination prohibition. *Ante*, at 13. That is nonsense. Although, as the Court notes, we used the status/conduct distinction in *Burlington* to explain why Title VII's antiretaliation provision must sweep more broadly than its antidiscrimination provision in order to achieve its purpose, 548 U. S., at 63–64, it does not follow that the distinction between status and conduct is irrelevant here. To the contrary, *Burlington* underscores the fact that status-based discrimination and conduct-based retaliation are distinct harms that call for tailored legislative treatment. That is why Congress, in Title VII and a host of other statutes, has enacted separate provisions prohibiting discrimination and retaliation. See Brief for Petitioner 17–18 (citing statutes); see also *ante*, at 10–11 (same). Construing a general ban on discrimination such as that contained in §1981 to cover retaliation would render these separate antiretaliation provisions superfluous, contrary to the normal rules of statutory interpretation.

Of course, this is not the first time I have made these

---

grievance under petitioner's open-door policy. Brief for Respondent 27; see also *id.*, at 33 ("[S]ection 1981 forbids an employer from having one dismissal policy for blacks who complain about race discrimination, and another for whites who complain about such discrimination"). But respondent cites no record evidence to support his assertion that petitioner treated him differently than it would have treated a similarly situated white complainant. And while the Court of Appeals found that respondent had established a prima facie case of retaliation, 474 F. 3d 387, 406–407 (CA7 2007), it did not identify any evidence that would permit a jury to conclude that the alleged retaliation was race based. Indeed, the Court of Appeals held that respondent had "waived . . . his discrimination claim by devoting only a skeletal argument [to it] in response to [petitioner's] motion for summary judgment." *Id.*, at 407.

points. Three Terms ago in *Jackson* v. *Birmingham Bd. of Ed.*, 544 U. S. 167 (2005), the Court held that Title IX of the Education Amendments of 1972, 20 U. S. C. §1681 *et seq.*, which prohibits recipients of federal education funding from discriminating "on the basis of sex," §1681(a), affords an implied cause of action for retaliation against those who complain of sex discrimination. In so doing, the Court disregarded the fundamental distinction between status-based discrimination and conduct-based retaliation, asserting that retaliation against those who complain of sex discrimination "is discrimination 'on the basis of sex' because it is an intentional response to the nature of the complaint: an allegation of sex discrimination." 544 U. S., at 174. But as I explained in my dissenting opinion in *Jackson*, "the sex-based topic of the complaint cannot overcome the fact that the retaliation is not based on anyone's sex, much less the complainer's sex." *Id.*, at 188.

Likewise here, the race-based topic of the complaint cannot overcome the fact that the retaliation is not based on anyone's race. To hold otherwise would be to ignore the fact that "protection from retaliation is separate from direct protection of the primary right [against discrimination] and serves as a prophylactic measure to guard the primary right." *Id.*, at 189; see also *Burlington, supra*, at 63 (explaining that Title VII's "antidiscrimination provision seeks a workplace where individuals are not discriminated against because of their racial, ethnic, religious, or gender-based status," whereas its "antiretaliation provision seeks to secure that primary objective by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees"). In other words, "[t]o describe retaliation as discrimination on the basis of [race] is to conflate the enforcement mechanism with the right itself, something for which the statute's text provides no warrant." *Jackson, supra*, at 189 (THOMAS, J., dissenting).

Cite as: 553 U. S. ____ (2008)          7

THOMAS, J., dissenting

Notably, the Court does not repeat *Jackson*'s textual analysis in this case, perhaps because no amount of repetition could make it any more plausible today than it was three years ago. Instead, the Court acknowledges that "the statute's language does not expressly refer to the claim of an individual (black or white) who suffers retaliation." *Ante*, at 9. The Court concludes, however, that the statute's failure expressly to provide a cause of action for retaliation "is not sufficient to carry the day," *ibid.*, despite our usual rule that "affirmative evidence of congressional intent must be provided for an implied remedy . . . for without such intent the essential predicate for implication of a private remedy simply does not exist," *Alexander* v. *Sandoval*, 532 U. S. 275, 293, n. 8 (2001) (internal quotation marks and emphasis deleted); see also *id.*, at 286–287 (emphasizing that, absent evidence of Congress' intent to create a cause of action, the "cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute").

Section 1981's silence regarding retaliation is not dispositive, the Court says, because "it is too late in the day" to resort to "a linguistic argument" that was supposedly rejected in *Sullivan* v. *Little Hunting Park, Inc.*, 396 U. S. 229 (1969). *Ante*, at 10. As I explain below, the Court's reliance on *Sullivan* is entirely misplaced. But it also bears emphasis that the Court does not even purport to identify any basis in the statutory text for the "well-embedded interpretation of §1981," *ante,* at 8–9, it adopts for the first time today. Unlike the Court, I find the statute's text dispositive. Because §1981 by its terms prohibits only discrimination based on race, and because retaliation is not discrimination based on race, §1981 does not provide an implied cause of action for retaliation.

THOMAS, J., dissenting

## II

Unable to justify its holding as a matter of statutory interpretation, the Court today retreats behind the figleaf of ersatz *stare decisis.* The Court's invocation of *stare decisis* appears to rest on three considerations: (1) *Sullivan*'s purported recognition of a cause of action for retaliation under §1982; (2) *Jackson*'s (re)interpretation of *Sullivan;* and (3) the Courts of Appeals' view that §1981 provides a cause of action for retaliation. None of these considerations, separately or together, justifies implying a cause of action that Congress did not include in the statute. And none can conceal the irony in the Court's novel use of *stare decisis* to decide a question of first impression.

I turn first to *Sullivan,* as it bears most of the weight in the Court's analysis. As I explained in my dissent in *Jackson, Sullivan* did not "hol[d] that a general prohibition against discrimination permitted a claim of retaliation," but rather "that a white lessor had standing to assert the right of a black lessee to be free from racial discrimination." 544 U. S., at 194. Thus, "[t]o make out his third-party claim on behalf of the black lessee, the white lessor would necessarily be required to demonstrate that the defendant had discriminated against the black lessee on the basis of race." *Ibid.* Here, by contrast, respondent "need not show that the [race] discrimination forming the basis of his complaints actually occurred." *Ibid.* Accordingly, as it did in *Jackson,* the Court "creates an entirely new cause of action for a secondary rights holder, beyond the claim of the original rights holder, and well beyond *Sullivan.*" *Id.,* at 194–195.

Having reexamined *Sullivan,* I remain convinced that it was a third-party standing case. Sullivan did not argue that his expulsion from the corporation—as opposed to the corporation's refusal to approve the assignment—violated §1982. Instead, he argued that his expulsion was "contrary to public policy" because it was the "direct result of

THOMAS, J., dissenting

his having dealt with Freeman, as the statute requires, on a non-discriminatory basis." Brief for Petitioners in *Sullivan* v. *Little Hunting Park, Inc.*, O. T. 1969, No. 33, p. 32. Sullivan further contended not that his own rights under §1982 had been violated, but that he "ha[d] standing to rely on the rights of the Negro, Freeman," since he was best situated to vindicate those rights.[3] *Id.*, at 33; see also Pet. for Cert. in *Sullivan* v. *Little Hunting Park, Inc.*, O. T. 1969, No. 33, p. 17, n. 13 ("Although the statute declares the rights of Negroes not to be discriminated against, Sullivan, a Caucasian, has standing to rely on the invasion of the rights of others, since he is the only effective adversary capable of vindicating them in litigation arising from his expulsion" (internal quotation marks omitted)). Similarly, the United States, appearing as *amicus curiae* in support of Sullivan, argued that because "the private action involved in refusing to honor the assignment was itself illegal," "relief should be available to all persons injured by it, or as a consequence of their efforts to resist it." Brief for United States, O. T. 1969, No. 33, p. 34.

Thus, both Sullivan and the United States argued that Sullivan had standing to seek relief for injuries he suffered as a result of the corporation's violation of Freeman's rights—not that Sullivan's own rights under §1982 were violated. And that is the best interpretation of what the

---

[3] In contrast to his argument based on §1982, which he consistently tied to the violation of Freeman's rights, Sullivan also argued that his *own* First Amendment rights were violated:

"Since Sullivan's expulsion was in retaliation for his having obeyed the dictate of the law the expulsion was against public policy, and he should be reinstated. For the law to sanction punishment of a person such as Sullivan for refusing to discriminate against Negroes would be to render nugatory *the rights guaranteed to Negroes* by 42 U. S. C. §§1981, 1982 . . . . Furthermore, by giving sanction to Sullivan's expulsion, the state court deprived Sullivan of *his rights*, guaranteed by the First Amendment to criticize the conduct of the association's directors." Brief for Petitioners, O. T. 1969, No. 33, p. 14 (emphasis added).

Thomas, J., dissenting

Court subsequently held. Tracking the parties' arguments, the Court first concluded that that the corporation's "refus[al] to approve the assignment of the membership share . . . was clearly an interference with Freeman's right to 'lease'" under §1982. 396 U. S., at 237. Only then did it conclude—based on *Barrows* v. *Jackson*, 346 U. S. 249 (1953), a third-party standing case in which another white litigant was permitted to "rely on the invasion of the rights of others," *id.*, at 255—that Sullivan "ha[d] standing to maintain this action." *Sullivan*, 396 U. S., at 237. The word "retaliation" does not appear in the Court's opinion. Nor is there any suggestion that Sullivan would have had "standing" absent the violation of Freeman's rights.

Of course, *Sullivan* is not a model of clarity, and Justice Harlan, writing in dissent, was correct to criticize the "undiscriminating manner" in which the Court dealt with Sullivan's claims. *Id.*, at 251. Sullivan had sought relief both for the corporation's refusal to approve the assignment and for his expulsion. *Id.*, at 253. But in stating that Sullivan had standing to maintain "this action," *id.*, at 237, the Court did not specify what relief Sullivan was entitled to pursue on remand. Lamenting the Court's "failure to provide any guidance as to the legal standards that should govern Sullivan's right to recovery on remand," *id.*, at 252 (dissenting opinion), Justice Harlan provided an instructive summary of the ambiguities in the Court's opinion:

"One can imagine a variety of standards, each based on different legal conclusions as to the 'rights' and 'duties' created by §1982, and each having very different remedial consequences. For example, does §1982 give Sullivan a right to relief only for injuries resulting from Little Hunting Park's interference with *his* statutory duty to Freeman under §1982? If so, what is Sullivan's duty to Freeman under §1982? Unless

THOMAS, J., dissenting

§1982 is read to impose a duty on Sullivan to *protest* Freeman's exclusion, he would be entitled to reinstatement under this standard only if the Board had expelled him for the simple act of assigning his share to Freeman.

"As an alternative, Sullivan might be thought to be entitled to relief from those injuries that flowed from the Board's violation of *its* 'duty' to Freeman under §1982. Such a standard might suggest that Sullivan is entitled to damages that resulted from Little Hunting Park's initial refusal to accept the assignment to Freeman but again not to reinstatement. Or does the Court think that §1982 gives Sullivan a right to relief from injuries that result from his 'legitimate' protest aimed at convincing the Board to accept Freeman?" *Id.*, at 254–255.

It is noteworthy that of the three possible standards Justice Harlan outlined, the first two clearly depend on a showing that Freeman's §1982 rights were violated. Only the third—"Or does the Court think that §1982 gives Sullivan a right to relief from injuries that result from his 'legitimate' protest"—resembles a traditional retaliation claim and, in context, even it is probably best read to presuppose that Sullivan was protesting an actual violation of Freeman's rights. *Id.*, at 255. Which, if any, of these standards the Court had in mind is anybody's guess. It did not say.

I thus adhere to my view that *Sullivan* is best read as a third-party standing case. That is how the parties argued the case, and that is the most natural reading of the Court's opinion. But even if *Sullivan* could fairly be read as having inferred a freestanding cause of action for retaliation—which I doubt it can, at least not without superimposing an anachronistic outlook on a Court that was not as familiar with retaliation claims as we are today—the

Court's one-paragraph discussion of the issue was, at best, both cursory and ambiguous. This is hardly the stuff of which *stare decisis* is made.

Steadfastly refusing to acknowledge any ambiguity, the Court asserts that it is "not surprising that following *Sullivan*, federal appeals courts concluded, on the basis of *Sullivan* or its reasoning, that §1981 encompassed retaliation claims." *Ante*, at 5. But given *Sullivan*'s use of the word "standing" and its reliance on a third-party standing case, what is unsurprising is that each of the cases the Court cites either characterized the issue as one of standing, *Winston* v. *Lear-Siegler, Inc.*, 558 F. 2d 1266, 1270 (CA6 1977) (characterizing the issue as "whether or not the white plaintiff in this action has standing to sue his former employer under 42 U. S. C. §1981 for discharging him in alleged retaliation for plaintiff's protesting the alleged discriminatory firing of a black co-worker"), or recognized that it was taking a step beyond *Sullivan* in inferring a cause of action for retaliation, *Choudhury* v. *Polytechnic Inst. of N. Y.*, 735 F. 2d 38, 42 (CA2 1984) (stating that the Second Circuit "ha[d] never decided whether §1981 creates a cause of action for retaliation," even though it had previously held, based on *Sullivan*, "that a white person who claimed to have suffered reprisals as a result of his efforts to vindicate the rights of non-whites had standing to sue under §1981"); *Goff* v. *Continental Oil Co.*, 678 F. 2d 593, 598, n. 7 (CA5 1982) (recognizing that *Sullivan* and a previous Fifth Circuit decision relying on *Sullivan* were "essentially standing cases holding that white people can assert civil rights claims when they are harmed by someone's discrimination against blacks," which is distinct from holding that "a particular type of conduct—retaliation for the filing of a §1981 law suit—is actionable in the first place").

Moreover, even if *Sullivan* had squarely and unambiguously held that §1982 provides an implied cause of action

THOMAS, J., dissenting

for retaliation, it would have been wrong to do so because §1982, like §1981, prohibits only discrimination based on race, and retaliation is not discrimination based on race.[4] The question, then, would be whether to extend *Sullivan*'s erroneous interpretation of §1982 to §1981. The Court treats this as a foregone conclusion because "our precedents have long construed §§1981 and 1982 similarly." *Ante*, at 4. But erroneous precedents need not be extended to their logical end, even when dealing with related provisions that normally would be interpreted in lockstep.[5]

---

[4] The majority claims that *Sullivan* "did not embrace" this "linguistic argument." *Ante*, at 10. That is because the argument was not before the Court. The corporation did not argue that §1982's text could not reasonably be construed to create a cause of action for retaliation; nor did Justice Harlan in dissent. No one made this argument because that was not how the issue was framed, either by Sullivan or by the Court. The majority suggests that the argument was "apparent at the time the Court decided *Sullivan*." *Ibid.* But the only evidence it cites is Justice Harlan's observation that the Court's holding in *Jones* v. *Alfred H. Mayer Co.*, 392 U. S. 409 (1968), that §1982 prohibits private as well as governmental discrimination was "in no way required by [§1982's] language." *Sullivan*, 396 U. S., at 241. I fail to see how that observation—or Justice Harlan's further observation that the Court in *Sullivan* had gone "yet beyond *Jones*," *ibid.*—shows that the Court considered and rejected the entirely different argument that §1982's text does not provide a cause of action for retaliation.

[5] For example, we have refused to extend the holding of *J. I. Case Co.* v. *Borak*, 377 U. S. 426 (1964), which inferred a private right of action for violations of §14(a) of the Securities Exchange Act of 1934, to other sections of the Act. *Borak* applied the understanding—later abandoned in *Cort* v. *Ash*, 422 U. S. 66, 78 (1975)—that "it is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose" expressed by a statute. 377 U. S., at 433. As Chief Judge Easterbrook explained in dissent below, the analogy to the present case is obvious:

"The argument goes that, because *Sullivan* ignored the language of §1982 and drafted an 'improved' version of the statute, we are free to do the same today for §1981, its neighbor. The Supreme Court requires us to proceed otherwise. *Borak* dealt with §14(a) of the Securities Exchange Act of 1934, 15 U. S. C. §78n(a). It was as freewheeling in

14            CBOCS WEST, INC. *v.* HUMPHRIES

Otherwise, *stare decisis*, designed to be a principle of stability and repose, would become a vehicle of change whereby an error in one area metastasizes into others, thereby distorting the law. Two wrongs do not make a right, and an aesthetic preference for symmetry should not prevent us from recognizing the true meaning of an Act of Congress.

The Court's remaining reasons for invoking *stare decisis* require little discussion. First, the Court relies on the fact that *Jackson* interpreted *Sullivan* as having recognized a cause of action for retaliation under §1982. See *ante,* at 3, 9–10. That is true but irrelevant. It was only through loose language and creative use of brackets that *Jackson* was able to assert that *Sullivan* "upheld Sullivan's cause of action under 42 U. S. C. §1982 for '[retaliation] for the advocacy of [the black person's] cause.'" 544 U. S., at 176 (quoting *Sullivan,* 396 U. S., at 237; brackets in original). Of course, *Sullivan* did not use the word "retaliation," did not say anything about a "cause of action," and did not state that Sullivan had rights under §1982. It most certainly did not "interpre[t] a general prohibition on racial discrimination to cover retaliation against those who advocate the rights of groups protected by that prohibition." *Jackson,* 544 U. S., at 176. *Jackson*'s assertion that

_____

'interpreting' that law as *Sullivan* was with §1982. Yet the Court has held that the change of interpretive method announced in *Cort* applies to all other sections of the Securities Exchange Act. See *Piper v. Chris-Craft Industries, Inc.,* 430 U. S. 1 (1977) (§14(e)); *Touche Ross & Co. v. Redington,* 442 U. S. 560 (1979) (§17(a)). *Borak* and similar decisions from the 1960s have not been overruled, but we have been told in no uncertain terms that they must not be extended. Indeed, in *Virginia Bankshares, Inc. v. Sandberg,* 501 U. S. 1083 (1991), the Court declined to apply *Borak* to a portion of §14(a) that had not been involved in *Borak.* So that case has been limited to a single sentence of one subsection. Why, then, may the method of *Sullivan* be applied to other sections of the Civil Rights Act of 1866 despite intervening precedent?" 474 F. 3d, at 410–411 (citations omitted).

THOMAS, J., dissenting

*Sullivan* "plainly held that the white owner could maintain his *own* private cause of action under §1982," *id.*, at 176, n. 1, misses the point entirely. While *Sullivan* held that "the white owner" had standing to maintain his own *suit*, it said nothing to suggest that he could sue to vindicate his own *right* to be free from retaliation under §1982. Rather, as I have explained, Sullivan's "standing" was derivative of the violation of Freeman's rights. In short, *Jackson*'s characterization of *Sullivan* was erroneous, and I am aware of no principle of *stare decisis* that requires us to give decisive weight to a precedent's erroneous characterization of another precedent—particularly where, as here, the cases involved different statutes, neither of which was the statute at issue in the case at bar.

Second, the Court appears to give weight to the fact that, since Congress passed the Civil Rights Act of 1991, §101, 105 Stat. 1071, "the lower courts have uniformly interpreted §1981 as encompassing retaliation actions." *Ante*, at 8. This rationale fares no better than the others. The Court has never suggested that rejection of a view uniformly held by the courts of appeals violates some principle of *stare decisis*. To the contrary, we have not hesitated to take a different view if convinced the lower courts were wrong. Indeed, it has become something of a dissenter's tactic to point out that the Court has decided a question differently than every court of appeals to have considered it. See, *e.g., McConnell* v. *Federal Election Comm'n*, 540 U. S. 93, 278, n. 11 (2003) (THOMAS, J., concurring in part, concurring in result in part, concurring in judgment in part, and dissenting in part); *Buckhannon Board & Care Home, Inc.* v. *West Virginia Dept. of Health and Human Resources*, 532 U. S. 598, 643 (2001) (GINSBURG, J., dissenting); *Sandoval*, 532 U. S., at 294 (STEVENS, J., dissenting); *Jones* v. *United States*, 526 U. S. 227, 254 (1999) (KENNEDY, J., dissenting); *McNally* v. *United States*, 483 U. S. 350, 365 (1987) (STEVENS, J.,

THOMAS, J., dissenting

dissenting). The Court does not explain what makes this particular line of lower court authority any more sacrosanct than those we have rejected in the past.

Of course, lower court decisions may be persuasive, and when the Court rejects the unanimous position of the courts of appeals, it is fair to point out that fact. But the point has traction only to the extent it tends to show that the Court's reasoning is flawed on the merits, as demonstrated by the number of judges who have reached the opposite conclusion. See, *e.g., Buckhannon, supra,* at 643–644 (GINSBURG, J., dissenting) ("When this Court rejects the considered judgment prevailing in the Circuits, respect for our colleagues demands a cogent explanation"). Unlike decisions of this Court, decisions of the courts of appeals, even when unanimous, do not carry *stare decisis* weight, nor do they relieve us of our obligation independently to decide the merits of the question presented. That is why, when we have affirmed a view unanimously held by the courts of appeals, we have done so (at least until today) not because we gave precedential weight to the lower courts' decisions, but because we agreed with their resolution of the question on the merits. See, *e.g., Gonzalez v. Crosby,* 545 U. S. 524, 531 (2005) ("Virtually every Court of Appeals to consider the question has held that such a pleading . . . is in substance a successive habeas petition . . . . We think those holdings are correct"); *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U. S. 350, 362 (1991) ("Thus, we agree with every Court of Appeals that has been called upon to apply a federal statute of limitations to a §10(b) claim").

III

As in *Jackson,* "[t]he question before us is only whether [§1981] prohibits retaliation, not whether prohibiting it is good policy." 544 U. S., at 195 (THOMAS, J., dissenting). "By crafting its own additional enforcement mechanism,

THOMAS, J., dissenting

the majority returns this Court to the days in which it created remedies out of whole cloth to effectuate its vision of congressional purpose." *Ibid.* That the Court does so under the guise of *stare decisis* does not make its decision any more justifiable. Because the text of §1981 provides no basis for implying a private right of action for retaliation, and because no decision of this Court holds to the contrary, I would reverse the judgment below.