IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

EDITH CHOMA,                            :
                                        :
          Plaintiff,                    :
                                        : Civil Action No. 06-486-JJF
                                        :
          v.                            :
                                        :
BLUE CROSS BLUE SHIELD of DELAWARE,:
                                        :
          Defendant.                    :

---

Herbert M. Mondros, Esquire, of MARGOLIS EDELSTEIN, Wilmington, Delaware.

Attorney for Plaintiff.

Scott A. Holt, Esquire and Adria B. Martinelli, Esquire, of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware.

Attorney for Defendant.

---

**MEMORANDUM OPINION**

September 18, 2008
Wilmington, Delaware

**Farnan, District Judge.**

Presently before the Court are Defendant's Motion Summary Judgment (D.I. 51), Plaintiff's Motion for Partial Summary Judgment (D.I. 52) and Plaintiff's Motion for Leave to File a Sur-Reply in Opposition to BCBSD's Motion for Summary Judgment (D.I. 70) filed by Plaintiff. For the reasons stated, the Court will (1) grant in part and deny in part Defendant's Motion for Summary Judgment (D.I. 51); (2) grant and consider Plaintiff's Motion for Leave to File a Sur-Reply in Opposition to BCBSD's Motion for Summary Judgment (D.I. 70); and (3) deny Plaintiff's Motion for Partial Summary Judgment (D.I. 52).

## Nature and State of the Proceedings

On August 7, 2006, Plaintiff Edith Choma ("Choma") filed a complaint against her former employer, Defendant Blue Cross Blue Shield of Delaware ("BCBSD"), asserting claims of age discrimination under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq. ("ADEA"), and 19 Del. C. § 711 (2006), disability discrimination under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, et seq. ("ADA") and 19 Del. C. §§ 723, 724 and 726 (2006), retaliation, and breach of the implied covenant of good faith and fair dealing.

Both parties have filed motions for summary judgment. BCBSD has filed for summary judgment on all of Choma's claims. (D.I. 51.) BCBSD contends that: (1) Choma's age discrimination claim should be dismissed because allegations based on her 1999

1

performance review are time-barred, her reassignment did not
constitute adverse employment action, and Choma has no evidence
that BCBSD's stated reasons for reassigning her were pretextual;
(2) Choma's disability discrimination claim should be dismissed
because she cannot establish that she is "disabled" under the
ADA, or that BCBSD failed to engage in an interactive process to
accommodate her disability; and Choma has no evidence that
BCBSD's stated reasons for reassigning her were a pretext for
disability discrimination; (3) Choma's retaliation claim should
be dismissed because she has not met her burden to prove the
prima facie elements of retaliation, and cannot establish that
BCBSD's reasons for its decisions were pretextual; (4) Choma
cannot establish constructive discharge; and (5) Choma's implied
covenant claim should be dismissed because it is barred by the
exclusivity provision of the Delaware's Discrimination in
Employment Act.

        Choma has filed for partial summary judgment, contending
that she is entitled to judgment as a matter of law on her
disability discrimination and retaliation claims. (D.I. 52.)
Choma has also filed a Motion for Leave to File a Sur-Reply in
Opposition to BCBSD's Motion for Summary Judgment. (D.I. 70.)
Finally, Choma does not contest summary judgment as to Count IX
of her Complaint, alleging Breach of the Implied Covenant of Good
Faith and Fair Dealing.

## Factual Background

Choma began working for BCBSD in 1989.  (D.I. 56 at A149.)

In 1995, she was diagnosed with Meniere's Disease, an inner ear

disease that causes hearing loss and vertigo. (D.I. 53, Exh. 2.)

In 1999, Dr. Paul Kaplan ("Kaplan") assumed the role of Acting

Medical Director for the Medical Management Division.[1] (D.I. 56

at A380-383.)  Kaplan was tasked with obtaining National

Committee for Quality Assurance ("NCQA") accreditation for BCBSD,

the equivalent of the Good Housekeeping Seal of Approval for a

health care insurer.

## I.    1999-2002: Choma Reports to Kaplan

Choma was assigned to Kaplan in 1999 as his administrative

assistant.  The Medical Management Division advises subscribers

when their health insurance claims are denied.  Choma's

responsibilities included typing letters to providers denying

their claims, providing administrative support for Kaplan related

to the NCQA process, scheduling meetings and teleconferences,

preparing files and reports, processing time sheets and

transcribing Kaplan's dictation.[2] (D.I. 54 at 4.)  Choma also

provided administrative support for other employees in the

_____

[1]Kaplan suffered a serious head injury in 1996 that forced
him to retire as a practicing physician. (D.I. 53, Kaplan Dep.
33-42.)

[2] "Transcription" was not listed in Choma's written job
description provided by BCBSD, but Choma testified in deposition
that transcription of dictation was one of her essential
functions.   (D.I. 56 at A151, A162-63, A187-88.)

3

Medical Management Division. (Id.)

According to Kaplan, Choma took too much time to accomplish tasks and lacked organization. (D.I. 54 at 5.) Also, Choma struggled with transcribing dictation as a result of her Meniere's Disease, and she advised Kaplan of this fact. (D.I. 66 at 2.) In July 1999, Kaplan gave Choma her first performance review, noting where Choma was not meeting his expectations, including transcription, and giving her an overall evaluation score of 2.69 (5 being the highest score Choma could have received). (D.I. 54 at 5.) Choma was unhappy with her review, because she felt that Kaplan did not understand the amount of work she completed for other employees of the Medical Management Division. (D.I. 54 at 5.) Choma confronted Kaplan about her review, and testified that Kaplan made several inappropriate statements to Choma during this meeting, including, "I don't like the way you lift up your glasses to look at the screen;" "Maybe its your thyroid;" "I don't think blood is getting to your brain;" and "You know the saying 'Kick the dog'? That's why I treat you the way I do."³ (D.I. 66 at 3.)

Choma contacted BCBSD Human Resources about her review and subsequent meeting with Kaplan. (D.I. 66 at 3.) The director of Human Resources, Vicki Sessoms, met with Kaplan and informed him that he should revise Choma's performance review. (D.I. 66 at 3.) Kaplan revised Choma's review, giving her a score of 3.48,

---

³Kaplan denies making these statement. (D.I. 66 at 3.)

which resulted in a 3.9 percent increase in pay. (D.I. 54 at 6.) Choma also received an increase in grade, and an accompanying one percent increase in salary, as compensation for her work with other directors. (Id.) As a result of Choma's increased grade, Kaplan sent her a memo on March 3, 2000 that detailed his increased performance expectations. (D.I. 54 at 7.)

Kaplan's performance reviews for Choma in 2000 and 2001 acknowledged that she was trying harder at her job. Kaplan testified that during this time period he was "very pleased that she was trying hard" (D.I. 56 at A392.) Choma testified that she was satisfied with her evaluations, and that she and Kaplan were working more efficiently together. (D.I. 56 at A178-79.) Kaplan remained dissatisfied with Choma's transcription abilities, however, which he noted in her 2000 performance review, and her speed and organization skills. Kaplan asked Choma if there was any accommodation BCBSD could make that would help her perform her job, but Choma stated that there was nothing that could be done to help her better hear Kaplan's dictation. (D.I. 56 at A187.) The two agreed that Choma would attempt to transcribe as best she could, and Kaplan would later fill in those sections Choma was unable to understand. (D.I. 65 at B131.)[4] To further compensate for her difficulties with transcription, Choma would turn up the volume of the dictation tape, and ask other employees

_____

[4]Kaplan testified, however, that this arrangement was not satisfactory to him. (D.I. 65 at B131.)

for assistance. (D.I. 56 at A183.)

During this time period, at a meeting with other BCBSD managers, Kaplan stated that he wanted to get rid of Choma because she could not hear.[5] (D.I.66 at 4.) In late-May and early-June 2002, Choma asked to attend a financial planning seminar, and Kaplan withheld approval until he determined whether the department was backed up with work. (D.I. 54 at 8-9.) Choma did not check back with Kaplan to see if she could attend. (Id.) Choma also contends that on one occasion, Kaplan spoke harshly to her regarding completion of benefit paperwork. (D.I. 54 at 9.)

## II. 2002 - 2004: Kaplan Reassigns Choma to Sweeney

The Medical Management Division increased in size, and, in 2002, division members were relocated to accommodate this growth. (D.I. 54 at 9.) At this time, Kaplan reassigned primary responsibility for the NCQA accreditation process to the new Director of Quality Improvement, Debby Sweeney ("Sweeney"). (D.I. 54 at 9-10) Kaplan reassigned Choma to support Sweeney. (D.I. 54 at 10.) Kaplan assigned another administrative assistant, Patricia Carpenter ("Carpenter), to support him. (Id.) After the reassignment, Choma reported to Sweeney, who reported to Kaplan. (D.I. 66 at 5.) Human Resources informed Choma that the reassignment had no effect on her status as an

---

[5]The record is unclear as to whether Kaplan stated that he wanted to get rid of Choma because she could not hear, or if he stated that he wanted to get rid of Choma because she made mistakes because she could not hear.

6

administrative assistant or her compensation.  (D.I. 54 at 10.)
As a result of her reassignment, Choma was moved to a smaller
cubicle in "deplorable" condition.[6]  (D.I. 66 at 5.)  Choma viewed
her reassignment as a demotion, and filed charges of age and
disability discrimination with the EEOC and the Delaware
Department of Labor ("DDOL").  (D.I. 66 at 5; D.I. 54 at 11.)

        Initially, Sweeney did not assign Choma much work, and Choma
continued to perform transcription duties for Kaplan associated
with the NCQA process.[7]  Sweeney stated that she noticed Choma was
away from her desk for long periods of time.  On one occasion,
when Choma returned late from lunch with four other co-workers,
Sweeney publically admonished her.  (D.I. 66 at 6.)  The other
workers were not admonished because they were salaried employees.
(D.I. 54 at 12.)  Under BCBSD's policy, all overtime worked must
be approved in advice by the employee's supervisor.  Sweeney
often denied Choma's requests to work overtime hours.  (D.I. 54
at 13.)  In 2004, Choma's doctor's appointments increased in
number, and Choma contends that Sweeney required her to use PTO
time for these appointments, instead of allowing her to make up
the time.  (D.I. 54 at 14.)

---

[6]Two months later, BCBSD refurbished Choma's cubicle and she
received new furniture.  (D.I. 54 at 11.)

[7]Choma continued to transcribe Kaplan's dictation until she
left BCBSD in November 2004 because Kaplan considered this "an
NCQA function."  (D.I. 56 at A414.)

7

Choma's received a score of 3 (out of 5) on her 2003 performance review, and Sweeney noted that Choma had done a better job of adhering to BCBSD's standards regarding lunch times, and that Choma had shown greater initiative in 2003. (D.I. 54 at 14.) Sweeney also pointed out areas of improvement, and stated in the review that Choma would begin assisting Carpenter in sending denial and approval letters.[8] (D.I. 54 at 14.) While Carpenter was on vacation in July 2004, Choma was assigned to complete the letters. (D.I. 54 at 16.) When Carpenter returned from vacation, many of the letters assigned to Choma had not been competed, and those that were completed contained errors. (D.I. 54 at 16.)

Sweeney determined that Carpenter needed assistance in completing the letters, and divided responsibility for them between Choma and Carpenter. (D.I. 54 at 16; D.I. 66 at 6.) On August 20, 2004, Choma broke her wrist on her right (primary) hand. (Id.) She returned to work on August 23, 2004 wearing a soft cast. (D.I. 54 at 16.) Sweeney suggested Choma consider applying for short-term disability, but Choma stated she preferred to work. (Id. at 17.) Sweeney then suggested that Choma perform tasks that required only one hand, like distributing mail and making photocopies. (Id.) Choma stated that she preferred to remain seated so that she could keep her

---

[8]"Denial letters" are letters from BCBSD informing members or providers that their claim has been denied in whole or in part. (D.I. 54 at 15.) If a provider or member appealed this denial, BCBSD would send an "appeal letter" in response. (Id.)

8

wrist elevated. (Id.) Sweeney timed Choma to assess the rate at which she was typing the letters, and informed Choma that she was not typing quickly enough. (D.I. 66 at 6.) Attempting to complete the letters, Choma worked through lunch, and was reminded by Sweeney that this was contrary to BCBSD policy. Choma then informed Sweeney that she had worked unauthorized overtime in July 2004 during Carpenter's vacation. (Id.) Choma was unable to complete the batch of letters Sweeney assigned to her by the end of the day. (D.I. 54 at 17.)

On August 24, 2004, Sweeney revised Choma's duties to limit her to copying, sorting and distributing mail. (Id.) On August 25, 2007, Choma's doctor issued a note indicating that she could not perform work duties that involved her right arm, and Choma was subsequently placed on short-term disability leave. (Id.) When Choma returned from leave, Sweeney began formally tracking Choma's progress with the letters, and requested that Carpenter and Choma both monitor how long it took to complete each letter, as well as their error rates. (Id. at 18.) Choma's letter production and accuracy rates were below Carpenter's. (Id.) Sweeney contacted BCBSD Human Resources for assistance in developing a Performance Improvement Plan ("PIP") to improve Choma's performance, and she met with Donna May ("May"), of Human Resources, several times to develop the PIP. (Id.) Choma stated that she discovered that Sweeney was drafting the PIP because Sweeney had posted the document to her calendar, which Choma

9

accessed as her administrative assistant. (D.I. 56 at A279-82.)

On October 22, 2004. Choma again filed charges with the DDOL against BCBSD, alleging retaliation and discrimination. (D.I. 66 at 6; D.I. 56 at 19.) Choma alleged that, on or about October 22, 2004, Sweeney shook her finger in Choma's face and told her she was not typing the letters fast enough, and that she needed to follow directions. (D.I. 56 at A361.) The following week, Choma emailed Susan Slaysman of Human Resources ("Slaysman") that she was going to retire on January 3, 2005, so that she would receive her 2004 incentive bonus. She further stated that she had no option but to retire because she felt she was being harassed. (D.I. 55 at A95.) May investigated Choma's harassment allegation, and spoke with Sweeney about Choma's allegations. (D.I. 54 at 19.) May informed Sweeney that Choma had filed a previous discrimination charge in November 2002. (Id.) After investigating, May concluded there was no basis for Choma's claims. (D.I. 55 at A96.)

On October 29, 2004, Sweeney and May met with Choma to administer the PIP, which implemented performance objectives for processing the letters, obtaining approval for overtime, adhering to lunch breaks and confirming hours worked. (D.I. 54 at 19.) Choma was required to email Sweeney upon arrival, before and after leaving for lunch, and when she departed for the evening. (D.I. 66 at 7.) On November 1, 2004, the day after BCBSD implemented the PIP, Choma arrived at work, and emailed Sweeney

that she had arrived at 7:50 a.m.  Sweeney received the email at
7:56 a.m., and responded, asking Choma what she had done "between
7:50 and 7:56."  (D.I. 55 at A104.)  Choma worked one more day
and then took a medical leave of absence. (D.I. 56 at A307.)  She
officially retired on February 1, 2005.  (D.I. 56 at A308.) Choma
was 65 when she retired, and received her full pension and
retiree health benefits from BCBSD.  (D.I. 56 at A271-72.)

## Legal Standard

In pertinent part, Rule 56(c) of the Federal Rules of Civil
Procedure provides that a party is entitled to summary judgment
if a court determines from its examination of "the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any," that there are no genuine
issues of material fact and that the moving party is entitled to
judgment as a matter of law.  Fed. R. Civ. P. 56(c).   In
determining whether there is a triable dispute of material fact,
a court must review all of the evidence and construe all
inferences in the light most favorable to the non-moving party.
Valhal Corp. v. Sullivan Assocs., Inc., 44 F.3d 195, 200 (3d Cir.
1995).

However, a court should not make credibility determinations
or weigh the evidence.  Reeves v. Sanderson Plumbing Prods.,
Inc., 530 U.S. 133, 150 (2000).  To properly consider all of the
evidence without making credibility determinations or weighing
the evidence, a "court should give credence to the evidence

11

favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." Id. at 151 (internal citations omitted).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts. . . . In the language of the Rule, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)(internal citations omitted). However, the mere existence of some evidence in support of the non-movant will not be sufficient to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Thus, if the evidence is "merely colorable, or is not significantly probative," summary judgment may be granted. Id.

## Age Discrimination Claim

### I.    Parties' Contentions

BCBSD contends that Choma's age discrimination claim should be dismissed because her claim that her 1999 performance review was discriminatory is time-barred. BCBSD also contends that Choma cannot establish a prima facie case of discrimination, and, even if she could, cannot point to evidence sufficient for a

reasonable fact-finder to reasonably infer that BCBSD's reasons for her reassignment were a pretext for discrimination.

Choma contends that the 1999 performance review is not time-barred because it was part of a continuing violation. Choma further contends that she has proven her prima facie case of discrimination, and has set forth sufficient evidence to compel a jury that BCBSD's articulated reasons for her reassignment were a pretext for discrimination.

## II.  Discussion

### A.  Allegations Based On The 1999 Performance Review Are Time-Barred.

Choma filed her first charge of discrimination with the DDOL and EEOC in November 2002, and alleged, among other facts that she had been given a discriminatory performance review by Kaplan in July 1999. BCBSD contends that allegations with respect to the 1999 evaluation are time-barred, since Choma was required to file a discrimination charge within 300 days of the occurrence of an alleged unlawful employment practice.  BCBSD contends that the 1999 performance review was a discrete act, and that discrete discriminatory acts are not actionable if time barred, even when related to acts alleged in timely filed charges.

In response, Choma contends that her 2002 charges cited discrimination beyond the 1999 review, and her age discrimination charge here encompasses BCBSD's conduct in demoting and harassing Choma, and forcing her to retire.  Choma also contends that the 1999 review marked the beginning of Kaplan's and BCBSD's

13

persecution of Choma on age and disability grounds, since Kaplan was unhappy that Choma complained to Human Resources, and that he was forced to amend his original review. Choma thus contends that the 1999 evaluation was part of a continuing violation.

In National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002), the Supreme Court stated that discrete discriminatory acts are identifiable when they occur, and thus are "not actionable if time barred, even when they are related to acts alleged in timely filed charges." Courts have held that a performance review is a discrete discriminatory act. See, e.g., Lewis v. Norfolk Southern Corp., 271 F. Supp. 2d 807, 813 (E.D. Va. 2003). Choma testified in deposition that she thought the 1999 review was discriminatory at the time she received it, which is why she complained to Human Resources. However, she failed to file charges, despite her belief that the review was discriminatory.

Choma's position that the 1999 review is part of a continuous violation is weakened by the fact that she admitted in deposition that she and Kaplan worked more efficiently together following her 1999 review. (D.I. at A229, A178-79.) While Choma contends that she was harassed, publically castigated and that BCBSD put unreasonable demands upon her, her brief fails to point to evidence of instances in 1999-2002 that demonstrate pervasive and regular discrimination, beyond stating that Choma was forced to do Kaplan's transcription, while other secretaries were not,

14

that Kaplan would not allow her to attend a financial planning seminar because of work responsibilities, that she was disciplined by Kaplan for a confrontation with a temporary employee, and Kaplan complained about Choma's sick time in May 2002. These isolated incidents are insufficient to establish that the conduct Choma complains of was a "persistent, on-going pattern." Gadson v. City of Wilmington Fire Department, 478 F.Supp. 2d 635, 641 (D. Del. 2007) (finding that allegations of disparate treatment in imposition of discipline, and hiring and promotional policies and practices were discrete acts).

Choma cites to Samuels v. Albert Einstein Medical Ctr., No. 97-3448, 1998 WL 770624, *4 (E.D. Pa. 1998), which relies upon the Third Circuit's decision in Stewart v. Rutgers State Univ., 120 F.3d 426, 433 (3d Cir. 1997). In Stewart, the Third Circuit held that a discriminatory act that was time-barred could not be the basis of a discrimination claim, but could be considered as relevant background evidence, relying on precedent from United Air Lines v. Evans, 431 U.S. 553, 558 (1977). In United Air Lines, the Supreme Court stated that time-barred discriminatory evidence may still "constitute relevant background evidence in a proceeding in which the status of a current practice is at issue," even though "separately considered, it is merely an unfortunate event in history which *has no present legal consequences*." Id. (emphasis added.) Therefore, while Choma's discrimination claims cannot be based on her 1999 performance

review, the Court will consider the review as relevant evidence
regarding current practices.

B.    Choma Cannot Establish Discriminatory Animus.

When considering age discrimination claims under the ADEA, a
court must use the burden-shifting analysis of McDonnell Douglas
Corp. v. Green, 411 U.S. 792 (1973). Brewer v. Quaker State Oil
Refining Corp., 72 F.3d 326, 330 (3d Cir.1995). Under this
analysis, a plaintiff must first establish a prima facie case of
discrimination. Green, 411 U.S. at 802. A prima facie case of age
discrimination under the ADEA requires the plaintiff to allege
four elements: 1) he or she is at least 40 years of age, 2) he or
she is qualified for the position in question, 3) he or she has
suffered an adverse employment action, and 4) he or she has been
replaced by a sufficiently younger employee to permit a
reasonable inference of age discrimination. Sempier v. Johnson &
Higgins, 45 F.3d 724, 728 (3d Cir.1995).

Once the plaintiff has established a prima facie case of
discrimination, the burden shifts to the defendant. The defendant
must "articulate some legitimate, nondiscriminatory reason" for
its conduct. Green, 411 U.S. at 802. If the defendant produces a
sufficient reason for its actions, the burden shifts back to the
plaintiff to demonstrate that the reasons articulated by the
defendant are merely a pretext for discrimination. Fuentes v.
Perskie, 32 F.3d 759, 763 (3d Cir.1994). To defeat a motion for
summary judgment, a plaintiff must point to some evidence from

16

which the "factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Id. To accomplish this, a plaintiff can show a defendant's reasons are so weak, incoherent, implausible, or inconsistent such that they lack credibility. Id. at 765.

Reviewing the evidence presented in this case in the light most favorable to the plaintiff, the Court concludes that no fact-finder could reasonably find for Choma on her age discrimination claim.  Choma does establish a prima facie case of discrimination: (1) She was 62 when she was reassigned to Sweeney; (2) she was qualified for the position in question; (3) she suffered an adverse employment action (see discussion infra); and (4) she was replaced by Carpenter, who was 14 years her junior at the age of 49.  BCBSD contends that Kaplan reassigned Choma because (1) he believed Choma's knowledge of the accreditation process would be better utilized to support Sweeney; and (2) he believed Carpenter's organization and time management skills were better suited to his needs. Choma contends that at the time, no one at BCBSD attempted to justify her demotion on accreditation grounds, that Carpenter was also knowledgeable about the accreditation process, and Choma continued to do Kaplan's transcription.

17

The Court finds that Choma has not adduced sufficient evidence so that a reasonable jury would find that BCBSD's stated reasons for reassigning Choma were a pretext for age discrimination. Even if the Court *were* to allow allegations *based* on the 1999 review, Choma has minimal evidence tending to establish age-related animus. Kaplan's statements during the 1999 review certainly are unkind, but they do not suggest discriminatory animus based on age. For example, while older people might be more likely to wear glasses, a lot of younger people wear glasses, too. Choma's additional evidence of age discrimination is that Carpenter is younger than Choma, and, according to Choma, less qualified, as well as a hearsay statement from one of Choma's co-workers that Kaplan would not treat Choma the same way if she were younger. This is not sufficient for a fact-finder to reasonably (1) disbelieve BCBSD's articulated legitimate reasons; or (2) believe that an "invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action" Cole v. Delaware Tech. & Community College, 459 F. Supp. 2d 296, 303 (D.Del. 2006). Accordingly, the Court will grant Defendant's Motion for Summary Judgment as it pertain's to Choma's claim of age discrimination.

## Plaintiff's Disability Claims

### I.   Parties' Contentions

BCBSD contends that Choma cannot make a prima facie case of
disability discrimination because (1) Choma cannot show that she
is "disabled" under the ADA, (2) she was not a "qualified
individual," and (3) she cannot show that she suffered an adverse
employment action.  BCBSD further contends that Choma cannot
establish that BCBSD's reasons for her reassignment were
pretextual, and that Choma did not articulate to BCBSD a
reasonable form of accommodation.

Choma contends that summary judgment should be granted in
her favor on her disability discrimination claim because she has
met her prima facie case, and has set forth direct evidence of
discrimination.

### A.   Discussion

#### 1.   *Prima Facie*

To establish a claim under the ADA, a plaintiff must first
establish that she (1) has a disability, (2) is a qualified
individual, and (3) has suffered an adverse employment decision
because of that disability.[9]  Deane v. Ponoco Med. Ctr., 142 F.3d
138, 142 (3d Cir. 1998).  If a plaintiff meets this initial
burden, the Court must then decide whether the plaintiff has put

_____

[9]Choma's claim under Delaware's Handicapped Persons
Employment Protections Act, 19 Del. C. § 720 et seq, is governed
by the same legal standards.  Testerman v. Chrysler, 1997 WL
820934 at *11 (D.Del. Dec. 30, 1997).

forth direct or circumstantial evidence of discrimination. If the plaintiff has put forth direct evidence of discrimination, the Court uses a "mixed motive" theory, meaning that "a plaintiff only need show that the unlawful motive was a substantial motivating factor in the adverse employment action." Schellenberger v. Summit Bancorp, 318 F.3d 183, 187 (3d Cir. 2003)(citations omitted). If, however, the plaintiff has put forth circumstantial evidence of discrimination, the Court uses the McDonnell-Douglas burden-shifting analysis.

(a) Disability

To establish a disability within the meaning of the ADA, Choma must demonstrate that she has a "physical impairment that substantially limits one or more of the major life activities." 42 U.S.C. § 12102(2). Major life activities include tasks such as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(I).

While Choma's broken wrist does not qualify as a "disability" under the ADA, the Court finds that her hearing loss and vertigo caused by Meniere's Disease, an inner ear disease, does.[10] Choma's disability, Meniere's Disease, interferes with

---

[10] Plaintiff's brief cites to the Mayo Clinic website, which describes Meniere's disease as follows: "Meniere's disease is a condition characterized by sudden, sometimes severe attacks of vertigo, which is the sudden and unsteady sensation that you or your surroundings are moving or spinning. Named after 19th-century French physician Prosper Meniere, Meniere's disease involves an increase of fluid pressure in your inner ear,

20

her ability to hear and to work, and she has submitted medical evidence of these limitations in the form of doctors' notes. BCBSD contends that there is insufficient evidence that Choma's disability was substantially limiting, but the evidence adduced by Choma on this issue suggests otherwise. A letter from Choma's doctor states that the vertigo is "altering her life quality significantly," and that Choma has "low frequency sensorineural hearing loss, down to 50 decibels, with fluctuating hearing and periods of vertigo that last two to three hours with nausea and vomiting," (D.I. 53 at B12.) Thus, the Court concludes that Choma has adduced sufficient evidence, in the form of deposition testimony and letters from her doctors, of the fact that her hearing problems and spells of vertigo substantially limited her ability to hear and to work.

### (b) Qualified Individual

BCBSD contends that Choma cannot meet her burden to show that she was "qualified" to perform the essential functions of her job, with or without reasonable accommodation, since Choma testified in deposition that transcription duties were part of her job and an important component of the accreditation process. BCBSD contends that Choma could not perform transcription satisfactorily.

---

disrupting your balance and hearing."

21

Choma contends that "transcription" is not listed on BCBSD's official written job description provided to Choma, and therefore Kaplan was deliberately discriminating against Choma when he demanded that she transcribe his dictation. Further, Choma contends that the record reflects that Choma requested an accommodation and Kaplan purported to accommodate her: Kaplan and Choma agreed that he would fill in any blanks that Choma was unable to transcribe.

Both parties agree that Kaplan was not satisfied with this agreement, and BCBSD argues that this is further evidence that Choma was not qualified for her position, even with accommodation, since the ADA does not protect an employee unable to perform the essential functions of the position the employee holds. However, BCBSD's contention is belied by the record fact that Kaplan continued to have Choma do his transcription *even after* she no longer worked him.

Choma had worked for BCBSD for several years, and received generally positive performance reviews, including her 2000 and 2001 reviews from Kaplan. (D.I. 55 at A1-8 and A393.) This evidence, in addition to the fact that, despite his complaints, Kaplan continued to send Choma his transcription work after reassigning her, and that transcription duties are not listed on BCBSD's official job description (even though Choma testified that transcription was a part of her job) is enough to establish that Choma was qualified to perform the essential functions of

22

the job.

### (c) Adverse Employment Action

Choma contends that BCBSD's inflicted the following adverse employment actions: (1) BCBSD refused to accommodate Choma by having another secretary do dictation for Kaplan; (2) BCBSD refused Choma the three percent raise other employees received; (3) Kaplan publically stated that he wanted to get rid of Choma because she couldn't hear; (4) Kaplan transferred Choma from Administrative Assistant to the Chief Medical Officer to Administrative Assistant to the Director of Quality Improvement who reported to the Chief Medical Officer, a demotion; (5) BCBSD further demoted Choma by making her report to Kaplan's new secretary, Carpenter; and (6) BCBSD subjected Choma to additional, outrageous treatment.

An adverse employment action has been defined as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998). "The definition of adverse employment action goes beyond firing to reach conduct that alters an employee's compensation, terms, conditions, or privileges of employment." Storey v. Burns Int'l Sec. Servs., 390 F.3d 760, 764 (3d Cir. 2004).

Choma's reassignment by Kaplan can be considered an adverse employment action. Choma testified that she believed her

23

reassignment to Sweeney was a demotion. Her co-worker, Dave Martin, testified in deposition that her reassignment was a demotion. (D.I. 69 at Exh. D., p.26.) Sweeney also testified in deposition that her reassignment could be perceived as less prestigious than Choma's previous position. (D.I. 69 at Exh. F, p.84.)

Furthermore, Choma has presented evidence that Carpenter was her "official" supervisor: a departmental organization chart depicts Choma as reporting to Carpenter who reported to Kaplan (D.I. 65 at B9), and a Service Award Order Form received by Choma listed Carpenter as Choma's supervisor (Id. at B44). A reasonable person would perceive a reassignment from reporting directly to Kaplan to reporting to Kaplan's secretary, who then reports to Kaplan, as a demotion. BCBSD contends that there is no evidence that Carpenter supervised Choma's work, or evaluated her performance and that Carpenter was listed as the head of the administrative assistants for record-keeping and budgeting purposes. BCBSD has not presented any evidence indicating that this was ever explained to Choma, and, in light of the evidence Choma presented, it was not unreasonable for Choma to believe Carpenter was her supervisor.

The other employment actions Choma alleges are less capably characterized as adverse. BCBSD was not required to reassign Choma's transcription duties, and its failure to do so cannot be considered adverse employment action. With respect to the 3

24

percent raise Choma contends she was denied in 1999, Choma
actually received a 3.9 percent increase in salary, and, in
addition, received a one percent increase in salary based on her
increased grade. (D.I. 55 at A17-18.) Kaplan's statement that
he wanted to get rid of Choma did not, by itself, alter Choma's
employment status. Finally, regarding the PIP, Choma admitted in
deposition that the PIP was reasonable and attainable, and BCBSD
was not out of bounds for insisting that Choma's Denial and
Appeal Letter output equal that of other administrative
assistants completing the same task.

As for the additional, outrageous treatment, the evidence
supports Choma's contention that her reassigned cubicle with
mismatched walls and dust-mites was pretty unpleasant. One of
her co-workers testified in deposition that "[he'd] never seen
anything that bad. The part that [he] thought was odd about this
is that [the department] had just received new cubicles and the
old cubicles that they moved out were in nowhere near as bad
condition as what had been given to Edith...it appeared to [him]
that someone had gone out of their way to find really dirty,
misused pieces of a cubicle." (D.I. 65 at B80.) However, BCBSD
remodeled her cubicle within two months after she was relocated,
making it difficult to characterize the dilapidated cubicle as
anything more than a temporary inconvenience. Further, Choma has
not presented any evidence suggesting that the state of her
cubicle interfered with her ability to do her job.

As further evidence of outrageous treatment, Choma alleges that Sweeney publically berated her, forced her to type with a broken arm (and then timed her on her production of letters), and responded to an email from Choma on November 1, 2004 at 7:56 am that stated she was checking in at 7:50 am with the comment "This arrived at 7:56 what did you do between 7:50 and 7:56?" BCBSD has put forth valid explanations justifying this "outrageous" treatment, and the record is clear that some of this treatment Choma brought on herself (for example, by telling Sweeney that she would rather type with her broken wrist so that she could remain seated and keep her arm elevated, rather than perform duties that required only one hand, like copying). Cumulatively, however, the record evidence supports the conclusion that Choma was not having an easy time of it at work. However, the Court having determined that Choma's reassignment from Kaplan is sufficient to establish adverse employment action, the Court need not determine whether these additional alleged acts constitute adverse employment actions.

2.  *Direct Evidence*

Choma contends that Kaplan's statement to other managers at BCBSD that he wanted to get rid of her because she couldn't hear is direct evidence of discrimination, and so the Court should apply the "mixed motive" analysis to Choma's discrimination claim. Since Kaplan was involved in the decision-making process as to whether to transfer Choma to Sweeney, Choma contends his

statement is direct evidence of bias.

Defendants contend that Kaplan's frustration over mistakes Choma made because she could not hear prompted his comment, and cite to Jones v. Leavitt for the proposition that "statements that note problems with plaintiff's performance which are related to her disabilities are not actually direct evidence of discrimination." 454 F. Supp. 2d 459, 464 (M.D.N.C. 2006). In Jones, the plaintiff suffered from hearing problems and contended that statements indicating that plaintiff had problems communicating were direct evidence of discriminatory animus. The Court stated: "These statements about plaintiff's ability to communicate are simply statements of apparent fact. For example, merely because a person may lack an ability for whatever reason does not immediately transform the comment on the matter into a discriminatory remark. There is no clear animus associated with the statements." Id. at 464.

If Kaplan stated that he wanted to get rid of Choma because she could not hear, this would constitute direct evidence of discrimination. However, if Kaplan stated that he wanted to get rid of Choma because she made mistakes because she could not hear, discriminatory animus is less clear. Unfortunately, the record on this issue is muddled, as Choma herself testified in deposition that Kaplan said he wanted to get rid of her because she made mistakes because she couldn't hear, but Tim Toole, the Director of Behavioral Health at BCBSD, testified that Kaplan

27

"said he wished he could get rid of Edith because he said she couldn't hear." (D.I. 65 at B255-56 and B70-72.) Kaplan stated the following during deposition:

> Q:      What I would like to direct you to is that
>         portion of the testimony where Tim Toole
>         stated that he recalled you saying that you
>         wished you could get rid of Edith because she
>         couldn't hear...And my question to you is did
>         you ever say that in words or substance?
>
> Kaplan: I have no recollection of exactly saying
>         that, but I'm sure at some point I was
>         frustrated by her ability to do that job
>         that I did say it.

(D.I. 65 at B148.)

This issue of material fact prohibits summary judgment for Choma on her disability discrimination claim. Even if the Court *were* to construe Kaplan's statement as simply noting a problem with Choma's performance resulting from her hearing problems, his statement *plus* the evidence Choma set forth to establish pretext on her age discrimination claim are sufficient so that a reasonable jury could find that BCBSD's reasons for its decision were pretextual. Accordingly, the Court will deny both parties' motions for summary judgment on Choma's disability discrimination claim.

3. *Accommodation*

According to BCBSD, Choma's contentions that BCBSD failed to provide her reasonable accommodation fail because Choma never articulated a reasonable accommodation. First, BCBSD contends, while it was not required to accommodate Choma's fractured wrist

28

because it does not constitute a disability under the ADA, BCBSD encouraged Choma to apply her intermittent Family Medical Leave Act ("FMLA"). Second, BCBDS contends that BCBSD attempted to accommodate Choma's dizzy spells, but Choma could not articulate a reasonable form of accommodation.

Choma contends that BCBSD could have accommodated her Meniere's Disease by assigning transcription to another secretary in the department. Choma also contends that she and BCBSD did agree on an accommodation: Kaplan agreed that Choma would do the transcription in the best form she could, and then Kaplan would fill in the blanks. Kaplan continued, however, to complain about Choma's transcription, despite his agreement to this accommodation.

In response, BCBSD contends that Choma fails to present evidence that Choma requested an accommodation, and since Choma told Kaplan that there was no accommodation BCBSD could make regarding her job, she has not satisfied her burden of establishing that she requested a reasonable accommodation that would allow her to perform the essential functions of her position. BCBSD points out that it was not required to reassign Choma's transcription duties to someone else, and the "accommodation" Choma and Kaplan agreed upon did not allow Choma to perform the essential functions of her position.

The record is clear that Choma and Kaplan agreed to the accommodation Choma depicts in her brief. Kaplan testified to it

in deposition. (D.I. 65 B130-131 and B33-B35.) It is also clear that Kaplan was not satisfied with this accommodation as reflected in BCBSD's brief, and as well as Kaplan's complaints during deposition about Choma's transcription abilities. However, despite his stated dissatisfaction and the fact that, after November 2002, Kaplan could have asked Carpenter, *his* administrative assistant, to complete his transcriptions, Kaplan continued to send Choma his transcription until she left BCBSD. (D.I. 56 at A414.) Kaplan's stated unhappiness with Choma's transcription abilities is difficult to reconcile with his continued assignment of this work to her, even after she was no longer working for him directly. The inconsistencies between Kaplan's and BCBSD's statements of dissatisfaction, and Kaplan's actions are further reason to deny summary judgment on this claim.

## Retaliation Claim

### I. Parties' Contentions

Choma contends that BCBSD retaliated against her for complaining to BCBSD Human Resources, the EEOC and the DDOL by (1) refusing to pay her appropriate bonuses; (2) demoting her to work for Sweeney from Kaplan; (3) banishing her to a dilapidated cubicle; (4) refusing to accommodate her hearing and other disabilities; (5) harassing her by yelling at her in public and by placing unreasonable work demands and performance improvement plans upon her; and (6) ultimately forcing her into retirement.

Choma adduces the following evidence of antagonism and retaliatory animus following Choma's complaint to Human Resources in 1999: Kaplan continued to give Choma transcription, and complain about it, even though he knew her hearing impairment impeded her transcription abilities; in March 2001, Choma was disciplined by Kaplan for a confrontation with a temporary employee, and given areas in which her performance needed improvement; in May 2001, Kaplan complained about Choma's sick time; in May 2002, Choma was not permitted to attend a financial planning seminar; in January 2003, Sweeney and Choma disagreed over Choma's performance evaluation; in 2004, Choma was given a public tongue-lashing by Sweeney, required to type Denial and Appeal Letters with a broken wrist, and put on a PIP, which was zealously enforced.

BCBSD contends that Choma has not proven a causal connection to her 2002 charges of discrimination and Sweeney's acts in August 2004, since twenty months passed and there is no evidence linking the two events. Further, BCBSD contends there is no evidence that Sweeney was aware of Choma's charge of discrimination until after Sweeney had prepared the PIP, and causation requires evidence that the employer knew of the protected activity and acted with retaliatory motive. BCBSD contends that there is no evidence of a pattern of intervening antagonism that would suggest retaliatory motive. BCBSD also contends that Choma has not offered sufficient evidence that

31

BCBSD's reasons for their actions in August 2004 were so unworthy
of credence to constitute pretext.

Choma contends that the protected action she engaged in was
not just the November 2002 discrimination claim with the EEOC,
but also includes her complaint to Human Resources in 1999.
Choma contends that after Kaplan was required to change her 1999
performance review as a result of her complaints, he was angered,
and "a jury might infer that the adverse employment actions to
which [Choma] was subjected were retaliatory." (D.I. at 24.) As
further evidence of retaliation, Choma contends that BCBSD placed
Choma on her PIP exactly one week after Choma and Sweeney had a
"blow out," and Choma filed a second discrimination and
retaliation claim with the EEOC and DDOL on October 22, 2004.

In response, BCBSD points out that the 1999 performance
review was even more remote in time than the November 2002
charge, and that Choma has provided no explanation as to how
something even *more* remote establishes a causal link. BCBSD also
contends that it could not have retaliated against Choma based on
the October 22, 2004 charges, since these charges were not
received by BCBSD until November 10, 2004, after Choma's last
day.

## II.  Discussion

The Court finds that Choma engaged in "protected activities"
when she complained to Human Resources in 1999, when she filed
charges of discrimination and retaliation with the EEOC and DDOL

32

in 2002 and 2004, and when she notified Human Resources in
October 2004 that she felt she was being harassed. See Abramson
v. William Paterson Coll. of N.J., 260 F.3d 265, 287-88 (3d Cir.
2001) (protected activities include filing charges of
discrimination or complaints about discriminatory employment
practices). However, to make a prima facie case for retaliation,
Choma must show that a reasonable employee would have found the
alleged retaliatory actions "materially adverse" in that they
"well might have dissuaded a reasonable worker from making or
supporting a charge of discrimination." Burlington N. & Santa Fe
Ry. Co. v. White, 126 S.C. 2405, 2415 (2006). Finally, Choma
must establish a "causal connection between the plaintiff's
opposition to, or participation in proceedings against, unlawful
discrimination and an action that might dissuade a reasonable
worker from making or supporting a charge of discrimination."
Moore v. City of Philadelphia, 461 F.3d 331, 340 (3d Cir. 2006).

Choma's contentions regarding retaliation following her 1999
complaint to Human Resources are contradicted by her testimony
that she and Kaplan worked more efficiently together following
her 1999 performance review, and that she was pleased with future
reviews. (D.I. 56 at A-178-179.) The Court further concludes
that the events Choma complains of between 1999 and 2002 would
not dissuade a reasonable worker from making a charge of
discrimination. Although Kaplan did ultimately reassign Choma,
Choma sets forth scant, if any, evidence of a causal connection

between her 1999 complaint and her reassignment years later.

The Court further finds that Choma cannot establish retaliation based on her other protected activities because she has not established a causal connection between her protected activities and Sweeney's alleged harassment.  She has adduced no evidence that suggests that Sweeney was aware of Choma's charges of discrimination until October 2004.  See Clark County School District v. Breeden, 532 U.S. 268, 273 (2001) (finding no causation where there was no evidence that decision-maker knew of protected activity, and there was no temporal proximity).  In October 2004, following Choma's resignation email to Human Resources, and her notification to them that she felt she was being harassed, Sweeney became aware of Choma's allegations of discrimination.  After Sweeney became aware of Choma's allegations, she instituted the PIP she had been drafting.  However, Sweeney had been planning on instituting the PIP before she learned of Choma's discrimination charges.  Sweeney also sent the November 1, 2004 email asking Choma what she had done between 7:50 a.m. and 7:56 a.m.  While certainly unpleasant, the Court is not persuaded that this petty email would dissuade a reasonable worker from making a charge of discrimination.[11]

---

[11]The recent authority cited in Plaintiff's Notice of Supplemental Authorities, filed June 2, 2008, (D.I. 91), Gomez v. Potter, 128 S. Ct. 1931 (2008) and CBOCS West, Inc. v. Humphries, 128 S.Ct. 1951 (2008), does not alter the Court's conclusion.

## III. Choma's Motion for Leave to File a Sur-Reply in Opposition to Defendant's Motion for Summary Judgment

On November 16, 2007, Choma filed a Motion for Leave to File a Sur-Reply in Opposition to BCBSD's Motion for Summary Judgment to "correct a demonstrable inaccuracy in Defendant's Reply." (D.I. 70.) In violation of Local Rule 7.1.2, Choma improperly included her proposed sur-reply as an exhibit to her motion. In her proposed sur-reply, Choma takes issue with BCBSD's statement in its Reply (D.I. 68) that it could not have retaliated against Choma for her October 22, 2004 discrimination charges because it was not aware of these charges until November 10, 2004. Choma contends that emails between Kaplan, May and Sweeney on October 29, 2004 "prove that these representations in BCBSD's Reply . . . are inaccurate and that BCBSD was well-aware of [Choma's] October 22, 2004 discrimination complaint at least as early as October 28, 2004." (D.I. 70, Exh. 1 at 2.)

In response, BCBSD contends that Choma's Motion for Leave should be denied because it violates Local Rule 7.1.2, includes an argument not raised in Choma's answering brief, and is moot.

The Court will grant Choma's Motion for Leave, and has considered the contentions Choma raises in her proposed sur-reply. Choma's contentions, however, do not alter the Court's analysis with respect to her retaliation claim.[12] Accordingly,

---

[12]Further, the Court reads the email between Kaplan, May and Sweeney, which discusses "harassment and discrimination" charges filed by Choma, as regarding Choma's earlier filed charges (in 2002, as well as Choma's October 27, 2004 email to Human

35

Choma has not set forth sufficient evidence to establish a prima facie case of retaliation, and the Court will grant BCBSD's motion for summary judgment on Choma's retaliation claim.

## Constructive Termination

### I. Parties' Contentions

BCBSD contends that the conditions Choma alleges fall short of constructive discharge, and that the timing and sequence of events surrounding her retirement suggest it was related to her ability to draw full benefits from her retirement, and unrelated to BCBSD's actions. BCBSD contends that other employees were monitored on their completion of work, and those who did not meet expectations placed on a PIP. BCBSD further contends that Sweeney was justified in insisting on a reasonable and attainable standard of work, and that Choma testified that the PIP's goals were reasonable and achievable. Finally, BCBSD contends that Choma's emailed inquiry whether she would receive a full year's bonus in her notification of retirement is evidence that her working conditions were not so intolerable as she was prepared to endure two more months of these conditions to obtain her year-end bonus.

Choma contends that a jury would find that BCBSD constructively discharged Choma based on the following: (1) Kaplan's performance evaluation in 1999 and his accompanying

---

Resources where she stated that she felt she was being harassed), not her October 2004 filed charges.

discriminatory rant, (2) Kaplan's statements that he wanted to get rid of Choma because she couldn't hear; (3) Choma's demotion to working for Sweeney and then Carpenter; (4) the public castigations of Choma; (5) the timing of Choma's denial and appeal letters; (6) the performance improvement plan; and (7) the November 1, 2004 email incident.

## II. Discussion

To establish a prima facie case that her retirement resulted from a constructive discharge, Choma must show that the conduct complained of would have the foreseeable result of creating working conditions that were so unpleasant or difficult that a reasonable person in her position would resign. See Schafer v. Board of Public Educ., 903 F.2d 243, 249 (3d Cir. 1990). The alleged discrimination must surpass "a threshold of 'intolerable conditions.'" Duffy v. Paper Magic Group, Inc., 265 F.3d 163, 169 (3d Cir. 2001). Intolerability is assessed by the objective standard of whether a "reasonable person" in the employee's position would have felt he or she would have had no choice but to resign. Connors v. Chrysler Fin. Corp., 160 F.3d 971, 976 (3d Cir. 1998).

In the Court's view, the conduct alleged is insufficient to demonstrate that the circumstances and atmosphere of Choma's employment were so unpleasant that a reasonable person would have no choice but to resign. Choma has set forth evidence indicating that her working conditions were stressful. However,

discrimination laws do not guarantee a workplace free of stress. Connors, 160 F.3d at 976. Choma fails to set forth evidence sufficient to establish that working conditions were intolerable, especially in light of the fact that BCBSD placed other employees who were meeting their supervisor's expectations on PIPs, that other employees were monitored on their completion of work and Choma's testimony that the PIP's goals were not unreasonable. (D.I. 56 at A317, A358, A284-91.) Thus, the Court concludes that BCBSD's actions were insufficient to constitute constructive discharge, and therefore, the Court will grant Defendant's Motion for Summary Judgment as it pertains to Choma's constructive discharge claim.

## CONCLUSION

For the reasons discussed herein, Defendant's Motion for Summary Judgment (D.I. 51) will be granted in part, and denied in part, in accordance with this Memorandum Opinion. The Court will grant Plaintiff's Motion for Leave to File a Sur-Reply in Opposition to BCBSD's Motion for Summary Judgment (D.I. 70), and will deny Plaintiff's Motion for Partial Summary Judgment (D.I. 52).

An appropriate order will be entered.